**EXHIBIT F**

# THE Event

NEWS, ARTS & ENTERTAINMENT   Since 1981   VOL. 15, NO. 23   MARCH 28-APRIL 10, 1996

FREE



## Keeping Mum On Mormon Sexual Abuse

by Marion Smith
page 8

**INSIDE:**

**CORNDODGER**
Spiritual Seeds
of Sex Abuse
➢ page 5

**PULL-OUT SECTION**
Our Guide to Local CDs
➢ page 14



**MEDIA CIRCUS**
Revenge of the
Dominant Male
➢ page 17

000370

# Blame the Victim: Hushing Mormon Sexual Abuse

by Marion Smith
© Copyright 1996, The Event



Marion Smith, founder of the Intermountain Specialized Abuse Treatment Center, and a longtime chronicler of child sexual abuse, in the shadow of the LDS Church Office Building. Answers to her questions about abuse cover-up are not forthcoming.
Photo by Rob DeBerry.

With terror, James Adams confessed sexually abusing his two young children to his LDS bishop, stake president and other men in his Beckley, W V ward. The children's mother was in Alaska; he had custody of the children. His bishop did not report Adams' abuse to law enforcement. Nothing was done to help or protect the children.

The abuse was sadistic and frequent, and it continued for five more years until the children's mother and state police learned of a 55-minute video tape that Adams made of his molestation of his own children.

A $750 million lawsuit was filed on Jan. 16, 1996 in West Virginia, charging the Church of Jesus Christ of Latter-day Saints with negligence in reporting child sexual abuse in this case. The lawsuit names as defendants five church officials in Salt Lake City, including President Gordon B. Hinckley. Adams pleaded guilty to 37 counts of child sexual abuse and was sentenced to serve 75 years in prison.

As the highest profile case of child sexual abuse and the largest claim for monetary damages brought against the LDS Church, the resulting court battle could have far reaching ramifications for church officials and for how such abusive situations are handled in the future. While abuse has recently been condemned from the pulpit by some church authorities, individual cases are often hushed up, as officials act instinctively to protect the church's reputation first and victims only as an after-thought, resulting in a new round of secondary abuse.

The case brings national focus to an issue that only recently has been acknowledged and previously minimized or dismissed among Mormons.

Child advocates say that child sexual abuse exists in LDS congregations in Utah and across the country. A year and a half ago, Lisa Davis, a Phoenix newspaper reporter noted "at least thirty-five recent instances of molestation involving the Mormon Church," recorded in "national news and legal databases" ("Latter-day Sinners," *New Times*, December, 1994).

## Case study in cover-up

A high profile incident in Oklahoma is a case study in cover-up. For Merradyth McCallister and Mary Plourde of Oklahoma City, Okla., their efforts to expose the child sexual abuse problem in their local Mormon congregation not only resulted in cover-up, they were ecclesiastically punished for their pains.

In September, 1993, Merradyth and Jack McCallister and their son Scott of Yukon, Okla., told their stake president that Scott had been sexually abused by their bishop, Ronald Phelps. The stake president discounted and minimized Scott's abuse which had occurred over a two year period. Having learned from speaking with other families that Phelps had also abused other children in the ward, the McCallisters formed a support group for survivors of sexual abuse.

The McCallisters told *The Event* that the stake president then informed them they had "crucified an innocent man and destroyed his family," had "slandered Phelps," and that "the children's word could not be believed over that of a priesthood leader." They were advised not to pursue the issue.

## Public indecency

The McCallisters did a background check on Phelps and found that he had been arrested for indecent exposure prior to being called as bishop in 1990. He had also been charged with sexual abuse but not prosecuted; this charge was known to the stake leadership when Phelps was called to serve as bishop. On March 8, 1994, Phelps was again arrested in a men's rest room at Oklahoma University for investigation of public indecency and soliciting to commit an act of lewdness. The stake president then informed the McCallisters that the arrest had nothing to do with sexual abuse allegations. Phelps continued to serve in church positions.

The McCallisters continued to warn others that Phelps was a predator. They wrote to President Gordon B. Hinckley (a First Presidency counselor at that time), detailing these events and asking him to intervene. They heard nothing. When they went to the local media with the problem they were punished by their church leaders. In August, 1994 Merradyth was excommunicated from the LDS Church for "conduct unbecoming a member of the Church" and for "actions which have not only affected the good name of the Church but also the good names, lives and testimonies of the members."

Jack resigned his Church membership in protest. Mary Plourde, a family friend who worked on this case with the McCallisters was also excommunicated that same month, for the same reasons. Plourde and Merradyth reported they were refused copies of their excommunication notices, after being allowed to briefly see them and hear them read aloud by the bishop. They said the documents were signed by Gordon B. Hinckley. They have since taken their crusade to Oklahoma City detectives and prosecutors.

## Pervasiveness of abuse

Statistics from the Boy Scouts of America and the National Committee for the Prevention of Child Abuse indicate one in four girls and one in six boys will be sexually abused before they reach the age of 18. These statistics apply to all large populations. Despite public emphasis on family values, child abuse still invades Mormon families;

000371

one in four Mormon girls and one in six Mormon boys will be sexually abused by age 18.

Child abuse is disruptive to the individual and society. Its primary effect is shame and self-blame in the child's mind. A child is physically helpless and emotionally dependent. So the child's effort to gain control becomes a central issue. A child abuse victim seeks control in one of two ways: through self-blame, becoming a victim and re-enacting self abuse through multiple symptoms; or, by identifying with the abuser's power and re-enacting the abuse upon someone else. There is no way to assess the full cost of child abuse to the individual and society.

It is typical for abuse survivors to be in their 30s or 40s before they finally are able to start to deal with past abuse. Usually a survivor requires therapy for four to five years. The costs of therapy vary greatly, but $75 per hour is an average fee.

Sometimes, one generation of abuse shows up in particularly egregious violence in the next. Among the most notorious historical villains of the 20th century, Adolf Hitler, Saddam Hussein, and Romanian dictator Cescu were all brutally abused as children.

With the LDS Church awash in negative publicity regarding child sexual abuse in the past decade, church leaders have begun to speak publicly about the problem. General conference speeches have condemned it, educational materials have been prepared, training sessions have been held, Boy Scout leaders are instructed now to send more than one adult chaperon with children on outings.

The *Bishop's Handbook*—a resource available only to male leadership—now states that a bishop must report abuse, unless the information came from a perpetrator during a confessional interview.

Some bishops are more conscientious than others, child advocates observe. There are those willing to walk victims through the fallout of abuse. Others describe bishops who hinder the process.



Andrea Moore Emmett (left), Midvale: "If it hasn't happened already, it will happen in your neighborhood." Abuse survivor Kris Morton, was told to "follow your leaders."
Photos by Rob DeBerry

## Survival & betrayal

Fourteen years ago, when I began practicing as a therapist in the field of child sexual abuse, I met adult victims of abuse who literally might not have survived if it had not been for the extraordinary support of compassionate bishops. At its best, the church system can work to help heal and improve individuals. However, when support is not given, and victims are disbelieved, blamed or are counseled not to pursue the matter, the individual is betrayed by his or her extended religious family in whom trust has been invested as freely as protective and nurturing parents.

From clients whose identities remain anonymous, I listened to stories of how their abuse was intertwined with their religious life and church leaders. "John," a young man in his 20s says, "I was abused by my scout leader when I was 10. I tried to tell the bishop about it once. He asked me if I was gay. I never approached him again. I am no longer active in the church."

"Jane" is in her mid-40s. While working in the travel industry for many years, she was in therapy for abuse she suffered from her father and grandfather for years when she was young. While her father was abusing her he was also her bishop and was widely respected in the ward. "I used to look up at him when he stood at the pulpit and I thought he was God. It's still hard for me not to associate God and my father as one person, even after all these years of therapy."

A Provo woman, "Elaine," reported that after years of struggling alone, telling no one about being sexually abused by her father, she finally went to the stake president, with whom her father had served on the regional high council. His response was that he did not see how he could possibly judge events between her and her father. He therefore had to assume that her father was "an honorable man" because he held a high church office. She must be wrong, she was told.

"Jamie" had suffered guilt and self-hatred all her life. Intensely religious, she says for years she tried to tell bishops and others in the church of her abuse but she was always told to forgive and get on with her life. "I would go to church and feel different from everyone else and totally unworthy. I couldn't ask for a temple recommend. I tried to fade into the background." Recently she has finally found ways to express and process her feelings about the abuse through the help of her current bishop whom she says is supportive and understanding of her needs.

"Kate," who grew up in Salt Lake City, was repeatedly abused by a ward member between ages 7 and 9. Her sisters were also abused by this man. No one came to their aid. Years later, Kate and her sisters entered therapy to deal with their abuse. One day when Kate's sister attended an LDS temple session, she was horrified to see their abuser serving as a temple worker.

She also learned that this man was serving as a volunteer with children at a local hospital. She called the hospital and reported him to personnel there. He was discontinued as a volunteer at the hospital. Kate and her sister wrote to this man's bishop and explained the situation. They were told that they should forgive and forget; the bishop took no action against the man.

## Blame the victim

In spite of current instructions in the *Bishop's Handbook* telling bishops to report sexual abuse, many Mormon clergy do not appear to understand the legal imperative for reporting. A member of a 13-year-old Holladay girl's family told me that the girl was sexually abused by a ward member in his 30s.

A church disciplinary court was called against the girl, accusing her of sexual activity, describing it as an "affair" with this man. Subsequently, she behaved promiscuously with boys her own age. Called to church court, the girl made a serious suicide attempt. This did not deter the stake president from proceeding with her church discipline.

Only when the girl's grandfather intervened by contacting child advocates who threatened public exposure of the case, did the stake president drop the church action against the girl. Unfortunately, by then the girl had been deeply damaged by both sexual and ecclesiastical abuse. Without the threat of public exposure, the girl would possibly have been excommunicated while her abuser went unpunished.

## In your neighborhood

"From statistics available on child sexual abuse we know that it can and does happen in all neighborhoods, crossing all social, economic, ethnic and religious backgrounds," says Andrea Moore Emmett, Midvale, who encountered abuse in her neighborhood in the summer of 1993.

"If it hasn't already, it will happen in your neighborhood, to someone you know and care about; it may occur down the street or right under your own roof. Never mind the faceless statistics that say it's someone else's problem—now it's yours."

A young man in Emmett's LDS ward sexually abused neighborhood children in his mother's unlicensed day care. Knowledge of this abuse emerged later while he was serving an LDS mission; he was sent home. Emmett's children did not visit the day care and escaped the abuse, but other children were not so lucky. More than 14 neighborhood children were interviewed by a detective and found to have been abused by the young man at the day care over a period of several years. Charges were filed, but plea-bargaining lowered time served to two weeks in the county jail since his case was considered "a first offense". He was then placed on one year's probation by the court.

A friend living across the street from Emmett discovered that her child had been abused. When this mother pressed the bishop for help and therapy for her child, she was denied response or assistance from the church. She and her family soon moved from the neighborhood. The bishop showed no concern for the children's plight; and he treated my friend as if she was a 'troublemaker'," Emmett says. The young man was "disfellowshipped" (a punishment short of excommunication), but given support, therapy, a job and other assistance from the church.

Emmett resigned her church membership shortly afterward, saying "I was already disillusioned with the way the church treats women, but after this, I could no longer support the church as a member."

## Abuse helpline

In May 1995, under pressure from increased publicity and mounting legal problems, the LDS Church announced a toll-free phone number for reporting child abuse directly to church headquarters, 1-800-453-3860, ext. 1911. Some church members are encouraged by the helpline and express enthusiasm about having access to church headquarters for reporting child abuse problems. Others are less optimistic. The number is not for general use. Calls are accepted only from bishops or stake presidents.

"The impression [given Mormon members here] is to refer problems to the bishop and let him call the 800 number," says an anonymous Midwest Mormon woman. "We have learned first hand that it is foolish to leave this matter to be dealt with internally—more often than not the accused is afforded more concern and protection than the person abused.

"[Those of us] in stake Primary, Relief Society and Young Women's presidencies wanted to find aggressive ways to provide support for victims and others, beyond the 800 number. We got permission to put together a stake training meeting for women leaders of Primary, Young Women and Relief Society concerning child abuse. With many of the men in ward and stake leadership, we must battle the assumption that the story *ends* when the abuse is reported. We contend that the reporting (and the 800 number) is only one chapter in the middle of a very long book."

Some Utah Mormons assert that the helpline diverts information to church headquarters, where it is more effectively buried or covered-up.

## Speaking out

When children are sexually abused by church members, then abused again with acts of denial and cover-up by their ecclesiastical leaders, it creates a double betrayal. Some Mormons who've experienced both sexual and ecclesiastical abuse have come to believe that only by speaking out and making their stories publicly known can such abuses be avoided in the future.

The Mormon Alliance—an independent organization that identifies and documents cases of ecclesiastical abuse in the LDS Church—will publish in May its *Case Reports* of abuse (including sexual). Ecclesiastical abuse is defined as any type of coercion, repression or silencing of church members by church leaders. The Alliance has collected dozens of child sexual abuse cases in which ecclesiastical leaders have been negligent in reporting abuse, or punitive to those who point it out.

For example, a Calgary woman reported that in 1993, "An LDS psychologist specializing in treatment of LDS women who had experienced sexual abuse was excommunicated for 'destroying families and disobeying the priesthood [i.e., taking his patients' stories seriously].' Several women under his care now no longer pursue church channels to have their cases dealt with."

Mormon Alliance trustee Lavina Fielding Anderson, editor of the forthcoming *Case Reports*, documents 23 cases of criminal prosecution for child sexual abuse by Mormons. "Nothing in church policy or doctrine provides the slightest justification for child sexual abuse," she says. "That's why it is such a shattering betrayal of trust when an ecclesiastical officer chooses to put the well-being of the perpetrator ahead of the well-being of a child."

In addition to documenting abuses, "the Mormon Alliance works to promote healing and closure for abuse survivors, to build more sensitive church leadership, to empower LDS members, and to foster a healthier religious community," Anderson adds.

The Alliance believes that when child sexual abuse occurs among members of a church congregation, the result is enormous personal and legal problems. It damages individuals, families, the institutional church, as well as the Mormon community and surrounding communities.

## More hard cases

Take the case of LDS attorney Michael Shean in Santa Maria, Calif., an LDS seminary teacher convicted of sexually abusing young boys. Court records in a civil suit against the LDS Church allege gross negligence on the part of ward leaders who knew Shean had problems—as a counselor in his ward bishopric, he had been excommunicated for abuse of two young boys that surfaced years later when they were on LDS missions. He was excommunicated, re-baptized and

## The LDS Church Replies

The Church of Jesus Christ of Latterday Saints was asked to comment on the failure of bishops, stake presidents and other church officials to report and take action on egregious cases of child sexual abuse detailed in this story. In addition, *The Event* sought comment or response to the charges against the church in the $750 million lawsuit filed in West Virginia in January.

Don LeFevre of the Public Affairs Department of the church did not respond to either request, but faxed the following statement:

"Children are precious in the sight of the Lord and the Church. For this reason and also because child abuse is increasing in frequency and intensity in today's permissive society, the Church in recent years has been among those in the forefront of the battle against such vile conduct.

"The Church produces public affairs radio programs on the subject and distributes them widely. Members of the Church are taught to obey the laws of the land wherever they reside. This, of course, applies to child abuse reporting laws. If local leaders of the Church have any questions about local reporting requirements, they are encouraged to call the Church's 800-number 'Help Line' for counsel."

Continued on next page

March 28, 1996 **Event** 9

000372

# NOW YOU'RE TALKING!

Come to Pre-Paid Cellular's new retail outlet at 6570 South State Street in Salt Lake City. See how easy getting a cellular phone can be!

- NO CREDIT CHECKS
- NO CONTRACTS
- NO DEPOSITS



## PRE-PAID CELLULAR

6570 SOUTH STATE STREET • SALT LAKE CITY, UT
OPEN MON-FRI 9:00 AM-7:00 PM • SAT 10:00 AM-5:00 PM

CALL US TODAY
**269-1900**

general authorities. One father went to two general authorities on two occasions to plead that something be done to protect other children from more abuse by the named perpetrators. But no action was taken against the perpetrators who continued to hold church leadership positions.

"Their lack of response has been the most disillusioning and faith destroying experience of my life," this father told me.

## Disbelieving children

The wife of one man who was a perpetrator of the abuse later told me, "When my children described the horrific sexual abuse by their own father, the bishop counseled me to believe my husband over my children because he holds the priesthood. I have not been active in the church since he told me that."

Another mother said, "We could not afford to move from the ward. I had to sit in church with adults who had sexually molested our children, and who had in no way been disciplined. I could not comprehend such betrayal." Several parents moved from the neighborhood.

The perpetrator in the bishopric, divorced by his wife, moved to another ward and acquired a new wife with new children. Others tried to warn both his new wife and his new bishop about his past abuses of children.

This man abused at least 30 children over many years—from his teenage years into his forties. Nine children and four adult women independently reported to church leaders, their experience of sexual abuse by the man. No church or legal action was ever taken against him; instead, church leaders supported him and even paid his house mortgage.

## Ruined lives

Parents of children he abused believe that he was protected because of his close association with the daughter and son-in-law of a church apostle. When his second wife discovered he was abusing their children she divorced him and threatened to take him to court for abuse. She said, "My children would never have been abused if he had been excommunicated or the bishop had told me of his problems. I would never have married him. Now my children can't function and it feels like our lives are ruined."

One father in the ward, Mark Burton, approached LDS Church public relations, and then approached the regional representative of the church, pressing for action regarding safety of the children in the ward. He was advised they'd get back to him. They never did. Burton then talked to a member of the First Quorum of the Seventy, who promised to look into the matter. Burton never heard back from any church leader about any of the abuse in the ward. He speculates "This case was red-flagged by someone in the church hierarchy—it was just too hot to handle."

## Hope for change?

Can the LDS Church do better? I believe that it can and should. There are concrete ways of addressing abuse in any community and in the courts.

Gag orders in civil suits should be discontinued. Bishops and stake presidents should be required to report child abuse in compliance with the law. Prevention and education programs could be offered in church settings.

Bishops and stake presidents should realize that the needs of victims are equally important and take precedence over the needs of the offender. Victims should not be told to "forgive and forget" until it is in their therapeutic interest and capacity to do so.

The pervasive system of denial that says child abuse does not occur in good Mormon families must be radically changed. Perpetrators cannot be assumed innocent simply because they are "good members" of the church.

## A personal dilemma

If child abuse is truly the scourge that the experts report it to be—a main cause of broken homes, drug and alcohol abuse, crime, mental and physical illness, sexual dysfunction, eating disorders and more—then it is as important a social problem as any facing us today. If the statistics on child abuse are correct, on average there are 80 victims and five perpetrators sitting with you on church benches on any given Sunday morning.

Rather than appearing as fanged monsters hiding in the parking lot, perpetrators may be your neighbor, your ward clerk, your visiting teacher, your dentist or your attorney. This explains why all the documented stories in this article are representative of many Mormon wards and in a variety of churches and social institutions.

In every case of child abuse, someone is faced with the dilemma to speak out or not to speak. If we minimize abuse or try to justify it, we only make matters worse. If we confront or name abusers there are risks. We will always be faced with the cost of speaking out, or the cost of not speaking out, but either way, there is a price.

The bishop and stake president in West Virginia made a choice not to report James Adams' abuse of his children. Those two children's lives have been destroyed by this abuse. Hopefully the tragedy of the West Virginia case will not be repeated again and again. ✦

# Child Sexual Abuse Resources

## Sexual Abuse

*Confronting Abuse: An LDS Perspective On Understanding and Healing Emotional, Physical, Sexual, Psychological and Spiritual Abuse,* Anne L. Horton, B. Kent Harrison and Barry L. Johnson, Deseret Book, 1993.

*Paper Dolls: Healing From Sexual Abuse in Mormon Neighborhoods,* Carol Scott and April Daniels, Palingenesia Press, 1992.

*My Father's House: A Memoir of Incest and Healing,* Harper and Row, 1987.

## Ritual Abuse

"Cult Abuse of Children: Witch Hunt or Reality?" *Journal of Psychohistory,* Volume 2, No. 4, Spring 1994.

## Healing

*Repressed Memories,* Renee Fredrickson, Simon and Schuster, 1992.

*Soul Retrieval: Mending the Fragmented Self,* Sandra Ingerman, Harper, San Francisco, 1991.

*Reclaiming Our Lives,* Carol Poston and Karen Lison, Bantam, NY 1989.

*The Courage to Heal,* Ellen Bass Laura Davis, Harper Collins, 1988.

## Groups & Organizations

Utah Chapter, Prevention of Child Abuse, Salt Lake City.

Network Against Child Abuse, Salt Lake City.

Intermountain Specialized Abuse Treatment Center, Salt Lake City

Family Support Center, Salt Lake City.

Rape Recovery Center, Salt Lake City.

National Organization Victims Assistance, Washington, D.C.

Parents United, International, San Jose, Calif.

National Victim Cen[ter] Ft. Worth, Texas.

Henry Kempe Cen[ter] Denver, Colo.

00037

## Gagging public disclosure

In most settlements of civil cases of child abuse involving religious organizations, a so-called "gag order" is invoked, which means that the parties in the settlement promise not to disclose publicly any of the terms of settlement.

Gag orders make it difficult to ascertain how many millions of dollars churches like the Catholic and LDS church have paid in civil settlements. Some victim rights' advocates are asserting that gag orders may not be legal and that eventually they will be tested in court. But so far, this has not occurred. Some states, however, are currently considering legislation which would ban gag orders in any civil actions, not only in cases of child abuse.





Another problem with gag orders is that churches use them to deflect public scrutiny of a specific case where the church has behaved negligently or in a way that is protective of abuse perpetrators. Gag orders suppress information about a suit that might discredit the public image of the church.

Such was the case of Richard Kenneth Ray of Mesa, Ariz., who confessed to three separate Mormon bishops in 1968 that he was molesting children. They failed to report him for 16 years. In 1984, when the case came to court, the church was charged with failure to report to the police and with negligence in counseling Ray; he was sentenced to 61 years in prison for molesting five girls. A civil action suit was brought against the LDS Church which argued in vain for clergy confidentiality and lost; the Church then paid the victim an "undisclosed settlement" in 1990.

## Getting abuse on the record

State law requires citizens to report child abuse, but the reporting laws vary from state to state. Utah Law requires any person who is aware a child has been abused to notify the Division of Family Services or police.

Martha Pierce, an attorney for Utah's Guardian Ad Litem, which provides legal representation for children, says "We are legally obligated to report child abuse. There is only one exception and that is for clergy receiving a confession from a perpetrator."

The child abuse reporting law does not apply to clergy, if they meet five narrowly defined conditions: 1. Clergy must be acting in their professional capacity at the time they receive the information. 2. The information must be received during a confession. 3. The information must be obtained in the proper course of discipline set forth by the church to which that person belongs. 4. Information must come only from a perpetrator. (Thus if a witness or a victim tells the bishop, the bishop must report it.) 5. The clergy has an official responsibility or duty to keep confessional information confidential.

If all five conditions aren't met, a religious leader must report the abuse. If later a victim or a witness comes to the bishop and reports the abuse, then exemption is lost and the bishop must report it. A bishop can encourage an abuser to confess; he can also talk to the family and if any member reports the abuse, the bishop can then report it.

"This is the way it's supposed to work, but that's not necessarily what happens," Pierce says.

## Nurturing naiveté

Three women from different regions of the country have reported to me that in their LDS stakes, seminars for priesthood leaders actually discussed ways to *avoid* rather than comply with child abuse reporting laws. "I think that most Mormons are incredibly naive about the church's position on this issue—which is to protect the church and its interests, even at the expense of the victims," Kristy Sumner told me.

" My father is a bishop and when mandatory [child abuse] reporting laws were passed in the state in which he resides, the church held seminars for all local leaders. The purpose of these seminars was to instruct bishops, stake presidents and other leaders on ways *to get around* the new reporting laws. There were no seminars instructing these same leaders on what to do for the victims of abuse."

Pierce says that often bishops assume the responsibility to "fix" behavioral problems themselves instead of referring members to appropriate professionals. "Abuse cannot be solved in a simple interview—it needs a multi-disciplinary approach. A bishop's calling does not train him to counsel members other than in spiritual matters," she notes.

"While many bishops do report child abuse, it is surprising how many bishops testify as character witnesses on behalf of the perpetrator. Bishops try to negotiate with attorneys to get lesser sentences and keep people's records clean so they can serve in church callings, go on missions, etc. In my experience, too often church leaders tend to align themselves with the abuser instead of the victim."

A California lawyer recently told me, "I had a stake president who wanted to testify in a sexual abuse case that had gone on for many years and involved many victims. He had been very careful not to talk to the perpetrator alone and not in a priest-penitent relationship and felt the privilege did not apply.

"The day he was going to sign the affidavit we had prepared together, he called and said that a 'church attorney' told him he couldn't testify. He gave me the phone number and asked me to call the attorney.

"When I did, he said he believed the privilege belonged to the priest and the penitent. I disagreed and said that even if the privilege did apply in this case, the stake president/priest had waived the privilege. The church attorney said, 'No, I've instructed him not to do so.' I asked, 'You mean you have veto power over a stake president's inspiration and calling?' He said he didn't think of it quite that way. I replied, 'I don't doubt that one bit.'"

## Backlash in Bountiful

During the mid-1980s, information emerged about a child sexual abuse and pornography ring run by two counselors in a Bountiful bishopric and other adults in the ward. Eight children independently told their parents, police investigators and therapists how they were sexually abused by these ward members. Only one of the ward members named by the children, Brett Bullock, was prosecuted and is now in prison. Police records show that other ward members were not prosecuted, largely due to the fact that some parents considered their children too young and vulnerable and refused to let them testify in court.

However, in private, the children independently named the same adults and same events. Later, one child who had been abused pulled every hair out of her head, her eyelashes and eyebrows.

Parents of abused children in the ward were horrified by the abuse and sought response from their ward and stake church leaders but nothing happened. A few parents went further, to LDS Church

*Continued on next page*



# HOWARD JONES

### JON M. HUNTSMAN CENTER
### Saturday • April 20th • 7:30 pm

On Sale Friday, March 15th, 10 am
Tickets available at all Smith's Tixx outlets,
The Huntsman Center box office or by phone 467-TIXX, 1-800-888-TIXX
Concert Hotline 536-1234

X96

# BRUCE HORNSBY



Special guest: Aquarium Rescue Unit


**Wolf MOUNTAIN ARENA**

### Saturday, April 6th 7:30 PM

Tickets available at all  Smith's Tixx Outlets,
& by phone 467-TIXX, 1-800-888-TIXX

Produced by United Concerts          Concert Hotline 536-1234

March 28, 1996  **Event** 11

000374



# MEDIA PLAY
### MORE CHOICE. LESS PRICE. EVERY DAY.

## JOHN TESH CD'S NOW AVAILABLE AT MEDIA PLAY INCLUDING HIS LATEST RELEASE, DISCOVERY






## AVAILABLE AT ALL AREA MEDIA PLAY LOCATIONS!



# MEDIA PLAY
### MORE CHOICE. LESS PRICE. EVERY DAY.

assigned to work with youths.

Or the case in Magnolia, Texas, where Charles John Blome, a 66-year old Mormon high priest, was charged and found guilty of aggravated sexual assault and indecency with a child. Legal charges allege that his church leaders knew of Blome's pedophilia and covered-up critical evidence about his sexual abuse of children in the ward.

In 1995, a Salt Lake child advocate reported to me that a 15-year-old boy was sent by LDS Social Services to live in the home of a southern Utah bishop. Not long after moving in, the boy sexually abused the bishop's children. Social Services personnel knew that the boy had a history of sexually abusing children, but they did not warn the bishop of this problem. They simply said the boy was "troubled" and "needed a good environment." By accepting this call to care for a church member in need, the bishop and his family were devastated.

## Follow the leader

Or take Kris Morton's story. Morton was raised in a devoted Mormon family with a strong pioneer heritage. Her father was a high priest and their lives were centered around the church. She was sexually abused at various times during her childhood by family members. One was her great uncle, who served as a branch president in Utah. At night he would come to her room and sexually abuse her, telling her that he was "helping her," doing her "a favor." She says, "I tried to defend myself but I was no match for him in that situation and he knew it." Morton suffered alone, never telling anyone.

"In church they told us young women to be morally pure; they warned us about young men our own age trying to take sexual advantage of us, but they didn't warn us about our priesthood leaders or family members trying to do the same thing. They told us to honor male priesthood holders because they act for God on earth. They told us to follow our leaders and do what we were told and everything will be all right. Well, it wasn't all right, and I'm angry about that."

Finally, when Morton was 36 years old, she began to admit to herself the full realization of her abuse. She entered therapy and confronted her aunt with abuse by her uncle who had since died. Neither confirming nor denying the abuse, Morton's aunt said her uncle "was only human" and he "gave devoted service for so many years the Lord had forgiven him his sins." She blamed Morton for bringing the abuse upon herself, and she accused her of trying to tear apart the family.

"My aunt was so supportive of her husband she was compromised into denying the impact of sexual abuse," Morton says. "I needed her support, not her blame."

## Loyalty vs. the courts

The first lawsuit filed against an American clergyman for sexual abuse of a child occurred in 1984. Now, at least one such suit is filed each day ["Insurers Help Churches in Abuse Suits," *Salt Lake Tribune*, Oct. 15, 1994].

Loyalty to leaders may prevent most Mormons from seeking legal redress for child abuse. But continued lack of response to abuse, followed by denial or cover-up, are forcing some to seek action in civil courts.

Sometimes a lawsuit may be the only way to create responsibility. "I think we will see the Church change over time, largely because the lawsuits have forced the issue," says Sue McMurray, a Texas Mormon. Lisa Davis' *New Times* piece reported that child sexual abuse "has cost the [LDS] church millions of dollars—perhaps tens of millions—in liability lawsuits across the nation." And these were just the cases "that made it into the legal system."

The problem of increasing legal action against the church was reportedly addressed at a September, 1994 LDS Regional Priesthood Leadership meeting in Calgary, Canada.

Two men who attended the meeting but asked not to be identified reported that Pres. Hinckley responded to questions about child sexual abuse, warning leaders that if they had "the least inkling that people have a problem with this...then they should be left out of church positions."

Hinckley instructed leaders to watch for and take action on cases of sexual abuse since these cases were "costing the church millions of dollars in lawyer's fees and settlements." Hinckley said, "It costs the church time and money to fight these things," and added that "the church is being sued for millions...we have more lawyers than we know what to do with."

## The Catholic model

Like the Catholic Church, the LDS Church may soon be up to its neck in negative publicity in mishandling of child sexual abuse in its congregations, and in responding to civil suits. The Catholic Church has paid hundreds of millions of dollars in settling such suits. One of the largest of these is the case of Father Porter who abused over 300 boys in his parish. Father Porter is now in jail after being criminally prosecuted in two states. Over 130 adults sued the Catholic church in several states for their childhood abuse by him.



Clockwise from top left:

"I'm Free," a six-year-old sexual abuse victim's feelings of release when his perpetrator was imprisoned.

A child abused by a female perpetrator juxtaposes a pair of "sciccors" with the woman she calls "Miss Perfect."

This child's drawing illustrates the negative feelings associated with abuse.

In the Fall of 1995, the Catholic Church petitioned the Supreme Court of Texas to hold that the First Amendment to the United States Constitution (guaranteeing freedom of religion) requires that the church be granted immunity against any civil suit involving the sexual abuse of children by Catholic priests.

In December, 1995, an *Amicus Curiae* Brief (Friend of the Court) was submitted in support of the Catholic petition in the Texas Supreme Court by nine other churches including the LDS Church. The Catholic Church in this case is denying any liability for abuse committed by its priests even if the abuse has been reported to church hierarchy and continues to occur. These churches claim that the First Amendment right to religious freedom exempts them from liability even though case law holds them and their agents responsible for criminal acts.

## Who's responsible?

By attempting to avoid responsibility for their agents' actions, the LDS church appears to disclaim responsibility for decisions made by bishops or stake presidents even when they are aware of abuse and are legally mandated to report it.

The protection of children from sexual abuse is of compelling state interest. In many cases, civil action is the only available legal recourse for abuse victims. Churches which preach family values send a highly contradictory message when they spend long hours and big bucks to hide a danger that destroys children.

Many victims of abuse have pleaded with their church leaders to use church resources for therapy of victims instead of using the money to fight legal battles against the victims. Some church claims for First Amendment exemption have been rejected in Minnesota, Colorado, Ohio, and Pennsylvania.

00275