# EXHIBIT I

Dockets.Justia.com

**Page 1**

```
 1        IN THE CIRCUIT COURT OF THE STATE OF OREGON
 2              FOR THE COUNTY OF MULTNOMAH
 3
 4   JEREMIAH SCOTT,              )
 5        Plaintiff,             )
 6   vs                          )   No. 98-12-08640
 7   GREGORY LEE FOSTER, an      )
 8   Individual; THE CHURCH OF   )
 9   JESUS CHRIST OF LATTER-DAY  )
10   SAINTS, an unincorporated   )
11   association, aka, the "Mormon )
12   Church," THE CORPORATION OF )
13   THE PRESIDENT OF THE CHURCH OF )
14   JESUS CHRIST OF LATTER-DAY  )
15   SAINTS, a Utah corporation sole,)
16   CORPORATION OF THE PRESIDING )
17   BISHOP OF THE CHURCH OF JESUS )
18   CHRIST OF LATTER-DAY SAINTS, )
19   a Utah corporation sole,     )
20        Defendants.           )
21
22          DEPOSITION OF DWAYNE L. LIDDELL
23            Taken in behalf of the Plaintiff
24
25            Tuesday, November 28, 2000
```

**Page 2**

```
 1   EXHIBIT      DESCRIPTION
 2   6      Amended request for designation of witnesses
 3          in the case of Jane Doe vs Raleigh General
 4          Hospital
 5
 6   (Exhibit attached hereto)
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1         BE IT REMEMBERED THAT, the deposition of
 2   DWAYNE L. LIDDELL was taken before Debra C. Symonds,
 3   Registered Professional Reporter and Certified Shorthand
 4   Reporter for the State of Oregon, on Tuesday, November
 5   28, 2000, commencing at the hour of 10:30 a.m., in the
 6   Conference Room of the law firm of Dunn, Carney, Allen,
 7   Higgins & Tongue, 651 SW Sixth Avenue, Suite 1300, in
 8   the City of Portland, County of Multnomah, State of
 9   Oregon.
10                        -:-
11                   APPEARANCES:
12   DUNN, CARNEY, ALLEN, HIGGINS & TONGUE
13      By James M. Hillas and Tim Kosnoff, Attorneys at Law
14         Appearing in behalf of the Plaintiff
15   BULLIVANT, HOUSER, BAILEY
16      By David A. Ernst
17   KIRTON & McCONKIE
18      By Randy T. Austin
19         Attorneys at Law
20            Appearing in behalf of the Church Defendants
21   KILMER, VORHEES & LAURICK
22      By Jeffrey M. Kilmer, Attorney at Law
23         Appearing in behalf of Defendant Foster
24
25   Also present: Lisa Thomas
```

**Page 4**

```
 1                   DWAYNE L. LIDDELL
 2   was thereupon produced as a witness in behalf of the
 3   Plaintiff and, having been first duly sworn on oath, was
 4   examined and testified as follows:
 5
 6                     EXAMINATION
 7   BY-MR. KOSNOFF:
 8      Q. Please state your name and spell your last
 9   name.
10      A. Dwayne L. Liddell, L I D D E L L.
11      Q. Mr. Liddell, could you give us an address for
12   the record?
13      A. Would you like my business or home?
14      Q. Whatever you'd prefer to give.
15      A. 50 East North Temple, Salt Lake City, Utah,
16   84150.
17      Q. What is your current place of employment?
18      A. I'm employed by the Corporation of the
19   Presiding Bishop of the Church of Jesus Christ of
20   Latter-Day Saints.
21      Q. And that's a Utah corporation?
22      A. Utah corporation sole, S O L E.
23      Q. Could you describe your position there and
24   your responsibilities?
25      A. I am the director of risk management in the
```

**Page 5**

1  Risk Management Division. My responsibilities are risk
2  management.
3      Q. To whom do you report?
4      A. I report to the managing director of the
5  Finance Department, M. Ferrell Benson.
6      Q. With respect to your responsibilities as
7  director of the Risk Management Division, --
8      A. Yes, sir.
9      Q. -- how many employees or individuals report to
10  you?
11      A. We have approximately 24 full-time equivalent
12  head count in the Risk Management Division.
13      Q. Could you trace for us your educational
14  background?
15      A. Yes. I have a bachelor of science degree with
16  a major in accounting from the University of Utah.
17      Q. And in what year did you get that degree?
18      A. 1962.
19      Q. Could you discuss any advanced education or
20  training in the field of risk management that you've
21  received?
22      A. Yes. I've been to Signa University at the
23  Wharton Graduate School, University of Pennsylvania.
24  I've attended numerous seminars, continuing education
25  classes, seminars and other type of educational

**Page 6**

1  pursuits.
2      Q. How long have you been the, I'm sorry again,
3  director or commissioner of the Risk Management
4  Division?
5      A. I've been the director a little over 15 years.
6      Q. And what job did you hold before that?
7      A. I was a consultant in public accounting.
8      Q. Did you work alone or were you with a firm?
9      A. No, I was a partner with an international
10  firm.
11      Q. How many years were you there?
12      A. I was in public accounting approximately 23
13  years.
14      Q. Prior to coming on board as director, had you
15  had any training or education in the field of risk
16  management?
17      A. Yes, I did considerable consulting with
18  insurance companies, other business enterprises in
19  connection with various facets of risk management.
20      Q. And are you a member of the Mormon Church?
21      A. Yes, sir.
22      Q. How long have you been a member?
23      A. All my life.
24      Q. And in your position as director, do you
25  receive performance reviews by your superiors?

**Page 7**

1      A. I'm in an unclassified position. I do receive
2  annual reviews.
3      Q. Can you tell me what materials you have
4  reviewed in preparation for your deposition here today?
5      A. I've had discussions with legal counsel, I
6  reviewed a deposition that I gave in West Virginia
7  briefly, and I reviewed a document purported to request
8  the subject matter of my deposition today.
9      Q. Is it correct that you have testified in other
10  depositions in other cases?
11      A. Yes.
12      Q. On how many occasions?
13      A. Over what period of time?
14      Q. Over the period of time that you've been
15  director.
16      A. Approximately six or seven.
17      Q. Have you had occasion to testify in any courts
18  during that period of time?
19      A. Yes.
20      Q. What courts?
21      A. West Virginia.
22      Q. Was that the deposition you were referring to
23  a moment ago?
24      A. Yes, sir.
25      Q. Have you had occasion to testify as a trial

**Page 8**

1  witness in any courts? And by that I mean either a
2  judge or a jury trial context rather than a deposition.
3  I realize that there was a judge presiding over the
4  deposition in West Virginia. I'm getting at whether
5  there are any trials that you've testified in.
6      A. Since I've been the director of risk
7  management?
8      Q. Yes.
9      A. No.
10      Q. And have you testified in trials prior to
11  coming on board as the director?
12      A. Yes, sir.
13      Q. On how many occasions?
14      A. I don't recall.
15      Q. Can you discuss what your specific duties and
16  activities as director of risk management involve?
17      A. Yes. I'm responsible for the executive
18  management of risk within the Church of Jesus Christ of
19  Latter-Day Saints, an unincorporated association, and
20  the various affiliated legal entities that are
21  associated with the church.
22      Q. You mentioned before that the division is
23  within the Corporation of the Presiding Bishop. Does
24  your division provide risk management services to
25  entities outside of the Corporation of the Presiding

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 9

1  Bishop?
2      A.  Yes.
3      Q.  Could you identify those entities?
4      A.  That would be the Church of Jesus Christ of
5  Latter-Day Saints, an unincorporated association, the
6  Corporation of the President of the Church of Jesus
7  Christ of Latter-Day Saints, a Utah corporation sole,
8  and numerous other affiliated legal entities that are
9  associated with either of those -- either three. That's
10  not very good grammar. With any three of those
11  organizations.
12      Q.  With respect to the other entities outside of
13  those, could you identify those organizations associated
14  with the Mormon Church?
15      MR. ERNST: I'm not going to agree to let him
16  answer those questions. It's not within the scope of
17  the order.
18      MR. HILLAS: Dave, for the record, I think
19  that it would be permissible if Mr. Kosnoff is seeking
20  to lay a foundation that the other entities associated
21  with the CPB, COP or the unincorporated association are
22  controlled or are interrelated with respect to risk
23  management. I think it would be permissible to let him
24  explore that.
25      I respect your objection and I understand

Page 10

1  where you're going, but I think that there is a
2  permissible line of inquiry there that could be fairly
3  read in the scope of the order. Do you want to take a
4  break?
5      MR. ERNST: Yeah. See, I have duties and
6  responsibilities of risk manager, organizational
7  structure of CPB. Let me let us think about it here for
8  a second, see if we --
9      MR. HILLAS: Sure.
10      (Discussion off the record)
11      MR. ERNST: See if we can't try this. I'm not
12  going to let him answer questions about other entities
13  that are not parties here unless they have something to
14  do with allegations of or touches on the subject of
15  child abuse.
16      I think he can answer the question in a
17  general way and provide you with information, but, for
18  instance, we had this come up yesterday and the judge --
19  I'm not going to allow questions about these other
20  entities that you listed before. I'm not going to let
21  him answer questions about that. So I think --
22      MR. HILLAS: Let me just point out, though,
23  Item No. 4 on Page 4 of the order specifically does
24  permit inquiry into the duties and responsibilities of
25  the risk manager.

Page 11

1      So for that purpose, I think it would be
2  appropriate to find out what his duties and
3  responsibilities are, if that includes involvement in or
4  providing of risk management services to entities beyond
5  CPB, COP or the unincorporated association. I think
6  that is squarely within the order.
7      I agree that we would not be permitted to go
8  into great detail about those other entities, but to at
9  least find out what they are, how much, for example,
10  percentage of the risk management services which are
11  provided to organizations outside the COP, CPB or
12  unincorporated association. I think that type of
13  general inquiry would be within the scope of the order.
14      MR. ERNST: Take it question by question. But
15  remember this, at Page 42, remember that the judge said
16  I want to understand his role as director of risk
17  management, how he distinguishes between his role as
18  director of risk management for the unincorporated
19  association and his role for the corporations.
20      MR. HILLAS: Agree. And I think -- That is
21  exactly what she said --
22      MR. ERNST: Right.
23      MR. HILLAS: -- and we have no intent to skirt
24  the judge's order, but I do believe that in the context
25  of this, because there are, as we discovered yesterday,

Page 12

1  a number of related entities, for example the LDS Social
2  Services now known as Family Services, --
3      MR. ERNST: I think you can ask about that.
4      MR. HILLAS: -- there's some leeway I think
5  where we can stay within the scope and spirit of the
6  order.
7      MR. ERNST: Okay, I think we have a general
8  understanding.
9      MR. KOSNOFF: Rather than have you read back
10  the question, I think I'm just going to put another
11  question.
12      Q.  (By Mr. Kosnoff) As risk manager, you've
13  indicated that you provide risk management services to
14  certain church-related entities other than the
15  Corporation of the President, Corporation of the
16  Presiding Bishop.
17      Do you provide risk management services, for
18  example, to an entity called LDS Social Services?
19      A.  Now known as LDS Family Services, and the
20  answer is yes.
21      Q.  It was formerly known as LDS Social Services?
22      A.  Correct.
23      Q.  And are there other entities that you provide
24  risk management services to?
25      A.  Yes.

DWAYNE L. LIDDELL - 11/28/00      SCOTT V FOSTER, et al.

Page 13

1  MR. ERNST: You can answer.
2  Q. And what entities are those?
3  MR. ERNST: I'm not going to let him answer
4  that.
5  MR. HILLAS: Well, Dave, I think we just went
6  through. I mean, if you want to object and instruct him
7  not to answer, we'll note it in the transcript and
8  perhaps take it up later. But I think Mr. Kosnoff ought
9  to be allowed to ask, for example, about the percentage
10  of time or the relative amount of services and how they
11  are allocated to entities beyond the three discussed
12  explicitly.
13  Q. (By Mr. Kosnoff) Mr. Liddell, could you break
14  down, as best you can, the percentage of time that the
15  Division of Risk Management spends providing services to
16  the Corporation for the Presiding Bishop, the
17  Corporation of the President, and the Unincorporated
18  Association of the Mormon Church?
19  A. I can't. We really don't tabulate that type
20  of information.
21  Q. Do you know why you, as an employee of the
22  Corporation of the Presiding Bishop, would provide
23  services to another corporation?
24  A. To assist them in the management of risk.
25  Q. And when you provide that service, is your

Page 14

1  company or your division paid or compensated for the
2  delivery of those services to, for example, the
3  Corporation of the President?
4  A. No. To the taxable entities we would bill
5  them for services rendered.
6  Q. Same question with respect to the
7  Unincorporated Association of the Mormon Church.
8  A. No.
9  Q. You would not bill them?
10  A. No.
11  Q. So those services are provided gratuitously?
12  A. There's an allocation that allocates our total
13  budget across the board to all organizations that we
14  have responsibility for, but we do not bill them for
15  individual services rendered as we do for the for-profit
16  entities.
17  Q. Where does your funding come from?
18  A. The donations of members of the Church of
19  Jesus Christ of Latter-Day Saints.
20  Q. And are you saying that the donations of the
21  members of the Church of Jesus Christ of Latter-Day
22  Saints make those donations directly to the Corporation
23  of the Presiding Bishop or to your division?
24  A. I don't know.
25  Q. Do you know from what entity source, if any,

Page 15

1  that funding comes?
2  A. It comes through the Corporation of the
3  Presiding Bishop, but where it begins, I do not know.
4  Q. Just so that I am clear on this, is it your
5  testimony then that in your budget, that is the budget
6  of the division of which you're a director, you are
7  allocated monies to provide risk management services to
8  different entities such as the Corporation of the
9  President, the Unincorporated Association of the Mormon
10  Church, and, for example, LDS Social Services?
11  A. Yes.
12  Q. And do you know currently what that percentage
13  formulation is?
14  A. No.
15  Q. Do you know who sets that percentage?
16  A. No.
17  Q. Do you participate in the preparation of your
18  budget?
19  A. Yes.
20  Q. And are you assisted or is that something that
21  you do yourself?
22  A. No.
23  Q. You're not assisted?
24  A. The controller of our division handles our
25  budgets.

Page 16

1  Q. And then where does that budget then go once
2  it's prepared?
3  A. To the Finance Department.
4  Q. And where does it go beyond that?
5  A. I don't know.
6  Q. Please define risk management.
7  A. Risk management is the management of risk.
8  Q. How does your office determine what is a risk?
9  In other words, does your office have any guidelines?
10  A. You asked two questions. I'll try to answer
11  the first. A risk is any kind of an activity that can
12  produce a loss to an organization.
13  Q. And the second?
14  A. Do we have any guidelines?
15  Q. Yes.
16  A. We have best practices and various internal
17  documents that we utilize to define our mission and our
18  responsibilities.
19  Q. What are those documents that define your
20  mission and your responsibilities?
21  A. Our risk management manuals.
22  Q. And who prepared those risk management
23  manuals?
24  A. We did. Our Risk Management Division prepared
25  those manuals.

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 17

1    Q. Are they reviewed or approved by anyone else
2  within the Corporation of the Presiding Bishop?
3    A. We may discuss their contents with our
4  leadership in the Finance Department. They would also
5  be reviewed by church auditing.
6    Q. Same question only with respect to the Office
7  of the First Presidency.
8    A. I don't understand your question.
9    Q. Are the guidelines or the manuals, the mission
10 that you discussed, are any of those reviewed or
11 approved by anyone from the Office of the First
12 Presidency?
13   A. No.
14   Q. Are they reviewed by anybody outside of the
15 Corporation of the Presiding Bishop?
16   A. I don't believe so.
17   Q. How are risks made known to your office?
18   A. By direct reports of risk. By our knowledge
19 of the Church of Jesus Christ of Latter-Day Saints, the
20 corporate entities, we become aware or people report to
21 us.
22   Q. And is information collected by your division?
23   A. Information with respect to what?
24   Q. To various risks?
25   A. To a certain extent, yes.

Page 18

1    Q. How is it collected and maintained?
2    A. We will set up claims that are asserted
3  against the -- I'm going to refer to the unincorporated
4  association as the church so I'm not confusing.
5    Q. Good.
6    A. Or I'll refer to the corporate entity. Claims
7  that are asserted against the church or one of the
8  corporate entities, we would set up a claim file with
9  respect to that claim or incident and we would establish
10 reserves, and we would monitor it or we would manage it
11 over the pendency of that particular claim or incident.
12   Q. Does the church --
13   A. I should correct that somewhat, because if
14 that is a claim where there is insurance, those files
15 would be maintained by our insurer or third-party
16 administrator, but we would have access to that
17 information.
18   Q. What cases or claims are kept by your division
19 and which are referred to any insurance carriers?
20   A. I don't really know what you mean by kept by
21 our division. You mean managed by our division?
22   Q. Yes.
23   A. If it's an insured program, it would be
24 referred to our insurance carrier, such as automobile
25 liability coverage. If it were a general liability

Page 19

1  claim that we retain the risk on, we then would manage
2  that claim.
3    Q. You're acquainted with a number of claims
4  alleging negligence in some form or another against the
5  church in the area of child sexual abuse?
6    A. Yes.
7    Q. Is that the type of claim that is retained
8  within your division or is it one that's referred out to
9  insurance?
10   A. It is not retained in our division, nor is it
11 referred out to insurance.
12   Q. What happens to it?
13   A. Those claims are handled by Office of General
14 Counsel. We would provide support to that function, we
15 would establish reserves based on their determination,
16 and they would be responsible for the resolution of that
17 particular claim.
18   Q. When you say "general counsel," are you
19 referring to general counsel of the Corporation of the
20 Presiding Bishop?
21   A. I'm referring to Office of General Counsel for
22 the church and its affiliated legal enterprises.
23   Q. Is the Office of General Counsel
24 organizationally within the Corporation of the Presiding
25 Bishop or the Corporation of the President? Where does

Page 20

1  it fit in in the hierarchy of the church?
2    A. It comes under the Corporation of the
3  President.
4    Q. Under the Corporation of the President. So
5  just so I'm clear, the file is referred to that office
6  by your division?
7    A. They may have received it initially or we may
8  have received it. In any event, for sexual abuse type
9  claims that you're referring to, they have the
10 responsibility for managing those particular claims at
11 the present time.
12   Q. And do you have one contact person in
13 particular in these types of cases or claims in the
14 Office of General Counsel?
15   A. We have several contacts.
16   Q. Who is that?
17   A. Elder Lance B. Wickman who is Office of
18 General Counsel for the church or it could be William
19 Atkin or it could be Boyd Black. It's generally Elder
20 Wickman.
21   Q. Are there any other types of cases that are
22 handled in the manner that you've just described that
23 child sex abuse claims are handled?
24   A. Yes.
25   Q. What types of cases are those?

DWAYNE L. LIDDELL - 11/28/00                SCOTT V FOSTER, et al.

Page 21

1   A. Cases that would have implications with
2   respect to the First Amendment. Claims which may have
3   implications with respect to specific church leaders or
4   that could have adverse or favorable publicity for or
5   against the church.
6       Q. And is that something that you personally
7   assess before making the referral?
8       A. If I felt that those implications -- If I were
9   the one to receive that particular claim and I felt that
10  those type of implications may be present that I've
11  testified to in the last question, I would certainly
12  discuss those with Office of General Counsel.
13      Q. Does your division have excess liability
14  coverage for general liability claims such as child sex
15  abuse negligence claims?
16      A. I'm not sure what you mean does our division
17  have excess. To insure our division?
18      Q. Well, or however -- Well, strike that.
19          There are certain risks that are retained by
20  the church.
21      A. Referring to the unincorporated association --
22      Q. Yes.
23      A. -- or all of the entities?
24      Q. All of the entities.
25      A. Yes.

Page 22

1       Q. And are those risks maintained up to a certain
2   dollar amount, and then beyond that there is insurance
3   that covers any claim?
4       A. Depends on the line of business and the
5   specific program involved.
6       Q. With respect to the type of claim at issue
7   here, negligence in the area of child sex abuse, what
8   about in that instance?
9       A. Are you asking the question is there a
10  retention by the church and then the purchase of excess
11  coverage with respect to that? Is that your question?
12      Q. Yes.
13      A. The answer is yes.
14      Q. And what is the dollar amount at which that
15  coverage would kick in?
16          MR. ERNST: I'm not going to let him answer
17  that question. I don't think it reasonably follows from
18  this order. She's really been -- made very clear that
19  she's not -- In my opinion, the judge has made clear
20  that she's not interested in hearing about amounts,
21  judgments, claims, and she several times in the
22  transcript said specific --
23          MR. KOSNOFF: Okay, David, say no more.
24          MR. ERNST: Thank you.
25      Q. (By Mr. Kosnoff) Does your office quantify

Page 23

1   risk?
2       A. We analyze risk. I'm not sure exactly what
3   you're referring to when you say quantify. We do
4   analyze risk by its severity and frequency which some
5   people refer to as quantifying of risk.
6       Q. And why do you do that?
7       A. One reason is to set reserves and establish
8   actuarially developed ultimates with respect to claims,
9   losses.
10      Q. And what do you do to manage the risk that you
11  have quantified?
12      A. We determine what risk we will retain and what
13  risk we will transfer through insurance coverages
14  generally.
15      Q. And is your practice of referring certain
16  types of cases, as you've previously discussed, to the
17  Office of General Counsel, is that an example of a way
18  in which you have managed a certain risk?
19      A. The way we have managed a certain risk?
20      Q. Yes.
21      A. In those instances, those risks or those
22  claims that we've referred to would be managed by Office
23  of General Counsel.
24      Q. So the act of referring it to the Office of
25  General Counsel is not really an act of risk management?

Page 24

1       A. I don't think that's an accurate statement.
2   It's a function within the Risk Management Division so
3   it would certainly come under risk management.
4       Q. But would that be a way in which you manage a
5   risk that you have previously quantified?
6       A. Are you talking about the Risk Management
7   Division or are you talking about one of the church
8   organizations in general?
9       Q. Both.
10      A. Which would you like me to answer first?
11      Q. Take your pick.
12      A. With respect to the Risk Management Division,
13  we would manage risk generally in the way that I've
14  outlined, by determining the risk, determining the
15  levels of insurance coverage for that particular type of
16  risk if we desire or determine that we will transfer
17  that risk to an insurance company or retaining the risk
18  ourselves. There are numerous activities that go on in
19  the church and its affiliated legal enterprises in the
20  management of risk such as safety, loss control, and so
21  forth.
22      Q. Now, you've testified previously that part of
23  the functions of your division are to reduce risk as
24  much as possible for those entities that you serve.
25      A. Certainly it's our interest to reduce risk,

Page 25

1  but we operate in a different type of an organization
2  that most risk managers operate in, in that we, the
3  church, is an ecclesiastical organization that has
4  tenets, teachings, practices that operate within the
5  church organization and structure. It's our
6  responsibility in making suggestions or in consulting
7  with those organizations to manage the risk within those
8  tenets and those parameters. We do not have authority,
9  nor do we take authority, to try to force or coerce or
10  in any way set aside those tenets, doctrines and
11  principles.
12      Q. And is that different than the way a risk
13  management division would operate in a different context
14  such as with a corporation -- a nonreligious entity?
15      A. A for-profit entity?
16      Q. A for-profit entity?
17      A. I believe so, because there the interest is in
18  shareholders and earnings per share, cash flow, and
19  managing risk in a way that does not diminish or provide
20  severe fluctuations that would bear upon the
21  stockholders' earnings per share and so forth.
22      Q. Are there other risks that you have to manage
23  by virtue of the fact that you're operating within a
24  religious organization that you might not have to manage
25  if you were not in that context?

Page 26

1      A. I think the answer to that question would be
2  yes.
3      Q. What comes to mind?
4      A. The organization itself, the free exercise of
5  religion that's granted under the constitution, I think
6  that's quite a bit different than other organizations
7  would have.
8      Q. Anything else?
9      A. I could certainly think about it for a while,
10  but I'm sure that would be the -- because it is a
11  different type of an organization, because it is a group
12  of members of an unincorporated association practicing
13  religion, it would certainly be different than a
14  business enterprise manufacturing a product, per se.
15      Q. A risk manager for a for-profit organization,
16  one of his goals is to preserve the assets and perhaps
17  reputation of the corporation?
18      A. I'm sure that would be, but that would not be
19  as significant a goal, in my opinion, as cash flow and
20  earnings per share and developing programs that equalize
21  earnings per share so that there are not severe
22  fluctuations that would cause diminution in stockholder
23  value.
24      Q. And how might those practices then differ if
25  the principal concern was equalizing cash flow and

Page 27

1  earnings per share?
2      A. Well, I think our responsibility is more in
3  preservation of resources than it is in -- since we have
4  no earnings per share or reports to shareholders, that
5  doesn't become an issue.
6      Q. So that I understand then, a risk manager for,
7  say, Ford Motor Company is not then interested in
8  approaching risk management with a goal of preserving
9  the resources of Ford Motor Company?
10      A. I don't think that's a true statement.
11      Q. What about it is untrue?
12      A. I would believe he would be interested in
13  that. My comments were that his primary interest would
14  be focusing on earnings per share and cash flow, things
15  that dilute shareholder value.
16      Q. How do you know if a risk is reduced or not?
17      A. When the occurrence of that risk is
18  diminished.
19      Q. And how do you measure that?
20      A. You measure it in several different ways. The
21  number of claims that are asserted in that particular
22  line of business from one period to another, provided
23  that they're trended and developed so that you have
24  comparable data, would be one way.
25      Q. In the area of child sex abuse claims and

Page 28

1  litigation against the church, do you track that risk by
2  collecting data?
3      A. We track it within all general liability
4  claims so that we're looking at total general liability
5  claims as opposed to specific components of general
6  liability claims.
7      Q. And in what form is that data kept in your
8  office?
9      A. We have that in various databases that --
10  either that are -- Are you talking about overall
11  generally for all general liability claims?
12      Q. Let's talk about general and then specifically
13  with respect to child sex abuse claims.
14      A. We would track that data from our claims
15  files, our databases that would have information in them
16  concerning those claims. If others in certain areas
17  handled those claims, we would have access to their
18  databases which we could then download into our
19  database.
20      Q. What other -- Well, in this case what other
21  entities are we talking about when you say other
22  entities' databases?
23      A. Insurance carriers, third-party
24  administrators.
25      Q. What about the Office of General Counsel for

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 29

1  the church and its associated outside counsel?
2      A. We do not access their databases.
3      Q. Do you access or have access to any data or
4  information from them?
5      A. We maintain the databases for the claims which
6  they are responsible for.
7      Q. And that would consist of a claim file?
8      A. Yes.
9      Q. And what would be in that claim file?
10     A. If it's a hard copy claim file, it could have
11  a copy of the summons and complaint, it could have a
12  copy of the various legal filing documents. In our
13  electronic file we would maintain reserves, establish
14  reserves, and at the request of Office of General
15  Counsel, we would adjust those reserves as they deemed
16  appropriate.
17     Q. How do you use the documents that are in your
18  claim file to track the risk so that you can determine
19  whether or not the risk has been reduced or not?
20     A. Are you referring to a hard copy claim file?
21     Q. I'm referring to whatever data that you
22  maintain or retain within your division, whether it be
23  the hard copy claim file or anything else.
24     A. Okay. Would you mind repeating that question?
25  I think I've lost the first part of it.

Page 30

1      Q. Okay. What I would like to know is how you
2  use, starting with the hard copy claim file, the
3  documents that you've just discussed to compile data
4  which will help you know whether risk has been reduced
5  or not.
6      A. As I testified before, we actuarially develop
7  claim and loss ultimates which are then compared from
8  period to period where we can look at trend analysis and
9  so forth with respect to those lines of business.
10     Q. Could you tell us what your understanding is
11  of a risk ultimate?
12     A. I think I referred to a loss ultimate.
13     Q. Yes.
14     A. Is that what you're referring to?
15     Q. Yes.
16     A. That is taking the case base reserves that are
17  established for a particular claim or loss, actuarially
18  then trending and developing that information to compute
19  incurred but not reported data, combining those
20  elements, and coming to an overall estimate of what the
21  actual total loss, if you will, will be with respect to
22  that claim or loss over its life.
23     Q. Do you, and when I say you I mean your
24  division, do you use risk ultimates in comparison to the
25  costs of preventive action?

Page 31

1      A. Are you talking about loss ultimates again?
2      Q. Well, perhaps we --
3      A. You keep using the term "risk ultimates."
4      Q. Why don't we try to get our definitions
5  straight because maybe I don't understand and this is
6  not my field.
7         Is there a distinction between a risk ultimate
8  and a loss ultimate?
9      A. I'm not sure what a risk ultimate is. I'm
10  talking about loss ultimates. So there would be
11  apparently in my mind.
12     Q. Mr. Liddell, do you have a copy of your
13  deposition testimony in the West Virginia case with you?
14     A. No.
15        MR. KOSNOFF: Do you have it with you, David?
16        MR. ERNST: I do not. I don't.
17        MR. HILLAS: Do you want a copy of it?
18        MR. KOSNOFF: Let me try and work through this
19  on my copy. We'll make a copy of this at the break.
20     Q. (By Mr. Kosnoff) I certainly want to show it
21  to you, if possible, but it may not be necessary. I
22  want to ask you, you recall testifying at that
23  deposition back in October of 1999 --
24     A. I do.
25     Q. -- in Doe versus Raleigh General Hospital and

Page 32

1  church defendants?
2      A. Yes.
3      Q. And the plaintiff's counsel asked you a series
4  of questions, and I'd just like to read to you a couple
5  of questions and answers.
6         MR. ERNST: If you're going to ask him a
7  number of questions, I think it's fair that he be able
8  to see it.
9         MR. KOSNOFF: And I will if it would help him.
10     Q. (By Mr. Kosnoff) Question, let's start with
11  general categories. Is that done in your office?
12        Answer, we do analysis on risk ultimates using
13  actuaries and we review those from period to period.
14        Question, what do you mean by, quote, risk
15  ultimates and actuaries?
16        Answer, in order to understand current data
17  and compare it with prior periods, one cannot just take
18  raw data, one must actuarially develop and trend the
19  data so that it will be similar with data from prior
20  periods so that it's on the same basis.
21        In that deposition apparently you used the
22  term "risk ultimates." Do you recall what you meant by
23  that term?
24     A. I would have been referring to loss ultimates
25  if I used it.

IBA, SYMONDS & DUNN (503) 224-4438

DWAYNE L. LIDDELL - 11/28/00                SCOTT V FOSTER, et al.

**Page 33**

1    Q. I'll try and use loss ultimates.

2    A. It doesn't matter, it's fine.

3    Q. Do you use loss ultimates in comparison to the

4    costs of preventive action?

5    A. Not specifically, we do not, because a loss

6    ultimate would be the ultimate estimate of what that

7    loss would produce over time.

8    Q. Let me refer you again to this deposition in

9    West Virginia. You were asked the question, and do you

10   compare the -- once you ascertain the risk ultimate,

11   that is the ultimate cost of a particular risk, do you

12   compare that to the cost of taking some action to

13   prevent similar losses in the future?

14        Answer, we have not arrived at that state yet.

15   A. That's correct.

16   Q. Do you recall that question and answer?

17   A. Absolutely.

18   Q. What did you mean by that when you said, "We

19   have not arrived at that state yet"?

20   A. We do not have our risk management information

21   system to a point where we can do that.

22   Q. And why is that?

23   A. That's not yet developed.

24   Q. Do you know whether there is anything that

25   would prevent you from doing that?

**Page 34**

1    A. Yes, our system is not developed to that

2    point. We're in the process of that development

3    presently, and in the future we would be able to do

4    studies similar to that.

5    Q. Have you developed criteria for determining

6    whether a risk is serious enough to take preventive or

7    corrective action?

8    A. Are you referring to us as a Risk Management

9    Division or are you referring to a corporate entity or

10   are you referring to the church?

11   Q. Well, I'm not sure so let's try all three.

12   A. Okay.

13   Q. Let's start first with you as a division.

14   A. Would your repeat the question, please?

15        MR. KOSNOFF: Would you repeat the question?

16        (Reporter read as requested)

17   A. I think we would know whether or not a risk

18   was serious enough. Have we developed criteria. I

19   think we would know with our experience whether or not a

20   risk was serious enough that various preventive action

21   should be taken in certain lines of business where risks

22   may be significant or losses may be significant.

23   Q. How would you know -- just know that?

24   A. By the review of the loss ultimates or other

25   claims data.

**Page 35**

1    Q. And again, going back to your office, we've

2    talked about the hard file which contains a copy of the

3    complaint and summons and some sort of statement

4    regarding reserves?

5    A. No, there's not a statement in the hard file

6    concerning reserves. That's an electronic database.

7    Q. What other kind of information or data is

8    compiled in your office that would enable you to know

9    whether or not a risk is serious enough to take

10   preventive or corrective action?

11   A. It would generally be loss runs or, for

12   instance, if you take automobile liability claims, by

13   looking at loss ultimates in automobile liability claims

14   from period to period, we'd be able to analyze,

15   understand trends, and see if additional corrective

16   action should be taken with respect to drivers in our

17   fleet, to review of accidents specifically, or if

18   certain areas seem to be incurring accidents at a higher

19   rate than other areas, we then would look into that

20   further and suggest potential type of safety tips or

21   other kinds of things that may be necessary.

22   Q. How about in child sex abuse cases?

23   A. We do not, as the Risk Management Division.

24   Q. I'd like to clarify that last response, if I

25   could. Are you saying that you have not developed

**Page 36**

1    criteria for determining whether a risk is serious

2    enough to take preventive or corrective action in child

3    sex abuse cases?

4    A. I'm saying that we do that in all general

5    liability claims. In addition to that, in the area of

6    child sexual abuse, child sexual abuse or other sexual

7    abuse is deemed to be a sin within the church. Those

8    actions are taken by ecclesiastical leaders according to

9    church doctrine and principles.

10   Q. And does the declaration of an activity as a

11   sin reduce its risk of occurrence?

12        MR. ERNST: I object to the use of the words

13   "declaration" and "activity." Those haven't been

14   defined and I don't believe that was his testimony at

15   all. It's not an activity, it's a belief.

16   Q. Let me rephrase the question. I'm trying to

17   understand your last response, I'm not trying to be

18   impertinent. But in the context of our dialogue here,

19   you indicated that church leaders have declared or

20   asserted that child sex abuse is a sin, and I'm trying

21   to understand what that has to do with developing

22   criteria to reduce risk.

23   A. I think that has a lot to do with criteria, as

24   you define it. Sexual abuse is a moral transgression.

25   It's dealt with in an ecclesiastical manner. According

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 37

1   to Scripture, according to revelation from our leaders,
2   and according to the tenets of the church, that's a
3   risk, therefore, in the church that's managed by
4   ecclesiastical leaders in their calling and
5   responsibility as an ecclesiastical leader. It's not
6   like an automobile accident where two cars are involved
7   in an automobile accident where, according to various
8   legal premises, there may be negligence involved.
9   Certainly a different thing.
10      Q. Mr. Liddell, as the director of the Risk
11  Management Division with the responsibilities that you
12  have, do you believe that the church, the unincorporated
13  association, and its leaders have developed criteria or
14  policies which are adequate to respond to the risk
15  ultimates that you've assessed in these cases?
16      A. I believe that the organization of the church,
17  that its principles, that its teachings, that its
18  embodiment in striving to become more like Jesus Christ
19  in its organizational structure, in its leaders, in the
20  responsibilities that ecclesiastical leaders have, the
21  answer would be yes.
22      Q. So would it be fair to say then that, in your
23  professional opinion, the actions that the leadership of
24  the Mormon Church has taken on this subject are
25  sufficient and reasonable under the circumstances as you

Page 38

1   see them as the risk manager?
2       A. For the church, the answer is yes.
3       Q. For its members?
4       A. Absolutely.
5       Q. For the Risk Management Division of the
6   Corporation of the Presiding Bishop?
7       A. I'm not sure how that question relates.
8       Q. And have you personally consulted with your
9   leaders, that is the leaders of the church, on this
10  subject?
11      A. Of sexual abuse?
12      Q. Yes.
13      A. No.
14      Q. You have never consulted with any individual
15  leader from the Quorum of the 12 Apostles or the Office
16  of the First Presidency or the general authorities?
17      A. With respect to the programs or with respect
18  to claims?
19      Q. Let's start first with the programs.
20      A. I have not.
21      Q. Let's talk about claims then.
22      A. I have been in meetings with Office of General
23  Counsel or Kirton McConkie when claims have been
24  discussed with church leadership.
25      Q. With church leadership present?

Page 39

1       A. Pardon?
2       Q. You're saying with church leadership --
3       A. With church leadership.
4       Q. Have you participated in discussions either in
5   the offices of Kirton McConkie or elsewhere with leaders
6   of the Mormon Church regarding preventive action or
7   actions designed to reduce risk of child sex abuse
8   occurring?
9       A. I have been in those type of meetings where
10  the doctrines, the principles, the training of
11  ecclesiastical leaders, the establishment of a help line
12  have been discussed.
13      Q. And which church leaders were present during
14  those discussions?
15          MR. ERNST: You know, I'm not going to let
16  him -- These are attorney-client discussions, as it's
17  been set out to me. I'm not going to let him answer
18  attorney-client discussions. It's also not in this
19  order. I'm giving you a very wide berth today again on
20  this order.
21          MR. HILLAS: Well, Dave, for the record, I
22  would say No. 12 permits inquiry into all policies,
23  procedures and practices relating to the management of
24  risk associated with sex abuse of children within the
25  Mormon Church.

Page 40

1           MR. ERNST: Okay. The question I believe was
2   who was there. I think that's fine, but don't ask about
3   the discussions, please.
4       Q. (By Mr. Kosnoff) What church leaders have you
5   consulted with with respect to claims?
6       A. I think we're talking about what meetings have
7   I attended when those leaders, along with legal counsel,
8   were there.
9       Q. Yes, right.
10      A. Is that the question?
11      Q. Yes.
12      A. Members of the first presidency and the
13  presiding bishopric.
14      Q. Approximately when were those discussions?
15      A. Concerning claims, various times.
16      Q. Are there regular meetings that you have with
17  church leaders to discuss claims and risk issues related
18  to child sex abuse?
19      A. No.
20      Q. Is there any kind of committee that meets
21  regularly or has met at all to discuss these issues that
22  you've participated in?
23      A. No, other than -- well, other than the help
24  line committee.
25      Q. And what is the help line committee?

Page 41

1    A. It's a group of people from Kirton McConkie,
2  LDS Family Services, and myself from the Risk Management
3  Division who meet regularly to provide assistance to
4  ecclesiastical leaders who have called in on the help
5  line.
6    Q. How many times has that committee met?
7    A. It's scheduled to meet every two weeks. It
8  hasn't always met on that schedule.
9    Q. Do the meetings take place at a particular
10 location regularly?
11   A. Usually, yes.
12   Q. And where is that?
13   A. At LDS Family Services' office.
14   Q. And what is the purpose of those meetings?
15   A. As I testified, it's to provide help and
16 assistance to ecclesiastical leaders who have called in
17 on the help line.
18   Q. Can you identify the individuals that
19 regularly attend those meetings?
20   A. By name?
21   Q. Please.
22   A. Myself, Randy Austin from Kirton McConkie,
23 Merrill Nelson from Kirton McConkie, Alan Gundry from
24 LDS Family Services, and there generally are some
25 representatives there from certain departments such as

Page 42

1  the missionary department on an ad hoc basis, and most
2  of those, though, do attend regularly.
3    Q. Mr. Gundry -- Who is Mr. Gundry?
4    A. He is employed by LDS Family Services.
5    Q. What is his relationship to the help line?
6      MR. ERNST: You know, we did go over that in
7  some length yesterday so you got what you wanted. Why
8  ask it again?
9      MR. HILLAS: Well, --
10     MR. ERNST: Is he going to try to get him to
11 say something different?
12     MR. HILLAS: Well, Dave, I'm not asking the
13 questions, but I think Mr. Kosnoff is entitled to lay a
14 predicate to again discuss the relationship between
15 Mr. Liddell and his division and the services it
16 provides to the entities that are laid out in the order.
17   Q. Mr. Gundry, it was represented to us, is an
18 individual who is assigned to staff the help line. Is
19 that your understanding?
20   A. Yes, he's a social worker.
21   Q. And Mr. Brown indicated that he's the sole
22 help line --
23     MR. ERNST: That's not true.
24   Q. -- person. Is that your understanding?
25   A. No.

Page 43

1    Q. There are others?
2    A. Yes.
3    Q. Who else, to your knowledge, answers the help
4  line?
5    A. I don't know all of their names, but I know
6  legal counsel mans the help line when there's legal
7  questions involved, Merrill Nelson. I'm sure that Randy
8  Austin does the same. I'm sure there's other people who
9  fill in when Mr. Gundry is not available. I don't know
10 their names presently.
11   Q. Do you know what Mr. Gundry's qualifications
12 are?
13   A. I believe I testified, I believe he's a social
14 worker, counselor. I don't know his background more
15 than that.
16     MR. KILMER: While you're hesitating, what is
17 our situation for lunch?
18     MR. KOSNOFF: As soon as you're hungry, Jeff,
19 we're going to break.
20     MR. KILMER: Well, are we going to go into
21 like one or two o'clock before we break or what are we
22 going to do since we got started late?
23     MR. ERNST: He's had a long morning.
24        (Discussion off the record)
25   Q. (By Mr. Kosnoff) With regard to sex abuse

Page 44

1  cases against the church, is it true, Mr. Liddell, that
2  it is the risk management's procedure that when you
3  receive a claim or complaint regarding such a case, that
4  you immediately contact the Kirton McConkie law firm?
5    A. That was a procedure that we employed in the
6  past. We now contact Office of General Counsel if we
7  receive that claim. Generally speaking, they would
8  probably have received that claim before we would.
9    Q. When did that procedure change?
10   A. In the last year or two when Elder Wickman
11 became general counsel for the church.
12   Q. And how long was it that you began the
13 procedure that when a claim or complaint came in, that
14 you immediately contacted the Kirton McConkie law firm?
15   A. With respect to child sexual abuse cases?
16   Q. Yes.
17   A. As long as I can remember since I've been the
18 risk manager for the church and prior to that time.
19   Q. To your knowledge, was that the practice
20 before you came on board as risk manager?
21   A. I have no idea whether there were even any
22 child sexual abuse claims before I came on. There very
23 well might not have been any.
24   Q. I'll take that as a no?
25   A. I think it's an answer that I gave, that I'm

DWAYNE L. LIDDELL - 11/28/00                           SCOTT V FOSTER, et al.

Page 45

1  not sure there were any child sexual abuse claims
2  asserted against the church prior to 1985. If there
3  were, I'm sure that they would have contacted Kirton
4  McConkie who was general counsel for the church at that
5  time.
6      Q. And when you refer cases, and again all my
7  questions are related to sex abuse cases, do you ask
8  Kirton McConkie to investigate the claim?
9      A. It's the same answer I gave last time. Prior
10 to Office of General Counsel, we would have asked them
11 at that time to do that, but that goes back before that
12 time.
13     Q. And are you aware of what Kirton McConkie does
14 when they receive the claim via the Office of General
15 Counsel? Do you know whether they investigate the
16 claim?
17     MR. ERNST: I think you're touching here on a
18 privileged issue, work product, attorney-client. The
19 order says you can ask about the relationship between
20 the office of risk management and the general legal
21 counsel for the church, and I think this arguably comes
22 within that, but I'm not going to allow you to ask
23 questions that touch on the privilege.
24     MR. HILLAS: Dave, I don't think there's any
25 intent to violate a privilege with respect to any actual

Page 46

1  or pending claim, but I would again point out No. 12
2  which allows inquiry into all policies, procedures and
3  practices related to the management of risk.
4      To the extent that Mr. Kosnoff's question is
5  directed to the Kirton and McConkie firm's involvement
6  in a risk management policy, procedure or practice, I
7  think perhaps a general inquiry would be permissible
8  subject to attorney-client privilege or work product
9  doctrine regarding a particular claim.
10     MR. ERNST: I will say, though, that No. 12
11 talks about the procedures within the Mormon Church or
12 its corporate entities, and I think we would agree that
13 the law firm is not a corporate entity.
14     MR. AUSTIN: You point out -- make a good
15 point. At some point, too, you get into, even in
16 general terms, talking about what's your general
17 approach. That may be a matter of legal advice. This
18 is how this ought to be approached potentially. I'm not
19 suggesting we're there, but --
20     MR. HILLAS: Sure. And I think on a question-
21 by-question basis we are sensitive to the privilege that
22 you are entitled to assert.
23     Dave, one clarification, though. At least as
24 I read it, I think that the modification in No. 12 that
25 says within the Mormon Church refers to sexual abuse of

Page 47

1  children, not the practices, but that's maybe a semantic
2  difference.
3      MR. ERNST: Okay.
4      MR. HILLAS: Anyway, why don't we go ahead and
5  see if we can't skirt the privilege.
6      Q. (By Mr. Kosnoff) Just to clarify this issue,
7  is it correct that in other types of cases it's not
8  unusual for your division to investigate a claim?
9      A. Other than child sexual abuse?
10     Q. Yes.
11     A. That's correct.
12     Q. So investigation is a function of risk
13 management?
14     A. It is a function of the Risk Management
15 Division, yes.
16     Q. But with respect to child sex abuse cases that
17 are referred out that end up at the Kirton McConkie law
18 firm, the investigation -- it's expected that the
19 investigation will be done by them, if any. Is that
20 fair to say?
21     A. I believe that's correct, if either them or
22 local counsel are retained to defend the church in that
23 particular action.
24     Q. And risk management in that situation would
25 not undertake to conduct any investigation of the child

Page 48

1  sex abuse claim?
2      A. That's correct.
3      Q. And that is the practice, is it not, even when
4  no lawsuit has been filed?
5      A. Where a claim has been asserted --
6      Q. Yes.
7      A. -- alleging child sexual abuse?
8      Q. Yes.
9      A. Yes.
10     Q. Or even in situations where a claim for money
11 has not been expressly made, but it's been brought to
12 the attention of your division that a child has been
13 sexually abused and the church may be implicated in some
14 way.
15     A. I'm not sure that's happened where we have
16 been the recipient of that type of information. That
17 type of information would generally come through the
18 help line.
19     Q. Is it accurate that you developed this method
20 of dealing with these cases when you arrived as director
21 of risk management?
22     MR. ERNST: Objection to the use of the word
23 "method," vague.
24     Q. And by method I mean this method of dealing
25 with child sex abuse cases where they are referred over

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 49

1  to Kirton McConkie or to the Office of General Counsel
2  and then to Kirton McConkie who then undertakes the
3  investigation in handling the file.
4      A. That's been prevalent since I've been there.
5  Whether I'm the one that established that directly or
6  participated in that, I think it's a good way of
7  managing that. I don't really recall whether I'm the
8  direct one or whether that was a practice that we
9  employed.
10     Q. Did you testify that it was you who developed
11 that when you arrived?
12     A. I may have.
13     Q. In West Virginia you were asked who developed
14 that methodology, and you said, "I did when I first
15 arrived."
16     A. Could have.
17     Q. And when you came up with that methodology,
18 did you do that on your own or did you collaborate with
19 others in developing this approach?
20     A. I would have collaborated with Kirton McConkie
21 at that time.
22     Q. Did you confer with church leaders about this
23 approach?
24     A. I could have. I don't recall.
25     Q. Was this approach recommended to you by anyone

Page 50

1  or did you come up with the idea entirely by yourself?
2      A. I don't recall.
3      Q. And what was the reason that you came up with
4  this method of dealing with these particular types of
5  claims, child sex abuse claims?
6      A. To maintain confidentiality was one of the
7  overriding factors.
8      Q. And is it your view that this method has been
9  an effective strategy for dealing with sex abuse claims?
10     A. Yes.
11         MR. ERNST: What do you mean, a legal
12 strategy?
13     Q. A risk management strategy.
14     A. Yes.
15     Q. And is it also true that this strategy for
16 dealing with child sex abuse matters has been approved
17 by the highest leadership of the church?
18     A. Say that question again, please.
19     Q. Is it true that this effective strategy for
20 dealing with child sex abuse matters has been approved
21 by the leadership of the church?
22     A. I would assume they have when they asked Elder
23 Wickman to be general counsel and the practice remains.
24     Q. Could you clarify that last response for me?
25     A. Simply that he reports to the first presidency

Page 51

1  and we're continuing in this same tradition of handling
2  these types of claims. I have not discussed it directly
3  with them. I assume they would be aware of that and
4  concur with it.
5          MR. KOSNOFF: Lunchtime, Jeff.
6              (Lunch Break: 11:54 a.m.)

Page 52

1  Tuesday, November 28, 2000
2  1:03 p.m.
3
4              EXAMINATION
5  BY-MR. KOSNOFF (Cont.):
6      Q. Previously, Mr. Liddell, you testified
7  that child sex abuse matters, if they come in to your
8  office, are referred out to the Office of General
9  Counsel. And I believe you said that one of the reasons
10 that you -- or a reason that you use this methodology is
11 to maintain the confidentiality of those claims. Is
12 that correct?
13     A. Yes.
14     Q. What did you mean by maintaining the
15 confidentiality of those claims?
16     A. Maintaining, because legal counsel would have
17 privilege. The confidentiality could be assured for
18 victims, for others that may surface in those types of
19 claims.
20     Q. I'd like to clarify that response.
21         Is it your understanding or is it the belief
22 or position of your office that when claims are turned
23 over to the Office of General Counsel or to Kirton
24 McConkie, that whatever happens thereafter in connection
25 with those claims are enshrouded in attorney-client

IBA, SYMONDS & DUNN (503) 224-4438

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

**Page 53**

1  privilege and the work product rule?
2      A. I think part of that is true. I'm more
3  concerned about maintaining confidentiality of the
4  potential victims or others involved in that. I know
5  that Office of General Counsel and Kirton McConkle are
6  very diligent to ensure that that happens. I know that
7  they're very professional in their approach in handling
8  these types of matters and well experienced. Therefore,
9  we have confidence that these confidentialities will be
10  maintained.
11      Q. Is it your intent or belief that any documents
12  or recorded information regarding these matters can be
13  withheld from disclosure because they're not in your
14  possession?
15      A. That would be a legal determination, I'm sure.
16      Q. What is your belief or understanding?
17      A. I believe that my conversations with legal
18  counsel on these matters would be deemed privileged and
19  confidential. I'm not sure about documents that would
20  be discovered in the ordinary pendency of litigation.
21  I'm not an attorney.
22      Q. Are you saying then that any documents or
23  recorded information that may have been developed or
24  kept at the offices of Kirton McConkle in connection
25  with their investigation, it would not be incumbent upon

**Page 54**

1  you to disclose if a legal request was made to you to
2  disclose that information?
3      MR. ERNST: I'm going to object. I think he's
4  answered and these are legal issues and these certainly
5  are not -- this is not covered in the order at all.
6      Q. Go ahead and answer.
7      MR. ERNST: Go ahead and answer this question,
8  then I'd like you to move on.
9      A. If I understand the question correctly, I
10  believe that my discussions with Kirton McConkle would
11  certainly be privileged and confidential. Anything they
12  develop in connection with their investigations or
13  otherwise, if a court determined that that was work
14  product, it would be my belief that that would also be
15  privileged and confidential.
16      Q. And is it your thinking as part of your
17  strategy that this information can be shielded from
18  disclosure by virtue of this strategy?
19      MR. ERNST: Objection. I'd ask you to move
20  on. This is not covered in any way by the order.
21      MR. KOSNOFF: Yeah, it is, Dave.
22      MR. ERNST: No, it's not.
23      Q. (By Mr. Kosnoff) Go ahead.
24      MR. ERNST: He didn't say it was a strategy.
25      Q. Well, we've talked -- Go ahead and answer the

**Page 55**

1  question.
2      MR. ERNST: Object to the form, the use of the
3  word "strategy."
4      A. I believe, as I've testified, that certainly
5  is one reason, to maintain confidentiality. Other
6  reasons are, these are well-experienced people who have
7  had significant experience in these matters and handle
8  them very professionally and we're satisfied with that.
9      Q. What does their experience and professionalism
10  have to do with ensuring that any information that they
11  learn about a claim is shielded from disclosure?
12      A. Well, they're not going to violate -- they're
13  not going to release that information at will. We're
14  satisfied that they work in a confidential manner to
15  protect the rights of victims and others who may be
16  associated with sexual abuse. That's all I'm referring
17  to with respect to that.
18      Q. With respect to your handling of claims and
19  lawsuits, where a request comes to you in connection
20  with a lawsuit to produce documents associated with
21  claims, do you respond to those requests by examining
22  those documents and records that are in your files?
23      A. Are you talking about sexual abuse claims?
24      Q. Yes.
25      A. Do I respond to those by examining documents

**Page 56**

1  in our files? If requested by legal counsel, yes.
2      Q. And do you also produce relevant documents in
3  the possession of Kirton McConkle?
4      A. Do I produce those?
5      Q. Yes.
6      A. No.
7      Q. Do you do anything to facilitate or attempt to
8  facilitate their production by Kirton McConkle?
9      A. You're talking very generally. If we have
10  discussions and discuss documents that may be in their
11  possession, we may have certain discussions with respect
12  to those.
13      Q. When someone has made a claim against the
14  church in these kinds of cases, sex abuse cases, does
15  anyone in your office make a search of past records for
16  similar incidents that have occurred?
17      A. As a matter of practice or in terms of a
18  specific request?
19      Q. As a matter of practice.
20      A. No.
21      Q. Does anyone in your office make an effort to
22  make any type of findings or conclusions regarding the
23  information that has been gathered regarding a child sex
24  abuse claim?
25      A. As a specific request or as a general

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 57

1  practice?
2      Q. As a general practice.
3      A. No.
4      Q. With respect to specific claims, are any types
5  of findings or conclusions made regarding the
6  information which has been gathered in a child sex abuse
7  claim or lawsuit?
8      A. If legal counsel asks us to perform a certain
9  function, we would honor that request.
10     Q. Does that typically happen?
11     A. No.
12     Q. Are any plans of action or proposals for
13 remedial measures regarding reduction of child sexual
14 abuse incidents involving the church ever prepared by
15 you or your office?
16     A. As such, no. We have reviewed documents as
17 requested, such as the manual Sexual Abuse Help for
18 Ecclesiastical Leaders, and given any input we would
19 have had at that time. In addition, as I've testified
20 before, I sit on the help line committee.
21     Q. You mentioned the Helps for Ecclesiastical
22 Leaders. Would that be Responding to Abuse, Helps for
23 Ecclesiastical Leaders?
24     A. Yes.
25     Q. And you personally reviewed that?

Page 58

1      A. I did.
2      Q. Did you have any proposals for changes,
3  additions, deletions?
4      A. With respect to some grammatical comment is
5  all.
6      Q. And was that publication intended to be part
7  of your risk reduction efforts in this area?
8      A. No.
9      Q. Did it have anything to do with risk
10 reduction, in your opinion?
11     A. Well, certainly it provided ecclesiastical
12 leaders help in fulfilling their callings and
13 responsibilities.
14     Q. Would you call that a plan of action for risk
15 reduction?
16     A. I don't know if I'd use those words, but
17 certainly it's a help to ecclesiastical leaders.
18     Q. Do you consider it to be a remedial measure?
19     MR. ERNST: Object to the form. Sounds like a
20 legal conclusion.
21     Q. Well, what role, if any, does the document
22 Responding to Abuse, Helps for Ecclesiastical Leaders --
23     A. I think it gives them guidelines and counsel
24 on how to respond to those situations as described in
25 that manual.

Page 59

1      Q. And have you evaluated it in terms of its
2  utility in the area of risk reduction?
3      A. As I testified before, I think this is a
4  doctrinal type manual. It provides leaders help. I
5  have talked to some leaders and asked them if it was
6  helpful to them, in that context, but I haven't done any
7  studies or anything to see if there's some correlation
8  between what is said in that manual and what happens in
9  connection with number of claims outstanding or anything
10 of that nature.
11     Q. Why not?
12     A. I didn't think it was appropriate.
13     Q. You didn't think it was appropriate in what
14 sense?
15     A. I believe, as I've testified, this is a
16 document that provides assistance to ecclesiastical
17 leaders. There can be all kinds of things that can have
18 an effect on reduction of sexual abuse-type claims.
19     Q. Assuming this was not a document produced by
20 ecclesiastical leaders for a church, would you regard it
21 as being an adequate tool in any risk reduction program
22 directed at reducing child sex abuse?
23     A. I can't respond to that.
24     MR. ERNST: Just a second. Objection, it's
25 hypothetical.

Page 60

1      MR. KOSNOFF: Granted it's hypothetical, but
2  I'm still entitled to ask hypothetical questions.
3      MR. ERNST: Then I'm objecting to the form of
4  the question.
5      Q. (By Mr. Kosnoff) Go ahead and answer.
6      A. It would be pure conjecture. I have no basis
7  to answer that question.
8      Q. Have you received any training, attended any
9  seminars, read any books regarding the nature of
10 pedophilia?
11     A. I have some knowledge on that. I have not
12 been to any training sessions with respect to that.
13 Over the years I may have read some articles in
14 connection with that.
15     Q. Have you read or done anything to acquaint
16 yourself with any underwriting standards or requirements
17 for churches generally by insurance companies --
18     A. No.
19     Q. -- in the -- Let me finish. In the area of
20 child sex abuse?
21     A. The answer is no.
22     Q. You're not acquainted in any way with any of
23 the underwriting requirements that insurance companies
24 typically require of insureds seeking coverage?
25     A. I have no knowledge on that subject.

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 61

1    Q. Aside from the Helps for Ecclesiastical
2 Leaders, what other documents relevant to the issue of
3 child sex abuse and the reduction of child sex abuse
4 have you reviewed or had input into?
5    A. The Church Handbook of Instructions.
6    Q. Would that be the entire Handbook of
7 Instructions or certain portions?
8    A. It's the entire Handbook of Instructions that
9 I would have had input to. I reviewed that before it
10 was published.
11    Q. It's my understanding that that document
12 was -- that an updated edition was published in 1998?
13    A. Yes.
14    Q. And were there earlier editions that you
15 reviewed?
16    A. No. Well, excuse me.
17    Q. And by reviewed, I mean in your capacity as
18 risk manager.
19    A. Absolutely. In that capacity, I don't recall
20 specifically. I believe I reviewed the '89 edition.
21    Q. To your knowledge, was that the last previous
22 edition?
23    A. I believe so, before the 1998 edition.
24    Q. Mr. Liddell, have you yourself ever served as
25 a bishop or stake president?

Page 62

1    A. I've served as a branch president in a student
2 ward which is the equivalent of being a bishop.
3    Q. And in that capacity, did you have the
4 opportunity at that time to acquaint yourself with the
5 Handbook of Instruction as it existed back then?
6    A. Yes.
7    Q. What chapters in particular did you have input
8 into, if any?
9    A. In the 1998 edition?
10    Q. Yes.
11    A. I reviewed most of the handbook, but in
12 particular the areas dealing with insurance, safety
13 requirements for activities, and scanned the other
14 sections.
15    Q. Did you review Chapter 10 on church
16 discipline?
17    A. I would have looked through that, yes.
18    Q. Did you have any input into what was contained
19 in the '98 edition of that publication?
20    A. No, I did not.
21    Q. Did you make any recommendations regarding the
22 content of Chapter 10?
23    A. No, I did not.
24    Q. Did you see anything in Chapter 10 which
25 caused you concern in your capacity as a risk manager?

Page 63

1    A. No.
2    Q. As risk manager, you have to respond to all
3 types of occurrences, I assume, including things like
4 slip and fall cases?
5    A. Is that a question?
6    Q. Yes.
7    A. Yes.
8    Q. And can you think of an example where, as a
9 result of what you regarded as an abnormally high number
10 of incidents, you took some kind of remedial action or
11 proposed some kind of remedial action that the church
12 take?
13    A. Yes.
14    Q. Can you give me an example?
15    A. Yes, automobile accidents. The church has a
16 large fleet of vehicles. There was a large number of
17 missionary drivers. We have given significant input
18 into safety to help encourage 19 to 21 year olds in
19 missionary callings to drive safely.
20    Q. And has that resulted in some sort of specific
21 plan of action?
22    A. It has resulted in assisting those individuals
23 to become more conscious about their driving efforts.
24    Q. And how is that done?
25    A. Through establishment of accident review

Page 64

1 boards, of development of video presentations, and
2 teaching missionaries to be safer drivers.
3    Q. Does that program have a name?
4    A. It's just the automobile fleet program of the
5 church.
6    Q. And has that remedial program been effective,
7 in your opinion?
8    A. Not significantly.
9    Q. With respect to the church's risk management
10 program related to the handling of child sex abuse
11 cases, do you have an opinion as to whether or not it's
12 effective?
13    A. Yes.
14    Q. And what is that opinion?
15    A. I believe that the procedures that are
16 employed by the ecclesiastical leaders of the church and
17 the individuals who have been helped through that has
18 been a wonderful program.
19    Q. You said in your deposition before in West
20 Virginia, you said that as risk manager for the church,
21 that you thought this was a wonderful way of risk
22 management.
23    A. Absolutely.
24    Q. And has the leadership of the Mormon Church
25 ever expressed to you any dissatisfaction with this

DWAYNE L. LIDDELL - 11/28/00                          SCOTT V FOSTER, et al.

**Page 65**

1  method of risk management?
2      A. No.
3      Q. In that West Virginia case --
4              (EXHIBIT 6, MARKED)
5      Q. Looking at Exhibit No. 6, Mr. Liddell, this
6  document, do you recognize it?
7      A. Yes.
8      Q. This appears to be a true and correct copy of
9  deposition Exhibit No. 2 in the Dwayne Liddell
10  deposition of October 11, 1999; is that correct?
11     A. I believe it was an exhibit to my deposition,
12  as I recall.
13     Q. And it was an amended request for designation
14  of witnesses that you were asked to review prior to your
15  deposition. Do you recall that?
16     A. I believe so.
17     Q. And in your deposition you testified that you
18  had reviewed it and that with respect to the first 32
19  items, you were acquainted with those items.
20         MR. ERNST: What number are we on for the
21  order on this because this is talking about specific
22  cases. She's made -- The judge made it very clear she's
23  not going to let you do that.
24         MR. KOSNOFF: I think I'll meet your objection
25  here in a second.

**Page 66**

1          MR. ERNST: All right.
2      Q. (By Mr. Kosnoff) Do you recall indicating that
3  you recognized the first 32 but you didn't recognize the
4  remaining items on the list?
5      A. I don't think that was my testimony. I think
6  I said I recognized the first 32 and there were a couple
7  of others in here that I had some knowledge on, as I
8  recall my testimony at that time.
9      Q. With the remaining number, the numbers 33
10  through I guess 101, you indicated that you had some
11  familiarity with a few of those?
12     A. No, I believe there was two of those that I
13  had some knowledge of individuals there were mentioned in
14  there, I believe. I believe, as I testified, and I
15  don't remember the exact testimony, but as I testified,
16  I had no knowledge of any of these.
17     Q. And the first 32 you recognized as being
18  lawsuits or claims, child sex abuse claims, that have
19  been brought against the church?
20     A. The church or one of the other affiliated
21  legal entities, I believe.
22     Q. My question is, with respect to the items that
23  you testified back then in October of '99 that you
24  didn't recognize or didn't have any familiarity with,
25  have you or your office since gone back and acquainted

**Page 67**

1  yourself with any of these other matters?
2          MR. ERNST: See, you haven't met my objection
3  yet. This is not covered in this order.
4          MR. KOSNOFF: I think again it goes to --
5          MR. ERNST: To what?
6          MR. KOSNOFF: To their practices, risk
7  management practices.
8          MR. ERNST: I disagree. The risk management
9  practices by looking at a list of alleged claims or
10  contentions in another case? The judge said I need --
11         MR. KOSNOFF: Why don't we go off the record
12  for a second.
13             (Discussion off the record)
14         MR. KOSNOFF: David, on this point I'll stop,
15  leave it alone.
16         MR. KILMER: What is your timetable looking
17  like, Tim? Are you going to be most of the afternoon?
18         MR. KOSNOFF: Well, I think that -- I think
19  I'm going to try and finish in an hour.
20     Q. (By Mr. Kosnoff) As risk manager, have you
21  undertaken any examination of the policies of the Mormon
22  Church with respect to its participation in the Boy
23  Scout program?
24         MR. ERNST: Boy, you know, we went over this
25  at some length yesterday. Go ahead. Go ahead.

**Page 68**

1      A. Would you say it one more time? I got
2  distracted.
3          MR. ERNST: Sorry.
4      Q. Have you, as risk manager of your department,
5  examined in any way the policies of the church in
6  relation to its participation in the Boy Scouting
7  program?
8      A. Not as a specific assignment, but we do have a
9  relationship with the Boy Scouts of America. We've had
10  a number of discussions with the Boy Scouts of America
11  over issues of risk management and have an ongoing
12  relationship with them.
13     Q. What has been your relationship as a risk
14  manager with the Boy Scouts of America?
15     A. I have met with some of those people from time
16  to time. We have agreements between us for handling of
17  claims and other kinds of things that result from scout
18  activities, and that's been the subject of most of those
19  meetings.
20     Q. As a result of any of those meetings or
21  communications, has there been or have there been any
22  changes made in church policy?
23     A. With our relationship with the Boy Scouts of
24  America?
25     Q. Yes.

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 69

1    A. No.
2    Q. Has the Risk Management Department ever
3  attempted to utilize any resources either of the
4  Corporation of the Presiding Bishop, the unincorporated
5  association or the Corporation of the President or any
6  other church-related organizations to survey the extent
7  to which child sex abuse is occurring within the
8  membership of the church?
9    A. Has the Risk Management Division?
10   Q. Yes.
11   A. No.
12   Q. Are you aware of any such survey being done by
13 or on behalf of the church by anyone?
14   A. No.
15   Q. It's my understanding that the church and the
16 corporations, that none of them maintain a database or
17 central registry of members or ex-members who have been
18 accused of sexually abusing children. Is that correct?
19   A. I don't know.
20   Q. Are you aware of any such?
21   A. I am not.
22   Q. Have you ever considered or investigated the
23 possibility of maintaining such a database?
24   A. No.
25   Q. Are you acquainted with whether or not the Boy

Page 70

1  Scouts maintain a database of individuals who have been
2  rejected or dismissed as scout leaders as a result of
3  child sex abuse?
4    A. Yes.
5    Q. As a risk manager, what is your opinion of
6  that practice?
7    A. I don't have any opinion with respect to that
8  practice. That's the Boy Scout of America function.
9    Q. Have you ever considered adopting such a
10 system, a database or registry within the Division of
11 Risk Management?
12   A. Have I?
13   Q. Yes.
14   A. No.
15   Q. Have others to you?
16   A. I don't know.
17   Q. Has risk management ever done any type of
18 investigation or survey of local Salt Lake City social
19 workers, police, prosecutors and so forth to determine
20 whether or not the church's reporting policies in the
21 area of child sex abuse are being complied with?
22   A. No.
23   Q. You indicated earlier that you reviewed the
24 Church Handbook of Instructions and that you were
25 acquainted with the chapter on church discipline and

Page 71

1  that you had reviewed it as risk manager. Is that
2  right?
3    A. I may have reviewed it as a risk manager or as
4  a member of the church in an ecclesiastical position. I
5  have reviewed it.
6    Q. What is the relationship between the church's
7  child abuse risk reduction policies and procedures and
8  the church's policies and procedures regarding church
9  discipline?
10   MR. ERNST: I'm going to object to the form.
11 You said child abuse risk reduction procedures and I
12 don't believe there's been any testimony on that term or
13 use so I object to the form.
14   Q. I'll rephrase it.
15   What is the relationship between the efforts
16 of the church to reduce risk with respect to child sex
17 abuse and the church's policies and procedures regarding
18 church discipline?
19   A. They're all ecclesiastical matters that are
20 founded in revelation and Scripture, in doctrine of the
21 church, and in dealing by ecclesiastical leaders with
22 those issues.
23   Q. Do you believe that the church policies are
24 consistent with risk reduction efforts by your division
25 in the area of child sex abuse?

Page 72

1    A. I believe that we offer those under
2  ecclesiastical policies, procedures, church doctrine,
3  tenets, and that's how we manage risk within those
4  doctrinal matters.
5    Q. And my question again is, do you think that
6  they are consistent or do you think that they are
7  inconsistent?
8    A. I'm not sure I understand your question, but
9  that's how we deal, as risk managers, within those
10 purviews, so they would be consistent.
11   MR. KOSNOFF: Let me take a minute.
12             (Break: 1:43-1:50)
13   Q. (By Mr. Kosnoff) I want to go back and just
14 get a couple of clarifications on some things and then I
15 think we'll be close to wrapping up.
16   With respect to risk management services that
17 are provided to the various entities that you provide
18 those risk management services to, do you keep a record
19 within risk management? In other words, if you're
20 providing risk management services to the unincorporated
21 association, is a record kept that separates the
22 unincorporated association out or likewise the other two
23 corporations?
24   A. I'm not sure what you mean is a record kept.
25 A record kept of our services?

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

Page 73

1   Q. Yes. Do you maintain some sort of record that
2   reflects for which entity you provided risk management
3   services and how much?
4       A. I believe I've testified to that, that there
5   is a budget allocation that allocates costs to the
6   various affiliated legal entities, but we do not bill
7   them separately for services rendered, nor do we track
8   that.
9       Q. And that's also true with respect to all
10  claims files?
11      A. You mean all lines of business?
12      Q. Yes.
13      A. That's true.
14      Q. I don't think this is going to field an
15  objection, but do you provide risk management services
16  to other entities other than LDS Social Services,
17  Corporation of the Presiding Bishop, Corporation of the
18  Presidency?
19      A. And the church?
20      Q. And the unincorporated association of the
21  church?
22      A. Yes.
23      Q. What other entities?
24          MR. ERNST: Objection.
25      Q. Again, the question is narrowed to the issue

Page 74

1   of sex abuse, not generally.
2       A. The church operates in a number of
3   jurisdictions throughout the world. In some areas, such
4   as West Virginia, the church operated as a trust. So
5   there are other organizations other than the ones that
6   you've mentioned in your question where we have provided
7   service where the church operates in those areas under
8   another corporate structure or a specific corporate
9   structure that's developed that's not the Corporation of
10  the President or not the Corporation of the Presiding
11  Bishop but functions similar to those, but would be
12  specifically related to Great Britain or some other
13  place.
14      Q. What is the relationship between those other
15  entities that you provide risk management services to in
16  child sex abuse cases? How are they related to the
17  Corporation of the President or the Corporation of the
18  Presiding Bishop?
19      A. I misunderstood your prior question. You said
20  we provide child sexual abuse risk management services?
21      Q. Yes.
22      A. So it wasn't a general question as to
23  everything.
24          MR. ERNST: No.
25      A. Is that correct?

Page 75

1       Q. Correct.
2       A. They would be only those entities which may be
3   part of a claim against such entities, and we perform
4   those in the same manner as we do for the Corporation of
5   the President, Corporation of the Presiding Bishop or
6   the Church of Jesus Christ of Latter-Day Saints, an
7   unincorporated association.
8       Q. It's my understanding that with respect to
9   members of the church who are called to serve in
10  positions working with children, such as scouting,
11  primary programs, so forth, that it is not the practice
12  of the church to use a screening form or -- and by that
13  I mean a form in which the individual is asked to self-
14  disclose information about their background and possible
15  prior accusations of child sex abuse. Is that correct?
16      A. That's correct.
17      Q. As a risk manager, can you tell me why that
18  would not be a best practice for the Mormon Church?
19      A. Because, as I've testified before, this is a
20  church that is founded upon religious tenets. It's
21  governed by ecclesiastical leaders, and that is not part
22  of the program.
23      Q. If I were to ask you the same question with
24  respect to not maintaining a centralized database of
25  members who have been previously accused or disciplined

Page 76

1   for child abuse, would your answer be the same?
2       A. No, because if a member had been disciplined
3   for child abuse, his membership -- his or her membership
4   record would be flagged and that would travel with him
5   until an ecclesiastical leader felt that that flag
6   should be removed.
7       Q. Tell me what you mean by flagged.
8       A. Indicated that if that person moves into a
9   ward or a branch of the church, that then the bishop who
10  received that membership record from where he had
11  transferred from is to call that bishop or
12  ecclesiastical leader, branch president, and ascertain
13  why he should call and the circumstances concerning that
14  for material that he would disclose to him about that
15  individual so that that individual would not be called
16  to serve in a youth calling, for instance.
17      Q. Now, mechanically, does this flag appear on
18  the individual's membership record or is it on a
19  separate document?
20      A. I have no --
21          MR. ERNST: Just a minute. You had a
22  deposition on this point, and I think it's -- it's not
23  covered in this order as well and you had a deposition
24  on this point so you know the answers to these questions
25  so I don't see why you get to ask them again when it's

DWAYNE L. LIDDELL - 11/28/00                    SCOTT V FOSTER, et al.

**Page 77**

1  not even in this order.
2      MR. HILLAS: Well, Dave, I think we're nearing
3  the end, --
4      MR. ERNST: I appreciate that.
5      MR. HILLAS: -- and this is a question
6  directly relating to risk management practice. Whether
7  ecclesiastical or as part of Mr. Liddell's duties, it is
8  involving a practice related to the attempt to reduce
9  incidents of child sex abuse. I think it's a fair
10  question.
11      MR. ERNST: Okay. But I just want to -- See,
12  you're thinking that -- He's taking his authority from
13  ecclesiastical leaders, not making his own authority,
14  and I think that there's a disconnect on that. But go
15  ahead and answer the question.
16      A. Would you repeat it, please?
17      Q. Have you ever seen such a red flag?
18      A. Personally?
19      Q. Yes.
20      A. No.
21      Q. Do you know that they exist?
22      A. Yes. I'm not sure it's a red flag, it's an
23  indication on the membership certificate.
24      Q. And what is your understanding as to which
25  document that notification appears?

**Page 78**

1      A. On that person's membership record.
2      Q. If an individual is excommunicated for child
3  sex abuse and is then rebaptized back into the church,
4  and assuming further that that was a member who, prior
5  to his excommunication, had such a red flag on his
6  membership record, upon rebaptism into the church, do
7  you know whether or not that red flag is wiped from the
8  record or whether it continues to be maintained on the
9  record?
10      MR. ERNST: Just a moment. I'm going to
11  object. Again, this is beyond the scope. He was not
12  designated for this point. You had a deposition on
13  this, and there's no time frame connected with this
14  request so I'll make those objections.
15      Q. Go ahead, Mr. Liddell.
16      A. It's my understanding that that indication
17  stays on the membership record until an ecclesiastical
18  leader determines that it should be removed.
19      Q. And is it your understanding that that's true
20  even if that individual is rebaptized?
21      A. I don't know.
22      Q. Do you have any knowledge as to what criteria
23  are used by the church to determine whether or not that
24  red flag should be removed from a member's membership
25  record?

**Page 79**

1      A. I can only assume if I were bishop how I would
2  process that under the tenets of the church. I would
3  seek inspiration and guidance, I would pray about that,
4  and when I felt it was appropriate, I would remove it.
5      Q. Is it your understanding that it is the
6  bishop's decision whether or not that --
7      A. There are instances that require --
8      Q. Excuse me. Whether that notation should
9  remain on the record or not?
10      A. There are some instances that require approval
11  of the first presidency.
12      Q. And that's in the instance of excommunication?
13      MR. ERNST: You know, all this is covered in
14  the Handbook of Instructions which you've had for at
15  least a year and a half.
16      MR. KOSNOFF: Yeah, you're right, David.
17      MR. ERNST: So of course he might say
18  something that is not totally consistent with every word
19  in there and that would be very unfair.
20      MR. KOSNOFF: Okay. David, you made your
21  point.
22      Q. (By Mr. Kosnoff) To your knowledge,
23  Mr. Liddell, has risk management or anybody connected
24  with handling the child sex abuse claims and lawsuits
25  consulted with anybody from outside the church?

**Page 80**

1      MR. ERNST: On?
2      Q. On improving risk reduction?
3      A. I can only speak for the Risk Management
4  Division. We have not.
5      Q. Whose idea was the help line? Was it yours?
6      A. No.
7      Q. Were you involved with any protocols involving
8  the help line?
9      A. No.
10      Q. Did you have any input into how the help line
11  would be set up or staffed or what its mission would be?
12      A. No.
13      Q. Does the Office of Risk Management receive any
14  information back regarding the frequency of use of the
15  help line?
16      A. No. And by Office of Risk Management, I
17  presume you mean the Risk Management Division.
18      Q. The Risk Management Division. The answer is
19  the same?
20      A. No.
21      Q. Have you or your office ever requested that
22  the data collected through the help line be retained for
23  analysis by your department?
24      A. No.
25      Q. The committee that you said meets every two

DWAYNE L. LIDDELL - 11/28/00

SCOTT V FOSTER, et al.

Page 81

1 weeks at Kirton McConkie, are any minutes or documents
2 kept --
3         MR. ERNST:  I would --
4     Q. -- of those meetings?
5         MR. ERNST:  Two things.  That wasn't his
6 testimony.  It wasn't every two weeks and it wasn't at
7 Kirton McConkie.  Go ahead and answer the question.
8     A. I was going to correct that.  I believe I
9 testified it was LDS Social Services.
10     Q. It was held at social services?
11     A. LDS Social Services' office.
12     Q. And not every two weeks, but --
13     A. Generally.
14     Q. Generally every two weeks.
15         Do you keep any minutes or notes or any
16 records of those meetings?
17     A. I do not.
18     Q. Does anybody else in that meeting, to your
19 knowledge?
20     A. Yes.
21     Q. Who?
22     A. Kirton McConkie.
23     Q. And do they retain those or are you given a
24 copy?
25     A. I am not given a copy.

Page 82

1         MR. KOSNOFF:  That's all I have.
2         MR. ERNST:  Can we chat here for just a
3 second?  I think we're about done.
4             (Break:  2:07-2:09)
5         MR. ERNST:  No questions.
6             (DEPOSITION ADJOURNED at 2:09 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 83

1             C E R T I F I C A T E
2
3         I, Debra C. Symonds, a Certified Shorthand
4 Reporter for the State of Oregon, do hereby certify
5 that, DWAYNE L. LIDDELL personally appeared before me at
6 the time and place mentioned in the caption herein; that
7 the witness was by me first duly sworn on oath, and
8 examined upon oral interrogatories propounded by
9 counsel; that said examination, together with the
10 testimony of said witness, was taken down by me in
11 stenotype and thereafter reduced to typewriting; and
12 that the foregoing transcript, Pages 1 to 82, both
13 inclusive, constitutes a full, true and accurate record
14 of said examination of and testimony given by said
15 witness, and of all other oral proceedings had during
16 the taking of said deposition, and of the whole thereof.
17         Witness my hand and stamp at Portland, Oregon,
18 this 11th day of December 2000.
19
20         _____
21         Debra C. Symonds
22         CSR No. 90-0154
23
24
25

IBA, SYMONDS & DUNN (503) 224-4438