UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING, JOHN DOE, R.K., and T.D., | NO.  C04-2338 RSM |
| Plaintiffs, | DECLARATION OF MICHAEL T. PFAU IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL |
| v. | **NOTE ON MOTION CALENDAR: OCTOBER 28, 2005** |
| THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/d/a "MORMON CHURCH"; LDS SOCIAL SERVICES a/d/a LDS FAMILY SERVICES, a Utah corporation, | |
| Defendants. | |

I, Michael T. Pfau am over the age of 18 and am competent to testify as follows:

1.      I am attorney for the Plaintiffs in this case.  I have personal knowledge of the facts and circumstances surround this motion.

2.      Attached as Exhibit A are true and correct copies of the relevant excerpts of the deposition of Randall Borland.

3.      Attached as Exhibit B are true and correct copies of the relevant excerpts of the deposition of Phillip J. Coleman.

DECLARATION OF MICHAEL T. PFAU - 1 of 2
(C04-2338 RSM)
[152167 v3.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

4.      Attached as Exhibit C are true and correct copies of the relevant excerpts of the deposition of Frederick R. Johansen.

4.      Attached as Exhibit D are true and correct copies of the relevant excerpts from the deposition of Lloyd Hale.

5.      On October 6, 2005 I along with my co-counsel Timothy Kosnoff, held a conference with Marcus Nash, attorney for the Church of Latter Day Saints about the issues set forth in this Motion, including the assertion of privilege and instructions not to answer. This discussion was conducted pursuant to FRCP37.


I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT.


DATED at Seattle, Washington this 7th day of October 2005.

_____
Michael T. Pfau


DECLARATION OF MICHAEL T. PFAU - 2 of 2
(C04-2338 RSM)
[152167 v3.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

**GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP**
600 University Street, Suite 2100  ◆  Seattle, Washington  98101-4185
Office (206) 676-7500  ◆  Facsimile (206) 676-7575

# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE,:  No. C04-2338 RSM
                              :  (Judge Ricardo Martinez)
                              :
             Plaintiffs,:
                              :
        -v-                   :
                              :
THE CORPORATION OF THE        :
PRESIDENT OF THE CHURCH OF    :
JESUS CHRIST OF LATTER-DAY    :
SAINTS, a Utah corporation    :
sole, a/k/a "MORMON CHURCH"; :
LDS SOCIAL SERVICES a/k/a     :
LDS FAMILY SERVICES, a Utah   :  Videotaped Deposition of:
corporation,                  :  RANDALL BORLAND
                              :
             Defendants.:

September 20, 2005 - 9:08 a.m.

Location:  Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

Diane W. Flanagan, RPR
Notary Public in and for the State of Utah

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                RANDALL BORLAND

Page 50

1    Q   When you first joined the Kent Second Ward, was
2  Jack Loholt involved in the ward scouting program?
3    A   I'm not sure.  I don't know when the involvement
4  would be.  I don't know -- I don't -- I'm not sure of that.
5    Q   Do you recall whether Jack was involved in
6  scouting before you became bishop?
7    A   Yes.
8    Q   What do you remember about that?
9    A   That he was involved in scouting.
10   Q   What's your -- what's your specific memory of
11 that?
12   A   I remember him helping make canoes which was a big
13 project.  That's -- that's all I specifically remember.  But
14 the involvement would be an involvement.  You're part of the
15 scouting program, but I don't -- I didn't have hands-on
16 personally so...
17   Q   Do you have a recollection of whether, in your
18 opinion, the scout program within the ward was functioning
19 well when you became bishop?
20   A   No, I don't recall that.  I do not recall that.
21   Q   You don't recall having any beliefs or opinions
22 one way or the other about how well or how poorly it was
23 functioning?
24   A   When I became bishop?
25   Q   Yes.

Page 51

1    A   No, I don't recall that.
2    Q   Okay.  Who would have been responsible for making
3  sure that adult volunteers within the scouting program were
4  registered with the Boy Scouts of America?
5    A   That, I would believe, would be the president of
6  the MIA and I -- he would be the one, I would think, that
7  would make sure the forms were filled out.
8    Q   Do you ever recall reviewing or signing any
9  application for registration with the Boy Scouts on behalf
10 of any of the adult volunteers within the program?
11   A   I don't recall that, no, huh-uh (negative).
12   Q   At some point in time when you were a member of
13 the Kent Second Ward, did you become aware of any complaints
14 or concerns that Jack Loholt may be engaging in sexually
15 inappropriate activity?
16       MR. FREY:  Before you answer that question, I want
17 to tell you that you are not to reveal any confidences that
18 you gained in your capacity as bishop.
19   A   Okay.  Would you say that again, please?
20       MR. KOSNOFF:  Could you repeat the question.
21       (The record was read as requested.)
22   A   You said, "May be."  Yes, I did.
23   Q   Now, let's talk first about the period of time
24 before you became bishop.
25   A   Okay.

Page 52

1    Q   Did you become aware of problems in this regard
2  with regard to Jack Loholt during that time period?
3    A   No.
4    Q   Okay.  Now, turning to -- our attention to the --
5  let me back up a second.  We established when you became
6  bishop, we think, approximately in 19 -- February of 1971.  Do you remember when you were
7  excuse me, May of 1971.  Do you remember when you were
8  released as bishop?
9    A   Three years.  Excuse me.  The reason it was short
10 is I wanted to continue with my education.
11   Q   So did you ask to be released?
12   A   I did.
13   Q   And that was for the reason that you wanted to
14 continue your education at BYU?
15   A   Uh-huh (affirmative), yes.
16   Q   Did you -- did you start your -- your education at
17 BYU during the fall term?
18   A   I don't remember.
19   Q   Who succeeded you as bishop of the Kent Second
20 Ward?
21   A   It was one of two, and I'm relatively sure that it
22 was Coleman.  It was Coleman.
23   Q   The same records that we've received, Exhibit
24 No. 1.
25   A   Page 1?

Page 53

1    Q   Page 1 seems to indicate that Philip Coleman was
2  sustained as bishop August 19, 1973.
3    A   Where are we?
4    Q   Go to page 10.
5    A   Oh, 10.  August --
6    Q   -- 19th.
7    A   Okay.
8    Q   And it does seem to indicate on August 19th that
9  Randall K. Borland was released as bishop of the Kent Second
10 Ward.  Do you see that entry?
11   A   I do.
12   Q   Do you have any reason to believe that's not
13 accurate?
14   A   No, because I know I was released.
15   Q   Okay.  But that the date is accurate?
16   A   I -- I'm just going to assume.  I'm not going to
17 question it, but I don't remember that date.
18   Q   Okay.  And it indicates that Philip Coleman was
19 sustained as bishop on the same day.
20   A   Yes.
21   Q   To the best of your recollection, does that entry
22 and that date seem correct to you?
23   A   I don't remember the date at all, but I know
24 that's what transpired.  He succeeded me as bishop.
25   Q   Is it possible that you began Brigham Young

GARCIA & LOVE
801.538.2333

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                          RANDALL BORLAND

**Page 54**

1  University in the fall of 1973 and not in 1975?
2      A   Is it possible?
3      Q   Yes.
4      A   Instead of when?
5      Q   I believe you testified earlier that you thought
6  you came to Utah in 1975 to begin your studies.
7      A   That was a guess, wasn't it?  That was an
8  approximate guess.
9      Q   Yes.
10     A   Yeah, it's possible then.  It's possible, but I
11 don't know, but very possible.
12     Q   Okay.
13     A   That would fall in line.  This is -- in that
14 regard that's helpful.
15     Q   Well, as we get older, we all need these little
16 aids, don't we?
17         So during this approximate three-year time period
18 that you were bishop of the Kent Second Ward, you've
19 indicated that you did receive a complaint regarding
20 sexually inappropriate activity by Jack Loholt.  Correct?
21     MR. FREY:  I'm going to object to the form of the
22 question.  It assumes something that he hasn't testified to.
23         Go ahead.
24     Q   (By MR. KOSNOFF) Did you receive a complaint or
25 report from anybody that Jack Loholt had engaged in sexually

**Page 55**

1  inappropriate activity during the time that you were bishop
2  of the Kent Second Ward?
3      MR. FREY:  Now, again, Bishop, I'm going to
4  caution you that if you learned any of this information in
5  your capacity as a bishop in a confidential communication
6  that you have the privilege not to answer it, in my opinion.
7  Counsel may differ with that, but I would instruct you not
8  to answer it if that's the basis upon which you gained your
9  information.
10     MR. KOSNOFF:  I would like to ask a few foundation
11 questions before he answers that question in light of your
12 instruction to your client.
13     MR. FREY:  Okay.
14     Q   (By MR. KOSNOFF) Assuming the answer to the
15 question is yes, did you receive this communication in your
16 capacity as a clergy person for the Mormon church, that is,
17 in your role as clergy in the Mormon church?
18     MR. FREY:  Object to the --
19     A   That was a hypothetical.  That was hypothetical --
20     MR. FREY:  Excuse me.  I'm going to object to the
21 form of the question.
22         You may answer, though.  Go ahead.  Have her read
23 it back.  Please wait until -- give me a second because I
24 have the right to make objections.
25     THE WITNESS:  I'm sorry.

**Page 56**

1      MR. FREY:  Okay.  Go ahead.
2      (The record was read as requested)
3      A   I'm answering a question based on an assumption?
4      Q   Yes.  I'm not asking you for the content of the
5  communication yet.  I'm asking you questions about the
6  circumstances under which the communication was made.
7      A   Yes.
8      Q   Was the communication made for purposes of
9  pastoral response by you?
10     A   Are we still on an assumption?  Are these
11 questions or -- because you said assuming that the answer
12 was yes.  I've never answered that question yet, and forgive
13 me.  I'm being a little dense here, but I don't know if I'm
14 still answering on an assumption.  Am I saying that right
15 even?
16     Q   Yes, you are.
17     A   Okay.
18     Q   Because the answer yes or no to the question could
19 potentially violate a privilege.  But before you answer that
20 question, I'm asking you questions surrounding that
21 communication.  Okay?  I'm not asking you about what was
22 said or whether the answer to my -- that previous question
23 was yes or no.  I'm just asking you other questions related
24 to the nature of that communication and the surrounding
25 circumstances.

**Page 57**

1      A   Okay.
2      Q   So again my question is:  Was this something that
3  you learned in connection with pastoral counseling within
4  the Church?
5      A   Yes.
6      Q   Was the information that you received something
7  that you are required to keep confidential under the
8  doctrines and teachings of your church?
9      A   Yes.
10     Q   Was the communication that you received something
11 that you in fact kept confidential, that is, that you did
12 not disclose to any other person?
13     A   Let me make sure I understand that.  A
14 communication not disclosed to anybody else?
15     Q   Correct.
16     A   The answer to that question, if I've heard the
17 question correct, is yes or -- let me rephrase it, and then
18 tell you what I thought you said.
19     Q   Go ahead.
20     A   I did not disclose what was said confidentially to
21 me to others.
22     Q   Just so that I'm clear on this, you did not
23 disclose the content of what was said to you by that person
24 to any other person?
25     A   The content of that conversation, that meeting, I

GARCIA & LOVE
801.538.2333

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

Page 58

1 did not.
2 Q Okay.
3 A The best of my recollection.
4 Q Okay. Did you ever make a referral to LDS Social
5 Services for counseling Jack Loholt?
6 A I don't remember. I do not remember that.
7 Q Did you do anything or say anything to anyone else
8 following the communication that you received from this
9 person?
10 A Regarding specifics?
11 Q Anything.
12 A Yes.
13 Q What did you do or say?
14 A I talked --
15 MR. FREY: Again I'm going to caution you that if
16 you took any steps in your capacity as a clergyman and
17 ecclesiastical in accordance with the teachings and beliefs
18 of the LDS religion that you are not obligated to break that
19 confidentiality if in fact you learned that in those
20 circumstances.
21 And for the record, Counsel, what I'm trying to do
22 here is allow you to ask questions without reaching what I
23 believe is a privilege that he has as a bishop to receive
24 information, treat it with confidentiality, and act on it in
25 an ecclesiastical fashion.

Page 59

1 MR. KOSNOFF: Could you identify the source of
2 that privilege.
3 MR. FREY: State v. Martin and the statute, the
4 First Amendment.
5 MR. KOSNOFF: So are you relying on the clergy
6 penitent privilege?
7 MR. FREY: And his First Amendment rights.
8 MR. KOSNOFF: What First Amendment rights are you
9 referring to?
10 MR. FREY: Free exercise rights.
11 MR. KOSNOFF: Specifically what in the free
12 exercise clause are you basing this privilege?
13 MR. FREY: That he has the right to free exercise
14 of religion to be free from the restraint of having a civil
15 court interfere and make him disclose confidential
16 communications. We've been through this. We've briefed it.
17 We've already argued it in the Court of Appeals and won it.
18 MR. KOSNOFF: No. We've --
19 MR. FREY: And that's what I'm doing here.
20 MR. KOSNOFF: No. That was a completely different
21 issue and very different narrow issue than --
22 MR. FREY: And there's a third item involved here
23 that we haven't gotten to yet, but that is the privacy
24 rights of individuals who may be involved, if any. But I'm
25 trying not to interfere with your legitimate discovery area,

Page 60

1 and so I'm trying to be very careful here. And I want you
2 to understand that it's not my purpose here to frustrate
3 your discovery, but I do want him to be careful that he
4 doesn't breach any of the confidentiality that is imposed
5 upon him by his position as a clergyman.
6 So if you can read back the question. Sorry about
7 the speech --
8 MR. KOSNOFF: Well, I -- we have gone through the
9 criteria for the appropriate assertion of the clergy
10 penitent privilege, and that shields him from disclosing the
11 content of privileged communications based upon that
12 statute. My questions now are not directed at the content
13 of that communication. My questions are directed at what he
14 did or said to others following that communication.
15 MR. FREY: But that may very well involve his
16 working in an ecclesiastical capacity and involve
17 conversations with other people that are privileged, and
18 that's my point.
19 MR. KOSNOFF: That -- it's our position that that
20 would not be privileged and that he is required to answer
21 those questions.
22 MR. FREY: Just a second.
23 (Defense counsel confer)
24 MR. FREY: I -- I've made my objection. We
25 disagree. Okay?

Page 61

1 MR. KOSNOFF: Are you directing him not to answer.
2 MR. FREY: No, I'm not. I'm asking him if he can
3 answer without violating -- if he can answer about what he
4 did without violating any confidentiality that I believe he
5 has the right to maintain as a bishop, then he may answer
6 the question.
7 A I believe I can do that. Confidentiality is very
8 important to me. I -- the only reason I even hesitate at
9 all is because of the conversation, and I'm very respectful
10 of both of you. I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt. I had to talk with him.
14 Q And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16 A Yes, sir.
17 Q And what was said?
18 MR. FREY: Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21 A I don't believe I can answer that.
22 Q Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24 A Okay.
25 Q Because there's -- may well be a judge that's

16 (Pages 58 to 61)

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

September 20, 2005                                      RANDALL BORLAND

---

**Page 70**

1  Q  Would you communicate this information to the
2  police?
3  A  Not necessarily, no.
4  Q  Would you communicate it to the local Child
5  Protective Services agency?
6  A  No.
7  Q  Would you attempt to substantiate the accusation
8  yourself?
9  A  I suspect I would, uh-huh (affirmative).
10  Q  How?
11  A  It would depend on the circumstance. It would
12  depend on the people. It would depend on the emotions. It
13  would depend on a gamut of things, a wide range of things
14  that would all focus in on is this legitimate, is this real,
15  or is it just an accusation, is it somebody that's upset
16  with somebody and angry, whatever it might be.
17  Q  Have you ever actually had to conduct such an
18  investigation?
19  A  I'm sorry?
20  Q  Have you ever actually been presented with a
21  scenario like this?
22  A  I'm going to have a difficulty answering that
23  question --
24      MR. FREY: Again, I'm going to instruct you if
25  that's going to cause you -- or require you, pardon me, to

**Page 71**

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3      For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10  communication and to provide spiritual counseling." That's
11  what I'm trying to protect him with.
12      MR. KOSNOFF: That's one of the elements.
13      MR. FREY: Okay. Well --
14      MR. KOSNOFF: They didn't throw out the elements
15  of the statute, and I'm very well-acquainted with State v.
16  Martin.
17  Q  (By MR. KOSNOFF) Let's get back to -- let's get
18  back to Mr. Loholt. You testified earlier that you spoke
19  with Jack Loholt. Are you asserting the privilege with
20  respect to your communication with Jack Loholt regarding any
21  allegations of child sexual abuse?
22  A  As being confidential?
23  Q  Yes.
24  A  Yes.
25  Q  Did you speak with anybody else other than Jack

**Page 72**

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A  No.
4  Q  So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A  I can't speak for Jack Loholt. It was kept within
7  me.
8  Q  Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10  A  What information?
11  Q  Any information that Jack Loholt may have engaged
12  in sexual misconduct with a child.
13      MR. FREY: Again, these communications between you
14  and your counselors are also privileged, but go ahead.
15  A  So the answer -- I guess my answer would be -- is
16  my discussion with my counselors would be confidential. I
17  don't -- I don't remember discussing that with anybody.
18  Q  So you have no recollection of discussing with
19  anybody else?
20  A  I have no recollection of that.
21  Q  Okay.
22  A  That's correct. I do not.
23  Q  Did you remove Jack Loholt from any positions
24  working with youth in the ward while you were bishop?
25  A  Did I remove him?

**Page 73**

1  Q  Yes.
2  A  Released him --
3  Q  Okay.
4  A  -- yes.
5  Q  And what positions did you release him from?
6  A  His responsibility in scouting.
7  Q  Why did you release him?
8      MR. FREY: You can't --
9  A  I can't divulge that.
10  Q  I'm not asking you to reveal any communications.
11  I'm asking you your personal reasons why you released him
12  from scouting.
13      MR. FREY: Same objection. You're entitled to
14  claim the privilege.
15      One reveals the other, Counsel.
16  Q  (By MR. FREY) Isn't it a fact that you removed
17  Jack Loholt from scouting because you knew that he presented
18  a danger to boys of sexual abuse?
19  A  I -- I am not going to answer that.
20  Q  Did anybody ask you why you were releasing Jack
21  Loholt from scouting?
22  A  Nobody asked me why I was releasing him that I can
23  remember.
24  Q  Did you make any announcement to members of the
25  ward, either in a general meeting or in meetings of any

19 (Pages 70 to 73)

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS

September 20, 2005

RANDALL BORLAND

---

Page 78

1    Q   Okay.  After you removed Jack Loholt from
2 positions working with youth in the ward, did you ever
3 permit Jack Loholt to be alone with your children?
4        MR. FREY:  Object to the form of the question.
5 That isn't what he testified to, Counsel.  You misstated the
6 evidence.
7    A   Permit?
8    Q   Or allow?
9    A   It never happened.  I don't -- there's no permit
10 or allow.  It never happened.
11   Q   Okay.  All right.  So there was never an occasion
12 after you removed Jack Loholt from scouting that your
13 children were ever alone with Jack Loholt?
14   A   Not to my knowledge.
15   Q   Were your children in scouting in the ward?
16   A   Uh-huh (affirmative).
17       THE COURT REPORTER:  Excuse me.  Yes?
18   A   Yes.
19   Q   Were they in scouting in the ward when Jack Loholt
20 was involved in scouting?
21   A   I believe so.
22   Q   How do you know that your children were never
23 alone with Jack Loholt?  And when I say alone, I mean
24 with no other adults present.
25   A   That's why I said not to my knowledge.  I don't

---

Page 79

1 know, but to my knowledge they weren't.
2    Q   Have you ever inquired of your own children
3 whether or not Jack Loholt ever did anything of a sexually
4 inappropriate nature to them?
5    A   I'm not willing to answer that.
6    Q   Whether you did or didn't?
7    A   Yeah, I'm not willing to answer that question
8 because you used the word ever.
9    Q   Okay.  Let me rephrase the question.  At any --
10   A   Actually the answer to that question is:  No, I
11 didn't.  The question you asked, the answer is no.
12   Q   Okay.  You've never spoken to any of your children
13 as to whether Jack Loholt ever did anything of a sexually
14 inappropriate nature to them?
15   A   I have not.  I did not.  I have never asked them
16 that.
17   Q   Have -- and have any of your children ever
18 volunteered to you whether Jack Loholt had ever done
19 anything of a sexually inappropriate nature to them?
20   A   No.
21   Q   After you were released as bishop, is it your
22 recollection that you left Washington for Utah fairly soon
23 after that?
24   A   That's my recollection.
25   Q   And have you resided for any length of time in

---

Page 80

1 Washington state since you left?
2    A   Pardon me.  I went up there for a summer to play
3 baseball.
4    Q   Approximately what year?
5    A   It would be the summer or the second summer, I
6 believe, after we came down here.
7    Q   Were you some kind of semipro baseball player, or
8 was this a recreational --
9    A   This is just a rec -- yeah, just a rec, just to
10 get together.
11       THE VIDEOGRAPHER:  I have 90 seconds.
12   A   But also I had all my family up there, sisters and
13 brothers.
14       MR. NASH:  Did you hear, he has 90 seconds?
15   Q   (By MR. KOSNOFF) All right.  So I take it by your
16 answer this was recreational baseball, and it wasn't in any
17 professional capacity?
18   A   No, it was not professional.
19       MR. KOSNOFF:  Okay.  Why don't we take our break
20 so the court reporter (sic.) can change tapes.
21       (Recess taken 11:16 a.m. to 11:27 a.m.)
22       THE VIDEOGRAPHER:  This is tape No. 3 of the
23 deposition of Bishop Randall Borland.  The time is 11:27.
24   Q   (By MR. KOSNOFF) Bishop Borland, just to tie up a
25 few loose ends, I want to go back and identify the date, if

---

Page 81

1 we can, when Jack Loholt was released by you as assistant
2 scoutmaster of the Kent Second Ward.  If you would turn to
3 page 5 of Exhibit 1.  That is the numbered page 5.
4    A   Okay.
5    Q   If you go to February 6, 1972, the entry indicates
6 Jack Loholt was released as assistant scoutmaster on that
7 day?
8    A   Yes, that's what it says.  I don't remember the
9 dates.
10   Q   Okay.  But is that consistent with your general
11 recollection as to when you released Jack from the scouting
12 program?
13   A   Yes.
14   Q   And without disclosing the communication, was it
15 fairly quickly after you received information regarding Jack
16 Loholt?
17   A   Are you asking if that's my memory?
18   Q   Yes.
19   A   Yes, uh-huh (affirmative).
20   Q   And is it -- is it your testimony that you never
21 spoke to the scoutmaster, why you were releasing his
22 assistant scoutmaster?
23   A   That's correct.
24   Q   And you never told your first or second counselor
25 the reasons why you were taking that action?

---

21 (Pages 78 to 81)

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                                    RANDALL BORLAND

---

Page 82

1    A   I don't believe I did, huh-uh (negative). I
2  didn't divulge that, no.
3    Q   And nobody questioned you why you did that?
4    A   To my knowledge, no. But maybe said, What are you
5  doing this for? I don't remember that, though. I don't
6  remember anybody questioning.
7    Q   Did Jack Loholt argue or resist in any way your
8  decision to remove him as assistant scoutmaster?
9      MR. FREY: I'm going to object to the question
10 because it calls for him to reveal what Jack Loholt may or
11 may have not said to him in his capacity as clergy.
12   Q   (By MR. KOSNOFF) Did Jack Loholt appear to accept
13 your decision releasing him?
14     MR. FREY: Same objection. Instruct the witness
15 he does not have to answer if it requires him to divulge
16 information he learned in any communication which was
17 privileged.
18   Q   (By MR. KOSNOFF) Go ahead. I think you can answer
19 that.
20     THE WITNESS: Can I answer?
21     MR. FREY: Well, I'm just telling you --
22   Q   (By MR. KOSNOFF) My question was how he appeared.
23 Did his appearance and general demeanor seem to be one of
24 acceptance of your decision?
25   A   He accepted my decision.

---

Page 83

1    Q   Did you -- tell me everything you did to make sure
2  that Jack Loholt, notwithstanding the fact that you had
3  released him as assistant scoutmaster, was not continuing to
4  work in the scouting program?
5    A   I can't remember. I can't remember.
6    Q   Did you ever attend any scout meetings after you
7  released Jack Loholt to determine whether or not he was
8  attending those meetings?
9    A   To determine if he was attending them?
10   Q   Yes.
11   A   I can't remember doing so.
12   Q   Were you aware of where Jack Loholt was living
13 when you released him as assistant scoutmaster?
14   A   I'm not sure of that. I can't remember
15 specifically where he was, no.
16   Q   Do you have any recollection of him living at the
17 Allenbach compound?
18   A   The what?
19   Q   The property where the Allenbach -- the Herman
20 Allenbach family lived.
21   A   I seem to recollect him being there. If he lived
22 there or not, I don't remember that. I do not remember
23 that.
24   Q   Do you remember being aware of whether or not Jack
25 Loholt had a relationship with Herman Allenbach?

---

Page 84

1    A   What does relationship mean?
2    Q   A business relationship.
3    A   He might have worked on his dentist office one
4  time. I can't remember that. I don't remember that for
5  sure.
6    Q   You have no recollection of a close business
7  association between Dr. Allenbach and Jack Loholt?
8      MR. FREY: Object.
9    A   Business association, no.
10   Q   Do you have any recollection of whether Jack
11 Loholt either lived either on the Allenbach property or in
12 one of Mr. -- or Dr. Allenbach's rental homes?
13   A   I don't have a recollection of that.
14   Q   With respect to the communication that you
15 received to which you've asserted a privilege that resulted
16 in you removing Jack Loholt from scouting, did you -- would
17 the assertion of your privilege be the same if I were to
18 provide you with a written waiver from the person who made
19 that communication authorizing you to specifically talk
20 about that communication with me?
21   A   My confidentiality would remain.
22   Q   Why?
23   A   Maybe I didn't understand your question.
24   Q   My question is: If I was able to give you written
25 authorization from the source of that communication --

---

Page 85

1    A   Oh, from the source? Go ahead. Continue.
2    Q   -- that communication authorizing you to reveal
3  that communication, would you then reveal it to me?
4    A   I'm not sure. Be written and -- it couldn't just
5  be written, it would have to be verbal. I'm not sure. I
6  would have to analyze my thinking on the confidential nature
7  of it all because it seems to me there's more than one
8  person involved.
9    Q   Okay. Are you referring to yourself?
10   A   No.
11   Q   Okay. My -- my question is assuming that the
12 source of the confidential communication to which you've
13 asserted privilege is one individual. The purpose of my
14 question is to determine whether if I were to give you a
15 waiver, written, verbal, from that person that said you are
16 authorized to speak with Mr. Kosnoff about your
17 communication back then, would you then answer my questions
18 about that communication?
19   A   You're talking about a verbal face-to-face along
20 with the written. I don't know. I would really have to --
21 I would really have to analyze my -- my thoughts on that.
22 At this point I just don't know.
23   Q   Well, do you believe that even with a waiver from
24 the person that made the communication that you would not be able to
25 as confidential and privileged that you would not be able to

---

22   (Pages 82 to 85)

0cc34e3d-ad31-4072-a6d8-79f7ac2622c7

**GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP**
600 University Street, Suite 2100 ◆ Seattle, Washington 98101-4185
Office (206) 676-7500 ◆ Facsimile (206) 676-7575

# EXHIBIT B

Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,    )
                                 )
              Plaintiffs,        )
                                 )
        vs.                      )
                                 )
THE CORPORATION OF THE PRESIDENT )
OF THE CHURCH OF JESUS CHRIST OF ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah        )
corporation sole, a/k/a "MORMON  )
CHURCH"; LDS SOCIAL SERVICES a/k/a )
LDS FAMILY SERVICES, a Utah      )
corporation,                     )
                                 )
              Defendants.        )

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square        2208 North 30th Street, Suite 202
600 University St.      Tacoma, WA 98403
Suite 2300              (253) 627-6401
Seattle, WA 98101       (253) 383-4884 Fax
(206) 340-1316          scheduling@byersanderson.com
(800) 649-2034          www.byersanderson.com

25th Anniversary 1980-2005    Original in File

MTP WORKING COPY

Byers & Anderson, Inc.
Court Reporters & Video

Page 45

1   A   I can't infer the second from the earlier, but that
2       was a statement of fact of the position.
3   Q   Okay.
4   A   I don't recall how well Jack was doing or why he was
5       put in the position.
6   Q   He was already in that position when you became
7       bishop?
8   A   I don't recall that either.
9   Q   At some point during the three years that you were
10      bishop, did someone bring to your attention an
11      allegation that Jack LoHolt was sexually molesting
12      boys?
13  A   In the specific, I have to say no to sexually
14      molesting.
15  Q   What about generally?
16  A   In the general to sexually molesting, I have to say
17      no.
18  Q   Did you receive any information of any kind from any
19      person that Jack LoHolt was allegedly engaging in
20      sexually inappropriate activity?
21  A   Yes.
22  Q   From who whom did you learn that?
23              MR. FREY:  I am going to object at this
24      point in time.
25          Let me tell you the basis for the objection.

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 46

1    He was a bishop at the time, and we treat those
2    communications as confidential, and in trying to help
3    you with this answer, I'm not trying to present a
4    roadblock.
5        As an accommodation and because of the fact that
6    the individuals involved have not authorized this
7    information to be given, I think they have a right to
8    privacy in that regard and a right to have it
9    protected.
10        As an accommodation, I'll allow the witness to
11    tell you in a general sense what he heard had
12    happened, and I'm not waiving any privilege by doing
13    that.
14        If you'll accept that, we can go forward.
15        You don't have to accept my objection, but if you
16    want to go forward, I'm willing to do that on this
17    basis.
18        MR. KOSNOFF:  Tom, I would like to take
19    a brief bathroom break and come back and continue
20    this dialogue on that point.
21            (Recess 10:27 to 10:33 a.m.)
22
23        MR. KOSNOFF:  Mr. Frey, this is not
24    unfamiliar ground to the two of us, this point.
25    We've been at similar points in other cases.

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 47

1    From your comments I take that you are making an

2    objection based upon a number of criteria.  One, I

3    think I heard an assertion of the clergy penitent

4    privilege.

5              MR. FREY:  I'll make it simple for you.

6    I'll tell you what the basis for my objection is:

7    one, it's a constitutional objection on the free

8    exercise clause; number two, it may also be on the

9    basis of the priest penitent privilege depending on

10   the circumstances under which he may have heard

11   something; and the third ground is that we've said in

12   our answers to interrogatories I'm not prepared to

13   reveal the names of anybody or have my client reveal

14   the names of anyone who has been molested without

15   that person's consent because I know for a fact, and

16   I've gotten court orders on this, that it can be

17   devastating to have someone knock on their door and

18   say, "I understand you've been abused and I'd like to

19   talk to you about it."

20             For those three reasons-- I am willing to go

21   forward because I know that you have the right to

22   determine knowledge and what they knew and should

23   have known, and I'm willing to let him tell you in a

24   general fashion, and I guess I could proffer this for

25   the record what he can tell you to get you to where

Byers & Anderson, Inc.
Court Reporters & Video

1    you need to go--

2              MR. KOSNOFF:  Before we go there, I

3    think this is important that we establish enough of a

4    factual record here for Judge Martinez so we only

5    have to take one trip up and bring Dr. Coleman back

6    one more time as opposed to two more times, so I

7    would propose that with respect to the assertion of

8    the claimed privileges that you're making, that you

9    take a moment and establish whatever factual basis

10   you would like with Dr. Coleman to support the

11   assertion of those privileges.

12        I'm inviting you to do that because, as you know,

13   it's the proponent of the privilege that carries the

14   burden of establishing it, and I just want to make

15   sure that when this goes up to Judge Martinez, that

16   you've had a full opportunity to make as full an

17   evidentiary record as you need to make your arguments

18   to him.

19              MR. FREY:  It's not my burden.  Under

20   the rule I'm exercising those privileges, and I've

21   enumerated them.

22        If you wish to question the witness, you are free

23   to do that.  If you choose to go to Judge Martinez,

24   I'll be happy to supply whatever additional

25   information I need by way of affidavit or otherwise.

Philip J. Coleman
September 15, 2005

Byers & Anderson, Inc.
Court Reporters & Video

Page 49

1      I've tried to explain to you, and you're free to

2    ask him the circumstances and free to ask him a

3    number of questions, and I think you can get the

4    information that you need without revealing these

5    names.

6          Quite frankly, Tim, I don't want to reveal any

7    names or my client to reveal any names that he may

8    have heard of that are not public right now because I

9    simply don't think it's appropriate.

10     As I've said before, I've gotten court orders

11    restricting that information.

12                    MR. KOSNOFF:  I understand that there

13    are--

14                    MR. FREY:  So you can question him now

15    and ask him--

16                    MR. KOSNOFF:  I just want the record to

17    reflect that I am not unaware of the fact that there

18    are protected limited privacy interests of third

19    parties that the Court has to be mindful of, and it's

20    a weighing of rights and interests that the Court

21    will have to make.

22        Let me go forward with some additional questions

23    so that at least we have some factual record for the

24    Court.

25    Q    (By Mr. Kosnoff)  Dr. Coleman, as I understand

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

**GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP**
600 University Street, Suite 2100  ◆  Seattle, Washington  98101-4185
Office (206) 676-7500  ◆  Facsimile (206) 676-7575

# EXHIBIT C

Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,          )
                                       )
                Plaintiffs,            )
                                       )
        vs.                            )
                                       )
THE CORPORATION OF THE PRESIDENT       )
OF THE CHURCH OF JESUS CHRIST OF       ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah              )
corporation sole, a/k/a "MORMON        )
CHURCH"; LDS SOCIAL SERVICES a/k/a     )
LDS FAMILY SERVICES, a Utah            )
corporation,                           )
                                       )
                Defendants.            )

DEPOSITION OF FREDERICK R. JOHANSEN

September 16, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square      2208 North 30th Street, Suite 202
600 University St.    Tacoma, WA 98403
Suite 2300            (253) 627-6401
Seattle, WA 98101     (253) 383-4884 Fax
(206) 340-1316        scheduling@byersanderson.com
(800) 649-2034        www.byersanderson.com

25th Anniversary 1980-2005

Frederick R. Johansen
September 16, 2005

2e928ba7-0237-4029-b58e-63406e5d5e8d

Byers & Anderson, Inc.
Court Reporters & Video

Page 29

1   Q   For the purposes of this question, I would like you

2       to refer to the definition of sexual contact if you

3       have any question about the definition, but during

4       your time as a bishop did you ever come to learn any

5       information about Jack LoHolt having sexual contact

6       as it's defined there in Exhibit No. 1, with any

7       children under the age of 18?

8                   MR. FREY:  Before you answer that, I am

9       going to claim privilege if he learned it in any

10      context in which he had a member of the ward coming

11      to him in his capacity as a bishop, either in a

12      confessional sense or in a sense of spiritual

13      counseling with him.

14          If he learned it otherwise, that he just heard a

15      rumor in the ward, he's free to answer that.

16          Do you understand what I'm saying?

17  A   Yes.

18                  MR. FREY:  Then go ahead and answer.

19                  THE WITNESS:  The answer is no.

20  Q   (By Mr. Reich)  "No," meaning you've had no person in

21      any capacity approach you with any information about

22      LoHolt, Jack LoHolt, having sexual contact with

23      children under the age of 18?

24                  MR. FREY:  Again, I'm going to object

25      and instruct the witness not to answer that question

Frederick R. Johansen
September 16, 2005

2e928ba7-0237-4029-b58e-63406e5d5e8d

Byers & Anderson, Inc.
Court Reporters & Video

Page 30

1    with regard to anyone who came to see him in his

2    capacity as a bishop.

3            Other than that, he can answer, and I think he

4    has.

5                    MR. REICH:  Well, I want to explore that

6    because I'm not satisfied that there has been any

7    foundation yet for asserting that as a privilege.

8        I don't know whether he has learned of any

9    information.  I am asking whether he has learned from

10   any source, any information-- I am not asking what

11   was stated in a confessional or what setting.

12   Q   (By Mr. Reich)  I just want to know whether at any

13       point in time you learned while you were bishop that

14       LoHolt had had sexual contact with children under the

15       age of 18.

16                   MR. FREY:  I am making the same

17   objection.  You can go ahead and answer within the

18   confines that I told you.

19                   THE WITNESS:  The answer is no.

20   Q   (By Mr. Reich)  For the purposes of this question

21       then, have you heard from any source while you were a

22       bishop-- while you were bishop of the 2nd Ward have

23       you heard from any source whether Jack LoHolt engaged

24       in sexual intercourse as is defined in Exhibit No. 1

25       with a child under the age of 18?

Frederick R. Johansen
September 16, 2005

2e928ba7-0237-4029-b58e-63406e5d5e8d

Byers & Anderson, Inc.
Court Reporters & Video

Page 36

1    A    Oh, yes.

2         It's the Kent 2nd.

3    Q    I am not doing that intentionally.

4         Were you ever made aware of any counseling that

5         Jack LoHolt was receiving at any time that you were

6         at the Kent 2nd Ward?

7    A    No.

8    Q    Have you ever had discussions with any others in the

9         church hierarchy, meaning other bishops, stake

10        presidents, area presidents, regarding Jack LoHolt?

11                  MR. FREY:  Before you answer that, if

12        you had discussions with them in your capacity as a

13        bishop, in your ecclesiastical capacity concerning

14        Jack LoHolt, then that's protected in my opinion, and

15        I instruct you not to answer.

16        If you had discussions outside of that, then you

17        should answer Counsel's question.

18                  THE WITNESS:  The answer is no.

19   Q    (By Mr. Reich)  The question wasn't as specific as

20        the objection was.

21        The question was:  Did you ever have any

22        conversations with anyone about Jack LoHolt that was

23        within the hierarchy of the church, not the substance

24        of the conversation, but have you ever had a

25        conversation with anyone, including the other

Frederick R. Johansen
September 16, 2005

2e928ba7-0237-4029-b58e-63406e5d5e8d

**GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP**
600 University Street, Suite 2100 ◆ Seattle, Washington 98101-4185
Office (206) 676-7500 ◆ Facsimile (206) 676-7575

# EXHIBIT D

| Page 1 | Page 3 |
|---|---|

**Page 1**

1   IN THE CIRCUIT COURT OF THE STATE OF OREGON

2                FOR THE COUNTY OF MULTNOMAH

3

4   JEREMIAH SCOTT,              )

5           Plaintiff,      )

6      vs               )  No. 98-12-08640

7   GREGORY LEE FOSTER, an        )

8   individual; THE CHURCH OF     )

9   JESUS CHRIST OF LATTER-DAY    )

10  SAINTS, an unincorporated     )

11  association, aka, the "Mormon )

12  Church," THE CORPORATION OF   )

13  THE PRESIDENT OF THE CHURCH OF )

14  JESUS CHRIST OF LATTER-DAY    )

15  SAINTS, a Utah corporation sole,)

16  CORPORATION OF THE PRESIDING  )

17  BISHOP OF THE CHURCH OF JESUS )

18  CHRIST OF LATTER-DAY SAINTS,  )

19  a Utah corporation sole,      )

20         Defendants.      )

21

22           DEPOSITION OF LLOYD DEAN HALE, MD

23           Taken in behalf of the Plaintiff

24

25           Thursday, October 28, 1999

**Page 3**

1     BE IT REMEMBERED THAT, the deposition of LLOYD

2   DEAN HALE, MD was taken before Debra C. Symonds,

3   Registered Professional Reporter and Certified Shorthand

4   Reporter for the State of Oregon, on Thursday, October

5   28, 1999, commencing at the hour of 9:15 a.m., in the

6   Conference Room of the law firm of Dunn, Carney, Allen,

7   Higgins & Tongue, 651 SW Sixth Avenue, Suite 1500, in

8   the City of Portland, County of Multnomah, State of

9   Oregon.

10                   -:-

11              APPEARANCES:

12  DUNN, CARNEY, ALLEN, HIGGINS & TONGUE

13     By Gary E. Rhoades

14        and

15     Tim Kosnoff and Joel Salmi

16        Attorneys at Law

17        Appearing in behalf of the Plaintiff

18  BULLIVANT, HOUSER, BAILEY

19     By David A. Ernst

20     Attorney at Law

21        Appearing in behalf of the Church Defendants

22  KILMER, VORHEES & LAURICK

23     By Jeffrey M. Kilmer

24     Attorney at Law

25        Appearing in behalf of Defendant Foster

**Page 2**

| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Curriculum Vitae |
| 2 | Section 10, Church Discipline - Bates Nos. 0010-0022 |
| 3 | The Salt Lake Tribune - Excerpts of the Interview with LDS Church Officials |
| 4 | Child Abuse - Helps for Ecclesiastical Leaders - Bates Nos. 0118-0147 and 0104-0117 |

(Exhibits attached hereto)

**Page 4**

1              LLOYD DEAN HALE, MD

2   was thereupon produced as a witness in behalf of the

3   Plaintiff and, having been first duly sworn on oath, was

4   examined and testified as follows:

5

6              EXAMINATION

7   BY-MR. SALMI:

8      Q.  Dr. Hale, please state your full name and

9   address for the record.

10     A.  It's Lloyd, L L O Y D, Dean Hale, H A L E.  I

11  live at West Linn.  4950 Summit Street, West Linn,

12  that's Oregon, 97068.

13     Q.  Dr. Hale, again, I'm Joel Salmi and I

14  represent Jeremiah Scott in his lawsuit against Bishop

15  Foster and the church defendants, I'll call them.  We're

16  going to talk about how to designate the church in this

17  deposition in a minute, but I wanted to explain to you,

18  you've had an opportunity to talk to your attorney today

19  or previously about the procedure involved in a

20  deposition?

21     A.  Yes.

22     Q.  And you understand that when you give

23  responses to the court reporter, they need to be audible

24  responses rather than shaking your head or nodding?

25     A.  Yes.

Page 41

1  consider to be a confession.
2       MR. SALMI:  Well, Jeff, that was my question,
3  actually, so if this is an inaccurate statement of
4  doctrine, he can tell me.  I don't see that that's
5  legitimate.
6       MR. KILMER:  Your question was not a question.
7  Your question was, if they don't intend, in some
8  subjective way apparently, it to be confidential, then
9  it isn't a confession.
10      MR. SALMI:  And that's what I was asking him.
11      MR. KILMER:  No, that wasn't a question, that
12 was a statement, and I am objecting --
13      MR. SALMI:  I asked him to verify whether
14 that's true or not, and that's a question.  And I
15 understand, your objection is noted.  I don't think it's
16 a valid objection, but it's noted.
17      MR. KILMER:  Well, it's very valid in this
18 case.
19      Q.  (By Mr. Salmi) Let me rephrase that.  Let me
20 give you an example.  If a member reports to the bishop
21 of a church that their child has been molested by
22 another member of the church, do you consider that a
23 confession?
24      A.  No, because I consider that the member
25 reporting an incident.

Page 42

1       Q.  And in particular, if that member, when they
2  report this alleged molestation, ask you to do something
3  about it, that's not a confession, is it?
4       A.  No.
5       Q.  Assuming that we have a confession that's a
6  legitimate, valid confession given to a bishop, are
7  there any circumstances under which a bishop is
8  authorized to disclose that confession to anyone else?
9       MR. ERNST:  I'm going to object to the form on
10 the use of the word "valid confession."  I don't know
11 what that means.
12      MR. KILMER:  And I object on the further
13 ground that "anyone else" needs to be qualified as
14 opposed to inside and outside of certain church
15 doctrines or church hierarchy of authority.
16      A.  Can you restate it for me, please?
17      Q.  Yes.  Under any circumstances, is a bishop in
18 the church authorized to disclose confessions to anyone
19 other than the person who confessed to them?
20      A.  I believe he is not privileged to do that
21 unless the person gives their consent for him to discuss
22 it with another person who would only be the stake
23 president.
24      Q.  So unless the confessor consents, the bishop
25 cannot disclose that confession to anyone else.  Is that

Page 43

1  your testimony?
2       A.  That's my understanding, yes.
3       Q.  As a practical matter, in your experience, do
4  you know bishops who share confessions that they've
5  received with members of their bishopric?
6       A.  No, I do not.
7       Q.  How about sharing those confessions with the
8  stake president of the stake over which -- or in which
9  their ward is located?
10      A.  I believe bishops ask the individual or tell
11 the individual I need to discuss that or you will need
12 to discuss that with the stake president.  And in many
13 cases they will call me and say a person needs to talk
14 to you, and they don't share it unless the person has
15 told them it's okay and they feel there's a need to
16 prepare me, in a sense, but that's all.
17      Q.  Under church policy, are children allowed to
18 give confessions?
19      A.  I believe any member who wishes can talk to
20 the bishop and tell them about personal matters.  And it
21 wouldn't necessarily be a confession, it would be
22 anything the person felt was confidential.  They can
23 talk to their bishop in that sense.
24      Q.  But now I'm asking about a confession in
25 particular, and let's say of a major transgression.

Page 44

1  Would that confession of a child have the same standing
2  as a confession of any other member of the church?
3       MR. ERNST:  Just a minute.  I do want to ask
4  for a clarification, Joel.
5       MR. SALMI:  Sure.
6       MR. ERNST:  Are you talking about confessions
7  as a subset specifically of a specific kind of
8  confidential information?  Because he's telling you
9  people are bringing him confidential information, but
10 you're talking about a confession.
11      MR. SALMI:  I'm talking only about
12 confessions.
13      MR. ERNST:  Do you understand that?
14      THE WITNESS:  Okay.
15      Q.  (By Mr. Salmi) Yeah, I'm talking only about
16 confessions, not just about something -- you know, some
17 private conversation you have with a member.  But if
18 someone -- if a child comes and confesses, is that
19 considered a confession that has the same protection of
20 confidentiality as any other confession in the Mormon
21 church?
22      A.  Yes.
23      Q.  So if a child confesses to a major
24 transgression to a bishop, that bishop is not authorized
25 to inform the parents of that unless the child consents?

Page 45

1    A. That is my understanding.
2    Q. Disciplinary proceedings can be instituted
3  based upon confessions, can they not?
4    A. Yes.
5    Q. And that can be done even if the confessor
6  does not consent to further disclosure of that
7  confession; isn't that correct?
8    A. Yes.
9    Q. And are members advised when they confess to a
10  major transgression that a disciplinary proceeding could
11  be instituted based on that confession?
12    A. Yes.
13    Q. When such a confession is made, are they
14  advised what is entailed in a disciplinary proceeding?
15    A. That would depend on the bishop's style, but
16  if it's a realistic probability, he probably would.
17    Q. And we're going to talk about the nature of
18  disciplinary proceedings a little bit later, but your
19  understanding is that they would advise them not just
20  that discipline is going to be instituted but here's
21  what it's comprised of and describe it in some sense?
22    A. But probably -- maybe not at the time of the
23  confession. Sometimes there's a visit or two or three
24  before we get to that level of how are we going to
25  handle this.

Page 46

1    Q. So someone -- a member comes and confesses a
2  major transgression to a bishop, there's a conversation
3  about it, and maybe they come back two or three times in
4  their follow-up meetings with the bishop. That happens?
5    A. Yes.
6    Q. And then there would be a decision if the
7  bishop, for example, decides that there isn't progress
8  being made on taking care of this that a disciplinary
9  proceeding would be instituted?
10    A. That can happen that way, yes, provided he
11  discusses it with the stake president. That is, just
12  that there needs to be a council.
13    Q. I want to make reference to Exhibit 2 again,
14  which you have in front of you, and this would be at
15  Page 0011, which is I believe the second page of your
16  document. At the bottom of the left-hand column, the
17  last full paragraph, Subsection 2 reads, "Predators may
18  need to be identified to protect possible future
19  victims."
20    A. Uh-huh (affirmative response).
21    Q. Take your time and read that whole paragraph.
22  I won't read it into the record because it's part of the
23  record.
24    A. (Pause; referring). Okay.
25    Q. Now, this is under the section of the handbook

Page 47

1  entitled Confessions and Confidentiality. If someone
2  confesses to sexual molestation of children, to the
3  extent that you would consider them a predator, how are
4  they identified to protect possible future victims?
5    A. If a member confesses that type of
6  transgression, they are encouraged to report themselves
7  to local authorities, to take responsibility for their
8  action to the full extent of the law. So first the
9  member is encouraged to do so.
10      If a member chose not to do so, then -- and if
11  a disciplinary council was held, then the action of that
12  council would be used to inform those who might be
13  considered ones that should know that such as a bishop.
14  Even in the general priesthood session or in the adult
15  relief society session, if a person was a predator and
16  there could be victims, then they -- there would be a --
17  at least a general statement regarding the protection or
18  the watching, but the details of the person's
19  transgression would not be disclosed without their
20  permission.
21    Q. In the case of a sexual predator, would there
22  be a disclosure that they were a sexual predator?
23    A. With their permission, it could happen. I
24  have never seen that happen. Without their permission,
25  I do not know exactly how it would be handled. I would

Page 48

1  have to think that one through and perhaps even talk to
2  someone about -- other stake presidents, someone who has
3  experience in that area.
4    Q. You do not have personal experience in that
5  area?
6    A. Not as a predator.
7    Q. What about with someone who has confessed to a
8  major transgression of molesting children?
9    A. I have experience there.
10    Q. And do you have experience with that occurring
11  where a disciplinary council has been convened?
12    A. Yes.
13    Q. And what was the -- I just want to follow up
14  with this one example. What was the consequence or the
15  conclusion of the disciplinary council? What decision
16  did they reach?
17    MR. ERNST: You know, here I'm concerned that
18  we're getting into areas that are privileged. I'm not
19  going to let him talk about deliberations or conclusions
20  of actual disciplinary councils. I just don't think
21  that's going to be allowed by the judge.
22    MR. SALMI: Counsel, without identifying
23  anyone involved in the process, I don't see how that
24  could possibly violate any confidentiality, privacy or
25  anything else.

Page 113

1    agrees that it is.
2         MR. ERNST: No, it's not.
3    Q. (By Mr. Salmi) So given that example, you said
4    that first the bishop would try to get the person to
5    report themselves, to turn themselves in, then they
6    would try to get the person who gave them the initial
7    information to turn them in.
8    A. Right.
9    Q. Why wouldn't the bishop simply turn them in?
10        MR. ERNST: Object to the form. You've
11   assumed that somebody who is not the molester can't give
12   confidential information. That was my objection.
13        MR. KILMER: And it was a good one.
14        MR. ERNST: Thank you. You assume that a
15   molester is the only one who can give confidential
16   information. Object to the form.
17   A. The bishop would have learned this secondhand
18   from the individual who came to him. I think it would
19   be better if the individual who learned this or knew
20   this themselves went to children's services or to the
21   police department. There's no reason the bishop could
22   not do it, but -- and he may do it, but if someone else
23   makes the report who knows personally, it seems better.
24   Q. And isn't it the policy of the Mormon church
25   that bishops are to attempt to have other people report

Page 114

1    the abuse rather than reporting it themselves?
2    A. Generally that's true because the other person
3    may know more firsthand or immediate information, so
4    yes.
5    Q. Does that hold true with stake presidents as
6    well, that same concept, that they should attempt to get
7    the abuser first to report themselves, and if they
8    can't, then to find somebody else to report the abuse?
9    A. Yes.
10   Q. If the parent of a child in a ward comes to
11   the bishop and says, my child was molested by Brother
12   Smith in our ward and I want you to do something about
13   it, under the policy of the Mormon church, is that
14   considered a confidential communication?
15        MR. ERNST: Thank you.
16   A. Well, that's certainly not a confession but it
17   could be confidential, but I don't believe it would be a
18   protected confidential disclosure.
19   Q. Now, you've made a distinction here between
20   confidential and protected confidential, and I want you
21   to tell me what you mean by that.
22   A. Well, again, if the -- if in the course of the
23   offender confessing to the bishop or if in the course of
24   any meetings such as the disciplinary council any of
25   this information comes out, then the stake president

Page 115

1    would not be able to report it. If he learns about this
2    in another setting where an individual comes to him, he
3    very well may disclose it.
4    Q. And that was the example I gave you. I wasn't
5    raising this in the context of a disciplinary proceeding
6    where the information comes in there, but simply a
7    parent comes to the bishop and says, my child was
8    molested by Brother Smith, --
9    A. Okay.
10   Q. -- do something about it. Is that, under the
11   policy and doctrine of the Mormon church, considered a
12   confidential communication?
13   A. No, I don't believe so.
14   Q. And couldn't, under those circumstances, the
15   bishop go directly to the police and report that?
16   A. He could, and likely would, but he would also
17   encourage that parent to immediately go to the police.
18   Q. And is it the policy of the Mormon church that
19   under those circumstances the bishop would first go to
20   the accused person and confront them with the accusation
21   before reporting it to the police or anyone else?
22   A. If it could be done expeditiously, I believe
23   he would.
24   Q. And when such a confrontation is made, does
25   the Mormon church have any policy to avoid a situation

Page 116

1    where the alleged perpetrator flees the jurisdiction or
2    destroys evidence before they're reported to the police?
3    A. There's no policy on that in that regard.
4    Q. As a bishop, wouldn't you have that concern?
5    If you confronted somebody who had been accused of
6    molesting a child before you reported him to the police,
7    wouldn't you have a concern that they might flee?
8    A. I've not ever seen that happen. These are
9    generally people that live within the ward, I believe,
10   and I don't know that that would be a likely thing to
11   occur. It could happen, but I wouldn't be greatly
12   concerned.
13   Q. And again, under circumstances where someone
14   outside the context of a disciplinary proceeding reports
15   that some other member of the ward has molested their
16   child, under those circumstances, is report of the abuse
17   to law enforcement always made? Is that the policy of
18   the Mormon church?
19        MR. ERNST: I object to the form. It calls
20   for him to speculate.
21   A. I cannot say it always is. Ideally it is.
22   Q. That would be the policy of the church?
23   A. Yes, I believe so.
24   Q. To have it reported?
25   A. Yes, I believe it is.