The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING, JOHN DOE, R.K. and T.D.,<br><br>            Plaintiffs,<br><br>   v.<br><br>CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/k/a "MORMON CHURCH"; LDS SOCIAL SERVICES a/k/a LDS FAMILY SERVICES, a Utah corporation,<br><br>            Defendants. | NO.  04-2338 RSM<br><br>**DECLARATION OF**<br>**MARCUS B. NASH** |

1.      I am Marcus B. Nash, one of the attorneys of record for defendant in the above-captioned matter, and make this declaration on personal knowledge and belief.

2.      On or about October 6, 2005, I met with Mr. Kosnoff and Mr. Pfau to discuss various issues arising in this case.

3.      In our conversation, Mr. Pfau indicated that plaintiffs intended to file a motion to compel Bishop Borland to respond to questions posed in his deposition, and to which he asserted claims of privilege, privacy, and/or confidentiality.

4.      To my memory, there was no discussion regarding Bishops Johansen or Coleman.

5.      At the conclusion of our discussion, I asked plaintiffs' counsel to identify the questions they wished Bishop Boralnd to answer, and indicated that I would review his deposition transcript to re-familiarize myself with the context for the assertion of the privilege.

DECLARATION OF
MARCUS B. NASH - 1
7566-023128 36424

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

1    6.    Before I had the opportunity to complete a review of his deposition, the subject

2    motion to compel was served upon our offices.

3    7.    Attached hereto as Exhibit 1 is a true and correct copy of the Church Handbook of

4    Instructions, Pages 22 and 93.

5    8.    Attached hereto as Exhibit 2 is a true and correct copy of selected portions of the

6    transcripts of the Deposition of Bishop Frederick R. Johansen.

7    9.    Attached hereto as Exhibit 3 is a true and correct copy of selected portions of the

8    transcript of the Deposition of Bishop Phillip Coleman.

9    10.    Attached hereto as Exhibit 4 is a true and correct copy of selected portions of the

10    transcript of the Deposition of Bishop Randall Borland.

11    11.    Attached hereto as Exhibit 5 is a true and correct copy of my October 7, 2005

12    correspondence confirming the CR 37(a)(2) (copy) conference.  As the court will note, the letter

13    confirms that we discussed post-deadline deposition discovery, and I reiterated our position that,

14    while we would cooperate in conducting such depositions, the cooperation was to be done on a

15    witness-by-witness basis, not a carte blanche extension of the discovery cutoff.  The court will

16    further note that I confirmed our discussion in which Mr. Pfau indicated his intent to file a

17    motion to compel Bishop Borland to respond to certain questions, to which I requested that they

18    supply me with a list of questions they wished to ask him.  They have not supplied such a list.

19    I certify under the laws of the State of Washington and of the United States that
20    the foregoing is true and correct.

21    Signed at Seattle, Washington this 21ᵉ day of OCTOBER , 2005.

22

23

24    MARCUS B. NASH, WSBA #14471

25

26

27

DECLARATION OF
MARCUS B. NASH - 2
7566-023128 36424

STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

1

## CERTIFICATE OF SERVICE

2

I certify that on the date noted below I electronically filed Declaration of Marcus B. Nash

3

using the CM/ECF system which will send notification of such filing to the following persons:

4

5   Michael T. Pfau
Gordon Thomas Honeywell Malanca Peterson & Daheim

6   600 University Street, Suite 2100
Seattle, WA 98101-4185

7   Email: mpfau@gth-law.com
         *Attorneys for Plaintiffs*

8

Timothy D. Kosnoff

9   Law Offices of Timothy D. Kosnoff
600 University Street, Suite 2100

10  Seattle, WA 98101
Email: timkosnoff@comcast.net

11          *Attorneys for Plaintiffs*

12

13          DATED this 24th day of October, 2005, at Seattle, Washington.

14

15

16                              /s/ _____

17

18

19

20

21

22

23

24

25

26

27

DECLARATION OF
MARCUS B. NASH - 3
7566-023128 36424.DOC

STAFFORD FREY COOPER
PROFESSIONAL CORPORATION
601 Union Street, Suite 3100
Seattle WA 98101.1374
TEL 206.623.9900  FAX 206.624.6885

# Church Handbook of Instructions

## Book 1
## Stake Presidencies and Bishoprics

THE CHURCH OF
## JESUS CHRIST
OF LATTER-DAY SAINTS

EXHIBIT____1

The stake president or bishop should counsel members privately in his office. When meeting with a woman, he should ask a priesthood holder to be in an adjoining room, foyer, or hall. He should avoid circumstances that might be misunderstood.

The stake president or bishop should avoid making decisions for those he counsels. Instead, he helps them make their own decisions with the Lord's guidance. He also helps them analyze and resolve problems or questions in the context of the doctrines of the gospel and the plan of salvation.

When counseling, the stake president or bishop asks questions to help him understand the member's situation, though he should avoid unnecessary probing. Questions usually should bring out feelings and thoughts rather than *yes* or *no* replies. Members should do most of the talking.

While members talk, the stake president or bishop should listen carefully, giving full and sincere attention. Listening is vital in establishing confidence and trust. People often need someone they trust to listen to them as they work through their challenges and problems.

If a member has transgressed, the stake president or bishop firmly and lovingly helps him or her repent. He teaches that repentance includes having a broken heart and contrite spirit, recognizing and forsaking sin, seeking forgiveness, making restitution, and demonstrating a renewed commitment to keep the commandments. If necessary, he imposes informal Church discipline or initiates formal discipline. He should be familiar with the circumstances that may necessitate Church discipline and the procedures for initiating it.

When counseling members, the stake president and bishop help them take preventive action to resist temptations. For example, members who are courting, are having difficulty in their marriages, are separated or divorced, and are struggling with minor moral problems may be protected and strengthened by counseling designed to help them guard against transgression. Presiding officers need not wait for members to seek such help, but may call them in for counseling.

If a member needs professional counseling or therapy, the stake president or bishop should select or recommend a professional who will work in harmony with gospel teachings and principles. Leaders may work through LDS Social Services where it is available.

No priesthood officer is to counsel a person whom to marry. Nor should he counsel a person to divorce his or her spouse. Those decisions must originate and remain with the individual.

When a marriage ends in divorce, or if a husband and wife separate, they should always receive counseling from Church leaders. One or both may also need Church discipline if they have committed serious transgressions in connection with the divorce or separation.

The stake president or bishop may give a priesthood blessing if the member who is being counseled sincerely wants one.

## Keeping Confidences

During and after their term of service in a calling, leaders must keep confidences about matters discussed when interviewing and counseling. A breach of confidence can damage trust, testimonies, and faith. A leader must not discuss confidential matters with others, including his counselors and wife, unless he receives consent from the person he is interviewing or counseling. If the bishop or a counselor in the stake presidency encounters matters that need to be discussed with the stake president, he should explain this to the member and refer the member to the stake president without delay.

## Responding to Abuse

While interviewing or counseling a person, a priesthood leader may become aware of incidents of abuse of a child, spouse, or other person. Abuse cannot be tolerated in any form. Guidelines for responding to abuse are provided on pages 157–58.

## Restitution

As part of the restitution required for repentance, transgressors should do all they can to restore what their transgression has taken from others. They also should seek forgiveness from the people they have wronged. The repentance of a married person who is involved in a sexual transgression usually should include confessing to and seeking forgiveness from his spouse. A young unmarried person who commits a sexual transgression should be encouraged to inform his parents.

Repentance may include disclosure to government authorities. If confidential information indicates that a member has violated applicable law, the bishop or stake president should urge him to report the matter to appropriate government authorities. To obtain guidance on local laws that govern reporting abuse, see the instructions on page 158.

Disclosure of the identity of others who participated in a transgression should be *encouraged* as part of the repentance process, especially when this can help Church leaders encourage the repentance of those participants.

Disclosure of the identity of others who participated in a transgression may be *required* when it is necessary to restore or protect persons who have been or may be seriously injured as a result of the transgression. For example, a sexual transgressor who has been exposed or who has exposed others to a sexually transmitted disease must make the disclosures necessary to protect others. Predators may need to be identified to protect potential victims. A transgressor who holds or has held a prominent position of trust may need to be identified to Church leaders for the spiritual protection of members.

## Investigation

A bishop interviews any member of his ward who is accused of a serious transgression. If the member denies an accusation that the bishop has reliable evidence to support, the bishop (or the stake president if he will preside over the disciplinary council) gathers further evidence that would confirm or disprove the accusation. The presiding officer may conduct the investigation himself, or he may assign two reliable Melchizedek Priesthood holders to do so. He instructs them not to use methods that are unbecoming to priesthood holders or that could result in legal action. For example, they must not use electronic surveillance devices, hidden cameras, or tape recorders. They also must not maintain a watch on a member's home.

## Confidentiality

Bishops, stake presidents, and counselors in a stake presidency have a solemn duty to keep confidential all information that members give them in confessions and interviews. The same duty of confidentiality applies to all who take part in Church disciplinary councils. It includes what is said in the presentation of evidence and in deliberations. Confidential information must not be shared with anyone except authorized ecclesiastical leaders.

Information received in a member's confession cannot be used as evidence in a disciplinary council without the member's consent. When necessary, a bishop attempts to persuade the member to give this consent. He explains that refusal reflects a lack of contrition and repentance, preventing justice and mercy from operating fully for the good of the transgressor. If consent is not given, the bishop can still impose informal discipline on the basis of the confession. A lack of consent to use a confession in evidence does not prevent a disciplinary council from proceeding on the basis of other evidence.

If a bishop learns that a Church member outside his ward may have been involved in a serious transgression, he informs that member's bishop confidentially. When members of different wards transgress together, and when one has disclosed to his bishop the identity of the other transgressor, the bishop to whom the disclosure was made consults with the bishop of the other member.

If civil authorities challenge the confidentiality required of a clergyman, the priesthood leader who is challenged should seek legal advice from the Office of Legal Services at Church headquarters (telephone 1-801-240-6301 or 1-800-453-3860, extension 6301) or from local legal counsel in Church area offices.

## Informal Church Discipline

A bishop or branch president normally administers informal Church discipline. His counselors do not participate, and no disciplinary council is held. Except for the most serious transgressions, informal discipline may be sufficient for genuinely repentant persons (especially those who have confessed voluntarily), first offenders, those who have not violated temple covenants by their transgression, and those with significant mitigating circumstances. (See D&C 42:25–26 and pages 103–4.)

Informal Church discipline includes (1) private counsel and caution and (2) informal probation.

Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING and JOHN DOE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| THE CORPORATION OF THE PRESIDENT | ) |
| OF THE CHURCH OF JESUS CHRIST OF | ) No. 4-2338 RSM |
| LATTER-DAY SAINTS, a Utah | ) |
| corporation sole, a/k/a "MORMON | ) |
| CHURCH"; LDS SOCIAL SERVICES a/k/a | ) |
| LDS FAMILY SERVICES, a Utah | ) |
| corporation, | ) |
| | ) |
| Defendants. | ) |

DEPOSITION OF FREDERICK R. JOHANSEN

September 16, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

25th Anniversary 1980-2005

EXHIBIT 2

Byers & Anderson, Inc.
Court Reporters & Video

---

Page 26

1  Q  Were there others besides Brent and Jimmy Allenbach
2     and your son that were part of that troop though?
3  A  Yes.
4  Q  Do you recall any of the last names of the children
5     that were part of that group, other than the
6     Allenbachs?
7  A  I don't have a very good memory, but we had a lot of
8     boys in our ward.  I would say we had 10 or 12, more
9     or less.
10 Q  And were they all part of that Scout troop?
11 A  Yes.
12 Q  What were your impressions of Jack LoHolt as a
13    person?
14 A  He was a good friend.
15    He worked for me.
16 Q  How did he work for you?
17 A  He was a contractor, bulldozer, backhoe.
18 Q  So when you call Mr. LoHolt a good friend, did you
19    spend a lot of time with Mr. LoHolt just on a
20    one-on-one basis?
21 A  Just professionally.
22 Q  Ever have Mr. LoHolt over for dinner at your house?
23 A  No.
24 Q  What about the Allenbachs?  Did you ever have them
25    over for dinner at your house?

---

Page 27

1  A  Allenbachs were close, close friends of ours.
2  Q  So when you say that LoHolt was a good friend and the
3     Allenbachs were close, close friends, correct me if
4     I'm wrong, that says to me that the Allenbachs were
5     better friends of yours than LoHolt was.
6  A  Yes.
7  Q  What was your impression of Jack LoHolt's
8     relationship with the Allenbach family?
9  A  I would say it was close.  They were close friends.
10 Q  How about the friendship between Dr. Allenbach and
11    Mr. LoHolt?
12 A  Well, I think they were close, close friends.
13    Likewise-- they were good friends.
14 Q  During your time as the bishop, were you ever aware
15    of any problems with Jack LoHolt's behavior?
16 A  No.
17          (Mr. Frey exits.)
18
19        MR. NASH:  Counsel, he stepped out, do
20    you mind if I kind of step in his shoes while he's
21    out?
22        We're shifting the voice, but I want to make sure
23    it's okay with you.
24          MR. REICH:  That's fine.
25 Q  (By Mr. Reich)  During your time as bishop, did you

---

Page 28

1     ever learn about Jack LoHolt having any inappropriate
2     contact with children under the age of 18?
3  A  State the question again, please.
4          (Mr. Frey present).
5
6  Q  (By Mr. Reich)  During your time as a bishop, did you
7     ever come to learn any information about Jack LoHolt
8     having inappropriate contact with children under the
9     age of 18?
10 A  No.
11        MR. REICH:  I want to go off the record
12    to talk to my client.
13          (Recess 9:50 to 9:52 a.m.)
14          (Exhibit No. 1 marked for
15           identification.)
16
17 Q  (By Mr. Reich)  Mr. Johansen, I am handing you what
18    I've marked as Exhibit No. 1.
19    For the purposes of my question, I'd like to
20    define the word "sexual contact" as it's stated in
21    Exhibit No. 1, okay?
22    Well, let me back up.
23    Why don't you go ahead and review Exhibit No. 1
24    for me, please.
25 A  (Witness complies.)

---

Page 29

1  Q  For the purposes of this question, I would like you
2     to refer to the definition of sexual contact if you
3     have any question about the definition, but during
4     your time as a bishop did you ever come to learn any
5     information about Jack LoHolt having sexual contact
6     as it's defined there in Exhibit No. 1, with any
7     children under the age of 18?
8        MR. FREY:  Before you answer that, I am
9     going to claim privilege if he learned it in any
10    context in which he had a member of the ward coming
11    to him in his capacity as a bishop, either in a
12    confessional sense or in a sense of spiritual
13    counseling with him.
14    If he learned it otherwise, that he just heard a
15    rumor in the ward, he's free to answer that.
16    Do you understand what I'm saying?
17 A  Yes.
18        MR. FREY:  Then go ahead and answer.
19        THE WITNESS:  The answer is no.
20 Q  (By Mr. Reich)  "No," meaning you've had no person in
21    any capacity approach you with any information about
22    LoHolt, Jack LoHolt, having sexual contact with
23    children under the age of 18?
24        MR. FREY:  Again, I'm going to object
25    and instruct the witness not to answer that question

---

Frederick R. Johansen
September 16, 2005

Byers & Anderson, Inc.
Court Reporters & Video

Page 30

1  with regard to anyone who came to see him in his
2  capacity as a bishop.
3      Other than that, he can answer, and I think he
4  has.
5          MR. REICH:  Well, I want to explore that
6  because I'm not satisfied that there has been any
7  foundation yet for asserting that as a privilege.
8      I don't know whether he has learned of any
9  information.  I am asking whether he has learned from
10  any source, any information-- I am not asking what
11  was stated in a confessional or what setting.
12 Q  (By Mr. Reich)  I just want to know whether at any
13  point in time you learned while you were bishop that
14  LoHolt had had sexual contact with children under the
15  age of 18.
16          MR. FREY:  I am making the same
17  objection.  You can go ahead and answer within the
18  confines that I told you.
19          THE WITNESS:  The answer is no.
20 Q  (By Mr. Reich)  For the purposes of this question
21  then, have you heard from any source while you were a
22  bishop-- while you were bishop of the 2nd Ward have
23  you heard from any source whether Jack LoHolt engaged
24  in sexual intercourse as is defined in Exhibit No. 1
25  with a child under the age of 18?

Page 31

1          MR. FREY:  The question has been asked
2  and answered, and I will allow him to answer within
3  the confines that I have made; that is, giving
4  spiritual counseling or hearing a confession, you are
5  not to answer the question.  Otherwise, you may
6  answer it as to any other capacity which you were in
7  the ward.
8 Q  (By Mr. Reich)  Go ahead.
9          MR. FREY:  You can answer the question.
10  I think you've already answered it, but go ahead and
11  answer it again.
12          THE WITNESS:  No.
13 Q  (By Mr. Reich)  My previous questions had to do with
14  sexual contact as defined there.  My last question
15  had to do with sexual intercourse as defined in
16  Exhibit No. 1, so those with two distinct questions.
17      Let me ask you a different way.
18      During the time you were a bishop, did you ever
19  learn any information, not in your capacity as a
20  bishop, but did you ever learn any information about
21  Jack LoHolt having sexual contact with children under
22  the age of 18?
23 A  The answer is no.
24 Q  During the time that you were a bishop but not in
25  your capacity as a bishop did you ever learn any

Page 32

1  information about Jack LoHolt having sexual
2  intercourse with children under the age of 18?
3 A  You said-- state the question one more time.
4 Q  Did anyone, during your time that you were a bishop,
5  just during that as a time frame, not necessarily in
6  your role as a bishop, not as somebody approaching
7  you as Bishop Johansen but more in the context of
8  somebody talking to you outside of a confessional
9  context, did you ever have anyone approach you,
10  during that time frame, and inform you that there
11  were potential issues of LoHolt having sexual contact
12  with children under the age of 18?
13 A  The answer is no.
14 Q  The same question with regard to sexual intercourse?
15 A  No.
16 Q  During your time that you were a bishop for the Kent
17  ward, did you ever hear rumors that Jack LoHolt was
18  having inappropriate interactions or sexual contact
19  or sexual intercourse with children under the age of
20  18?
21 A  Could you state that one more time?
22 Q  It was a poor question.
23 A  I'm sorry to be so--
24 Q  I appreciate you asking me to clarify that.  It's
25  important.

Page 33

1      During your time that you were a bishop, did you
2  ever hear any rumors about Jack LoHolt having
3  inappropriate interactions with children under the
4  age of 18?
5 A  The answer is no.
6 Q  During the time you were a bishop, did you hear any
7  rumors about Jack LoHolt having any sexual contact
8  with children under the age of 18?
9 A  No.
10 Q  During your time as a bishop, did you ever hear any
11  rumors about Jack LoHolt having sexual intercourse
12  with children under the age of 18?
13 A  No.
14 Q  Before you were a bishop, did you ever hear or were
15  you aware of Jack LoHolt having inappropriate contact
16  with children under the age of 18?
17 A  No.
18 Q  Before you were bishop, were you aware of any
19  information about LoHolt having sexual contact with
20  children under the age of 18?
21 A  No.
22 Q  Before you were bishop did you have any-- were you
23  aware of Jack LoHolt having sexual intercourse with
24  children under the age of 18?
25 A  No.

9 (Pages 30 to 33)

Frederick R. Johansen
September 16, 2005

Byers & Anderson, Inc.
Court Reporters & Video

Page 34

1  Q  After you left the Kent ward in, I believe you said,
2     1974, did you learn that Jack LoHolt was having
3     inappropriate interactions with children under the
4     age of 18?
5  A  Did you say before or after?
6  Q  After you left the Kent ward.
7  A  I don't remember any.
8  Q  So as you sit here today, you were never aware of any
9     issues with regard to Jack LoHolt having
10    inappropriate interactions with children under the
11    age of 18?
12       I am not trying to trick you.
13          MR. FREY:  This is after 1974?
14          MR. REICH:  Yeah.
15 Q  (By Mr. Reich)  After you left the ward in 1974, did
16    you ever learn information that Jack LoHolt was
17    having inappropriate interactions with children under
18    the age of 18?
19 A  No.  The answer is no.
20 Q  Just to be thorough, since leaving the Kent ward in
21    1974--
22 A  Kent 2nd.
23 Q  Thank you.  Have you ever come to learn about Jack
24    LoHolt having any sexual contact with any child under
25    the age of 18, as "sexual contact" is defined in

Page 35

1     Exhibit No. 1?
2  A  The answer is no.
3  Q  Since leaving the 2nd Ward in Kent in 1974, have you
4     come to learn any information about Jack LoHolt
5     having sexual intercourse with children under the age
6     of 18 as it's defined in Exhibit No. 1?
7  A  No.
8  Q  So then as you sit here today, you have never heard
9     of any allegations of any type regarding Jack LoHolt
10    having inappropriate sexual contact or intercourse
11    with a child under the age of 18; is that correct?
12          THE WITNESS:  Can I set it off-- can I
13    shut you off for a minute?
14          MR. FREY:  You're all right.  If you
15    want to explain your answer, you should tell Counsel.
16          THE WITNESS:  I knew that Jack had some
17    problems because he went to prison for it, but what
18    those problems were, I never knew.
19 Q  (By Mr. Reich)  Do you remember when Jack LoHolt went
20    to prison?
21 A  No, I never did know, I don't think.
22       The answer is no, I don't know when he went, but
23    I know he went.
24 Q  Do you recall whether it was after you left the Kent
25    ward in 1974?

Page 36

1  A  Oh, yes.
2     It's the Kent 2nd.
3  Q  I am not doing that intentionally.
4     Were you ever made aware of any counseling that
5     Jack LoHolt was receiving at any time that you were
6     at the Kent 2nd Ward?
7  A  No.
8  Q  Have you ever had discussions with any others in the
9     church hierarchy, meaning other bishops, stake
10    presidents, area presidents, regarding Jack LoHolt?
11          MR. FREY:  Before you answer that, if
12    you had discussions with them in your capacity as a
13    bishop, in your ecclesiastical capacity concerning
14    Jack LoHolt, then that's protected in my opinion, and
15    I instruct you not to answer.
16       If you had discussions outside of that, then you
17    should answer Counsel's question.
18          THE WITNESS:  The answer is no.
19 Q  (By Mr. Reich)  The question wasn't as specific as
20    the objection was.
21       The question was:  Did you ever have any
22    conversations with anyone about Jack LoHolt that was
23    within the hierarchy of the church, not the substance
24    of the conversation, but have you ever had a
25    conversation with anyone, including the other

Page 37

1     bishops, stake presidents, area presidents, et
2     cetera, regarding Jack LoHolt?
3     What I am looking for is a "yes" or "no" answer,
4     not an explanation of what was discussed.
5  A  State your question again.
6  Q  It's just a "yes" or "no" question, for the time
7     being--
8  A  The answer is no.
9  Q  I need to make sure-- have you ever had any
10    conversations with any other members of the church
11    hierarchy, and when I say that, I mean bishops, stake
12    presidents, area presidents, et cetera, regarding
13    Jack LoHolt?
14 A  No.
15 Q  Have you ever had discussions with Jack LoHolt
16    directly regarding any issues related to his behavior
17    while you were a bishop?
18 A  While I was bishop, no.
19 Q  Ever had any conversations with Jack LoHolt directly
20    about his behavior before you were bishop?
21 A  No.
22 Q  Have you ever had any discussions with Jack LoHolt
23    directly about his behavior after you were bishop?
24 A  Yes.
25 Q  When did those conversations occur?

10 (Pages 34 to 37)

Frederick R. Johansen
September 16, 2005

Byers & Anderson, Inc.
Court Reporters & Video

Page 46

1   Q   (By Mr. Reich) I am not asking what you talked
2       about, but I was wondering if you looked at any
3       documents to prepare for today.
4           MR. FREY:  You're right, we didn't look
5       at any documents.
6               MR. REICH:  I would appreciate the
7       answer coming from Mr. Johansen.
8   Q   (By Mr. Reich) Can you say what the answer--
9   A   No.
10  Q   Do you know whether Dr. Allenbach was living in a
11      polygamist situation at any time?
12  A   No.
13  Q   You mean "no" he was not or you don't know?
14  A   I don't think he was, no.
15  Q   Okay.  Has anyone at any time ever come and
16      approached you about an issue related to Jack LoHolt?
17  A   No.
18  Q   And I am including your time as a bishop.
19          Did anyone at any time ever approach you about a
20      problem with Jack LoHolt?
21  A   No.
22          I assume your question is relating to this.
23      (Indicating.)
24          The answer is no.
25              MR. REICH:  Thank you, Mr. Johansen,

Page 48

1   STATE OF WASHINGTON )    I, Terilynn Pritchard, CCR, RPR,
                        ) ss CCR # 2047, a duly authorized
2   County of Pierce    )    Notary Public in and for the State
                                 of Washington, residing at
3                                Auburn, do hereby certify:
4
5           That the foregoing deposition of FREDERICK R.
        JOHANSEN was taken before me and completed on September 16,
6       2005, and thereafter was transcribed under my direction;
        that the deposition is a full, true and complete transcript
7       of the testimony of said witness, including all questions,
        answers, objections, motions and exceptions;
8
            That the witness, before examination, was by me
9       duly sworn to testify the truth, the whole truth, and
        nothing but the truth, and that the witness reserved the
10      right of signature;
11          That I am not a relative, employee, attorney or
        counsel of any party to this action or relative or employee
12      of any such attorney or counsel and that I am not
        financially interested in the said action or the outcome
13      thereof;
14          That I am herewith securely sealing the said
        deposition and promptly delivering the same to
15      Attorney Johnnie Dano.
16          IN WITNESS WHEREOF, I have hereunto set my hand
        and affixed my official seal this 19th day of September,
17      2005.
18
19
20
21          _____
            Terilynn Pritchard, CCR, RPR
22          Notary Public in and for the State
            of Washington, residing at
23          Auburn.
24
25

Page 47

1   that's all we have.
2           (Deposition concluded at 10:32 a.m.)
3           (Signature reserved.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Frederick R. Johansen
September 16, 2005

Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE,    )
                                 )
              Plaintiffs,         )
                                 )
         vs.                      )
                                 )
THE CORPORATION OF THE PRESIDENT  )
OF THE CHURCH OF JESUS CHRIST OF  ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah         )
corporation sole, a/k/a "MORMON   )
CHURCH"; LDS SOCIAL SERVICES a/k/a )
LDS FAMILY SERVICES, a Utah       )
corporation,                      )
                                 )
              Defendants.         )

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington

Byers & Anderson, Inc.
Court Reporters/Video/Videoconferencing
One Union Square    2208 North 30th Street, Suite 202
600 University St.  Tacoma, WA 98403
Suite 2300          (253) 627-6401
Seattle, WA 98101   (253) 383-4884 Fax
(206) 340-1316      scheduling@byersanderson.com
(800) 649-2034      www.byersanderson.com

25th Anniversary 1980-2005

EXHIBIT 3

Byers & Anderson, Inc.
Court Reporters & Video

Page 42

1  that your predecessor served?
2  A  Well, I started in 1973, and this was 1970, so no
3  less than three.  How much less, I don't remember.
4  Q  Can you give me a general sense of the kind of
5  communication or the types of communications that go
6  on between a departing bishop and an arriving bishop
7  regarding the transfer of responsibilities within the
8  ward?
9         MR. FREY:  Could I ask for a
10  clarification?
11     Are you talking about then or now?
12        MR. KOSNOFF:  He can only testify as to
13  his experience.
14  Q  (By Mr. Kosnoff)  If it changed in your later
15  bishopric, perhaps you can point that out, but I'm
16  trying to get a sense of is there a practice, is
17  there a custom.  How are the reigns transferred?
18        MR. FREY:  I am going to object to the
19  form of the question.  It's indeterminate in time,
20  but go ahead and answer.
21        THE WITNESS:  Is there a protocol?  I
22  don't remember.
23     I can remember what might have taken place.
24     There would be a transfer of records, keys, the
25  current mechanics in progress as far as the

Page 43

1  organization is concerned, nonconfidential items of
2  concern.
3  Q  (By Mr. Kosnoff)  Now, I understand that the
4  responsibilities of the bishop are great and
5  multifaceted and include both administrative
6  responsibilities and pastoral responsibilities.
7     Do you recall having discussions of an
8  administrative nature with your predecessor, Bishop
9  Borland?
10        MR. FREY:  I am going to object to the
11  form of the question.
12        THE WITNESS:  And I'm not sure I
13  understand the question.
14  Q  (By Mr. Kosnoff)  Well, you talked about keys,
15  records.  I'm assuming you're referring to things
16  that had to do with the administrative operations of
17  the ward.
18  A  Yes.
19  Q  Did it also involve discussions regarding personnel--
20  strike that.  Individuals in callings, positions, and
21  offices under the purview of the bishop?
22  A  It might have.
23  Q  Do you have any specific recollection of any of those
24  discussions?
25  A  I do not.

Page 44

1  Q  Did you have, for example, a discussion about how the
2  Boy Scout program was operating and what changes need
3  to be made there?
4  A  I do not recall any.
5  Q  Are there any protocols or practices that you recall
6  involving communicating confidential, sensitive
7  issues involving members of the ward?
8  A  I don't remember a protocol for that.
9  Q  Do you have any recollection of Bishop Borland
10  telling you sensitive or confidential information
11  concerning any members of the ward?
12  A  I do not.
13  Q  When you became bishop, at that point had you been
14  aware of there being any complaints of sexual
15  misconduct with boys by Jack LoHolt?
16  A  No.
17  Q  Had you heard any rumors to that effect?
18  A  No.
19  Q  To your understanding what kind of a job was Jack
20  LoHolt doing within the ward Scout program when you
21  became bishop?
22  A  A young men's secretary position is often given to a
23  person who is-- who needs something to do.
24  Q  And in that instance Jack LoHolt needed something to
25  do?

Page 45

1  A  I can't infer the second from the earlier, but that
2  was a statement of fact of the position.
3  Q  Okay.
4  A  I don't recall how well Jack was doing or why he was
5  put in the position.
6  Q  He was already in that position when you became
7  bishop?
8  A  I don't recall that either.
9  Q  At some point during the three years that you were
10  bishop, did someone bring to your attention an
11  allegation that Jack LoHolt was sexually molesting
12  boys?
13  A  In the specific, I have to say no to sexually
14  molesting.
15  Q  What about generally?
16  A  In the general to sexually molesting, I have to say
17  no.
18  Q  Did you receive any information of any kind from any
19  person that Jack LoHolt was allegedly engaging in
20  sexually inappropriate activity?
21  A  Yes.
22  Q  From who whom did you learn that?
23        MR. FREY:  I am going to object at this
24  point in time.
25     Let me tell you the basis for the objection.

12 (Pages 42 to 45)

Page 46

1    He was a bishop at the time, and we treat those
2    communications as confidential, and in trying to help
3    you with this answer, I'm not trying to present a
4    roadblock.
5    As an accommodation and because of the fact that
6    the individuals involved have not authorized this
7    information to be given, I think they have a right to
8    privacy in that regard and a right to have it
9    protected.
10    As an accommodation, I'll allow the witness to
11    tell you in a general sense what he heard had
12    happened, and I'm not waiving any privilege by doing
13    that.
14    If you'll accept that, we can go forward.
15    You don't have to accept my objection, but if you
16    want to go forward, I'm willing to do that on this
17    basis.
18    MR. KOSNOFF:  Tom, I would like to take
19    a brief bathroom break and come back and continue
20    this dialogue at this point.
21    (Recess 10:27 to 10:33 a.m.)
22
23    MR. KOSNOFF:  Mr. Frey, this is not
24    unfamiliar ground to the two of us, this point.
25    We've been at similar points in other cases.

Page 47

1    From your comments I take that you are making an
2    objection based upon a number of criteria.  One, I
3    think I heard an assertion of the clergy penitent
4    privilege.
5    MR. FREY:  I'll make it simple for you.
6    I'll tell you what the basis for my objection is:
7    one, it's a constitutional objection on the free
8    exercise clause; number two, it may also be on the
9    basis of the priest penitent privilege depending on
10    the circumstances under which he may have heard
11    something; and the third ground is that we've said in
12    our answers to interrogatories I'm not prepared to
13    reveal the names of anybody or have my client reveal
14    the names of anyone who has been molested without
15    that person's consent because I know for a fact, and
16    I've gotten court orders on this, that it can be
17    devastating to have someone knock on their door and
18    say, "I understand you've been abused and I'd like to
19    talk to you about it."
20    For those three reasons-- I am willing to go
21    forward because I know that you have the right to
22    determine knowledge and what they knew and should
23    have known, and I'm willing to let him tell you in a
24    general fashion, and I guess I could proffer this for
25    the record what he can tell you to get you to where

Page 48

1    you need to go--
2    MR. KOSNOFF:  Before we go there, I
3    think this is important that we establish enough of a
4    factual record here for Judge Martinez so we only
5    have to take one trip up and bring Dr. Coleman back
6    one more time as opposed to two more times, so I
7    would propose that with respect to the assertion of
8    the claimed privileges that you're making, that you
9    take a moment and establish whatever factual basis
10    you would like with Dr. Coleman to support the
11    assertion of those privileges.
12    I'm inviting you to do that because, as you know,
13    it's the proponent of the privilege that carries the
14    burden of establishing it, and I just want to make
15    sure that when this goes up to Judge Martinez, that
16    you've had a full opportunity to make as full an
17    evidentiary record as you need to make your arguments
18    to him.
19    MR. FREY:  It's not my burden.  Under
20    the rule I'm exercising those privileges, and I've
21    enumerated them.
22    If you wish to question the witness, you are free
23    to do that.  If you choose to go to Judge Martinez,
24    I'll be happy to supply whatever additional
25    information I need by way of affidavit or otherwise.

Page 49

1    I've tried to explain to you, and you're free to
2    ask him the circumstances and free to ask him a
3    number of questions, and I think you can get the
4    information that you need without revealing these
5    names.
6    Quite frankly, Tim, I don't want to reveal any
7    names or my client to reveal any names that he may
8    have heard of that are not public right now because I
9    simply don't think it's appropriate.
10    As I've said before, I've gotten court orders
11    restricting that information.
12    MR. KOSNOFF:  I understand that there
13    are--
14    MR. FREY:  So you can question him now
15    and ask him--
16    MR. KOSNOFF:  I just want the record to
17    reflect that I am not unaware of the fact that there
18    are protected limited privacy interests of third
19    parties that the Court has to be mindful of, and it's
20    a weighing of rights and interests that the Court
21    will have to make.
22    Let me go forward with some additional questions
23    so that at least we have some factual record for the
24    Court.
25  Q    (By Mr. Kosnoff)  Dr. Coleman, as I understand

13 (Pages 46 to 49)

Byers & Anderson, Inc.
Court Reporters & Video

Page 50

1    Mr. Frey's comments, you received a communication
2    from someone while you were bishop regarding an
3    allegation of sexual misconduct by Jack LoHolt; is
4    that correct?
5  A  That's correct.
6  Q  Was the person who communicated this to you a member
7    of the Mormon church?
8  A  Yes.
9  Q  Was this communication made to you in your capacity
10   as bishop?
11  A  I think so.
12  Q  Okay. Did it occur at, for example, the ward
13   building or your office?
14  A  I don't remember that.
15  Q  Okay. Was the person who communicated this to you,
16   in your view, making a statement of confession or
17   penitential contrition?
18  A  No.
19  Q  Under the doctrines and tenants of your faith, do you
20   believe that you are absolutely required to keep what
21   that person said to you confidential, and I mean that
22   you cannot repeat it to anyone?
23  A  No.
24  Q  Do you know the Harrison family?
25  A  I do.

Page 51

1  Q  Did a member of the Harrison family disclose to you
2    that Jack LoHolt had or was sexually molesting one or
3    more of their sons?
4     MR. FREY: I am going to object to the
5    question and instruct the witness that he does not
6    have to answer it.
7     THE WITNESS: I am going to say no.
8     MR. KOSNOFF: I'm sorry, Tom, I missed
9    what you said. Did you say that you were instructing
10   him not to answer?
11     MR. FREY: I instructed him not to
12   answer, but he already said "No."
13  Q  (By Mr. Kosnoff) You knew the Harrison family?
14  A  Yes.
15  Q  And as I recall, she was a member of the church but
16   Mr. Harrison was not?
17  A  That's as I recall.
18  Q  And they had three sons who were members of the
19   church?
20  A  I think so.
21  Q  Did any member of the Harrison family tell you that
22   Jack LoHolt was sexually molesting you?
23     MR. FREY: If this is going to require
24   you to breach any confidential agreement or
25   understanding that you believe you have had and/or to

Page 52

1    confirm, I suppose, the name of a victim, then I'm
2    going to tell you you don't have to answer it.
3     THE WITNESS: To my own understanding of
4    the question, the answer is no.
5  Q  (By Mr. Kosnoff) In October of 2003, did you get a
6    phone call from a woman that was asking you about
7    what you knew about Jack LoHolt?
8  A  I did.
9  Q  And did you tell her that Jack's problem came to your
10   awareness, "When some young boys came to me and told
11   me that Jack had been molesting them"?
12  A  I did not say that, to my knowledge.
13  Q  Did you tell that person that after talking with
14   those people, that you spoke with Jack LoHolt and his
15   parents?
16  A  This question was contingent on the prior one about
17   boys having spoken to me, and the answer to that one
18   is no, and therefore the answer to this one is no.
19     May I take a moment with these gentlemen?
20  Q  Of course.
21     Have you finished your last answer?
22  A  On that question, yes.
23     (Recess 10:43 to 10:47 a.m.)
24
25     MR. FREY: We can go back on the record,

Page 53

1    and the witness wants to clarify the answer is maybe
2    the best way to put it.
3  Q  (By Mr. Kosnoff) Dr. Coleman, do you want to clarify
4    an earlier answer?
5  A  If I may.
6     With regard to an individual making me aware of
7    something that happened between her sons and Jack
8    LoHolt, the answer is yes, and the answer is that
9    there was an exposure.
10    In my own mind, at least at the time, maybe not
11   now, that did not constitute abuse.
12    That's why I gave "no" to those answers, but I
13   wanted you to be aware of what did happen.
14  Q  What was your understanding of what Jack LoHolt had
15   done, allegedly?
16  A  Exposed his private parts.
17  Q  To whom and where?
18  A  As I recall it--
19     MR. FREY: I am going to again instruct
20   the witness not to say the names of who, but he can
21   say anything else.
22     THE WITNESS: As I recall, two boys, as
23   I recall it, on an outing, which Jack frequently took
24   them, either fishing or camping-- he was a bit of a
25   replacement for an absentee father.

14 (Pages 50 to 53)

Byers & Anderson, Inc.
Court Reporters & Video

Page 54

1  Q  (By Mr. Kosnoff)  In fact, Jack had become kind of a
2     surrogate father to the boys in absence of their
3     natural father?
4  A  That's calling for a judgment.
5  Q  Is that your understanding?
6  A  I think what I said earlier would be appropriate.
7  Q  But it was your understanding that Jack had been
8     spending a lot of time with these boys?
9  A  I think so.
10 Q  When you received this information, were you
11    concerned?
12 A  Indeed.
13 Q  Were you very concerned?
14 A  Indeed.
15 Q  Okay.  Being very concerned, what did you do?
16 A  Spoke to Jack.
17 Q  Where did that conversation take place?
18 A  In the bishop's office.
19 Q  Did you call him in?
20 A  I did.
21 Q  What was said by Jack to you?
22 A  I don't recall the details, but he denied it.
23 Q  Jack denied that he'd engaged in the conduct?
24 A  He did.
25 Q  Did Jack acknowledge, however--

Page 55

1        MR. FREY:  For the record, I want to
2     make this clear because this is going to come up
3     again.
4        In those conversations where you're acting with
5     your bishop's hat on and you're speaking to one of
6     your people and it involves what could be classified
7     as a transgression within the church, you do have the
8     right not to disclose that information.
9        On the other hand, I want you to be able to
10    answer Counsel's question as best you can because he
11    has a right to find out what we knew or didn't know
12    or should have known.
13 Q  (By Mr. Kosnoff)  I would add whether or not a
14    privilege really applies really depends on the
15    circumstances and the conduct and the intent of the
16    parties.
17 A  I think in this context it would.
18 Q  The question of whether or not under the doctrine and
19    beliefs of the Mormon church and the circumstances of
20    this communication between you and Jack, is it your
21    belief that this was a privileged communication
22    between bishop and member?
23 A  May I make a statement?
24       The information came to me other than Jack.
25 Q  I understand that, but I'm referring to the meeting

Page 56

1     that you had with Jack.
2  A  That would fall under the auspices of a privileged
3     communication, yes, I think so.
4  Q  After you talked with Jack, did you talk with his
5     parents?
6  A  I did.
7  Q  Where did that take place?
8  A  Bishop's office.
9  Q  Okay.  What was said by the parents to you-- strike
10    that.
11       Did you tell the parents the information that you
12    had regarding Jack's behavior?
13 A  I did.
14 Q  What was their reaction?
15 A  Disbelief.
16 Q  Okay.  After that exchange, what did you do with this
17    information?
18 A  We released Jack from his church callings, and I
19    notified, as I recall, at least some key individuals
20    who would need to know about it.
21 Q  And those were priesthood leaders?
22 A  My counselors.  I remember specifically-- I can't
23    honestly say I remember talking to the young men's
24    president, but that might have been usual, and
25    perhaps to the Scout master, but I don't remember

Page 57

1     that.
2  Q  Richard Pettit was one of your counselors, correct?
3  A  He was.
4  Q  And, in fact, you did tell Richard Pettit?
5  A  That's my recollection.
6  Q  What else did you do?
7  A  If I can digress for a moment, my role as a bishop
8     was to serve everyone, including, if possible, Jack.
9        During an era at that time where at least
10    personally and I think rather generally there was
11    little information about the recurrent nature or
12    problem of a sexual offender and indeed little about
13    how to deal with it in the social aspect, I continued
14    to work privately with Jack to try to help him to be
15    reconciled to Christ.
16 Q  Through your work with Jack to be reconciled with
17    Christ, did you come away with a feeling that the
18    problem had been adequately addressed?
19       MR. FREY:  In answering that question--
20       THE WITNESS:  I can't answer that.  I
21    can't say.
22 Q  (By Mr. Kosnoff)  Did you do anything to investigate
23    whether there may have been other incidents and other
24    victims?
25 A  I want to say yes, but I frankly don't remember the

15 (Pages 54 to 57)

Byers & Anderson, Inc.
Court Reporters & Video

Page 94

1  Q  You understood that, at that time, what Jack LoHolt
2     did was a crime; did you not?
3  A  No, I did not understand that.
4  Q  You did not believe it was a crime?
5  A  I did not believe it was a crime.
6  Q  So it's your testimony then, Dr. Coleman, that you
7     did not know that an adult man exposing his genitals
8     to young boys was a crime at that time?
9        Is that your testimony?
10 A  That's my testimony.
11 Q  I take it that you would not have wanted Jack LoHolt
12    to expose his genitals to your young children at that
13    time.
14       Is that fair to say?
15 A  Fair to say.
16 Q  Are you saying that you didn't believe that there was
17    a danger that Jack LoHolt would do the same thing to
18    the children of other members of the Kent 2nd Ward?
19       MR. FREY:  I am going to object to the
20    form of the question.
21       You may answer.
22       THE WITNESS:  I don't think I can
23    remember what I believed at the time.
24 Q  (By Mr. Kosnoff)  What is the source of your
25    statement that back during this period of time

Page 95

1     society had insufficient knowledge about problems
2     such as Jack's problem, such that they would not have
3     known to keep him away from other children or to warn
4     other parents?
5        MR. FREY:  I am going to object to the
6     form of the question.
7        THE WITNESS:  I'm a professional.  I
8     deal with the public all the time.  I see dozens of
9     people a day.
10       We were trained professionally to watch for child
11    abuse later, not earlier, not in dental school, not
12    for many years later.  That's one I can think of.
13       I'm also fairly well read.  I read the newspaper,
14    I'm fairly literate in reading books, at least those
15    that are nonfictional.  I think I was fairly well
16    informed as to the level of society's stance or
17    understanding, recognition of, and treatment of such
18    things.
19 Q  (By Mr. Kosnoff)  What specific knowledge, education
20    or training did you have when you were bishop when
21    you learned about Jack LoHolt that made you think you
22    had the competency, qualifications or authority to
23    treat him?
24       MR. FREY:  Object to the form of the
25    question.

Page 96

1        THE WITNESS:  I can't answer that
2     question.  I didn't say I was treating him.
3  Q  (By Mr. Kosnoff)  Or counseling him?
4  A  I can't answer that question.
5        MR. KOSNOFF:  Okay.  I think I'm done.
6        MR. FREY:  No questions.
7        (Deposition concluded at 12:17 p.m.)
8        (Signature reserved.)
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 97

1  STATE OF WASHINGTON )   I, Terilynn Pritchard, CCR, RPR,
                        ) ss CCR # 2047, a duly authorized
2  County of Pierce    )   Notary Public in and for the State
                            of Washington, residing at
3                           Auburn, do hereby certify:
4
5        That the foregoing deposition of PHILIP J. COLEMAN
   was taken before me and completed on September 15, 2005, and
6  thereafter was transcribed under my direction; that the
   deposition is a full, true and complete transcript of the
7  testimony of said witness, including all questions, answers,
   objections, motions and exceptions;
8
9        That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
10 nothing but the truth, and that the witness reserved the
   right of signature;
11       That I am not a relative, employee, attorney or
   counsel of any party to this action or relative or employee
12 of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
13 thereof;
14       That I am herewith securely sealing the said
   deposition and promptly delivering the same to
15 Attorney Johnnie Dano.
16       IN WITNESS WHEREOF, I have hereunto set my hand
   and affixed my official seal this 19th day of September,
17 2005.
18
19
20
21       _____
         Terilynn Pritchard, CCR, RPR
22       Notary Public in and for the State
         of Washington, residing at
23       Auburn.
24
25

Philip J. Coleman
September 15, 2005

```
                  UNITED STATES DISTRICT COURT
                WESTERN DISTRICT OF WASHINGTON
                        AT SEATTLE
KENNETH FLEMING and JOHN DOE,:  No. C04-2338 RSM
                             :  (Judge Ricardo Martinez)
                             :
                 Plaintiffs,:
                             :
             -v-             :
                             :
THE CORPORATION OF THE       :
PRESIDENT OF THE CHURCH OF   :
JESUS CHRIST OF LATTER-DAY   :
SAINTS, a Utah corporation   :
sole, a/k/a "MORMON CHURCH"; :
LDS SOCIAL SERVICES a/k/a     :
LDS FAMILY SERVICES, a Utah  :  Videotaped Deposition of:
corporation,                 :  RANDALL BORLAND
                             :
                 Defendants.:
```

        September 20, 2005 - 9:08 a.m.

        Location:  Kirton & McConkie
      60 East South Temple, Suite 1800
            Salt Lake City, Utah

        Diane W. Flanagan, RPR
   Notary Public in and for the State of Utah

EXHIBIT___4___

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                                    RANDALL BORLAND

Page 54

1    University in the fall of 1973 and not in 1975?
2       A    Is it possible?
3       Q    Yes.
4       A    Instead of when?
5       Q    I believe you testified earlier that you thought
6    you came to Utah in 1975 to begin your studies.
7       A    That was a guess, wasn't it?  That was an
8    approximate guess.
9       Q    Yes.
10       A    Yeah, it's possible then.  It's possible, but I
11    don't know, but very possible.
12       Q    Okay.
13       A    That would fall in line.  This is -- in that
14    regard that's helpful.
15       Q    Well, as we get older, we all need these little
16    aids, don't we?
17          So during this approximate three-year time period
18    that you were bishop of the Kent Second Ward, you've
19    indicated that you did receive a complaint regarding
20    sexually inappropriate activity by Jack Loholt.  Correct?
21          MR. FREY:  I'm going to object to the form of the
22    question.  It assumes something that he hasn't testified to.
23          Go ahead.
24       Q    (By MR. KOSNOFF) Did you receive a complaint or
25    report from anybody that Jack Loholt had engaged in sexually

Page 55

1    inappropriate activity during the time that you were bishop
2    of the Kent Second Ward?
3          MR. FREY:  Now, again, Bishop, I'm going to
4    caution you that if you learned any of this information in
5    your capacity as a bishop in a confidential communication
6    that you have the privilege not to answer it, in my opinion.
7    Counsel may differ with that, but I would instruct you not
8    to answer it if that's the basis upon which you gained your
9    information.
10          MR. KOSNOFF:  I would like to ask a few foundation
11    questions before he answers that question in light of your
12    instruction to your client.
13          MR. FREY:  Okay.
14       Q    (By MR. KOSNOFF) Assuming the answer to the
15    question is yes, did you receive this communication in your
16    capacity as a clergy person for the Mormon church, that is,
17    in your role as clergy in the Mormon church?
18          MR. FREY:  Object to the --
19       A    That was a hypothetical.  That was hypothetical --
20          MR. FREY:  Excuse me.  I'm going to object to the
21    form of the question.
22          You may answer, though.  Have her read
23    it back.  Please wait until -- give me a second because I
24    have the right to make objections.
25          THE WITNESS:  I'm sorry.

Page 56

1          MR. FREY:  Okay.  Go ahead.
2          (The record was read as requested)
3       A    I'm answering a question based on an assumption?
4       Q    Yes.  I'm not asking you for the content of the
5    communication yet.  I'm asking you questions about the
6    circumstances under which the communication was made.
7       A    Yes.
8       Q    Was the communication made for purposes of
9    pastoral response by you?
10       A    Are we still on an assumption?  Are these
11    questions or -- because you said assuming that the answer
12    was yes.  I've never answered that question yet, and forgive
13    me.  I'm being a little dense here, but I don't know if I'm
14    still answering on an assumption.  Am I saying that right
15    even?
16       Q    Yes, you are.
17       A    Okay.
18       Q    Because the answer yes or no to the question could
19    potentially violate a privilege.  But before you answer that
20    question, I'm asking you questions surrounding that
21    communication.  Okay?  I'm not asking you about what was
22    said or whether the answer to my -- that previous question
23    was yes or no.  I'm just asking you other questions related
24    to the nature of that communication and the surrounding
25    circumstances.

Page 57

1       A    Okay.
2       Q    So again my question is:  Was this something that
3    you learned in connection with pastoral counseling within
4    the Church?
5       A    Yes.
6       Q    Was the information that you received something
7    that you are required to keep confidential under the
8    doctrines and teachings of your church?
9       A    Yes.
10       Q    Was the communication that you received something
11    that you in fact kept confidential, that is, that you did
12    not disclose to any other person?
13       A    Let me make sure I understand that.  A
14    communication not disclosed to anybody else?
15       Q    Correct.
16       A    The answer to that question, if I've heard the
17    question correct, is yes or -- let me rephrase it, and then
18    tell you what I thought you said.
19       Q    Go ahead.
20       A    I did not disclose what was said confidentially to
21    me to others.
22       Q    Just so that I'm clear on this, you did not
23    disclose the content of what was said to you by that person
24    to any other person?
25       A    The content of that conversation, that meeting, I

GARCIA & LOVE
801.538.2333

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                                                RANDALL BORLAND

Page 58

1  did not.
2      Q   Okay.
3      A   The best of my recollection.
4      Q   Okay. Did you ever make a referral to LDS Social
5  Services for counseling Jack Loholt?
6      A   I don't remember. I do not remember that.
7      Q   Did you do anything or say anything to anyone else
8  following the communication that you received from this
9  person?
10     A   Regarding specifics?
11     Q   Anything.
12     A   Yes.
13     Q   What did you do or say?
14     A   I talked --
15         MR. FREY:  Again I'm going to caution you that if
16  you took any steps in your capacity as a clergyman and
17  ecclesiastical in accordance with the teachings and beliefs
18  of the LDS religion that you are not obligated to break that
19  confidentiality if in fact you learned that in those
20  circumstances.
21         And for the record, Counsel, what I'm trying to do
22  here is allow you to ask questions without reaching what I
23  believe is a privilege that he has as a bishop to receive
24  information, treat it with confidentiality, and act on it in
25  an ecclesiastical fashion.

Page 59

1          MR. KOSNOFF:  Could you identify the source of
2  that privilege.
3          MR. FREY:  State v. Martin and the statute, the
4  First Amendment.
5          MR. KOSNOFF:  So are you relying on the clergy
6  penitent privilege?
7          MR. FREY:  And his First Amendment rights.
8          MR. KOSNOFF:  What First Amendment rights are you
9  referring to?
10         MR. FREY:  Free exercise rights.
11         MR. KOSNOFF:  Specifically what in the free
12  exercise clause are you basing this privilege?
13         MR. FREY:  That he has the right to free exercise
14  of religion to be free from the restraint of having a civil
15  court interfere and make him disclose confidential
16  communications. We've been through this. We've briefed it.
17  We've already argued it in the Court of Appeals and won it.
18         MR. KOSNOFF:  No. We've --
19         MR. FREY:  And that's what I'm doing here.
20         MR. KOSNOFF:  No. That was a completely different
21  issue and very different narrow issue than --
22         MR. FREY:  And there's a third item involved here
23  that we haven't gotten to yet, but that is the privacy
24  rights of individuals who may be involved, if any. But I'm
25  trying not to interfere with your legitimate discovery area,

Page 60

1  and so I'm trying to be very careful here. And I want you
2  to understand that it's not my purpose here to frustrate
3  your discovery, but I do want him to be careful that he
4  doesn't breach any of the confidentiality that is imposed
5  upon him by his position as a clergyman.
6          So if you can read back the question. Sorry about
7  the speech --
8          MR. KOSNOFF:  Well, I -- we have gone through the
9  criteria for the appropriate assertion of the clergy
10  penitent privilege, and that shields him from disclosing the
11  content of privileged communications based upon that
12  statute. My questions now are not directed at the content
13  of that communication. My questions are directed at what he
14  did or said to others following that communication.
15         MR. FREY:  But that may very well involve his
16  working in an ecclesiastical capacity and involve
17  conversations with other people that are privileged, and
18  that's my point.
19         MR. KOSNOFF:  That -- it's our position that that
20  would not be privileged and that he is required to answer
21  those questions.
22         MR. FREY:  Just a second.
23         (Defense counsel confer)
24         MR. FREY:  I -- I've made my objection. We
25  disagree. Okay?

Page 61

1          MR. KOSNOFF:  Are you directing him not to answer.
2          MR. FREY:  No, I'm not. I'm asking him if he can
3  answer without violating -- if he can answer about what he
4  did without violating any confidentiality that I believe he
5  has the right to maintain as a bishop, then he may answer
6  the question.
7      A   I believe I can do that. Confidentiality is very
8  important to me. I -- the only reason I even hesitate at
9  all is because of the conversation, and I'm very respectful
10  of both of you. I didn't talk about, to another person, the
11  content of my discussion with the ward member that contacted
12  me, but the circumstance surrounding it I did, and that was
13  Jack Loholt. I had to talk with him.
14     Q   And that conversation that you had with Jack
15  Loholt took place fairly soon after?
16     A   Yes, sir.
17     Q   And what was said?
18         MR. FREY:  Again, you may answer that question if
19  it will not violate any privilege that you have as a
20  clergyman.
21     A   I don't believe I can answer that.
22     Q   Again let's go through some of the questions that
23  I asked you before, a checklist, if you will.
24     A   Okay.
25     Q   Because there's -- may well be a judge that's

16 (Pages 58 to 61)

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

---

Page 70

1  Q   Would you communicate this information to the
2  police?
3  A   Not necessarily, no.
4  Q   Would you communicate it to the local Child
5  Protective Services agency?
6  A   No.
7  Q   Would you attempt to substantiate the accusation
8  yourself?
9  A   I suspect I would, uh-huh (affirmative).
10  Q   How?
11  A   It would depend on the circumstance. It would
12  depend on the people. It would depend on the emotions. It
13  would depend on a gamut of things, a wide range of things
14  that would all focus in on is this legitimate, is this real,
15  or is it just an accusation, is it somebody that's upset
16  with somebody and angry, whatever it might be.
17  Q   Have you ever actually had to conduct such an
18  investigation?
19  A   I'm sorry?
20  Q   Have you ever actually been presented with a
21  scenario like this?
22  A   I'm going to have a difficulty answering that
23  question --
24      MR. FREY: Again, I'm going to instruct you if
25  that's going to cause you -- or require you, pardon me, to

---

Page 71

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3      For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10  communication and to provide spiritual counseling." That's
11  what I'm trying to protect him with.
12      MR. KOSNOFF: That's one of the elements.
13      MR. FREY: Okay. Well --
14      MR. KOSNOFF: They didn't throw out the elements
15  of the statute, and I'm very well-acquainted with State v.
16  Martin.
17  Q   (By MR. KOSNOFF) Let's get back to -- let's get
18  back to Mr. Loholt. You testified earlier that you spoke
19  with Jack Loholt. Are you asserting the privilege with
20  respect to your communication with Jack Loholt regarding any
21  allegations of child sexual abuse?
22  A   As being confidential?
23  Q   Yes.
24  A   Yes.
25  Q   Did you speak with anybody else other than Jack

---

Page 72

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A   No.
4  Q   So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A   I can't speak for Jack Loholt. It was kept within
7  me.
8  Q   Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10  A   What information?
11  Q   Any information that Jack Loholt may have engaged
12  in sexual misconduct with a child.
13      MR. FREY: Again, these communications between you
14  and your counselors are also privileged, but go ahead.
15  A   So the answer -- I guess my answer would be -- is
16  my discussion with my counselors would be confidential. I
17  don't -- I don't remember discussing that with anybody.
18  Q   So you have no recollection of discussing with
19  anybody else?
20  A   I have no recollection of that.
21  Q   Okay.
22  A   That's correct. I do not.
23  Q   Did you remove Jack Loholt from any positions
24  working with youth in the ward while you were bishop?
25  A   Did I remove him?

---

Page 73

1  Q   Yes.
2  A   Released him --
3  Q   Okay.
4  A   -- yes.
5  Q   And what positions did you release him from?
6  A   His responsibility in scouting.
7  Q   Why did you release him?
8      MR. FREY: You can't --
9  A   I can't divulge that.
10  Q   I'm not asking you to reveal any communications.
11  I'm asking you your personal reasons why you released him
12  from scouting.
13      MR. FREY: Same objection. You're entitled to
14  claim the privilege.
15      One reveals the other, Counsel.
16  Q   (By MR. FREY) Isn't it a fact that you removed
17  Jack Loholt from scouting because you knew that he presented
18  a danger to boys of sexual abuse?
19  A   I -- I am not going to answer that.
20  Q   Did anybody ask you why you were releasing Jack
21  Loholt from scouting?
22  A   Nobody asked me why I was releasing him that I can
23  remember.
24  Q   Did you make any announcement to members of the
25  ward, either in a general meeting or in meetings of any

---

19 (Pages 70 to 73)

Case 2:04-cv-02338-RSM    Document 56    Filed 10/24/2005    Page 22 of 26

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                                    RANDALL BORLAND

Page 58

1  did not.
2     Q   Okay.
3     A   The best of my recollection.
4     Q   Okay.  Did you ever make a referral to LDS Social
5  Services for counseling Jack Loholt?
6     A   I don't remember.  I do not remember that.
7     Q   Did you do anything or say anything to anyone else
8  following the communication that you received from this
9  person?
10    A   Regarding specifics?
11    Q   Anything.
12    A   Yes.
13    Q   What did you do or say?
14    A   I talked --
15       MR. FREY:  Again I'm going to caution you that if
16 you took any steps in your capacity as a clergyman and
17 ecclesiastical in accordance with the teachings and beliefs
18 of the LDS religion that you are not obligated to break that
19 confidentiality if in fact you learned that in those
20 circumstances.
21       And for the record, Counsel, what I'm trying to do
22 here is allow you to ask questions without reaching what I
23 believe is a privilege that he has as a bishop to receive
24 information, treat it with confidentiality, and act on it in
25 an ecclesiastical fashion.

Page 59

1        MR. KOSNOFF:  Could you identify the source of
2  that privilege?
3        MR. FREY:  State v. Martin and the statute, the
4  First Amendment.
5        MR. KOSNOFF:  So are you relying on the clergy
6  penitent privilege?
7        MR. FREY:  And his First Amendment rights.
8        MR. KOSNOFF:  What First Amendment rights are you
9  referring to?
10       MR. FREY:  Free exercise rights.
11       MR. KOSNOFF:  Specifically what in the free
12 exercise clause are you basing this privilege?
13       MR. FREY:  That he has the right to free exercise
14 of religion to be free from the restraint of having a civil
15 court interfere and make him disclose confidential
16 communications.  We've been through this.  We've briefed it.
17 We've already argued it in the Court of Appeals and won it.
18       MR. KOSNOFF:  No.  We've --
19       MR. FREY:  And that's what I'm doing here.
20       MR. KOSNOFF:  No.  That was a completely different
21 issue and very different narrow issue than --
22       MR. FREY:  And there's a third item involved here
23 that we haven't gotten to yet, but that is the privacy
24 rights of individuals who may be involved, if any.  But I'm
25 trying not to interfere with your legitimate discovery area,

Page 60

1  and so I'm trying to be very careful here.  And I want you
2  to understand that it's not my purpose here to frustrate
3  your discovery, but I do want him to be careful that he
4  doesn't breach any of the confidentiality that is imposed
5  upon him by his position as a clergyman.
6        So if you can read back the question.  Sorry about
7  the speech --
8        MR. KOSNOFF:  Well, I -- we have gone through the
9  criteria for the appropriate assertion of the clergy
10 penitent privilege, and that shields him from disclosing the
11 content of privileged communications based upon that
12 statute.  My questions now are not directed at the content
13 of that communication.  My questions are directed at what he
14 did or said to others following that communication.
15       MR. FREY:  But that may very well involve his
16 working in an ecclesiastical capacity and involve
17 conversations with other people that are privileged, and
18 that's my point.
19       MR. KOSNOFF:  That -- it's our position that that
20 would not be privileged and that he is required to answer
21 those questions.
22       MR. FREY:  Just a second.
23       (Defense counsel confer)
24       MR. FREY:  I -- I've made my objection.  We
25 disagree.  Okay?

Page 61

1        MR. KOSNOFF:  Are you directing him not to answer.
2        MR. FREY:  No, I'm not.  I'm asking him if he can
3  answer without violating -- if he can answer about what he
4  did without violating any confidentiality that I believe he
5  has the right to maintain as a bishop, then he may answer
6  the question.
7     A   I believe I can do that.  Confidentiality is very
8  important to me.  I -- the only reason I even hesitate at
9  all is because of the conversation, and I'm very respectful
10 of both of you.  I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt.  I had to talk with him.
14    Q   And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16    A   Yes, sir.
17    Q   And what was said?
18       MR. FREY:  Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21    A   I don't believe I can answer that.
22    Q   Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24    A   Okay.
25    Q   Because there's -- may well be a judge that's

16 (Pages 58 to 61)

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

Page 70

1   Q   Would you communicate this information to the
2   police?
3   A   Not necessarily, no.
4   Q   Would you communicate it to the local Child
5   Protective Services agency?
6   A   No.
7   Q   Would you attempt to substantiate the accusation
8   yourself?
9   A   I suspect I would, uh-huh (affirmative).
10   Q   How?
11   A   It would depend on the circumstance. It would
12   depend on the people. It would depend on the emotions. It
13   would depend on a gamut of things, a wide range of things
14   that would all focus in on is this legitimate, is this real,
15   or is it just an accusation, is it somebody that's upset
16   with somebody and angry, whatever it might be.
17   Q   Have you ever actually had to conduct such an
18   investigation?
19   A   I'm sorry?
20   Q   Have you ever actually been presented with a
21   scenario like this?
22   A   I'm going to have a difficulty answering that
23   question --
24       MR. FREY: Again, I'm going to instruct you if
25   that's going to cause you -- or require you, pardon me, to

Page 71

1   go ahead and disclose any type of information that you
2   received in your position as a clergy member.
3       For the record, I want to make this clear,
4   Counsel. I'm quoting from State v. Martin so we'll know
5   exactly what we're talking about. And they there say that
6   rather than the statute -- "Rather, the statute only
7   requires the clergy member receiving the confidential
8   communication be enjoined by the practices or rules of the
9   clergy member's religion to receive the confidential
10   communication and to provide spiritual counseling." That's
11   what I'm trying to protect him with.
12       MR. KOSNOFF: That's one of the elements.
13       MR. FREY: Okay. Well --
14       MR. KOSNOFF: They didn't throw out the elements
15   of the statute, and I'm very well-acquainted with State v.
16   Martin.
17   Q   (By MR. KOSNOFF) Let's get back to -- let's get
18   back to Mr. Loholt. You testified earlier that you spoke
19   with Jack Loholt. Are you asserting the privilege with
20   respect to your communication with Jack Loholt regarding any
21   allegations of child sexual abuse?
22   A   As being confidential?
23   Q   Yes.
24   A   Yes.
25   Q   Did you speak with anybody else other than Jack

Page 72

1   Loholt regarding information that he may have engaged in
2   sexual misconduct with a child?
3   A   No.
4   Q   So anything that was said between Jack Loholt and
5   yourself was kept strictly to yourself. Is that correct?
6   A   I can't speak for Jack Loholt. It was kept within
7   me.
8   Q   Was that information shared with anyone else on
9   the bishopric, such as your first or second counselor?
10   A   What information?
11   Q   Any information that Jack Loholt may have engaged
12   in sexual misconduct with a child.
13       MR. FREY: Again, these communications between you
14   and your counselors are also privileged, but go ahead.
15   A   So the answer -- I guess my answer would be -- is
16   my discussion with my counselors would be confidential. I
17   don't -- I don't remember discussing that with anybody.
18   Q   So you have no recollection of discussing with
19   anybody else?
20   A   I have no recollection of that.
21   Q   Okay.
22   A   That's correct. I do not.
23   Q   Did you remove Jack Loholt from any positions
24   working with youth in the ward while you were bishop?
25   A   Did I remove him?

Page 73

1   Q   Yes.
2   A   Released him --
3   Q   Okay.
4   A   -- yes.
5   Q   And what positions did you release him from?
6   A   His responsibility in scouting.
7   Q   Why did you release him?
8       MR. FREY: You can't --
9   A   I can't divulge that.
10   Q   I'm not asking you to reveal any communications.
11   I'm asking you your personal reasons why you released him
12   from scouting.
13       MR. FREY: Same objection. You're entitled to
14   claim the privilege.
15       One reveals the other, Counsel.
16   Q   (By MR. FREY) Isn't it a fact that you removed
17   Jack Loholt from scouting because you knew that he presented
18   a danger to boys of sexual abuse?
19   A   I -- I am not going to answer that.
20   Q   Did anybody ask you why you were releasing Jack
21   Loholt from scouting?
22   A   Nobody asked me why I was releasing him that I can
23   remember.
24   Q   Did you make any announcement to members of the
25   ward, either in a general meeting or in meetings of any

19 (Pages 70 to 73)

Page 106

1  the Mormon church after you left Seattle asking you
2  questions about Jack Loholt other than related to this
3  immediate lawsuit?
4      A   No, no.
5          MR. KOSNOFF:  Thank you, Bishop.  That's all I
6  have.
7          THE WITNESS:  Thank you.
8          MR. FREY:  I have no questions.  And we will get a
9  copy of the transcript if it's ordered.
10         MR. NASH:  Do you want to waive signature?
11         MR. FREY:  We're not going to waive signature.  He
12 has to read it and sign it.  We can go off the record.
13         (Proceeding was adjourned at 12:14 p.m.)
14                        * * *
15         Reading copy mailed to the witness.
16
17
18
19
20
21
22
23
24
25

Page 108

1              C E R T I F I C A T E
2  STATE OF UTAH      )
3  COUNTY OF SALT LAKE )
4      THIS IS TO CERTIFY that the sworn testimony of RANDALL
   BORLAND was taken before me, Diane W. Flanagan, a Registered
5  Professional Reporter, and Notary Public in and for the State
   of Utah.
6
       That the said witness was by me, before examination,
7  duly sworn to testify the truth in said cause.
8      That said testimony was reported by me and thereafter
   transcribed into typewriting, and that a full, true, and
9  correct transcription of said testimony is set forth in the
   foregoing pages, numbered from 3 through 106 inclusive.
10
       I further certify that after said testimony was
11 transcribed, a reading copy of same was delivered to the
   witness for reading and signature and signed before a Notary
12 Public.
13     I further certify that I am not of kin or otherwise
   associated with any of the parties to said cause of action
14 and that I am not interested in the event thereof.
15     WITNESS MY HAND and official seal at Salt Lake City,
   Utah, this 26th day of September, 2005.
16
17
18
19     _____
20          Diane W. Flanagan
            Registered Professional Reporter
21
22 My notary commission expires:
   December 28, 2008
23
24
25

Page 107

1  Case:  Fleming vs. The Corporation of the President
   Date Taken:  September 20, 2005     No.:  C04-2338 RSM
2  Reporter:  Diane W. Flanagan, RPR
       W I T N E S S   C E R T I F I C A T E
3
4  I, RANDALL BORLAND, HEREBY CERTIFY that I have read the
   foregoing testimony consisting of 104 pages, numbered from 3
5  through 106, inclusive, and the same is a true and correct
   transcription of said testimony, with the exception of the
6  following corrections listed below, giving my reasons
   therefor.
7  PAGE  LINE
8          NOW READS:_____
           SHOULD READ_____
9          REASON FOR CHANGE_____
           NOW READS_____
10         SHOULD READ_____
           REASON FOR CHANGE_____
11         NOW READS_____
           SHOULD READ_____
12         REASON FOR CHANGE_____
           NOW READS_____
13         SHOULD READ_____
           REASON FOR CHANGE_____
14         NOW READS_____
           SHOULD READ_____
15         REASON FOR CHANGE_____
           NOW READS_____
16         SHOULD READ_____
           REASON FOR CHANGE_____
17         NOW READS_____
           SHOULD READ_____
18         REASON FOR CHANGE_____
           NOW READS_____
19         SHOULD READ_____
           REASON FOR CHANGE_____
20         NOW READS_____
           SHOULD READ_____
21         REASON FOR CHANGE_____
22 Subscribed and sworn to before me this ___ day of _____.
23
   _____     _____
   NOTARY PUBLIC                RANDALL BORLAND
24 My commission expires:       Signed under penalty of
                                perjury.
25

28 (Pages 106 to 108)

# STAFFORD FREY COOPER

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100, Seattle, WA 98101-1374 TEL (206) 623-9900 FAX (206) 624-6885

October 7, 2005

**Via U.S. Mail & Fax: (206) 676-7575**

Michael T. Pfau
Gordon Thomas Honeywell Malanca Peterson & Daheim
600 University Street, Suite 2100
Seattle, WA 98101-4185

Timothy D. Kosnoff
Law Offices of Timothy D. Kosnoff
600 University Street, Suite 2100
Seattle, WA 98101-4185

     Re:    Fleming, et al. v. COP, et al.
            Our File: 7566-025226

Gentlemen:

    This letter will confirm our CR 37(a)(2)(A) conference relating to deposition discovery in this case. To date, we have been able to work cooperatively in completing the discovery that needs to be done. Following the deposition of Mr. Jensen, we met and agreed as follows: (1) that you will continue to attempt to schedule the deposition of Mr. LoHolt prior to the discovery deadline if possible; and (2) that you would give me a list of the witnesses you would like to depose after the discovery cut-off.

    You indicated that if we continue to cooperate in discovery, you would not move the Court for an order striking our expert witnesses. While I maintain that the parties have already agreed that COP may use their identified experts, I have nonetheless indicated to you that we do intend to continue to work cooperatively within reason, in the conduct of discovery in this case. However, I cautioned that we are not agreeable to a carte blanche extension of the discovery cut-off, and that any extension of discovery would have to be done on a witness-by-witness basis so that the decisions are made with some specificity as opposed to just a general discussion. Again, we wish to cooperate in the conduct of discovery in this case, but on a witness-specific basis. Thus, I ask that you give me a list of the witnesses, and I will do likewise.

    The list of post-deadline discovery to be completed within a reasonable amount of time may include: (1) selected fact witnesses to which we mutually agree; (2) depending on the circumstances, Jack LoHolt's deposition may need to be taken after the discovery cut-off, depending on how quickly his deposition can be arranged; (3) if necessary, depositions of Richard Pettit and Don Boren may be taken before or after discovery cut-off – assuming that we cannot find open dates prior to the Cavalieri trial;



EXHIBIT _5

Michael T. Pfau
Timothy D. Kosnoff
Re:  Fleming, et al. vs COP, et al.
October 7, 2005
Page 2


(4) in addition to those fact witnesses you have identified (which I ask be confirmed in writing), we hereby inform you that we intend to depose Arlene Land, Linda Herman, and Tony Asworth; and (5) we intend to depose your experts, including your rebuttal expert.  If you will cooperate in calendaring the depositions of these individuals, our office will work with your office in arranging our respective schedules; otherwise, because of the impending deadline, we will be forced to simply note the depositions.

You stated your intent to move the Court to compel Bishop Borland to respond to certain questions regarding conversations which were asserted in his deposition to be privileged and/or confidential under both the First Amendment and the Priest-Penitent privilege statute.  I suggested that you supply me with a list of questions which you wish to ask him, and frankly do not recall whether you agreed to supply the list or not.  We disagreed as to the scope of the protection afforded by the Priest-Penitent privilege statue, as well as under the First Amendment for clergy-parishioner spiritual counseling in the religious context.

Lastly, given the recent spate of cancellations and re-schedulings of depositions, I suggest that your assistant, Johnnie, call Mary Ann and that a new, updated discovery schedule be provided so that each of us is aware of what discovery remains to be completed.

Please do not hesitate to give me a call or to reply in writing if you feel that my letter is inaccurate or incomplete in any way.

Very truly yours,

STAFFORD FREY COOPER



Marcus B. Nash
Attorney at Law

MBN/as
cc:  Thomas D. Frey