1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

KENNETH FLEMING, JOHN DOE, R.K.,
and T.D.,

                    Plaintiffs,

        v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole, a/d/a "MORMON CHURCH"; LDS
SOCIAL SERVICES a/d/a LDS FAMILY
SERVICES, a Utah corporation,

                    Defendants.

| NO. C04-2338 RSM |
| --- |
| **DECLARATION OF MICHAEL T. PFAU IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL** |
| **NOTE ON MOTION CALENDAR: JANUARY 13, 2006** |

I, Michael T. Pfau am over the age of 18 and am competent to testify as follows:

1.      I am attorney for the Plaintiffs in this case. I have personal knowledge of the facts and circumstances that surround this motion.

2.      On November `29th, 2005, I along with my co-counsel held a Rule 37 discussion with Marcus Nash, counsel for the Church of Latter Day Saints, about the issues set forth in this motion.

3.      We also followed the Rule 37 with letters that reflect the results of the discussion and our clients' respective positions.

DECLARATION OF MICHAEL T. PFAU - 1 of 2
(C04-2338 RSM)
[155870 v6.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Dockets.Justia.com

4.    Attached as **Exhibit 1** is a true and correct copy of a letter from Marcus Nash to Michael Pfau and Timothy Kosnoff dated November 29, 2005.

5.    Attached as **Exhibit 2** is a true and correct copy of a letter from Michael Pfau to Marcus Nash dated December 16, 2005.

6.    Attached as **Exhibit 3** are true and correct copies of excerpts of the deposition of Randall Borland dated September 20, 2005.

7.    Attached as **Exhibit 4** are true and correct copies of excerpts from the deposition of Phillip Coleman dated September 15, 2005.

8.    Attached as **Exhibit 5** are true and correct copies of excerpts of the deposition of Lloyd Hale.

I declare under penalty of perjury under the laws of the State of Washington that the foregoing is true and correct.

DATED at Seattle, Washington this ⟨26⟩ day of December, 2005.

_____
Michael T. Pfau

DECLARATION OF MICHAEL T. PFAU - 2 of 2
(C04-2338 RSM)
[155870 v6.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

# Exhibit #1

# STAFFORD FREY COOPER

GORDON, THOMAS, HONEYWELL
MALANCA, PETERSON & DAHEIM L.L.P.

DEC 01 2005

PROFESSIONAL CORPORATION
601 Union Street, Suite 3100, Seattle, WA 98101-1374 TEL (206) 623-9900 FAX (206) 624-6885

November 29, 2005

Michael T. Pfau
Gordon Thomas Honeywell Malanca Peterson & Daheim, LLP
600 University Street, Suite 2100
Seattle, WA 98101-4185

Timothy D. Kosnoff
Law Offices of Timothy D. Kosnoff
600 University Street, Suite 2100
Seattle, WA 98101

Re:     Fleming, et al. v. Corporation of the President of The Church of
        Jesus Christ of Latter-day Saints
        Our File No.: 7566-025226

Dear Mr. Pfau and Mr. Kosnoff:

This letter will confirm our discussion in today's Fed. R. Civ. P. 37(a)(2)(B) meeting. In our meeting, we discussed the five items identified in your November 29, 2005, correspondence. As to the broad questions posed in your correspondence, we reiterated that they are so broad that it is virtually impossible for us to respond in any meaningful way. While we agree that some inquiry is legitimate, we believe it is permissible only to a certain extent before it invades the privilege. Thus, we attempted to address the issues in a more specific way, by reference to the witnesses in question; i.e., Bishops Johansen, Coleman, and Borland.

With regard to Bishop Johansen, we pointed out that in our reading of the deposition, it appears that he never asserted the privilege and that further deposition is unnecessary. You agreed to reread the deposition and let us know if your reading of the transcript is consistent with ours.

With regard to Bishop Coleman, we pointed out that, again in our reading of that deposition, Bishop Coleman ultimately did not claim any privilege except: (1) as to penitential/confessional communications with Jack LoHolt (to which you did not object at the time of the deposition), and (2) as to the identity of other potential victims which you claim are material witnesses. In our attempt to be responsive to your position while protecting the privacy rights of the third parties involved (which is a significant concern), we informed you in our conference today that the Church would be willing to turn over the names of the victims if you and your clients were willing to enter into a protective order, keeping the identities of the victims confidential. You agreed to draft a pleading/document for our review in order to try to reach an amicable resolution on the



Marcus B. Nash   Dir Tel: (206) 667-8241   Dir Fax: (206) 748-9032   mnash@staffordfrey.com   www.staffordfrey.com
ADMITTED IN Washington

Michael T. Pfau and
Timothy D. Kosnoff
Re: Fleming vs. COP
November 29, 2005
Page 2

issue. You agreed to reread the transcripts of this deposition as well and let us know if your reading of the deposition testimony accords with ours.

With regard to Bishop Borland, we reiterated our position that his assertion of the privilege was appropriate under the facts and circumstances, and we essentially agreed that that issue will likely need to be resolved by Judge Martinez.

Lastly, you agreed to extend the dispositive motions filing deadline to January 5, 2006.

Please advise whether this correspondence is in any way inaccurate or incomplete as it pertains to the content of today's Fed. R. Civ. P 37(a)(2)(B) conference.

Very truly yours,

STAFFORD FREY COOPER

Marcus B. Nash
Attorney at Law

MBN/as
cc: Thomas D. Frey

# Exhibit #2

LAW OFFICES

# GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP

SEATTLE OFFICE
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON  98101-4185
(206) 676-7500
FACSIMILE (206) 676-7575
REPLY TO SEATTLE OFFICE

TACOMA OFFICE
1201 PACIFIC AVENUE, SUITE 2100
POST OFFICE BOX 1157
TACOMA, WASHINGTON  98401-1157
(253) 620-6500
FACSIMILE (253) 620-6565

**Michael T. Pfau**
Direct: (206) 676-7533
E-mail: mpfau@gth-law.com

December 16, 2005

**VIA FACSIMILE and U.S. MAIL**

Marcus Nash
STAFFORD FREY COOPER
601 Union Street, Suite 3100
Seattle WA  98101-1734

   RE: *Fleming, et al. v. Corporation of the President of The Church of Jesus Christ of Latter-day Saints*

Dear Mr. Nash:

  Thank you for your letter dated November 29th in follow-up to our Rule 37(a)(2)(B) conference on that date.  This letter is in reply to your November 29th letter.  Below find the exact deposition questions for which we will seek an order from Judge Martinez compelling deposition testimony.  In an attempt to resolve this discovery dispute, we invite you to contact us if your position changes from what was discussed in our Rule 37 conference and your letter of November 29th.  We will file our motion next Thursday with a hearing date of January 6th.

**A.** **Frederick Johansen**

  With regard with Bishop Johansen, upon re-reading the deposition, we find that defense counsel instructed the witness not to answer based upon claimed privilege rendering the deponent's ultimate utterance non-responsive, in the instances noted below. The alleged privilege claimed by defense counsel was characterized as "if he learned it in any context in which he had

[3c6m12!1.DOC]

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 2

a member of the ward coming to him in his capacity as bishop, either in a confessional sense or in a spiritual counseling with him."[1]

**1.**    Q:  For the purposes of this question, I would like you to refer to the definition of sexual contact if you have any question about the definition, but during your time as a bishop did you ever come to learn any information about Jack LoHolt having sexual contact as it's defined there in Exhibit No. 1, with any children under the age of 18?

MR. FREY:  Before you answer that, I am going to claim privilege if he learned it in any context in which he had a member of the ward coming to him in his capacity as a bishop, either in a confessional sense or in a sense of spiritual counseling with him.  If he learned it otherwise, that he just heard a rumor in the ward, he's free to answer that.

Do you understand what I'm saying?

A: Yes.

MR. FREY:  Then go ahead and answer.

THE WITNESS: The answer is no.

Q:  (By Mr. Reich)  "No," meaning you've had no person in my capacity approach you with any information about LoHolt, Jack LoHolt, having sexual contact with children under the age of 18?

MR. FREY:  Again, I'm going to object and instruct the witness not to answer that question with regard to anyone who came to see him in his capacity as a bishop.  Other than that, he can answer, and I think he has.

MR. REICH:  Well, I want to explore that because I'm not satisfied that there has been any foundation yet for asserting that as a privilege.

I don't know whether he has learned of any information.  I am asking whether he has learned from any source, any information — I am not asking what was stated in a confessional or what setting.[2]

---

[1] Johansen Dep. 3, 29: 9-15.

[3c6m12!1.DOC]

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 3

2.    Q:  I just want to know whether at any point in time you learned while you were a bishop that LoHolt had had sexual contact with children under the age of 18.

MR. FREY:  I am making the same objection.  You can go ahead and answer within the confines that I told you.

THE WITNESS:  The answer is no.[3]

3.    Q:  (By Mr. Reich)  Have you ever had discussions with any others in the church hierarchy, meaning other bishops, stake presidents, area presidents, regarding Jack LoHolt?

MR. FREY:  Before you answer that, if you had discussions with them in your capacity as a bishop, in your ecclesiastical capacity concerning Jack LoHolt, then that's protected in my opinion, and I instruct you not to answer.  If you had discussions outside of that, then you should answer Counsel's question.

THE WITNESS:  The answer is no.[4]

**B.    Philip Coleman**

With regard to Bishop Coleman, I understand that you will turn over the names of the victims if we will agree to enter a protective order to protect the confidentiality interests of these third parties.  We agree to redact the names of those victims in documents filed with the Court.  I will forward you a protective order for your review and signature under separate cover.

Upon re-reading Bishop Coleman's position, Bishop Coleman claimed an alleged privilege as to:  (i) from whom Coleman learned that LoHolt was allegedly engaging in sexually inappropriate activity; (ii) communication with Jack Holt to which plaintiffs' counsel responded on the record stating "whether or not a privilege really applies really depends on the circumstances and the conduct and the intent of the parties"[5].

---

[2] *Id.,* 29: 1-30: 1-11.

[3] *Id.,* 30: 12-19.

[4] *Id.,* 36: 8-18.

[5] Coleman Dep., 55: 13-16.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 4

Our upcoming motion will address Coleman's refusal to answer the following questions:

**1.**     Q: From whom did you learn that?

MR. FREY: I am going to object at this point in time.

Let me tell you the basis for the objection.

He was a bishop at the time, and we treat those communications as confidential, and in trying to help you with this answer, I'm not trying to present a roadblock.

As an accommodation and because of the fact that the individuals involved have not authorized this information to be given, I think they have a right to privacy in that regard and a right to have it protected.

As an accommodation, I'll allow the witness to tell you in a general sense what he heard had happened, and I'm not waiving any privilege by doing that.

If you'll accept that, we can go forward.

You don't have to accept my objection, but if you want to go forward, I'm willing to do that on this basis.

MR. KOSNOFF: Tom, I would like to take a brief bathroom break and come back and continue this dialogue on that point.

(Recess 10:27 to 10:33 a.m.)

MR. KOSNOFF: Mr. Frey, this is not unfamiliar ground to the two of us, this point. We've been at similar points in other cases.

From your comments I take that you are making an objection based upon a number of criteria. One, I think I heard an assertion of the clergy penitent privilege.

MR. FREY: I'll make it simple for you. I'll tell you what the basis for my objection is: one, it's a constitutional objection on the free exercise clause; number two, it may also be on the basis of the priest penitent privilege depending on the circumstances under which he may have heard something; and the third ground is that we've said in our answers to interrogatories I'm not prepared to reveal the names of anybody or have my client reveal the names of

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 5

anyone who has been molested without that person's consent because I know for a fact, and I've gotten court orders on this, that it can be devastating to have someone knock on their door and say "I understand you've been abused and I'd like to talk to you about it."

For those three reasons – I am willing to go forward because I know that you have the right to determine knowledge and what they knew and should have known, and I'm willing to let him tell you in a general fashion, and I guess I could proffer this for the record what he can tell you to get you to where you need to go—

MR. KOSNOFF:   Before we go there, I think this is important that we establish enough of a factual record here for Judge Martinez so we only have to take one trip up and bring Dr. Coleman back one more time as opposed to two more times, so I would propose that with respect to the assertion of the claimed privileges that you're making, that you take a moment and establish whatever factual basis you would like with Dr. Coleman to support the assertion of those privileges.

I'm inviting you to do that because, as you know, it's the proponent of the privilege that carries the burden of establishing it, and I just want to make sure that when this goes up to Judge Martinez, that you've had a full opportunity to make as full an evidentiary record as you need to make your arguments to him.

MR. FREY:   It's not my burden.     Under the rule I'm exercising those privileges, and I've enumerated them.

If you wish to question the witness, you are free to do that.  If you choose to go to Judge Martinez, I'll be happy to supply whatever additional information I need by way of affidavit or otherwise.

I've tried to explain to you, and you're free to ask him the circumstances and free to ask him a number of questions, and I think you can get the information that you need without revealing these names.

Quite frankly, Tim, I don't want to reveal any names or my client to reveal any names that he may have heard of that are not public right now because I simply don't think it's appropriate.

[3c6m12!1.DOC]

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 6

As I've said before, I've gotten court orders restricting that information.[6]

**2.**   Q: Did Jack acknowledge, however—

MR. FREY:  For the record, I want to make this clear because this is going to come up again.

In those conversations where you're acting with your bishop's hat on and you're speaking to one of your people and it involves what could be classified as a transgression within the church, you do have the right not to disclose that information.

On the other hand, I want you to be able to answer Counsel's question because he has a right to find out what we knew or didn't know or should have known.

Q:  (By Mr. Kosnoff)  I would add whether or not a privilege really applies really depends on the circumstances and the conduct and the intent of the parties.[7]

**C.   Randall Borland**

With regard to Bishop Borland, we agreed that the issue of Bishop Borland's claimed privilege will likely need to be resolved by Judge Martinez.  Plaintiffs will seek an Order from Judge Martinez ordering Bishop Borland to appear for deposition to answer the following questions he evaded by claimed privilege in the instances noted below:

**1.**   Q:  (By Mr. Kosnoff)  Did you receive a complaint or report from anybody that Jack LoHolt had engaged in sexually inappropriate activity during the time that you were Bishop of the Kent Second Ward?

MR. FREY:  Now, again, Bishop, I'm going to caution you that if you learned any of this information in your capacity as a Bishop in a confidential communication that you have the privilege not to answer it,

---

[6] *Id.*, 45: 22 – 49: 11.

[7] *Id.*, 54: 25 – 55: 16.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 7

in my opinion. Counsel may differ with that, but I would instruct you not
to answer it if that's the basis upon which you gained your information.[8]

2.        Q.: . . . Did you ever make a referral to LDS Social Services for
counseling Jack LoHolt?

A:        I don't remember. I do not remember that.

Q:        Did you do anything or say anything to anyone else following the
communication that you received from this person?

A:        Regarding specifics?

Q:        Anything.

A:        Yes.

Q:        What did you do or say?

A:        I talked –

MR. FREY:  Again, I'm going to caution you that if you took any steps in your
capacity as a clergyman and ecclesiastical in accordance with the teachings and
beliefs of the LDS religion that you are not obligated to break that
confidentiality if in fact you learned that in those circumstances.

And for the record, Counsel, what I'm trying to do here is allow you to ask
questions without reaching what I believe is a privilege that he has as a bishop
to receive information, treat it with confidentiality, and act on it in
ecclesiastical fashion.

MR. KOSNOFF:  Could you identify the source of that privilege?

MR. FREY:  *State v. Martin* and the statute, the First Amendment.

MR. KOSNOFF:  So are you relying on the clergy penitent privilege?

---

[8] Borland Dep., 54: 24 – 55: 9.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 8

MR. FREY: And his First Amendment rights.

MR. KOSNOFF: What First Amendment rights are you referring to?

MR. FREY: Free exercise rights.

MR. KOSNOFF: Specifically what in the free exercise clause are you basing this privilege?

MR. FREY: That he has the right to free exercise of religion to be free from the restraint of having a civil court interfere and make him disclose confidential communications. We've been through this. We've briefed it. We've already argued it in the Court of Appeals and won it.

MR. KOSNOFF: No. We've—

MR. FREY: And that's what I'm doing here.

MR. KOSNOFF: No. That was a completely different issue and very different narrow issue than —

MR. FREY: And there's a third item involved here that we haven't gotten to yet, but that is the privacy rights of individuals who may be involved, if any. But I'm trying not to interfere with your legitimate discovery area, and so I'm trying to be very careful here. And I want you to understand that it's not my purpose here to frustrate your discovery, but I do want him to be careful that he doesn't breach any of the confidentiality that is imposed upon him by his position as a clergyman.

So if you can read back the question. Sorry about the speech –

MR. KOSNOFF: Well, I – we have gone through the criteria for the appropriate assertion of the clergy penitent privilege, and that shields him from disclosing the content of privileged communications based upon that statute. My questions now are not directed at the content of that communication. My questions are directed at what he did or said to others following that communication.

MR. FREY: But that may very well involve his working in an ecclesiastical capacity and involve conversations with other people that are privileged, and that's my point.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 9

MR. KOSNOFF:  That – it's our position that that would not be privileged and that he is required to answer those questions.

MR. FREY:  Just a second.

(Defense counsel confer)

MR. FREY:  I – I've made my objection.  We disagree.  Okay?

MR. KOSNOFF:  Are you directing him not to answer?

MR. FREY:  No, I'm not.  I'm asking him if he can answer without violating – if he can answer about what he did without violating any confidentiality that I believe he has the right to maintain as a bishop, then he may answer the question.

A:    I believe I can do that.  Confidentiality is very important to me.  I – the only reason I even hesitate at all is because of the conversation, and I'm very respectful of both of you.  I didn't talk about, to another person, the content of my discussion with the ward member that contacted me, but the circumstance surrounding it I did, and that was Jack LoHolt.  I had to talk with him.

Q:    And that conversation that you had with Jack LoHolt took place fairly soon after?

A:    Yes, sir.

Q:    And what was said?

MR. FREY:  Again, you may answer that question if it will not violate any privilege that you have as a clergyman.

A:    I don't believe I can answer that.[9]

**3.**    Q:    Have you ever actually been presented with a scenario like this?

A:    I'm going to have a difficulty in answering that question —

---

[9] *Id.*, 58: 4 – 61: 21.

[3c6m12!1.DOC]

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 10

MR. FREY:  Again, I'm going to instruct you if that's going to cause you — or require you, pardon me, to go ahead and disclose any type of information that you received in your position as a clergy member.

For the record, I want to make this clear, Counsel, I'm quoting from *State v. Martin* so we'll know exactly what we're talking about.  And they there say that rather than the statute – "Rather, the statute only requires the clergy member receiving the confidential communication be enjoined by the practices or rules of the clergy member's religion to receive the confidential communication and to provide spiritual counseling."  That's what I'm trying to protect him with.[10]

4.      Q:      Why did you release him?

MR. FREY:  You can't —

A:      I can't divulge that.

Q:      I'm not asking you to reveal any communications.  I'm asking you your personal reasons why you released him from Scouting.

MR. FREY:  Same objection.  You're entitled to claim that privilege.

One reveals the other, Counsel.

Q:  (By Mr. Frey)  Isn't it a fact that you removed Jack LoHolt from Scouting because you knew he presented a danger to boys of sexual abuse?[11]

5.      Q:      Did you ever speak with your stake president generally about – without identifying the individual, a concern about a Scoutmaster, assistant Scoutmaster molesting children?

MR. FREY:  Object to the form of the question.

What time period are we talking about now?

---

[10] *Id.*, 70: 20 – 71: 11.

[11] *Id.*, 73: 7 – 19.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 11

MR. KOSNOFF:  When he was Bishop of the Kent Second Ward.

MR. FREY:    Okay.    Again, as long as this doesn't violate any type of
confidence that you have between your counselors and your stake president in
your ecclesiastical position.

A:      That's what I'm wrestling with, and I believe it does.  I don't believe I
can answer that question.

Q:  (By Mr. Kosnoff)  So did I understand, your hesitancy to answer the
question is that you're taking the privilege – or the position that any
communication between you and the stake president is also privileged?

A:      Anything that would break confidentiality I take as an ecclesiastical
privilege, yes.[12]

6.      Q:      If he had, would that have been a concern to you?

MR. FREY:  Again, if you can answer that question without breaching any of
your confidentiality obligations as a Bishop, you may answer it.

A:      Yeah, I can't answer the question.[13]

---

[12]  *Id.*, 76: 6 – 25.

[13]  *Id.*, 77: 13 – 17.

GORDON, THOMAS, HONEYWELL,
MALANCA, PETERSON & DAHEIM LLP

December 16, 2005
Page 12


    Again, we will file our motion to compel on December 22nd. If your positions change from what was articulated in our Rule 37 conference and your letter of November 29th, and you agree to let us re-depose Bishops Johansen, Coleman and Borland as to the above questions, at your expense, please contact me by December 21st.

    Thank you.

                Very truly yours,

                Michael T. Pfau

MTP:vad
cc:    Timothy Kosnoff

[3c6m12!1.DOC]

# Exhibit #3

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

---

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE,: No. C04-2338 RSM
                                    : (Judge Ricardo Martinez)

          Plaintiffs,:
                      :
     -v-              :
                      :
THE CORPORATION OF THE      :
PRESIDENT OF THE CHURCH OF  :
JESUS CHRIST OF LATTER-DAY  :
SAINTS, a Utah corporation  :
sole, a/k/a "MORMON CHURCH";:
LDS SOCIAL SERVICES a/k/a   :
LDS FAMILY SERVICES, a Utah : Videotaped Deposition of:
corporation,                : RANDALL BORLAND
                      :
          Defendants.:
                      :

September 20, 2005 - 9:08 a.m.

Location: Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

Diane W. Flanagan, RPR
Notary Public in and for the State of Utah

**Page 2**

A P P E A R A N C E S
For the Plaintiffs:
        Tim Kosnoff
        ATTORNEY AT LAW
        600 University
        Suite 2101
        Seattle, Washington 98101-4161
        206.676.7610

For the Defendants:
        Thomas D. Frey
        Marcus B. Nash
        STAFFORD FREY COOPER
        601 Union Street
        Suite 3100
        Seattle, Washington 98101-1374
        206.623.9900

        Randy T. Austin
        KIRTON & McCONKIE
        60 East South Temple
        Suite 1800
        Salt Lake City, Utah 84111
        801.328.3600
Also present:
        Josh Jentzsch, Videographer
        Garcia & Love Reporting

                I N D E X
WITNESS                         PAGE
RANDALL BORLAND
Examination by Mr. Kosnoff            3

              E X H I B I T S
EXHIBIT NO.                      PAGE
No. 1   Defendant COP's Supplemental Response to   3
        Plaintiffs' First Requests for Production of
        Documents

**Page 3**

1   September 20, 2005                9:08 a.m.
2          P R O C E E D I N G S
3   (Exhibit No. 1 marked)
4          THE VIDEOGRAPHER:  This is the videotaped
5   deposition of Bishop Randall Borland, being held in the law
6   offices of Kirton & McConkie in Salt Lake City, Utah, on
7   September 20, 2005, at 9:08 a.m.
8          My name is Josh Jentzsch, legal videographer for
9   Garcia & Love Reporting.  The court reporter is Diane
10  Flanagan, also with Garcia & Love Reporting.
11         Will Counsel please state their appearances for
12  the record, and the witness will be sworn.
13         MR. KOSNOFF:  For the record, Timothy Kosnoff on
14  behalf of the plaintiffs.
15         MR. FREY:  Thomas Frey on behalf of the
16  defendants.
17         MR. NASH:  Marcus Nash also on behalf of the
18  defendants.
19         RANDALL BORLAND,
    called as a witness by and on behalf of the Plaintiffs, being
20  first duly sworn, was examined and testified as follows:
21              EXAMINATION
22  BY MR. KOSNOFF:
23    Q   Good morning, sir.  Would you please state your
24  full name?
25    A   Yes.  Randall Kent Borland.

**Page 4**

1     Q   Mr. Borland, I'm going to introduce myself again.
2   We met briefly before we got started this morning.  My name
3   is Tim Kosnoff.  I'm one of the attorneys for the plaintiffs
4   in this matter.  How are you feeling today, sir?
5     A   I'm sorry?
6     Q   How are you feeling today?
7     A   I feel pretty good.  I'm dealing with an allergy.
8   I'm a bit tired, but I feel pretty good.
9     Q   Good.  I want you to know that we will accommodate
10  whatever your needs are today.  If you feel that you need to
11  get up and stretch your legs, take a walk, use the rest
12  room, please let me know at any point, and we will take a
13  break?
14    A   Okay.  I didn't take an allergy capsule because
15  sometimes they make you drowsy.  If I need it later, I'll
16  take it.
17    Q   Very good.
18    A   I'm fine right now.
19    Q   Good.  Sir, could you give us a mailing address?
20    A   Yes.  620 Sumac, S-U-M-A-C, Avenue Provo, Utah
21  84604.
22    Q   Mr. Borland, have you ever had your deposition
23  taken before?
24    A   I have.
25    Q   On how many occasions?

1 (Pages 1 to 4)

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

Page 53

1    Q   Page 1 seems to indicate that Philip Coleman was
2  sustained as bishop August 19, 1973.
3    A   Where are we?
4    Q   Go to page 10.
5    A   Oh, 10.  August --
6    Q   -- 19th.
7    A   Okay.
8    Q   And it does seem to indicate on August 19th that
9  Randall K. Borland was released as bishop of the Kent Second
10 Ward.  Do you see that entry?
11   A   I do.
12   Q   Do you have any reason to believe that's not
13 accurate?
14   A   No, because I know I was released.
15   Q   Okay.  But that the date is accurate?
16   A   I -- I'm just going to assume.  I'm not going to
17 question it, but I don't remember that date.
18   Q   Okay.  And it indicates that Philip Coleman was
19 sustained as bishop on the same day.
20   A   Yes.
21   Q   To the best of your recollection, does that entry
22 and that date seem correct to you?
23   A   I don't remember the date at all, but I know
24 that's what transpired.  He succeeded me as bishop.
25   Q   Is it possible that you began Brigham Young

Page 54

1  University in the fall of 1973 and not in 1975?
2    A   Is it possible?
3    Q   Yes.
4    A   Instead of when?
5    Q   I believe you testified earlier that you thought
6  you came to Utah in 1975 to begin your studies.
7    A   That was a guess, wasn't it?  That was an
8  approximate guess.
9    Q   Yes.
10   A   Yeah, it's possible then.  It's possible, but I
11 don't know, but very possible.
12   Q   Okay.
13   A   That would fall in line.  This is -- in that
14 regard that's helpful.
15   Q   Well, as we get older, we all need these little
16 aids, don't we?
17       So during this approximate three-year time period
18 that you were bishop of the Kent Second Ward, you've
19 indicated that you did receive a complaint regarding
20 sexually inappropriate activity by Jack Loholt.  Correct?
21       MR. FREY:  I'm going to object to the form of the
22 question.  It assumes something that he hasn't testified to.
23       Go ahead.
24   Q   (By MR. KOSNOFF) Did you receive a complaint or
25 report from anybody that Jack Loholt had engaged in sexually

Page 55

1  inappropriate activity during the time that you were bishop
2  of the Kent Second Ward?
3        MR. FREY:  Now, again, Bishop, I'm going to
4  caution you that if you learned any of this information in
5  your capacity as a bishop in a confidential communication
6  that you have the privilege not to answer it, in my opinion.
7  Counsel may differ with that, but I would instruct you not
8  to answer it if that's the basis upon which you gained your
9  information.
10       MR. KOSNOFF:  I would like to ask a few foundation
11 questions before he answers that question in light of your
12 instruction to your client.
13       MR. FREY:  Okay.
14   Q   (By MR. KOSNOFF) Assuming the answer to the
15 question is yes, did you receive this communication in your
16 capacity as a clergy person for the Mormon church, that is,
17 in your role as clergy in the Mormon church?
18       MR. FREY:  Object to the --
19   A   That was a hypothetical.  That was hypothetical --
20       MR. FREY:  Excuse me.  I'm going to object to the
21 form of the question.
22       You may answer, though.  Go ahead.  Have her read
23 it back.  Please wait until -- give me a second because I
24 have the right to make objections.
25       THE WITNESS:  I'm sorry.

Page 56

1        MR. FREY:  Okay.  Go ahead.
2        (The record was read as requested)
3    A   I'm answering a question based on an assumption?
4    Q   Yes.  I'm not asking you for the content of the
5  communication yet.  I'm asking you questions about the
6  circumstances under which the communication was made.
7    A   Yes.
8    Q   Was the communication made for purposes of
9  pastoral response by you?
10   A   Are we still on an assumption?  Are these
11 questions or -- because you said assuming that the answer
12 was yes.  I've never answered that question yet, and forgive
13 me.  I'm being a little dense here, but I don't know if I'm
14 still answering on an assumption.  Am I saying that right
15 even?
16   Q   Yes, you are.
17   A   Okay.
18   Q   Because the answer yes or no to the question could
19 potentially violate a privilege.  But before you answer that
20 question, I'm asking you questions surrounding that
21 communication.  Okay?  I'm not asking you about what was
22 said or whether the answer to my -- that previous question
23 was yes or no.  I'm just asking you other questions related
24 to the nature of that communication and the surrounding
25 circumstances.

14 (Pages 53 to 56)

Page 57

1    A    Okay.
2    Q    So again my question is: Was this something that
3  you learned in connection with pastoral counseling within
4  the Church?
5    A    Yes.
6    Q    Was the information that you received something
7  that you are required to keep confidential under the
8  doctrines and teachings of your church?
9    A    Yes.
10    Q    Was the communication that you received something
11  that you in fact kept confidential, that is, that you did
12  not disclose to any other person?
13    A    Let me make sure I understand that.  A
14  communication not disclosed to anybody else?
15    Q    Correct.
16    A    The answer to that question, if I've heard the
17  question correct, is yes or -- let me rephrase it, and then
18  tell you what I thought you said.
19    Q    Go ahead.
20    A    I did not disclose what was said confidentially to
21  me to others.
22    Q    Just so that I'm clear on this, you did not
23  disclose the content of what was said to you by that person
24  to any other person?
25    A    The content of that conversation, that meeting, I

Page 58

1  did not.
2    Q    Okay.
3    A    The best of my recollection.
4    Q    Okay.  Did you ever make a referral to LDS Social
5  Services for counseling Jack Loholt?
6    A    I don't remember.  I do not remember that.
7    Q    Did you do anything or say anything to anyone else
8  following the communication that you received from this
9  person?
10    A    Regarding specifics?
11    Q    Anything.
12    A    Yes.
13    Q    What did you do or say?
14    A    I talked --
15    MR. FREY:  Again I'm going to caution you that if
16  you took any steps in your capacity as a clergyman and
17  ecclesiastical in accordance with the teachings and beliefs
18  of the LDS religion that you are not obligated to break that
19  confidentiality if in fact you learned that in those
20  circumstances.
21    And for the record, Counsel, what I'm trying to do
22  here is allow you to ask questions without reaching what I
23  believe is a privilege that he has as a bishop to receive
24  information, treat it with confidentiality, and act on it in
25  an ecclesiastical fashion.

Page 59

1    MR. KOSNOFF:  Could you identify the source of
2  that privilege?
3    MR. FREY:  State v. Martin and the statute, the
4  First Amendment.
5    MR. KOSNOFF:  So are you relying on the clergy
6  penitent privilege?
7    MR. FREY:  And his First Amendment rights.
8    MR. KOSNOFF:  What First Amendment rights are you
9  referring to?
10    MR. FREY:  Free exercise rights.
11    MR. KOSNOFF:  Specifically what in the free
12  exercise clause are you basing this privilege?
13    MR. FREY:  That he has the right to free exercise
14  of religion to be free from the restraint of having a civil
15  court interfere and make him disclose confidential
16  communications.  We've been through this.  We've briefed it.
17  We've already argued it in the Court of Appeals and won it.
18    MR. KOSNOFF:  No.  We've --
19    MR. FREY:  And that's what I'm doing here.
20    MR. KOSNOFF:  No.  That was a completely different
21  issue and very different narrow issue than --
22    MR. FREY:  And there's a third item involved here
23  that we haven't gotten to yet, but that is the privacy
24  rights of individuals who may be involved, if any.  But I'm
25  trying not to interfere with your legitimate discovery area,

Page 60

1  and so I'm trying to be very careful here.  And I want you
2  to understand that it's not my purpose here to frustrate
3  your discovery, but I do want him to be careful that he
4  doesn't breach any of the confidentiality that is imposed
5  upon him by his position as a clergyman.
6    So if you can read back the question.  Sorry about
7  the speech --
8    MR. KOSNOFF:  Well, I -- we have gone through the
9  criteria for the appropriate assertion of the clergy
10  penitent privilege, and that shields him from disclosing the
11  content of privileged communications based upon that
12  statute.  My questions now are not directed at the content
13  of that communication.  My questions are directed at what he
14  did or said to others following that communication.
15    MR. FREY:  But that may very well involve his
16  working in an ecclesiastical capacity and involve
17  conversations with other people that are privileged, and
18  that's my point.
19    MR. KOSNOFF:  That -- it's our position that that
20  would not be privileged and that he is required to answer
21  those questions.
22    MR. FREY:  Just a second.
23    (Defense counsel confer)
24    MR. FREY:  I -- I've made my objection.  We
25  disagree.  Okay?

GARCIA & LOVE
801.538.2333

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

Page 61

1      MR. KOSNOFF: Are you directing him not to answer.
2      MR. FREY: No, I'm not. I'm asking him if he can
3  answer without violating -- if he can answer about what he
4  did without violating any confidentiality that I believe he
5  has the right to maintain as a bishop, then he may answer
6  the question.
7      A   I believe I can do that. Confidentiality is very
8  important to me. I -- the only reason I even hesitate at
9  all is because of the conversation, and I'm very respectful
10 of both of you. I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt. I had to talk with him.
14     Q   And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16     A   Yes, sir.
17     Q   And what was said?
18     MR. FREY: Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21     A   I don't believe I can answer that.
22     Q   Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24     A   Okay.
25     Q   Because there's -- may well be a judge that's

Page 62

1  going to review this transcript and make a decision, a
2  ruling, as to whether or not you've appropriately or legally
3  asserted the privilege in this context, and so I just want
4  to make sure that we've got a clear record.
5      Was your communication -- was your -- was your
6  communication with Jack Loholt done in your capacity as a
7  clergyman?
8      A   Was my communication with him done in the capacity
9  of a clergyman?
10     Q   Yes.
11     A   Yes.
12     Q   And would you agree with me that as a bishop
13 you -- you have many functions within the ward?
14     A   Many responsibilities in the ward?
15     Q   Responsibilities. Correct?
16     A   Yes.
17     Q   And some of those are administrative, financial
18 management, things of a nonecclesiastical nature?
19     A   I think that's all -- in my mind that's all
20 ecclesiastical.
21     Q   That everything the bishop does --
22     A   Yes.
23     Q   -- all of his functions are ecclesiastical?
24     A   To me, that's my understanding.
25     Q   Does a bishop have overall responsibility for

Page 63

1  making sure that the ward building is closed and locked when
2  it's not in use?
3      A   Not necessarily. There might be other people that
4  do that. The bishop doesn't go that generally.
5      Q   I understand that, but does the bishop have
6  ultimate responsibility for making sure that the building is
7  secured?
8      A   Which bishop?
9      Q   The bishop of the ward.
10     A   It would be the agent bishop of that building.
11 That particular person -- the buck would stop there, I
12 suspect.
13     Q   Yes.
14     A   Yes.
15     Q   So would you regard that as an ecclesiastical
16 responsibility?
17     A   I haven't given any such thing a thought, but I
18 would have to think that all of the responsibilities are
19 based upon his ecclesiastical calling, I would think.
20     Q   Okay. Does the -- when you were bishop, did you
21 have responsibility for tending to the proper handling of
22 tithing receipts?
23     A   Did I have responsibility?
24     Q   Yes.
25     A   Yes.

Page 64

1      Q   Okay. And do you regard that as a -- as an
2  ecclesiastical or clerical function in your role as bishop?
3      A   Which one?
4      Q   Either or both.
5      A   Ecclesiastical or clerical?
6      Q   Okay. Do you draw a distinction between --
7      A   Well, it would -- again, everything -- it seems to
8  me in my own perhaps ignorant way of looking at it that
9  everything that the bishop has that is his responsibility
10 that's under the mantle of a bishop's responsibility would
11 be ecclesiastical in nature.
12     Q   Okay.
13     A   I don't -- I can't draw a distinction.
14     Q   So, for example, the proper management of dealing
15 with tithing receipts that come in, you would equate with
16 pastoral counseling that you would deliver as bishop --
17     A   With what?
18     Q   -- to a member? With pastoral counseling.
19     A   Equate?
20     Q   Yes.
21     A   They're both responsibilities.
22     Q   Okay. Are they both clergy functions of the
23 bishop?
24     A   Well, yeah, they are, uh-huh (affirmative).
25     Q   Okay. So you don't recognize there being any

16 (Pages 61 to 64)