FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

Page 69

1  A  I would say that's possibly.
2  Q  Would that include communicating it to the mother
3  of the child that made the complaint?
4  A  If it evolved to that point.
5  Q  If -- I'm sorry. If what evolved?
6  A  Well, this is all an assumption. Everything is an
7  assumption. Did you say that a mother came in and said that
8  a child, not her child? Am I right?
9  Q  Just a woman in the ward, a ward worker, a
10 volunteer hypothetically in the Primary, receives this
11 report from a child and she conveys it to you.
12 A  And so then I would --
13 Q  And my question is: Would you find it appropriate
14 to convey this confidential information to the mother of
15 that child?
16 A  I would have to have more groundwork on it before
17 I did that. I would probably -- if I felt that there was a
18 substantive basis for it, I would talk to the mother.
19 Q  If you felt that there was a substantive basis for
20 the accusation?
21 A  But there's footnote to that. The person that
22 came to me, if they came with the idea that, Bishop, I want
23 to talk with you, this is in confidence, that particular
24 individual's name, circumstance, involvement would not --
25 that would be held confidential.

Page 70

1  Q  Would you communicate this information to the
2  police?
3  A  Not necessarily, no.
4  Q  Would you communicate it to the local Child
5  Protective Services agency?
6  A  No.
7  Q  Would you attempt to substantiate the accusation
8  yourself?
9  A  I suspect I would, uh-huh (affirmative).
10 Q  How?
11 A  It would depend on the circumstance. It would
12 depend on the people. It would depend on the emotions. It
13 would depend on a gamut of things, a wide range of things
14 that would all focus in on is this legitimate, is this real,
15 or is it just an accusation, is it somebody that's upset
16 with somebody and angry, whatever it might be.
17 Q  Have you ever actually had to conduct such an
18 investigation?
19 A  I'm sorry?
20 Q  Have you ever actually been presented with a
21 scenario like this?
22 A  I'm going to have a difficulty answering that
23 question --
24    MR. FREY: Again, I'm going to instruct you if
25 that's going to cause you -- or require you, pardon me, to

Page 71

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3       For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10 communication and to provide spiritual counseling." That's
11 what I'm trying to protect him with.
12    MR. KOSNOFF: That's one of the elements.
13    MR. FREY: Okay. Well --
14    MR. KOSNOFF: They didn't throw out the elements
15 of the statute, and I'm very well-acquainted with State v.
16 Martin.
17 Q  (By MR. KOSNOFF) Let's get back to -- let's get
18 back to Mr. Loholt. You testified earlier that you spoke
19 with Jack Loholt. Are you asserting the privilege with
20 respect to your communication with Jack Loholt regarding any
21 allegations of child sexual abuse?
22 A  As being confidential?
23 Q  Yes.
24 A  Yes.
25 Q  Did you speak with anybody else other than Jack

Page 72

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A  No.
4  Q  So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A  I can't speak for Jack Loholt. It was kept within
7  me.
8  Q  Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10 A  What information?
11 Q  Any information that Jack Loholt may have engaged
12 in sexual misconduct with a child.
13    MR. FREY: Again, these communications between you
14 and your counselors are also privileged, but go ahead.
15 A  So the answer -- I guess my answer would be -- is
16 my discussion with my counselors would be confidential. I
17 don't -- I don't remember discussing that with anybody.
18 Q  So you have no recollection of discussing with
19 anybody else?
20 A  I have no recollection of that.
21 Q  Okay.
22 A  That's correct. I do not.
23 Q  Did you remove Jack Loholt from any positions
24 working with youth in the ward while you were bishop?
25 A  Did I remove him?

Page 73

1  Q  Yes.
2  A  Released him --
3  Q  Okay.
4  A  -- yes.
5  Q  And what positions did you release him from?
6  A  His responsibility in scouting.
7  Q  Why did you release him?
8     MR. FREY: You can't --
9  A  I can't divulge that.
10 Q  I'm not asking you to reveal any communications. I'm asking you your personal reasons why you released him from scouting.
13    MR. FREY: Same objection. You're entitled to claim the privilege.
15    One reveals the other, Counsel.
16 Q  (By MR. FREY) Isn't it a fact that you removed Jack Loholt from scouting because you knew that he presented a danger to boys of sexual abuse?
19 A  I -- I am not going to answer that.
20 Q  Did anybody ask you why you were releasing Jack Loholt from scouting?
22 A  Nobody asked me why I was releasing him that I can remember.
24 Q  Did you make any announcement to members of the ward, either in a general meeting or in meetings of any

Page 74

1  units within the ward, that Jack Loholt should not be permitted to work with or around children?
3  A  I don't recall any such thing.
4  Q  Was -- was LDS Social Services available to you as a bishop for referrals when you were bishop of the Kent Second Ward?
7  A  I can't remember the dates. It seemed like it was just coming into the fore, and I don't remember when. And so I -- I don't remember that.
10 Q  Did you send Jack Loholt to LDS Social Services for any reason?
12 A  I don't remember doing that.
13 Q  Are you saying you didn't?
14 A  I say I don't remember ever doing that. It was a long time ago.
16 Q  You have no recollection of sending Jack Loholt to LDS Social Services for sexual deviancy counselling?
18    MR. FREY: Counsel, I'm going to object to this question. You've asked it three times now, and he's answered the question twice already saying he has no memory of it. I think your badgering the witness.
22    You can answer it one more time, and then we're not going to answer it again.
24 A  What was it again?
25 Q  You have no recollection of having released Jack

Page 75

1  Loholt to LDS Social Services for sexual deviancy?
2  A  I have no recollection of doing that.
3  Q  Did you ever at any time tell anybody that they should not allow Jack Loholt to work with or around their children?
6  A  Did -- do I remember telling anybody that?
7  Q  Anybody.
8  A  I do not remember that.
9  Q  If as bishop you had determined that an assistant scoutmaster was sexually molesting boys, what would you have done to warn or protect children within the ward from that assistant scoutmaster?
13    MR. FREY: For the record, I'm going to object to the question. It assumes, No. 1, facts not in evidence, and the question is incomplete.
16    Go ahead. Object to the form.
17 A  What would I do if an assistant scoutmaster was, I guess, taking liberties, immoral liberties, or how would you say it?
20 Q  Yes, sexual -- you had credible reason to believe that a scoutmaster or assistant scoutmaster was sexually abusing kids in the ward.
23 A  If I had that credible --
24 Q  Yes.
25 A  I would -- if I had that, that that was happening,

Page 76

1  I would -- I would talk to my stake president if I had that kind of information, that it was credible.
3  Q  Did you ever speak to your stake president regarding Jack Loholt?
5  A  Not specifically, no.
6  Q  Did you ever speak with your stake president generally about -- without identifying the individual, a concern about a scoutmaster, assistant scoutmaster molesting children?
10    MR. FREY: Object to the form of the question. What time period are we talking about now?
12    MR. KOSNOFF: When he was bishop of the Kent Second Ward.
14    MR. FREY: Okay. Again, as long as this doesn't violate any type of confidence that you have between your counselors and your stake president in your ecclesiastical position.
18 A  That's what I'm wrestling with, and I believe it does. I don't believe I can answer that question.
20 Q  (By MR. KOSNOFF) So did I understand, your hesitancy to answer the question is that you're taking the privilege -- or the position that any communication between you and the stake president is also privileged?
24 A  Anything that would break confidentiality I take as an ecclesiastical privilege, yes.

19 (Pages 73 to 76)

Page 77

1  Q  So you're saying that any communication that you
2  had with the stake president about information you regarded
3  as confidential would itself be privileged?
4  A  I think what I'm saying is that there was nothing
5  said that would be confidential with names involved, and to
6  get into that, then I'm breaking confidentiality.
7  Q  When you were bishop, was Jack Loholt ever the
8  subject of either formal or informal church discipline?
9  A  No.
10  Q  Was Jack Loholt ever returned to positions working
11  with youth in the ward while you were bishop?
12  A  Not to my knowledge, no.
13  Q  If he had, would that have been a concern to you?
14      MR. FREY:  Again, if you can answer that question
15  without breaching any of your confidentiality obligations as
16  a bishop, you may answer it.
17  A  Yeah, I can't answer the question.
18  Q  When you were bishop, how old were your children?
19  A  How old were they?
20  Q  Yes.
21  A  Got your pencil?
22  Q  Give me approximate ages.  Kyle was 45 -- is 45
23  now.
24  A  I'm going to say they were between 12 and 14,
25  right in there.

Page 78

1  Q  Okay.  After you removed Jack Loholt from
2  positions working with youth in the ward, did you ever
3  permit Jack Loholt to be alone with your children?
4      MR. FREY:  Object to the form of the question.
5  That isn't what he testified to, Counsel.  You misstated the
6  evidence.
7  A  Permit?
8  Q  Or allow?
9  A  It never happened.  I don't -- there's no permit
10  or allow.  It never happened.
11  Q  Okay.  All right.  So there was never an occasion
12  after you removed Jack Loholt from scouting that your
13  children were ever alone with Jack Loholt?
14  A  Not to my knowledge.
15  Q  Were your children in scouting in the ward?
16  A  Uh-huh (affirmative).
17      THE COURT REPORTER:  Excuse me.  Yes?
18  A  Yes.
19  Q  Were they in scouting in the ward when Jack Loholt
20  was involved in scouting?
21  A  I believe so.
22  Q  How do you know that your children were never
23  alone or with Jack Loholt?  And when I say alone, I mean
24  with no other adults present.
25  A  That's why I said not to my knowledge.  I don't

Page 79

1  know, but to my knowledge they weren't.
2  Q  Have you ever inquired of your own children
3  whether or not Jack Loholt ever did anything of a sexually
4  inappropriate nature to them?
5  A  I'm not willing to answer that.
6  Q  Whether you did or didn't?
7  A  Yeah, I'm not willing to answer that question
8  because you used the word ever.
9  Q  Okay.  Let me rephrase the question.  At any --
10  A  Actually the answer to that question is:  No, I
11  didn't.  The question you asked, the answer is no.
12  Q  Okay.  You've never spoken to any of your children
13  as to whether Jack Loholt ever did anything of a sexually
14  inappropriate nature to them?
15  A  I have not.  I did not.  I have never asked them
16  that.
17  Q  Have -- and have any of your children ever
18  volunteered to you whether Jack Loholt had ever done
19  anything of a sexually inappropriate nature to them?
20  A  No.
21  Q  After you were released as bishop, is it your
22  recollection that you left Washington for Utah fairly soon
23  after that?
24  A  That's my recollection.
25  Q  And have you resided for any length of time in

Page 80

1  Washington state since you left?
2  A  Pardon me.  I went up there for a summer to play
3  baseball.
4  Q  Approximately what year?
5  A  It would be the summer or the second summer, I
6  believe, after we came down here.
7  Q  Were you some kind of semipro baseball player, or
8  was this a recreational --
9  A  This is just a rec -- yeah, just a rec, just to
10  get together.
11      THE VIDEOGRAPHER:  I have 90 seconds.
12  A  But also I had all my family up there, sisters and
13  brothers.
14      MR. NASH:  Did you hear, he has 90 seconds?
15  Q  (By MR. KOSNOFF)  All right.  So I take it by your
16  answer this was recreational baseball, and it wasn't in any
17  professional capacity?
18  A  No, it was not professional.
19      MR. KOSNOFF:  Okay.  Why don't we take our break
20  so the court reporter (sic.) can change tapes.
21      (Recess taken 11:16 a.m. to 11:27 a.m.)
22      THE VIDEOGRAPHER:  This is tape No. 3 of the
23  deposition of Bishop Randall Borland.  The time is 11:27.
24  Q  (By MR. KOSNOFF)  Bishop Borland, just to tie up a
25  few loose ends, I want to go back and identify the date, if

### Page 78

1   Q   Okay. After you removed Jack Loholt from
2   positions working with youth in the ward, did you ever
3   permit Jack Loholt to be alone with your children?
4       MR. FREY: Object to the form of the question.
5   That isn't what he testified to, Counsel. You misstated the
6   evidence.
7   A   Permit?
8   Q   Or allow?
9   A   It never happened. I don't -- there's no permit
10  or allow. It never happened.
11  Q   Okay. All right. So there was never an occasion
12  after you removed Jack Loholt from scouting that your
13  children were ever alone with Jack Loholt?
14  A   Not to my knowledge.
15  Q   Were your children in scouting in the ward?
16  A   Uh-huh (affirmative).
17      THE COURT REPORTER: Excuse me. Yes?
18  A   Yes.
19  Q   Were they in scouting in the ward when Jack Loholt
20  was involved in scouting?
21  A   I believe so.
22  Q   How do you know that your children were never
23  alone or with Jack Loholt? And when I say alone, I mean
24  with no other adults present.
25  A   That's why I said not to my knowledge. I don't

### Page 79

1   know, but to my knowledge they weren't.
2   Q   Have you ever inquired of your own children
3   whether or not Jack Loholt ever did anything of a sexually
4   inappropriate nature to them?
5   A   I'm not willing to answer that.
6   Q   Whether you did or didn't?
7   A   Yeah, I'm not willing to answer that question
8   because you used the word ever.
9   Q   Okay. Let me rephrase the question. At any --
10  A   Actually the answer to that question is: No, I
11  didn't. The question you asked, the answer is no.
12  Q   Okay. You've never spoken to any of your children
13  as to whether Jack Loholt ever did anything of a sexually
14  inappropriate nature to them?
15  A   I have not. I did not. I have never asked them
16  that.
17  Q   Have -- and have any of your children ever
18  volunteered to you whether Jack Loholt had ever done
19  anything of a sexually inappropriate nature to them?
20  A   No.
21  Q   After you were released as bishop, is it your
22  recollection that you left Washington for Utah fairly soon
23  after that?
24  A   That's my recollection.
25  Q   And have you resided for any length of time in

### Page 80

1   Washington state since you left?
2   A   Pardon me. I went up there for a summer to play
3   baseball.
4   Q   Approximately what year?
5   A   It would be the summer or the second summer, I
6   believe, after we came down here.
7   Q   Were you some kind of semipro baseball player, or
8   was this a recreational --
9   A   This is just a rec -- yeah, just a rec, just to
10  get together.
11      THE VIDEOGRAPHER: I have 90 seconds.
12  A   But also I had all my family up there, sisters and
13  brothers.
14      MR. NASH: Did you hear, he has 90 seconds?
15  Q   (By MR. KOSNOFF) All right. So I take it by your
16  answer this was recreational baseball, and it wasn't in any
17  professional capacity?
18  A   No, it was not professional.
19      MR. KOSNOFF: Okay. Why don't we take our break
20  so the court reporter (sic.) can change tapes.
21      (Recess taken 11:16 a.m. to 11:27 a.m.)
22      THE VIDEOGRAPHER: This is tape No. 3 of the
23  deposition of Bishop Randall Borland. The time is 11:27.
24  Q   (By MR. KOSNOFF) Bishop Borland, just to tie up a
25  few loose ends, I want to go back and identify the date, if

### Page 81

1   we can, when Jack Loholt was released by you as assistant
2   scoutmaster of the Kent Second Ward. If you would turn to
3   page 5 of Exhibit 1. That is the numbered page 5.
4   A   Okay.
5   Q   If you go to February 6, 1972, the entry indicates
6   Jack Loholt was released as assistant scoutmaster on that
7   day?
8   A   Yes, that's what it says. I don't remember the
9   dates.
10  Q   Okay. But is that consistent with your general
11  recollection as to when you released Jack from the scouting
12  program?
13  A   Yes.
14  Q   And without disclosing the communication, was it
15  fairly quickly after you received information regarding Jack
16  Loholt?
17  A   Are you asking if that's my memory?
18  Q   Yes.
19  A   Yes, uh-huh (affirmative).
20  Q   And is it -- is it your testimony that you never
21  spoke to the scoutmaster, why you were releasing his
22  assistant scoutmaster?
23  A   That's correct.
24  Q   And you never told your first or second counselor
25  the reasons why you were taking that action?

**Page 82**

1    A   I don't believe I did, huh-uh (negative). I
2 didn't divulge that, no.
3    Q   And nobody questioned you why you did that?
4    A   To my knowledge, no. But maybe said, What are you
5 doing this for? I don't remember that, though. I don't
6 remember anybody questioning.
7    Q   Did Jack Loholt argue or resist in any way your
8 decision to remove him as assistant scoutmaster?
9      MR. FREY: I'm going to object to the question
10 because it calls for him to reveal what Jack Loholt may or
11 may have not said to him in his capacity as clergy.
12    Q   (By MR. KOSNOFF) Did Jack Loholt appear to accept
13 your decision releasing him?
14      MR. FREY: Same objection. Instruct the witness
15 he does not have to answer if it requires him to divulge
16 information he learned in any communication which was
17 privileged.
18    Q   (By MR. KOSNOFF) Go ahead. I think you can answer
19 that.
20      THE WITNESS: Can I answer?
21      MR. FREY: Well, I'm just telling you --
22    Q   (By MR. KOSNOFF) My question was how he appeared.
23 Did his appearance and general demeanor seem to be one of
24 acceptance of your decision?
25    A   He accepted my decision.

**Page 83**

1    Q   Did you -- tell me everything you did to make sure
2 that Jack Loholt, notwithstanding the fact that you had
3 released him as assistant scoutmaster, was not continuing to
4 work in the scouting program?
5    A   I can't remember. I can't remember.
6    Q   Did you ever attend any scout meetings after you
7 released Jack Loholt to determine whether or not he was
8 attending those meetings?
9    A   To determine if he was attending them?
10    Q   Yes.
11    A   I can't remember doing so.
12    Q   Were you aware of where Jack Loholt was living
13 when you released him as assistant scoutmaster?
14    A   I'm not sure of that. I can't remember
15 specifically where he was, no.
16    Q   Do you have any recollection of him living at the
17 Allenbach compound?
18    A   The what?
19    Q   The property where the Allenbach -- the Herman
20 Allenbach family lived.
21    A   I seem to recollect him being there. If he lived
22 there or not, I don't remember that. I do not remember
23 that.
24    Q   Do you remember being aware of whether or not Jack
25 Loholt had a relationship with Herman Allenbach?

**Page 84**

1    A   What does relationship mean?
2    Q   A business relationship.
3    A   He might have worked on his dentist office one
4 time. I can't remember that. I don't remember that for
5 sure.
6    Q   You have no recollection of a close business
7 association between Dr. Allenbach and Jack Loholt?
8      MR. FREY: Object.
9    A   Business association, no.
10    Q   Do you have any recollection of whether Jack
11 Loholt either lived either on the Allenbach property or in
12 one of Mr. -- or Dr. Allenbach's rental homes?
13    A   I don't have a recollection of that.
14    Q   With respect to the communication that you
15 received to which you've asserted a privilege that resulted
16 in you removing Jack Loholt from scouting, did you -- would
17 the assertion of your privilege be the same if I were to
18 provide you with a written waiver from the person who made
19 that communication authorizing you to specifically talk
20 about that communication with me?
21    A   My confidentiality would remain.
22    Q   Why?
23    A   Maybe I didn't understand your question.
24    Q   My question is: If I was able to give you written
25 authorization from the source of that communication --

**Page 85**

1    A   Oh, from the source? Go ahead. Continue.
2    Q   -- that communication authorizing you to reveal
3 that communication, would you then reveal it to me?
4    A   I'm not sure. Be written and -- it couldn't just
5 be written, it would have to be verbal. I'm not sure. I
6 would have to analyze my thinking on the confidential nature
7 of it all because it seems to me there's more than one
8 person involved.
9    Q   Okay. Are you referring to yourself?
10    A   No.
11    Q   Okay. My -- my question is assuming that the
12 source of the confidential communication to which you've
13 asserted privilege is one individual. The purpose of my
14 question is to determine whether if I were to give you a
15 waiver, written, verbal, from that person that said you are
16 authorized to speak with Mr. Kosnoff about your
17 communication back then, would you then answer my questions
18 about that communication?
19    A   You're talking about a verbal face-to-face along
20 with the written. I don't know. I would really have to --
21 I would really have to analyze my -- my thoughts on that.
22 At this point I just don't know.
23    Q   Well, do you believe that even with a waiver from
24 the person that made the communication which you're treating
25 as confidential and privileged that you would not be able to

# Exhibit #4

Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,           )
                                        )
                Plaintiffs,             )
                                        )
        vs.                             )
                                        )
THE CORPORATION OF THE PRESIDENT        )
OF THE CHURCH OF JESUS CHRIST OF        ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah               )
corporation sole, a/k/a "MORMON         )
CHURCH"; LDS SOCIAL SERVICES a/k/a      )
LDS FAMILY SERVICES, a Utah             )
corporation,                            )
                                        )
                Defendants.             )

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com

25th Anniversary 1980-2005

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 45

| | | |
|---|---|---|
| 1 | A | I can't infer the second from the earlier, but that |
| 2 | | was a statement of fact of the position. |
| 3 | Q | Okay. |
| 4 | A | I don't recall how well Jack was doing or why he was |
| 5 | | put in the position. |
| 6 | Q | He was already in that position when you became |
| 7 | | bishop? |
| 8 | A | I don't recall that either. |
| 9 | Q | At some point during the three years that you were |
| 10 | | bishop, did someone bring to your attention an |
| 11 | | allegation that Jack LoHolt was sexually molesting |
| 12 | | boys? |
| 13 | A | In the specific, I have to say no to sexually |
| 14 | | molesting. |
| 15 | Q | What about generally? |
| 16 | A | In the general to sexually molesting, I have to say |
| 17 | | no. |
| 18 | Q | Did you receive any information of any kind from any |
| 19 | | person that Jack LoHolt was allegedly engaging in |
| 20 | | sexually inappropriate activity? |
| 21 | A | Yes. |
| 22 | Q | From who whom did you learn that? |
| 23 | | MR. FREY: I am going to object at this |
| 24 | | point in time. |
| 25 | | Let me tell you the basis for the objection. |

Byers & Anderson, Inc.
Court Reporters & Video

Page 53

1  and the witness wants to clarify the answer is maybe
2  the best way to put it.
3  Q  (By Mr. Kosnoff)  Dr. Coleman, do you want to clarify
4     an earlier answer?
5  A  If I may.
6        With regard to an individual making me aware of
7  something that happened between her sons and Jack
8  LoHolt, the answer is yes, and the answer is that
9  there was an exposure.
10       In my own mind, at least at the time, maybe not
11 now, that did not constitute abuse.
12       That's why I gave "no" to those answers, but I
13 wanted you to be aware of what did happen.
14 Q  What was your understanding of what Jack LoHolt had
15    done, allegedly?
16 A  Exposed his private parts.
17 Q  To whom and where?
18 A  As I recall it--
19            MR. FREY:  I am going to again instruct
20 the witness not to say the names of who, but he can
21 say anything else.
22            THE WITNESS:  As I recall, two boys, as
23 I recall it, on an outing, which Jack frequently took
24 them, either fishing or camping-- he was a bit of a
25 replacement for an absentee father.

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 54

1  Q  (By Mr. Kosnoff)  In fact, Jack had become kind of a
2     surrogate father to the boys in absence of their
3     natural father?
4  A  That's calling for a judgment.
5  Q  Is that your understanding?
6  A  I think what I said earlier would be appropriate.
7  Q  But it was your understanding that Jack had been
8     spending a lot of time with these boys?
9  A  I think so.
10 Q  When you received this information, were you
11    concerned?
12 A  Indeed.
13 Q  Were you very concerned?
14 A  Indeed.
15 Q  Okay.  Being very concerned, what did you do?
16 A  Spoke to Jack.
17 Q  Where did that conversation take place?
18 A  In the bishop's office.
19 Q  Did you call him in?
20 A  I did.
21 Q  What was said by Jack to you?
22 A  I don't recall the details, but he denied it.
23 Q  Jack denied that he'd engaged in the conduct?
24 A  He did.
25 Q  Did Jack acknowledge, however--

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 55

1    MR. FREY: For the record, I want to
2 make this clear because this is going to come up
3 again.
4    In those conversations where you're acting with
5 your bishop's hat on and you're speaking to one of
6 your people and it involves what could be classified
7 as a transgression within the church, you do have the
8 right not to disclose that information.
9    On the other hand, I want you to be able to
10 answer Counsel's question as best you can because he
11 has a right to find out what we knew or didn't know
12 or should have known.
13 Q  (By Mr. Kosnoff) I would add whether or not a
14    privilege really applies really depends on the
15    circumstances and the conduct and the intent of the
16    parties.
17 A  I think in this context it would.
18 Q  The question of whether or not under the doctrine and
19    beliefs of the Mormon church and the circumstances of
20    this communication between you and Jack, is it your
21    belief that this was a privileged communication
22    between bishop and member?
23 A  May I make a statement?
24    The information came to me other than Jack.
25 Q  I understand that, but I'm referring to the meeting

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

Byers & Anderson, Inc.
Court Reporters & Video

Page 56

1  that you had with Jack.
2  A  That would fall under the auspices of a privileged
3     communication, yes, I think so.
4  Q  After you talked with Jack, did you talk with his
5     parents?
6  A  I did.
7  Q  Where did that take place?
8  A  Bishop's office.
9  Q  Okay. What was said by the parents to you-- strike
10    that.
11    Did you tell the parents the information that you
12    had regarding Jack's behavior?
13 A  I did.
14 Q  What was their reaction?
15 A  Disbelief.
16 Q  Okay. After that exchange, what did you do with this
17    information?
18 A  We released Jack from his church callings, and I
19    notified, as I recall, at least some key individuals
20    who would need to know about it.
21 Q  And those were priesthood leaders?
22 A  My counselors. I remember specifically-- I can't
23    honestly say I remember talking to the young men's
24    president, but that might have been usual, and
25    perhaps to the Scout master, but I don't remember

Philip J. Coleman
September 15, 2005

e146643a-cbca-4152-9aa8-001672d25f48

# Exhibit #5

## Page 1

```
 1       IN THE CIRCUIT COURT OF THE STATE OF OREGON
 2              FOR THE COUNTY OF MULTNOMAH
 3
 4   JEREMIAH SCOTT,              )
 5         Plaintiff,             )
 6   vs                           ) No. 98-12-08640
 7   GREGORY LEE FOSTER, an       )
 8   individual; THE CHURCH OF    )
 9   JESUS CHRIST OF LATTER-DAY   )
10   SAINTS, an unincorporated    )
11   association, aka, the "Mormon )
12   Church," THE CORPORATION OF  )
13   THE PRESIDENT OF THE CHURCH OF )
14   JESUS CHRIST OF LATTER-DAY   )
15   SAINTS, a Utah corporation sole,)
16   CORPORATION OF THE PRESIDING )
17   BISHOP OF THE CHURCH OF JESUS )
18   CHRIST OF LATTER-DAY SAINTS, )
19   a Utah corporation sole,     )
20         Defendants.            )
21
22         DEPOSITION OF LLOYD DEAN HALE, MD
23            Taken in behalf of the Plaintiff
24
25            Thursday, October 28, 1999
```

## Page 2

```
     EXHIBIT       DESCRIPTION
 1
 2     1   Curriculum Vitae
 3     2   Section 10, Church Discipline - Bates Nos.
 4         0010-0022
 5     3   The Salt Lake Tribune - Excerpts of the
 6         Interview with LDS Church Officials
 7     4   Child Abuse - Helps for Ecclesiastical
 8         Leaders - Bates Nos. 0118-0147 and 0104-0117
 9
10   (Exhibits attached hereto)
```

## Page 3

```
 1         BE IT REMEMBERED THAT, the deposition of LLOYD
 2   DEAN HALE, MD was taken before Debra C. Symonds,
 3   Registered Professional Reporter and Certified Shorthand
 4   Reporter for the State of Oregon, on Thursday, October
 5   28, 1999, commencing at the hour of 9:15 a.m., in the
 6   Conference Room of the law firm of Dunn, Carney, Allen,
 7   Higgins & Tongue, 651 SW Sixth Avenue, Suite 1500, in
 8   the City of Portland, County of Multnomah, State of
 9   Oregon.
10                           -:-
11                       APPEARANCES:
12   DUNN, CARNEY, ALLEN, HIGGINS & TONGUE
13      By Gary E. Rhoades
14         and
15      Tim Kosnoff and Joel Salmi
16      Attorneys at Law
17            Appearing in behalf of the Plaintiff
18   BULLIVANT, HOUSER, BAILEY
19      By David A. Ernst
20      Attorney at Law
21            Appearing in behalf of the Church Defendants
22   KILMER, VORHEES & LAURICK
23      By Jeffrey M. Kilmer
24      Attorney at Law
25            Appearing in behalf of Defendant Foster
```

## Page 4

```
 1              LLOYD DEAN HALE, MD
 2   was thereupon produced as a witness in behalf of the
 3   Plaintiff and, having been first duly sworn on oath, was
 4   examined and testified as follows:
 5
 6                     EXAMINATION
 7   BY-MR. SALMI:
 8      Q. Dr. Hale, please state your full name and
 9   address for the record.
10      A. It's Lloyd, L L O Y D, Dean Hale, H A L E. I
11   live at West Linn. 4950 Summit Street, West Linn,
12   that's Oregon, 97068.
13      Q. Dr. Hale, again, I'm Joel Salmi and I
14   represent Jeremiah Scott in his lawsuit against Bishop
15   Foster and the church defendants, I'll call them. We're
16   going to talk about how to designate the church in this
17   deposition in a minute, but I wanted to explain to you,
18   you've had an opportunity to talk to your attorney today
19   or previously about the procedure involved in a
20   deposition?
21      A. Yes.
22      Q. And you understand that when you give
23   responses to the court reporter, they need to be audible
24   responses rather than shaking your head or nodding?
25      A. Yes.
```

### Page 41

1 consider to be a confession.
2     MR. SALMI: Well, Jeff, that was my question,
3 actually, so if this is an inaccurate statement of
4 doctrine, he can tell me. I don't see that that's
5 legitimate.
6     MR. KILMER: Your question was not a question.
7 Your question was, if they don't intend, in some
8 subjective way apparently, it to be confidential, then
9 it isn't a confession.
10     MR. SALMI: And that's what I was asking him.
11     MR. KILMER: No, that wasn't a question, that
12 was a statement, and I am objecting --
13     MR. SALMI: I asked him to verify whether
14 that's true or not, and that's a question. And I
15 understand, your objection is noted. I don't think it's
16 a valid objection, but it's noted.
17     MR. KILMER: Well, it's very valid in this
18 case.
19     Q. (By Mr. Salmi) Let me rephrase that. Let me
20 give you an example. If a member reports to the bishop
21 of a church that their child has been molested by
22 another member of the church, do you consider that a
23 confession?
24     A. No, because I consider that the member
25 reporting an incident.

### Page 42

1     Q. And in particular, if that member, when they
2 report this alleged molestation, ask you to do something
3 about it, that's not a confession, is it?
4     A. No.
5     Q. Assuming that we have a confession that's a
6 legitimate, valid confession given to a bishop, are
7 there any circumstances under which a bishop is
8 authorized to disclose that confession to anyone else?
9     MR. ERNST: I'm going to object to the form on
10 the use of the word "valid confession." I don't know
11 what that means.
12     MR. KILMER: And I object on the further
13 ground that "anyone else" needs to be qualified as
14 opposed to inside and outside of certain church
15 doctrines or church hierarchy of authority.
16     A. Can you restate it for me, please?
17     Q. Yes. Under any circumstances, is a bishop in
18 the church authorized to disclose confessions to anyone
19 other than the person who confessed to them?
20     A. I believe he is not privileged to do that
21 unless the person gives their consent for him to discuss
22 it with another person who would only be the stake
23 president.
24     Q. So unless the confessor consents, the bishop
25 cannot disclose that confession to anyone else. Is that

### Page 43

1 your testimony?
2     A. That's my understanding, yes.
3     Q. As a practical matter, in your experience, do
4 you know bishops who share confessions that they've
5 received with members of their bishopric?
6     A. No, I do not.
7     Q. How about sharing those confessions with the
8 stake president of the stake over which -- or in which
9 their ward is located?
10     A. I believe bishops ask the individual or tell
11 the individual I need to discuss that or you will need
12 to discuss that with the stake president. And in many
13 cases they will call me and say a person needs to talk
14 to you, and they don't share it unless the person has
15 told them it's okay and they feel there's a need to
16 prepare me, in a sense, but that's all.
17     Q. Under church policy, are children allowed to
18 give confessions?
19     A. I believe any member who wishes can talk to
20 the bishop and tell them about personal matters. And it
21 wouldn't necessarily be a confession, it would be
22 anything the person felt was confidential. They can
23 talk to their bishop in that sense.
24     Q. But now I'm asking about a confession in
25 particular, and let's say of a major transgression.

### Page 44

1 Would that confession of a child have the same standing
2 as a confession of any other member of the church?
3     MR. ERNST: Just a minute. I do want to ask
4 for a clarification, Joel.
5     MR. SALMI: Sure.
6     MR. ERNST: Are you talking about confessions
7 as a subset specifically of a specific kind of
8 confidential information? Because he's telling you
9 people are bringing him confidential information, but
10 you're talking about a confession.
11     MR. SALMI: I'm talking only about
12 confessions.
13     MR. ERNST: Do you understand that?
14     THE WITNESS: Okay.
15     Q. (By Mr. Salmi) Yeah, I'm talking only about
16 confessions, not just about something -- you know, some
17 private conversation you have with a member. But if
18 someone -- if a child comes and confesses, is that
19 considered a confession that has the same protection of
20 confidentiality as any other confession in the Mormon
21 church?
22     A. Yes.
23     Q. So if a child confesses to a major
24 transgression to a bishop, that bishop is not authorized
25 to inform the parents of that unless the child consents?

Page 45

1  A. That is my understanding.
2  Q. Disciplinary proceedings can be instituted
3  based upon confessions, can they not?
4  A. Yes.
5  Q. And that can be done even if the confessor
6  does not consent to further disclosure of that
7  confession; isn't that correct?
8  A. Yes.
9  Q. And are members advised when they confess to a
10 major transgression that a disciplinary proceeding could
11 be instituted based on that confession?
12 A. Yes.
13 Q. When such a confession is made, are they
14 advised what is entailed in a disciplinary proceeding?
15 A. That would depend on the bishop's style, but
16 if it's a realistic probability, he probably would.
17 Q. And we're going to talk about the nature of
18 disciplinary proceedings a little bit later, but your
19 understanding is that they would advise them not just
20 that discipline is going to be instituted but here's
21 what it's comprised of and describe it in some sense?
22 A. But probably -- maybe not at the time of the
23 confession. Sometimes there's a visit or two or three
24 before we get to that level of how are we going to
25 handle this.

Page 46

1  Q. So someone -- a member comes and confesses a
2  major transgression to a bishop, there's a conversation
3  about it, and maybe they come back two or three times in
4  their follow-up meetings with the bishop. That happens?
5  A. Yes.
6  Q. And then there would be a decision if the
7  bishop, for example, decides that there isn't progress
8  being made on taking care of this that a disciplinary
9  proceeding would be instituted?
10 A. That can happen that way, yes, provided he
11 discusses it with the stake president. That is, just
12 that there needs to be a council.
13 Q. I want to make reference to Exhibit 2 again,
14 which you have in front of you, and this would be at
15 Page 0011, which is I believe the second page of your
16 document. At the bottom of the left-hand column, the
17 last full paragraph, Subsection 2 reads, "Predators may
18 need to be identified to protect possible future
19 victims."
20 A. Uh-huh (affirmative response).
21 Q. Take your time and read that whole paragraph.
22 I won't read it into the record because it's part of the
23 record.
24 A. (Pause; referring). Okay.
25 Q. Now, this is under the section of the handbook

Page 47

1  entitled Confessions and Confidentiality. If someone
2  confesses to sexual molestation of children, to the
3  extent that you would consider them a predator, how are
4  they identified to protect possible future victims?
5  A. If a member confesses that type of
6  transgression, they are encouraged to report themselves
7  to local authorities, to take responsibility for their
8  action to the full extent of the law. So first the
9  member is encouraged to do so.
10    If a member chose not to do so, then -- and if
11 a disciplinary council was held, then the action of that
12 council would be used to inform those who might be
13 considered ones that should know that such as a bishop.
14 Even in the general priesthood session or in the adult
15 relief society session, if a person was a predator and
16 there could be victims, then they -- there would be a --
17 at least a general statement regarding the protection or
18 the watching, but the details of the person's
19 transgression would not be disclosed without their
20 permission.
21 Q. In the case of a sexual predator, would there
22 be a disclosure that they were a sexual predator?
23 A. With their permission, it could happen. I
24 have never seen that happen. Without their permission,
25 I do not know exactly how it would be handled. I would

Page 48

1  have to think that one through and perhaps even talk to
2  someone about -- other stake presidents, someone who has
3  experience in that area.
4  Q. You do not have personal experience in that
5  area?
6  A. Not as a predator.
7  Q. What about with someone who has confessed to a
8  major transgression of molesting children?
9  A. I have experience there.
10 Q. And do you have experience with that occurring
11 where a disciplinary council has been convened?
12 A. Yes.
13 Q. And what was the -- I just want to follow up
14 with this one example. What was the consequence or the
15 conclusion of the disciplinary council? What decision
16 did they reach?
17    MR. ERNST: You know, here I'm concerned that
18 we're getting into areas that are privileged. I'm not
19 going to let him talk about deliberations or conclusions
20 of actual disciplinary councils. I just don't think
21 that's going to be allowed by the judge.
22    MR. SALMI: Counsel, without identifying
23 anyone involved in the process, I don't see how that
24 could possibly violate any confidentiality, privacy or
25 anything else.

Page 49

1  MR. ERNST: Well, since I'm not the stake
2  president, I can't answer that. I'm going to just
3  instruct you that if you feel like you're having to
4  disclose anything that may violate someone's privacy
5  rights, then you don't answer the question. If you can
6  do it without answering the question, go ahead.
7  MR. SALMI: Are we talking, Counsel, just for
8  the record now, are we talking about a clergy-penitant
9  privilege issue or are you talking about some right of
10 privacy other than clergy-penitant privilege? I
11 certainly don't intend to invade any clergy-penitant
12 privilege.
13 MR. ERNST: All right. Then I guess we
14 understand each other.
15 MR. SALMI: Is that all you're talking about
16 or is there some other generalized privacy right which
17 you're instructing your client not to answer if it
18 invades?
19 MR. ERNST: Well, I'm not going to be deposed
20 so why don't we go forward.
21 MR. KILMER: Let me just say that I believe in
22 behalf of Bishop Foster at the time that he is deposed
23 that there are both privacy and privilege issues
24 involved in the discussions of individual cases, and
25 that will certainly be involved as we discuss the merits

Page 50

1  of this particular case.
2  So although I can't advise this witness not to
3  answer, it does seem to me, and I will assert when it's
4  my client's turn in the barrel, that there are privacy
5  implications as well as privilege implications here.
6  MR. SALMI: And we're going to have an
7  opportunity to argue that before Judge Ceniceros
8  hopefully in the not too distant future.
9  MR. KILMER: Right.
10 Q. (By Mr. Salmi) I'm asking you -- And let's go
11 back to the line of questioning. I'm going to ask you
12 the same question, and I would ask you that same
13 question except I don't quite remember it so I'm going
14 to ask the court reporter to read back the last question
15 that I asked.
16         (Reporter read as requested)
17 Q. Dr. Hale, can you testify regarding this
18 matter in general terms without identifying any
19 individuals?
20 A. I believe I can.
21 Q. So again, and I repeat the question, in this
22 situation where someone had confessed to you of
23 molestation and a disciplinary council had been
24 convened, what was the consequence or decision of that
25 disciplinary council?

Page 51

1  A. The confession and all of the discussions that
2  take place in the council are considered confidential
3  Information. So I hope -- I don't know if I'm following
4  clearly, but the outcome of one I'm considering or
5  thinking of, --
6  Q. Yes.
7  A. -- the member was excommunicated.
8  Q. And this will get back to what we were talking
9  about, making reference to the section of the handbook
10 at Page 0011, predators may need to be identified to
11 protect possible future victims. Was there any attempt
12 in that case made to warn members of the church about
13 this sexual predator or this child molester?
14 MR. ERNST: I object to the form. It's very
15 unfair, in my opinion, for you to take this second
16 subsection out of the context of the entire paragraph,
17 and I think you know that. It talks about disclosure of
18 the identity of other persons, and you're focusing on
19 something unfairly that I believe is trying to trick
20 him, and I just won't allow him to be tricked.
21 MR. SALMI: I'm not trying to trick him, I'm
22 simply asking him was anything done. And, Counsel, just
23 for the record, I know that --
24 MR. ERNST: You offered Section 2.
25 MR. SALMI: -- he has had the opportunity, I

Page 52

1  specifically asked him to read this entire section --
2  MR. ERNST: Yes.
3  MR. SALMI: -- before testifying. He's had
4  the opportunity to do it. And every time I ask a
5  question about this, I'm not going to read the entire
6  paragraph. He has read it.
7  Q. (By Mr. Salmi) And all I'm asking you is, was
8  anything done to warn church members about this child
9  molester after the excommunication decision was reached
10 by the disciplinary council?
11 MR. ERNST: Object to the form, use of the
12 word "child molester."
13 A. To those people who had a reason to know, the
14 action of the disciplinary council was reported; the
15 bishop, the priesthood leaders, the relief society and
16 so forth. There was already general knowledge in the
17 ward that he had had a problem, and there was really no
18 need to go back and report to them.
19 Q. When you say there was already general
20 knowledge in the ward, did that general knowledge in the
21 ward exist before the initial confession was made to the
22 bishop? I believe that was you.
23 A. No, I was stake president then.
24 Q. Oh, you were stake president, okay.
25 A. And I believe -- I don't really know how that

Page 53

1  all transpired. I would be guessing and I don't want to
2  do that.
3      Q. Is the fact of the convening of a disciplinary
4  council, is that known to the ward at large?
5      A. No.
6      Q. That's kept secret?
7      A. I don't like secret, but it's not broadcast.
8  There are -- The high council knows, their wives have a
9  right to know there's a council, that they're going to
10 be gone for the evening, but no one knows really who is
11 there or what's happening or what the situation is.
12     Q. And they don't know the subject matter of the
13 disciplinary proceeding?
14     A. No.
15     Q. When you say that the decision of the
16 disciplinary council is then communicated, and you
17 mentioned the relief society and some other folks, when
18 you say the decision is communicated, is the reason for
19 the decision also communicated, not just that they were
20 excommunicated but they were excommunicated for
21 molesting children?
22     A. It was not in this case because, as I said, I
23 believe most people knew that by this time. The man was
24 required to report to the church -- to the legal
25 authorities as one issue that would have to be

Page 54

1  considered before he could ever be considered for
2  readmission to the church. There were certain
3  stipulations of which him disclosing and taking
4  responsibility were required of him and he complied, so
5  I really didn't feel the need to go make the public
6  announcements.
7      Q. If the church membership had not had general
8  knowledge --
9      A. Okay.
10     Q. -- that this person had molested children,
11 would the reason for the excommunication have been
12 communicated to these organizations within the church
13 that you've testified to?
14         MR. ERNST: Object to the form, calls for
15 speculation.
16     Q. I'm asking you to testify again on behalf of
17 the church as their designee to testify.
18         MR. ERNST: That doesn't change my objection.
19 It calls for speculation.
20     A. I could answer that on the basis of what I
21 would do with my knowledge. It's difficult for me to
22 say I'm speaking for the church in this because I've
23 never faced that issue.
24         MR. KILMER: In that event, I want to join in
25 his objection. Whatever he says has no validity at all

Page 55

1  as to either churches or what other people in the church
2  should do or are supposed to do.
3      A. I would handle that by telling the individual
4  that I would need to inform those where there could be a
5  potential for abuse or victims, and I would inform them.
6  And if it were in the context of a meeting, that's -- of
7  the priesthood or the relief society, that's where I
8  would do so.
9      Q. And when you say you would inform them, you
10 would inform not only that the individual had been
11 excommunicated, but that they had been excommunicated
12 for child molestation?
13         MR. ERNST: Object to the form. It calls for
14 speculation.
15         MR. KILMER: I think you're saying more than
16 he intended to say.
17     A. I think you're taking it further than I'd
18 like. I believe I would say that he has been
19 excommunicated, and I think for the well-being of your
20 children you should not have them at any event where he
21 might be left alone with them. I would probably say
22 something to that effect, which I believe would convey
23 the message, but I don't like publicly identifying
24 somebody as a predator, as such, because that becomes a
25 judgmental thing that I'm not sure I'm privileged to

Page 56

1  identify. That's almost a legal term rather than an
2  ecclesiastical.
3      Q. Assuming now that the decision of the
4  disciplinary council was based on a finding of the
5  disciplinary council that this individual had in fact
6  molested a child, and assuming again that you told the
7  individuals you believe needed to know that they should
8  not allow their children, I believe that was your
9  testimony, to be around this person, what if the person
10 asked you why not? What would you say?
11         MR. ERNST: Object to the form, speculation,
12 assumes facts not in evidence.
13     A. I would not feel privileged to disclose this
14 individual's personal confession about details of the
15 transgression because I don't believe it would be
16 necessary. I believe if I told people he'd been
17 excommunicated and for the safety of their children they
18 need to keep them away from him, I believe the
19 information is there.
20     Q. And you believe that by telling them that they
21 need to keep their children away, they will understand
22 you to mean that he's a danger to children?
23     A. Yes, or could be.
24     Q. Or could be?
25     A. Yes.

Page 113

1  agrees that it is.
2       MR. ERNST: No, it's not.
3       Q. (By Mr. Salmi) So given that example, you said
4  that first the bishop would try to get the person to
5  report themselves, to turn themselves in, then they
6  would try to get the person who gave them the initial
7  information to turn them in.
8       A. Right.
9       Q. Why wouldn't the bishop simply turn them in?
10      MR. ERNST: Object to the form. You've
11 assumed that somebody who is not the molester can't give
12 confidential information. That was my objection.
13      MR. KILMER: And it was a good one.
14      MR. ERNST: Thank you. You assume that a
15 molester is the only one who can give confidential
16 information. Object to the form.
17      A. The bishop would have learned this secondhand
18 from the individual who came to him. I think it would
19 be better if the individual who learned this or knew
20 this themselves went to children's services or to the
21 police department. There's no reason the bishop could
22 not do it, but -- and he may do it, but if someone else
23 makes the report who knows personally, it seems better.
24      Q. And isn't it the policy of the Mormon church
25 that bishops are to attempt to have other people report

Page 114

1  the abuse rather than reporting it themselves?
2       A. Generally that's true because the other person
3  may know more firsthand or immediate information, so
4  yes.
5       Q. Does that hold true with stake presidents as
6  well, that same concept, that they should attempt to get
7  the abuser first to report themselves, and if they
8  can't, then to find somebody else to report the abuse?
9       A. Yes.
10      Q. If the parent of a child in a ward comes to
11 the bishop and says, my child was molested by Brother
12 Smith in our ward and I want you to do something about
13 it, under the policy of the Mormon church, is that
14 considered a confidential communication?
15      MR. ERNST: Thank you.
16      A. Well, that's certainly not a confession but it
17 could be confidential, but I don't believe it would be a
18 protected confidential disclosure.
19      Q. Now, you've made a distinction here between
20 confidential and protected confidential, and I want you
21 to tell me what you mean by that.
22      A. Well, again, if the -- if in the course of the
23 offender confessing to the bishop or if in the course of
24 any meetings such as the disciplinary council any of
25 this information comes out, then the stake president

Page 115

1  would not be able to report it. If he learns about this
2  in another setting where an individual comes to him, he
3  very well may disclose it.
4       Q. And that was the example I gave you. I wasn't
5  raising this in the context of a disciplinary proceeding
6  where the information comes in there, but simply a
7  parent comes to the bishop and says, my child was
8  molested by Brother Smith, --
9       A. Okay.
10      Q. -- do something about it. Is that, under the
11 policy and doctrine of the Mormon church, considered a
12 confidential communication?
13      A. No, I don't believe so.
14      Q. And couldn't, under those circumstances, the
15 bishop go directly to the police and report that?
16      A. He could, and likely would, but he would also
17 encourage that parent to immediately go to the police.
18      Q. And is it the policy of the Mormon church that
19 under those circumstances the bishop would first go to
20 the accused person and confront them with the accusation
21 before reporting it to the police or anyone else?
22      A. If it could be done expeditiously, I believe
23 he would.
24      Q. And when such a confrontation is made, does
25 the Mormon church have any policy to avoid a situation

Page 116

1  where the alleged perpetrator flees the jurisdiction or
2  destroys evidence before they're reported to the police?
3       A. There's no policy on that in that regard.
4       Q. As a bishop, wouldn't you have that concern?
5  If you confronted somebody who had been accused of
6  molesting a child before you reported him to the police,
7  wouldn't you have a concern that they might flee?
8       A. I've not ever seen that happen. These are
9  generally people that live within the ward, I believe,
10 and I don't know that that would be a likely thing to
11 occur. It could happen, but I wouldn't be greatly
12 concerned.
13      Q. And again, under circumstances where someone
14 outside the context of a disciplinary proceeding reports
15 that some other member of the ward has molested their
16 child, under those circumstances, is report of the abuse
17 to law enforcement always made? Is that the policy of
18 the Mormon church?
19      MR. ERNST: I object to the form. It calls
20 for him to speculate.
21      A. I cannot say it always is. Ideally it is.
22      Q. That would be the policy of the church?
23      A. Yes, I believe so.
24      Q. To have it reported?
25      A. Yes, I believe it is.