Fleming, et al. v. COP, et al.
No. CV04-2338 RSM

DECLARATION OF MARCUS B. NASH
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             WESTERN DISTRICT OF WASHINGTON
 3                       AT SEATTLE
 4   _____

                                            )
 5   KENNETH FLEMING and JOHN DOE,          )
                                            )
 6              Plaintiffs,                 )
                                            )
 7        vs.                               ) NO. 04-2338 RSM
                                            )
 8   THE CORPORATION OF THE PRESIDENT OF THE)
     CHURCH OF JESUS CHRIST OF LATTER-DAY   )
 9   SAINTS, a Utah corporation sole, a/k/a )
     "MORMON CHURCH"; LDS SOCIAL SERVICES   )
10   a/k/a LDS FAMILY SERVICES, a Utah      )
     corporation,                           )
11                                          )
                Defendant.                  )
12   _____
13        DEPOSITION UPON ORAL EXAMINATION OF
14                    ROBERT KELLY
15               VIDEOTAPED PROCEEDING
16   _____
17                 1:10 o'clock p.m.
18                 August 29, 2005
19                 601 Union Street
20                    Suite 3100
21                 Seattle, Washington
22
23
24
     REPORTED BY:
25   ALISON LOTT, CCR#2337              EXHIBIT  A
```

Page 2

```
             APPEARANCES

For the Plaintiffs:   TIMOTHY KOSNOFF
                      Attorney at Law
                      One Union Square
                      600 University
                      Suite 2101
                      Seattle, Washington  98101-4161


For the Defendants:   THOMAS D. FREY
                      MARCUS NASH
                      Stafford Frey Cooper
                      601 Union Street
                      Suite 3100
                      Seattle, Washington  98101


Videotaped by:        Brook Young
                      Prolumina Trial Technologies


             EXHIBIT INDEX
NUMBER       DESCRIPTION                        PAGE
  1    Defendant COP's First Interrogatories and   34
       Requests for Production to Plaintiff R.K.
```

Page 3

THE VIDEOGRAPHER: We are on the record. This is the video tape portion in the deposition of Robert Kelly. My name is Brook Young. I'm employed by Prolumina Trial Technologies, located at 80 South Washington, Suite 200, in Seattle, Washington, 98104. This deposition is being recorded on this 29th day of August, 2005.

The time now is approximately 1:10 p.m., and we are located at 601 Union Street, Suite No. 3100 in Seattle, Washington. This deposition is being recorded in the matter of Fleming, et al. versus the Corporation of the President of the Church of Jesus Christ of Latter Day Saints, et al. The case number is 04-2338 RSM, in the United States District Court, Western District of Washington at Seattle.

This deposition was noticed by Thomas Frey. Counsel and all present may identify themselves for the record, and the witness may be sworn in.

MR. KOSNOFF: For the record, Timothy Kosnoff, co-counsel on behalf of the plaintiff.

MR. FREY: Tom Frey, co-counsel on behalf of the defendant -- all of the defendants.

MR. NASH: Marcus Nash, counsel for the defendants.

Page 4

ROBERT KELLY, having been duly sworn by the Notary to tell the truth, the whole truth and nothing but the truth, testified as follows:

DIRECT EXAMINATION
BY MR. FREY:
Q   Mr. Kelly, my name is Tom Frey. I'm one of the attorneys for the LDS Church, and I want to go over a few preliminary matters with you. Have you ever had your deposition taken before?
A   No, I haven't.
Q   I'm going to be asking you a series of questions, and if at any time you wish to take a break, we can do that for any reason. The only time we can't take a break is if I have a question pending and you haven't answered it, then you should answer the question first. If you need to speak with your attorney, you can do that, again, as long as a question isn't pending.

The nature of these cases is such that they sometimes involve testimony which is fairly, either intimate or personal or what-have-you. My goal and the object here is not to embarrass you. I won't intentionally do that. I may have to ask you some questions which will be difficult for you to answer, or they may even be a little bit embarrassing, and I can assure you it's not my intention to do that for my own purposes or any other

Page 5

purposes, but because of the nature of the claims, I have to ask some questions like that. If you want to take a break, if you get upset or if anything occurs during the dep., again, if you want to take a break, please let me know and we'll just stop.

Lastly, you've nodded your head a couple of times. The reporter cannot take down nods. So would you please answer audibly, yes or no, or whatever your answer is.
A   I understand.
Q   Okay. And also, if you don't understand my question, if it isn't perfectly clear to you, please tell me that, and I'll try to restate it. Otherwise, I'm going to assume, and the court will assume, for which we could use this deposition, that you understood and gave the correct answer, okay?
A   Okay.
Q   All right. For the record, would you please state your name, your date of birth, and your current residence.
A   My name is Robert Kelly; my date of birth is June 26, 1962. And my place of residence is 1 -- the address?
Q   Yes, please.
A   The address is 15016 Southeast 260th Street, Kent, Washington, 98042.
Q   And is that a residence, a home, or is it an apartment?
A   It's a home.
Q   And how long have you lived there?

Page 6

1  A   My whole life with the exception of the two and a half year
2      marriage.
3  Q   Was this your parents' home?
4  A   Yes.
5  Q   Was this the home that was adjacent to the property back in
6      the '60s that was owned by the Allenbach family?
7  A   Yes, that's correct.
8  Q   Who lives at that address with you, if anyone?
9  A   My mother and my dad. My mom and my dad.
10 Q   How old is your father now?
11 A   Dad is 78.
12 Q   And how is his health?
13 A   Excellent for his age.
14 Q   And your mother's age?
15 A   80 years old.
16 Q   Your current occupation is what?
17 A   I'm a high school science teacher.
18 Q   Are you currently at -- is it Todd Beamer High School?
19 A   Yes, that's correct.
20 Q   And you teach biology and chemistry?
21 A   This year I'm teaching chemistry, leadership and math.
22 Q   Are those three separate subjects?
23 A   Mm-hmm. Yes, it is.
24 Q   What is leadership?
25 A   I've never taught it before, but I think it's going to be

Page 7

1      where I teach the kids what it takes to be a good leader as
2      far as values, and making the right choices, and
3      contributing to society.
4  Q   Do you have to have any special training to teach that?
5  A   You have to be a certified science -- or, a certified
6      teacher, but I don't think you need any special
7      endorsements.
8  Q   What is your current -- what is your educational
9      background?
10 A   Would you like a listing of what -- what exactly are you
11     asking?
12 Q   My understanding -- I can maybe shorten this up a little
13     bit. You went through grade school, high school, college
14     and you have some advanced degrees; is that correct?
15 A   That's correct.
16 Q   Would you tell me where you went to college and what the
17     advanced degrees are in.
18 A   All the colleges?
19 Q   Yes.
20 A   Okay. I first started attending college the winter term of
21     the year after I graduated, it was Green River Community
22     College. I went there for three years, I think, and then I
23     went to Highline Community College for a year. Then I went
24     to Seattle University, and in two years I got my bachelor
25     of arts degree, and then after that I immediately attended

Page 8

1      Seattle University Graduate School of Public Administration
2      and got my graduate degree in public administration in
3      three years.
4  Q   Is that a master's degree?
5  A   Yes. Then I worked for several years in secretarial
6      positions, and then I went back to college about 2001 to
7      Pacific Lutheran University and got my teaching
8      certificate, with special endorsement in chemistry and
9      science. And I went to Harvard University Graduate School
10     of Education, and I did a leadership institute after
11     Pacific Lutheran University. After that, I was a Fulbright
12     Memorial Fund Scholar, and that was credits -- in Japan,
13     and I earned credits through Seattle Pacific University
14     through that program, and I'm currently in a principal
15     training program and graduate school at Seattle Pacific
16     University. I'm training to be a principal.
17 Q   At the -- did you say Seattle Pacific?
18 A   Mm-hmm.
19 Q   And you currently are married or single?
20 A   Single.
21 Q   You were married at one time?
22 A   Yes, that's correct.
23 Q   And for how long and to whom?
24 A   It was about -- approximately two and a half years, and her
25     name is Julie Garasi.

Page 9

1  Q   Any children by that marriage?
2  A   Yes.
3  Q   How many, and what sex?
4  A   Gabriel, and he's male.
5  Q   And his age?
6  A   Gabe's now five and a half.
7  Q   How are the custody arrangements with Gabriel and your
8      ex-wife Julie?
9  A   I see Gabriel every other weekend and a full month in the
10     summertime, and then half of the major holidays during
11     Christmas breaks, spring break and mid-winter break.
12 Q   Do you have any children other than Gabriel?
13 A   Yes, I do.
14 Q   Who are they?
15 A   Timmy, his birth name is Cameron Timateo deGusman.
16 Q   Would you spell that, please?
17 A   Sure. C-A-M-E-R-O-N, Timateo is T-I-M-A-T-E-O, deGuzman is
18     lower case D-E, upper case G-U-Z-M-A-N, and Timmy is
19     currently now 13 years old.
20 Q   Any other children?
21 A   No.
22 Q   Do you have visiting arrangements with -- what does he go
23     by, Timmy or --
24 A   His nickname is "Muk," M-U-K, but I call him Timmy, that's
25     my nickname for him.

Page 10

1 Q Do you have visitation rights with him?
2 A I don't see him any more.
3 Q Tell me why.
4 A When Timmy was about nine years old, there was a lot of
5   conflict with Timmy's mom, a lot of anger towards me, and
6   she really never instilled a loving relationship, and so
7   Timmy and I kind of grew apart, and he said at about nine
8   years of age he wanted to not see me on Wednesdays any
9   more, and that fairly quickly evolved into not having
10  overnight visitations.
11 Q Did that have anything to do with any allegations by
12   Timmy's mother of some type of sexual abuse towards him --
13   pardon me. I misspoke. Did that have anything to do with
14   Timmy's mother making allegations against you concerning
15   child abuse?
16 A No, it did not.
17 Q Were any allegations like that ever made?
18 A Yes.
19 Q By whom?
20 A Can you rephrase your question?
21 Q Can you give me the name of the individual who made
22   allegations against you concerning child abuse.
23 A There was more than one individual. Evalyn -- I'm not sure
24   of the exact date, but when Timmy was approximately four
25   years old, she accused me of sexually abusing him.

Page 11

1 Q And Evalyn is whom?
2 A Timmy's mom.
3 Q And anybody else make similar -- or, anyone else make
4   similar allegations, other than Evalyn?
5 A Yes.
6 Q Who was that?
7 A His name is Kai Brown and Tiffany, his wife. He's the
8   former significant other of my ex-wife.
9 Q Your ex-wife Julie, right?
10 A Yes.
11 Q Did anything ever come of those allegations?
12 A They were dismissed.
13 Q When you say they were dismissed, was there a hearing or
14   something on them?
15 A There was never a hearing. They were investigated by, I
16   think, Child Protective Services and Family Court Services,
17   and after they investigated they dismissed it, and --
18 Q They took no action, in other words, they felt there wasn't
19   sufficient evidence to pursue it; isn't that correct?
20 A That's correct.
21 Q Turning for a moment now to the abuse that you were
22   involved with, that you were the victim of, you were living
23   at that time at the address you just gave us at the
24   beginning of the deposition; is that not correct?
25 A That's correct.

Page 12

1 Q And that's 15016 Southeast 260th Street in Kent?
2 A That's correct.
3 Q How many brothers do you have -- or, put it this way: How
4   many siblings do you have?
5 A Would that include -- by --
6 Q Let's start with the number of biological siblings, full
7   brothers and sisters.
8 A Full brothers and sisters?
9 Q Full brothers and sisters.
10 A Full brothers, are you asking full biological brothers and
11   sisters?
12 Q Right.
13 A Okay. I have one younger brother and one older sister.
14 Q And their names, please?
15 A Thomas M. Kelly and Karen K. Kelly.
16 Q Do you have any either half sisters or half brothers?
17 A Yes. I have three older sisters, but they're not
18   biologically related. And I have -- that's from my mom's
19   side. And then from my dad's side I have two sisters and
20   one brother.
21 Q And again, they're not related by blood?
22 A Well, they're actually -- sorry. My -- they're my mom's
23   biological children, so they're my half sisters
24   biologically, and they're my dad's biological children, and
25   so they're my half siblings biologically.

Page 13

1 Q Very good. Okay, thank you. Are you aware that your
2   mother's deposition has been taken in this case?
3 A Yes, I am.
4 Q And have you spoken with her about that deposition?
5 A I've spoken with her, not in great detail.
6 Q Did you read her deposition?
7 A No, I did not.
8 Q What did you talk about with your mother concerning her
9   deposition?
10 A What it was like to meet you.
11 Q And did she talk to you about the questions that she was
12   asked?
13 A Can you rephrase the question, please?
14 Q Did your mother discuss with you the questions that she was
15   asked in her deposition?
16 A Yes.
17 Q And what did she tell you she was asked?
18 A When the abuse occurred, and that's pretty much all we
19   talked about, is the dates of the abuse.
20 Q To the best of your memory, what was your age at the time
21   the abuse commenced?
22 A I know the abuse happened somewhere in the early to mid
23   '70s. And I was born in 1962, so that would put it
24   around -- somewhere between nine and twelve years old,
25   somewhere in that area.

Page 14

1  Q   I asked that question because in the records from the anger
2      control school or management that you took, there's two
3      references in there to you being abused at the age of six
4      for a period of months, which is allegedly attributed to
5      you. In fact, to be more specific, in a letter dated April
6      4, 2001, a Mr. Keith Waterman, to which the notes are
7      attached, it states, "Client asked that his own sexual
8      abuse with an adult neighbor at age six, that lasted for
9      several months, not be released to others because it
10     appeared it would be construed that the sexual allegations
11     of child abuse against him would be given more merit." Was
12     he correct in his recounting that conversation with you,
13     both as to the age and the amount of time that the abuse
14     lasted?
15 A   Well, I don't recall the specifics of that conversation
16     with Mr. Waterland.
17 Q   By the way, have you reviewed the notes of your treatment
18     at the anger management before your deposition today?
19 A   No.
20 Q   There's another reference by -- I guess it is correct,
21     Dr. Warland, W-A-R-L-A-N-D, middle initial D, as in duck,
22     Wight, W-I-G-H-T, Ph.D., in which he is writing to an
23     individual by the name of Carl Kocis, K-O-C-I-S, one of
24     your attorneys. And there's a mention made in that letter
25     that he says, "He was sexually abused at six years old, and

Page 15

1      has never obtained treatment for it." Again, do you
2      remember telling him that that was about the age that you
3      were molested?
4  A   I don't recall that conversation. I mean, the specific
5      dates that were discussed. I remember meeting with
6      Dr. Wight, but I don't recall the specific dates that I
7      mentioned to him.
8  Q   Well, both of these mention you being six years of age. Do
9      you think it was older now, than being six, when this first
10     happened?
11 A   Since I met with Dr. Wight, I had a chance to more
12     critically reflect on the dates and now I think it was at
13     an older age.
14 Q   So you think it's between nine and twelve now?
15 A   That's correct.
16 Q   What made you change your mind?
17 A   Well, I reflectively thought that -- I know I wasn't abused
18     when I -- I transferred to a private grade school when I
19     was midway through my sixth year grade, and I know I wasn't
20     abused at that point on and afterwards. It happened before
21     then. And it happened sometime during the point when Jack
22     moved into the home. And I didn't -- when I met with
23     Dr. Wight and Keith Waterland, I didn't connect those two.
24 Q   Now, did you and one of the Allenbach children both go to a
25     different private school in the sixth grade?

Page 16

1  A   That's correct.
2  Q   And which child was that?
3  A   Jimmy Allenbach.
4  Q   Have you spoken with Jimmy Allenbach prior to your becoming
5      a plaintiff in this litigation?
6  A   No, I have not.
7  Q   Did you speak with Ken Fleming before you became involved
8      in this litigation?
9  A   I -- yes, I spoke with him.
10 Q   When did you speak with him?
11 A   I spoke with him maybe approximately three weeks ago.
12 Q   You did not, then, speak with him prior to becoming a
13     plaintiff in this lawsuit?
14 A   We grew up together, and we -- you know, growing up, we
15     spoke. But for several years there was no contact.
16 Q   Okay. But my question, more precisely is, before you
17     became a plaintiff in this lawsuit, did you discuss joining
18     the lawsuit with Ken Fleming?
19 A   I don't recall. I don't think so.
20 Q   Did Ken Fleming -- you don't recall having any conversation
21     with him about joining this lawsuit, then, before you
22     became a plaintiff; is that correct?
23 A   That's correct.
24 Q   And would you have the same answer for Jimmy Allenbach?
25 A   That's correct.

Page 17

1  Q   Could you have talked with him and don't remember?
2  A   I don't think so. I would recall.
3  Q   Were you aware of the lawsuit being filed before you became
4      a party to it?
5  A   Can you rephrase the question, please?
6  Q   You were not an original plaintiff in this lawsuit.
7  A   That's correct.
8  Q   Did you learn of the lawsuit being filed?
9  A   Yes, I did.
10 Q   And how did you learn about it being filed?
11 A   There was an article in the Seattle Times.
12 Q   Was it based upon that article that you decided to join the
13     lawsuit?
14 A   I read the article, and I saw Kenny's name in there, and
15     Jack's name, and then I called the paper, because I wanted
16     more information, because -- because I was abused by Jack
17     too. And so then, the -- I think the -- then I read that
18     there was an attorney involved for Kenny, and then I called
19     that attorney, Tim Kosnoff, Michael, and that's when I
20     first spoke with the attorneys about it. And Kenny -- I
21     think I spoke to Kenny, I think several weeks after that.
22 Q   Before or after you joined the lawsuit?
23 A   After.
24 Q   And did you know Dr. Herman Allenbach?
25 A   Yes, I did, sir.

DEPOSITION OF ROBERT KELLY - FLEMING, et al. v. MORMON CHURCH, et al. - 8/29/05

Page 18

1  Q   How well?
2  A   Very well.
3  Q   You say you knew him very well. What do you mean by that?
4      Did you see him on a regular basis?
5  A   Yes.
6  Q   Did you speak with him on a regular basis?
7  A   Yes.
8  Q   Did you stay overnight at the Allenbach residence as a
9      young boy?
10 A   Occasionally, yeah.
11 Q   Did the Allenbach children come and stay at your place?
12 A   Occasionally, they did.
13 Q   Were you and Jimmy Allenbach good friends?
14 A   Yes, very good friends. Ricky, too.
15 Q   Where did you first meet Jack Loholt?
16 A   First met Jack when he moved into the Allenbach home.
17 Q   Where did he live in that home?
18 A   He lived in a downstairs apartment.
19 Q   And were you in grade school at the time that you first met
20     him or did you meet him before you started grade school?
21 A   I was in grade school at the time.
22 Q   Do you remember what grade you were in?
23 A   Don't recall what grade.
24 Q   In your answers to interrogatories, you list in response to
25     a question to describe the occurrences of inappropriate

Page 19

1      sexual conduct, six separate incidences of abuse. Do you
2      remember that?
3  A   Yes, I do.
4  Q   In each of those -- well, the first one you indicate
5      occurred in a field near the Allenbach home. In each of
6      the others, you relate that the incident occurred in
7      Mr. Loholt's apartment. Is that the apartment in the
8      basement of the Allenbach house?
9  A   That's correct.
10 Q   Did any of the abuse which you sustained at the hands of
11     Jack Loholt occur anyplace other than in the apartment in
12     the Allenbach home?
13 A   Well, there was the incident in the field.
14 Q   Other than that?
15 A   All the abuse occurred in his apartment.
16 Q   The incident in the field, you indicate, is the first
17     incident of abuse. And that involved whom?
18 A   Jimmy was in the field, my brother Tom, and me, and Jack.
19 Q   And had you met Jack Loholt prior to that incident?
20 A   Yes, I did.
21 Q   How long had you known him prior to that incident?
22 A   I don't really recall.
23 Q   Was it a matter of years, or was it a matter of months?
24 A   I don't recall. It was at least months.
25 Q   Had you ever had any contact with him prior to that

Page 20

1      incident in the field? And by that -- by contact, I mean,
2      had you been to his apartment, had you done anything with
3      him by way of playing any games or going over to visit him
4      or anything of that nature?
5  A   Yes.
6  Q   How long had you had contact with him in the sense I just
7      mentioned prior to this incident in the field?
8  A   Well, he abused me, I -- I'm not a hundred percent sure if
9      that's the exact order that the abuse occurred, but I
10     remember the specific incidences of abuse, and I recall
11     that abuse occurred -- I'm pretty sure it happened before
12     the incident in the field, because I knew him, I -- we were
13     in and around his apartment, and I recall ice cream -- Jack
14     had an ice cream making machine, and he used to make ice
15     cream and root beer floats for us.
16 Q   Are you telling me that, in your answers to
17     interrogatories, the sequence in which you list the abuse,
18     that's not necessarily the way it happened?
19         MR. KOSNOFF: Objection, form of the
20     question.
21 Q   (By Mr. Frey) Go ahead, you can answer.
22 A   Can you rephrase the question, please?
23 Q   Read it back to him, please
24         (The question as transcribed on
25         Lines 16 through 18 above was read

Page 21

1          by the reporter.)
2  A   I'm not sure about the sequence, if it's in the right order
3      or not. I'm not a hundred percent sure about that.
4  Q   If you had been abused other than in the field first, that
5      is, if you'd been abused in the basement of Mr. Loholt's
6      apartment, do you think you would have gone and told your
7      mother like you did after the incident in the field?
8  A   Can you rephrase the question, please?
9  Q   Do you want to read it back to him, please.
10         (The pending question was read by
11         the reporter.)
12         MR. KOSNOFF: Objection, form of the
13     question, calls for speculation.
14 Q   (By Mr. Frey) You may answer.
15 A   I was afraid to.
16 Q   Well, my question was not whether you were afraid to. Do
17     you think you would have?
18         MR. KOSNOFF: Same objection.
19 A   I don't know.
20 Q   (By Mr. Frey) You did go tell your mother about the abuse
21     in the field; is that correct?
22 A   That's correct.
23 Q   Okay. And according to your mother's testimony, you were
24     scared and terrified, and you came to speak with her about
25     what happened out in the field; is that correct?

Page 26

```
 1     ceased.  They thought Jack stopped abusing us.  And so they
 2     told us not to be around Jack, but -- and they thought the
 3     problem didn't happen any more.
 4  Q  Did the incident with Jack in the field embarrass you or
 5     scare you in any way?
 6  A  Yeah, it scared me a lot.
 7  Q  And according to the incidents that you relate that
 8     followed after that, you apparently continued to go back to
 9     the apartment where Mr. Loholt was living, though; is that
10     correct?
11  A  That's correct.
12  Q  Is there some reason that you continued to go back there
13     even after you were so frightened from the first incident
14     involving the -- his masturbating in front of you in the
15     field?
16  A  Well, Jack was a -- seemed like an expert at manipulation
17     and intimidation, and so he -- it was like -- he had like
18     two sides to his personality.  He lured us into his place,
19     his apartment, by like playing with us, and then he started
20     abusing us.  And -- so the lure was really neat, because it
21     was like making root beer floats, and homemade ice cream,
22     and I especially liked the firecrackers, because he had --
23     he gave us firecrackers if we did what he wanted.  And so I
24     liked the firecrackers.
25  Q  Did your mother ever follow up and ask you whether or not
```

Page 27

```
 1     you'd had any more encounters with Jack Loholt?
 2  A  Since what time?
 3  Q  From the time you first told her about the incident in the
 4     field.  Did she ever come to you and say have you seen --
 5     is Jack Loholt still there, are you still seeing Jack
 6     Loholt, did she ask you -- make any follow-up after you
 7     disclosed to her about that first -- that abuse incident?
 8  A  Since mom and dad met with -- went over that night after
 9     dinner and talked with Dr. and Mrs. Allenbach, they really
10     never mentioned it again because they thought the
11     problem -- Jack wasn't abusing us any more.
12  Q  But my question is, did they ever follow up on that, and
13     say, "Have you seen Jack Loholt," or "Is he still over
14     there," or any other questions in that nature at all?
15  A  I think they periodically might have asked those questions.
16  Q  And what did you tell them?
17  A  I don't recall.
18  Q  Okay.  Did any of the Allenbach boys live in that basement
19     apartment?
20  A  In Jack's apartment?
21  Q  Mm-hmm, or in any rooms adjacent to Jack's apartment.
22  A  Yes.  There -- there's Jack's apartment downstairs, and
23     then they have a big play area downstairs, there's a big
24     rec room, and then they have two bedrooms down there, too.
25  Q  And which of the --
```

Page 28

```
 1  A  And in the bedrooms, to answer your question, in the
 2     bedrooms it was Jimmy's bedroom and the one that was
 3     closest to the stairs, and the one that was down the hall
 4     right across the hallway from Jack's apartment was Brent's
 5     room, and then I think it became Joe's room later on.
 6  Q  At the time that this abuse occurred, were you a member of
 7     the LDS church?
 8  A  No.
 9  Q  Were your parents?
10  A  No, they were not.
11  Q  Were any of your step brothers or sisters?
12  A  No.  No.
13  Q  Were you a member of any religion, formal religion?
14  A  Yes, I was.
15  Q  What?
16  A  The Catholic church.
17  Q  Where did you go to church, if you did?
18  A  St. Anthony's down in Kent.
19  Q  Did you attend on a regular basis?
20  A  Yes, I did.
21  Q  Did you take CCD classes there?
22  A  Yes, I did.
23  Q  Who was your pastor; do you remember?
24  A  I had several.  Father Lyons was the earliest one, then --
25     he's the one I remember most when I was a kid.
```

Page 29

```
 1  Q  All right.  Anyone else you can remember?
 2  A  Yeah, there was -- his name started with a B, but I don't
 3     remember his last name fully.  But Father Lyons I remember
 4     most.
 5  Q  At some point in time, did you join the Mormon Church?
 6  A  Yes, I did.
 7  Q  When?
 8  A  I was in graduate school, and one of my classmates, she was
 9     really beautiful, and she was an active member and real
10     interested in recruiting, and I found that the more -- I
11     wanted to date her and become closer to her, and she kind
12     of proselytized me into the church.  And I didn't have any
13     kind of core group of friends at the time, so they -- these
14     friends, they were really welcoming me, these young -- it
15     was kind of a young youth group, so I became part of a
16     youth group.
17  Q  How long did you remain a member?
18  A  Until I found out she didn't want to date me.
19  Q  How long did that last?
20  A  Less than a year, I think.
21  Q  What was that young lady's name?
22  A  Liz Hale, H-A-L-E, is the last name.
23  Q  H-A-L-E?
24  A  Yes.
25  Q  Does she still reside in the area?
```

Page 30

1  A   I don't know. I haven't had contact with her in several
2      years.
3  Q   Were you baptized in the church?
4  A   Yeah, I went through the baptism.
5  Q   Do you remember who baptized you?
6  A   I know that Rick was there, Ricky Allenbach, and -- I
7      remember Dr. Allenbach was there, and he was nearby, but I
8      don't know if he was involved with that.
9  Q   You don't know who baptized you?
10 A   I think it -- I don't really recall. I remember that I --
11     I kind of was doing it for the wrong reasons.
12 Q   I'm not really interested in why did you it right now, I'm
13     interested in who baptized you.
14 A   I don't remember.
15 Q   Were you ordained into the priesthood?
16 A   What priesthood?
17 Q   In the Mormon Church.
18 A   I'm not too sure of the policies of that, but I think that
19     once you became baptized as a male, and as an adult male,
20     you are a Melchizedek priest.
21 Q   You don't have any memory as to whether or not you were
22     ordained into the priesthood, then?
23 A   I don't recall.
24 Q   You could have been, but don't remember?
25 A   Yes.

Page 31

1  Q   You said there was another -- was there another -- any
2      other building on the Allenbach property where Jack Loholt
3      lived that you're aware of?
4  A   Not that I'm aware of. I think he lived always in that
5      apartment.
6  Q   After the abuse which you described in your interrogatory
7      answers ceased, did you ever see Jack Loholt again, just
8      physically see him anywhere around?
9  A   Yes, I did.
10 Q   And where did you typically see him?
11 A   On the Allenbach property, mostly.
12 Q   Do you have any idea why your abuse ceased beyond these
13     instances -- after these instances which you've described
14     in your answers to interrogatories?
15 A   I don't know why.
16 Q   Did you continue to go back over to the Allenbach property?
17 A   Yes, we did.
18 Q   Do you know if Jimmy was continuing to be abused?
19 A   I'm pretty certain that -- I never saw the abuse
20     physically, but I heard a lot of rumors, what was going
21     around.
22 Q   Did Jack Loholt ever say anything to you at all after
23     the -- what you describe as the sixth incident of abuse?
24 A   No, he just gave me these really intimidating looks and
25     hateful stares, and I never -- I never initiated contact

Page 32

1      with him after that.
2  Q   Now, none of this abuse occurred while you were a member of
3      the Boy Scout troop, did it?
4  A   No.
5  Q   And you were never a member of any Boy Scout troop
6      sponsored by the LDS church, were you?
7  A   No, I wasn't.
8  Q   And you weren't a member of the LDS church when this abuse
9      occurred, were you?
10 A   No.
11 Q   At any point in time since you were abused, have you ever
12     sought any type of specific psychological or psychiatric
13     help to assist you in dealing with your abuse as a child?
14 A   No.
15 Q   Is there some reason for that?
16 A   I didn't make the connection fully between the problems I
17     was having as a child and as an adult to the abuse. I'm
18     only recently making that connection.
19 Q   And why did you just recently make that connection?
20 A   I have a -- my current girlfriend, her name is Rochelle
21     Howard, and she's a principal, and she -- we've been dating
22     a little over two years, and about a year into our
23     relationship, she -- we started having a lot of problems in
24     our relationship about my anger and not letting her in to
25     me emotionally, and being very close, and I was having a

Page 33

1      lot of psychological issues, and so she made it as a
2      condition that I either get psychological help or we're not
3      going to continue our relationship.
4  Q   And have you sought psychological help?
5  A   No.
6  Q   You've had problems with anger management quite a bit prior
7      to your meeting Rochelle Howard; isn't that true?
8  A   Yes.
9  Q   And you were required to go to anger management counseling,
10     were you not?
11 A   Yes.
12 Q   And how long did that last?
13 A   A year.
14 Q   And at that time, you had discussed with your counselors
15     and made known to them that you had been sexually abused as
16     a child, hadn't you?
17 A   Yes.
18 Q   Did they recommend that you get psychological help to deal
19     with any issues that you felt at that time you were being
20     bothered by as a result of your abuse?
21 A   I remember there was a referral to Dr. Wight, and I met
22     him, and he's the psychologist that's in charge of anger
23     control treatment therapies.
24 Q   But did they refer you to him for purposes of your seeking
25     treatment for what you believed or they believed could have

Page 34

1   been related to your childhood sexual abuse?
2 A  I don't think so. It seemed to me like it was just a
3   psychological evaluation.
4 Q  Did anyone who counseled with you for your anger management
5   ever relate to you, or in any testing or any therapy, that
6   your anger management was a result of your having been
7   abused as a child?
8 A  I don't think so.
9 Q  Can we just take a break?
10       MR. KOSNOFF: Sure.
11       THE VIDEOGRAPHER: Going off the record. The
12  time now is approximately 2:00 p.m.
13           (A brief recess was taken.)
14           (Exhibit No. 1 was marked for
15            identification.)
16       THE VIDEOGRAPHER: Going back on the record.
17  The time now is approximately 2:04 p.m.
18       MR. FREY: Would you read back the last
19  question for me.
20           (The pending question was read by
21            the reporter.)
22 Q  (By Mr. Frey) There's a mention made in the letter, a
23  report dated October 10, 2001, which I referred to earlier,
24  from Dr. Wight, W-I-G-H-T, to your attorney, Carl Kocis --
25  is that the correct pronunciation of his name?

Page 35

1 A  I think so.
2 Q  And in that report to your attorney, the statement is made,
3   "I recommend that Mr. Kelly obtain a sexual deviance
4   evaluation based on a number of factors. He had two sexual
5   abuse allegations against him. He was sexually abused at
6   six years old, and has never obtained treatment for it. In
7   fact, he seems to be willing to spend significant time and
8   money avoiding such an evaluation." Is he correct, that
9   is, is Dr. Wight correct that you spent or are willing to
10  spend a significant amount of time and money to avoid an
11  evaluation?
12       MR. KOSNOFF: Objection, form of the
13  question.
14 Q  (By Mr. Frey) Do you believe that's true?
15 A  I don't know.
16 Q  Have you been urged to seek an evaluation for any
17  difficulties that you've had as a result of the abuse at
18  the hands of plaintiff Loholt?
19 A  I don't know.
20 Q  And my understanding is, as of today, you've still not
21  sought any type of help with regard to the sexual abuse
22  which Jack Loholt visited upon you; is that correct?
23 A  Yes.
24       MR. FREY: I have marked as Exhibit 1,
25  Mr. Kosnoff, a copy of the answers to -- and responses --

Page 36

1   well, our -- answers our interrogatories and first requests
2   for production. I have a copy in front of you, Mr. Kelly.
3   First of all, I want to ask you, would you take a quick
4   look through that, and see if you recognize the document at
5   all.
6 A  Yes, I recognize this document.
7 Q  Okay. And did you supply answers to Mr. Kosnoff's office
8   for purposes of responding to these interrogatories?
9 A  Yes, I did.
10 Q  Did you review the answers after they had been prepared?
11 A  Yes.
12 Q  And you approved those answers as being correct and
13  accurate; is that --
14 A  Yes, that's correct.
15 Q  Now, if you would look at Page 9 of 14 in Exhibit 1, in
16  fact, you may want to go back, the interrogatory is on the
17  preceding page at the bottom --
18       MR. KOSNOFF: Are you referring to Page 9 or
19  Interrogatory 9?
20       MR. FREY: I referred to Page 9, it's Page 8
21  and Page 9.
22 Q  (By Mr. Frey) At the bottom of Page 8, Interrogatory No. 8
23  asked you to identify those people that you informed about
24  the inappropriate sexual contact and to the best of your
25  ability the date you did so. And then on Page 9, in your

Page 37

1   response, you list first of all, your mother and father,
2   and that was in the early to mid '70s, it states. Is that
3   the discussion you had that we've already talked about --
4 A  Yes.
5 Q  -- after the incident in the field; is that correct?
6 A  Can you rephrase the question, please?
7 Q  Want to read it back?
8           (The portion of the proceedings
9            beginning on Page 36, Line 25,
10           through Line 5 above, was read by
11           the reporter.)
12 A  Yes.
13 Q  Now, you say you told your sisters, early to mid '70's.
14  Which sisters did you tell? Those would be stepsisters,
15  correct?
16 A  Yes. Diane and my older half sisters, Vicki, Nancy, and
17  Peggy. And -- my sister Peggy is dead, though, right now,
18  she died about eight years ago.
19 Q  So you told your stepsisters, Karen, Vicki, and Nancy; is
20  that correct?
21 A  Yes.
22 Q  As well as Peggy who's deceased. And you told them about
23  the same time as you told your mother and father; is that
24  correct?
25 A  That's correct.

Page 38

1  Q  What did you tell them?
2  A  I don't recall.
3  Q  You don't know whether you told them about the facts of the
4     abuse or simply that you were abused or that somebody did
5     something inappropriate? You have no memory today of what
6     you told them; is that correct?
7  A  I know it wasn't a lengthy conversation, and I -- it didn't
8     go into detail telling them, but -- so I don't really
9     recall.
10 Q  Would you have told them as much as you told your mother?
11 A  No.
12 Q  Why did you tell your sisters?
13 A  Well, I only knew that they knew about it, but it's
14    something that we just didn't talk about.
15 Q  But my question was, why did you tell your sisters, if you
16    told them?
17 A  I don't know.
18 Q  Did you ever discuss it after that first disclosure with
19    either Karen, Vicki, or Nancy, after the mid to -- early to
20    mid '70s?
21 A  Not that I recall.
22 Q  The next person listed is Evalyn deGuzman, and that's 1990
23    to '91. What did you tell her?
24 A  I don't recall specifically what I told her.
25 Q  Did you describe for her the type of abuse you'd been

Page 39

1     subjected to?
2  A  I don't think I went into detail with -- just that she knew
3     that I was abused.
4  Q  And why did you tell her about that?
5  A  I don't know.
6  Q  Were you telling her about that because of difficulties you
7     were having in your relationship with her?
8  A  I don't know.
9  Q  All right. The next person that you list is Jovine Umali?
10 A  Jovine.
11 Q  Umali; is that right?
12 A  She's Filipino, and it's Jovine Umali.
13 Q  And what did you tell her about the abuse?
14 A  I don't recall.
15 Q  Would your answer be the same for Julie Garasi?
16 A  Mm-hmm.
17 Q  And how about Rochelle Cope?
18 A  Well, Rochelle knows more because I'm closer to her.
19 Q  How much have you told Rochelle?
20 A  I didn't go into a lot of detail, but I -- she just knows
21    that I was significantly abused -- sexually abused as a
22    child.
23 Q  Where does Rochelle Cope live?
24 A  She lives in Redondo -- in Federal Way, Washington.
25 Q  Redondo Beach?

Page 40

1  A  Yeah.
2  Q  Any other people that you've told of this abuse -- you
3     didn't list any of the people from the anger management
4     treatment that you took. Is there some reason you didn't
5     do that?
6  A  I don't know. Maybe -- I don't know.
7  Q  But you did tell them you were sexually abused, did you
8     not?
9  A  Mm-hmm.
10 Q  Do you know who you told?
11 A  Dr. Wight, and I don't recall if I told Keith Waterland or
12    not.
13 Q  If you'll turn to Page 10, I'd like to ask you about
14    another interrogatory there. In Interrogatory No. 10,
15    you're asked if you're making a claim for lost wages, and
16    your response is, I'm not making a claim for lost wages.
17    In No. 11 you're asked are you making a claim for lost
18    earning capacity, please state the amount of such claim.
19    Are you making a claim for lost earning capacity, that is,
20    for your inability to make as much as you think you could
21    make in the future?
22 A  Like the interrogatory says, I need a higher professional
23    who's skilled in the area to make that evaluation,
24    according to my earning capacity.
25 Q  Okay. What I want to ask you, though, is in your opinion,

Page 41

1     not in any expert's opinion, do you feel that you've been
2     unable to secure any job that you wanted to date because of
3     the sexual abuse that you've been subjected to?
4  A  I don't know.
5  Q  Well, is there a job that you applied for that you didn't
6     get?
7  A  In my past, yes, mm-hmm.
8  Q  And give me an example of one.
9  A  Oh, I worked -- after I got my graduate degree I worked as
10    a senior secretary at the University of Washington.
11 Q  You worked as a student secretary?
12 A  Senior secretary.
13 Q  Senior secretary, okay. And what is there about that --
14    did you want to get the job and didn't get it?
15 A  I applied for several jobs after, and -- and I -- yeah.
16    I'm not sure that -- can you rephrase the question?
17 Q  Well, let me go back. What I'm trying to find out is if
18    there's anything in your mind that you know of that you
19    believe has hindered you from obtaining or impacted your
20    ability to earn the amount of money that you think you're
21    capable of earning because of your abuse?
22 A  If you state your question leaving out "this abuse" I would
23    agree completely. Because I never have made the
24    connection, that the -- and I'm only now kind of
25    discovering that that's the reason why I've been so

Page 42

1 dysfunctional in my life, professionally and on a personal
2 level.
3 Q And how are you discovering this?
4 A Rochelle is really helping me a lot. I'm -- she's the
5 closest relationship I've ever had, emotionally.
6 Q Rochelle is not a psychologist or psychiatrist, is she?
7 A No. Well, actually, in -- she studied psychology in
8 college.
9 Q She's not a licensed psychologist or psychiatrist, is she?
10 A No.
11 Q And you've not done any testing of any kind, either
12 administered by Rochelle or any other person relative to
13 this abuse; is that correct?
14 A That's correct.
15 Q And you've never sought any psychological counseling or
16 help for this abuse, you've told me; is that correct?
17 A That's correct.
18 Q Okay. Now, have you gone to any person, any expert, to
19 have them discuss with you your lost -- or, the potential
20 for lost earning capacity to date?
21 A No.
22 Q Do you know whether or not Jack Loholt took any videos or
23 pictures of you while he was engaged in this abuse?
24 A I'm not aware.
25 Q You're not aware of any?

Page 43

1 A I'm not aware of any videos.
2 Q Or pictures, photographs of any kind?
3 A Or pictures or photographs.
4 Q Can you give me any idea of how long, in terms of either
5 months or years, that you believe these six incidents of
6 sexual abuse occurred that you've answered in your
7 interrogatories?
8 A I'm not sure how long the time frame was.
9 Q Well, I understand that, but is it we're talking about five
10 years or two years or a matter of months? Can you give me
11 some idea of how long this lasted?
12 A I recall that it occurred at least over a several month
13 period.
14 Q Could you tell me in year own words -- we're not talking
15 about expert testimony here, but I want to know in your own
16 words what you believe are the damages that you have
17 sustained as a result of the abuse by Mr. Loholt.
18 A Ever since I was a teenager, I had thoughts of suicide, and
19 I thought of -- when I began to drive, I thought of, like,
20 crashing into a truck or something. And so even to this
21 day, I have thoughts of suicide and depression, anxiety.
22 I've never been at my -- I mean, we talked about my
23 education. I'm very educated, I've shown that I can do
24 super in school, but I've never -- I think because of my
25 personality, and whatever, I haven't been able to work in

Page 44

1 the capacity to what I'm educated at. Never have really --
2 realizing my full potential. Now I'm teaching and I've
3 been teaching under contract for two years, and I love
4 teaching kids, and I love the subject that I teach, but my
5 last evaluation was not a stellar evaluation, based on
6 maybe personality or communicating. I still -- I still
7 live at home, because I've -- I find that a very protective
8 atmosphere, with mom and dad. It's safe. And I have
9 significant anger problems, I think still -- and still -- I
10 just have unresolved psychological conflicts, and I'm
11 not -- I just -- it's been my life, you know, that's just
12 been how it has been for me ever since I can remember,
13 since I was abused by Jack.
14 Q Now, with regard to these notions of suicide, for instance,
15 when did you first start having those?
16 A Early teens, I think.
17 Q How about depression and anxiety?
18 A Significant as an adult. Since -- I've had depression and
19 anxiety since I was a kid, but I thought it was a natural
20 part of growing up. But as an adult I realize that it's a
21 significant problem. But I never really realized it. It
22 was just part of my life.
23 Q Now, let me go back for a minute. You've described in some
24 detail these six instances of abuse, and I wanted to ask
25 you, is it correct that, from the time that abuse

Page 45

1 occurred -- or, at least, let's go up to the time when it
2 stopped, after some months or whatever the time period was,
3 that abuse was always in your mind, was it not? You didn't
4 forget it?
5 A It was in the back of my mind. I just buried it.
6 Q My question is, you were aware that it had occurred, you
7 were aware of what had happened, and that was something
8 that had not been forgotten, put it that way, after the
9 abuse stopped; isn't that correct?
10 A That's correct.
11 Q And whether you wanted to talk about it or not talk about
12 it, that isn't my question. My question is really, were
13 you aware of that abuse and what had been done to you by
14 Jack Loholt, and it was something that -- is it correct
15 that it's something that bothered you from the time it
16 started, and continued to bother you throughout your
17 teenage and adult life?
18 A It was something that was in the back of my mind, and it's
19 something that I didn't dwell on.
20 Q Well, you told your -- a number of people about it, as far
21 back as, back in '91, about the abuse, did you not?
22 A What page are you referring to in the interrogatory?
23 Q Well, according to your answers to interrogatories, you
24 told Evalyn deGuzman back in 1990 and 1991 about the abuse.
25 So it was in your mind then about the abuse, right?

Page 70

1  Q   They don't send you envelopes or anything like that?
2  A   No.
3  Q   So is it fair to characterize that you go to church with
4      your parents on a periodic basis, you do receive communion
5      when you go, but other than that you're not active in the
6      church at all; is that correct?
7  A   That's correct.
8  Q   When this incident -- the first incident occurred with Jack
9      Loholt out in that field, that was on the Allenbach
10     property; is that correct?
11 A   I don't recall if it was on their property.
12 Q   Was it on their property or your property or was it
13     someplace else in Kent?
14 A   It's -- it either -- I'm not sure. It happened definitely
15     in the field near the house. There's a field called "The
16     Old Man's Field," and it was not the Allenbachs property,
17     it was a property owned by this other -- just down the
18     lane, but it was all part of the back area there, and so it
19     might have been in The Old Man's Field.
20 Q   And what specifically did you tell your mother, to the best
21     of your memory, about the incident?
22 A   I don't recall.
23 Q   You don't have any recollection today of anything you told
24     her about that incident?
25 A   I remember running back to the house and telling mom, but I

Page 71

1      don't remember what.
2  Q   Did any of the Allenbach children go with you?
3  A   Jimmy and Tom and -- so Jimmy.
4  Q   So your brother, Tom, was involved?
5  A   Yes.
6  Q   Where does Tom live now?
7  A   My parents subdivided the property and he has a house up
8      near the top end of the lane which would be the east
9      direction of my parents' house.
10 Q   So that means he's still -- he lives somewhere on 260th or
11     not?
12 A   Yes, he does, yeah.
13 Q   What does he do?
14 A   He's a truck driver.
15 Q   For any particular company?
16 A   Star Rentals.
17 Q   Is he married?
18 A   He is married.
19 Q   And his wife's name?
20 A   Sharon.
21 Q   I may have asked you this: You're not under any
22     restrictions with regard to visitation on your child,
23     Gabriel, are you?
24 A   No.
25 Q   Do you plan on seeing a psychologist or other health care

Page 72

1      provider with regard to any of the issues that you've
2      discussed with me which you believe are the result of your
3      abuse?
4  A   Yes, I do.
5  Q   When do you intend to start pursuing that help?
6  A   I believe I'm scheduled for a psychological evaluation this
7      Wednesday by Dr. Jon Conte.
8  Q   Okay. Have you ever been involved in any other litigation?
9  A   What kind of litigation?
10 Q   Litigation of any kind.
11 A   Family law litigation.
12 Q   And that dealt with your divorce?
13 A   Yes.
14 Q   Have you ever made a claim against anyone for damages?
15 A   Not that I recall. I don't think so.
16 Q   Have you ever been convicted of a crime?
17 A   I'm just trying to think. When -- I don't think so. I
18     don't think I've ever been convicted.
19 Q   Have you ever been arrested?
20 A   Yes.
21 Q   What for?
22 A   Domestic violence.
23 Q   What was the outcome of that?
24 A   I was transferred down to the Kent Jail, and my dad bailed
25     me out, and I think it was dismissed. That's what I was

Page 73

1      reflecting on earlier. I think that was dismissed.
2  Q   Was there a deferred prosecution if you went to anger
3      management or something of that nature? Is that what that
4      was about?
5  A   I don't think so. I think they're non-related.
6  Q   Why do you think it was dismissed?
7  A   I don't know.
8  Q   Do you know a woman named Linda Walker?
9  A   I don't recall.
10 Q   When you say you don't recall, you don't remember, you
11     don't know, what does that --
12 A   The name doesn't sound familiar.
13 Q   Okay. Did you ever speak to Dr. Allenbach at any time
14     after this abuse?
15 A   Yes.
16 Q   And before he died?
17 A   Yes.
18 Q   When did you speak with him?
19 A   Well, I --
20 Q   My question is poorly phrased. Let me restate it for you.
21     Did you ever speak to Dr. Allenbach at any time after you
22     were abused concerning the fact of your abuse?
23 A   Not that I recall.
24 Q   After your abuse, did you ever have any discussions with
25     Dr. Allenbach, and if so, what were the nature of those?

19 (Pages 70 to 73)

DEPOSITION OF ROBERT KELLY - FLEMING, et al. v. MORMON CHURCH, et al. - 8/29/05

Page 74

1  A   Well, he continued to be my neighbor, and so there was many
2      discussions over the years regarding a variety of topics.
3      Could be baseball, playing baseball, or it could be working
4      in the yard or help -- you know, I don't know, it could be
5      any number of things.
6  Q   So you spoke with him after the abuse, but on the basis of
7      one neighbor to another, principally?
8  A   (Witness nods).
9  Q   And the topic of your abuse never came up; is that correct?
10 A   Not that I recall.
11 Q   Okay. I think I'm finished. Just a second here.
12             (Brief pause in the proceedings.)
13 Q   In this incident in the field, do you remember about what
14     time of the day that occurred?
15 A   I don't know.
16             (Brief pause in the proceedings.)
17 Q   Do you have any information, Mr. Kelly, that the LDS church
18     knew of the abuse that was occurring to you in the basement
19     of Mr. Allenbach's home at the time that it was going on?
20 A   What was the first part of your question, again?
21 Q   Do you want to read it back to him?
22             (The pending question was read by
23              the reporter.)
24 A   I don't know.
25 Q   Do you have any information, Mr. Kelly, that the LDS church

Page 75

1      engaged in any type of cover-up concerning the abuse of
2      Mr. Loholt towards you?
3  A   I don't know.
4  Q   Have you talked to any victims, sexual abuse victims of Mr.
5      Loholt who indicated that they told anyone in the LDS
6      church about the abuse that was occurring to them?
7  A   Can you read it, please, again.
8             (The pending question was read by
9              the reporter.)
10 A   I don't know.
11 Q   So it's clear, you did not come to know Mr. Loholt because
12     of any type of involvement that you had with the LDS church
13     at the time; is that correct?
14 A   That's correct.
15 Q   He simply was a neighbor living in the basement of
16     Dr. Allenbach's house; is that right?
17 A   That's right.
18 Q   And he never at any time that he was abusing you made any
19     claims concerning either his membership or affiliation or
20     anything to do with the LDS church; is that correct?
21 A   I don't know.
22 Q   I have no other questions. Thank you very much.
23 A   Thank you, Mr. Frey.
24             THE VIDEOGRAPHER: This concludes the
25     deposition of Robert Kelly. The time now is approximately

Page 76

1  3:23 p.m. This is the end of tape No. 2. Going off the
2  record.
3             (At 3:23 p.m. the proceedings were
4              adjourned.)
5             (Signature was reserved.)

Page 77

CERTIFICATE

STATE OF WASHINGTON  )
                     ) ss.
COUNTY OF KING       )

   I, Alison Lott, Notary Public in and for the State of
Washington, do hereby certify:
   That the annexed and foregoing deposition was taken
stenographically by me and reduced to typewriting under my
direction;
   I further certify that I am in no way related to any
party to the cause of action concerned, nor to any of counsel,
nor do I have a financial interest in the event of the cause;
   I further certify that the deposition as transcribed is
a full, true and correct transcript of the proceedings;
   IN WITNESS WHEREOF, I have hereunto set my hand and
affixed my Official Seal this 7th day of September, 2005.


                    Notary Public in and for the State
                    of Washington, residing at Edmonds.
                    My Commission expires 1/15/07.

20 (Pages 74 to 77)