<u>Fleming, et al. v. COP, et al.</u>
No. CV04-2338 RSM

DECLARATION OF MARCUS B. NASH
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT C

Page 1

```
                  UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
                          AT SEATTLE

_____

                                         )
KENNETH FLEMING and JOHN DOE,            )
                                         )
              Plaintiffs,                )
                                         )
         vs.                             )  NO. 04-2338 RSM
                                         )
THE CORPORATION OF THE PRESIDENT OF THE  )
CHURCH OF JESUS CHRIST OF LATTER-DAY     )
SAINTS, a Utah corporation sole, a/k/a   )
"MORMON CHURCH"; LDS SOCIAL SERVICES     )
a/k/a LDS FAMILY SERVICES, a Utah        )
corporation,                             )
                                         )
              Defendant.                 )
_____

              DEPOSITION UPON ORAL EXAMINATION OF
                         TODD DENNY
                    VIDEOTAPED PROCEEDING
_____

                      10:06 o'clock a.m.
                      September 7, 2005
                       601 Union Street
                         Suite 3100
                      Seattle, Washington




REPORTED BY:
ALISON LOTT, CCR#2337                         EXHIBIT  C
```

Verb8M Reporting
800 Fifth Ave., Suite 101-122, Seattle, WA 98104 - (206) 467-0800

Page 6

1   answer it. Do you understand that?
2 A Yes.
3 Q Okay. So with that background, do you have any questions
4   at all about how we're going to proceed?
5 A No.
6 Q All right. Now, this deposition, lastly, can be used for
7   any purpose since you're a party, which means we can use it
8   in court and it's just as though you're testifying in
9   court; do you understand that?
10 A Yes.
11 Q What is your current occupation?
12 A I'm a software engineer for the Boeing Company.
13 Q How long have you worked for Boeing?
14 A Almost 14 years.
15 Q What do your duties involve as a software engineer?
16 A Currently I'm doing system administration on a new project,
17   program that we're developing for business intelligence
18   supporting.
19 Q Could you tell me a little bit about your educational
20   background? I'm not -- well, let's even start with grade
21   school. Where did you go to grade school?
22 A Meridian Elementary.
23 Q How about high school?
24 A Kentwood High School.
25 Q And how did you do in high school? What would you say your

Page 7

1   grade point was when you graduated?
2 A 3.5, 3.4 or so. I can't remember.
3 Q Do you consider yourself a good student?
4 A Yes.
5 Q How about college? Where did you go?
6 A I started at Washington State University, and graduated
7   from Western Washington University.
8 Q All right. And what did you take your degree in?
9 A Political science.
10 Q And have you had any graduate studies that you've pursued
11   since you -- you did graduate from Western Washington?
12 A Yes, I did.
13 Q Since you graduated from Western Washington?
14 A Only worked for Boeing.
15 Q Okay. And how did you become knowledgeable or proficient
16   in software?
17 A I took some classes at Western in computing -- computer
18   sciences as well, electives, and just was interested in the
19   computing side as opposed to --
20 Q Have you taken any non-collegiate type training with regard
21   to your softwares work?
22 A Boeing provides me a lot of training, on a yearly basis,
23   several times a year.
24 Q Would these be classes that you take, where they allow you
25   to go and become updated on new systems and new

Page 8

1   procedures --
2 A Yes.
3 Q -- and so forth? Okay. My understanding is that you were
4   divorced a short time ago; is that correct?
5 A November 30 of 2004.
6 Q And are you currently single or are you married?
7 A I'm single.
8 Q Are you presently dating any particular person?
9 A No.
10 Q Your wife's name was Michelle; is that correct?
11 A Yes.
12 Q And you and Michelle had three children; is that right?
13 A That's correct.
14 Q Jordan, Regan, and Cameron?
15 A Yes.
16 Q And do they live -- they split between you and your
17   mother --
18 A Yes.
19 Q -- I mean -- mother? You and your wife, ex-wife, Michelle.
20 A They go a week to her house and a week to my house.
21 Q And that arrangement is working out okay for you?
22 A It's fantastic.
23 Q All right. Where do your children presently attend school?
24 A My two oldest daughters go to St. Anthony in Renton, it's a
25   Catholic school, and my son is just starting preschool.

Page 9

1   Yesterday was his first day.
2 Q Are you Catholic?
3 A No.
4 Q Was your wife Catholic?
5 A Yes.
6 Q Do you belong to any particular religious organization or
7   sect?
8 A No.
9 Q Have you ever been a member of any particular organized
10   religion?
11 A No.
12 Q I forgot to ask you, when you graduated from Western
13   Washington, what were your grades like?
14 A I --
15 Q As best you remember them. I'm not going to hold you to a
16   specific --
17 A Three point or so, I'm guessing, I can't remember. Maybe a
18   little less than that.
19 Q My understanding is that you at one point, along with your
20   wife, I guess -- and correct me if I'm wrong -- engaged in
21   some counseling at Valley Counseling; is that correct?
22 A That is correct.
23 Q And who is the individual you dealt with there?
24 A Bill --
25 Q Let me see here. Is it Stanley?

DEPOSITION OF TODD DENNY - FLEMING v. CHURCH OF LDS - 9/7/05

Page 10

1  A  Bill Stanley I think is what his name is, yes.
2  Q  Dr. Stanley?
3  A  Dr. Stanley, yes. I'm not sure --
4  Q  Was that prior to the time that divorce proceedings were
5     initiated or --
6  A  Yes, that was prior to that.
7  Q  All right. And am I correct in assuming that this was an
8     attempt to try and resolve some of your marital issues to
9     avoid having a break-up?
10 A  Yes, that's true.
11 Q  During the course of that -- how long did that counseling
12    last, by the way?
13 A  Only a couple of months.
14 Q  All right. During the course of that counseling, did the
15    fact of your having ever been sexually abused come to the
16    forefront in any way?
17 A  No.
18 Q  Did you ever disclose to your wife the fact that you'd been
19    sexually abused?
20 A  No.
21 Q  Are your parents still alive?
22 A  Yes.
23 Q  And could you give me their names and addresses.
24 A  Charlie and Linda Denny.
25 Q  And do you know where they live?

Page 11

1  A  Sure.
2  Q  Please tell me.
3  A  25702 -135th Place Southeast, Kent, Washington, and I
4     believe the zip code is 98032.
5        MR. PFAU: I'm sorry, could you repeat that,
6     Todd?
7        THE WITNESS: 98032.
8  Q  (By Mr. Frey) Have you ever disclosed to your parents the
9     fact that you were sexually abused?
10 A  No.
11 Q  Are your parents members of any particular religion or
12    sect?
13 A  Not in my lifetime.
14 Q  At the time that you were abused as described in your
15    answers to interrogatories, where did you live?
16 A  At that same address.
17 Q  And is this particular address anywhere near the Allenbach
18    residence?
19 A  It's probably half a mile to three-quarters of a mile.
20 Q  Were any of the Allenbach children friends of yours?
21 A  Yes, Jill, Dr. Allenbach's daughter, was my age. We went
22    to school together from second grade through at least
23    eighth grade or ninth grade.
24 Q  How about any of the boys?
25 A  No. I know Jim Allenbach, and I know -- I knew their

Page 12

1     oldest brother, but I don't know them well.
2  Q  Brent?
3  A  Brent, yeah. Thank you.
4  Q  Were you and Jill pretty good friends?
5  A  Yeah, reasonably, I'd say, yeah.
6  Q  I'm not talking about any kind of a dating relationship or
7     anything, but I mean, as chums, going up to school?
8  A  Yeah. We would hang out with the same crowd, if you --
9  Q  Who were some of the people that you did hang out with, if
10    I can use that term, during the time you were going to
11    grade school?
12 A  Who were some of the people?
13 Q  Right. Some of your best friends.
14 A  Dan Grant, Chuck Sekyra.
15 Q  How do you spell his last name?
16 A  S-E-K-Y-R-A.
17 Q  S-E-K --
18 A  -- Y-R-A, yes.
19 Q  Thank you. Anyone else -- I'm just -- not just all your
20    classmates, but boys that you -- or girls that you
21    considered friends, that you hung out with from time to
22    time.
23 A  That's all I can think of right now.
24 Q  Do they still live in the area?
25 A  Yeah.

Page 13

1  Q  Did you ever meet Dr. Allenbach?
2  A  Yes. He pulled my wisdom teeth.
3  Q  Other than pulling your wisdom teeth, did you ever have any
4     other interaction with him, playing baseball or doing
5     anything at their home?
6  A  I met him once at the Allenbach house, yes.
7  Q  What were the circumstances of that?
8  A  We were just playing out in the yard, Jill and I, and one
9     of her friends.
10 Q  Did you know Mrs. Allenbach at all?
11 A  No.
12 Q  Did you ever see Jack Loholt on the Allenbach property?
13 A  No.
14 Q  Am I correct in assuming that at the time of your abuse,
15    you were not a member, then, of the LDS church?
16 A  Yes, that is correct.
17 Q  And were you a member of any Boy Scout troop sponsored by
18    the LDS church?
19 A  No.
20 Q  Were you the member of any Boy Scout troop at the time of
21    your abuse?
22 A  No.
23 Q  In your answers to interrogatories, you mention that this
24    abuse occurred -- would you mark that as an exhibit.
25       (Exhibit No. 1 was marked for

4 (Pages 10 to 13)

Page 14

1    identification.)
2 Q  You mention in your answers to interrogatories, in
3    particular Interrogatory 7 --
4        MR. PFAU: Let me -- let's get to the place,
5    Tom.
6        THE WITNESS: Right here (indicating)?
7        MR. PFAU: Yeah, exactly.
8 Q  (By Mr. Frey) And I'm paraphrasing this, it says you were
9    invited to a Boy Scout trip at Lake Kachees on Snoqualmie
10   Pass "by my neighbor, Kenneth Fleming." How well did you
11   know Ken Fleming?
12 A I knew him very well. But I was invited to the trip with
13   his brother, Dan Fleming, not Ken.
14 Q Was Dan younger or older?
15 A Younger [sic]. He was a year older than I was.
16 Q Did you spend a fair amount of time with Dan Fleming prior
17   to this instance?
18 A Yeah.
19 Q Was he a classmate of yours at school, or -- I mean, in the
20   sense that he went to the same school you did?
21 A Only for about a year, and then he was a year ahead of me
22   so he went off to junior high or so --
23 Q What's the difference in age between you and Dan?
24 A One year, I believe.
25 Q How well did you know Ken Fleming?

Page 15

1 A  Pretty well.
2 Q  And Ken was how much older than you?
3 A  I think he's two or three years older than me -- than I am.
4        MR. PFAU: Todd, you want to remember to keep
5    your voice up.
6        THE WITNESS: Okay. Thank you.
7 Q  (By Mr. Frey) In your answers to -- well, strike that.
8    Let me go back. We've marked as Exhibit 1 what has been
9    served upon us and purports to be the answers to our first
10   interrogatories to you. Have you seen this document before
11   today?
12 A Yes.
13 Q Did you assist in the preparation of it?
14 A Yes.
15 Q Did you read it and sign it at the time that it was
16   completed?
17 A Yes.
18 Q In answer to interrogatory No. 7, where you're asked to
19   describe the instances of abuse, you list one instance
20   which we've just alluded to that occurred on a Boy Scout
21   trip at Lake Kachees on Snoqualmie Pass. Were there any
22   other instances of abuse at the hands of Jack Loholt, other
23   than that one instance?
24 A No.
25 Q Is it correct, then, that I'm assuming that the only

Page 16

1    instance of abuse involving Jack Loholt was this one that
2    is described in the answer to Interrogatory No. 7?
3 A  That's correct.
4 Q  Have you ever been the victim of any type of sexual abuse
5    by any other person?
6 A  No.
7 Q  Do you remember how many boys were on that trip which is
8    described in the answer to Interrogatory No. 7?
9 A  I don't. I can venture a guess, but I --
10       MR. PFAU: You don't want to guess. If you
11   can estimate, you can do that. But --
12 Q (By Mr. Frey) Can you tell me the names of the boys who
13   were there that you do remember.
14 A Danny Fleming and myself. The rest of the boys were older
15   than I.
16 Q Did you -- had you met Jack Loholt prior to this particular
17   instance?
18 A Yes, I had.
19 Q Where did you meet him?
20 A At his house.
21 Q How long prior to this instance had you met him?
22 A I had met him more than one time.
23 Q When you say his house, do you remember where his house was
24   located?
25 A I remember it almost every day. It's right next to

Page 17

1    Dr. Allenbach's property, right next to my elementary
2    school, within a few blocks, and also within quarter of a
3    mile from my parents' house.
4 Q  When you met him, he was not living on the Allenbach
5    property?
6 A  No.
7 Q  Did you know that he had lived on the Allenbach property?
8 A  I did not.
9 Q  Who was the one that invited you to go on the trip?
10 A Daniel Fleming.
11 Q And did you have to clear that with your parents?
12 A Yes.
13 Q Prior to this trip, had Daniel Fleming ever told you
14   anything about any type of abuse or problems with Jack
15   Loholt?
16 A No.
17 Q You said you believed it was about in -- it was in June of
18   1975 or '76, and you were about eleven years old. How did
19   you come up with those dates?
20 A I just tried to think of the times that Danny and I were
21   playing together, and I don't believe he was at school the
22   same time I was, so that would have put him in junior high
23   or -- best guess.
24 Q All right. Is there any event or anything in your life
25   that had happened that you can connect with this trip,

DEPOSITION OF TODD DENNY - FLEMING v. CHURCH OF LDS - 9/7/05

Page 18

1 something earlier that year, a trip to go visit your
2 grandparents or anything that would give you some notion of
3 the time?
4 A   I have thought about this a lot, and I can't -- I cannot
5 pinpoint it.
6 Q   All right. Now, you indicate that -- you indicate in this
7 answer that Ken Fleming was the one who invited you, but
8 you're now telling me it was Danny?
9 A   Yeah. I -- it was definitely Danny.
10 Q   You said you were there for one night; is that --
11 A   That's correct.
12 Q   -- is that how you remember it?
13 A   Yep.
14 Q   And were you in a tent or you indicate something about a
15 cabin here?
16 A   There was a cabin.
17 Q   Who else was in the cabin besides you and Jack Loholt?
18 A   I believe everybody was in the cabin.
19 Q   So there were a number of boys in there --
20 A   Yes.
21 Q   -- is that correct? You have no idea today beyond just a
22 shear guess as to how many were there?
23 A   No, sir.
24 Q   You said you ended up sleeping next to Jack Loholt. How
25 did that occur, to the best of your memory? Why did you

Page 19

1 end up sleeping next to him?
2 A   I have no idea.
3 Q   Just the way it happened, as far as you know?
4 A   As far as I know.
5 Q   When Mr. Loholt, you've described, reached into your
6 sleeping bag and fondled you, was -- were you asleep, did
7 this wake you up or --
8 A   I was asleep.
9 Q   And so all of a sudden you realized this fellow is touching
10 you in some fashion, and what was your -- kind of your
11 response to that? Were you just shocked or --
12 A   I think shock is the appropriate term.
13 Q   Okay. Did you say anything to him that you remember?
14 A   No, I -- I don't -- I didn't say anything to him.
15 Q   You described something about his reaching into your
16 sleeping bag and "put each of my toes into his mouth."
17 A   That's correct.
18 Q   How did that happen? I'm trying to --
19 A   I'm assuming he unzipped it.
20 Q   Did he ask you to get out of the sleeping bag or did he
21 unsip it or do something --
22 A   He unzipped it.
23 Q   That seemed a bit strange to you?
24 A   Very strange.
25 Q   How long did this whole incident last?

Page 20

1 A   Seemed like quite a while, but I -- probably no more than
2 20 minutes or so.
3 Q   After he had touched you or fondled you, did he then go
4 ahead and put your toes in his mouth?
5 A   I'm sorry, could you repeat that?
6 Q   Did it happen in the sequence you've described, that is,
7 after he touched you, then he -- did he then suck on your
8 toes?
9 A   After he -- after he put my hand on his penis.
10 Q   And that's what I was going to ask you next. What --
11 that's not described in here. So did something beyond his
12 fondling you, or his sucking on your toes occur between the
13 two of you?
14 A   No, other than him putting his hand on my penis. I
15 believe -- I thought that was in here.
16 Q   Did he ask you to touch him?
17 A   He put my hand on him.
18 Q   Okay. And this is after he touched you?
19 A   Yes.
20 Q   And so -- in this whole series of events, anything else
21 that he did? Let's start there.
22 A   Other than sucking the toes, no.
23 Q   Okay. And this whole series of events may have lasted as
24 long as 20 minutes; is that what you're saying?
25 A   I believe that's true.

Page 21

1 Q   Did he say anything to you?
2 A   I think he said -- he said "shh" or something of that
3 nature. I do not recall exactly.
4 Q   So there was no real conversation going on between the two
5 of you?
6 A   No.
7 Q   After this incident concluded, what did you do?
8 A   Fell asleep.
9 Q   Did you move your sleeping bag?
10 A   No.
11 Q   Did he attempt to touch you any further that evening in any
12 way?
13 A   No.
14 Q   Did he say anything to you when you woke up, about what had
15 occurred, make any reference to it in any way?
16 A   No.
17 Q   When is the first time you told anybody about what happened
18 that evening?
19 A   First thing in the morning.
20 Q   And who did you tell?
21 A   Daniel Fleming.
22 Q   What did he say when you told him?
23 A   I can't remember his response.
24 Q   Did he act surprised or shocked or --
25 A   He acted surprised, yes.

6 (Pages 18 to 21)

Page 30

1    lawsuit, I guess, was Dan Fleming; is that correct?
2  A  That's correct.
3  Q  Have you ever since the filing of this lawsuit discussed it
4     with your parents or anyone else?
5  A  No.
6  Q  Am I correct in -- strike that. Is it true that from the
7     time of the abuse until today, you've always had that --
8     the fact of the abuse and what happened that night in your
9     mind, even though it may not be right in the forefront
10    every day, but it's not something you forgot about?
11 A  No, absolutely not. It's as clear as it happened
12    yesterday.
13 Q  All right. Is there some reason you haven't sought any
14    type of professional help as relates to this abuse?
15 A  Hard to slow down, busy life, three kids.
16 Q  I understand that. Is part of the reason, in addition to
17    being busy with your job and your family, also that it
18    wasn't something that was that pressing that was affecting
19    you on a daily basis?
20 A  No, I just believe it's something I don't want to talk
21    about.
22 Q  Can you tell me, then, how you deal with it.
23 A  Internalizing, compartmentalizing, keeping it inside.
24 Q  Are you aware of any discussions with -- that you've had
25    with any of the parties to this lawsuit -- not their

Page 31

1    attorneys, not your attorneys -- concerning filing a
2    lawsuit against Dr. Allenbach, or his estate?
3  A  Could you -- I'm sorry, could you --
4  Q  Have you had any discussions with any of the plaintiffs in
5     this lawsuit, the other plaintiffs, concerning a lawsuit
6     against Dr. Allenbach or his estate?
7  A  No.
8  Q  Have you had any discussions with any other parties not
9     your attorneys concerning a lawsuit against Dr. Allenbach's
10    estate?
11 A  No.
12 Q  Let's take a break for just a minute.
13       THE VIDEOGRAPHER: Going off the record, the
14    time is approximately 10:49.
15       (A brief recess was taken.)
16       THE VIDEOGRAPHER: Back on the record. The
17    time is approximately 10:57.
18 Q  (By Mr. Frey) Mr. Denny, I want to just ask you to clarify
19    a couple of things for me. First of all, when we were
20    talking about your feelings about the church and its
21    involvement, you said something about he -- and you correct
22    me if I'm wrong -- that Danny told his dad, and his dad
23    told the church?
24 A  That's my impression only. I have no knowledge or no
25    factual basis for that. I just -- somebody must have

Page 32

1    known, because they -- you know, I was contacted by an
2    investigator. So my story got out somehow. I mean --
3  Q  Okay. But Danny never told you that he told his father?
4  A  I --
5  Q  That's what I'm trying to get at.
6  A  I don't remember any specific incident of him telling me
7     that.
8  Q  And you don't have any firsthand knowledge that his dad
9     told any church officials about this?
10 A  I do not.
11 Q  And these questions that I'm asking you with regard to
12    Danny and his father, I'm talking about back at the time,
13    right after the incident happened.
14 A  Right. Right.
15 Q  All right. I don't have any other questions.
16       MR. PFAU: Nothing.
17       THE VIDEOGRAPHER: This is the end of video
18    tape No. 1, and concludes the deposition of Todd Denny.
19    The time is --
20       MR. FREY: Excuse me. We've go got to stay
21    on the record for just a minute. Subject only to what we
22    discussed off the record -- for the record, I've tried to
23    get records from Valley Counseling. Dr. Stanley seems to
24    be reluctant to give them. The witness has agreed to work
25    with his attorney; he'll stop by and see if we can get the

Page 33

1    records. If there's anything in there of consequence, I do
2    want to reserve the right to call him back. I'm not going
3    to do it unless it's absolutely necessary.
4        MR. PFAU: And no objection, subject, of
5    course, to mutual cooperation on depositions, which has
6    been the case to date, and I assume will be the case. Are
7    we off record?
8        MR. FREY: Okay.
9        THE VIDEOGRAPHER: This is the end of video
10   tape No. 1, and adjourns the deposition of Todd Denny. The
11   time its approximately 10:59.
12           (At 10:59 a.m. the proceedings were
13           adjourned.)
14           (Signature was reserved.)

DEPOSITION OF TODD DENNY - FLEMING v. CHURCH OF LDS - 9/7/05

Page 34

CERTIFICATE

STATE OF WASHINGTON )
) ss.
COUNTY OF KING )

I, Alison Lott, Notary Public in and for the State of Washington, do hereby certify:

That the annexed and foregoing deposition was taken stenographically by me and reduced to typewriting under my direction;

I further certify that I am in no way related to any party to the cause of action concerned, nor to any of counsel, nor do I have a financial interest in the event of the cause;

I further certify that the deposition as transcribed is a full, true and correct transcript of the proceedings;

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my Official Seal this 20th day of September, 2005.

Notary Public in and for the State of Washington, residing at Edmonds.
My Commission expires 1/15/07.

Page 36

AFFIDAVIT

STATE OF WASHINGTON )
) ss.
COUNTY OF )

I have read the foregoing deposition, and declare under penalty of perjury that the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the "Correction Notes" sheet hereof.

TODD DENNY

Executed at _____,

Washington, this ___ day of _____, 2005.

Page 35

CORRECTION SHEET

Please make all changes or corrections on this sheet, not in the transcript itself, showing page, line, and reason for the change. If there are no changes, write "none" across the page. Sign this sheet and the affidavit.

PAGE    LINE         CHANGE OR CORRECTION

SIGNATURE OF DEPONENT
DATE SIGNED: