<u>Fleming, et al. v. COP, et al.</u>
No. CV04-2338 RSM

DECLARATION OF MARCUS B. NASH
IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# EXHIBIT G

Page 1

```
                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
                           AT SEATTLE
_____

                                        )
KENNETH FLEMING and JOHN DOE,           )
                                        )
           Plaintiffs,                  )
                                        )
    vs.                                 )  NO. 04-2338 RSM
                                        )
THE CORPORATION OF THE PRESIDENT OF THE )
CHURCH OF JESUS CHRIST OF LATTER-DAY    )
SAINTS, a Utah corporation sole, a/k/a  )
"MORMON CHURCH"; LDS SOCIAL SERVICES    )
a/k/a LDS FAMILY SERVICES, a Utah       )
corporation,                            )
                                        )
           Defendant.                   )
_____

         DEPOSITION UPON ORAL EXAMINATION OF
                    KENNETH FLEMING
                (VIDEOTAPED PROCEEDING)
_____

                 9:38 o'clock a.m.
                  July 20, 2005
                 601 Union Street
                   Suite 3100
                Seattle, Washington




REPORTED BY:
ALISON LOTT, CCR#2337
```

COPY

EXHIBIT G

Page 6

1  some questions which are pretty personal in nature, and I'm
2  not doing that for any reason to embarrass you or to make
3  this more difficult than it is. It's simply that it's
4  necessary to go through this procedure and understand the
5  nature of the claims that you're making. So I want you to
6  know that in advance. If you feel uncomfortable at any
7  time with a question, emotionally or any other way, if it
8  bothers you, please ask me, I'm happy to take a break and
9  let you go out and get a drink of water or whatever else,
10 all right?
11 A  Yes.
12 Q  Okay. First of all, would you give me -- state your full
13    name for the record, and give me your current address.
14 A  Kenneth Ervin Fleming, 841 Alvord Avenue North, Kent,
15    Washington, 98031.
16 Q  Mr. Fleming, are you still a member of the -- what I will
17    refer to in this deposition as the Mormon Church?
18 A  No, I'm not.
19 Q  Did you take any steps to formally leave the Mormon Church?
20 A  Yes, I did.
21 Q  What was that?
22 A  I wrote a letter to the church.
23 Q  When did you do that?
24 A  To the best of my recollection, I believe I was in my early
25    30s.

Page 7

1  Q  Was that letter in conjunction with a meeting or discussion
2     with any church member?
3  A  No.
4  Q  Did you mail the letter directly to the church?
5  A  No.
6  Q  What did you do with the letter?
7  A  I gave it to the stake president.
8  Q  And who was that?
9  A  I believe at the time that was Larry Pitts.
10 Q  And did you have a discussion with Mr. Pitts at that time?
11 A  I did.
12 Q  What was the nature of that discussion?
13 A  I told him what I was going to do. He wanted me to think
14    about it, wait. I told him I didn't think that the outcome
15    would be any different whether I waited or whether I gave
16    him the letter now. And so I asked him to forward it to
17    the offices of the church.
18 Q  Now, when you say that it was in your early thirties, what
19    causes you to think it was in your early thirties? Do you
20    have some connection in time?
21 A  I just recall that it was in my early thirties. I knew I
22    was in my thirties. I can't think of the specific reason
23    why to give you that early thirties answer, other than to
24    say I know that's when it was.
25 Q  If we were to go back into the church records and find when

Page 8

1     Mr. Pitts served as stake president, would you agree that
2     it would be during that time period that he served that you
3     gave this letter to him and talked with him?
4  A  To the best of my recollection, I believe that is when it
5     took place. Exact year I can't give you.
6  Q  But my question was, if we were able to determine from the
7     church records when he was stake president, that would
8     be -- let's say if it were a four-year period, it would
9     have happened sometime during that four-year period or
10    two-year period whenever he was stake president?
11 A  I believe that's correct.
12 Q  Do you believe that the Mormon Church is the true church
13    today?
14 A  No, I don't.
15       MR. KOSNOFF: Objection. Relevance. Not
16    reasonably calculated to lead to relevant and admissible
17    testimony. It also invades his rights under both the
18    federal and state constitution. What his religious beliefs
19    are are not relevant to this litigation.
20 Q  (By Mr. Frey) You may answer. Counsel will make
21    objections from time to time, Mr. Fleming, and unless he
22    instructs you not to answer, his objections are for the
23    record, and then you can go ahead and answer my question.
24    So with his objection noted, my question again is, do you
25    believe that the Mormon Church is the true church?

Page 9

1  A  No, I don't.
2  Q  When did you first become a member of the Mormon Church?
3  A  I believe that you probably have that on record; however,
4     that being said, I also believe it was in the early '70s.
5  Q  Do you remember how old you were?
6  A  Maybe 10 to 12.
7  Q  And by the way, what is your date of birth, just for
8     purposes of this deposition, so we have a reference?
9  A  4/1/62.
10 Q  So your current age today is?
11 A  43.
12 Q  Did your family join the church at the same time that you
13    did, or had they been members before you joined?
14 A  They joined at the same time.
15 Q  Your biological father's name is?
16 A  Ervin Ellsworth Fleming.
17 Q  Is he still alive?
18 A  Yes.
19 Q  Have you seen him -- when is the last time you saw him?
20 A  Sunday of this last week.
21 Q  Is he still a member of the church?
22 A  No, he's not.
23 Q  How would you describe your relationship with him?
24 A  My father is like my best friend, currently.
25 Q  Could you itemize for me what you believe -- as far as

Page 10

1 you're concerned, what you believe that your damages are as
2 a result of the abuse that you assert you suffered at the
3 hands of Jack Loholt?
4     MR. KOSNOFF: Objection, form of the
5 question.
6 Q (By Mr. Frey) Go ahead.
7 A Can you ask me that question again, please?
8 Q Would you read it back, please.
9     (The pending question was read by
10     the reporter.)
11 A I'm an insecure person; I don't trust people. I don't -- I
12 have not -- it's been hard for me to allow people to get
13 close to me. It's hard for me to be emotionally attached
14 to people. I don't know who I am sometimes; I feel lost
15 sometimes. I look for direction and can't find it, and I
16 feel like an impostor. I lost out on a family, on
17 children, on an honest and trusting relationship. I feel
18 that my sexual life has been damaged or hampered by the
19 experiences that I was subject to as a boy. I have a hard
20 time holding a job, feel like I need to -- like I have to
21 run away from things.
22 Q Anything else that you feel?
23 A Currently, I -- there's nothing else I wish to share.
24 Q When you say that's all you wish to share, is there
25 something more?

Page 11

1 A Not at this time.
2 Q Okay, this is the time, I want you to be complete in your
3 answer, so if there's something else that you feel you're
4 impacted by or that has impacted you or feelings that you
5 have, I'd like you to express those at this point.
6 A I feel that I've shared with you what I --
7 Q Okay. And to the best of your knowledge, now, that's
8 everything?
9 A I can't say that's everything, but I guess currently,
10 sitting here with you, it is difficult to respond to the
11 questions, to share with you the emotions or the
12 experiences that I went through, the fears, so I believe
13 that that is what I will share with you.
14 Q Okay. Would you itemize or tell me or supplement this
15 answer at any time during the deposition if you feel that
16 you have something else that you believe represents an
17 impact on your life or a consequence, if I can put it that
18 way, of Mr. Loholt's conduct toward you? All right?
19 A Yes.
20 Q In other words, before the deposition is over, if there's
21 anything you want to add, I'd ask you to interrupt or at a
22 break come back and say I'd like to tell you more. Would
23 you agree to do that?
24 A Yes.
25 Q Okay. I'd like to ask you some questions about your family

Page 12

1 now. How many brothers and sisters do you have?
2 A Seven.
3 Q Would you give us their names, please.
4 A Kathy Wheeler, Diana Fleming Sirrine.
5 Q Would you spell her last name?
6 A S-I-R-R-I-N-E.
7 Q Okay.
8 A Daniel Fleming, Christina Threlkeld.
9 Q Christina what?
10 A Threkeld.
11 Q Can you spell that, please?
12 A T-H-R-E-L-K-E-L-D.
13 Q Thank you.
14 A Cari Nash, Michael Nash.
15 Q Were any of your siblings, to your knowledge, ever the
16 victims of any type of sexual abuse?
17 A Yes.
18 Q Which ones?
19 A Daniel Fleming.
20 Q Do you know who was the perpetrator of that abuse?
21 A Yes.
22 Q Who?
23 A Jack Loholt.
24 Q Have you talked with your brother, Daniel, about your
25 abuse?

Page 13

1 A My brother Dan knows that the abuse took place. He does
2 not know the extent of the abuse.
3 Q When did you tell him of the abuse?
4 A I believe I told my whole family in 2004.
5 Q Has Dan discussed with you the abuse that he suffered?
6 A Yes.
7 Q What did he tell you?
8 A Just that he was molested by Jack.
9 Q Did he tell you more than that?
10 A No, he did not want to share what happened.
11 Q Is your bother Daniel still a member of the church?
12 A Yes, I believe he is.
13 Q Where does he currently reside?
14 A In Black Diamond, Washington.
15 Q Any other of your siblings been the victim of abuse as far
16 as you know?
17 A Not that I know of.
18 Q Your mother is still alive; is that correct?
19 A That's correct.
20 Q Is she still a member of the church?
21 A Yes, she is.
22 Q How long were your biological father and your mother
23 married?
24 A I believe they were married for approximately 17 years.
25 Q And did that end in a divorce?

Page 14

1  A  Yes.
2  Q  Did your mother remarry?
3  A  Yes.
4  Q  Who did she marry?
5  A  Donald Payne.
6  Q  P-A-I-N-E?
7  A  P-A-Y-N-E.
8  Q  Thank you. And how long did that marriage last?
9  A  Six months.
10 Q  Six months?
11 A  Yes.
12 Q  I might mention to you, I have a hearing problem. You're
13    on my bad ear to begin with, so this -- I only have one
14    good one. So if I ask you to repeat, I'm not trying to
15    give you a bad time; I just can't hear. Did your mother
16    remarry again?
17 A  Yes.
18 Q  To whom?
19 A  Ronald Nash.
20 Q  And how long did that marriage last?
21 A  I believe approximately nine years.
22 Q  Did that end in divorce?
23 A  Yes.
24 Q  Did your mother remarry after that?
25 A  Yes.

Page 15

1  Q  To whom is she married?
2  A  Donald Land.
3  Q  L-A-N-D?
4  A  Yes.
5  Q  Is she still married to Mr. Land?
6  A  Yes.
7  Q  Is he a member of the church?
8  A  Yes.
9  Q  To the best of your knowledge, do your mother and
10    stepfather still regularly attend the Mormon Church?
11 A  What do you mean by regularly?
12 Q  Well, put it this way: More often than not, would they be
13    in attendance?
14 A  I would say they go occasionally.
15 Q  How old were you when your biological father and your
16    mother divorced? Approximately. I don't need the exact
17    age.
18 A  Approximately ten.
19 Q  You were in grade school, then, at the time; is that a fair
20    statement?
21 A  Yes.
22 Q  What do you understand the reason for that divorce to be,
23    if you have one?
24 A  I believe that my father had a drinking problem, which
25    created other problems which led to the divorce.

Page 16

1  Q  Do you recall as a youngster there being either verbal or
2     physical abuse in the family home as a result of your
3     father's drinking?
4  A  Yes.
5  Q  When I say your father, now, I'm going to refer only to
6     your biological father; otherwise, I'll qualify it as a
7     stepparent. Was the abuse physical towards your mother, as
8     well as verbal?
9  A  Yes.
10 Q  And you actually witnessed some of that; is that correct?
11 A  On occasion.
12 Q  When your mother and father divorced, and then she
13    remarried, how did that marriage go as far as the
14    relationship being abusive or not abusive?
15 A  I do recall one instance of abuse between the two of them.
16 Q  It's my understanding -- and correct me if I'm wrong --
17    that there were occasions, either with your father or one
18    of your stepfathers where your mother was actually
19    physically struck, and you witnessed that sort of thing; is
20    that correct?
21 A  That's correct.
22 Q  And that that had happened on more than one occasion; is
23    that correct?
24 A  I only recall two, maybe three times that I witnessed it.
25 Q  I assume this was a matter of concern and upset for you at

Page 17

1     the time that it happened; is that a fair statement?
2  A  I was frightened.
3  Q  How old is Dan, your brother Daniel?
4  A  41.
5  Q  Are you currently receiving counseling or some sort of
6     psychological help as far as your dealing with your abuse
7     problems?
8  A  Yes.
9  Q  Is that from Linda Herman?
10 A  Yes.
11 Q  And have you received any type of counseling or help with
12    your abuse problems from anyone else, other than Linda
13    Herman?
14 A  Yes.
15 Q  Who would that be?
16 A  Fred Denison.
17 Q  And Fred Denison is whom?
18 A  He is, or was, a counselor for the Mormon Church.
19 Q  And when did you receive counseling from Fred Denison?
20 A  Shortly after my mission.
21 Q  Do you remember when your mission was?
22 A  I served from 1981 to 1983.
23 Q  So when you returned from your mission is when you --
24    sometime after that? Was it within a year or can you
25    pinpoint it a little bit for me?

Page 18

1  A  I would say one to three years, maybe.
2  Q  Why did you go to see Fred Denison?
3  A  Because I felt guilty.
4  Q  Guilty about what?
5  A  Of the sexual abuse.
6  Q  How long did you see Fred Denison?
7  A  I believe that the church gave me 12 visits.
8  Q  Did you see someone first, before you went to see Fred
9     Denison so that they would authorize or enable you to get
10    some help?
11 A  No.
12 Q  When you say the church authorized 12 visits, how did that
13    come about?  Who did you talk to?
14 A  Before I left on my mission, I spoke with my bishop about
15    it.  After I got back from my mission, I spoke with my
16    bishop about it, and I asked him, was there anything the
17    church would do.  He authorized six visits.  I asked him if
18    I could see him a little longer.  He authorized six more.
19 Q  Who was your bishop that you spoke with before you left on
20    your mission?
21 A  I spoke with Richard Pettit.
22 Q  And when you returned from your mission, who was your
23    bishop?
24 A  I believe it was Hoisington.  I don't recall his first
25    name, other than bishop.

Page 19

1  Q  And where did you physically go to meet with Mr. Fred
2     Denison?
3  A  In Provo, Utah, at a church -- social service building, I
4     believe.
5  Q  At that time, you were living in Provo?
6  A  Provo or Orem.
7  Q  And what were you employed -- you were employed down there,
8     were you not?
9  A  No, I was attending school.
10 Q  At one point, did you work in Utah?
11 A  Yes.
12 Q  And that was for some coal company or coal distributing
13    company or --
14 A  No, it was for an insulation company.
15 Q  So you were attending BYU at the time?
16 A  No.
17 Q  You were attending what?
18 A  Utah Technical College.
19 Q  Have you ever attended BYU?
20 A  No.
21 Q  Did you complete your studies at Utah Technical?
22 A  I did not leave with a degree.
23 Q  But did you complete your studies?  Did you get enough
24    credits to get a degree?  Put it that way.
25 A  No.

Page 20

1  Q  How long did these 12 sessions last?  Was it over a period
2     of weeks or months or what?
3  A  I don't recall.
4  Q  Do you have a notion of how often you went?  Would it be
5     more than once a week?
6  A  I really don't recall.
7  Q  Have you spoken to Fred Denison since you quit seeing him?
8  A  Not that I can recall.
9  Q  What was your purpose of going to see Fred Denison,
10    specifically?
11 A  I believe that one of the purposes was to try to get rid of
12    the guilt I was carrying.  The other purpose was to try to
13    give me some direction.  And there may be other purposes,
14    but it's been many years ago.  My initial intentions, I --
15    I can't completely recall.
16        MR. KOSNOFF:  Tom, I'm sorry.  I know we've
17 only recently gotten started, but I do need a brief
18 bathroom break.
19        MR. FREY:  Okay.
20        MR. KOSNOFF:  I'll try and be quick.
21        MR. FREY:  All right.
22        THE VIDEOGRAPHER:  Going off the record.  The
23 time now is approximately 10:14 a.m.
24        (A brief recess was taken.)
25        THE VIDEOGRAPHER:  Back on the record.  The

Page 21

1  time now is approximately 10:18 a.m.
2  Q  (By Mr. Frey)  Mr. Fleming, in my own mind, I want to try
3     to get these dates down.  You served on your mission from
4     1981 to 1983.  You told your bishop in 1981 of the abuse.
5     You told your bishop when you returned in 1983 of the
6     abuse, if I understand your testimony; is that correct?
7  A  That's not completely correct.
8  Q  Okay.  Correct me, then.  Where am I wrong?
9  A  I told my bishop in approximately 1979-1980.
10 Q  And you told him of the abuse by Jack Loholt; is that
11    correct?
12 A  Yes.
13 Q  I want to focus on that for a minute.  At the time, what
14    did you tell him?  What did you --
15        MR. KOSNOFF:  Objection, form of the
16 question, referring to the 1979?
17        MR. FREY:  1979.
18 A  I told him that I didn't think I would be able to go on a
19    mission, but my friends were going on missions and I wanted
20    to.  So in that discussion, we talked about why I felt I
21    couldn't go on a mission.  And I told him about the abuse.
22 Q  How detailed were you with him?
23 A  I was not -- I don't recall being very detailed, other than
24    to say that I was abused by Jack for many years.  And I
25    felt that that would keep me from my mission.

Page 22

1  Q  Did you express to him that as a result of this abuse you
2     felt that perhaps you weren't worthy, as that term was used
3     in the church? Is that correct?
4  A  Correct.
5  Q  And what else did you describe? Anything beyond that as
6     far as how your feelings were, why you couldn't serve on a
7     mission?
8  A  That I felt guilty and unworthy. Those are the two best
9     terms I could think of that I told him.
10 Q  Did you tell him that it affected you in any other ways
11    that might impact your serving as a missionary?
12 A  I don't recall.
13 Q  As a result of that, what did the bishop advise you?
14 A  The bishop told me -- the bishop apologized to me. And he
15    said that they thought that they had taken care of the
16    problem with Jack Loholt years ago. They had sent him to
17    some treatment, thought things were taken care of, put him
18    back in the Scouts because they thought that's where he
19    would be best served -- serving.
20 Q  Now again, this was bishop --
21 A  Pettit.
22 Q  Pettit was telling you this? All right. Did he explain to
23    you that the abuse you had suffered did not make you
24    unworthy or did not in any way prohibit you from serving as
25    a missionary?

Page 23

1  A  I don't recall all that he said back then, but I do know
2     that I did serve a mission, and so I believe that he
3     perhaps tried to comfort me in saying it wasn't my fault.
4  Q  Did you ask at that time for any help from the church by
5     way of any counseling or anything else?
6  A  I don't recall.
7  Q  And was Bishop Pettit a man that you trusted?
8  A  Yes.
9  Q  Did you know his son, by the way?
10 A  I knew several of his sons.
11 Q  Do you know whether any of his sons had been the subject of
12    any abuse?
13 A  I don't know that, and I -- I do recall him asking me, do
14    you know if my sons were abused.
15 Q  I assume you told him you didn't know; is that correct?
16 A  That's correct.
17 Q  Was your mission delayed at all because of this disclosure
18    to Bishop Pettit?
19 A  No.
20 Q  Your counsel has furnished us with your journal from the
21    time that you served as a missionary, and in reading that
22    journal, I did not notice any entries in which you spoke of
23    having any difficulties or problems serving as a missionary
24    or in your relationship with the other missionaries because
25    of this abuse. Is that a fair statement?

Page 24

1  A  I can't say that that's a fair statement.
2  Q  Can you remember any journal entries, then, in which you
3     discussed or --
4  A  I don't recall any journal entries of which I discussed
5     that. I do recall journal entries of -- you know, I don't
6     recall any journal entries. I do, however, know that my
7     goal was to try to focus on being the best missionary.
8  Q  Did you complete your mission?
9  A  Yes.
10 Q  Do you believe you successfully completed your mission?
11 A  Yes.
12 Q  Upon your return from that mission, my understanding is,
13    you again spoke with your bishop, and you believe it was
14    Bishop Hoisington; is that correct?
15 A  Hoisington.
16 Q  And what did you tell him when you returned?
17 A  I don't recall what I told him, but I believe that through
18    our discussion, I was -- things were set up to where I
19    could receive some counseling.
20 Q  Mr. Denison, as far as you knew, was a -- at least licensed
21    or qualified counselor with LDS Social Services; is that
22    correct?
23 A  As far as I knew.
24 Q  As far as you knew? Okay. In your meetings and
25    discussions with him, did you go over how you felt at the

Page 25

1     time, both as to any guilt you had or any of the other
2     problems that you felt were associated with the abuse?
3  A  I don't recall, really, any of my discussions with him,
4     because it was so long ago.
5  Q  So you're telling me today, you don't know what you told
6     him or what you discussed with him during these sessions?
7  A  I just know that it revolved around that issue.
8  Q  And what do you mean by "that issue"?
9  A  The abuse.
10 Q  The abuse? Okay. At the time you stopped seeing
11    Mr. Denison, did you feel you had progressed at all in
12    resolving the issues of your abuse and the effect it had
13    upon you?
14 A  I felt like I had resolved the issue as far as the guilt.
15 Q  Okay.
16 A  And then it was put to rest.
17 Q  The guilt was put to rest or what was put to rest?
18 A  And the whole ordeal. I just -- I had come to know that it
19    wasn't my fault, that I wasn't at guilt, and I put it in
20    the back of my mind and said now, you need to try to move
21    on.
22 Q  And did you, in fact -- as far as you are concerned, were
23    you able to move on?
24 A  As best I could, yes.
25 Q  What do you mean by, "as best I could"?

Page 26

1  A   I moved on in as normal of a fashion as I could, or as I
2      thought was normal.
3  Q   I want to go back for a minute. With regard to the abuse
4      that occurred in your family towards your mother, the
5      physical abuse, what happened to her? What type of abuse
6      did you witness?
7  A   I witnessed my father hit her.
8  Q   In what fashion? I mean, can you be a little more precise
9      than that?
10 A   In what fashion?
11 Q   Well, I mean, did he strike her on the face, did he kick
12     her, did he -- how did he physically -- well, what
13     happened, as you remember it?
14 A   I can't answer that question. I know that it happened, I
15     know my sister pulled us into another room, I knew they
16     were fighting.
17 Q   Was your father, biological father, again, was he a member
18     of the church at the time?
19 A   No, none of us were.
20 Q   You're currently working where?
21 A   Kent School District.
22 Q   And how long have you been there?
23 A   About a week and a half.
24 Q   Immediately before that, you worked for whom?
25 A   Palmer Coking Coal.

Page 27

1  Q   And that is where, in Black Diamond?
2  A   Black Diamond.
3  Q   How long had you worked for them?
4  A   14 months, approximately.
5  Q   Before the Palmer Coking Coal Company, you had worked for
6      the Kent School District, hadn't you?
7  A   Yes.
8  Q   What is your current capacity with the Kent School
9      District?
10 A   I'm a custodian.
11 Q   You were a custodian before, were you not?
12 A   Yes.
13 Q   Why did you go back to the Kent School District from the
14     Palmer Coking Coal Company, or Coal Coking Company,
15     whatever it is?
16 A   Because it is the least stressful place I could find to
17     work.
18 Q   Were you dismissed or fired from the Palmer Company?
19 A   No.
20 Q   What was your job there?
21 A   I took care of accounts receivable, collections, customer
22     service, order entry, running the scale house, fixed odds
23     and ends around that needed to be fixed around the company.
24 Q   What does that company do, by the way?
25 A   It's a mine -- gravel mining operation.

Page 28

1  Q   Was there something about that job that was stressful?
2  A   I don't believe it was something about that job; it was
3      just that I didn't feel like I could manage or take care of
4      my responsibilities there with the way I feel.
5  Q   After you saw Mr. Denison in the mid '80s -- we don't know
6      exactly when it was, but it was after you returned from
7      your mission in '83 -- after you stopped seeing him, did
8      you ever seek any further help with counseling from any
9      other source related to the abuse that you were subjected
10     to by Mr. Loholt?
11 A   No.
12 Q   According to the medical records which we have, you began
13     to see a counselor by the name of Linda -- is it Herman?
14     Is that correct?
15 A   Correct.
16 Q   You saw her first time I believe sometime in '97?
17 A   Correct.
18 Q   And in reviewing those records from '97 until sometime in
19     2002 or '3 or something like that, you had various issues
20     that you were seeing her for relating to your relationship
21     with your partner; is that correct?
22 A   That's correct.
23 Q   Did you ever discuss with her anything to do with your
24     abuse --
25 A   No.

Page 29

1  Q   -- during that time period, at least?
2  A   No.
3  Q   Is it fair for me to assume that your abuse was not an
4      issue then in your life?
5          MR. KOSNOFF: Form of the question. Which
6      time period are you referring to?
7          MR. FREY: From 1997 until --
8          MR. KOSNOFF: Well, there were two distinct
9      time periods.
10 Q   (By Mr. Frey) From when you first saw her with regard to
11     the relationship -- the break up of your relationship with
12     your partner up until sometime -- and I can get the exact
13     date; we'll confirm the date -- but I think the first entry
14     is sometime in June of perhaps 2002, but I'll confirm that.
15 A   It -- the first --
16 Q   You saw her on two separate occasions starting in '97, did
17     you not?
18 A   In '97, I went to see her regarding some relationship
19     issues.
20 Q   Right.
21 A   I can't tell you; however, you probably have it in your
22     documents, how long I saw her. And then I did not return
23     to her until 2003. And that's when I returned to her in
24     regard to the -- to talk to her in regard to the abuse.
25 Q   And did you return to her in 2003 after you had made the

8 (Pages 26 to 29)

Page 30

1      decision to commence this litigation and to retain counsel,
2      pursue a claim against the church?
3 A  I don't believe so.
4 Q  Is it fair for me to assume, then, when you first saw her
5      in 1997, and for the period following that initial visit
6      during 1997 and 1998, the records reflect that you never
7      discussed with her anything to do with your -- with the
8      problems with abuse?
9 A  I believe that's true.
10 Q  Can I assume from that that you did not -- you were not
11      experiencing any problems with the abuse or the aftermath
12      of that?
13 A  Correct.
14 Q  You were functioning, as far as you knew, without having
15      any impact on your life of the abuse which you claim now
16      that Jack Loholt -- and I'm not saying that it didn't
17      happen, but the claims against Jack Loholt; is that
18      correct?  Let me rephrase the question.
19 A  Thank you.
20 Q  Up until -- and the records reflect, by the way, that you
21      started seeing her in October of '97, and that that went on
22      through '98, '99 -- pardon me.  From '97 through '98, and
23      then you did not go back to see her until February of 2003.
24      So from '98 to 2003, there is a gap.  Am I correct in
25      assuming that when you saw her in '97 and '98, that during

Page 31

1      that time period, you weren't having any difficulties with
2      dealing with the aftermath of the abuse, or the effects of
3      the abuse by Jack Loholt; is that correct?
4           MR. KOSNOFF:  Objection.  To the extent it
5      calls for an expert opinion, we would object.
6           MR. FREY:  I'm just asking him about his
7      feelings.
8 Q  (By Mr. Frey)  Is that correct?
9 A  I was functioning to what I felt was normal.
10 Q  And prior to seeing Linda Herman, am I correct in assuming
11      that you felt that you were not suffering the after effects
12      or the impact of this abuse from the time you quit seeing
13      Mr. Denison until you went to see Ms. Herman?  Is that
14      correct?  In other words, there's another period in your
15      life when you didn't see any counselors; is that correct,
16      from the time you quit seeing Mr. Denison until you went to
17      see Ms. Herman?
18 A  That's correct.
19 Q  During that time period in your life, is it fair to state
20      that you didn't feel you were impacted or affected enough
21      in any way by this abuse to have to seek some sort of help?
22 A  The abuse was not anything I was thinking about at the
23      time.  I was functioning as normal as I could.  It wasn't
24      anything I was dwelling on.
25 Q  Let me kind of explore a point here with you.  Are you

Page 32

1      telling me that you forgot about the abuse, or are you
2      telling me that you had put the abuse behind you during
3      this period?
4 A  I don't think you could ever forget about the abuse.  I
5      knew the abuse happened.  But it was something that I had
6      put to bed.
7 Q  And then, when you were going through your difficulties
8      with -- was the break-up with your partner the reason you
9      went to see Linda Herman?
10 A  Yes.
11 Q  And she was -- you were referred to her by what, your
12      physician, or how did you get to see her?
13 A  I don't recall who referred me.
14 Q  But the purpose you went to see him was because of the fact
15      that you had split with your partner and he had left
16      permanently and this was a matter of real distress to you
17      at the time; is that correct?
18 A  That's correct.
19 Q  And for the record, am I correct that this was a homosexual
20      or gay relationship that you had with this partner; is that
21      right?
22 A  Yes.
23 Q  What, if you can tell me, was the reason that you went back
24      to see Linda Herman in 2003 after your last visit, which
25      according to the records I have, was in March of 1998?

Page 33

1 A  I went back because I thought I was going to lose myself.
2 Q  You thought you were going to lose yourself?  Why did you
3      feel that way?
4 A  I was feeling stressed, overwhelmed, unsure of things,
5      insecure.  I felt like a mess, and I didn't know why.
6 Q  Had you talked with an attorney about suing the church
7      prior to your going to see Linda Herman again in 2003?
8 A  I believe I talked to an attorney after I went to see
9      Linda, several months after.
10 Q  If the records from Linda Herman indicate that when she saw
11      you in February -- February 11, 2003, that you had gone to
12      an attorney prior to seeing her, would you think she made
13      an erroneous entry or do you think she could be correct --
14           MR. KOSNOFF:  Objection.
15 Q  (By Mr. Frey) -- that you had seen an attorney before you
16      went to see her?
17           MR. KOSNOFF:  Objection to the form of the
18      question.
19 Q  (By Mr. Frey)  Go ahead.  You may answer.
20 A  I don't believe that I spoke with an attorney until several
21      months after I saw her.
22 Q  What caused, in your mind, what caused your feelings about
23      the abuse to come to the foreground where you felt you
24      needed the help of Linda Herman?
25 A  I have no idea how they came up.  They just did.

Page 42

1  A   I was living in Provo with some roommates.
2  Q   Can you tell me the names of those roommates?
3  A   Dan Brown, Troy Christiansen, that's all I can recall.
4      There were others but I don't recall who they were.
5  Q   And did you have a job while you were going to court
6      reporting school?
7  A   I don't believe so.
8  Q   How did you support yourself?
9  A   I had a grant, and I had saved up some money.
10 Q   What kind of a grant did you have?
11 A   A PELL Grant.
12 Q   A PELL Grant?
13 A   Yes.
14 Q   For the record, what kind of grant is that?
15 A   I'm not exactly sure, other than the government gives you
16     money to help you with your schooling. I don't know if
17     that's an acronym for something, I'm not sure.
18 Q   And did you complete your court reporting training?
19 A   No.
20 Q   Following that, what did you do?
21 A   I believe after that, I came back home.
22 Q   Is that when you worked for Iddings, Inc. in Kent, a loader
23     operator?
24 A   I believe it is.
25 Q   So as I understand it, from an educational standpoint, you

Page 43

1      have a high school degree, you graduated from high school?
2  A   Yes.
3  Q   You did not receive any type of certificate of completion
4      or anything from Utah Tech; is that correct?
5  A   Correct.
6  Q   And the court reporting school that you went to, you didn't
7      complete that so you're not qualified to engage in that
8      profession; is that correct?
9  A   Correct.
10 Q   Have you taken any other types of classes or training to
11     try to gain any skills? For instance, an apprentice
12     electrician or anything of that nature where you go and
13     actually enroll in some sort of a program with a union or
14     some other trade organization to try to learn a skill or --
15 A   No.
16 Q   Is the income you make as a janitor with Kent School
17     District more or less than you were making with Palmer Coal
18     and Coke Company?
19 A   Palmer Coking Coal.
20 Q   Okay, Coking Coal.
21 A   No, it's quite a bit less.
22 Q   By quite a bit less, how much less is it?
23 A   In dollars per hour, five. In an additional benefit that I
24     got from them, another two-twenty.
25 Q   What was the additional benefit that you got from them,

Page 44

1      meaning Palmer?
2  A   Because I did other things outside of their office. They
3      had rental homes, and I'd go tend to the rental homes, fix
4      a door that's broken or -- so I got extra money.
5  Q   Is that because you've had experience doing remodeling and
6      carpentry and other type of construction work?
7  A   I've had experience on my own doing that, yes.
8  Q   Are the benefits as far as health insurance, retirement and
9      so forth, better or less beneficial with the school
10     district than they are with Palmer?
11 A   I believe they would be comparable. I've not written them
12     down and looked at them side by side.
13 Q   Who was your supervisor or your boss at Palmer?
14 A   Bill Kombol, K-O-M-B-O-L.
15 Q   And how did -- did you know him before you went to work for
16     the company?
17 A   No.
18 Q   Is he a member of the Mormon Church?
19 A   No.
20 Q   Is he the one who hired you?
21 A   Yes.
22 Q   I want to turn for a moment to talk a little bit about the
23     abuse from Mr. Jack Loholt. And in your answers to
24     interrogatories, you state, quote, "The sexual abuse I
25     endured by Jack Loholt/Onefrey," O-N-E-F-R-E-Y, "started

Page 45

1      when I was about 12 years old, just after being baptized in
2      LDS church in 1972, and when I transferred from the locally
3      run Boy Scout troop to the LDS Church Scout troop, and
4      continued until I was 17, or when Jack fled to Canada." Is
5      that an accurate statement?
6  A   Yes.
7  Q   Can you tell me the first instance of abuse that you
8      remember with Jack Loholt?
9  A   The first instance that I recall was being on a camp out.
10 Q   Was being on a camp out?
11 A   A Boy Scout camp out, and having to sleep with him, and him
12     touching me.
13 Q   This would have been when you were about 12 years old; is
14     that correct?
15 A   I believe so.
16 Q   And you slept with him. Is this because your sleeping bag
17     was wet or something like that, or what was the
18     circumstance that you ended up sleeping with him?
19 A   On another occasion it was because my sleeping bag was wet.
20 Q   But on the first occasion, why were you --
21 A   But on this occasion it's because that's where he told me I
22     was sleeping.
23 Q   Were there other boys with you at the time?
24 A   There were other boys on the camp out, but I was the only
25     one that was sleeping with him.

Page 46

1  Q   Were you in a separate tent from the other boys, or a
2      separate room, or where were you?
3  A   I don't recall.
4  Q   After that instance, can you remember the next time that
5      you were abused by Jack Loholt?
6  A   I can't remember every instance.
7  Q   I understand that.
8  A   I just remember there were many.
9  Q   Can you give me some notion -- when you say many, about how
10     many times you were touched or abused by him?
11 A   I would say every time we went on a camping Scout trip,
12     every time we were at his house working on a merit badge or
13     spending the night, every time I went and worked for him,
14     every time.
15 Q   Okay.
16 A   And occasionally in the church.
17 Q   When did it happen in the church?
18 A   We would have Boy Scout meetings in the church. I remember
19     the room.
20 Q   Okay.
21 A   When I would need to go use the restroom.
22 Q   When you what? Needed to go to the restroom?
23 A   (Witness nods.)
24 Q   He would follow you in there?
25 A   He would show up in there.

Page 47

1  Q   Okay. And he abused you, then, in the restroom?
2  A   Yes.
3  Q   Where did Jack Loholt live, as you remember it?
4  A   He lived on the corner of 256th and 140th, approximately
5      140th.
6  Q   How far was that from your family home?
7  A   At one point, it was probably five miles. We moved, and it
8      was approximately a half a mile.
9  Q   How old were you when you moved to where you were a half a
10     mile from his house, if you can tell me?
11 A   An early teenager.
12 Q   To your knowledge, were you aware that any other boys were
13     involved with Jack Loholt in a sexual fashion during the
14     time that you were being abused?
15 A   During the time that I was being abused, no. However,
16     there was one instance when I do recall another Scout in
17     the room.
18 Q   When you were being abused?
19 A   Yes.
20 Q   Who was that other Scout?
21 A   That was Jim Allenbach.
22 Q   Were you ever abused on any property or buildings owned by
23     the the Allenbach family?
24 A   They owned property near Lake Kachees in eastern
25     Washington, they had a cabin there. And yes, there. And

Page 48

1      at the other location the Allenbachs lived at, I don't
2      recall anything happening there.
3  Q   Were you aware that Jack Loholt lived on the Allenbach
4      property for a while?
5  A   Yes.
6  Q   How did you become aware of that?
7  A   I guess just the boys just knew that, that he lived there
8      at the Allenbachs'.
9  Q   What boys?
10 A   The Boy Scouts.
11 Q   When you first joined the Boy Scouts, did you know whether
12     or not he was living on the Allenbach property at the time,
13     or was he living at the other home on 256th?
14 A   I don't know.
15 Q   Do you believe that Dr. Allenbach knew that Jack Loholt was
16     abusing some of the Scouts?
17 A   Do I believe that?
18 Q   Yes.
19 A   I would find it hard to believe if he didn't know it.
20 Q   Is that a yes or a no? I mean, I'm asking for your
21     personal belief, I'm not saying it's a fact. But do you
22     believe that Dr. Allenbach knew?
23 A   I believe he did.
24 Q   And why do you believe that?
25 A   I believe that he was wrapped up with him financially to

Page 49

1      where it would have been a loss for him had he made it
2      known.
3  Q   Have you been told by anyone that Dr. Allenbach knew about
4      the abuse that Jack Loholt was engaging in with these young
5      Scouts?
6  A   No.
7  Q   Are you aware that Jimmy Allenbach has stated under oath
8      that he told his father about the abuse?
9  A   As you mention that, yes, Jim has said that to me. I do
10     recall he did say that to me.
11 Q   Have you had conversations with Jim Allenbach about this
12     lawsuit?
13 A   Yes.
14 Q   On how many occasions have you talked with him?
15 A   We have talked three or four times.
16 Q   Was it prior to you filing the lawsuit?
17 A   No.
18 Q   After the lawsuit was filed?
19 A   Yes.
20 Q   Have you discussed with Jimmy Allenbach or any other
21     person, except attorneys, any other lay person, suing the
22     Allenbach estate for the damages that you sustained at the
23     hands of Jack Loholt?
24 A   Have I discussed it with anyone else?
25 Q   With anyone, not attorneys, anyone else. Jim Allenbach or

13 (Pages 46 to 49)

Page 50

1    anyone else?
2  A  Jim Allenbach and Rick Allenbach.
3  Q  And what is your belief would be the basis for your suing
4     the Allenbach estate?
5          MR. KOSNOFF: Objection, mischaracterizes his
6     testimony.
7  Q  (By Mr. Frey) Go ahead. You can answer.
8  A  I felt he was negligent.
9  Q  In what way?
10 A  If it's true that he knew, he should have said something.
11 Q  Have you talked to Mrs. Kelly?
12         MR. KOSNOFF: Objection, form. When? Where?
13         MR. FREY: Objection is noted.
14 Q  (By Mr. Frey) Have you talked with Mrs. Kelly about this
15    lawsuit?
16 A  We have spoke on the phone.
17 Q  When did you speak with her?
18 A  It's been months ago.
19 Q  Was it after you filed the lawsuit?
20 A  By filing the lawsuit, do you mean that --
21 Q  I mean when it was commenced. When the lawsuit was
22    formally filed, and the lawsuit was commenced, that is, the
23    filing of a complaint and so forth.
24         MR. KOSNOFF: Objection. Do you know the
25    date that the lawsuit was filed?

Page 51

1          THE WITNESS: No.
2  Q  (By Mr. Frey) Let's go back, and we can get the date of
3     the lawsuit, but did you talk with her in preparation of
4     filing the lawsuit, to get information from her? For the
5     record it was October 25, 2004 the lawsuit was filed.
6  A  I don't recall when I spoke with her, was it before, or if
7     it was after.
8  Q  And what did you talk to her about?
9  A  I didn't talk to her about anything that -- any details of
10    what happened to me. In fact, I didn't call her or
11    approach her looking for her. I was more concerned with
12    her boys.
13 Q  All right. In what way were you concerned about her boys?
14 A  They were neighbors.
15 Q  Pardon me?
16 A  They were neighbors. Were they abused.
17 Q  Neighbors of the Allenbachs?
18 A  Yes.
19 Q  And why, being neighbors of the Allenbachs, would you think
20    that would put them in a position where they may be abused?
21 A  Because Jack lived there.
22 Q  This is something you learned later?
23 A  That Jack lived there?
24 Q  Right.
25 A  Oh, I knew Jack lived there, and I knew the Kelly boys from

Page 52

1     school.
2  Q  At the time that you sustained abuse at the hands of Jack
3     Loholt -- that was one of my earlier questions -- was he
4     living on 256th or was he living at the Allenbach
5     residence?
6  A  I don't recall when he moved to 256th.
7  Q  Did you ever visit Jack Loholt at his home on 256th where
8     you voluntarily walked over to see him?
9  A  I don't recall ever doing that.
10 Q  Am I correct in my assumption -- and that's the reason for
11    that first question -- that any time you were abused, it
12    was in conjunction with your being with Mr. Loholt in some
13    sort of a Scouting function, or am I wrong in that?
14 A  It was in the form of a Scouting function and/or I was
15    employed by him.
16 Q  Now, you were employed by him when you were, what, 17 years
17    old?
18 A  16, 17.
19 Q  And I'm trying to understand, when you're 16 or 17 years
20    old -- I assume this abuse was offensive to you from the
21    time it started up until the time it ceased; is that
22    correct?
23 A  Yes.
24 Q  And I'm trying to understand, when you're 16 or 17 years
25    old, why would you continue to work or be near him if he

Page 53

1     was abusing you when that occurred?
2  A  I felt trapped there. And I guess that question could also
3     be asked to a woman that's being beaten by her husband, why
4     did you stay? I didn't know how to get away from it.
5  Q  Were you living at home at the time?
6  A  Yes.
7  Q  Did you have to pay room and board or anything while you
8     were living at home when were you 16 and 17, or did your
9     family provide you a place to sleep and eat?
10 A  I did not pay room and board.
11 Q  So they provided you a place to sleep and food on the
12    table, I presume; is that correct?
13 A  That's correct.
14 Q  So, when you went to work for Jack Loholt, this was
15    something that you didn't have to do? Nobody forced you to
16    go to work for him; you could have worked someplace else;
17    is that correct?
18 A  Actually, I don't believe that is, because I felt trapped
19    into going to work for Jack Loholt.
20 Q  Can you tell me why you felt trapped into working for him?
21 A  A lot of the parents thought Jack was good for the boys.
22    He had a construction company. He built things. He ran
23    bulldozers and backhoes and dump trucks. And I tried to
24    get away from Jack Loholt, and Jack Loholt approached my
25    mother, offered a job for me. I couldn't say no.

Page 70

1  Q  Why did you tell them?
2  A  For the same reason that I told Jim, was to let them know
3     that -- what I was doing. I didn't know where the
4     investigation would go -- so that they wouldn't be
5     surprised.
6  Q  Did you seek to have them join your lawsuit?
7  A  No.
8  Q  Did you tell them they could join your lawsuit if they felt
9     they had been abused?
10 A  I don't believe I said that.
11 Q  Is there anyone else you can think of at this time, other
12    than the Grosses?
13 A  I don't recall anyone else at this time.
14 Q  Do you know Barbara and Robert Searle?
15 A  Yes.
16 Q  How well do you know them?
17 A  I haven't seen them in many, many years.
18 Q  How well did you know them growing up?
19 A  They were good to me.
20 Q  But how well did you know them?
21 A  I believe I knew them well.
22 Q  Did you visit their home often?
23 A  Yes.
24 Q  Was she a confidante of yours, Mrs. Searle, Barbara Searle?
25 A  I shared things with her.

Page 71

1  Q  Isn't it a fact that you spent a great deal of time
2     confiding in her about various things in your life?
3  A  I wouldn't say I spent a great deal of time confiding in
4     her. I don't know that I had a lot to confide. I visited
5     with her, because she was a person that visited with
6     everybody. I was at their house, because I was friends --
7     close friends with their daughters.
8  Q  That was my next question. You were close to their
9     daughters, weren't you?
10 A  Yes.
11 Q  Did you attend any weddings of their daughters?
12 A  Yes.
13 Q  And you were invited to those by the family?
14 A  Yes.
15 Q  Did you visit their daughters when they were at BYU?
16 A  Yes.
17 Q  Did you ever disclose to Barbara Searle the facts of your
18    abuse and how it impacted you?
19 A  I don't recall ever doing that.
20 Q  You have no memory of ever talking to her about it?
21 A  No.
22 Q  Do you deny that you told her?
23 A  I don't recall that I told her.
24 Q  That's different than my question. My question is, do you
25    deny you told her?

Page 72

1  A  I do not remember ever telling her.
2  Q  So you don't have any memory of sitting down with her and
3     telling her about the abuse, and actually crying in front
4     of her and telling her about the incidents on the Scout
5     outings where you'd get your sleeping bag wet and get your
6     clothes wet so you'd have to sleep with him and go into
7     that kind of detail with her? You're saying you didn't
8     ever do that?
9  A  I don't recall ever telling her that.
10 Q  Do you deny you ever told her that?
11        MR. KOSNOFF: Objection, it's been asked and
12 answered four times now. Put your next question.
13        MR. FREY: I don't believe he's answered that
14 question.
15 Q  (By Mr. Frey) My question is, do you deny it?
16        MR. KOSNOFF: He's answered the question.
17 Move on. He's not going to answer it a fourth time.
18        MR. FREY: Are you objecting? The basis of
19 the objection?
20        MR. KOSNOFF: I'm objecting because it's now
21 an abusive question. He's answered the question. You've
22 put it three different ways three times. He's denied
23 recalling having ever made such a statement to her. I'm
24 going to direct him not to answer any further questions
25 along these lines.

Page 73

1         MR. FREY: Counsel, are you claiming a
2  privilege? That's the --
3         MR. KOSNOFF: Yes.
4         MR. FREY: -- that's the only basis for
5  instructing him not to answer. What's the privilege?
6         MR. KOSNOFF: The basis of the objection is
7  the repetitive and abusive nature of the questioning at
8  this point. He does not have to submit to questions that
9  are repetitive and abusive in nature. I'm instructing him
10 not to answer.
11 Q  (By Mr. Frey) I'm going to ask you another way, then. If
12    Mrs. Searle were to say that you, on more than one
13    occasion, were with her, met with her, discussed in detail
14    the fact that you'd been abused by Jack Loholt, and on more
15    than one of those occasions you even cried, telling her
16    about the story, and that you were upset and distraught
17    about it, and that you even told her about Jimmy Allenbach
18    being one of his favorites, and told her about Jack hiring
19    you to work for him, and he abused you during that time
20    period, would you deny that you did that?
21 A  I don't recall ever talking to her about that.
22 Q  Would you read back the answer?
23        (The pending answer was read by the
24        reporter.)
25 Q  I'm not trying to harass you, and I want to make that very

Page 74

1  clear on the record. There's a difference when someone
2  says, "I don't recall," than when a person says, "It didn't
3  happen, I know it didn't happen." What I'm trying to
4  elicit from you is -- you may not recall it -- what I'm
5  trying to elicit from you, are you saying, "It never
6  happened"? "I know it never happened"? "I deny that it
7  happened"?
8           MR. KOSNOFF: Objection, Mr. Frey, I don't
9  know how else to make it clear to you. A person cannot
10 make a denial of something he doesn't remember one way or
11 the other. You've now asked it five different times. I'm
12 directing him not to respond to that question any more in
13 whatever form you put it. If I need to make that objection
14 any clearer or any stronger, I will. But you've asked the
15 question now five times. He has no memory of such a
16 conversation with her.
17 Q  (By Mr. Frey) So I'm clear on the record, you have no
18 memory of ever discussing anything to do with abuse, Jack
19 Loholt, or any of the claims that you're making in this
20 lawsuit, you have no -- you do not recall ever discussing
21 that with Barbara Searle or her husband at any time, ever?
22 A  I do not recall.
23 Q  Do you remember the Searles ever visiting you when you
24 lived in Maple Valley?
25 A  They may have. I had people that came by and visited me.

Page 75

1  I'm not going to say they didn't.
2  Q  Did you ever have a conversation with Barbara Searle or her
3  husband in which you told them that you were gay?
4  A  I don't recall.
5  Q  Did you ever tell Barbara Searle or her husband that you
6  had had a confrontation with Jack Loholt, telling him, and
7  complaining to him about the damage and injury that he had
8  caused to you by abusing you?
9  A  I don't recall.
10 Q  Did you ever tell Barbara Searle that you believed you were
11 gay because of what Jack Loholt had done to you?
12 A  I don't recall.
13 Q  Did you go to their daughter, Paula's wedding?
14 A  I believe I did.
15 Q  Did you have any discussions with Barbara Searle at the
16 wedding?
17 A  I'm sure I visited with her.
18 Q  Anything to do with your abuse?
19 A  I don't recall.
20 Q  You mentioned earlier that you had gone to the basement,
21 the apartment basement in Mr. Allenbach's house and made
22 root beer down there. Was that with Jack Loholt?
23 A  Yes.
24 Q  Who was there with you when you did that, if you remember?
25 A  There were other boys. I don't know who they were.

Page 76

1  Q  Do you know if Jimmy Allenbach was one of them?
2  A  He most likely was.
3  Q  But you have no memory today of who the other boys were
4  that were there?
5  A  No.
6  Q  Do you remember if there was -- how many there were?
7  A  No.
8  Q  When you were doing your mission in Chicago, did you
9  befriend a young lady back there during the course of your
10 mission?
11 A  I met a lot of people. I don't -- no name comes to mind.
12 Q  At some point, did you strike up a friendship with a young
13 lady who was serving a mission in South America?
14 A  I don't remember anything like that.
15 Q  Do you blame Jack Loholt for any of the damages or injury
16 that you have sustained because of this abuse?
17          MR. KOSNOFF: Objection, form of the
18 question.
19 Q  (By Mr. Frey) Go ahead, you may answer.
20 A  I think that, because of the abuse, I will never know who I
21 am.
22 Q  My question is, do you blame or lay any fault on Jack
23 Loholt for the abuse?
24          MR. KOSNOFF: Objection, form of the
25 question. In what sense?

Page 77

1  Q  (By Mr. Frey) Go ahead. You can answer.
2  A  Yes.
3  Q  Am I correct in assuming, then, that you feel Jack Loholt
4  did something wrong towards you?
5  A  Yes.
6  Q  Do you feel it was a substantial wrong?
7  A  Yes.
8  Q  Do you feel that he bears any responsibility for the
9  injuries and damages that you feel you've sustained as a
10 result of this -- of his conduct?
11          MR. KOSNOFF: Objection. Form of the
12 question, relevance.
13          MR. FREY: Counsel, the rule provides that
14 you can object on the basis of privilege or the form of the
15 question. That's all.
16          MR. KOSNOFF: No, that's not entirely true,
17 Tom. In fact, I can object if I believe that the question
18 is improperly phrased; I can object if I believe that it's
19 not relevant, it's not reasonably calculated to lead to the
20 admission of relevant and admissible testimony. I can
21 state an objection for that reason as well.
22          MR. FREY: Well, we can get the rule at the
23 lunch break, but that isn't the rule.
24 Q  (By Mr. Frey) I'm going to ask you now, Mr. Fleming --
25          MR. KOSNOFF: You're asking him questions

20 (Pages 74 to 77)

Page 78

1  about legal relevance, about the --
2         MR. FREY: I'm not, Counsel, and stop the
3  speaking objections. We can call the Federal Judge. But
4  I'm not going to put up with it.
5         MR. KOSNOFF: You inquired, Counsel, the
6  basis for my objection, and you asserted wrongly that I
7  cannot assert an objection when you're going on a fishing
8  expedition asking him about aspects of his claims, about
9  which -- he's not an attorney; his opinion about the legal
10 aspects of his claim are not relevant to his deposition.
11 Q  (By Mr. Frey) Mr. Fleming, I'm going to ask you again, and
12    we can go back -- will you find the question before the
13    colloquy starter.
14         (The pending question was read by
15         the reporter.)
16 A  He was put into a position that he had power and control,
17    and that position allowed him to hurt me, and yes, I do
18    feel that he harmed me.
19 Q  And he bears responsibility, in your mind, for the acts
20    that he committed upon you; is that correct?
21         MR. KOSNOFF: Objection, form of the
22    question.
23 Q  (By Mr. Frey) You may answer.
24         MR. KOSNOFF: It's up to a jury to decide.
25         MR. FREY: Counsel.

Page 79

1  Q  (By Mr. Frey) You may answer.
2  A  I believe he is partially responsible.
3  Q  You believe he committed a wrong towards you?
4  A  Yes, I do.
5  Q  Now, I'm going to ask you, why did you not choose to sue
6     Mr. Loholt, if that was your decision? If it wasn't your
7     decision, then I don't want to ask what you discussed with
8     your counsel.
9  A  Because the church put him there.
10 Q  So as I understand your answer, in your own mind -- I'm not
11    talking about legal aspects -- in your own mind, you
12    believe it's all the church's fault, and that Mr. Loholt --
13    because they put him there, that Mr. Loholt is not
14    responsible?
15 A  Mr. Loholt bears part of the responsibility, but the church
16    did not take action to -- they put him there and they
17    didn't take him out.
18 Q  What is your belief, or understanding, as to what the
19    church knew or didn't know about Mr. Loholt?
20 A  When Richard Pettit told me that they knew. It could have
21    stopped a long time ago.
22 Q  When did Richard Pettit tell you this?
23         MR. KOSNOFF: Objection, it's been asked and
24    answered.
25 Q  (By Mr. Frey) Go ahead. You can answer.

Page 80

1  A  In 1979-'80.
2  Q  So in 1979 and 1980, Richard Pettit, when you met with him,
3     told you the church knew about it?
4  A  Yes.
5  Q  And that's the conversation you told me about earlier where
6     he said they thought they had taken care of the problem; is
7     that correct?
8  A  That's correct.
9  Q  So you've known since that time, at least in your own mind,
10    that the church had some knowledge, according to
11    Mr. Pettit; is that correct?
12 A  Yes.
13 Q  And is there anything else that you're aware of, other than
14    this conversation with Richard Pettit, that makes you
15    believe that the church had knowledge or knew something
16    about Jack Loholt's activities with regard to abuse of
17    children?
18 A  There are a few things that I've learned since I filed
19    this.
20 Q  What have you learned?
21 A  Through investigation, that things of -- that have come to
22    light. When I talked to Rick, let him know what I was
23    doing, he informed his brother which means that goes back
24    farther -- or that his brother was abused, which means it
25    goes back farther than me.

Page 81

1  Q  Okay. Anything else that you're aware of that you believe
2     demonstrates the church knew about Jack Loholt and his
3     activities?
4  A  Not that I can recall at this time; however, my
5     acknowledgment by Richard Pettit was enough. I don't need
6     to know any more.
7  Q  At the time that you learned from Richard Pettit the
8     information that he gave you about -- that you've testified
9     to about where you've indicated he told you the church
10    thought they had taken care of that, did that upset you?
11 A  Yes.
12 Q  Did you express the fact that you were upset or angry with
13    Richard Pettit?
14 A  I don't recall exactly what I said, but I do remember
15    thinking this never had to happen to me.
16 Q  Did you feel anger and frustration and some type of
17    betrayal at that point when you learned that information
18    from him?
19 A  I would say that I was angry and frustrated, yes.
20 Q  Did you feel the church had wronged you?
21 A  Yes.
22 Q  How old were you then?
23 A  17, 18.
24 Q  Do you have any notion -- and this may be repetitive, I
25    acknowledge that at the beginning -- do you have any notion

21 (Pages 78 to 81)

Page 94

1  A   Not that I can recall.
2  Q   Have you ever heard the term Explorer Scouts?
3  A   I have heard the term Explorer Scouts.
4  Q   Were you an Explorer Scout?
5  A   I don't know. I was in Scouting.
6  Q   How long did you stay in Scouting?
7  A   I don't know.
8  Q   Did you ever have any Scout leader other than Jack Loholt?
9  A   While I was in the church?
10 Q   Mm-hmm.
11 A   There may have been leaders with him, but I recall he was
12     present my whole Scouting experience, as far as I can
13     recall. When he was the Assistant Scout Master, the Head
14     Master, I don't recall.
15 Q   My question is a little different than that. Do you
16     remember any other person that you were involved with,
17     other than Jack Loholt, as either an Assistant Scout Master
18     or as a Scout Master?
19 A   There was involved with Scouting while I was in Scouting?
20 Q   Exactly.
21 A   I believe that Ken Keller was involved in Scouting, and I
22     believe that -- last name Hoffman rings a bell. I can't
23     think of a first name.
24 Q   Tom Dabling?
25 A   He was in the ward. I don't recall if he was in the

Page 95

1      Scouts.
2  Q   Was all of your contact in all of your Scouting activities,
3      then, with Jack Loholt as the principal person with whom
4      you dealt and worked with?
5  A   He was the principal person that -- it appeared to me that
6      way, that worked with the boys all the time. He was the
7      one that was at everything.
8  Q   Was he working with the older boys, 16, 17 year olds, and
9      the 12 year olds, all across the board?
10 A   I don't know.
11 Q   Do you have any memory of being in Scouting activities when
12     you were 16 and 17?
13 A   I can't answer that, honestly tell you if that was the
14     case. 16, 17 -- I don't recall.
15 Q   In your employment -- you're talking about 1978 and 1979
16     you worked for Jack Loholt. That would have been when you
17     were 16 and 17 years old. Were you in a Scouting movement
18     then with the church?
19 A   I don't know. I was at his home. I worked for him. I
20     don't know if I was still going on Scouting events.
21 Q   I want to go back for a moment to a little bit about your
22     family circumstance. When you -- we talked about the abuse
23     that you recalled involving your biological father. When
24     your mother married Mr. Payne, how was that relationship
25     with regard to either verbal or physical abuse towards your

Page 96

1      mother?
2  A   That relationship was real short, six months, maybe. I
3      don't remember much about that relationship. I think it
4      was a rebound relationship for my mother. She was in it
5      and she was out of it. I don't recall much about it.
6  Q   Do you recall why they separated?
7  A   No, I don't know why they separated.
8  Q   You don't recall any arguments or physical abuse at all
9      going on during that time period?
10 A   Not that I can recall.
11 Q   How about Mr. Ron Nash, your -- I guess he'd be your
12     stepfather still, wouldn't he?
13 A   No.
14 Q   Pardon?
15 A   No, he's not.
16 Q   I mean, he would have been at the time?
17 A   He would have been, yes. He's not currently.
18 Q   How was the relationship between Ron Nash and your mother?
19 A   They seemed to get along good for long periods, and then
20     they would argue, and they would get along good.
21 Q   Do you remember his being physically violent towards your
22     mother on any occasions?
23 A   I can't picture in my mind him or her beating on each
24     other, but I did hear arguments.
25 Q   How would you describe their relationship?

Page 97

1  A   Controlling by Ron Nash.
2  Q   Do you ever recall your mother going to the bishop and
3      telling you she went to the bishop to complain about the
4      way she was being treated by Ron Nash?
5  A   I know she went and talked to somebody. I know she was
6      informed to stay with him.
7  Q   Pardon me?
8  A   I know she was encouraged to stay with him.
9  Q   How about the relationship with Mr. Land? Were you at home
10     during that time period?
11 A   No.
12 Q   Nevertheless, did you know about how that relationship has
13     progressed?
14 A   They've been married for many years. I think they --
15 Q   Pardon me?
16 A   I think they get along pretty good.
17 Q   When you first started being abused by Mr. Loholt, I think
18     you indicated earlier that it didn't start with the more
19     physical type of abuse, which you've described for us, but
20     it worked up to that at some point. When the abuse -- how
21     soon was it after you got into Scouting that the abuse
22     started?
23 A   I believe it was my first camping trip with them, with the
24     Scouts.
25 Q   Is that the circumstance you described where he asked you

Page 98

1      to sleep in his sleeping bag, or told you to?
2 A He told me to. "I'm going to protect you, you'll be
3      sleeping with me."
4 Q Did you feel he was doing that because you were new in the
5      troop or whatever?
6 A Mm-hmm, yes.
7 Q And then, how often after that first incident would this
8      occur, where he would attempt to touch you in some way
9      or --
10 A Like I said earlier, I recall at nearly every Scouting
11      event I was at.
12 Q How often would that be? Were Scouts once a week?
13 A I think they were one day during the week.
14 Q Is that what they called mutual? Would they occur during
15      the mutual?
16 A They called something mutual, an activity at the church,
17      yeah, mutual.
18 Q And that would be at the church?
19 A Mm-hmm.
20 Q And is that where the Scout meetings would then take place?
21 A Some of them took place there; some of them took place at
22      his house.
23 Q How often were they at his house, versus when they were at
24      the church? When I say the church, I'm talking about the
25      ward building.

Page 99

1 A It seemed like we were at his house a lot, because we would
2      do things at his house.
3 Q And there were other Scouts there at the time with you?
4 A Yeah.
5 Q And did this abuse that occurred to you occur in front of
6      those Scouts or with those Scouts present?
7 A Some of it, but it would be subtle to where it was a touch,
8      a push, a help up the ladder with his hand between your
9      legs.
10 Q When did it move to this more, for lack of a better term,
11      aggressive or physical type of contact?
12 A When? I can't give you a date as to when. We would go on
13      camping trips, we would go to his home. And if he had
14      occasion where we were sleeping over somewhere, that's
15      where it would be more aggressive.
16 Q Did the type of conduct involving masturbation,
17      ejaculation, the laying on top of you and taking off of
18      your clothes, that type of conduct, did that -- that didn't
19      occur at the Scout meetings, did it?
20 A No. The Scout meetings -- at the church?
21 Q At the church or at his home.
22 A Oh, at his home, sure, sometimes. We may be having
23      something in the -- his field, and I may have to go to his
24      house with him for something, and for a short period of
25      time, something would happen.

Page 100

1 Q And would this be fondling or something more -- if I can
2      use the term, more aggressive than that?
3 A I can't tell you what times were just fondling and what
4      times were more aggressive. It seemed like it just
5      progressed to be --
6 Q When this -- after this started, then, you've indicated it
7      was -- was it at virtually every Scout meeting that
8      something happened? Not at first, but as it progressed?
9 A Not at first. As it progressed, and I would say as it
10      progressed, it just got more and more frequent.
11 Q And as this was happening to you, what was your reaction to
12      it? How did you feel about it?
13 A I was frightened. I was scared. I remember praying my
14      little heart out to somehow somebody make it stop. I laid
15      there as a frightened boy.
16 Q And afterwards, when it stopped, and you were able to get
17      out of there, how did you feel about what had happened?
18 A Well, I always felt guilty about it. The church says
19      don't -- anything sexual is bad. It was sexual. To me it
20      was bad. I felt guilty about it.
21 Q Did you feel -- did it make you feel insecure?
22 A I didn't trust people, because he would say he loved me,
23      and yet he was doing this to me. I mean --
24 Q Did you find it hard to get close to other people or to
25      make relationships with other people because of this?

Page 101

1 A Yes.
2 Q Did you feel that you were confused and you were kind of
3      losing your direction with your life, or where you were
4      going, or what was happening in any way?
5 A When I was a young boy and it was happening, I didn't know
6      how to control it. Was I confused? Sure. I didn't know
7      what was happening. I didn't know how it stop it. I --
8      the only path that I knew was to stay as involved in the
9      church as I could, because even though I felt being there
10      was hurting me, not being there I was afraid.
11 Q Did you feel lost?
12 A I felt lost.
13 Q And when it got to the point where you were working with
14      him, you said you felt you couldn't leave?
15 A Correct.
16 Q What was the reason for that? What were the feelings that
17      you had at that point that you felt you couldn't leave him?
18 A I felt trapped. He had expressed to my mother, I have an
19      opportunity for your son. If I would have left his
20      employment, how could I explain it to my mother? And so I
21      felt like I was stuck there, because I didn't want people
22      to know. I was embarrassed about what had happened and
23      felt guilty about it. I didn't want them to know.
24 Q Did you feel kind of isolated because of this?
25 A Yes. I thought I was the only one.

Page 126

```
1   A   41.
2   Q   Is the address you gave me a home that you're living in?
3       Is that a house?
4   A   Yes.
5   Q   And who owns the house?
6   A   I do.
7   Q   Did you own it before you met Scott?
8   A   No.
9   Q   Did you buy it after you met Scott?
10  A   Yes.
11  Q   Is he a part owner in any way of the home?
12  A   No.
13  Q   Is Scott employed?
14  A   Yes.
15  Q   Where?
16  A   Boeing.
17  Q   Pardon?
18  A   Boeing.
19  Q   I still can't understand you.
20  A   The Boeing Company.
21  Q   Is that where you met him?
22  A   No.
23  Q   Where did you meet him?
24  A   I met him out one night.
25  Q   After you met him, how long was it before the two of you --
```

Page 127

```
1       he moved in and became a partner with you?
2   A   Maybe six, eight months.
3   Q   And has that been a continuous relationship since then?
4   A   Yes.
5   Q   You obtain your health insurance through him; is that
6       correct, or not?
7   A   That is correct.
8   Q   Was Tony Ashworth your prior partner?
9   A   Yes.
10  Q   And where is he now; do you know?
11  A   He lives in Kent.
12  Q   Asworth? Is that right? A-S-W-O-R-T-H?
13  A   I believe it's A-S-H-W-O-R-T-H.
14  Q   Have you -- do you see him? Have you seen him from time to
15      time?
16  A   Yes.
17  Q   And what's your relationship like with him?
18  A   Friend.
19  Q   Does he have a new partner now?
20  A   No.
21  Q   I don't think I have any other questions. Thank you very
22      much.
23          MR. KOSNOFF: No questions.
24          THE VIDEOGRAPHER: This is the end of
25      videotape No. 3. This concludes the deposition of Kenneth
```

Page 128

```
1   Fleming. The time now is approximately 3:18 p.m., going
2   off the record.
3           (At 3:18 p.m. the proceedings were
4           adjourned.)
5           (Signature was reserved.)
```

Page 129

```
1               C E R T I F I C A T E
2
3   STATE OF WASHINGTON   )
                          ) ss.
4   COUNTY OF KING        )
5
6       I, Alison Lott, Notary Public in and for the State of
7   Washington, do hereby certify:
8       That the annexed and foregoing deposition was taken
9   stenographically by me and reduced to typewriting under my
10  direction;
11      I further certify that I am in no way related to any
12  party to the cause of action concerned, nor to any of counsel,
13  nor do I have a financial interest in the event of the cause;
14      I further certify that the deposition as transcribed is
15  a full, true and correct transcript of the proceedings;
16      IN WITNESS WHEREOF, I have hereunto set my hand and
17  affixed my Official Seal this 24th day of July, 2005.
18
19
20
21
22
            Notary Public in and for the State
23          of Washington, residing at Edmonds.
            My Commission expires 1/15/07.
24
25
```

33 (Pages 126 to 129)