**Fleming, et al. v. COP, et al.**
No. CV04-2338 RSM

**DECLARATION OF MARCUS B. NASH**
**IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# EXHIBIT J

Dockets.Justia.com

FILED

'05 DEC 21 AM 8:33

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

DEPUTY

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MELANIE H., individually, | Civil No. 04-1596-WQH-(WMc) |
| Plaintiff, | |
| v. | **ORDER** |
| DEFENDANT DOE 1; DOES 2 through 1000, inclusive. | |
| SISTERS OF THE PRECIOUS BLOOD, Counterclaimant, | |
| v. | |
| MELANIE H., individually; et al., Counterclaim Defendant. | |
| STATE OF CALIFORNIA, Intervenor-Plaintiff, | |
| ROMAN CATHOLIC BISHOP OF SAN DIEGO, Third Party Counterclaimant, | |
| v. | |
| MELANIE H., STATE OF CALIFORNIA, et al., Plaintiffs-Counterclaim Defendants; Fourth Party Defendants. | |

163          EXHIBIT J

1    Pending before the Court are Plaintiff's Motion to Dismiss the Counterclaim and

2 Defendants' Motion for Summary Judgment. On September 8, 2005, the parties appeared before

3 the Honorable William Q. Hayes for oral argument on both Motions. After considering the

4 arguments raised by the parties in their briefing and during oral argument, the Court now issues

5 the following rulings.

6                                    **BACKGROUND**

7    On December 30, 2004, Plaintiff Melanie H., a female adult proceeding under a pseud-

8 onym, filed a complaint in California State Court alleging that she was sexually molested by a

9 priest and parish/school worker at St. Mary's parish school between 1974 through 1977. The

10 Complaint alleges that the Defendant Sisters of the Precious Blood, the order of nuns that ran the

11 school, negligently failed to supervise the perpetrator and negligently failed to protect Plaintiff.

12    Plaintiff's Complaint alleges sexual abuse by Father Victor Uboldi. Father Uboldi was a

13 Catholic Priest incardinated at the Diocese of San Diego and assigned to St. Mary's Parish at the

14 time the alleged abuse occurred. Father Uboldi retired to Italy in the early 1980's and is now

15 deceased.

16    Defendant Sisters removed the action to Federal Court and filed an Answer asserting

17 fifteen affirmative defenses, including a defense based on the statute of limitations. Addition-

18 ally, Defendants filed a Counterclaim seeking declaratory relief.

19    Defendant Sisters allege they provided services at the School and Parish at the request of

20 the Bishop of San Diego. The Bishop intervened as a Defendant under the theory that if the

21 Sisters are liable to Melanie, then the Bishop is liable to the Sisters. The State of California

22 intervened as a matter of right to defend the constitutionality of Senate Bill 1779 (codified as

23 California Code of Civil Procedure section 340.1) (hereinafter "SB 1779").

24    Effective January 1, 2003, the California Legislature enacted SB 1779 in order to create

25 retroactive employer liability in certain types of child abuse actions. The Bill created a one year

26 window for filing certain sexual abuse cases that would have otherwise been barred by the

27 statute of limitations. Prior to 2003, Plaintiff's claim against the Defendants would have become

28                                          2

1  barred by the statute of limitations on her 26th birthday. However, with the enactment of SB

2  1779, Plaintiff's claim would not be otherwise barred by the statute of limitations. In their

3  Counterclaim, Defendants request that the Court grant summary judgment and declare those

4  portions of California Civil Code of Procedure Section 340.1 which were amended by SB 1779

5  unconstitutional.

6      SB 1779 provides in pertinent part:

7

8      § 340.1. Childhood sexual abuse; certificates of merit executed by attorney; violations; failure to file; name designation of defendant; periods of

9      limitation; legislative intent

10         (a) In an action for recovery of damages suffered as a result of childhood sexual abuse, the time for commencement of the action

11         shall be within eight years of the date the plaintiff attains the age of majority or within three years of the date the plaintiff discovers or

12         reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual

13         abuse, whichever period expires later, for any of the following actions:

14             (1) An action against any person for committing an act of childhood sexual abuse.

15

16             (2) An action for liability against any person or entity who owed a duty of care to the plaintiff, where a wrongful or

17             negligent act by that person or entity was a legal cause of the childhood sexual abuse which resulted in the injury to the

18             plaintiff.

19             (3) An action for liability against any person or entity where an intentional act by that person or entity was a legal cause of

20             the childhood sexual abuse which resulted in the injury to the plaintiff.

21     (b)     (1) No action described in paragraph (2) or (3) of subdivision (a) may be commenced on or after the plaintiff's 26th birth-

22             day.

23             (2) This subdivision does not apply if the person or entity

24             knew or had reason to know, or was otherwise on notice, of any unlawful sexual conduct by an employee, volunteer,

25             representative, or agent, and failed to take reasonable steps, and to implement reasonable safeguards, to avoid acts of

26             unlawful sexual conduct in the future by that person, including, but not limited to, preventing or avoiding placement of

27             that person in a function or environment in which contact

28                                    3

with children is an inherent part of that function or environment. For purposes of this subdivision, providing or requiring counseling is not sufficient, in and of itself, to constitute a reasonable step or reasonable safeguard.

(c) Notwithstanding any other provision of law, any claim for damages described in paragraph (2) or (3) of subdivision (a) that is permitted to be filed pursuant to paragraph (2) of subdivision (b) that would otherwise be barred as of January 1, 2003, solely because the applicable statute of limitations has or had expired, is revived, and, in that case, a cause of action may be commenced within one year of January 1, 2003. Nothing in this subdivision shall be construed to alter the applicable statute of limitations period of an action that is not time barred as of January 1, 2003.

Cal.C.C.P. § 340.1.

## I. MOTION FOR SUMMARY JUDGMENT

On May 11, 2005, Defendant Roman Catholic Bishop of San Diego and the Sisters of the Precious Blood filed a Joint Motion for Summary Judgment. The Motion raises several constitutional issues. Among them, the Defendants contend that: (1) SB 1779 violates the First Amendment Free Exercise Clause; (2) SB 1779 violates the First Amendment Establishment Clause; (3) SB 1779 violates the Due Process Clause; (4) SB 1779 violates the Ex Post Facto Clause; and (5) SB 1779 is an unconstitutional Bill of Attainder.

## STANDARD OF REVIEW

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may meet this burden in two ways: (1) by presenting evidence that negates an essential element of the

4

nonmoving party's case or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322-23. If the moving party fails to discharge this initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159-60 (1970).

If the moving party satisfies its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also Anderson*, 477 U.S. at 252 ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)) (internal quotations omitted).

In ruling on a motion for summary judgment, "[t]he district court may limit its review to the documents submitted for purposes of summary judgment and those parts of the record specifically referenced therein." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the Court is not obligated to "scour the record in search of a genuine issue of triable fact." *Keenan v. Allen*, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)). The Court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. "Credibility determinations [and] the weighing of evidence ... are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255.

## DISCUSSION

### I. *The First Amendment Free Exercise Clause*

The Free Exercise Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303(1940),

1  provides "Congress shall make no law respecting an establishment of religion, *or prohibiting the*
2  *free exercise thereof ⋯.*" U.S. Const. Amend. I. (emphasis added).

3        In *Employment Division v. Smith*, 494 U.S. 872 (1990), the Supreme Court held that the
4  right of free exercise of religion does not relieve persons of the obligation to comply with valid
5  or neutral laws of general applicability. In *Employment Division v. Smith*, the Supreme Court
6  held that the State was not prevented by the Free Exercise Clause from outlawing the use of
7  sacramental peyote and denying unemployment benefits to employees discharged for using
8  peyote. The Supreme Court explained that a State would prohibit the free exercise of religion if
9  it was to ban acts solely because of their religious motivation. However, the Supreme Court
10 found that the Free Exercise Clause was not violated when a State required compliance with an
11 otherwise neutral law that incidentally impacted religious practice. The Supreme Court ex-
12 plained:

13        The free exercise of religion means, first and foremost, the right to believe and
        profess whatever religious doctrine one desires. Thus, the First Amendment
14        obviously excludes all "governmental regulation of religious beliefs as such."
        *Sherbert v. Verner* at 402. The government may not compel affirmation of reli-
15        gious belief, *see Torcaso v. Watkins*, 367 U.S. 488 (1961), punish the expression
        of religious doctrines it believes to be false, *United States v. Ballard*, 322 U.S. 78,
16        86-88 (1944), impose special disabilities on the basis of religious views or reli-
        gious status, *see McDaniel v. Paty*, 435 U.S. 618 (1978); *Fowler v. Rhode Island*,
17        345 U.S. 67, 69 (1953); cf. *Larson v. Valente*, 456 U.S. 228, 245 (1982), or lend its
        power to one or the other side in controversies over religious authority or dogma,
18        *see Presbyterian Church in U. S. v. Mary Elizabeth Blue Hull Memorial Presbyte-
        rian Church*, 393 U.S. 440, 445-452 (1969); *Kedroff v. St. Nicholas Cathedral*,
19        344 U.S. 94, 95-119 (1952); *Serbian Eastern Orthodox Diocese v. Milivojevich*,
        426 U.S. 696, 708-725 (1976).

20

21 *Employment Div. v. Smith*, 494 U.S. at 886 (emphasis added).

22        In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 547 (1993),
23 the legislature passed a law forbidding animal slaughtering for sacrificial purposes while still
24 allowing animal slaughtering for other purposes, such as within the meat packing industry. The
25 Supreme Court held that the ordinance in question was unconstitutional because its clear *object*
26 was to prevent animal sacrifice for religious purposes, despite its facially neutral appearance.
27 The Supreme Court stated, "[t]he principle that government, in pursuit of legitimate interests,

28                                          6

1 cannot in a selective manner impose burdens only on conduct motivated by religious belief is
2 essential to the protection of the rights guaranteed by the Free Exercise Clause." *Id.* at 542-543.
3 The Supreme Court explained the circumstances under which the protections of the Free
4 Exercise Clause pertain. "At a minimum, the protections of the Free Exercise Clause pertain if
5 the law at issue discriminates against some or all religious beliefs or regulates or prohibits
6 conduct because it is undertaken for religious reasons." *Id.* at 532.

7     The Supreme Court in *Lukumi* cited to *McDaniel v. Paty*, 435 U.S. 618 (1978) and
8 *Fowler v. Rhode Island*, 345 U.S. 67 (1953) for examples of the type of cause of action that
9 would implicate the Free Exercise Clause. Both *Fowler* and *McDaniel* involved clear intrusion
10 by the State upon the practice of religion. In *Fowler*, the Supreme Court held that a public
11 ordinance which prohibited public preaching by a Jehovah's Witness, but not by a priest or
12 minister, was unconstitutional. In *McDaniel*, the Supreme Court invalidated a law prohibiting
13 clergymen from holding public offices. The Supreme Court found that the challenged provision
14 violated the First Amendment right to the free exercise of religion because it conditioned that
15 right on the surrender of the right to seek office.

16     The Court's decision in this case is guided by the rulings in both *Lukumi* and *Employment*
17 *Division*. However, the facts of this case differ significantly in that the legislation at issue is not
18 aimed at promoting or prohibiting religious beliefs, opinions or practices. Both *Lukumi* and
19 *Employment Division* involved regulation of religious practices, sacramental peyote use and
20 animal sacrifice respectively. In comparison, SB 1779 allows tort claims against a third party for
21 failure to supervise or negligent hiring to be filed retroactively.

22     Plaintiff contends that SB 1779 is "neutral, generally applicable legislation that retroac-
23 tively extended the statute of limitation for certain claims wholly without regard to the religious
24 or non-religious character of the defendant." Melanie H. Response at 1:22-2:1. Plaintiff
25 contends "...SB 1779 does not attempt to regulate any conduct because of its specifically
26 religious content. On this point, the contrast with *Church of Lukumi Babalu Aye* could not be
27 more striking. The ordinance invalidated in that case effectively forbade the church from

28                                     7

1  engaging in a religious ritual.  In this case, no one suggests that child abuse is a religiously

2  approved, much less religiously mandated, practice." *Id.* at 12:11-15. Plaintiff asserts that "SB

3  1779 is general, religiously-neutral legislation that extends the statute of limitations for certain

4  childhood sexual abuse claims against all private institutions that knew or should have known

5  about childhood sexual abuse committed by their employees, volunteers, representatives, or

6  agents and that failed to take reasonable steps to avoid future repetitions of such conduct." *Id.* at

7  6:9-13. Plaintiff further asserts "SB 1779 in no way targets inherently religious or religiously

8  motivated conduct...." *Id.* at 12:16-17.

9      Defendants concede that the inquiry ends if the law does not burden religious practices[1],

10  but provide several theories for asserting that SB 1779 violates the First Amendment.  However,

11  a review of these arguments and the statute itself reveals that SB 1779 does not impermissibly

12  regulate the free exercise of religion because the legislation does not interfere with religious

13  beliefs, opinions, or practices.

14      Defendants contend that the legislation is unconstitutional because it took away the

15  "counseling defense" and, "as far as we are aware, only the Catholic Church provided and

16  required counseling as one of its responses to inappropriate sexual conduct." Joint Motion at

17  3:24-26. Defendants further argue that "[c]ourts and juries will second guess the ecclesiastical

18  decisions of Bishops and other Catholic leaders (who are now mostly dead) as to whether they

19  acted 'reasonable' when–years ago–they counseled, disciplined, and assigned priests and other

20  Catholic clergy." Reply Re: First Amendment at 7.  Defendants contend, "[t]he Legislature then

21  cut off any argument that the Church had acted reasonably when it sent priests to counseling...."

22  Joint Motion at 6:24-26. Defendants further contend, "[t]he reason that counseling was excluded

23

24  [1]    The Court: ...what if the law targets a Church, but the result of the law is that it doesn't
         burden the religious practices of the Church, what happens then?

25

26      Mr. Hennigan [Counsel for Defendants]: If it doesn't burden religious practices, I think
         we are pretty much at the end of the inquiry.

27      Oral Argument Transcript at 28:4-9.

28                                            8

1 as a reasonable response that would allow Catholic institutions to assert the statute of repose

2 defense was that it was the response of the Catholic Church...." *Id.* at 16:16-19. Defendants

3 assert "[i]t is also a core belief of the Catholic Church that each priest represents the 'presence of

4 Christ' among the faithful, and that one of the highest duties of the Bishop is to exercise greatest

5 care in the progressive formation of priests. One context in which a Bishop does that is assuring

6 adherence to vows of celibacy. In that context, the Bishop engages in pastoral counseling, and

7 where, based on prayer and spiritual reflection, he determines that it is necessary and appropri-

8 ate, he may also refer a priest to lay counseling. Whatever approach he takes, the Bishop must

9 decide, based on the beliefs and teachings of the Church, whether a priest should continue in

10 ministry, with or without restrictions, or be excluded from public ministry." *Id.* at 14:14-21.

11      The Court concludes that the provision of SB 1779 relating to counseling does not

12 regulate a religious practice. Counseling often occurs apart from any religious belief. Defen-

13 dants concede that counseling is utilized by the State and required in the Penal Code. Defendants

14 argue that "[m]andating that counseling was never a reasonable response to possible sexual

15 misconduct is also unreasonable because providing counseling for childhood sex offenders has

16 long been public policy in California....Counseling is expressly required as a condition of

17 probation for conviction of child molestation." *Id.* at 22:3-9 (citations omitted). Furthermore,

18 the fact that counseling is not a "religious practice" is especially clear in light of the fact that the

19 Church no longer uses counseling when faced with abuse allegations. Accordingly, counseling

20 can not serve as the "religious practice" giving rise to First Amendment protection.

21      Defendants raise several arguments regarding the effects of SB 1779 upon the Church's

22 practices of choosing, supervising, and retaining priests. Defendants argue "[a]t the heart of SB

23 1779 is the implicit command that a priest of the Church must be permanently removed from his

24 position, and from all future contact with children, whenever there is suspicion of misconduct.

25 This standard could never apply to the public schools, and it directly offends basic religious

26 principles of the Catholic Church. Like the public schools, the Church requires real proof and

27 due process before a Bishop can effectively destroy a priests vocation." *Id.* at 18:8-12. Defen-

28                                        9

1  dants also assert, "[f]reedom to choose clergy is protected by the Free Exercise Clause." *Id.* at

2  18:13-14. Additionally, Defendants contend, "[t]he legislative history of SB 1779 is marked by

3  intent to reform Catholic practices regarding choice of its clergy and to hold Catholic institutions

4  accountable for those practices." *Id.* at 18:17-19.

5      The Court concludes that SB 1779 does not burden the choice, supervision, or retention

6  of priests. While the gate keeping function of the statute does not allow an institution to avoid

7  litigation by showing that it counseled its members, the statute does not proscribe any procedure

8  for choosing, supervising, or retaining priests. SB 1779 also does not automatically impose

9  liability on the Church. Rather, it allows certain types of claims to be filed. While Defendants

10 argue that basic religious principles of the Catholic Church have been offended, and that SB

11 1779 intends to reform Catholic practices regarding choice of clergy, the Court finds that

12 Defendants have failed to show that the practices implicated involve religious beliefs, opinions

13 or conduct.

14     Furthermore, Defendants argue that the statute burdens the religious practices of the

15 Church by imposing financial burden. Counsel for Defendants described the economic impact

16 as an "economic holocaust" and stated:

17

18     "...to date, in the few cases that have been settled out of a thousand cases pending
       in the State–180 or so have been settled at the tune of hundreds of millions of

19     dollars. There's 700 cases left, one could do the math–that this is the biggest, if
       it's survived, will be one of the largest transfers of wealth from an institution to its

20     former parishioners at the urging of the legislature that has ever occurred."

21

22 Oral Argument Transcript at 26:10-17. The Court concludes that financial burden in defending

23 lawsuits is not a burden on religious belief or practice. Financial burden incurred as a result of

24 having to defend a lawsuit does not implicate any religious belief, opinion, or practice. Any

25 defendant will incur financial burden in defending a lawsuit against it. Moreover, allowing First

26 Amendment protection under the circumstances presented would create a preference for the

27 Church over other institutions.

28                                        10

A review of the statute itself does not reveal any reference to or attempt to regulate a religious practice or belief. Third party liability for sexual assault does not implicate or effect any religious belief, opinion, or practice. The failure to supervise or negligent hiring of a person that commits sexual assault does not implicate or effect any religious belief, opinion, or practice. SB 1779 regulates only conduct that the State is free to regulate. The Court concludes that SB 1779 is a general law, not aimed at the promotion or restriction of religious beliefs. The law does not "discriminate against some or all religious *beliefs* or regulate or prohibit conduct *because it is undertaken for religious reasons.*" *Lukumi* 508 U.S. at 532 (emphasis added). SB 1779 does not regulate religious beliefs or punish the expression of religious doctrine.

While the Bishop of San Diego and the Sisters of the Precious Blood are the Defendants in this matter, the Court concludes that SB 1779 does not implicate any Catholic beliefs or practices. Religious organizations are not entitled to First Amendment protection based simply on their religious status. The Supreme Court has held that the First Amendment does not provide automatic tort immunity for religious institutions or their clergy. *See United States v. Ballard*, 322 U.S. 78, (1944); *see also Employment Division v. Smith* (explaining that the Court has never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law.) In *Employment Division Smith*, the Supreme Court discussed the historical conflict between otherwise neutral laws that incidentally effect religious practice and explained:

> We have never held that an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate. On the contrary, the record of more than a century of our free exercise jurisprudence contradicts that proposition. As described succinctly by Justice Frankfurter in *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594-595 (1940): "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs. The mere possession of religious convictions which contradict the relevant concerns of a political society does not relieve the citizen from the discharge of political responsibilities (footnote omitted)." We first had occasion to assert that principle in *Reynolds v. United States*, 98 U.S. 145 (1879), where we rejected the claim that criminal laws against polygamy could not be constitutionally applied to those whose religion commanded the practice. "Laws," we said, "are made for the government of actions, and while they cannot interfere with mere religious belief and opinions, they may with practices. . . . Can a man excuse his practices to the contrary because of his religious belief? To permit this would be to make the professed doctrines of

11

religious belief superior to the law of the land, and in effect to permit every citizen to become a law unto himself." *Id.*, at 166-167.

*Employment Div. v. Smith*, 494 U.S. at 879.

Defendants contend that "all briefs discussing free exercise agree that if SB 1779 targeted Catholic institutions for disfavored treatment, then it would be unconstitutional." Reply Re: First Amendment at page 1, line 14. However, the Court finds that the dispositive question is whether the statute infringes on a religious *exercise*, meaning a belief or practice. Starting with the very basic principle that "Congress shall make no law...prohibiting the free exercise [of religion]"- it is clear that the legislation must impact some type of "exercise of religion." Accordingly, the Court finds that SB 1779 does not impermissibly regulate the free exercise of religion because the legislation does not interfere with religious beliefs, opinions, or practices. Based on this finding, the Court need not address the arguments of the parties regarding the neutrality and general applicability of SB 1779.

## II. The First Amendment Establishment Clause

The Establishment Clause of the First Amendment, which has been applied to the States through the Fourteenth Amendment, *see Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940), provides that "Congress shall make no law *respecting an establishment of religion*, or prohibit-ing the free exercise thereof···. " U.S. Const. Amend. I.

Defendants contend that SB 1779 violates the Establishment Clause by disfavoring Catholic institutions. Citing to *Lukumi*, 598 U.S. at 532, the Defendants contend "[t]he establishment clause forbids official disfavor of a particular religion." Joint Motion at 13.

Defendants further contend that SB 1779 violates the Establishment Clause because it impermissibly entangles the State in the church minister relationship. Defendants argue "[c]ourts and juries will second guess the ecclesiastical decisions of Bishops and other Catholic leaders (who are now mostly dead) as to whether they acted 'reasonable' when–years ago–they counseled, disciplined, and assigned priests and other Catholic clergy." Reply Re: First Amendment at 7. Defendants raise several arguments regarding the Church's practices in

12

choosing, supervising, and retaining priests, and the effects of SB 1779 upon those practices: "[a]t the heart of SB 1779 is the implicit command that a priest of the Church must be permanently removed from his position, and from all future contact with children, whenever there is suspicion of misconduct. This standard could never apply to the public schools, and it directly offends basic religious principles of the Catholic Church. Like the public schools, the Church requires real proof and due process before a Bishop can effectively destroy a priests vocation." Joint Motion at 18:8-12; "[f]reedom to choose clergy is protected by the Free Exercise Clause." Joint Motion at 18:13-14; and "[t]he legislative history of SB 1779 is marked by intent to reform Catholic practices regarding choice of its clergy and to hold Catholic institutions accountable for those practices." Joint Motion at 18:17-19.

Citing to *McCreary County v. ACLU*, 125 S. Ct. 2722, 2733 (2005), Plaintiff contends "[a]n Establishment Clause violation occurs only when a legislature acts with the predominant purpose of advancing [or inhibiting] religion." Melanie H. Response at 13:25-26. Plaintiff further contends "[t]he pertinent question is, therefore, whether section 340.1, as amended by SB 1779, has a 'principle or primary' effect of advancing or inhibiting religion." *Id.* at 13:27-28, and that "[t]here is no need to interpret Church doctrine, since Church doctrine has no bearing on the secular reasonableness of conduct that poses a threat of harm to innocent third parties." *Id.* at 15:17-19. Citing to *Malicki v. Doe*, 814 So. 2d 347 (Fla. 2002), Plaintiff contends "[d]isputes between a church and its own ministers 'must be distinguished from disputes between churches and third parties.' " Melanie H. Response at 18: 3-5.

The Establishment Clause prevents a State from enacting laws that have the "purpose" or "effect" of advancing or inhibiting religion. *Zelman v. Simmons-Harris*, 536 U.S. 639, 649 (2002); *see also Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 532 (1993). The Establishment Clause prohibits excessive State entanglement with religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 614-15 (1971). However, entanglement must be "excessive" before it runs afoul of the Establishment Clause. *Agostini v. Felton*, 521 U.S. 203, 233 (U.S. 1997).

In *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 793 (9th Cir. 2005), the Ninth

13

1  Circuit held "...suits seeking damages for sexual harassment do not pose a threat to First

2  Amendment rights, and are therefore permitted." *Id.* at 793. The Court further explained that

3  "[t]he effect of sexual abuse suits brought by parishioners on the employment practices of the

4  church is thus almost certain to be far greater than the effect of sexual harassment suits by

5  ministers. Yet it is clearly established law that such suits are not constitutionally barred, *see, e.g.*,

6  *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 430-31 (2d Cir. 1999);

7  *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66, 72-74 (D. Conn. 1995); *Moses v.*

8  *Diocese of Colorado*, 863 P.2d 310, 319-21 (Colo. 1993)." 397 F.3d at 792.

9      The First Amendment Establishment Clause does not prevent courts from deciding

10  secular disputes involving religious institutions even where they require reference to religious

11  matters. *See, e.g.*, *Serbian E. Orthodox Diocese v. Milivojevich*, 426 U.S. 696, 709 (1976)

12  (resolution of the dispute would have to involve "extensive inquiry" into religious law and polity

13  before the First Amendment would bar a secular court from adjudicating a civil dispute);

14  *General Council on Fin. & Admin. v. Cal. Superior Court*, 439 U.S. 1369, 1373 (1978)(finding

15  that perceived dangers that the State will become entangled in essentially religious controversies

16  or intervene on behalf of groups espousing particular doctrinal beliefs are not applicable to

17  purely secular disputes between third parties and a particular defendant, albeit a religious

18  affiliated organization, in which fraud, breach of contract, and statutory violations are alleged);

19  *Watson v. Jones*, 80 U.S. 679, 714 (1872)([r]eligious organizations come before us in the same

20  attitude as other voluntary associations for benevolent or charitable purposes, and their rights of

21  property, or of contract, are equally under the protection of the law, and the actions of their

22  members subject to its restraints); *Elvig v. Calvin Presbyterian Church*, 397 F.3d 790, 793 (9th

23  Cir. 2005) (holding "[t]he First Amendment protects a church's right to hire, fire, promote, and

24  assign duties to its ministers as it sees fit not because churches are exempt from all employment

25  regulations (for they are not), but rather because judicial review of those particular employment

26  actions would interfere with rights guaranteed by the First Amendment. As we explained in

27  *Bollard*, suits seeking damages for sexual harassment do not pose a threat to First Amendment

28

rights, and are therefore permitted."); *Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 F.3d 409, 431 (2d Cir. 1999) ([t]he First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters."); *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 338 (5th Cir. 1998) (citing *Smith*, 494 U.S. at 881; *Yoder*, 406 U.S. at 215; and *Destefano*, 763 P.2d at 283-84 and finding that "to invoke the protection of the First Amendment ...[a party] must assert that the specific conduct allegedly constituting a breach of his professional and fiduciary duties was rooted in religious belief."); *Nutt v. Norwich Roman Catholic Diocese*, 921 F. Supp. 66, 74 (D. Conn. 1995) (holding the common law doctrine of negligence does not intrude upon the free exercise of religion, as it does not discriminate against [a] religious belief or regulate or prohibit conduct because it is undertaken for religious reasons); *Mrozka v. Archdiocese of St. Paul & Minneapolis*, 482 N.W.2d 806, 811 (Minn. Ct. App. 1992) (conduct by the Church that results in external and secular harm is not protected by the First Amendment.)

The Court finds the *Malicki v. Doe* 814 So.2d. 347 (Fla. 2002) case instructive:

> We recognize that the Free Exercise Clause and the Establishment Clause require constant vigilance to prevent the government from either stifling the free exercise of religion or excessively and impermissibly entangling itself with interpreting religious doctrine on matters solely within the purview of religious institutions. However, with regard to a third party tort claim against a religious institution, we conclude that the First Amendment does not provide a shield behind which a church may avoid liability for harm arising from an alleged sexual assault and battery by one of its clergy members.
>
> By holding that the First Amendment does not bar the court's consideration of the parishioners' allegations, we expressly do not pass on the merits of the underlying case. Our holding today is only that the First Amendment cannot be used at the initial pleading stage to shut the courthouse door on a plaintiff's claims, which are founded on a religious institution's alleged negligence arising from the institution's failure to prevent harm resulting from one of its clergy who sexually assaults and batters a minor or adult parishioner. To hold otherwise and immunize the Church Defendants from suit could risk placing religious institutions in a preferred position over secular institutions, a concept both foreign and hostile to the First Amendment.

*Id.* at 365. Furthermore, the "court inquiring into the reasonableness of the steps a church has taken to prevent or correct sexual harassment need intrude no further in church autonomy . . .

15

than [a court does], for example, in allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior. " *Elvig v. Calvin Presbyterian Church,* 397 F.3d 790, 793 (9th Cir. 2005) (internal citations omitted).

The Court concludes that Defendants have not shown that SB 1779 favors one religion over another, or disfavors religion. Defendants have not shown that resolution of cases brought under SB 1779 will involve excessive entanglement of Church and State. The First Amendment does not protect every decision made by a religious leader. Furthermore, SB 1779 does not impose liability, but rather, allows cases which were otherwise barred by the statute of limitations to move forward. A determination of third party liability under SB 1779 whether the Defendants negligently supervised a priest would not "prejudice or impose upon any of the religious tenets or practices of Catholicism." *Malicki v. Doe,* 814 So. 2d 347, 363 (Fla. 2002). "[The First] Amendment embraces two concepts, -- freedom to believe and freedom to act. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940). Neither is implicated here, and thus, the Court finds that Defendants have failed to show that SB 1779 is unconstitutional under the First Amendment Establishment Clause and will deny summary judgment on the First Amendment Establishment Clause claims.

### *III. The Due Process Clause*

Defendants contend that SB 1779 violates the Due Process Clause because the statute deprives the Catholic Church of fair warning, unconstitutionally revives time barred claims, and unconstitutionally vitiates vested property rights. The Defendants argue that their cases are not defendable, that the witnesses are gone and the evidence lost. In their Counterclaim, Defendants allege: "[t]here were four to five members of the Sisters present at St. Mary's parish between the years of 1975 and 1980. At least three of the members are recently deceased, and one is suffering from Alzheimer's disease. All Pastors of St. Mary's Parish and all Bishops of San Diego at the time of the alleged events are now deceased." Counterclaim at 2. Defendants further contend that "one-hundred-five Complaints, by 140 individuals, have been filed against

1  the Bishop of San Diego since enactment. The claims involved date back as far as 1939; the

2  most recent is based on events more than a decade old. All but one allege acts prior to 1991

3  when the current Bishop was installed and amendment of CCPO §340.1 created the statutory tort

4  of childhood sexual abuse. At least one of the cases asserts claims that already resulted in a

5  judgment of dismissal based on the preexisting [s]tatute of [l]imitations." *Id.* at 11.

6      Defendants allege that, "[o]f the 43 priests with parish assignments in the Diocese of San

7  Diego who are subjects of complaints, 24 are dead. There are also claims based on alleged

8  misconduct by seven Nuns, ten Brothers, four other priests and seven lay persons. To the extent

9  that any information is available to the Bishop, it is that five of the seven Nuns are deceased; the

10  other is no longer affiliated with her Order and her last-known residence was outside of the

11  United States. At least three of the lay persons are deceased and two may be deceased." Joint

12  Motion at 11.

13      Plaintiff contends that SB 1779 does not violate Defendants Due Process rights because it

14  is a facially neutral, procedural statute. Plaintiff further contends that SB 1779 is permissible

15  legislation extending a civil statute of limitations. Plaintiff also contends that SB 1779 does not

16  deprive Defendants of fair warning, destroy property, or take vested rights.

17      In *International Union of Electrical v. Robbins & Myers, Inc.*, 429 U.S. 229, 243-244

18  (1976), the Supreme Court made clear that the lifting of a statute of limitation, so as to restore a

19  remedy lost through mere lapse of time, is not per se unconstitutional. The Supreme Court

20  explained:

21      Respondent contends, finally, that Congress was without constitutional power to
        revive, by enactment, an action which, when filed, is already barred by the running

22      of a limitations period. This contention rests on an unwarrantedly broad reading of
        our opinion in *William Danzer Co. v.. Gulf & Ship Island R. Co.*, 268 U.S. 633

23      (1925). *Danzer* was given a narrow reading in the later case of *Chase Securities*
        *Corp. v. Donaldson*, 325 U.S. 304, 312 n. 8 (1945). The latter case states the

24      applicable constitutional test in this language:

25          "The Fourteenth Amendment does not make an act of state legisla-
            tion void merely because it has some retrospective operation. What it

26          does forbid is taking of life, liberty or property without due process
            of law... Assuming that statutes of limitation, like other types of

27          legislation, could be so manipulated that their retroactive effects

28                                    17

would offend the Constitution, certainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment." *Id.*, at 315-316.I

Applying that test to this litigation, we think that Congress might constitutionally provide for retroactive application of the extended limitations period which it enacted.

*Id.* at 243-244 (1976).

The Ninth Circuit Court of Appeals and the California State Courts have concluded that the legislature can revive civil claims by enacting legislation that retroactively extends the statute of limitations period. *See Underwood Cotton Co. v. Hyundai Merch. Marine*, 288 F.3d 405, 409 (9th Cir. 2002) (holding that there are circumstances in which a legislature can remove a statute of limitations impediment retroactively and that the same can be true of a statute of repose[2] in proper circumstances); *Osmundsen v. Todd Pacific Shipyard*, 755 F.2d 730, 733 (9th Cir. 1985) citing *Davis v. Valley Distributing Co.*, 522 F.2d 827, 830 n.7 (9th Cir. 1975) (holding that extending a statute of limitations does not violate due process, even if the right of action has been time barred); *Starks v. S. E. Rykoff & Co.*, 673 F.2d 1106, 1109 (9th Cir. 1982) (holding that retroactive application of a statute which serves to extend a lapsed statute of limitations is not unconstitutional under the Fourteenth Amendment); *Tietge v. Western Province of the Servites, Inc.*, 55 Cal. App. 4th 382, 386 (Cal. Ct. App. 1997)( relying on *Lent v. Doe* 40 Cal. App. 4th 1177 (1995) finding that the legislature had the power to retroactively revive a cause of action for childhood sexual abuse previously time-barred under prior statute of limitations); *Liebig v. Superior Court,* 209 Cal. App. 3d 828, 830 (Cal. Ct. App. 1989) (holding the Legisla-

---

[2]Defendants contend that the legislation in question is a statute of repose, and that "[a] completed statute of repose provides vested rights that cannot be impaired by subsequent legislative act." Joint Motion at 25:12-13. However, the courts have held that even in cases involving a statute of repose, the legislature can act to revive a previously barred claim without offending the constitution. *See Underwood Cotton Co. v. Hyundai Merch. Marine*, 288 F.3d 405, 409 (9th Cir. 2002) (holding that there are circumstances in which a legislature can remove a statute of limitations impediment retroactively and that the same can be true of a statute of repose in proper circumstances). Regardless of whether the statute is one of limitations or repose, the Defendants have not shown that SB 1779 is unconstitutional.

18

1    ture has the power to retroactively extend a civil statute of limitations to revive a cause of action

2    time-barred under the former limitations period).

3          In *Roman Catholic Bishop of Oakland v. Superior Court*, 128 Cal. App. 4th 1155, 1162

4    (Cal. Ct. App. 2005), the California Court of Appeal discussed at length the past challenges to

5    previously revised sections of the same statute at issue here, and set forth a detailed analysis of

6    the cases as they relate to due process challenges. The court summarized:

7          It is equally well settled that legislation reviving the statute of limitations on civil
           law claims does not violate constitutional principles. In *Chase Securities Corp. v.*
8          *Donaldson* (1945) 325 U.S. 304, 314 [89 L. Ed. 1628, 65 S. Ct. 1137], the court
           held that due process notions were not affected by the revival of a civil law claim
9          because civil limitations periods "find their justification in necessity and conve-
           nience rather than in logic. ... They are by definition arbitrary, and their operation
10         does not discriminate between the just and the unjust claim, or the avoidable and
           unavoidable delay. ... Their shelter has never been regarded as ... a 'fundamental'
11         right ... the history of pleas of limitation shows them to be good only by legislative
           grace and to be subject to a relatively large degree of legislative control." (Fns.
12         omitted.) In *Liebig v. Superior Court* (1989) 209 Cal. App. 3d 828, 831-834 [257
           Cal. Rptr. 574], the court held that the Legislature had the power to revive lapsed
13         common law claims based on childhood sexual abuse under an earlier version of
           section 340.1.

14
     *Roman Catholic Bishop of Oakland v. Superior Court*, 128 Cal. App. 4th 1155, 1162 (Cal. Ct.
15
     App. 2005).
16
           The Court finds that the mere passage of SB 1779 does not offend the Due Process
17
     Clause of the Constitution. The Court concludes that the legislation is not per se unconstitu-
18
     tional. While the facial challenge to the legislature's right to pass SB 1779 fails, the Court finds
19
     that a determination of whether the statute "so manipulated that [its] retroactive effects []offend
20
     the Constitution." *See Chase Securities Corp. v. Donaldson*, 325 U.S. 304, 315 (1945) is
21
     premature.
22
           Defendants rely on *United States v. Marion* for the proposition that "the right to be free of
23
     stale claims in time comes to prevail over the right to prosecute them." Reply Re: Due Process
24
     at 2 citing *United States v. Marion*, 404 U.S. 307, 325 (U.S. 1971). However, in *Marion*, the
25
     Court explained that even in the criminal context, the Court must evaluate the potential
26
     prejudice on a case-by-case basis. "To accommodate the sound administration of justice to the
27

28                                                    19

1   rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the

2   circumstances of each case. It would be unwise at this juncture to attempt to forecast our

3   decision in such cases." *United States v. Marion*, 404 U.S. 307, 325 (U.S. 1971).

4        The Court concludes that it would be "unwise at this juncture" to "forecast a decision"

5   on the potential prejudice to Defendants as the necessary facts regarding time passed and

6   potential prejudice are not before the Court at this time. *See Id.* First, while many of the cases

7   may involve old claims, faded memories, and missing witnesses, it is not clear that these factors

8   will be involved in all of the cases impacted by the legislation. For example, there may be an

9   instance where a Plaintiff is attempting to recover from the Church and there are witnesses

10  available and evidence that has been preserved. Defendants contend that "[k]ey witnesses are

11  deceased. Memories of victim [sic] and witnesses are faded. Details are lost to time." Reply Re:

12  Due Process at 1:11. In order to determine whether Defendants' due process rights have been

13  violated, the Court would need to examine the circumstances of each case. The Court cannot

14  conclude that due process is per se violated simply because the legislation was enacted, or that

15  due process was violated because time passed. While there has been a significant passage of

16  time indicating potential prejudice to Defendants, such prejudice has not been established.

17  While the unavailability of witnesses and the absence of evidence may, in fact, impact a court's

18  decision on whether due process has been violated, that question is not currently before the

19  Court.

20       While the parties raise some arguments that relate to an "as applied" challenge, the Court

21  does not decide whether SB 1779 is unconstitutional as applied to the facts of this case or any

22  other case. The record on these issues stands undeveloped at this time. Accordingly, the Court

23  finds that the question of whether the due process rights of the Defendants have been violated is

24  premature. As previously noted, this is a facial challenge and a challenge to the statute as

25  applied may be raised after discovery has been conducted. Accordingly, the Court finds that the

26  enactment of SB 1779 is not per se unconstitutional and denies the Defendants' Motion for

27  Summary Judgment on this issue, without prejudice.

28                                      20

## IV. The Ex Post Facto Clause

Defendants contend that SB 1779 violates the Ex Post Facto Clause of the U.S. Constitution because the legislative purpose and motive for the law was to punish the Catholic Church. Defendants further argue that Ex Post Facto applies to both criminal and civil law and that the Ex Post Facto clause prohibits retroactive penal legislation.

Defendants contend that the civil remedies of SB 1779 are simply the civil supplement to a criminal statute, and that therefore, the statute falls within the ban on Ex Post Facto laws. Melanie H. Opposition at 36:27-28. Defendants rely on *Handle v. Artukovic*, 601 F. Supp. 1421(D. Cal. 1985), a Central District Court case involving an extension of the statute of limitations to file civil suits stemming from war crimes. In that case, Judge Rymer (then a District Court Judge) held that the cause of action was for a violation of criminal law, and that the civil statute was simply the civil supplement to a criminal issue. The Court therefore found the statute unconstitutional. In *Handle,* the court explained "[s]tatutes of limitation are enacted as matters of public policy designed to promote justice and prevent the assertion of stale claims after the lapse of long periods of time. Statutes of limitation are not disfavored in the law. To the contrary they are favored in the law because they promote desirable social ends and give security and stability to human affairs." *Id.* at 1434 (internal citations omitted).

Plaintiff argues that Defendant's Ex Post Facto arguments fail because SB 1779 is not penal for Ex Post Facto purposes. Plaintiff argues that "SB 1779's extension of the statute of limitations imposes 'no affirmative disability or restraint' beyond an obligation to pay damages, and that civil damages have historically been regarded as a civil remedy, not a criminal penalty." Melanie H. Response at 30:20-22 *citing Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168 (1963).

The Ex Post Facto Clauses of the U.S. Constitution prohibit the Federal Government and the States from enacting laws with certain retroactive effects. *See* Art. I, § 9, cl. 3; *Stogner v. California,* 539 U.S. 607, 610 (2003). *Stogner* involved a law that created a new criminal limitations period extending the time within which prosecution was allowed. The Supreme

21

1  Court explained:

2      Long ago the Court pointed out that the Clause protects liberty by preventing
       governments from enacting statutes with "manifestly unjust and oppressive"
3      retroactive effects. *Calder v. Bull*, 3 U.S. 386, 3 Dallas 386, 1 L. Ed. 648 (1798).
       Judge Learned Hand later wrote that extending a limitations period after the State
4      has assured "a man that he has become safe from its pursuit . . . seems to most of
       us unfair and dishonest." *Falter v. United States*, 23 F.2d 420, 426 (CA2), cert
5      denied, 277 U.S. 590, 72 L. Ed. 1003, 48 S. Ct. 528 (1928). In such a case, the
       government has refused "to play by its own rules," *Carmell v. Texas*, 529 U.S. 513,
6      533, 146 L. Ed. 2d 577, 120 S. Ct. 1620 (2000). It has deprived the defendant of
       the "fair warning," *Weaver v. Graham*, 450 U.S. 24, 28, 67 L. Ed. 2d 17, 101 S Ct.
7      960 (1981), that might have led him to preserve exculpatory evidence. F. Wharton,
       Criminal Pleading and Practice § 316, p 210 (8th ed. 1880) ("The statute [of
8      limitations] is . . . an amnesty, declaring that after a certain time . . . the offender
       shall be at liberty to return to his country . . . and . . . may cease to preserve the
9      proofs of his innocence"). And a Constitution that permits such an extension, by
       allowing legislatures to pick and choose when to act retroactively, risks both
10     "arbitrary and potentially vindictive legislation," and erosion of the separation of
       powers, *Weaver*, supra, at 29, and n 10, 450 U.S. 24, 67 L Ed 2d 17, 101 S Ct 960.
11     *See Fletcher v. Peck*, 10 U.S. 87, 6 Cranch 87, 137-138, 3 L. Ed. 162 (1810)
       (viewing the Ex Post Facto Clause as a protection against "violent acts which
12     might grow out of the feelings of the moment").

13  *Id.* at 611. In *Calder v. Bull*, 3 U.S. 386, (1798), the Supreme Court set forth four categorical

14  descriptions of *ex post facto* laws:

15     1st. Every law that makes an action done before the passing of the law, and which
       was innocent when done, criminal; and punishes such action. 2d. Every law that
16     aggravates a crime, or makes it greater than it was, when committed. 3d. Every law
       that changes the punishment, and inflicts a greater punishment, than the law
17     annexed to the crime, when committed. 4th. Every law that alters the legal rules of
       evidence, and receives less, or different, testimony, than the law required at the
18     time of the commission of the offence, in order to convict the offender. All these,
       and similar laws, are manifestly unjust and oppressive.
19

20  *Id.* at 391 (U.S. 1798). The Court concludes that SB 1779 is not unconstitutional under the Ex

21  Post Facto Clause. The Court concludes that SB 1779 does not impose a criminal penalty and

22  SB 1779 is not an extension of criminal punishment. Rather, SB 1779 extends the statute of

23  limitations for the filing of a civil tort cause of action. Accordingly, the Court finds that

24  Defendants' Motion for Summary Judgment based on the Ex Post Facto Clause should be

25  denied.

26  ///

27

28                                        22

1  *V. Bill of Attainder*

2      Defendants contend that SB 1779 is an unconstitutional Bill of Attainder because of its

3  "retributive focus on legislatively-condemned past conduct by Catholic Institutions that cannot

4  possibly be undone." Joint Motion at 32:2-3. Defendants argue that the Bill of Attainder Clause

5  prohibits the legislature from "singling out disfavored persons" and "meting out summary

6  punishment for past conduct." *Id.*

7      Plaintiff contends that SB 1779 "does not impose punishment, let alone punishment

8  without trial. Section 340.1 enables trial; it does not bypass one." Melanie H. Opposition at

9  30:3-4.

10     The Constitution instructs Congress that "No Bill of Attainder ⋯ shall be passed." U.S.

11  Const. art. I, § 9, cl. 3. A bill of attainder is "a law that legislatively determines guilt and inflicts

12  punishment upon an identifiable individual without provision of the protections of a judicial

13  trial." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).

14

15      Statutes are presumed constitutional. *Heller v. Doe*, 509 U.S. 312, 320, 113 S.Ct.
    2637, 125 L.Ed.2d 257 (1993). Only the clearest proof suffices to establish the

16      unconstitutionality of a statute as a bill of attainder. *Communist Party of United
    States v. Subversive Activities Control Bd.*, 367 U.S. 1, 83, 81 S.Ct. 1357, 6

17      L.Ed.2d 625 (1961). In judging the constitutionality of [a statute, the Court will]
    look to its terms, to the intent expressed by Members of Congress who voted its

18      passage, and to the existence or nonexistence of legitimate explanations for its
    apparent effect.

19

20  *SeaRiver Maritime Financial Holdings, Inc. v. Mineta* 309 F.3d 662, 668 -669 (9th Cir. 2002). A

21  statute that (1) specifies the affected persons, and (2) inflicts punishment (3) without a judicial

22  trial, is a bill of attainder. *See Selective Serv. Sys. v. Minnesota Pub. Interest Research Group*,

23  468 U.S. 841, 847 (1984).

24      The Court finds that the third factor of the test is clearly dispositive, and therefore, the

25  Court need not discuss the first and second factors. Defendants have failed to show that the

26  statute inflicts punishment without a judicial trial. *See Selective Serv. Sys.* 468 U.S. at 847. SB

27  1779 extends the statute of limitations for the filing of a civil tort cause of action. SB 1779 does

28

1   not automatically impose liability on the Church. Rather, it allows certain types of claims to be

2   filed. Defendants have failed to show that the statute inflicts punishment without a judicial trial,

3   and the Court will deny Defendants' Motion for Summary Judgment based on the Bill of

4   Attainder Clause.

## II. MOTION TO DISMISS

6       Plaintiff moves for dismissal on abstention grounds. Plaintiff contends that dismissal, or

7   in the alternative, a stay is required under three abstention doctrines. Plaintiff's Motion is only

8   filed against Defendant Roman Catholic Bishop. Therefore, Plaintiff does not contend that the

9   Court should abstain from hearing the claims by and against the Sisters. Additionally, the State,

10  who intervened to defend the constitutionality of the legislation, has not moved for abstention.

12      On August 6, 2004, Defendants removed the case to Federal Court on the basis of

13  diversity jurisdiction. Defendant Sisters of the Precious Blood is a non-profit Ohio Corporation;

14  Plaintiff is a citizen of California. Accompanying the Notice of Removal, Defendant filed an

15  Answer and Counterclaim. Defendant's Answer asserts fifteen affirmative defenses, including a

16  defense based on the statute of limitations.[3] Additionally, Defendants filed five Counterclaims

17  seeking declaratory relief requesting that the Court declare California Civil Code of Procedure

18  Section 340.1 subdivisions (b)(2), (c) and (d) unconstitutional. The Bishop joined in the

19  Counterclaims and Melanie H. now asks the Court to refrain from deciding the constitutionality

20  issue as the Bishop is a party to many similar actions currently pending in State Court.

21      Plaintiff's arguments are moot. Plaintiff asks the Court to refrain from deciding the

22  constitutionality of the issue so that the decision cannot have a res judicata effect in the

23  coordinated proceedings pending in State court. However, as clear from this Order, the Court

24  finds that based on the current record, SB 1779 is constitutional. Thus, to the extent that the

26      [3]Defendant's eighth affirmative defense reads: Plaintiff's claims are barred by the
27  applicable statute of limitations, including, without limitation, Cal.Code of Civ. Proc. Sections
    335.1, 338, 340(c), 340.1, and 343.

28                                          24

Plaintiff attempts to prohibit a finding of unconstitutionality from "interrupting" the coordinated proceedings pending in State court, the Court finds that the issue is moot. Accordingly, the Court will deny Plaintiff's Motion to Dismiss as moot.

## CONCLUSION & ORDER

The Court finds that SB 1779 does not violate the Free Exercise Clause or the Establishment Clause of the First Amendment because SB 1779 does not target a religious practice, a religious belief, or religious conduct of the Church.

The Court finds that SB 1779 is not per se unconstitutional under the Due Process Clause. The Court further finds that many of the Due Process arguments are premature, and will deny the portion of the Motion relying on Due Process without prejudice.

The Court finds that SB 1779 does not violate the Ex Post Facto Clause. The Defendants have failed to show that the law is penal in nature. The Court further finds that SB 1779 is not an unconstitutional bill of attainder. The Defendants have failed to show that the legislation inflicts punishment without a judicial trial.

The Court finds that the Motion to Dismiss is moot. For these reasons, and for all of the reasons discussed above, the Court will deny Defendants' Motion for Summary Judgment, and deny Plaintiff's Motion to Dismiss or Stay this action as moot.

///

///

///

///

///

///

///

25

1  Accordingly,

2      **IT IS ORDERED** Plaintiff's Motion to Dismiss is **DENIED** as moot.

3      **IT IS FURTHER ORDERED** Defendants' Motion for Summary Judgment with respect

4  to the Due Process Clause claim is **DENIED** without prejudice.

5      **IT IS FURTHER ORDERED** Defendants' Motion for Summary Judgment with respect

6  to the First Amendment, Ex Post Facto, and Bill of Attainder claims is **DENIED** with prejudice.

7

8      **IT IS SO ORDERED.**

9

10

11  Dated: _12/20/05_                         WILLIAM Q. HAYES
                                         United States District Judge
12

13

14  CC: Magistrate Judge McCurine;
15      All parties
16

17

18

19

20

21

22

23

24

25

26

27

28                              26