Byers & Anderson, Inc.
Court Reporters & Video

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE, )
)
Plaintiffs, )
)
vs. )
)
THE CORPORATION OF THE PRESIDENT )
OF THE CHURCH OF JESUS CHRIST OF ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah )
corporation sole, a/k/a "MORMON )
CHURCH"; LDS SOCIAL SERVICES a/k/a )
LDS FAMILY SERVICES, a Utah )
corporation, )
)
Defendants. )

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington

Byers & Anderson, Inc.
Court Reporters/Video/Videoconferencing

| One Union Square | 2208 North 30th Street, Suite 202 |
|---|---|
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

25th Anniversary 1980-2005

Philip J. Coleman
September 15, 2005

EXHIBIT 4

Byers & Anderson, Inc.
Court Reporters & Video

Page 42

1  that your predecessor served?
2  A  Well, I started in 1973, and this was 1970, so no
3     less than three. How much less, I don't remember.
4  Q  Can you give me a general sense of the kind of
5     communication or the types of communications that go
6     on between a departing bishop and an arriving bishop
7     regarding the transfer of responsibilities within the
8     ward?
9            MR. FREY: Could I ask for a
10    clarification?
11       Are you talking about then or now?
12           MR. KOSNOFF: He can only testify as to
13    his experience.
14 Q  (By Mr. Kosnoff) If it changed in your later
15    bishopric, perhaps you can point that out, but I'm
16    trying to get a sense of is there a practice, is
17    there a custom. How are the reigns transferred?
18           MR. FREY: I am going to object to the
19    form of the question. It's indeterminate in time,
20    but go ahead and answer.
21           THE WITNESS: Is there a protocol? I
22    don't remember.
23       I can remember what might have taken place.
24       There would be a transfer of records, keys, the
25    current mechanics in progress as far as the

Page 43

1     organization is concerned, nonconfidential items of
2     concern.
3  Q  (By Mr. Kosnoff) Now, I understand that the
4     responsibilities of the bishop are great and
5     multifaceted and include both administrative
6     responsibilities and pastoral responsibilities.
7        Do you recall having discussions of an
8     administrative nature with your predecessor, Bishop
9     Borland?
10           MR. FREY: I am going to object to the
11    form of the question.
12           THE WITNESS: And I'm not sure I
13    understand the question.
14 Q  (By Mr. Kosnoff) Well, you talked about keys,
15    records. I'm assuming you're referring to things
16    that had to do with the administrative operations of
17    the ward.
18 A  Yes.
19 Q  Did it also involve discussions regarding personnel--
20    strike that. Individuals in callings, positions, and
21    offices under the purview of the bishop?
22 A  It might have.
23 Q  Do you have any specific recollection of any of those
24    discussions?
25 A  I do not.

Page 44

1  Q  Did you have, for example, a discussion about how the
2     Boy Scout program was operating and what changes need
3     to be made there?
4  A  I do not recall any.
5  Q  Are there any protocols or practices that you recall
6     involving communicating confidential, sensitive
7     issues involving members of the ward?
8  A  I don't remember a protocol for that.
9  Q  Do you have any recollection of Bishop Borland
10    telling you any sensitive or confidential information
11    concerning any members of the ward?
12 A  I do not.
13 Q  When you became bishop, at that point had you been
14    aware of there being any complaints of sexual
15    misconduct with boys by Jack LoHolt?
16 A  No.
17 Q  Had you heard any rumors to that effect?
18 A  No.
19 Q  To your understanding what kind of a job was Jack
20    LoHolt doing within the ward Scout program when you
21    became bishop?
22 A  A young men's secretary position is often given to a
23    person who is-- who needs something to do.
24 Q  And in that instance Jack LoHolt needed something to
25    do?

Page 45

1  A  I can't infer the second from the earlier, but that
2     was a statement of fact of the position.
3  Q  Okay.
4  A  I don't recall how well Jack was doing or why he was
5     put in the position.
6  Q  He was already in that position when you became
7     bishop?
8  A  I don't recall that either.
9  Q  At some point during the three years that you were
10    bishop, did someone bring to your attention an
11    allegation that Jack LoHolt was sexually molesting
12    boys?
13 A  In the specific, I have to say no to sexually
14    molesting.
15 Q  What about generally?
16 A  In the general to sexually molesting, I have to say
17    no.
18 Q  Did you receive any information of any kind from any
19    person that Jack LoHolt was allegedly engaging in
20    sexually inappropriate activity?
21 A  Yes.
22 Q  From who whom did you learn that?
23           MR. FREY: I am going to object at this
24    point in time.
25       Let me tell you the basis for the objection.

Byers & Anderson, Inc.
Court Reporters & Video

Page 50

1  Mr. Frey's comments, you received a communication
2  from someone while you were bishop regarding an
3  allegation of sexual misconduct by Jack LoHolt; is
4  that correct?
5  A  That's correct.
6  Q  Was the person who communicated this to you a member
7  of the Mormon church?
8  A  Yes.
9  Q  Was this communication made to you in your capacity
10    as bishop?
11  A  I think so.
12  Q  Okay. Did it occur at, for example, the ward
13    building or your office?
14  A  I don't remember that.
15  Q  Okay. Was the person who communicated this to you,
16    in your view, making a statement of confession or
17    penitential contrition?
18  A  No.
19  Q  Under the doctrines and tenants of your faith, do you
20    believe that you are absolutely required to keep what
21    that person said to you confidential, and I mean that
22    you cannot repeat it to anyone?
23  A  No.
24  Q  Do you know the Harrison family?
25  A  I do.

Page 51

1  Q  Did a member of the Harrison family disclose to you
2    that Jack LoHolt had or was sexually molesting one or
3    more of their sons?
4       MR. FREY: I am going to object to the
5  question and instruct the witness that he does not
6  have to answer it.
7       THE WITNESS: I am going to say no.
8       MR. KOSNOFF: I'm sorry, Tom, I missed
9  what you said. Did you say that you were instructing
10  him not to answer?
11       MR. FREY: I instructed him not to
12  answer, but he already said "No."
13  Q  (By Mr. Kosnoff) You knew the Harrison family?
14  A  Yes.
15  Q  And as I recall, she was a member of the church but
16    Mr. Harrison was not?
17  A  That's as I recall.
18  Q  And they had three sons who were members of the
19    church?
20  A  I think so.
21  Q  Did any member of the Harrison family tell you that
22    Jack LoHolt was sexually molesting them?
23       MR. FREY: If this is going to require
24  you to breach any confidential agreement or
25  understanding that you believe you have had and/or to

Page 52

1    confirm, I suppose, the name of a victim, then I'm
2    going to tell you you don't have to answer it.
3       THE WITNESS: To my own understanding of
4    the question, the answer is no.
5  Q  (By Mr. Kosnoff) In October of 2003, did you get a
6    phone call from a woman that was asking you about
7    what you knew about Jack LoHolt?
8  A  I did.
9  Q  And did you tell her that Jack's problem came to your
10    awareness, "When some young boys came to me and told
11    me that Jack had been molesting them"?
12  A  I did not say that, to my knowledge.
13  Q  Did you tell that person that after talking with
14    those people, that you spoke with Jack LoHolt and his
15    parents?
16  A  This question was contingent on the prior one about
17    boys having spoken to me, and the answer to that one
18    is no, and therefore the answer to this one is no.
19       May I take a moment with these gentlemen?
20  Q  Of course.
21    Have you finished your last answer?
22  A  On that question, yes.
23       (Recess 10:43 to 10:47 a.m.)
24
25       MR. FREY: We can go back on the record,

Page 53

1  and the witness wants to clarify the answer is maybe
2  the best way to put it.
3  Q  (By Mr. Kosnoff) Dr. Coleman, do you want to clarify
4    an earlier answer?
5  A  If I may.
6    With regard to an individual making me aware of
7    something that happened between her sons and Jack
8    LoHolt, the answer is yes, and the answer is that
9    there was an exposure.
10    In my own mind, at least at the time, maybe not
11    now, that did not constitute abuse.
12    That's why I gave "no" to those answers, but I
13    wanted you to be aware of what did happen.
14  Q  What was your understanding of what Jack LoHolt had
15    done, allegedly?
16  A  Exposed his private parts.
17  Q  To whom and where?
18  A  As I recall it--
19       MR. FREY: I am going to again instruct
20  the witness not to say the names of who, but he can
21  say anything else.
22       THE WITNESS: As I recall, two boys, as
23  I recall it, on an outing, which Jack frequently took
24  them, either fishing or camping-- he was a bit of a
25  replacement for an absentee father.

Byers & Anderson, Inc.
Court Reporters & Video

Page 54

1  Q  (By Mr. Kosnoff) In fact, Jack had become kind of a
2     surrogate father to the boys in absence of their
3     natural father?
4  A  That's calling for a judgment.
5  Q  Is that your understanding?
6  A  I think what I said earlier would be appropriate.
7  Q  But it was your understanding that Jack had been
8     spending a lot of time with these boys?
9  A  I think so.
10 Q  When you received this information, were you
11    concerned?
12 A  Indeed.
13 Q  Were you very concerned?
14 A  Indeed.
15 Q  Okay. Being very concerned, what did you do?
16 A  Spoke to Jack.
17 Q  Where did that conversation take place?
18 A  In the bishop's office.
19 Q  Did you call him in?
20 A  I did.
21 Q  What was said by Jack to you?
22 A  I don't recall the details, but he denied it.
23 Q  Jack denied that he'd engaged in the conduct?
24 A  He did.
25 Q  Did Jack acknowledge, however--

Page 55

1         MR. FREY: For the record, I want to
2     make this clear because this is going to come up
3     again.
4         In those conversations where you're acting with
5     your bishop's hat on and you're speaking to one of
6     your people and it involves what could be classified
7     as a transgression within the church, you do have the
8     right not to disclose that information.
9         On the other hand, I want you to be able to
10    answer Counsel's question as best you can because he
11    has a right to find out what we knew or didn't know
12    or should have known.
13 Q  (By Mr. Kosnoff) I would add whether or not a
14    privilege really applies really depends on the
15    circumstances and the conduct and the intent of the
16    parties.
17 A  I think in this context it would.
18 Q  The question of whether or not under the doctrine and
19    beliefs of the Mormon church and the circumstances of
20    this communication between you and Jack, is it your
21    belief that this was a privileged communication
22    between bishop and member?
23 A  May I make a statement?
24        The information came to me other than Jack.
25 Q  I understand that, but I'm referring to the meeting

Page 56

1     that you had with Jack.
2  A  That would fall under the auspices of a privileged
3     communication, yes, I think so.
4  Q  After you talked with Jack, did you talk with his
5     parents?
6  A  I did.
7  Q  Where did that take place?
8  A  Bishop's office.
9  Q  Okay. What was said by the parents to you-- strike
10    that.
11        Did you tell the parents the information that you
12    had regarding Jack's behavior?
13 A  I did.
14 Q  What was their reaction?
15 A  Disbelief.
16 Q  Okay. After that exchange, what did you do with this
17    information?
18 A  We released Jack from his church callings, and I
19    notified, as I recall, at least some key individuals
20    who would need to know about it.
21 Q  And those were priesthood leaders?
22 A  My counselors. I remember specifically-- I can't
23    honestly say I remember talking to the young men's
24    president, but that might have been usual, and
25    perhaps to the Scout master, but I don't remember

Page 57

1     that.
2  Q  Richard Pettit was one of your counselors, correct?
3  A  He was.
4  Q  And, in fact, you did tell Richard Pettit?
5  A  That's my recollection.
6  Q  What else did you do?
7  A  If I can digress for a moment, my role as a bishop
8     was to serve everyone, including, if possible, Jack.
9         During an era at that time where at least
10    personally and I think rather generally there was
11    little information about the recurrent nature or
12    problem of a sexual offender and indeed little about
13    how to deal with it in the social aspect, I continued
14    to work privately with Jack to try to help him to be
15    reconciled to Christ.
16 Q  Through your work with Jack to be reconciled with
17    Christ, did you come away with a feeling that the
18    problem had been adequately addressed?
19        MR. FREY: In answering that question--
20        THE WITNESS: I can't answer that. I
21    can't say.
22 Q  (By Mr. Kosnoff) Did you do anything to investigate
23    whether there may have been other incidents and other
24    victims?
25 A  I want to say yes, but I frankly don't remember the

Philip J. Coleman
September 15, 2005