# Exhibit #1

Case 2:04-cv-02338-RSM    Document 73-2    Filed 01/13/2006    Page 2 of 7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
December 13, 2005                                                                                   RICHARD PETTIT

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE, )
                              ) Case No. C04-2338 RSM
     Plaintiffs,              )
                              )
     vs.                      ) Videotaped Deposition
                              ) of:
THE CORPORATION OF THE PRESIDENT) RICHARD PETTIT
OF THE CHURCH OF JESUS CHRIST OF)
LATTER-DAY SAINTS, a Utah     )
corporation sole, a/d/a "MORMON )
CHURCH"; LDS SOCIAL SERVICES, )
a/d/a LDS FAMILY SERVICES, a  )
Utah corporation,             )
                              )
     Defendants.              )

December 13, 2005
9:24 a.m.

Kirton & McConkie
1800 Eagle Gate Tower
60 East South Temple
Salt Lake City, UT  84145-0120

Sharon Morgan, CSR, RPR, CRR
Notary Public in and for the State of Utah

Page 2

```
 1         APPEARANCES
 2  For the Plaintiffs:
 3      Tim Kosnoff, Esq.
        One Union Square
 4      600 University, Suite 2101
        Seattle, WA  98101-4161
 5      206.676.7610
 6  For the Defendants:
 7      Thomas D. Frey, Esq.
        Marcus B. Nash, Esq.
 8      STAFFORD, FREY, COOPER
        3100 Two Union Square
 9      601 Union Street
        Seattle, WA  98101-1374
10      206.623.9900
11  Also Present:
12      Josh Jentzsch, Videographer
13
14
            INDEX
15
    RICHARD PETTIT            PAGE
16
        Examination by Mr. Kosnoff    3
17
        Examination by Mr. Fey       76
18
        Further Examination by Mr. Kosnoff   78
```

Page 3

```
 1              PROCEEDINGS
 2         THE VIDEOGRAPHER:  We are on the record.
 3  This is the beginning of tape No. 1 of the deposition
 4  of Bishop Richard Pettit being held in the law offices
 5  of Kirton & McConkie in Salt Lake City, Utah on
 6  December 13, 2005 at 9:24 a.m.
 7         My name is Josh Jentzsch, legal videographer
 8  for Garcia & Love Reporting.  The court reporter is
 9  Sharon Morgan, also with Garcia & Love Reporting.
10         Will counsel please state their appearances
11  for the record and the witness will be sworn.
12         MR. KOSNOFF:  Timothy Kosnoff on behalf of
13  the plaintiffs.
14         MR. FREY:  Thomas Frey on behalf of the
15  defendants -- oops, sorry about that.  Thomas Frey on
16  behalf of the defendants, and Marcus Nash is here with
17  me as well on behalf of the defendants.
18              RICHARD PETTIT,
19  called as a witness on behalf of the plaintiffs, being
20  duly sworn, was examined and testified as follows:
21              EXAMINATION
22  BY MR. KOSNOFF:
23     Q.  Would you state your full name and spell your
24  last name.
25     A.  Richard P. Pettit, P-e-t-t-i-t.
```

Page 4

```
 1     Q.  Where do you currently reside, Mr. Pettit?
 2     A.  I live in Morgan, Utah.
 3     Q.  And could you give us a mailing address?
 4     A.  P.O. Box 5, Morgan, Utah, 84050.
 5     Q.  How long have you lived at that address?
 6     A.  Approximately two and a half years.
 7     Q.  And do you live alone?
 8     A.  No.
 9     Q.  With whom do you live?
10     A.  My wife.
11     Q.  What is her name?
12     A.  Arlene.
13     Q.  Do you have children?
14     A.  Yes.
15     Q.  What are their names?
16     A.  Lawrence, Randy, Scott, Tammy, Shawna, Tyler
17  and Kyle.
18     Q.  And are all of your children grown and out of
19  the home?
20     A.  Yes.
21     Q.  What is your age, sir?
22     A.  I'm 74.
23     Q.  And have you lived in Utah your entire life?
24     A.  No.
25     Q.  Could you review for us your -- where you
```

# Exhibit #2

# CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

```
KENNETH FLEMING and JOHN DOE,  :  No. C04-2338 RSM
                               :  (Judge Ricardo Martinez)
              Plaintiffs,      :
                               :
         -v-                   :
                               :
THE CORPORATION OF THE         :
PRESIDENT OF THE CHURCH OF     :
JESUS CHRIST OF LATTER-DAY     :
SAINTS, a Utah corporation     :
sole, a/k/a "MORMON CHURCH";   :
LDS SOCIAL SERVICES a/k/a      :
LDS FAMILY SERVICES, a Utah    :  Videotaped Deposition of:
corporation,                   :  RANDALL BORLAND
                               :
              Defendants.      :
```

**September 20, 2005 - 9:08 a.m.**

Location: Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

Diane W. Flanagan, RPR
Notary Public in and for the State of Utah



GARCIA & LOVE
COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

Case 2:04-cv-02338-RSM   Document 73-2   Filed 01/13/2006   Page 5 of 7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                    RANDALL BORLAND

**Page 61**

1    MR. KOSNOFF: Are you directing him not to answer.
2    MR. FREY: No, I'm not. I'm asking him if he can
3 answer without violating -- if he can answer about what he
4 did without violating any confidentiality that I believe he
5 has the right to maintain as a bishop, then he may answer
6 the question.
7    A   I believe I can do that. Confidentiality is very
8 important to me. I -- the only reason I even hesitate at
9 all is because of the conversation, and I'm very respectful
10 of both of you. I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt. I had to talk with him.
14   Q   And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16   A   Yes, sir.
17   Q   And what was said?
18       MR. FREY: Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21   A   I don't believe I can answer that.
22   Q   Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24   A   Okay.
25   Q   Because there's -- may well be a judge that's

**Page 62**

1 going to review this transcript and make a decision, a
2 ruling, as to whether or not you've appropriately or legally
3 asserted the privilege in this context, and so I just want
4 to make sure that we've got a clear record.
5        Was your communication -- was your -- was your
6 communication with Jack Loholt done in your capacity as a
7 clergyman?
8    A   Was my communication with him done in the capacity
9 of a clergyman?
10   Q   Yes.
11   A   Yes.
12   Q   And would you agree with me that as a bishop
13 you -- you have many functions within the ward?
14   A   Many responsibilities in the ward?
15   Q   Many responsibilities. Correct?
16   A   Yes.
17   Q   And some of those are administrative, financial
18 management, things of a nonecclesiastical nature?
19   A   I think that's all -- in my mind that's all
20 ecclesiastical.
21   Q   That everything the bishop does --
22   A   Yes.
23   Q   -- all of his functions are ecclesiastical?
24   A   To me, that's my understanding.
25   Q   Does a bishop have overall responsibility for

**Page 63**

1 making sure that the ward building is closed and locked when
2 it's not in use?
3    A   Not necessarily. There might be other people that
4 do that. The bishop doesn't go do that generally.
5    Q   I understand that, but does the bishop have
6 ultimate responsibility for making sure that the building is
7 secured?
8    A   Which bishop?
9    Q   The bishop of the ward.
10   A   It would be the agent bishop of that building.
11 That particular person -- the buck would stop there, I
12 suspect.
13   Q   Okay.
14   A   Yes.
15   Q   So would you regard that as an ecclesiastical
16 responsibility?
17   A   I haven't given any such thing a thought, but I
18 would have to think that all of the responsibilities are
19 based upon his ecclesiastical calling, I would think.
20   Q   Okay. Does the -- when you were bishop, did you
21 have responsibility for tending to the proper handling of
22 tithing receipts?
23   A   Did I have responsibility?
24   Q   Yes.
25   A   Yes.

**Page 64**

1    Q   Okay. And do you regard that as a -- as an
2 ecclesiastical or clerical function in your role as bishop?
3    A   Which one?
4    Q   Either or both.
5    A   Ecclesiastical or clerical?
6    Q   Okay. Do you draw a distinction between --
7    A   Well, it would -- again, everything -- it seems to
8 me in my own perhaps ignorant way of looking at it that
9 everything that the bishop has that is his responsibility
10 that's under the mantle of a bishop's responsibility would
11 be ecclesiastical in nature.
12   Q   Okay.
13   A   I don't -- I can't draw a distinction.
14   Q   So, for example, the proper management of dealing
15 with tithing receipts that come in, you would equate with
16 pastoral counseling that you would deliver as bishop --
17   A   With what?
18   Q   -- to a member? With pastoral counseling.
19   A   Equate?
20   Q   Yes.
21   A   They're both responsibilities.
22   Q   Okay. Are they both clergy functions of the
23 bishop?
24   A   Well, yeah, they are, uh-huh (affirmative).
25   Q   Okay. So you don't recognize there being any

**Page 65**

1 functions that are distinctly clergy and other functions of
2 the bishop that are nonclergy?
3  A  I'm not sure I understand that question.
4  Q  Okay.
5  A  And it might be because I was trying to think of
6 what the question was so hard that I lost it.
7  Q  Okay. All right. Let me come at it a different
8 way.
9  A  Okay.
10  Q  Do you regard any communication that you receive
11 from any member as bishop at any time and under any
12 circumstance as confidential?
13  A  Any communication?
14  Q  Yes.
15  A  May I give you an example to see if I understand
16 the question?
17  Q  Certainly.
18  A  If somebody says we need new song books, that's
19 not confidential to me.
20  Q  Okay.
21  A  So I guess the answer to your question is I -- is,
22 no, I don't consider every communication as confidential.
23  Q  By what measure, then, do you determine a
24 communication to be confidential as opposed to not
25 confidential?

**Page 66**

1  A  Give me a moment to put this in the right words --
2  Q  Certainly.
3  A  -- how I feel about it. Things that have to do
4 with their personal lives -- it could be a personal
5 financial problem that they come and talk to me about. They
6 might need food. They might come to me disturbed because
7 they made a mistake in life and would like to discuss it
8 with me. See, I can't say a specific thing, a word. I can
9 only give you examples. Maybe if a husband and wife came to
10 me and they were having some struggles together and they
11 wanted to discuss them with me, things of that nature --
12 those are confidential.
13  Q  What if a woman leader in the ward came to you and
14 said, A child has told me that her stepfather is molesting
15 her at night, would that be a confidential communication?
16  A  If -- if a what? If a child --
17  Q  If one of the leaders of your -- say the Primary
18 organization came to you and said, A child in Primary has
19 told me that her stepfather is coming into her bedroom at
20 night and doing bad things to her?
21  A  Okay.
22  Q  Is that confidential?
23  A  I understand the question. Yes, that's
24 confidential.
25  Q  Are all confidential -- is all confidential

**Page 67**

1 information that you receive treated the same by you in the
2 sense that you do not disclose it to any other person?
3  A  To any other person. That is correct. That
4 would -- I would say that would be correct.
5  Q  So in that instance where you learned that a child
6 had reported being sexually molested by her stepfather at
7 night, you would not reveal that information to any other
8 person?
9  A  You would have to understand that in that case the
10 person who -- it would be my responsibility not to just
11 think of that individual that came to me but also that
12 particular individual that was accused. So in that
13 regard -- and I don't know a specific individual case. In
14 that regard I can see the possibility of having to talk to
15 that other person. So, therefore, that's another person
16 that you didn't put in that first equation. Because if you
17 have somebody coming in that accuses somebody, you would
18 then go talk to that person what was accused. Is that
19 clear?
20  Q  Yes. Would you talk to anybody else?
21  A  Would I talk to anybody else?
22  Q  Yeah. Would you feel that you were free to -- to
23 reveal that confidential information to anyone else other
24 than the accused person?
25  A  I think I would have to look at that on an

**Page 68**

1 individual basis, an individual, I'll use the word, case and
2 determine if it -- if I had to talk with anybody else about
3 it.
4  Q  So you would have to evaluate it on a case-by-case
5 basis. Is that your testimony?
6  A  Evaluate each instance case by case discussing it
7 with them? Yes.
8  Q  But there are circumstances where you would then
9 communicate that confidential information to other people?
10  A  You say there are circumstances?
11     MR. FREY: Object.
12     THE WITNESS: I'm sorry.
13  Q  (By MR. KOSNOFF) I'm assuming by your answer that
14 there are other circumstances in which you would feel free
15 to communicate that confidential information to others
16 besides the accused.
17     MR. FREY: I'm going to object to the form of the
18 question.
19     You can answer it, the hypothetical, if you can.
20  A  So do I answer the question?
21  Q  Yes.
22     MR. FREY: Yes.
23  A  Okay. So would you repeat it, please?
24     MR. KOSNOFF: Would you read it back, please.
25     (The record was read as requested)

17 (Pages 65 to 68)

Case 2:04-cv-02338-RSM    Document 73-2    Filed 01/13/2006    Page 7 of 7

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                          RANDALL BORLAND

**Page 69**

1  A  I would say that's possibly.
2  Q  Would that include communicating it to the mother
3  of the child that made the complaint?
4  A  If it evolved to that point.
5  Q  If -- I'm sorry. If what evolved?
6  A  Well, this is all an assumption. Everything is an
7  assumption. Did you say that a mother came in and said that
8  a child, not her child? Am I right?
9  Q  Just a woman in the ward, a ward worker, a
10  volunteer hypothetically in the Primary, receives this
11  report from a child and she conveys it to you.
12  A  And so then I would --
13  Q  And my question is: Would you find it appropriate
14  to convey this confidential information to the mother of
15  that child?
16  A  I would have to have more groundwork on it before
17  I did that. I would probably -- if I felt that there was a
18  substantive basis for it, I would talk to the mother.
19  Q  If you felt that there was a substantive basis for
20  the accusation?
21  A  But there's footnote to that. The person that
22  came to me, if they came with the idea that, Bishop, I want
23  to talk with you, this is in confidence, that particular
24  individual's name, circumstance, involvement would not --
25  that would be held confidential.

**Page 70**

1  Q  Would you communicate this information to the
2  police?
3  A  Not necessarily, no.
4  Q  Would you communicate it to the local Child
5  Protective Services agency?
6  A  No.
7  Q  Would you attempt to substantiate the accusation
8  yourself?
9  A  I suspect I would, uh-huh (affirmative).
10  Q  How?
11  A  It would depend on the circumstance. It would
12  depend on the people. It would depend on the emotions. It
13  would depend on a gamut of things, a wide range of things
14  that would all focus in on is this legitimate, is this real,
15  or is it just an accusation, is it somebody that's upset
16  with somebody and angry, whatever it might be.
17  Q  Have you ever actually had to conduct such an
18  investigation?
19  A  I'm sorry?
20  Q  Have you ever actually been presented with a
21  scenario like this?
22  A  I'm going to have a difficulty answering that
23  question --
24  MR. FREY: Again, I'm going to instruct you if
25  that's going to cause you -- or require you, pardon me, to

**Page 71**

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3  For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10  communication and to provide spiritual counseling." That's
11  what I'm trying to protect him with.
12  MR. KOSNOFF: That's one of the elements.
13  MR. FREY: Okay. Well --
14  MR. KOSNOFF: They didn't throw out the elements
15  of the statute, and I'm very well-acquainted with State v.
16  Martin.
17  Q  (By MR. KOSNOFF) Let's get back to -- let's get
18  back to Mr. Loholt. You testified earlier that you spoke
19  with Jack Loholt. Are you asserting the privilege with
20  respect to your communication with Jack Loholt regarding any
21  allegations of child sexual abuse?
22  A  As being confidential?
23  Q  Yes.
24  A  Yes.
25  Q  Did you speak with anybody else other than Jack

**Page 72**

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A  No.
4  Q  So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A  I can't speak for Jack Loholt. It was kept within
7  me.
8  Q  Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10  A  What information?
11  Q  Any information that Jack Loholt may have engaged
12  in sexual misconduct with a child.
13  MR. FREY: Again, these communications between you
14  and your counselors are also privileged, but go ahead.
15  A  So the answer -- I guess my answer would be -- is
16  my discussion with my counselors would be confidential. I
17  don't -- I don't remember discussing that with anybody.
18  Q  So you have no recollection of discussing with
19  anybody else?
20  A  I have no recollection of that.
21  Q  Okay.
22  A  That's correct. I do not.
23  Q  Did you remove Jack Loholt from any positions
24  working with youth in the ward while you were bishop?
25  A  Did I remove him?