# Exhibit #3

Page 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE,   )
                                )
        Plaintiffs,             )
                                )
    vs.                         )
                                )
THE CORPORATION OF THE PRESIDENT)
OF THE CHURCH OF JESUS CHRIST OF) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah       )
corporation sole, a/k/a "MORMON )
CHURCH"; LDS SOCIAL SERVICES a/k/a )
LDS FAMILY SERVICES, a Utah     )
corporation,                    )
                                )
        Defendants.             )

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington


Byers & Anderson, Inc.
Court Reporters/Video/Videoconferencing
One Union Square    2208 North 30th Street, Suite 202
600 University St.  Tacoma, WA 98403
Suite 2300         (253) 627-6401
Seattle, WA 98101  (253) 383-4884 Fax
(206) 340-1316     scheduling@byersanderson.com
(800) 649-2034     www.byersanderson.com

25th Anniversary 1980-2005

Page 2

1  APPEARANCES
2      For the Plaintiff:
3          Tim Kosnoff
           Law Office of Tim Kosnoff
4          600 University Street
           Suite 2101
5          Seattle, WA 98101
           206.676.7610
6          425.837.9692 Fax
           Timkosnoff@comcast.net
7
8
9      For the Defendants:
10         Thomas D. Frey
           Marcus B. Nash
11         Stafford Frey Cooper
           601 Union Street
12         Suite 3100
           Seattle, WA 98101-1374
13         206.623.9900
           206.624.6885 Fax
14         Mnash@staffordfrey.com
15
16
17
18
19
20
21
22
23
24
25

Page 3

1              EXAMINATION INDEX
2  EXAMINATION BY:                    PAGE NO.
3  MR. KOSNOFF                            4
4
5              EXHIBIT INDEX
6  EXHIBIT NO.    DESCRIPTION         PAGE NO.
7
8  Exhibit No. 1   34-page stake directory.    17
9  Exhibit No. 2   24-page Defendant COP's     62
                   supplemental response to
10                 Plaintiffs' first requests
                   for production of documents.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              BE IT REMEMBERED that on Thursday,
2  September 15, 2005, at 600 University Street, Suite
3  2300, Seattle, Washington, at 9:16 a.m., before
4  TERILYNN PRITCHARD, CCR, RPR, Notary Public in and
5  for the State of Washington, appeared PHILIP J.
6  COLEMAN, the witness herein;
7              WHEREUPON, the following
8  proceedings were had, to wit:
9
10                 <<<<<< >>>>>>
11
12  PHILIP J. COLEMAN,      having been first duly sworn
13                 by the Notary, deposed and
14                 testified as follows:
15
16             EXAMINATION
17  BY MR. KOSNOFF:
18  Q  Good morning, Dr. Coleman.  My name is Tim Kosnoff.
19     How are you this morning?
20  A  I'm very well.  How are you?
21  Q  Good.  Thank you.
22         Dr. Coleman, we met just briefly before we got
23     started, but I wanted to introduce myself.  I, as I'm
24     sure you know by now, am one of the attorneys for the
25     plaintiffs in this case entitled Fleming versus the

Page 45

1  A  I can't infer the second from the earlier, but that
2     was a statement of fact of the position.
3  Q  Okay.
4  A  I don't recall how well Jack was doing or why he was
5     put in the position.
6  Q  He was already in that position when you became
7     bishop?
8  A  I don't recall that either.
9  Q  At some point during the three years that you were
10    bishop, did someone bring to your attention an
11    allegation that Jack LoHolt was sexually molesting
12    boys?
13 A  In the specific, I have to say no to sexually
14    molesting.
15 Q  What about generally?
16 A  In the general to sexually molesting, I have to say
17    no.
18 Q  Did you receive any information of any kind from any
19    person that Jack LoHolt was allegedly engaging in
20    sexually inappropriate activity?
21 A  Yes.
22 Q  From who whom did you learn that?
23       MR. FREY: I am going to object at this
24    point in time.
25       Let me tell you the basis for the objection.

Page 46

1        He was a bishop at the time, and we treat those
2     communications as confidential, and in trying to help
3     you with this answer, I'm not trying to present a
4     roadblock.
5        As an accommodation and because of the fact that
6     the individuals involved have not authorized this
7     information to be given, I think they have a right to
8     privacy in that regard and a right to have it
9     protected.
10       As an accommodation, I'll allow the witness to
11    tell you in a general sense what he heard had
12    happened, and I'm not waiving any privilege by doing
13    that.
14       If you'll accept that, we can go forward.
15       You don't have to accept my objection, but if you
16    want to go forward, I'm willing to do that on this
17    basis.
18       MR. KOSNOFF: Tom, I would like to take
19    a brief bathroom break and come back and continue
20    this dialogue on that point.
21          (Recess 10:27 to 10:33 a.m.)
22
23       MR. KOSNOFF: Mr. Frey, this is not
24    unfamiliar ground to the two of us, this point.
25    We've been at similar points in other cases.

Page 47

1        From your comments I take that you are making an
2     objection based upon a number of criteria.  One, I
3     think I heard an assertion of the clergy penitent
4     privilege.
5        MR. FREY: I'll make it simple for you.
6     I'll tell you what the basis for my objection is:
7     one, it's a constitutional objection on the free
8     exercise clause; number two, it may also be on the
9     basis of the priest penitent privilege depending on
10    the circumstances under which he may have heard
11    something; and the third ground is that we've said in
12    our answers to interrogatories I'm not prepared to
13    reveal the names of anybody or have my client reveal
14    the names of anyone who has been molested without
15    that person's consent because I know for a fact, and
16    I've gotten court orders on this, that it can be
17    devastating to have someone knock on their door and
18    say, "I understand you've been abused and I'd like to
19    talk to you about it."
20       For those three reasons-- I am willing to go
21    forward because I know that you have the right to
22    determine knowledge and what they knew and should
23    have known, and I'm willing to let him tell you in a
24    general fashion, and I guess I could proffer this for
25    the record what he can tell you to get you to where

Page 48

1     you need to go--
2        MR. KOSNOFF: Before we go there, I
3     think this is important that we establish enough of a
4     factual record here for Judge Martinez so we only
5     have to take one trip up and bring Dr. Coleman back
6     one more time as opposed to two more times, so I
7     would propose that with respect to the assertion of
8     the claimed privileges that you're making, that you
9     take a moment and establish whatever factual basis
10    you would like with Dr. Coleman to support the
11    assertion of those privileges.
12       I'm inviting you to do that because, as you know,
13    it's the proponent of the privilege that carries the
14    burden of establishing it, and I just want to make
15    sure that when this goes up to Judge Martinez, that
16    you've had a full opportunity to make as full an
17    evidentiary record as you need to make your arguments
18    to him.
19       MR. FREY: It's not my burden.  Under
20    the rule I'm exercising those privileges, and I've
21    enumerated them.
22       If you wish to question the witness, you are free
23    to do that.  If you choose to go to Judge Martinez,
24    I'll be happy to supply whatever additional
25    information I need by way of affidavit or otherwise.

Byers & Anderson, Inc.
Court Reporters & Video

Page 61

1  A  Mm-hm.
2  Q  Did you say anything to any of your own children
3     along the lines of, "Stay away from Jack. Avoid
4     Jack"?
5  A  If I did, I don't remember that.
6  Q  After you became aware of the situation with Jack,
7     did you do anything to limit the contact that Jack
8     LoHolt had with any of your own children?
9  A  I don't know that there was any necessity of doing
10    that.
11       There would have been no reason for him to have
12    contact with my children, but I would have, I think,
13    if that helps.
14 Q  During the period that you were working with Jack to
15    try and help him, did he continue to attend Sunday
16    services?
17 A  I'm unsure about that. My best recollection is no.
18 Q  Did you exclude him?
19 A  No.
20 Q  Were you aware, when you found out about the
21    situation with Jack, where Jack was residing?
22 A  Yes, I think so.
23 Q  And was he residing at the Allenbach compound?
24 A  A home on the property belonging to Herman Allenbach,
25    a small home.

Page 62

1  Q  Did you communicate what you knew about Jack's
2     situation to Doc and Mrs. Allenbach?
3  A  I don't remember.
4  Q  Did you have any communication with either Doc or
5     Veloy Allenbach about Jack's and I'll refer to it as
6     problem?
7  A  I'm hesitant because the answer might be "possibly,"
8     but I don't remember that.
9  Q  Do you remember specifically informing any particular
10    parents within the ward about Jack's problem?
11 A  Not beyond what I've told you.
12           (Exhibit No. 2 marked for
13            identification.)
14
15 Q  (By Mr. Kosnoff) Dr. Coleman, I have had marked as
16    Coleman Exhibit No. 2 a multipage document that I
17    would represent to you is the defendant corporation
18    of the church in this case, their supplemental
19    response to our first request for production of
20    documents.
21       The first four pages are the general responses,
22    and then there are documents attached, and I've--
23    although they were unnumbered, I went ahead and
24    numbered them on my own, 5 through 24.
25       Turning your attention to Pages 5 through 24, if

Page 63

1     you'd just take a moment to look those over and tell
2     me what you believe those documents to be.
3        MR. FREY: Counsel, while he's doing
4     that, I just want to ask a question.
5     Are you representing on the record that this is a
6     complete copy of what was produced to you or have
7     you--
8        MR. KOSNOFF: Yes.
9        MR. FREY: Have you gone ahead and left
10    some of the pages out that were given?
11       MR. KOSNOFF: Tom, I was given a copy of
12    this document when it came in from your office. I
13    saw it in electronic form. I thought it was the
14    entire document.
15    If there are additional pages, I don't have them.
16       MR. FREY: You've started at 5. Is
17    there a 1 through 4?
18       MR. KOSNOFF: Yes, and it's your actual
19    response, so I didn't number them 1 through 4 because
20    they're already numbered.
21       MR. FREY: Okay.
22 Q  (By Mr. Kosnoff) Dr. Coleman, is this some kind of
23    regular historical record of positions, callings, and
24    offices within the Kent 2nd Ward of the Renton Stake?
25 A  It appears to be.

Page 64

1  Q  And it has some identifying information at the top of
2     each page, including the president/bishop, the
3     signature of the-- I assume that to be the ward
4     clerk?
5  A  Possibly historical, but I believe this is the ward
6     clerk.
7  Q  And then it indicates, "For the year ending December
8     31," and then a blank allowing the person preparing
9     the record to type in the calender year that these
10    entries reflect.
11 A  Right.
12 Q  Have you ever seen this document or a document like
13    it before?
14 A  Looks like I've signed one.
15 Q  Does your name appear on one of these?
16 A  Yes, December 31st, 1973.
17 Q  Page 13, okay.
18 A  Page 9 as well, Page 11 and 12, and Page 13, and Page
19    15.
20 Q  Just for clarification, Page 9, I don't see your name
21    on Page 9.
22       Is that under the "clerk"? Is that what you're
23    referring to?
24 A  The Page 9 that I have, the "president/bishop" line
25    at the top says, "Philip J. Coleman."

Philip J. Coleman
September 15, 2005

Page 69

1  A  No.
2  Q  So I take it from that answer that Bishop Borland
3     never advised you of any knowledge that he had
4     regarding Jack's problems?
5  A  That's correct, as I remember it.
6  Q  Are you aware that Jack was sent to LDS Social
7     Services for counseling around the sexual deviancy
8     before you became aware of Jack's problem?
9  A  I was unaware of that.
10 Q  Have you since learned whether or not Jack had been
11    sent to LDS Social Services surrounding his sexual
12    deviancy problem?
13 A  I don't recall anything about that.
14 Q  Is that the kind of information you would have liked
15    to have as bishop under the circumstances?
16 A  I'd have to say yes.
17 Q  Would that have affected the degree-- strike that.
18    Would that have affected how serious you would
19    have regarded Jack's exposure incident?
20 A  I would have to say probably.
21 Q  Is it possible it would have affected the course of
22    actions you took had you known that information?
23 A  That word "possible" is surely open-ended, and I have
24    to give that a yes.
25 Q  Do you think it would?

Page 70

1  A  I would give it a "probably."
2  Q  Was Ken Keller the Scout master when you were bishop?
3  A  Ken Keller was a Scout master. I do not recall what
4     period of time Ken was the Scout master.
5  Q  Do you have any recollection of talking to Ken Keller
6     about Jack's problem?
7  A  I have no recollection of that.
8  Q  Do you have a recollection of speaking directly with
9     any of the other Scout leaders within the ward's
10    program regarding Jack's problem?
11 A  I not only don't recollect that, but I also don't
12    recollect who the leaders were.
13 Q  The exhibit that we were looking at a moment ago,
14    No. 2, at Page 16 has an entry of October 28th in
15    which it indicates that Jack LoHolt was sustained on
16    that date as assistant Venture leader.
17 A  Page 16, October--
18 Q  28th.
19 A  I see it.
20 Q  Now, that would have been, I guess, a few months
21    after you became bishop in August?
22       MR. FREY: I am going to object to the
23    form of the question.
24       There's another bishop named on that document,
25    Counsel.

Page 71

1  Q  (By Mr. Kosnoff) Well, let's go back to page--
2  A  That's me.
3  Q  Let's go to Page 14 first and establish some dates,
4     and look at the August 19th entry.
5        It indicates that on that date Randall Borland
6     was released as bishop and Philip Coleman was
7     sustained as bishop.
8        Do you have any reason to believe that that's
9     inaccurate?
10 A  I don't.
11 Q  So then turning the page to Page 16, the October 28th
12    entry, it would seem that Jack LoHolt was sustained
13    as the assistant Venture leader a couple of months
14    after you were sustained as bishop, correct?
15 A  Looks that way to me.
16 Q  And to say that somebody was sustained, does that
17    mean that the bishop called that person and then the
18    membership sustained that person in that position?
19 A  In means at least a member of the bishopric called
20    them, and that yes, the congregation would have
21    sustained him.
22 Q  Do you have any recollection whether you made the
23    decision to place Jack as the assistant Venture
24    leader or whether one of your first or second
25    counselors--

Page 72

1  A  Normally that would have been a first counselor call,
2     but I surely don't recollect that.
3  Q  Why do you say normally that one would have been?
4  A  That's the 14- to 16-year-old group. The second
5     counselor is assigned to the 12 to 13; first
6     counselor, age 14, 15; and bishop, 16 to 18.
7  Q  So it was sort of the age-appropriate area of
8     responsibility for one of the counselors and not the
9     bishop?
10 A  That's correct.
11 Q  If you turn to Page 17, entry for May 15th, 1974--
12    May 5th on Page 18 indicates that Jack was apparently
13    released as assistant Venture advisor on that date,
14    May 15th, 1974, and sustained to Scout master the
15    same day.
16 A  Yes.
17 Q  Now, as Scout master would you have been, as bishop,
18    the person that called him to that position?
19 A  Possibly. It might have been a counselor.
20 Q  Is it fair to say that had Jack's problem been known
21    to you at or about May 15th, 1974, that you would not
22    have called him to the position of Scout master?
23 A  Yes.
24 Q  If you would, turn to Page 19.
25       Does that document reflect that on October 20th,