THE HONORABLE RICARDO MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING, JOHN DOE, R.K., and T.D., Plaintiffs, <br> v. <br> THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/d/a "MORMON CHURCH"; LDS SOCIAL SERVICES a/d/a LDA FAMILY SERVICES, a Utah corporation, Defendants. | NO. C04-2338 RSM <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' GENERAL MOTIONS FOR SUMMARY JUDGMENT** <br><br> NOTE ON MOTION CALENDAR: <br> FRIDAY, FEBRUARY 3, 2006 |

## I. STATEMENT OF RELEVANT FACTS

**A.  JACK LOHOLT.**

Jack Loholt abused multiple children of the Kent 2nd Ward and other persons who were abused on Mormon-sponsored activities, including plaintiffs John Doe, R.K. and T.D.

Jack Loholt was a member of the Mormon church and a member in the Kent 2nd Ward from 1969 until 1980 when he moved to Canada.[1] As a member, he rose in stature with the

---

[1] To understand this case, it may be helpful to go over some basic facts and terminology about the Mormon Church. A Mormon Church "ward" is the smallest unit within the Mormon Church, generally about 300 to 400 families organized by geographic location. The head of a ward is called the "Bishop." A Mormon "Stake" is a cluster of approximately 10 to 12 wards, again organized by geographic location. The head of a Mormon Stake is the Stake President. The term "High Priest" refers to a man who holds an office in the Melchisedek Priesthood. A Melchesidek Priest is regarded as being part of the clergy of Mormon Church. The priesthood of the Mormon church is a lay clergy meaning it is not a paid professional clergy. Some Melchesidek priests are eventually selected and ordained for leadership roles in the church. They tend to be older adult men. These men are called the High Priests." High Priests of the ward function as the leadership body of the ward. Some High Priests work

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 1
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Dockets.Justia.com

organization gaining titles of Melchesidek Priest and Elder. He served as a member of the ward Elders' Quorum. Additionally, Mormon officials "called" upon Loholt to serve as an officer of the ward's Young Mens' Mutual Improvement Association and to serve in the Church's Scouting program and eventually as a troop leader.[2]

### B. LOHOLT'S ABUSE OF CHILDREN/COP'S KNOWLEDGE OF THE ABUSE.

COP was repeatedly warned that Loholt was actively abusing children and it did nothing to stop him. In 1971 Richard Pettit informed the then-Bishop of the Kent 2nd Ward, Randall Borland, that Loholt had abused his (Pettit's) own son while on a Boy Scout camp out at which Loholt was the Scout leader.[3]

In late 1972/early 1973 Borland received another complaint that Loholt had sexually molested children in the Mormon-sponsored Boy Scout program. Borland confronted Loholt about the accusations.[4] Loholt denied the accusations but admitted to Bishop Borland that he was abusing three boys from the Allenbach family, including plaintiff John Doe.[5] At the time of this admission, Loholt had been living in an apartment that adjoined the Allenbach main house. He had been raping and sodomizing the Allenbach boys, as well as their friends (Scott Pettit and plaintiff R.K.) in that apartment several times per month for three and one-half years.[6] Bishop Borland knew (or at least should have known) of Loholt's living arrangements

---

within the High Priest Group, an elite group within the Ward that meets and functions in leadership roles at the Ward level and as part of a larger body of High Priests in a Mormon Stake that is called the High Priests Quorum. Within the Mormon Church, to become Bishop one must first be a High Priest. Bishops generally serve approximately five years and then another High Priest is selected by the Stake President to serve as Ward Bishop. A Bishop is said to be the presiding High Priest in the Ward.

[2] *See, COP's Supplemental Response to Plaintiffs' First Request for Production of Documents*, **Exhibit A to Declaration of Michael T. Pfau ("Pfau Decl.")**, filed herewith.

[3] *Deposition of Richard Pettit, 28:13 – 31:21* (**Exhibit B to Pfau Decl.**).

[4] *Borland Deposition, pg. 54 – 61* (**Exhibit C to Pfau Decl.**). During this line of questioning, counsel for COP, prevented plaintiffs' counsel from obtaining the requisite information due to what plaintiffs' believe are improper assertions of privilege.

[5] *Loholt Deposition, pg. 120* (**Exhibit D to Pfau Decl.**) Dr. Allenbach was a High Priest in the Kent 2nd Ward and Loholt believes he was a church leader who served on the Stake High Council. *Loholt Depo., pg. 202.*

[6] *Loholt Depo., pgs. 90, 92, 105-106.*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 2
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

because Loholt's address in the church directory was the same address as the Allenbach home.[7] Shortly after Loholt's admission of his abuse of the Allenbach boys, Dr. Allenbach learned of the abuse. Dr. Allenbach asked Loholt to move out of the apartment.[8] However, Borland did not report the incidents of child abuse to Child Protective Services ("CPS") or the police. In the fact, the only action Borland took was to temporarily remove Loholt as the Kent 2nd Ward's Assistant Scoutmaster and to, apparently, refer Loholt for sexual deviancy therapy at LDS Social Services.[9] Loholt treated with counselors at LDS Social Services for one year. He was truthful with the counselors.[10] Despite being mandatory reporters, the counselors at LDS Social Services did not report the abuse to the police or CPS.[11]

Despite being in sexual deviancy treatment, COP allowed Loholt to continue "helping out" with the Ward's scouting program. Loholt would supply transportation and would go on fifty-mile hikes and campouts with the boys.[12] Inexplicably, in October 1973, COP appointed Loholt as the Wards' Assistant Venturer Leader, a scout position working with older scouts (ages 14-16).[13] In February 1974, COP appointed Loholt as lead Scoutmaster of the Kent 2nd Ward.[14] As Scoutmaster, Loholt continued to molest young boys. At this point, Loholt would lure his victim by using the pretense of conducting merit badge testing, which would occur at his home. However, by this time, Loholt was not limiting his abuse to Mormon

---

[7] *A copy of the relevant Church Directory is attached to the Pfau Decl. as **Exhibit E**.*
[8] *Loholt Depo., pg. 159.*
[9] *Loholt Depo., pg. 138-139;* Loholt admitted to treatment with LDS Social Services. However, plaintiffs have been unable to obtain definitive information as to whether Bishop Borland referred him to the therapy because COP has improperly instructed witnesses not to respond to questions on that subject citing the clergy-penitent privilege. *Id.*
[10] *Loholt Depo., pg. 137.*
[11] *Loholt Depo., pg. 139-140; see, also, December 29, 2005, letter from DSHS in which DSHS states it has "no records for Jack Loholt," (**Exhibit F** to Pfau Declaration).*
[12] *Loholt Depo., pg. 120.*
[13] *In his deposition, Loholt stated that he could not recall receiving this appointment; however, the "Record of Callings," supports this assertion.*
[14] *"Record of Callings".*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 3
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

children; instead, he offered "merit badge testing" to boys in other scout troops.[15] Loholt subjected the boys to the most disgusting forms of sexual abuse imaginable, including performing oral sex on them, making them perform oral sex on him, ejaculating into their mouths, inserting sticks and pencils up their rectums and making plaster casts of their penises, genitals and feet. He photographed them naked and while performing sex acts upon them. He forced his victims to ejaculate into vials which he saved in his refrigerator.[16]

In 1973 Phillip Coleman attained the position of Bishop of the Kent 2nd Ward. His immediate predecessor, Borland, did not advise Coleman (or anyone else) of the previous complaints about Loholt's abuse of children despite Loholt's continued and well-known involvement in the Scouting program.[17] At this same time, Richard Pettit attained the position of "counselor" to Bishop Coleman.[18] In 1974, Coleman, like his predecessors, learned that Loholt was abusing children. At that time, another member of the Ward informed Coleman that Loholt had exposed himself to her two sons.[19] Coleman, a leader of the Kent 2nd Ward, never reported these complaints to the police or CPS, never warned the congregation and did nothing to protect the children. However, he did inform his "counselor" Richard Pettit (who already knew Loholt was an abuser because Loholt had abused his son).[20]

In 1975, after Richard Pettit attained the position of Bishop, another victim, D.F. complained to Pettit that Loholt had molested his non-Mormon friend, plaintiff T.D., on a scouting trip to Lake Kachees. Bishop Pettit told D.F. to "keep quiet" and not to let the

---

[15] *Loholt Depo., pg. 149-152.*
[16] *Deposition of John Doe, pgs. 31-32, 55-55 and 61-63* (**Exhibit G** *to Pfau Decl.*); *deposition of Ken Fleming, pg. 55* (**Exhibit H** *to Pfau Decl.*).
[17] *Borland Depo., pgs. 57, 58, 72 and 76* (**Exhibit C**).
[18] *See* **Exhibit F** *"Record of Callings".*
[19] *Coleman Depo., pgs. 45, 48, 49 and 53* (**Exhibit I** *to Pfau Decl.*).
[20] *Coleman Depo., pgs. 57 and 58.*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 4
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

information "leak out."[21] Additionally, Loholt was observed by Ken Hoffman, an assistant scout leader, molesting another boy on another camping trip. Hoffman reported the incident to Bishop Pettit who, again, took no action and failed to report it to the civil authorities.[22]

C.  **PLAINTIFF JOHN DOE.**

John Doe was the adopted son of Dr. Allenbach. He was seven or eight years old when Loholt began raping and sodomizing him and his brothers Ricky and Brent in the downstairs apartment attached to his family's home. Loholt anally raped him, penetrated him with his fingers, shoved pencils up his rectum, urinated on him and showed him vials of semen he had saved.[23] The abuse continued for the entire three and one-half years that Loholt lived in the downstairs apartment and continued after John Doe joined scouting and began going on camp outings and attending scout meetings. The abuse continued at merit badge testing sessions after Loholt moved to his own house about a mile away. John Doe told Mormon leaders he was being abused by Loholt but no action was ever taken to stop Loholt nor report the abuse to civil authorities.[24]

D.  **PLAINTIFF T.D.**

In 1976 T.D. went on a Mormon-sponsored Boy Scout camping trip; he was ten or eleven years old. T.D. was not a Mormon; however, he had been invited on the camp out by his neighbor and good friend (and another victim), D.F. On the night of the camp out, Loholt, the Scout leader at the time, entered T.D.'s tent and sexually abused him by fondling his penis, making T.D. fondle his (Loholt's) penis and by sucking on his toes. The morning after the abuse, T.D. told D.F. about what had happened.[25]

---

[21] *Dan Fleming Depo., pg. 15-21* (***Exhibit J** to Pfau Decl.*).
[22] *Loholt Depo., pg.163-164.*
[23] *John Doe Depo., pg. 61-63.*
[24] *John Doe Depo., pg. 31-32; 55-57.*
[25] *Dan Fleming Depo., pg. 16-17.*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 5
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

E.  **PLAINTIFF R.K.**

R.K. and his family lived next door to the Allenbach property. R.K. was "best friends" with Ricky Allenbach and plaintiff John Doe throughout his childhood. The boys spent significant amounts of time at each other's houses. They spent most of their time at the Allenbach property.[26] During his visits, R.K. (along with his brother and sister) was subjected to considerable pressure to join the Mormon faith. R.K. and his siblings (all Roman Catholics) were questioned about their faith while, at the same time, the Allenbach family sang the praises of the Mormon faith. The Allenbach family "showed" R.K. how fun it was to be a Mormon by inviting him to participate in many of the multiple Church-related activities, celebrations and rituals which occurred at the Allenbach compound and/or were sponsored by the Mormon Church. For example, R.K. participated in Church-sponsored softball games held at the Allenbach compound and played on the Church-sponsored softball team and in tournaments sponsored by the Church. R.K. attended meetings with missionaries who were guests at the Allenbach compound and he prayed with the Allenbach family. He also attended church services at the actual church building, went to Mormon seminary classes in the mornings before school and, at times, attended Sunday services.[27] It was during this time period that R.K. met Jack Loholt who lived at the Allenbach compound during R.K.'s childhood. Loholt was the Mormon Assistant Scout Master.

F.  **THE ALLENBACH PROPERTY WAS A *DE FACTO* EXTENSION OF CHURCH PROPERTY.**

The "ward," in which Loholt, the victims, and the Bishops were assigned was the Kent 2nd Ward. The "official" location of the "ward" was on the East Hill in Kent; however, property owned by plaintiff John Doe's father, Herman Allenbach, D.D.S, was used for

---

[26] *Declaration of R.K.*, ¶3.
[27] *R.K. Decl.*, ¶9.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 6
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

myriad Church activities. Dr. Allenbach, now deceased, was a prominent member of the Mormon Church having served as high priest; the member in charge of the Eagle Scout program for the Church; and, it is believed, a member of the stake council.[28] The Allenbach "compound" was quite extensive and consisted of a very large main house, multiple other residential duplexes, storage buildings and an athletic field. It was used as an extension of the Kent 2nd Ward and church events at the property included holding regularly-scheduled prayer and leadership meetings, church wedding receptions, softball games, missionary presentations, parties and other social gatherings, and other Church-related activities. The Allenbach property was also used to provide housing to Church members, missionaries in the area and other Mormon transients or associates who passed through the area.[29] Jack Loholt was among those persons housed at the complex. In fact, for several years, the unmarried Melchesidek high priest resided in an apartment attached to the Allenbach main house.[30] Loholt used the apartment to rape and sodomize young boys he met through his affiliation with the Mormon Church and Mormon-sponsored Scouting (in addition to raping and sodomizing boys on scouting activities).

## II.   LEGAL ARGUMENT

A.   A CIVIL ACTION MAY BE BASED ON VIOLATION OF THE MANDATORY REPORTING STATUTE.

### 1.   INTRODUCTION.

Plaintiffs have asserted that they were damaged by the negligence of COP and LDS Social Services.[31] The claims are being pursued under both a common law duty theory and

---

[28] *Loholt Depo., pg. 202-203.*
[29] *Loholt Depo., pgs. 86-92; R.K. Decl., ¶¶ 9, 10 and 11.*
[30] *Loholt Depo., pgs. 90, 92, 105-106.*
[31] In this opposition, the term "COP" is used to refer to both defendants except where necessary to differentiate between the two entities.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 7
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

the theory that COP and LDSSS breached their statutorily mandated duties to report known instances of child abuse, RCW 26.44.030.[32] While RCW 26.44.030 does not explicitly authorize a private cause of action, a negligence claim based on violation of that statute may nevertheless be pursued. The elements of a negligence action are duty, breach, causation and injury. *Hartley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985). Under the claims which are based on violation of the mandatory reporting statute, COP had a duty to protect the plaintiffs because, at the time of the actions giving rise to this claim, RCW 26.44 required COP to protect children from predators by reporting even suspected instances of child abuse.

Prior to 1975, members of the clergy were included in the list of mandatory reporters. *See, e.g., State v. Motherwell*, 114 Wn.2d 353, 358-59, 788 P.2d 1066 (1990). Likewise, LDS Social Services employees were, at all relevant times, mandatory reporters. As discussed in more detail herein, both COP and LDS Social Services had actual knowledge of Loholt's sexual abuse of children but nevertheless breached its mandatory duty to report that knowledge to the proper authorities. COP's breach of that duty caused serious injuries to the plaintiffs.

2. **WASHINGTON COURTS HAVE ALREADY HELD THAT THE MANDATORY REPORTING STATUTE MAY FORM THE BASIS OF A NEGLIGENCE CLAIM.**

Washington courts specifically recognize a church's duty to warn or protect children from foreseeable harm by sexual abusers known to present a danger to children. *C.J.C. V. Corp. of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 985 P.2d 262 (1999). In *C.J.C.*, the defendant, represented by the same attorneys as here, made the same flawed argument. The defendant in *C.J.C.* asserted that its clergy were exempt from the mandatory reporting requirements of RCW 26.44 and, therefore, had no duty of reasonable care to warn or protect

---

[32] This section of this opposition will focus solely on the claim based on the statutory duty to report. Common law duties are discussed below. It should be noted however, that COP does not challenge plaintiffs John Doe and T.D.'s common law negligence claims.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 8
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

children from priests and church members it knew were pedophiles and a danger to children. The Washington Supreme Court rejected this argument, holding that regardless of whether defendants had violated the reporting statute, a duty of care arose from the mere existence of the reporting statute. The court stated:

> "We need not determine whether the Church specifically violated the statute [RCW 26.44]. We find merely that the statute reflects a clear public policy in favor of protecting children against reasonably suspected sexual abuse through report to the proper persons."

*C.J.C., supra,* at 138 Wash. 2d 728, n.16. The court further observed that

> "....where duty is based on common law principles, an analogous statute, even when not specifically violated, reflects strong public policy in favor of imposing a duty."

*Id.* (citing *Bernethy v. Walt Failor's, Inc.,* 97 Wash. 2d 929, 932-33, 653 P.2d 280 (1982)).[33]

While breach of a statutory duty is no longer negligence per se, it is admissible evidence on the issue of negligence. *State v. Lopez,* 93 Wn.App. 619, 970 P.2d 765 (1999); *Mathis v. Ammons,* 84 Wn.App. 411, 928 P.2d 431 (1996), *review denied,* 132 Wn.2d 1008, 940 P.2d 653 (1997). In other words, even where breach of the statute does not immediately establish liability, it is evidence that there existed a duty and defendants breached it. At the time of R.K. and John Doe's abuse (prior to 1975), members of the clergy were expressly

---

[33] Plaintiffs contend COP is negligent under both a common law duty and a statutory duty. The *C.J.C.* court explained the importance of the reporting statute in recognizing a legal duty of care by the church regardless of whether there had been an actual violation of the statute:

While the reporting requirement is permissive as to "other persons" not specifically defined, see RCW 26.44.030(3), the Legislature has made clear that the prevention of child abuse is of "the highest priority, and all instances of child abuse must be reported to the proper authorities who should diligently and expeditiously take appropriate action ...." Laws of 1985, ch. 259 (legislative findings appended to RCW 26.44.030)[.]

We, therefore, conclude the Church and Schulz owed a duty of reasonable care to affirmatively act to prevent the harm, in view of their relationship to the plaintiffs, their relationship to Wilson, and given the knowledge they allegedly possessed. Whether there was a causal connection between the harm and the fact of Wilson's position in the Church, or whether the risk of harm was or should have been reasonably foreseen at the time the harm occurred, **are questions of fact to be determined by the jury.** *C.J.C., supra,* at 138 Wash. 2d at 727. (Emphasis added)

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 9
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

included as "mandatory reporters." *State v. Motherwell,* 114 Wn.2d 353, 358-59, 788 P.2d 1066 (1990). All three ordained Mormon Bishops who served in the Kent 2nd Ward from 1971-1978 had knowledge of the abuse. Further, LDS Social Services had knowledge of the abuse. As such, RCW 26.44.030 provides guidance as to the critical importance of COP's role in this case. The statute was created specifically to prevent members of the clergy from turning a "blind eye" to known instances of abuse of children.[34]

### 3. AN IMPLIED RIGHT OF ACTION EXISTS FOR VIOLATION OF THE MANDATORY REPORTING STATUTE.

As even COP admits, a private right of action for violation of a statute may be pursued whenever the Legislature explicitly **or implicitly** provides for such an action. *Bennett v. Hardy,* 113 Wn.2d 912, 919, 784 P.2d 1258 (1990). A cause of action will be implied from a statute when (1) the plaintiff is within the class for whose special benefit the statute was enacted; (2) legislative intent explicitly or implicitly supports a remedy; and (3) implying a remedy is consistent with the underlying purpose of the statute. *Id.* at 920; *see also, Tyner v. State Department of Social and Health Services,* 141 Wn.2d 68, 77-78, 1 P.3d 1148 (2000) (finding implied cause of action in RCW 26.44.050). These elements are present here.

### (a) PLAINTIFFS ARE WITHIN THE CLASS OF PERSONS THE STATUTE WAS DESIGNED TO PROTECT.

Child victims of sexual abuse, like plaintiffs here, are within the class of persons the statute is designed to protect. The mandatory reporting statute's declared purpose is the protection of children. RCW 26.44.010. On multiple occasions, the Washington Supreme Court has held that "children are within the class of individuals the legislature intended to

---

[34] Even if the Court were to find that the statute does not create a "cause of action," it provides important background into the nature of other duties COP owed to plaintiffs, and it tells a compelling story of how these defendants breached that duty. Thus, RCW 26.44.030 – admissible evidence regarding negligence – must remain as a part of plaintiff's common law negligence claim.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 10
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

protect in enacting" RCW 26.44 et seq., and that this protection is of "paramount" importance. *See, e.g., C.J.C. v. Corp. of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 728, n. 16, 985 P.2d 262 (1999); *Yonker v. Dept. of Social & Health Servs.*, 85 Wn.App. 71, 82, 930 P.2d 958 (1997) *rev. denied* 132 Wn.2d 1010 (1997); *Tyner v. Dept. of Social & Health Services*, 141 Wn.2d at 79.

### (b) LEGISLATIVE INTENT WILL BE PROMOTED BY A CIVIL REMEDY.

When a statute is silent as to whether an implied cause of action is contained within the statute, the court making the determination will "'assume that the legislature is aware of the doctrine of implied statutory causes of action.'" *Tyner*, 141 Wn.2d at 80 (quoting *Bennett v. Hardy*, 113 Wn.2d 912, 919, 784 P.2d 1258 (1990) (quoting *McNeal v. Allen*, 95 Wn.2d 265, 274, 621 P.2d 1285 (1980) (Brachtenbach, J., dissenting)). The *Tyner* court has already affirmatively answered the question of whether an implied right of action exists for portions of RCW 26.44, *et. seq.* The *Tyner* court specifically addressed whether an implied right of action existed under RCW 26.44.050 (negligent investigation of reports of child abuse) for parents accused of abuse of their children. In determining that a private cause of action existed, the court noted the public policy underlying the statute to begin with – protecting and fostering the parent/child relationship – and stated that the importance of that relationship indicated that the "Legislature intends a remedy for both the parent and the child if that interest is invaded." *Id.* at 80.

Here, there can be no real contention regarding the importance of protecting children from sexual abusers. If the Legislature intends a remedy for a parent who is the victim of a negligent investigation of child abuse allegations, certainly there should also be a remedy for the child victims of sexual abuse when those mandated to protect children fail to report abuse.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 11
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

### (c) IMPLYING A REMEDY IS CONSISTENT WITH THE UNDERLYING PURPOSE OF THE STATUTE.

Finally, implying a remedy is consistent with the underlying purposes of the statute itself. The mandatory reporting statute's underlying purpose is the protection of children, the fostering of reporting and imposing consequences for non-reporting. By requiring certain persons to report known instances of child abuse, the statute compels those persons in the position of being able to protect children to take action. A civil remedy, and the consequent possibility of a civil judgment, further motivates mandatory reporters into taking some action and, thus, furthers the goals of the statute itself.

### 4. THE AUTHORITIES CITED BY COP ARE INAPPLICABLE.

In support of their assertion that there is not a private of action for violation of the mandatory reporting statute, COP cites to general case law relating to the rules pertaining to when an implied right of action is, or is not, created. However, none of the cases cited in the body of the brief pertain to the mandatory reporting statute (or any other portion of RCW 26.44, *et seq.*) and, as discussed above, the determination of whether an implied right of action exists wholly depends on the language, and underlying purpose, of the actual statute at issue.

With regard to the string cite contained in footnote 4 of COP's Motion, it is true that the courts in other jurisdictions determined that their mandatory reporting statutes did not create a private right of action. However, COP points to these authorities without any discussion as to how or why case law from other jurisdictions should control Washington jurisprudence. Instead, COP appears to be inviting this Court to determined the issue in the same way as the other jurisdictions did simply because the other jurisdictions have done so. This is contrary to principles of jurisprudence and an analysis is required. Plaintiffs should

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 12
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

not be compelled to respond to arguments that have not been raised.

Furthermore, as discussed herein, the Washington Supreme Court has signaled its intention not to follow the lead of these jurisdictions and to permit a private cause of action based on violation of the mandatory reporting statute. First, the Court stated as much in *C.J.C.*, 138 Wash. 2d 728, n.16, when the Court noted that a duty of care arose from the "mere existence" of the reporting statute. Second, the Court has already determined that another section of RCW Ch. 26.44 may form the basis of a private cause of action – *Tyner v. State Dept. of Social & Health Services*, 141 Wn.2d at 72.

**B.   R.K.'S CLAIMS AGAINST COP SHOULD NOT BE DISMISSED BECAUSE A SPECIAL RELATIONSHIP EXISTED BETWEEN COP AND R.K.**

COP is correct in asserting that there is not a "generalized" duty to protect a person from the harm of another. However, the duty will arise when, among other things, there is a "special relationship" between the entity and the perpetrator **or** the entity and the victim. *Funkhouser v. Wilson*, 89 Wn.App. 644, 653-54, 950 P.2d 501 (1998) *aff'd, C.J.C, supra*.

Those relationships between a defendant and a foreseeable victim that have been recognized by Washington courts as "special" and, therefore, giving rise to a legal duty to protect the victim from foreseeable criminal acts of third parties, have been described as "protective in nature, historically involving an affirmative duty to render aid." *Lauritzen v. Lauritzen*, 74 Wn. App. 432, 438-39, 874 P.2d 861 (1994), citing *Hutchins v. 1001 Fourth Ave. Assoc.*, 116 Wn.2d 217, 228, 802 P.2d 1360 (1991); *see, also,* W. PAGE KEETON et al., *Prosser and Keeton on Torts* § 56, at 383 (5th ed. 1984).

Churches are subject to the same duties of reasonable care as would be imposed on any person or entity in selecting or supervising their workers, or in protecting vulnerable persons within their custody, so as to prevent reasonably foreseeable harm. *CJC v. Corporation of the Catholic Bishop of Yakima*, 138 Wn.2d 699, 722, 985 P.2d 262 (1999).

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 13
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Under circumstances similar to the present, the *CJC* court found the conjunction of four factors persuasive in determining the existence of a duty of care: (1) whether there is a special relationship between the church and the perpetrator; (2) whether there is a special relationship between the church and the victim; (3) the knowledge of risk possessed by the church; and (4) the causal connection between the perpetrator's position in the church and the resulting harm. *CJC*, 138 Wn.2d at 724. Contrary to COP's assertion, Washington law does not mandate that each factor be present. Instead, as was noted in *Funkhouser v. Wilson*, 89 Wn.App. 644 at 653-54 *aff'd*, *C.J.C*, *supra*, a "special relationship giving rise to a duty to protect victims of child abuse exists if **either**

> (a) a special relation exists between the defendant and the tort-feasor which imposes a duty upon the defendant to control the tort-feasor's conduct, **or** (b) a special relation exists between the defendant and the victim which gives the victim a right to protection.

(Emphasis added.).[35] Analysis of the four factors is instructive:

### 1. COP HAD A SPECIAL RELATIONSHIP WITH JACK LOHOLT.

A special relationship between a church and a perpetrator sufficient to give rise to a duty of care to a third person will exist if the perpetrator held a position of prominence within the church which position placed him into "positions of trust over children." *C.J.C.*, at 725. Here, COP placed Jack Loholt into a position of trust and respect when it deemed him to be

---

[35] Regardless, all four factors are indeed present in the instant case. However, contrary to COP's assertion (at pg. 8-9 of its Motion), the *CJC* court did **not** hold that all four factors are necessary to a finding of a special relationship. Rather, the *CJC* court merely found the conjunction of those factors "persuasive" under the circumstances of that case. In other cases, the court has found a duty to protect from criminal acts by third parties based *solely* on the special relationship between the defendant and the plaintiff, *see, e.g., Niece v. Elmview Group Home*, 131 Wn.2d 39 (1997)(adult family home had duty to protect developmentally disabled resident who was sexually assaulted by a staff member). The *Niece* court also held that the plaintiff's negligent supervision claim had adequate support based solely upon the special relationship between the defendant and the perpetrator. *Id.* at 43-44. Additionally, in *Petersen v. State*, 100 Wn.2d 421, 426, 671 P.2d 230 (1983), the court found that the psychiatrist-patient relationship *alone* gave rise to a duty to take reasonable precautions to protect all persons foreseeably endangered by a mental patient's release into the community.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 14
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

worthy of the title of Melchesidek Priest and Elder in their organization and when they allowed him to obtain the positions of assistant Scout leader and, eventually, Scout leader. The fact that Loholt was never an employee of COP is of no import in determining whether the "special relationship" between Loholt and COP existed. Indeed, the perpetrator in *CJC* was not an employee but was instead in the same position as is Loholt in this case – a person who "held unpaid positions of leadership in the church." *CJC*, 138 Wn.2d at 730 (Madsen concurrence/dissent). Instead, the critical inquiry is whether the roles undertaken by the perpetrator place the perpetrator in a position of prominence within the church and made him a danger to children. *Id.* at 725-26. The varied ways he gained access to children is not determinative of COP's duty.

### 2. COP HAD A SPECIAL RELATIONSHIP WITH ALL OF THE PLAINTIFFS, INCLUDING R.K.

The second prong of the *C.J.C.* test is whether a "special relationship" exists between a church and the victim – its children congregants. In fact, the *C.J.C.* court specifically held that the duties legitimately imposed on a church (with respect to its children congregants) "are similar to those of a school." *Id.* at 721. The reason underlying the *C.J.C.* court's determination in this regard is, simply, that as "with any other agency relationship, a church chooses its officials, directs their activities and may restrict and control their conduct." *Id.*

COP's attempt to evade liability by emphasizing that R.K. was not an official member of its organization, must also fail. As discussed in detail above, R.K. actively participated in many events sponsored by the Mormon Church through his relationship with prominent Mormon leaders and fellow Scout Master, Dr. Allenbach. It is illogical and non-sensical to assert that a child victim of sex abuse must be a "card-carrying member" of a given organization before a duty to protect that child will exist.

COP does not appear to dispute that it had a special relationship with plaintiffs John

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 15
**(C04-2338 RSM)**

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Doe or T.D.; instead, it focuses its argument on R.K.[36] Under COP's theory, it cannot be liable for harm which befell R.K. because he was not an "official member" of the Church. In making this argument COP is asserting that it may wholly abandon its obligations to protect children who attend Church activities, but who do not necessarily belong to their organization, based apparently, on the distinction of whether the child has been baptized into the Church or not. This is not the law, nor should it be. Our courts have already held that actual membership is not a prerequisite to obtaining the protection of church officials. As *Funkhouser v. Wilson*, 89 Wn.App. 644, 659, 950 P.2d 501 (1998) *aff'd, C.J.C., supra* explained:

> The vulnerability of children to sexual abuse by adults who are placed in positions of responsibility and authority over their well-being, whether of a spiritual or a temporal nature, **does not vary depending upon whether the children are members of the church or simply attend on a regular basis.**

*Id.* at 659 (emphasis added).

Here, R.K. actively participated in Mormon activities and functions, including playing on the Mormon softball team, traveling to Mormon-sponsored softball tournaments, attending meetings with missionaries, "fellowshipping" with Mormon visitors at the Allenbach compound, praying with Mormons, and attending seminary and Sunday services at the Church itself. Additionally, the Allenbach family and other Mormon Church members, continuously and pervasively proselytized the virtues of the Mormon faith in an attempt to recruit R.K. into the fold.[37] These facts, at a minimum, create a question of fact as to whether

---

[36] COP had a special relationship with John Doe because he was a child member of the Kent 2nd Ward. COP had a special relationship with T.D. because he attended Scout activities in the Mormon Church's Scout troop. Both men were abused by the scout leader during scout activities. The fact that R.K. was not introduced to Loholt as a result of R.K.'s direct involvement with the Mormon Church is a distinction without a difference. .

[37] The Mormon faith is not a faith which only operates on Sundays. Instead, its members are all required to be missionaries, whether they are on an actual mission or not. The traditional concept of services occurring only in a "church building" does not comport with the Mormon "way."

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 16
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

R.K. was a foreseeable victim and, therefore, COP's motion for summary judgment on this ground must be denied.

### 3. COP HAD KNOWLEDGE OF A RISK OF HARM TO ALL PLAINTIFFS, INCLUDING R.K., PRIOR TO THE TIME OF THE ABUSE.

COP does not address the "knowledge of risk of harm" prong contained in what it refers to as the four "mandatory" prongs for liability. That is because there is overwhelming proof COP knew Loholt was a child molester and failed to take action. In fact, he was promoted to Scout Master despite three Bishops having knowledge of his abuse of children.

COP gained knowledge that Loholt was abusing children in 1971 when former Bishop Richard Pettit advised then-Bishop, Randall Borland, that his (Pettit's) own son had been abused by Loholt.[38] The evidence in the record as to when R.K. was abused is R.K.'s own testimony (which is not contradicted by COP) that the abuse began in 1971 and continued for years.[39] Here, it was reasonably foreseeable that Loholt would sexually abuse other children: He was already sexually abusing a member of the congregation – Scott Pettit – and COP had been informed of such abuse.

### 4. LOHOLT'S POSITION WAS A CAUSE OF R.K.'S HARM.

COP appears to assert that in the absence of a traditional "special relationship" between it and Loholt (e.g., an employment or agency relationship), it cannot be liable for Loholt's conduct vis-à-vis R.K. Again, that question was specifically addressed in *C.J.C.* and that decision is contrary to COP's assertion. In fact, the *C.J.C.* court specifically held that liability will be imposed if the harm proximately resulted from the perpetrator's position within the Church. *Id.* at 724, fn. 12. In *C.J.C.*, the perpetrator of the abuse was a volunteer gardener for the church. Here, Jack Loholt held the position of Melchesidek Priest and that of

---

[38] *Pettit Depo., pgs. 28-31.*
[39] *R.K. Depo., pg. 13, ll. 20-25 (Exhibit K).*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 17
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Scout leader. At the very minimum, by allowing Loholt to retain his position as Scout leader, COP held Loholt out to the world as a person of moral worth. R.K. (like the other plaintiffs) was aware of Loholt's stature within the Church. Here, just as in *C.J.C,* a jury could reasonably find that Loholt's position within the Church was a causal factor in plaintiffs' harms. The fact that one of Loholt's victims was a visitor to the Church and participated in Church-related activities, instead of an actual member of the congregation, does not alter his status as an individual who was foreseeably endangered by Loholt. COP had a duty to control Loholt and to protect **all** foreseeable victims.

COP knew that Loholt had easy access to children, including R.K., during the years R.K. was abused. COP knew, or should have known, that Loholt was residing at the Allenbach compound and knew that young children, including R.K., often visited (and lived) at the Allenbach compound. COP knew, or should have known, that Loholt had access to Mormon and neighborhood children as Scout Master. COP provided Loholt with indicia of moral trustworthiness and respect when it failed to remove his title of Melchesidek Priest and failed to remove him from the scouting program. At a minimum, these facts demonstrate that there is a genuine issue of material fact as to whether Loholt's position within the Church was a causal factor in the harms that befell all of the plaintiffs here, including R.K. Furthermore, here, as in *C.J.C.,* "given the church's specific and superior knowledge of the facts, a jury could reasonably find the church knew or should have known that children, and specifically these particular plaintiffs, were exposed to an unreasonable risk of harm at the hands of [defendant]." *Id.*[40]

---

[40] COP asserts that because the abuse of R.K. did not occur on "Church premises or in connection with a Church function," that it should have no responsibility for Loholt's actions. These facts are irrelevant to the determination of whether a duty existed. The Washington Supreme Court specifically instructed that the determination of whether the duty has been breached is not dependent on **where** the harm occurred. Instead, the Court specifically held that the scope of a church's duty can extend to sexual abuse that occurs off church premises or even outside church activities. *C.J.C.,* at 722.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 18
(C04-2338 RSM)
LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

C. **LDS SOCIAL SERVICES OWED A COMMON LAW DUTY OF CARE TO ALL THE PLAINTIFFS, INCLUDING R.K.**

In their brief, COP and LDS Social Services ignore the critical issue of R.K. being abused while Loholt was in counseling. Regardless of COP's liability under the *CJC* analysis, LDS Social Services is liable under established Washington case law. A therapist or social service counsel has a common law duty to protect persons from the dangerous propensities of their patients. *Petersen v. State,* 100 Wn2.d 421, 671 P.2d 230 (1983). In that case a plaintiff was injured in a car accident by a defendant who had been released from Western State Psychiatric Hospital five (5) days earlier. The plaintiff brought an action against the state asserting that it had a duty to "protect he from [the perpetrator's] dangerous propensities." The Washington Supreme Court agreed and, in reliance on the California case of *Tarasoff v. Regents of the Univ. of California,* 551 P.2d 334 (Cal.1976), stated that a therapist incurs a "duty to take reasonable precautions to protect **anyone** who might foreseeably be endangered by [the patient's] mental problems." *Id.* at 428.

Here, LDS Social Services treated Jack Loholt for sexual deviancy problems in the 1972/1973 time frame. This was during the very period R.K. was being abused. Jack Loholt has testified that during his treatment he told the counselors the "truth."[41] Thus, it must be assumed the counselors knew the nature and extent of Loholt's sexual abuse of minors and that he was likely to continuing abusing young boys. Furthermore, they were mandatory reporters, as well. Consequently, there is, at a minimum, a question of fact as to whether the counselors had a duty to protect Loholt's foreseeable victims, including R.K.

D. **COP'S AND LDSS VIOLATIONS OF THE MANDATORY REPORTING STATUTE.**

As discussed in detail above, R.K. lived next door to the Allenbach compound and was often a guest at the Allenbach home. COP and LDS Social Services knew of Loholt's

---

[41] *Loholt Depo., pg. 138.*

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 19
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

abuse of children during the time R.K. was abused. Had either of these entities complied with their statutorily-imposed duty to report Loholt to the proper authorities, Loholt would never have had the opportunity molest R.K.[42] The concept of whether a duty is owed necessarily includes the determination of whether the victim is "reasonably foreseeable." In fact, negligence "necessarily involves a foreseeable risk, a threatened danger of injury, and conduct unreasonable in proportion to the danger." *Hunsley v. Giard*, 87 Wn.2d 424, 435, 553 P.2d 1096 (1976) (quoting W. PROSSER, TORTS § 43 AT 250 (9TH ED. 1971). While foreseeability of harm will not, in and of itself, give rise to a duty where one did not exist in the first place, it is indication of the existence of the duty with the "ultimate test" being whether "harm may result if due care is not exercised." *Meneely v. S.R. Smith, Inc.*, 101 Wn. App. 845, 860, 5 P.3d 49 (2000) quoting *King v. National Spa & Pool Ins., Inc.*, 570 So.2d 612, 615, 1 A.L.R. 5th (1990) (Ala. 1990) (quoting *Bush v. Alabama Power Co.*, 457 So.2d 3350, 353 (Ala. 1984)).

Here, where COP and LDS Social Services had unequivocal knowledge of Loholt's profound and pervasive abuse of multiple children, it cannot reasonably be disputed that it would be "reasonably foreseeable" that Loholt would abuse children who, while not "officially" members of the Mormon Church, nonetheless were guests of the Mormon Church or participated in Mormon Church functions – such as R.K. When COP failed to meet its statutorily-imposed duty to report suspected child abusers to law enforcement personnel, it opened itself for claims of harm from the foreseeable victim of Loholt's abuse, including claims from victims such as R.K.[43]

---

[42] Had Loholt's abuse been reported, CPS would likely have investigated the abuse, arrested Loholt or taken steps to limit his access to all children foreseeably in harm's way.

[43] COP's reliance on the Maine case of *Bryan R. v. Watchtower Bible and Tract Soc. of New York*, 738 A.2d 839 (Me. 1999) is misplaced. While the court declined to find a duty to protect existed in that case, the underlying reason was because the perpetrator of the abuse was not an employee or agent of the church. *See, Fortin v. Roman Catholic Bishop of Portland*, 871 A.2d 1208, 1218, (Me. 2005). Here, Jack Loholt was a volunteer, agent and Scout Master within the Mormon Church and, as clearly expressed in *C.J.C., supra*, a duty will arise to protect people from persons who have volunteered within a church organization. *C.J.C.* at 720, n. 10.

PLAINTIFFS' OPPOSITION TO MOTIONS FOR SUMM JGMT - 20
(C04-2338 RSM)

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575