FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
December 13, 2005　　　　　　　　　　　　　　　　　　　　　　　　　　RICHARD PETTIT

```
             UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON
                     AT SEATTLE
_____
KENNETH FLEMING and JOHN DOE,      )
                                   ) Case No. C04-2338 RSM
         Plaintiffs,               )
                                   )
    vs.                            ) Videotaped Deposition
                                   ) of:
THE CORPORATION OF THE PRESIDENT)    RICHARD PETTIT
OF THE CHURCH OF JESUS CHRIST OF)
LATTER-DAY SAINTS, a Utah          )
corporation sole, a/d/a "MORMON    )
CHURCH"; LDS SOCIAL SERVICES,      )
a/d/a LDS FAMILY SERVICES, a       )
Utah corporation,                  )
                                   )
         Defendants.               )
_____
```

　　　　　　　　　　　　December 13, 2005
　　　　　　　　　　　　　　9:24 a.m.

　　　　　　　　　　　　Kirton & McConkie

　　　　　　　　　　　1800 Eagle Gate Tower

　　　　　　　　　　　　60 East South Temple

　　　　　　　　　Salt Lake City, UT　84145-0120

　　　　　　　　Sharon Morgan, CSR, RPR, CRR

　　　Notary Public in and for the State of Utah

GARCIA & LOVE
801.538.2333

c8f86cac-5f2b-4958-94e9-770cda26c303
B - 23
dockets.Justia.com

Page 26

1  mission?
2  A. As of now, no.
3  Q. Were you asked to serve that mission to
4  Nauvoo or did you volunteer yourself to do that?
5  A. I was asked.
6  Q. By whom were you asked?
7  A. Our bishop.
8  Q. Now, when you were a member of the Kent
9  Second Ward, were you directly involved in the ward
10 scouting program in any capacity?
11 A. Could you explain by what you mean directly?
12 Q. Well, did you ever serve as scout master?
13 A. No.
14 Q. Did you ever serve as assistant scout master?
15 A. No.
16 Q. Did you ever serve as a leader in the Venture
17 program?
18 A. No.
19 Q. Did they have a Blazer or Cub Scout program
20 in the ward?
21 A. Yes.
22 Q. Did you ever serve as adult leader in that
23 program?
24 A. No.
25 Q. Did you serve as -- did you serve as a

Page 27

1  support adult for the scouting program within the ward
2  at any time?
3  A. Support for the scouting program?
4  Q. Yes.
5  A. Not designated as such.
6  Q. Okay. But you volunteered to help out?
7  A. Part of my assignment was to oversee
8  scouting. That's just part of it.
9  Q. And part of your assignment, you're referring
10 to your responsibility when you were first counselor
11 to Bishop Coleman?
12 A. It would be second counselor.
13 Q. Second counselor. So was it the practice
14 that the second counselor had some particular
15 responsibilities with regard to the ward scouting
16 program?
17 A. It's common.
18 Q. And during the time that you were second
19 counselor with those responsibilities to the ward
20 scouting program, was Jack LaHolt involved as a scout
21 leader?
22 A. To my knowledge, yes.
23 Q. Do you know who appointed him scout leader at
24 that time?
25 A. No.

Page 28

1  Q. Did you have any authority to appoint or
2  remove any leader within the scout program?
3  A. Only to -- not to initiate, but to ratify.
4  Q. Okay. To ratify. Could you elaborate on
5  that?
6  A. Agree with it.
7  Q. Whose decision would you be asked to ratify?
8  A. The bishop's.
9  Q. So would you have authority to make a
10 recommendation to the bishop and to agree or disagree
11 with that decision?
12 A. Yes.
13 Q. At any point in time that you were a member
14 of the Kent Second Ward, did you become aware of
15 concerns that Jack LaHolt may have been engaging in
16 inappropriate behavior with children?
17 A. Yes.
18 Q. When was your first such awareness of that?
19 A. Sometime in 1971.
20 Q. And what was the nature of the information
21 that you received?
22 A. It was given to me by an individual.
23 Q. And what was that information?
24 A. That there was some inappropriate touching.
25 Q. Was that person a child?

Page 29

1  A. Yes.
2  Q. And was that child a member of the scout
3  troop?
4  A. Yes. Let me -- scout troop?
5  Q. The ward scout troop.
6  A. There's three -- basically two or three
7  divisions of the scout troop.
8  Q. Would you clarify that?
9  A. There's the Boy Scouts, which is the younger
10 group, and then from 12 to 14 and on up to 16 is
11 another group. And as a second counselor, I was
12 working with the 12 to 14.
13 Q. And was the child that gave you this
14 information within that 12 to 14 age group that you've
15 described?
16 A. To my knowledge, he was -- he had graduated
17 into the other group.
18 Q. The older group?
19 A. The older group.
20 Q. 15 and older?
21 A. Uh-huh (affirmative).
22 Q. Did that group have a name?
23 A. Venture.
24 Q. What did that boy tell you?
25 A. What did the work tell me?

Page 30

1  Q. What did the boy tell you about Jack LaHolt?
2  A. He had been touched inappropriately.
3  Q. Did he say where it had taken place?
4  A. No. Oh, where -- where in the area?
5  Q. What location had it occurred at?
6  A. On a scout outing.
7  Q. And what was your understanding of where that
8  scout outing was?
9  A. Somewhere in the Snoqualmie Pass area of
10 Washington.
11 Q. And did the boy tell you specifically what
12 Jack LaHolt had done?
13 A. No.
14 Q. What did he say, to the best of your
15 recollection?
16 A. My recollection is he was touched
17 inappropriately.
18 Q. Do you remember where he was touched
19 inappropriately?
20 A. No.
21 Q. Did you ask him any further details about how
22 Jack LaHolt had touched him?
23 A. No.
24 Q. At the time that you received this
25 information, were you serving as either a first or

Page 31

1  second counselor?
2  A. Second. I'm sorry, now, I was not -- in 1971
3  I was not a counselor.
4  Q. Okay. What were the circumstances under
5  which you received this information from this boy?
6  A. It was voluntary.
7  Q. Where did he tell you this?
8  A. In my home.
9  Q. Was the boy a friend of your son?
10 A. No.
11 Q. Was it one of your sons?
12 A. Yes.
13 Q. Was it Scott?
14 A. Yes.
15 Q. When your son Scott told you this
16 information, did you believe it?
17 A. Yes.
18 Q. Did you do anything with this information?
19 A. Yes.
20 Q. What was that?
21 A. I went to Bishop Borland.
22 Q. And did you tell Bishop Borland what your son
23 Scott had told you?
24 A. Yes.
25 Q. And what did Bishop Borland say?

Page 32

1  A. He was shocked.
2     MR. FREY: At this point -- did you expect
3  your conversation -- let me interpose an objection and
4  ask a question. Do you expect your conversation with
5  Bishop Borland to be confidential?
6     THE WITNESS: Yes.
7     MR. FREY: Are you willing to waive that
8  confidentiality and testify about it today, about what
9  you spoke to about with Bishop Borland?
10    THE WITNESS: Yes.
11    MR. FREY: Okay. Go ahead, Counsel.
12 Q. (By Mr. Kosnoff) When you went to Bishop
13 Borland, you were not going to him for purposes of
14 confessing your sin, were you?
15 A. No.
16 Q. And you would hope that he would -- that --
17 strike that. What was your reason for going to Bishop
18 Borland?
19 A. To inform him of the situation.
20 Q. And was it your hope or intention that Bishop
21 Borland would use this information and take some kind
22 of concrete action with respect to Jack LaHolt?
23 A. Yes.
24 Q. And what was your -- what did you hope that
25 he would do?

Page 33

1  A. Correct it.
2  Q. What did Bishop Borland say to you?
3  A. I don't remember.
4  Q. Did he tell you that he would do something
5  about Jack?
6  A. I don't remember.
7  Q. Did he give you any kind of assurances that
8  the matter would be handled?
9  A. Yes.
10 Q. And did you trust that the matter would be
11 handled?
12 A. Yes.
13 Q. Was it handled?
14 A. Yes.
15 Q. To your knowledge, what happened with respect
16 to Jack LaHolt?
17 A. Within one week he was released.
18 Q. How did you become aware that he had been
19 released?
20 A. At the church service the following week.
21 Q. Did somebody communicate that to you?
22 A. Yes.
23 Q. Bishop Borland?
24 A. Yes.
25 Q. And he told you that he released Jack?

# EXHIBIT C

# CONDENSED TRANSCRIPT

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

```
KENNETH FLEMING and JOHN DOE,  :  No. C04-2338 RSM
                               :  (Judge Ricardo Martinez)
              Plaintiffs,      :
                               :
         -v-                   :
                               :
THE CORPORATION OF THE         :
PRESIDENT OF THE CHURCH OF     :
JESUS CHRIST OF LATTER-DAY     :
SAINTS, a Utah corporation     :
sole, a/k/a "MORMON CHURCH";   :
LDS SOCIAL SERVICES a/k/a      :
LDS FAMILY SERVICES, a Utah    :  Videotaped Deposition of:
corporation,                   :  RANDALL BORLAND
                               :
              Defendants.      :
```

**September 20, 2005 - 9:08 a.m.**

Location: Kirton & McConkie
60 East South Temple, Suite 1800
Salt Lake City, Utah

Diane W. Flanagan, RPR
Notary Public in and for the State of Utah



GARCIA & LOVE
COURT REPORTING AND VIDEOGRAPHY

36 South State Street • Suite 1220 • Salt Lake City, UT 84111 • 801.538.2333 • Fax 801.538.2334

C - 27

Case 2:04-cv-02338-RSM    Document 81-2    Filed 01/30/2006    Page 6 of 10

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                          RANDALL BORLAND

**Page 53**

1  Q  Page 1 seems to indicate that Philip Coleman was
2  sustained as bishop August 19, 1973.
3  A  Where are we?
4  Q  Go to page 10.
5  A  Oh, 10. August --
6  Q  -- 19th.
7  A  Okay.
8  Q  And it does seem to indicate on August 19th that
9  Randall K. Borland was released as bishop of the Kent Second
10 Ward. Do you see that entry?
11 A  I do.
12 Q  Do you have any reason to believe that's not
13 accurate?
14 A  No, because I know I was released.
15 Q  Okay. But that the date is accurate?
16 A  I -- I'm just going to assume. I'm not going to
17 question it, but I don't remember that date.
18 Q  Okay. And it indicates that Philip Coleman was
19 sustained as bishop on the same day.
20 A  Yes.
21 Q  To the best of your recollection, does that entry
22 and that date seem correct to you?
23 A  I don't remember the date at all, but I know
24 that's what transpired. He succeeded me as bishop.
25 Q  Is it possible that you began Brigham Young

**Page 54**

1  University in the fall of 1973 and not in 1975?
2  A  Is it possible?
3  Q  Yes.
4  A  Instead of when?
5  Q  I believe you testified earlier that you thought
6  you came to Utah in 1975 to begin your studies.
7  A  That was a guess, wasn't it? That was an
8  approximate guess.
9  Q  Yes.
10 A  Yeah, it's possible then. It's possible, but I
11 don't know, but very possible.
12 Q  Okay.
13 A  That would fall in line. This is -- in that
14 regard that's helpful.
15 Q  Well, as we get older, we all need these little
16 aids, don't we?
17     So during this approximate three-year time period
18 that you were bishop of the Kent Second Ward, you've
19 indicated that you did receive a complaint regarding
20 sexually inappropriate activity by Jack Loholt. Correct?
21     MR. FREY: I'm going to object to the form of the
22 question. It assumes something that he hasn't testified to.
23     Go ahead.
24 Q  (By MR. KOSNOFF) Did you receive a complaint or
25 report from anybody that Jack Loholt had engaged in sexually

**Page 55**

1  inappropriate activity during the time that you were bishop
2  of the Kent Second Ward?
3     MR. FREY: Now, again, Bishop, I'm going to
4  caution you that if you learned any of this information in
5  your capacity as a bishop in a confidential communication
6  that you have the privilege not to answer it, in my opinion.
7  Counsel may differ with that, but I would instruct you not
8  to answer it if that's the basis upon which you gained your
9  information.
10    MR. KOSNOFF: I would like to ask a few foundation
11 questions before he answers that question in light of your
12 instruction to your client.
13    MR. FREY: Okay.
14 Q  (By MR. KOSNOFF) Assuming the answer to the
15 question is yes, did you receive this communication in your
16 capacity as a clergy person for the Mormon church, that is,
17 in your role as clergy in the Mormon church?
18    MR. FREY: Object to the --
19 A  That was a hypothetical. That was hypothetical --
20    MR. FREY: Excuse me. I'm going to object to the
21 form of the question.
22    You may answer, though. Go ahead. Have her read
23 it back. Please wait until -- give me a second because I
24 have the right to make objections.
25    THE WITNESS: I'm sorry.

**Page 56**

1     MR. FREY: Okay. Go ahead.
2     (The record was read as requested)
3  A  I'm answering a question based on an assumption?
4  Q  Yes. I'm not asking you for the content of the
5  communication yet. I'm asking you questions about the
6  circumstances under which the communication was made.
7  A  Yes.
8  Q  Was the communication made for purposes of
9  pastoral response by you?
10 A  Are we still on an assumption? Are these
11 questions or -- because you said assuming that the answer
12 was yes. I've never answered that question yet, and forgive
13 me. I'm being a little dense here, but I don't know if I'm
14 still answering on an assumption. Am I saying that right
15 even?
16 Q  Yes, you are.
17 A  Okay.
18 Q  Because the answer yes or no to the question could
19 potentially violate a privilege. But before you answer that
20 question, I'm asking you questions surrounding that
21 communication. Okay? I'm not asking you about what was
22 said or whether the answer to my -- that previous question
23 was yes or no. I'm just asking you other questions related
24 to the nature of that communication and the surrounding
25 circumstances.

Case 2:04-cv-02338-RSM   Document 81-2   Filed 01/30/2006   Page 7 of 10

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                          RANDALL BORLAND

**Page 57**

1   A   Okay.
2   Q   So again my question is: Was this something that
3   you learned in connection with pastoral counseling within
4   the Church?
5   A   Yes.
6   Q   Was the information that you received something
7   that you are required to keep confidential under the
8   doctrines and teachings of your church?
9   A   Yes.
10  Q   Was the communication that you received something
11  that you in fact kept confidential, that is, that you did
12  not disclose to any other person?
13  A   Let me make sure I understand that. A
14  communication not disclosed to anybody else?
15  Q   Correct.
16  A   The answer to that question, if I've heard the
17  question correct, is yes or -- let me rephrase it, and then
18  tell you what I thought you said.
19  Q   Go ahead.
20  A   I did not disclose what was said confidentially to
21  me to others.
22  Q   Just so that I'm clear on this, you did not
23  disclose the content of what was said to you by that person
24  to any other person?
25  A   The content of that conversation, that meeting, I

**Page 58**

1   did not.
2   Q   Okay.
3   A   The best of my recollection.
4   Q   Okay. Did you ever make a referral to LDS Social
5   Services for counseling Jack Loholt?
6   A   I don't remember. I do not remember that.
7   Q   Did you do anything or say anything to anyone else
8   following the communication that you received from this
9   person?
10  A   Regarding specifics?
11  Q   Anything.
12  A   Yes.
13  Q   What did you do or say?
14  A   I talked --
15       MR. FREY: Again I'm going to caution you that if
16  you took any steps in your capacity as a clergyman and
17  ecclesiastical in accordance with the teachings and beliefs
18  of the LDS religion that you are not obligated to break that
19  confidentiality if in fact you learned that in those
20  circumstances.
21       And for the record, Counsel, what I'm trying to do
22  here is allow you to ask questions without reaching what I
23  believe is a privilege that he has as a bishop to receive
24  information, treat it with confidentiality, and act on it in
25  an ecclesiastical fashion.

**Page 59**

1        MR. KOSNOFF: Could you identify the source of
2   that privilege.
3        MR. FREY: State v. Martin and the statute, the
4   First Amendment.
5        MR. KOSNOFF: So are you relying on the clergy
6   penitent privilege?
7        MR. FREY: And his First Amendment rights.
8        MR. KOSNOFF: What First Amendment rights are you
9   referring to?
10       MR. FREY: Free exercise rights.
11       MR. KOSNOFF: Specifically what in the free
12  exercise clause are you basing this privilege?
13       MR. FREY: That he has the right to free exercise
14  of religion to be free from the restraint of having a civil
15  court interfere and make him disclose confidential
16  communications. We've been through this. We've briefed it.
17  We've already argued it in the Court of Appeals and won it.
18       MR. KOSNOFF: No. We've --
19       MR. FREY: And that's what I'm doing here.
20       MR. KOSNOFF: No. That was a completely different
21  issue and very different narrow issue than --
22       MR. FREY: And there's a third item involved here
23  that we haven't gotten to yet, but that is the privacy
24  rights of individuals who may be involved, if any. But I'm
25  trying not to interfere with your legitimate discovery area,

**Page 60**

1   and so I'm trying to be very careful here. And I want you
2   to understand that it's not my purpose here to frustrate
3   your discovery, but I do want him to be careful that he
4   doesn't breach any of the confidentiality that is imposed
5   upon him by his position as a clergyman.
6        So if you can read back the question. Sorry about
7   the speech --
8        MR. KOSNOFF: Well, I -- we have gone through the
9   criteria for the appropriate assertion of the clergy
10  penitent privilege, and that shields him from disclosing the
11  content of privileged communications based upon that
12  statute. My questions now are not directed at the content
13  of that communication. My questions are directed at what he
14  did or said to others following that communication.
15       MR. FREY: But that may very well involve his
16  working in an ecclesiastical capacity and involve
17  conversations with other people that are privileged, and
18  that's my point.
19       MR. KOSNOFF: That -- it's our position that that
20  would not be privileged and that he is required to answer
21  those questions.
22       MR. FREY: Just a second.
23       (Defense counsel confer)
24       MR. FREY: I -- I've made my objection. We
25  disagree. Okay?

**Page 61**

1  MR. KOSNOFF: Are you directing him not to answer.
2  MR. FREY: No, I'm not. I'm asking him if he can
3  answer without violating -- if he can answer about what he
4  did without violating any confidentiality that I believe he
5  has the right to maintain as a bishop, then he may answer
6  the question.
7  A  I believe I can do that. Confidentiality is very
8  important to me. I -- the only reason I even hesitate at
9  all is because of the conversation, and I'm very respectful
10 of both of you. I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt. I had to talk with him.
14 Q  And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16 A  Yes, sir.
17 Q  And what was said?
18 MR. FREY: Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21 A  I don't believe I can answer that.
22 Q  Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24 A  Okay.
25 Q  Because there's -- may well be a judge that's

**Page 62**

1  going to review this transcript and make a decision, a
2  ruling, as to whether or not you've appropriately or legally
3  asserted the privilege in this context, and so I just want
4  to make sure that we've got a clear record.
5  Was your communication -- was your -- was your
6  communication with Jack Loholt done in your capacity as a
7  clergyman?
8  A  Was my communication with him done in the capacity
9  of a clergyman?
10 Q  Yes.
11 A  Yes.
12 Q  And would you agree with me that as a bishop
13 you -- you have many functions within the ward?
14 A  Many responsibilities in the ward?
15 Q  Many responsibilities. Correct?
16 A  Yes.
17 Q  And some of those are administrative, financial
18 management, things of a nonecclesiastical nature?
19 A  I think that's all -- in my mind that's all
20 ecclesiastical.
21 Q  That everything the bishop does --
22 A  Yes.
23 Q  -- all of his functions are ecclesiastical?
24 A  To me, that's my understanding.
25 Q  Does a bishop have overall responsibility for

**Page 63**

1  making sure that the ward building is closed and locked when
2  it's not in use?
3  A  Not necessarily. There might be other people that
4  do that. The bishop doesn't go do that generally.
5  Q  I understand that, but does the bishop have
6  ultimate responsibility for making sure that the building is
7  secured?
8  A  Which bishop?
9  Q  The bishop of the ward.
10 A  It would be the agent bishop of that building.
11 That particular person -- the buck would stop there, I
12 suspect.
13 Q  Okay.
14 A  Yes.
15 Q  So would you regard that as an ecclesiastical
16 responsibility?
17 A  I haven't given any such thing a thought, but I
18 would have to think that all of the responsibilities are
19 based upon his ecclesiastical calling, I would think.
20 Q  Okay. Does the -- when you were bishop, did you
21 have responsibility for tending to the proper handling of
22 tithing receipts?
23 A  Did I have responsibility?
24 Q  Yes.
25 A  Yes.

**Page 64**

1  Q  Okay. And do you regard that as a -- as an
2  ecclesiastical or clerical function in your role as bishop?
3  A  Which one?
4  Q  Either or both.
5  A  Ecclesiastical or clerical?
6  Q  Okay. Do you draw a distinction between --
7  A  Well, it would -- again, everything -- it seems to
8  me in my own perhaps ignorant way of looking at it that
9  everything that the bishop has that is his responsibility
10 that's under the mantle of a bishop's responsibility would
11 be ecclesiastical in nature.
12 Q  Okay.
13 A  I don't -- I can't draw a distinction.
14 Q  So, for example, the proper management of dealing
15 with tithing receipts that come in, you would equate with
16 pastoral counseling that you would deliver as bishop --
17 A  With what?
18 Q  -- to a member? With pastoral counseling.
19 A  Equate?
20 Q  Yes.
21 A  They're both responsibilities.
22 Q  Okay. Are they both clergy functions of the
23 bishop?
24 A  Well, yeah, they are, uh-huh (affirmative).
25 Q  Okay. So you don't recognize there being any

Case 2:04-cv-02338-RSM   Document 81-2   Filed 01/30/2006   Page 9 of 10

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                    RANDALL BORLAND

**Page 69**

1  A  I would say that's possibly.
2  Q  Would that include communicating it to the mother
3  of the child that made the complaint?
4  A  If it evolved to that point.
5  Q  If -- I'm sorry. If what evolved?
6  A  Well, this is all an assumption. Everything is an
7  assumption. Did you say that a mother came in and said that
8  a child, not her child? Am I right?
9  Q  Just a woman in the ward, a ward worker, a
10 volunteer hypothetically in the Primary, receives this
11 report from a child and she conveys it to you.
12 A  And so then I would --
13 Q  And my question is: Would you find it appropriate
14 to convey this confidential information to the mother of
15 that child?
16 A  I would have to have more groundwork on it before
17 I did that. I would probably -- if I felt that there was a
18 substantive basis for it, I would talk to the mother.
19 Q  If you felt that there was a substantive basis for
20 the accusation?
21 A  But there's footnote to that. The person that
22 came to me, if they came with the idea that, Bishop, I want
23 to talk with you, this is in confidence, that particular
24 individual's name, circumstance, involvement would not --
25 that would be held confidential.

**Page 70**

1  Q  Would you communicate this information to the
2  police?
3  A  Not necessarily, no.
4  Q  Would you communicate it to the local Child
5  Protective Services agency?
6  A  No.
7  Q  Would you attempt to substantiate the accusation
8  yourself?
9  A  I suspect I would, uh-huh (affirmative).
10 Q  How?
11 A  It would depend on the circumstance. It would
12 depend on the people. It would depend on the emotions. It
13 would depend on a gamut of things, a wide range of things
14 that would all focus in on is this legitimate, is this real,
15 or is it just an accusation, is it somebody that's upset
16 with somebody and angry, whatever it might be.
17 Q  Have you ever actually had to conduct such an
18 investigation?
19 A  I'm sorry?
20 Q  Have you ever actually been presented with a
21 scenario like this?
22 A  I'm going to have a difficulty answering that
23 question --
24    MR. FREY: Again, I'm going to instruct you if
25 that's going to cause you -- or require you, pardon me, to

**Page 71**

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3      For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10 communication and to provide spiritual counseling." That's
11 what I'm trying to protect him with.
12     MR. KOSNOFF: That's one of the elements.
13     MR. FREY: Okay. Well --
14     MR. KOSNOFF: They didn't throw out the elements
15 of the statute, and I'm very well-acquainted with State v.
16 Martin.
17 Q  (By MR. KOSNOFF) Let's get back to -- let's get
18 back to Mr. Loholt. You testified earlier that you spoke
19 with Jack Loholt. Are you asserting the privilege with
20 respect to your communication with Jack Loholt regarding any
21 allegations of child sexual abuse?
22 A  As being confidential?
23 Q  Yes.
24 A  Yes.
25 Q  Did you speak with anybody else other than Jack

**Page 72**

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A  No.
4  Q  So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A  I can't speak for Jack Loholt. It was kept within
7  me.
8  Q  Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10 A  What information?
11 Q  Any information that Jack Loholt may have engaged
12 in sexual misconduct with a child.
13     MR. FREY: Again, these communications between you
14 and your counselors are also privileged, but go ahead.
15 A  So the answer -- I guess my answer would be -- is
16 my discussion with my counselors would be confidential. I
17 don't -- I don't remember discussing that with anybody.
18 Q  So you have no recollection of discussing with
19 anybody else?
20 A  I have no recollection of that.
21 Q  Okay.
22 A  That's correct. I do not.
23 Q  Did you remove Jack Loholt from any positions
24 working with youth in the ward while you were bishop?
25 A  Did I remove him?

Case 2:04-cv-02338-RSM   Document 81-2   Filed 01/30/2006   Page 10 of 10

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                              RANDALL BORLAND

**Page 73**

1  Q  Yes.
2  A  Released him --
3  Q  Okay.
4  A  -- yes.
5  Q  And what positions did you release him from?
6  A  His responsibility in scouting.
7  Q  Why did you release him?
8     MR. FREY: You can't --
9  A  I can't divulge that.
10 Q  I'm not asking you to reveal any communications.
11 I'm asking you your personal reasons why you released him
12 from scouting.
13    MR. FREY: Same objection. You're entitled to
14 claim the privilege.
15    One reveals the other, Counsel.
16 Q  (By MR. FREY) Isn't it a fact that you removed
17 Jack Loholt from scouting because you knew that he presented
18 a danger to boys of sexual abuse?
19 A  I -- I am not going to answer that.
20 Q  Did anybody ask you why you were releasing Jack
21 Loholt from scouting?
22 A  Nobody asked me why I was releasing him that I can
23 remember.
24 Q  Did you make any announcement to members of the
25 ward, either in a general meeting or in meetings of any

**Page 74**

1  units within the ward, that Jack Loholt should not be
2  permitted to work with or around children?
3  A  I don't recall any such thing.
4  Q  Was -- was LDS Social Services available to you as
5  a bishop for referrals when you were bishop of the Kent
6  Second Ward?
7  A  I can't remember the dates. It seemed like it was
8  just coming into the fore, and I don't remember when. And
9  so I -- I don't remember that.
10 Q  Did you send Jack Loholt to LDS Social Services
11 for any reason?
12 A  I don't remember doing that.
13 Q  Are you saying you didn't?
14 A  I say I don't remember ever doing that. It was a
15 long time ago.
16 Q  You have no recollection of sending Jack Loholt to
17 LDS Social Services for sexual deviancy counselling?
18    MR. FREY: Counsel, I'm going to object to this
19 question. You've asked it three times now, and he's
20 answered the question twice already saying he has no memory
21 of it. I think your badgering the witness.
22    You can answer it one more time, and then we're
23 not going to answer it again.
24 A  What was it again?
25 Q  You have no recollection of having released Jack

**Page 75**

1  Loholt to LDS Social Services for sexual deviancy?
2  A  I have no recollection of doing that.
3  Q  Did you ever at any time tell anybody that they
4  should not allow Jack Loholt to work with or around their
5  children?
6  A  Did -- do I remember telling anybody that?
7  Q  Anybody.
8  A  I do not remember that.
9  Q  If as bishop you had determined that an assistant
10 scoutmaster was sexually molesting boys, what would you have
11 done to warn or protect children within the ward from that
12 assistant scoutmaster?
13    MR. FREY: For the record, I'm going to object to
14 the question. It assumes, No. 1, facts not in evidence, and
15 the question is incomplete.
16    Go ahead. Object to the form.
17 A  What would I do if an assistant scoutmaster was, I
18 guess, taking liberties, immoral liberties, or how would you
19 say it?
20 Q  Yes, sexual -- you had credible reason to believe
21 that a scoutmaster or assistant scoutmaster was sexually
22 abusing kids in the ward.
23 A  If I had that credible --
24 Q  Yes.
25 A  I would -- if I had that, that that was happening,

**Page 76**

1  I would -- I would talk to my stake president if I had that
2  kind of information, that it was credible.
3  Q  Did you ever speak to your stake president
4  regarding Jack Loholt?
5  A  Not specifically, no.
6  Q  Did you ever speak with your stake president
7  generally about -- without identifying the individual, a
8  concern about a scoutmaster, assistant scoutmaster molesting
9  children?
10    MR. FREY: Object to the form of the question.
11 What time period are we talking about now?
12    MR. KOSNOFF: When he was bishop of the Kent
13 Second Ward.
14    MR. FREY: Okay. Again, as long as this doesn't
15 violate any type of confidence that you have between your
16 counselors and your stake president in your ecclesiastical
17 position.
18 A  That's what I'm wrestling with, and I believe it
19 does. I don't believe I can answer that question.
20 Q  (By MR. KOSNOFF) So did I understand, your
21 hesitancy to answer the question is that you're taking the
22 privilege -- or the position that any communication between
23 you and the stake president is also privileged?
24 A  Anything that would break confidentiality I take
25 as an ecclesiastical privilege, yes.