# EXHIBIT D

D - 33

Dockets.Justia.com

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE, )
)
    Plaintiffs, )
)
vs. ) No. C04-2338RSM
)
THE CORPORATION OF THE )
PRESIDENT OF THE CHURCH OF )
JESUS CHRIST OF LATTER-DAY )
SAINTS, a Utah corporation )
sole, a/k/a the "MORMON )
CHURCH," LDS SOCIAL SERVICES, )
a/k/a LDS FAMILY SERVICES, )
a Utah corporation, )
)
    Defendants. )

VIDEOTAPED DEPOSITION OF JACK A. ONEFREY

January 27, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| | |
|---|---|
| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

**Page 78**

1  Q  Okay. Did you receive any sexual deviancy therapy or
2     counseling while in prison?
3  A  A little bit of evaluation. But it wasn't a long
4     enough time to go through any therapy or anything.
5  Q  Your sentence wasn't long enough to go into a program
6     of therapy?
7  A  Right.
8  Q  When you -- was your -- was your sexual deviancy
9     classified or ranked or graded by seriousness at that
10    time?
11 A  I don't know.
12 Q  In any event, after serving that sentence, you were
13    released and you moved to California?
14 A  Oh, I just went to California because my mother was
15    going to pick up some furniture. So I drove down with
16    her.
17 Q  And -- and then did you stay in California?
18 A  No. We just went down to pick up her furniture.
19 Q  And where did you -- when you picked it up, where did
20    you go?
21 A  Up to Kent.
22 Q  Up to Kent. And then you stayed in Kent, or did you
23    return to Canada?
24 A  I returned to Canada. Was living in B.C. for a while,
25    lower mainland.

**Page 79**

1  Q  Where?
2  A  Langley.
3  Q  What were you doing there?
4  A  Really nothing.
5  Q  And then how long did you stay there before you
6     returned to Washington?
7  A  Maybe a year and a half.
8  Q  Now -- so you were not present for the church
9     disciplinary court that resulted in your
10    excommunication?
11 A  I wasn't able to.
12 Q  Is it because you were en route or in California?
13 A  Well, I wasn't living in Ontario or Manitoba at the
14    time, so there was -- and then I had to go down to
15    help my mother bring up her furniture, so I wasn't
16    able to attend.
17 Q  Were you -- were you interviewed by anybody in
18    connection with the church disciplinary court up in
19    Winnipeg?
20 A  I had a meeting with the stake president.
21 Q  Okay. Did you -- were you aware that you had the
22    opportunity to be present at the church court?
23 A  Yes.
24 Q  Okay.
25 A  I received a letter.

**Page 80**

1  Q  So you knew when it was and where it was?
2  A  Yes.
3  Q  Okay. So it would be fair to say that you chose not to
4     attend it?
5  A  No, I didn't choose not to attend it. I -- I was
6     unable to attend it. I wrote a letter to them
7     explaining that --
8  Q  All right.
9  A  -- that I wasn't able to --
10         MR. FREY: I'm going to object at
11 this point. I don't know whether the witness is aware
12 of it, but the court has ruled in this state that
13 anything to do with the disciplinary council, anything
14 said during that disciplinary council is privileged.
15 And you should know that. I don't know whether your
16 attorney knows that.
17         MR. KOSNOFF: Well, I'm sorry, Tom,
18 but you're now interfering with my deposition. This
19 man --
20         MR. FREY: I'm not interfering.
21         MR. KOSNOFF: This man has a lawyer,
22 and he knows what his rights are, and he can assert
23 the privilege as he sees fit. And it's not the place
24 of the church to be instructing the witness as to
25 whether or not he's going to answer questions about

**Page 81**

1  what occurred in the church disciplinary court.
2          MR. FREY: Counsel, you know as well
3  as I do, you don't have a right as an officer of the
4  court to ask him a question which you know is a
5  privileged communication and has been a published
6  decision in the court of appeals.
7          MR. KOSNOFF: Tom, privileges can
8  be waived.
9          MR. FREY: All right.
10         MR. WOLFE: Let me make it very
11 clear, Mr. Loholt has no intent of waiving a privilege
12 and is going to object to any questions that seek to
13 invade the privilege. I cannot review all of the
14 materials in this case and be as intimately familiar
15 as the counsel who represent parties are.
16    To the extent that there is an order that -- as
17 Mr. Frey has described, we're going to assert the
18 privilege. And I'm a little surprised that if there
19 is an order, that there's an effort to subvert it.
20         MR. KOSNOFF: There's no order. Mr.
21 Wolfe, now what you need to do --
22         MR. WOLFE: Excuse me.
23         MR. KOSNOFF: What you need to do --
24         MR. WOLFE: I've given you the
25 courtesy of letting you make your statements. And I'm

21 (Pages 78 to 81)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 82

going to make mine.
    There is an assertion of privilege. He intends to assert the privilege and assert confidentiality over those communications with church officials that fall within the privilege. Period.
    There is not going to be an inadvertent waiver here because you're asking questions that try to sneak around it or kind of fray away at the edges. You're a very good lawyer, Tim, and I understand what you're trying to do.
        MR. KOSNOFF: So are you --
        MR. WOLFE: I don't --
        MR. KOSNOFF: So are you, John, but the point is, John --
        MR. WOLFE: We're not going to have any inadvertent waivers.
        MR. KOSNOFF: Well, the assertion -- the person who is maintaining the privilege has to assert the privilege. And we're not going to just have the assertion of a blanket privilege. I'll ask the questions, and you can assert the -- advise him that he has a right to assert the privilege or not, but I'm not not going to inquire in certain areas.
        MR. WOLFE: If you have been directed by the Court or there are --

Page 83

        MR. KOSNOFF: I've not been directed. No, that's a misstatement by Mr. Frey.
        MR. FREY: I didn't say he was directed by the Court.
        MR. WOLFE: If there's an order.
        MR. KOSNOFF: There's no order.
        MR. FREY: There is a court --
        MR. KOSNOFF: There's no order.
        MR. FREY: -- decision.
        MR. KOSNOFF: Which is -- which is subject to interpretation, and I don't share Mr. Frey's interpretation of that particular decision.
    But nonetheless, any communication, whether it's privileged or not, has to be evaluated according to the criteria set up in the privilege. And if it doesn't meet the criteria, then it falls outside and he must answer the question.
    So you have to listen to the question and decide -- and I'll allow you to confer with your client -- whether or not the privilege applies to that particular communication. But to simply say that "I am going to lay down a blanket objection to all questions relating to the church disciplinary court" is improper.
    The privilege applies to communications,

Page 84

penitential communications, confidential communications, communications that have not been waived through subsequent disclosure --
        MR. WOLFE: By whom?
        MR. KOSNOFF: -- to other individuals.
        MR. WOLFE: By whom?
        MR. KOSNOFF: By the communicant.
        MR. WOLFE: I don't believe that Mr. Loholt is intending to waive any privilege, and he hasn't as far as I know, and we're asserting it.
        MR. FREY: For the record, I want to make it clear my objection. I do believe on behalf of the church that we have the right under the First Amendment in case authority in similar cases to object to the questions which invade the church disciplinary proceeding, which Division I of the Court of Appeals, in a case in which Mr. Kosnoff was counsel for the plaintiff, ruled specifically that any and all communications, writings or other activities that occurred in a church disciplinary proceeding are akin to and covered by the priest-penitent privilege and they are confidential and they don't have to be revealed.
        MR. KOSNOFF: Well, they're not, Mr.

Page 85

Frey, for a number of reasons. You overstate and misrepresent the holding of that case. But perhaps the most important factual distinction between the Doe case and this case is that in Doe, the communicant was present and participated in the disciplinary court.
    Testimony here is that this witness was not present in the disciplinary court. And even an expansive interpretation of Doe is limited to the -- to the -- to the -- to the result that communications within the disciplinary court are subject to the clergy-penitent privilege. As this man was not present in a disciplinary court, I don't see the basis of your objection.
        MR. FREY: Well, I'll tell you the basis of my objection, Mr. Kosnoff. Number one, if he had any communication with his bishop relative to going or about or anything to do with that court, or whether or not the bishop sent him any letter to do with that court, all of those materials in my view are covered, and I emphatically disagree with your interpretation of Doe.
    So that's my view. And some judge may go ahead and tell us later on that I'm wrong, but I doubt that.
Q   (By Mr. Kosnoff) Were you subsequently notified in some form that you had been excommunicated from the

22 (Pages 82 to 85)

Byers & Anderson
Court Reporters & Video

Page 86

```
 1  church?
 2          MR. WOLFE: We're going to assert a
 3  privilege --
 4          THE WITNESS: No.
 5          MR. WOLFE: Excuse me. We're going
 6  to assert a privilege as to communication relating to
 7  the disciplinary court.
 8  Q  (By Mr. Kosnoff) When you met Dr. Allenbach for the
 9     first time, he was teaching this investigator class.
10     Did your relationship change at that time? Did you
11     become friends? Did you go to work for him? What
12     was the -- how did the nature of your relationship
13     change, if any?
14  A  Just friends.
15  Q  Okay. What were the circumstances that led to you
16     moving to -- to the Allenbach compound?
17  A  Compound?
18  Q  You were -- was Dr. Allenbach living on a house on a
19     property on --
20  A  Yeah, it's his home.
21  Q  It's his home?
22  A  Yeah.
23  Q  Okay. This was an acreage?
24  A  Yes.
25  Q  Okay. And there were other buildings besides his home
```

Page 87

```
 1     on the property?
 2  A  Not at that time.
 3  Q  Not at that time. There was just his home?
 4  A  Yeah.
 5  Q  Okay. Was it a large home?
 6  A  Yes.
 7  Q  Did it have an apartment or --
 8  A  Yeah.
 9  Q  -- attached to it? And did you move into that
10     apartment?
11  A  Yes.
12  Q  How did that come about that you came to live in that
13     apartment attached to the Allenbachs' home?
14  A  Well, I -- I just told him my parents were taking the
15     trailer back because they wanted to move it to
16     California. So I told him I was going to be look --
17     going to be moving. And his apartment was empty at
18     the time, so I rented that from him.
19  Q  Okay. And did you come to know the Allenbach children
20     at that time?
21  A  I knew them before that time.
22  Q  You knew them. From church?
23  A  Yeah.
24  Q  After you were baptized into the church, you began
25     attending the Kent 2nd Ward?
```

Page 88

```
 1  A  Yeah.
 2  Q  Okay. Did you go through the various levels of the
 3     priesthood?
 4  A  Yes.
 5  Q  And did you eventually become a Melchizedek priest?
 6  A  I'm not sure. I think --
 7          MR. NASH: I'll have to object to
 8  the form because counsel's not listening.
 9          MR. FREY: I join the objection.
10          MR. WOLFE: Can we take a
11  five-minute break?
12          MR. KOSNOFF: You're going to have
13  to object to every question and answer I guess.
14          MR. WOLFE: Tim, can we take a
15  five-minute break?
16          MR. KOSNOFF: Sure.
17          MR. FREY: That was a cheap shot.
18          MR. KOSNOFF: All right. We'll take
19  a break.
20          THE VIDEOGRAPHER: We're going off
21  record. The time is 10:51.
22              (Recess from 10:51 to 11:00.)
23          THE VIDEOGRAPHER: We are back on
24  record. The time is 11:00 a.m.
25
```

Page 89

```
 1              EXAMINATION (Continuing)
 2  BY MR. KOSNOFF:
 3  Q  We were talking about your moving into the apartment.
 4     Can you describe this apartment, its size,
 5     configuration and its -- where it was in relation to
 6     the main house?
 7  A  It was underneath the main bedroom.
 8  Q  And what did it consist of?
 9  A  A bedroom, bathroom, a little kitchen.
10  Q  Did you pay Dr. Allenbach rent to stay there?
11  A  Yes.
12  Q  And you had gotten to know the Allenbach family from
13     church --
14  A  Yes.
15  Q  -- before you moved in?
16  A  Yes.
17  Q  And had you been a guest there at their home before you
18     moved there?
19  A  Yes.
20  Q  Frequently?
21  A  I don't remember how often.
22  Q  At the time you moved in, had you done any work for Dr.
23     Allenbach?
24  A  I built a little horse stall about as big as this room
25     I guess.
```

23 (Pages 86 to 89)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 90

1  Q  On his property?
2  A  Yeah. That's all I did.
3  Q  Did Dr. Allenbach talk with you about the plans he had
4     for building other structures on the property?
5  A  No.
6  Q  Did he at some point later?
7  A  Yes.
8  Q  Okay. And what were his plans?
9  A  I'm not sure what his plans were. Just that on a
10    piece of property, I tore down a building and I
11    reassembled it out there.
12 Q  So one of the things you did -- was that one of the
13    first things you did, was to tear down a building and
14    reassemble it on his property?
15 A  Yes.
16 Q  Okay. Was that before or after you were living there?
17 A  After.
18 Q  How long did you live at the Allenbach --
19 A  About three and a half years.
20 Q  Now, eventually the Allenbach property had two more
21    duplex structures on it, didn't it?
22 A  Yes. He --
23 Q  Did you help build those?
24 A  No.
25 Q  Okay. Were those being built during the time that you

Page 91

1     lived there?
2  A  No.
3  Q  Came after you left?
4  A  Yes.
5  Q  What were the other structures that were eventually
6     built on the property?
7  A  Who?
8  Q  The other structures?
9  A  What about them?
10 Q  What were they?
11 A  There were like little apartments for his mother and
12    his aunt.
13 Q  Did Mormon missionaries sometimes live in those
14    structures?
15 A  After -- no. No, they didn't.
16 Q  They didn't?
17 A  No.
18 Q  There were no Mormon missionaries that stayed in those
19    apartments?
20 A  They stayed where I stayed.
21 Q  Where did -- which was where?
22 A  The main house underneath the big bedroom.
23 Q  And these would be missionaries that would come into
24    the area to serve their mission, and that's where they
25    would stay?

Page 92

1  A  Yes.
2  Q  And so they would stay with you in that apartment?
3  A  No. I had long since --
4  Q  Okay. So they --
5  A  -- moved.
6  Q  -- moved into the apartment attached to the main house?
7  A  Well, actually, they -- they moved in when I was in
8     Canada.
9  Q  Okay. Well, with respect to the time period that you
10    lived at the Allenbach house, did you only live there
11    one time?
12 A  Yes.
13 Q  Okay. And that would have been roughly what time
14    period?
15 A  Oh, are you looking for a date or something?
16 Q  Well, we talked about your having spent three years in
17    the trailer before you moved to the Allenbachs', and
18    that would have been approximately 1969 or 1970?
19 A  Okay.
20 Q  And you moved into that apartment attached to the
21    house. How long did you stay there?
22 A  I said three and a half years.
23 Q  For three and a half years?
24 A  Yeah.
25 Q  And then where did you move?

Page 93

1  A  Just about a mile down the road. I bought a house.
2     It has long since been torn down, so you probably
3     don't have a picture of it.
4  Q  Do you know the address?
5  A  No.
6  Q  You say it was about a mile away?
7  A  (Witness nods head.)
8  Q  Did you buy that house --
9         MR. WOLFE: Speak up.
10 Q  (By Mr. Kosnoff) Did you buy that house from Dr.
11    Allenbach?
12 A  No.
13 Q  How many years did you stay in that house?
14 A  Nine.
15 Q  Did you live alone, or did you have a roommate?
16 A  I lived alone.
17 Q  Did Dr. Allenbach also build a sports field on his
18    property?
19 A  Yes.
20 Q  Did you help him build that?
21 A  No.
22 Q  What kind of sports field was it?
23 A  Baseball.
24 Q  And were games played there?
25 A  I don't know.

24 (Pages 90 to 93)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 94

1  Q  Did you ever participate in any --
2  A  No.
3  Q  -- baseball or softball games there?
4  A  No.
5  Q  Do you know whether any church league games took on --
6     or took place there?
7  A  I don't know. He was involved with community baseball
8     too, so...
9  Q  So you have no knowledge whether or not there were any
10    church --
11 A  No.
12 Q  -- league baseball games played there?
13 A  No.
14 Q  What kinds of church activities took place at the
15    Allenbach --
16 A  I didn't hear you.
17 Q  What kind of church-related activities took place at
18    the Allenbach property?
19 A  I don't know of any.
20 Q  Were there prayer meetings?
21 A  No.
22 Q  Were there ever meetings of any elders?
23 A  There wasn't any church meetings that I know of.
24 Q  Okay. But there may have been meetings that you were
25    not aware of?

Page 95

1  A  I don't think so.
2         MR. FREY: Object to the form of the
3     question.
4  Q  (By Mr. Kosnoff) Well, you said that there were -- so
5     you're not aware of any church leadership meetings that
6     took place at the Allenbachs'?
7  A  No.
8  Q  Okay. You never saw any church leaders there?
9  A  Maybe just visiting or something, but there wasn't any
10    meetings held.
11 Q  Okay. At least during the time that you lived there?
12 A  Yeah.
13 Q  And up until the time that you moved on to the
14    Allenbach property, you never molested a child?
15 A  I don't think so.
16 Q  And you never thought about molesting a child?
17 A  No, I thought about it.
18 Q  When did you first start thinking about molesting a
19    child?
20 A  I really -- sometime prior to that. But I can't
21    really tell you when.
22 Q  Who was the first child you molested?
23 A  I'm not sure.
24 Q  Did you molest Brent Allenbach?
25 A  Yes.

Page 96

1  Q  Did you molest Rick Allenbach?
2  A  Yes.
3  Q  Jim Allenbach?
4  A  Yes. They would be the first.
5  Q  They were the first ones?
6  A  Yeah.
7  Q  Do you know whether -- which one of those brothers you
8     molested first?
9  A  No.
10 Q  Did the molestation take place in your apartment? I'm
11    referring to the apartment at the Allenbach property.
12 A  Yeah. I'm -- I'm not sure.
13 Q  Did you -- did you molest Bob Kelly?
14 A  No.
15 Q  You never molested Bob Kelly?
16 A  No.
17 Q  Did you molest Tom Kelly?
18 A  No.
19 Q  Did you ever masturbate in front of boys in a field at
20    the Allenbach home in approximately 1970 or '71?
21 A  No.
22 Q  Did Dr. Allenbach ever speak to you about allegations
23    that you had molested a child?
24 A  I don't remember.
25 Q  You don't remember --

Page 97

1  A  No.
2  Q  -- whether he ever spoke to you?
3  A  No.
4  Q  Do you know whether he was aware that you had molested
5     children?
6  A  I don't know that either.
7  Q  You can't recall any conversation that you ever had
8     with Dr. Allenbach concerning the question of whether
9     you had molested a child?
10 A  No. Well, I don't remember.
11 Q  You don't remember?
12 A  No.
13 Q  It may have happened, but you've forgotten?
14 A  I don't think it happened or I'd remember.
15 Q  He never spoke to you about an incident involving you
16    masturbating to the point of ejaculation in a field in
17    front of the Allenbach boys and the Kelly boys?
18 A  I just can't remember.
19 Q  It doesn't even ring a bell?
20 A  No.
21 Q  And same question with respect to Veloy Allenbach, Mrs.
22    Allenbach; she never spoke to you ever about concerns
23    that you had molested a child?
24 A  No.
25 Q  With respect to your molesting Brent, Rick and Jimmy,

25 (Pages 94 to 97)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 102

1    of their penis and genitals was Rickie and nobody else?
2  A  That's right.
3  Q  Did you take pictures of the boys while you were
4    molesting them?
5  A  Of Kenny.
6  Q  And did you save those photographs?
7  A  I got rid of them.
8  Q  How long did you keep them?
9  A  Well, when I moved, Kenny asked me to, and I destroyed
10    them.
11  Q  About what year was that?
12  A  1980.
13  Q  So how many years had you kept them?
14  A  Oh, it was a matter of months.
15  Q  Where did you keep them?
16  A  Oh, probably in the dresser drawer or something.
17  Q  Why did you take them?
18  A  Well, I was moving just in -- to remember him I guess.
19  Q  Naked with his -- with an erection?
20  A  I don't know if he had an erection or not.
21  Q  Well, the photographs I'm talking about are photographs
22    of him naked, photographs of his genitals.
23  A  Yeah.
24  Q  You took photographs like that?
25  A  Yes.

Page 103

1  Q  Were there -- and were there photographs of you also
2    having sexual contact with him?
3  A  It's possible. I don't quite remember.
4  Q  Did you also make plaster casts of the boys' feet?
5  A  Ken I did.
6  Q  Why did you do that?
7  A  Probably just for something to do I guess.
8  Q  Do feet -- do children's feet sexually arouse you?
9  A  I'm not sure.
10  Q  Did they then?
11  A  Well, it wasn't a sexual part of his body, and --
12  Q  That wasn't my question. My question was whether or
13    not children's feet sexually aroused you at that time?
14  A  And I said I don't know.
15  Q  Was your making plaster casts of his feet something
16    that you wanted for sexual purposes?
17  A  No.
18  Q  And you have no recollection of your reasons for
19    wanting to do that?
20  A  I don't remember why.
21       THE VIDEOGRAPHER: We need to change
22    the tape.
23       MR. KOSNOFF: Yeah.
24       THE VIDEOGRAPHER: Going off record.
25    The time is 11:17. This is the end of Tape No. 1.

Page 104

1       (Discussion off the record.)
2
3       THE VIDEOGRAPHER: We are back on
4    record. The time is 11:20. This is the beginning of
5    Tape No. 2.
6  Q  (By Mr. Kosnoff) Mr. Onefrey, other than the
7    photographs that you discussed of Ken Fleming, did you
8    take photographs of any other children that you
9    molested?
10  A  I might have taken some of Rickie.
11  Q  And do you have any photographs of any children that
12    you molested?
13  A  No.
14  Q  Do you know where they are?
15  A  I destroyed them about -- somewhere in around 1980
16    after I moved.
17  Q  Do you remember about how many photographs you had that
18    you destroyed?
19  A  Oh, maybe, 30 or 40. They were slides.
20  Q  You testified that you had mutual oral sex with these
21    children. Did you ejaculate in their mouths?
22  A  Maybe with Brent. I'm not sure.
23  Q  Do you remember one way or the other whether you
24    ejaculated or not into the mouths of the children you
25    molested?

Page 105

1  A  I think Brent was -- I'm not sure about the others.
2  Q  Did you have sexual contact or did you sexually expose
3    yourself to any of these people: Jill Allenbach?
4  A  Yes.
5  Q  You did Jill?
6  A  Yes.
7  Q  What did you do to Jill?
8  A  I'm not too sure what it all involved.
9  Q  Well, tell me everything you remember about the sexual
10    contact or exposure to Jill Allenbach.
11  A  I think we fondled each other.
12  Q  By you way, before we move on, how old was Brent
13    Allenbach when you first started molesting him?
14  A  About 11.
15  Q  Okay. And how many years did it go on?
16  A  Two, three years, something like that.
17  Q  And what was the frequency? Was it daily?
18  A  No.
19  Q  Couple of times a week?
20  A  Oh, maybe a couple of times a month for a few months.
21  Q  Same question with respect to Rick Allenbach?
22  A  About the same.
23  Q  And Jim Allenbach?
24  A  Less than that.
25  Q  Okay. Were they all -- how old was Jim Allenbach when

27 (Pages 102 to 105)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 106

1  you first started molesting him?
2  A  Maybe seven or eight.
3  Q  And Brent you said 11. How about Rick?
4  A  Maybe nine or ten.
5  Q  How were you able to molest these boys in their home
6     without their parents knowing?
7  A  I'm not too sure how to answer that. I don't know.
8  Q  Were you almost caught? Were there ever any near
9     misses with Dr. and Mrs. Allenbach?
10 A  No.
11 Q  What did you do to protect yourself from being caught
12    or detected?
13 A  I don't know that I did anything.
14 Q  Would this happen -- would your molesting these boys
15    take place during the day?
16 A  Probably both.
17 Q  Day and night?
18 A  Yeah. Day or night.
19 Q  Did Dr. and Mrs. Allenbach ever come down to your
20    apartment to check on their children?
21 A  I can't recall.
22 Q  Do you remember any incidents where you were concerned
23    that maybe they suspected or believed that you were
24    molesting their boys?
25 A  No.

Page 107

1  Q  How many incidents were there with Jill Allenbach?
2  A  I'm not sure.
3  Q  Okay. Do you recall taking baths with the Allenbach
4     children?
5  A  Yes.
6  Q  Okay. When did -- how often did that occur?
7  A  Maybe once or twice.
8  Q  Was that in the bathtub in your apartment?
9  A  Yes.
10 Q  And did you take baths with Jill Allenbach?
11 A  Yes.
12 Q  Okay. And is that one of the contacts in which you
13    molested her?
14 A  I don't think so. They were -- I don't think so.
15 Q  So you didn't molest Jill Allenbach in the bathtub?
16 A  I don't think so. I can't remember it.
17 Q  Where did the sexual contact between you and Jill
18    Allenbach take place?
19 A  In bed.
20 Q  How did you get the kids to come down to your apartment
21    to engage in sexual contact with you?
22 A  I don't remember what I did.
23 Q  Did you offer them candy or toys or anything like that?
24 A  No.
25 Q  Were there any kind of inducements that you used to get

Page 108

1  them down there?
2  A  No.
3  Q  Did you ever make ice cream for them?
4  A  No.
5  Q  They just came down there on their own and had sex with
6     you?
7  A  Well, they come down to visit.
8  Q  Did you do anything to try and keep them quiet, that
9     is, keep them from telling?
10 A  No.
11 Q  Did you ever threaten any of them?
12 A  No.
13 Q  Did you ever tell them that they'd get in trouble if
14    they ever told?
15 A  No.
16 Q  Never said anything like that?
17 A  No.
18 Q  So they just came down there on their own; you were
19    able to molest them, sometimes as often as a couple of
20    times a week; you didn't do anything to protect
21    yourself from detection; and you didn't do anything to
22    induce them to come down there to have sexual contact
23    with you. Is that your testimony?
24 A  Right.
25        MR. FREY: I'm going to object to

Page 109

1     the form of the question. You can answer.
2  Q  (By Mr. Kosnoff) Is that your testimony?
3  A  Yes.
4  Q  All right. I believe you testified that you did not
5     molest Tom Kelly?
6  A  Right.
7  Q  Did you expose yourself to Tom Kelly?
8  A  No.
9  Q  Did you molest Dan Fleming?
10 A  Yes.
11 Q  Okay. Where did that occur?
12 A  In my truck.
13 Q  Okay. How many -- on how many occasions?
14 A  Just briefly once.
15 Q  Okay. What about on a camping trip?
16 A  Well, that was it.
17 Q  That was it?
18 A  Yeah.
19 Q  The truck, was that a truck camper that you're
20    referring to?
21 A  No. It's -- it was a big truck.
22 Q  And it had a sleeping area?
23 A  No.
24 Q  No?
25 A  Him and Todd Denny were in the front seat.

28 (Pages 106 to 109)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 118

1  Q  After you became assistant scoutmaster, what kind of
2     activities did you participate in as assistant
3     scoutmaster?
4  A  Some of the teachings, the skills, camping skills and
5     rope and that kind of thing.
6  Q  Who was in the pack or the troop at that time?
7  A  Probably Brent and Scott Pettit. I can't think of the
8     others' names.
9  Q  John Llewitt?
10 A  I don't remember that name.
11 Q  Brent Parkin?
12 A  Yeah, Brent was in it.
13 Q  How about Terry Clark?
14 A  Yeah.
15 Q  Where were the meetings held?
16 A  At the chapel.
17 Q  At the ward building?
18 A  Yes.
19 Q  How active was Ken Keller as the scoutmaster?
20 A  He was quite active.
21 Q  Was he always present at all the meetings?
22 A  I think so.
23 Q  At some point were you released from that position as
24    assistant scoutmaster?
25 A  Yes.

Page 119

1  Q  By Bishop Borland?
2  A  Yes.
3  Q  What were the circumstances of your being released as
4     assistant scoutmaster?
5         MR. WOLFE: We're going to object
6     here on privilege. This goes back to -- this relates
7     to the operations of the church and the management of
8     the scout troop.
9         MR. KOSNOFF: Are you directing him
10    not to answer?
11        MR. WOLFE: Yes.
12 Q  (By Mr. Kosnoff) Isn't it a fact that you were
13    released as assistant scoutmaster because there had
14    been an allegation that you'd sexually molested a boy?
15        MR. WOLFE: We're going to object on
16    privilege.
17        THE WITNESS: Yeah.
18        MR. WOLFE: Privilege.
19 Q  (By Mr. Kosnoff) You had sexually molested Scott
20    Pettit, and Bishop Borland became aware of that fact,
21    isn't that true?
22        MR. WOLFE: We're going to object on
23    privilege.
24        THE WITNESS: No. I'm going to
25    object too.

Page 120

1         MR. WOLFE: Mr. -- yeah.
2  Q  (By Mr. Kosnoff) Were you released as assistant
3     scoutmaster because of allegations that you had
4     sexually molested a boy?
5         MR. WOLFE: We're going to object on
6     privilege.
7  Q  (By Mr. Kosnoff) After you were released as assistant
8     scoutmaster, you continued to work in the ward's scout
9     program though?
10 A  No.
11 Q  No? You didn't? Did you come back into the scouting
12    program at some later date?
13 A  Not sure when I came back.
14 Q  The records that have been provided by the church
15    indicate that you were released as assistant
16    scoutmaster of the Kent 2nd Ward in February of 1972.
17 A  Could be.
18 Q  So approximately one year after you had been appointed
19    assistant scoutmaster you were released?
20 A  Yeah, I wasn't -- I don't know what the dates are.
21 Q  And at some later point you recall coming back in and
22    working with the scouts, though, don't you?
23 A  I probably supplied some transportation and things.
24 Q  Supplied transportation, went on 50 mile hikes, went on
25    campouts, that kind of thing?

Page 121

1         MR. FREY: Object to the form of the
2     question.
3         THE WITNESS: Yeah.
4  Q  (By Mr. Kosnoff) Yes?
5  A  Yeah. I object.
6  Q  Okay. And was Ken Keller still the scoutmaster when
7     you came back in to scouting?
8  A  I don't remember that.
9  Q  The records that have been provided to us indicate that
10    in October of 1973 you were sustained by the Kent 2nd
11    Ward as assistant venturer leader.
12 A  No.
13 Q  What was the -- what was the venturer program?
14 A  They're the older scouts.
15 Q  And so that's part of scouting but for older scouts?
16 A  It's 14 to 16.
17 Q  Okay. And so you began working with that age group of
18    scouts in the ward?
19 A  No.
20 Q  No? You didn't work with them as the assistant
21    venturer leader starting in October 1973?
22 A  I was never, that I remember being, associated with
23    the older boys other than help with the
24    transportation.
25 Q  So you have no recollection of receiving this

31 (Pages 118 to 121)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

### Page 122

1 appointment or calling from the bishop in October of
2 1973?
3 A No.
4         MR. WOLFE: As it relates to
5 communications with the bishop in any way, I'm going
6 to object, assert the privilege.
7 Q (By Mr. Kosnoff) Do you know the Mina Harrison family?
8 A Yes.
9 Q Okay. Was there a complaint by the Mina Harrison
10 family regarding your conduct with their children?
11 A Yes.
12 Q Okay. Tell me about that.
13 A I did not miss -- had no -- had no con -- trying to
14 say sexual contact with them at all.
15 Q Were they in the scout troop?
16 A Yes.
17 Q Okay. And somebody told you that they'd accused you of
18 molesting them?
19 A I didn't know it until just a few weeks ago.
20 Q You didn't know what until a few weeks ago?
21 A That they had complained.
22 Q Well, in fact, Mr. Onefrey, when you and I spoke about
23 18 months ago, we talked about the Harrison family, and
24 you told me that Bishop Borland had come to you and
25 told you that the Harrison boys had accused you of

### Page 123

1 sexual molestation; correct?
2         MR. WOLFE: I'm going to object
3 here.
4         MR. FREY: Object to the form of the
5 question.
6         THE WITNESS: Yeah. I object to
7 that.
8         MR. WOLFE: You let me do the
9 objecting.
10         THE WITNESS: Oh, okay.
11 Q (By Mr. Kosnoff) Go ahead and answer the question.
12 A What -- restate it.
13         MR. KOSNOFF: Go ahead.
14             (Question on Page 122, Line 22
15             read by the reporter.)
16
17         MR. WOLFE: So the question
18 really -- just so that I understand, the question is
19 what is alleged to have been said by Mr. Onefrey to
20 you, Mr. Kosnoff? Is that the question?
21         MR. KOSNOFF: The question stands.
22         MR. WOLFE: Let's read it again.
23             (Question on Page 122, Line 22
24             read by the reporter.)
25

### Page 124

1         MR. WOLFE: So the question to you,
2 Mr. Onefrey, is, did you say that to Mr. Kosnoff.
3         THE WITNESS: I didn't say
4 Harrisons.
5 Q (By Mr. Kosnoff) Who did you say?
6 A Well, I just had recently learned that they had -- had
7 said -- accused me of that.
8 Q So you say you just learned that -- about that
9 accusation recently?
10 A Well, I -- I learned who said it cos you told me.
11 Q Okay. But at the time, you knew that there was an
12 accusation, and you're saying but you didn't know who
13 was the source of that accusation?
14 A I didn't know who filed it.
15         MR. WOLFE: Not -- okay.
16 Q (By Mr. Kosnoff) And you became aware of that
17 accusation through Bishop Borland?
18         MR. WOLFE: And we're going to
19 object.
20         THE WITNESS: Yeah.
21         MR. WOLFE: Assert privilege.
22         THE WITNESS: Yeah.
23         MR. WOLFE: You need to let me
24 finish, sir.
25         THE WITNESS: Okay. Sorry.

### Page 125

1         MR. WOLFE: All right? So I'm
2 advising my client to assert privilege here. And are
3 you going to follow my advice and assert the
4 privilege?
5         THE WITNESS: Yes.
6         MR. WOLFE: All right.
7 Q (By Mr. Kosnoff) And Bishop Borland -- you told me
8 when we talked that Bishop Borland had come to you and
9 said, "We've received a complaint of you sexually
10 molesting some brothers."
11     Remember you telling me that?
12 A I said something, but I don't remember what it was.
13 Q And do you remember telling me that when the bishop
14 told you who was making the accusation, that you denied
15 abusing those boys, but that you admitted to him that
16 you were abusing the Allenbach brothers.
17     Remember telling me that?
18 A Yes.
19 Q Okay. And that discussion happened just before you
20 were removed by Bishop Borland as assistant scoutmaster
21 in February of 1973?
22         MR. WOLFE: Excuse me. Just so that
23 I understand, which discussion? The discussion with
24 you or discussion with somebody else? Because I think
25 the question is ambiguous.

32 (Pages 122 to 125)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

### Page 126

1  MR. KOSNOFF: I agree. I'll strike
2  it.
3  Q (By Mr. Kosnoff) The discussion that you told me about
4  on the telephone with Bishop Borland, okay, that
5  conversation with Bishop Borland, preceded Bishop
6  Borland removing you as scoutmaster in February of
7  1973?
8       MR. WOLFE: Wait one minute. All
9  right? Can I consult with -- I'm going to consult
10 with Mr. Onefrey for just a minute outside.
11      MR. KOSNOFF: Well, there's a
12 question pending.
13      MR. WOLFE: I represent him. This
14 is not an adverse party. It's different.
15      MR. KOSNOFF: Well, it's not. The
16 rules apply to all deponents.
17      MR. WOLFE: It relates to a question
18 of privilege.
19      MR. KOSNOFF: All right. Go ahead.
20      THE VIDEOGRAPHER: Going off record.
21 The time is 11:50.
22          (Recess from 11:50 to 11:58.)
23
24      THE VIDEOGRAPHER: We are back on
25 record. The time is 11:58.

### Page 127

1       MR. KOSNOFF: Would the court
2  reporter please read back the last question.
3          (Question on Page 126, Line 3
4          read by the reporter.)
5
6       EXAMINATION (Continuing)
7  BY MR. KOSNOFF:
8  Q Correct?
9  A I can't remember.
10 Q When we talked on the phone, you told me on more than
11 one occasion that no matter what happened in this case
12 you were going to tell the truth?
13 A That's right.
14 Q Okay. And do you still feel that same way today?
15 A Yes.
16 Q Okay.
17      MR. FREY: I'm going to object to
18 the form of the question. If I can have a running
19 objection to your characterization of what was said,
20 Tim, because I think they're improper. The form of
21 them is improper. But go ahead.
22 Q (By Mr. Kosnoff) Well, at the time you talked with me,
23 you were trying to be truthful, weren't you?
24 A Yes.
25 Q And you were truthful?

### Page 128

1  A I don't -- it's hard for me to answer that because I
2  don't hear well on the phone at all.
3  Q But you weren't trying to deceive me, were you?
4  A No.
5  Q And is it true that the Mormon Church is paying your
6  attorneys' fees to represent you?
7  A They're loaning me the money I guess.
8  Q What's your understanding of that loan and how or
9  whether it's supposed to be repaid?
10 A Well, it's -- I simply could not be down here without
11 borrowing some money or something.
12 Q So the church is giving you money for travel?
13 A Not yet, no.
14 Q Okay. You -- but they're going to reimburse you?
15 A I don't know.
16 Q Well, your -- do you have an understanding that they
17 will reimburse you?
18 A No, I don't.
19 Q Has anyone made a representation that the church will
20 reimburse you for your travel down here?
21 A No.
22 Q Well, you talked a moment ago about there being a loan
23 and repayment. What were you referring to?
24 A Well, I charged a lot of this on my credit cards,
25 so -- and I need help somewhere.

### Page 129

1  Q Has anybody from the church or their attorneys
2  indicated to you that they'll give you that help?
3  A If I have -- if I need something for food or groceries
4  or my electrical bills because of money I'm spending,
5  then they'll give me that help.
6  Q Okay. And who did you have that understanding with?
7  A My branch president.
8  Q Okay. When did you have that conversation?
9  A It's been a little while ago, because I'm putting out
10 this money, and that is money that has to go for
11 power, telephone, food and that kind of thing. So I
12 can't pay an attorney and pay my payments on -- on
13 living stuff. And it's -- it comes under the welfare
14 where they'll help if we're in need.
15 Q Okay. So -- but have you written -- well, have you
16 paid any of your money to Mr. Wolfe to represent you?
17 A No.
18 Q And is it your understanding that the church or the
19 church's lawyers have paid Mr. Wolfe to represent you?
20 A Well, I've gotten some money, so I don't really know
21 how it's working out.
22 Q Okay. But you haven't personally paid Mr. Wolfe for
23 his time and service?
24 A No.
25 Q And --

33 (Pages 126 to 129)

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961
D - 44

Byers & Anderson
Court Reporters & Video

Page 134

1  Q  But you didn't molest him?
2  A  No.
3  Q  Craig Parkin?
4  A  No.
5  Q  You recognize the name?
6  A  Yeah.
7  Q  But you didn't molest him?
8  A  No.
9  Q  Terry Clark?
10 A  I recognize the name, but --
11 Q  Did you molest him?
12 A  No.
13 Q  Brent Parkin?
14 A  No.
15 Q  Again, you recognize the name, but you're --
16 A  Right.
17 Q  In your no's, are you -- you remember that you didn't
18    molest them?
19 A  Right.
20 Q  Okay. Mark Johansen?
21 A  I recognize him, but no.
22 Q  Did you molest him?
23 A  No.
24 Q  John Llewitt?
25 A  No.

Page 135

1  Q  Brian Gross?
2  A  Yeah, I know him. But --
3  Q  Did you molest him?
4  A  No.
5  Q  David Gross?
6  A  No.
7  Q  Steven Harrison?
8  A  No.
9  Q  Glen Harrison?
10 A  No.
11 Q  Ron Harrison?
12 A  No.
13 Q  Egil Knutsen?
14 A  No.
15 Q  Dick Dilley?
16 A  No.
17 Q  Do you know Dick Dilley?
18 A  Yes.
19 Q  Was he a scout when you were an assistant scoutmaster
20    in the Kent 2nd Ward?
21 A  I'm not sure if he was a scout, what time.
22 Q  Well, when you were involved --
23 A  But I know he was -- I know he was a scout.
24 Q  When you were involved in scouting in the ward either
25    as an assistant scoutmaster, transporting bags --

Page 136

1  A  That's about it, at that time.
2         MR. NASH: I'm sorry. I didn't hear
3     the answer.
4         (Answer on Page 136, Line 1,
5         read by the reporter.)
6
7  Q  (By Mr. Kosnoff) It was during that time period that
8     you recall him being in scouting?
9  A  Yes.
10 Q  Sort of the early period of time that you were involved
11    in scouting in the ward?
12 A  I'm not sure what time period that is.
13 Q  Okay. And you're saying you didn't have any sexual
14    contact with him?
15 A  No.
16 Q  David Blair?
17 A  No.
18 Q  Brian Nielsen?
19 A  No.
20 Q  Do you recognize those names?
21 A  Yes.
22 Q  Steve Dabling?
23 A  Don't recognize that.
24 Q  Don't recognize that name?
25 A  I think -- I think I know who that is, but the answer

Page 137

1     is no.
2  Q  Pat McVey?
3  A  No.
4  Q  Do you recognize that name?
5  A  Yes.
6  Q  Was he in scouting?
7  A  I don't know when.
8  Q  I mean, when I say in scouting, I mean during the time
9     that you were involved in the ward's scouting program.
10 A  Okay. Well, I don't think so.
11 Q  Duke Anderson?
12 A  Duke -- no.
13 Q  You're sure?
14 A  I think so. I'm really not sure about that name.
15 Q  Chelsey Wieder?
16 A  Yes.
17 Q  Do you have any idea how many children you have
18    sexually molested in your life?
19 A  I've never counted. The ones that we're talking
20    about, and Kenora, and Chelsey Wieder.
21 Q  So we've identified everybody that you've ever sexually
22    molested?
23 A  I think so.
24 Q  Can't think of anybody else?
25 A  No.

35 (Pages 134 to 137)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 138

1  Q  Did you ever tell Chelsey Wieder that you had had sex
2     with more than 250 children in your life?
3  A  No.
4  Q  Never made that statement?
5  A  No.
6  Q  Never said anything like that to her?
7  A  No.
8  Q  Did you ever go to LDS Social Services for sexual
9     deviancy counseling or treatment?
10 A  Yes.
11 Q  Okay. About what time period?
12 A  Probably -- I'm really not sure on that.
13 Q  But it was while you were in the Kent 2nd Ward in the
14    1970s?
15 A  Yes.
16 Q  Okay. And you were referred there by a bishop?
17          MR. WOLFE: We're going to object,
18    assert privilege.
19 Q  (By Mr. Kosnoff) You were referred to or sent to LDS
20    Social Services by Bishop Borland, isn't that correct?
21          MR. WOLFE: Assert privilege.
22 Q  (By Mr. Kosnoff) When you went to LDS Social Services,
23    you told them about your -- you were truthful about
24    your sexual contact with children, weren't you?
25 A  Yes.

Page 139

1           MR. WOLFE: Assert privilege.
2           THE WITNESS: Oh, sorry.
3  Q  (By Mr. Kosnoff) And that was the reason you were
4     there, was to discuss your sexual deviant attractions
5     to children; isn't that correct?
6           MR. WOLFE: Assertion of privilege.
7           MR. KOSNOFF: What's the basis of
8     the privilege?
9           MR. WOLFE: It's the privilege we've
10    discussed earlier, Mr. Kosnoff, the priest-penitent
11    privilege. Based upon my understanding of the church
12    law, there is a legitimate basis to assert privilege
13    here.
14          MR. KOSNOFF: So what you're saying
15    is him going to LDS -- the social service wing of the
16    church, that you're asserting the clergy-penitent
17    privilege with respect to his communications with
18    social service workers? Is that --
19          MR. WOLFE: Based upon my
20    understanding of the law of the Mormon Church, yes.
21          MR. FREY: With social services he
22    has a privilege, Counsel, besides that
23    physician-patient, which covers psychologists,
24    psychiatrists and everyone else.
25 Q  (By Mr. Kosnoff) How many -- how long a period of time

Page 140

1     did you go to LDS Social Services for sexual deviancy
2     treatment?
3  A  About a year.
4  Q  About a year? Did it do any good?
5  A  Yes.
6  Q  Did LDS Social Services to your knowledge ever report
7     you to the police or Child Protective Services?
8  A  No idea.
9           MR. FREY: Excuse me. His answer
10    was "I have no idea"?
11          THE REPORTER: (Nodding.)
12          MR. FREY: Thank you.
13 Q  (By Mr. Kosnoff) Did you ever have a discussion with
14    LDS Social Services about the fact that CPS or the
15    police would have to be notified?
16          MR. WOLFE: Objection, assert
17    privilege.
18 Q  (By Mr. Kosnoff) Were you ever contacted by the police
19    or LDS Social Services after the period that you were
20    going to LDS Social Services?
21          MR. WOLFE: Object and assert
22    privilege as it relates to the LDS Social Services
23    program. You can answer with respect to police.
24          MR. KOSNOFF: Whether he was
25    contacted by the police or CPS?

Page 141

1           MR. WOLFE: You didn't say CPS, Tim.
2     You said LDS Social Services.
3           MR. KOSNOFF: Repeat the question.
4           (Question on Page 140, Line 18
5           read by the reporter.)
6
7           MR. WOLFE: Object as it relates to
8     LDS Social Services. You can answer with respect to
9     were you contacted by police, but not as it relates to
10    LDS Social Services.
11          MR. KOSNOFF: If I understand your
12    objection, you're objecting to whether or not he was
13    contacted by the police after the period of time that
14    he was at LDS Social Services?
15          MR. WOLFE: That's not what I said
16    at all.
17          MR. FREY: He's not saying that.
18          MR. WOLFE: You asked a compound
19    question, and I'm breaking it down into was he
20    contacted by the police, not contacted by the police
21    or LDS Social Services.
22 Q  (By Mr. Kosnoff) Were you contacted by the police or
23    CPS following the period of time that you were going to
24    LDS Social Services?
25 A  What is the CPS?

36 (Pages 138 to 141)

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961
D - 46

Page 146

1  we're trying to establish.
2           MR. NASH: Well, then we'll wait and
3  reserve the issue.
4  Q  (By Mr. Kosnoff) What was the -- what was the time
5     period that you went to -- the one year that you were
6     going to LDS Social Services?
7  A  I can't remember when that was.
8           (Mr. Frey enters.)
9
10 Q  (By Mr. Kosnoff) Was it -- how soon after you were
11    removed as scoutmast- -- assistant scoutmaster in
12    February of 1973?
13 A  I really can't remember the -- the date.
14 Q  But was it soon after that?
15 A  I have two recollections, and I really don't know.
16 Q  Okay. Let's talk about the first recollection you
17    have. What is the first recollection you have?
18 A  That I might have gone right after Bishop Borland.
19 Q  And the second recollection?
20 A  It might have been after that sometime somewhere.
21 Q  Do you think there may have been more than two times
22    you went to LDS Social Services, that is, two separate
23    periods of counseling?
24 A  I only went one period, but I don't know where in
25    the...

Page 147

1  Q  From the time that you started going to LDS Social
2     Services, were you also prevented from taking sacrament
3     in the church?
4  A  There was a time.
5  Q  Was it about the same time period?
6  A  Well, it -- it started right away.
7  Q  Not being permitted to take sacrament?
8  A  Right. I wasn't worthy to take it.
9  Q  Did anybody in the congregation speak to you or comment
10    about the fact that you were not taking sacrament?
11 A  No.
12 Q  After you returned from LDS Social Services, did you
13    continue to molest children?
14 A  I didn't hear that.
15 Q  After the one year period of time that you spent at LDS
16    Social Services, did you continue to molest children in
17    the Kent 2nd Ward?
18 A  Not for a long time.
19 Q  How long a period of time did you go without molesting
20    children?
21 A  That I'm not sure.
22 Q  What's your -- who is the first person you recall
23    molesting after you went to LDS Social Services?
24 A  Rickie Allenbach.
25 Q  Okay. Now, there's been testimony in this case that

Page 148

1  during a period of time after Ken Fleming joined the
2  church in 1972 that you were the scoutmaster and that
3  scout meetings were taking place at your house.
4      Did scout meetings take place at your house?
5  A  No.
6  Q  You have no recollection of holding any scout functions
7     at your house?
8  A  Not official.
9  Q  Okay. What about unofficial?
10 A  They wanted to know if they could come over and eat
11    pizza, if they bring their own pizzas and that. So
12    there was several of the boys that came over.
13 Q  And would you -- would you treat this as a scout
14    meeting?
15 A  No. It's just -- just -- I'm not sure what they --
16    you'd call it.
17 Q  Did you tell their parents or announce to the ward that
18    this was a scout meeting that was taking --
19 A  No.
20 Q  -- place at your house?
21 A  It's just something that they asked me if they could
22    do. And I think twice they came over.
23 Q  So you only remember two occasions where that happened
24    at your house?
25 A  Yes, because they were throwing snowballs at cars, so

Page 149

1  that ended that.
2  Q  So it's your testimony that there were not regular
3     scout meetings held at your house?
4  A  No. That's right.
5  Q  And that all the scout meetings, the regular scout
6     meetings, took place at the chapel?
7  A  Yes.
8  Q  When you were holding scout meetings or taking kids on
9     scout outings, were there occasions when you were the
10    only adult scout leader present?
11 A  I can't remember being alone.
12 Q  You can't remember one occasion where you were alone
13    with boys?
14 A  No. There was always the scoutmaster, the assistant
15    scoutmaster there. Anything -- any time I might have
16    been alone with them was on my own.
17 Q  On your own?
18 A  How would you say it? I'd invite them or they asked
19    me if they could come along.
20 Q  How did you invite 11 and 12 year old boys?
21 A  Well, they liked me quite a bit. I was good to them
22    in a lot of ways. And so they would just ask if they
23    could -- if I was going up to the mountains to work on
24    my cabin or something, if they came along, or they'd
25    ask me if they could come over and work on their merit

38 (Pages 146 to 149)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 150

1  badges. And usually they just wanted to watch
2  television. So I just used to go to bed, and they'd
3  stay up until all hours because they'd always -- seems
4  like they always forget their little books on
5  different merit badges.
6  Q  So these meetings that you had at your house, were
7     those merit badge training sessions?
8  A  That's what I thought they were going to be, but they
9     never brought their -- they just brought their bags of
10    candy and stuff, so...
11 Q  Is that what you would tell their parents, that it was
12    a merit badge training session?
13 A  I never told them anything. They'd call up and ask me
14    if they could come over and work on their merit
15    badges. But they'd never show up with their -- with
16    their books, so --
17 Q  And did you ever have any conversations with Ken
18    Fleming's mother in which you told her that Ken was
19    going to be at your house for merit badge training?
20 A  I don't remember Ken being at my place.
21 Q  Ever?
22 A  Not when he was in scouts.
23 Q  What about same question with respect to Jim Allenbach?
24 A  I really don't remember if he came or not. There's
25    different groups. You know, you'd have one group that

Page 151

1  would move on, then you'd get some more in. And so
2  it's hard for me to pinpoint anybody or -- like that.
3  Q  All right. Well, I understand that boys were always
4     coming in and boys were leaving the troop. My question
5     goes to how you were able to communicate an invitation
6     to boys who lived with their parents. In other words,
7     didn't you have communications with parents about these
8     scout activities that were going on?
9  A  Well, they weren't really scout activities. The boys
10    would just want to come over and usually watch
11    television or something. You know, they -- I was kind
12    of, Make sure you bring your -- your merit badge
13    things.
14       And I was doing that because I was a merit badge
15    counselor for two or three or maybe four different
16    merit badges with district, Chief Seattle Council. I
17    was on their list. And I've had boys from other
18    troops come over as well. And I'd work with them on
19    their merit badges.
20 Q  At your house?
21 A  Yeah. But it wasn't anything to do with the church.
22    It was to do with the Boy Scout Association.
23          THE VIDEOGRAPHER: We're going off
24    record. The time is 12:29.
25          (Tape pause.)

Page 152

1          THE VIDEOGRAPHER: We are back on
2     record. The time is 12:30.
3  Q  (By Mr. Kosnoff) So boys from other troops would be
4     referred to you for merit badge training?
5  A  Not training. Testing.
6  Q  Testing?
7  A  Yeah.
8  Q  What were the merit badge categories that you were
9     expert in?
10 A  One was to do with ropes. And one was to do with
11    first aid; canoeing. And I can't think of what the
12    other one was.
13 Q  And did those -- any of those boys ever spend the
14    night?
15 A  No.
16 Q  Did you molest any of those boys?
17 A  No.
18 Q  And so that I understand your testimony, you -- when
19    the boys came over, you wanted them to bring their --
20    their merit badge --
21 A  Books.
22 Q  -- books so that you could work on merit badge --
23 A  Yes.
24 Q  -- training?
25 A  Because they knew I was qualified in four or five of

Page 153

1  those things with the Chief Seattle Council.
2  Q  And your recollection is that that only happened on two
3     occasions?
4  A  No, it's several occasions.
5  Q  How many is several?
6  A  Oh --
7  Q  Dozens?
8  A  Probably. Mostly it was Brian Gross and Kevin
9     Borland, but there was --
10 Q  And during this time, there were no other adult
11    volunteers present, just you?
12 A  Yes.
13 Q  Were the bishops aware that merit badge training was
14    happening at your house?
15 A  I don't think so. This is -- was through the Boy
16    Scout Association.
17 Q  But with respect to the merit badge training of boys
18    within the Kent 2nd Ward troop, were the bishops aware
19    of that?
20 A  I don't think so, because I was on a list of merit
21    badge counselors. And the boys from any troop could
22    call me up, make an appointment to be tested on those.
23 Q  And when they have succeeded, there's a merit badge
24    card that has to be signed?
25 A  Yes.

39 (Pages 150 to 153)

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961
D - 48

Byers & Anderson
Court Reporters & Video

Page 158

1  these boys pursuing you?
2  A  Well, I didn't hardly -- I hardly had any time for
3     myself. And so I kind of made excuses after awhile
4     because I had so much work I had to get done.
5  Q  How many times do you think you molested boys up at
6     Lake Kachess?
7  A  Other than Todd Denny, that's the only one that I can
8     remember.
9  Q  Didn't molest anybody else up there?
10 A  No.
11 Q  That was the only incident?
12 A  Uh-huh.
13           MR. KOSNOFF: Does anybody want to
14    take a break?
15           MR. WOLFE: Lunch break?
16           MR. NASH: How's the court reporter
17    doing? That's the main, and then Mr. Onefrey.
18           THE VIDEOGRAPHER: Go off record?
19           MR. KOSNOFF: Yeah.
20           THE VIDEOGRAPHER: Going off record.
21    The time is 12:38.
22           (Recess from 12:38 to 1:18.)
23
24           THE VIDEOGRAPHER: We are back on
25    the record. The time is 1:18.

Page 159

1           EXAMINATION (Continuing)
2  BY MR. KOSNOFF:
3  Q  Mr. Onefrey, during the year that you were going to LDS
4     Social Services, where were you living at that time?
5  A  In my house.
6  Q  Okay. You were no longer living at the Allenbachs'?
7  A  No.
8  Q  You're certain of that?
9  A  Positive.
10 Q  Why are you so positive?
11 A  Because it was just after that deal there that I moved
12    out, only a matter of a few days.
13 Q  Did Dr. Allenbach ask you to leave?
14 A  Yes.
15 Q  And was that because he found out that you'd been
16    molesting his sons?
17 A  Yes.
18 Q  Was he angry with you?
19 A  I don't remember.
20 Q  Tell me what you remember about that conversation where
21    he told you he wanted you to move out.
22 A  He just said it would be best if you moved out. And
23    so I bought that little house.
24 Q  Was that all that was said about it?
25 A  That's all I remember that was said.

Page 160

1  Q  Did you have any conversation with Mrs. Allenbach at
2     that time about it?
3  A  No.
4  Q  Did Dr. Allenbach say or do anything that indicated
5     that Mrs. Allenbach also knew?
6  A  No idea at all.
7  Q  Did you ever have any conversation with Mrs. Allenbach
8     about the fact that you molested her three sons?
9  A  No.
10 Q  And do you know how Dr. Allenbach found out?
11 A  I really don't know how. Probably through the
12    bishopric or whatever.
13 Q  Did he indicate to you how he had found out?
14 A  No.
15 Q  During any of that disclosure to Dr. Allenbach, did
16    anybody tell you that they were contemplating reporting
17    it to the police?
18 A  I don't think I talked to anybody.
19 Q  Were you worried that it would get reported to the
20    police?
21 A  Well, I didn't really know that it was -- what it was,
22    whether it was a crime or what.
23 Q  You didn't know what you'd --
24 A  No.
25 Q  -- been doing was a crime?

Page 161

1  A  No.
2  Q  But you knew it was wrong?
3  A  Pardon?
4  Q  You knew it was wrong?
5  A  It was wrong as far as it was not natural type of
6     thing. And when I was a boy, all the other boys were
7     doing something like that, so...
8  Q  You didn't know at that time in the 1970s that child
9     molesters could be sent to prison?
10 A  No.
11 Q  Have you ever had homosexual contact, that is, sexual
12    contact with an adult man?
13 A  No.
14 Q  Is that something that is -- has ever been of interest
15    to you?
16 A  No.
17 Q  During the time that you were in the Kent 2nd Ward, did
18    you -- did you date women?
19 A  Yes.
20 Q  Okay. Who did you date?
21 A  Faye Miller. And Norma. I'm not sure her last name.
22 Q  Was she a woman in the church?
23 A  Yes. And I had a couple of other lady friends, but it
24    wasn't very -- it was brief.
25 Q  Okay. Was your relationship with Faye Miller a

41 (Pages 158 to 161)

Jack A. Onefrey
January 27, 2006

Page 162

1  romantic relationship as opposed to a platonic
2  relationship?
3  A  It never quite got to that.
4  Q  Okay. Did you know her adopted sons?
5  A  I know she had four adopted children, four or five.
6  Q  Did you ever know her -- well, were you aware that she
7  had sons?
8  A  Oh, yeah.
9  Q  Did you know them?
10 A  I didn't have anything to do with her children, so I
11 don't remember their names or anything.
12 Q  Okay. You never had any social -- social contact with
13 her children?
14 A  No.
15 Q  And you never molested them?
16 A  No.
17 Q  Going over my notes over the lunch break, I want to ask
18 you, getting back to this incident that occurred with
19 Todd Denny, you testified earlier about Todd putting
20 his hand on -- putting your hand on his private parts?
21 A  No. He pulled my hand -- it was laying -- I was
22 asleep. It was laying beside the sleeping bag.
23 Wasn't in the sleeping bag, and he pulled it over and
24 rolled on top of my hand.
25 Q  Now, you had never known Todd Denny before that camping

Page 163

1  trip, had you?
2  A  No.
3  Q  So this was the first time you'd ever spent any time
4  with Todd Denny?
5  A  I knew he was Danny's friend. That's it.
6  Q  Do you recall telling me that Ken Hoffman saw that and
7  reported it to the bishop?
8  A  I think so.
9         MR. FREY: Object to the form of the
10 question. You may go ahead and answer.
11        THE WITNESS: What's what?
12        MR. KOSNOFF: Go ahead and answer.
13        MR. WOLFE: Go ahead and answer.
14        MR. FREY: Let me explain something
15 on the record, Mr. Loholt. I have a right, if I think
16 the form of his question is improper, to object for
17 the record later on for a judge. But that doesn't
18 mean you don't answer. Just --
19        THE WITNESS: Oh, okay.
20        MR. FREY: -- give me a chance to
21 make the objection.
22        THE WITNESS: Now, what was the
23 question again?
24 Q  (By Mr. Kosnoff) Did you tell me in our conversation
25 that the incident -- the Todd Denny incident, that Ken

Page 164

1  Hoffman saw it and reported it to the bishop?
2  A  Yes.
3  Q  And is what happened?
4  A  Yes.
5  Q  And you think that the bishop that Ken Hoffman reported
6  it to was Bishop Pettit?
7  A  I think so.
8  Q  And Ken Hoffman was -- he was another assistant
9  scoutmaster?
10 A  I'm not sure what role he played at the time, and I'm
11 not positive that he told the bishop. So I can't
12 really say a positively either to those questions.
13 Q  But in any event, Bishop Pettit confronted you about
14 the incident; correct?
15        MR. WOLFE: We're going to -- we
16 will object to this. And don't answer.
17        MR. KOSNOFF: You're instructing him
18 not to answer?
19        MR. WOLFE: Yes, sir.
20 Q  (By Mr. Kosnoff) Bishop Pettit never told you that an
21 accusation had been made of sexual misconduct against
22 you concerning Todd Denny?
23        MR. WOLFE: We're going to object to
24 those conversations, any conversations that may have
25 occurred. Assert privilege.

Page 165

1  Q  (By Mr. Kosnoff) Do you know whether or not Bishop
2  Pettit met with any parents of the boys that had
3  accused you of molesting them?
4  A  You mean Todd Denny?
5  Q  Todd Denny or anybody else.
6  A  Well, I can't say for sure.
7  Q  Okay. What do you know?
8  A  It was just -- I really don't know. You know, I
9  assume, but I don't know.
10 Q  Why did you assume that?
11 A  Well, he had to find out somehow. Maybe it was one of
12 the boys. I don't know.
13 Q  After the incident with Todd Denny, were you contacted
14 by the police concerning that incident?
15 A  No.
16 Q  Were you ever contacted by Child Protective Services
17 concerning that incident?
18 A  I don't think so.
19 Q  After Dr. Allenbach asked you to move out of the house,
20 were you ever contacted by the police or Child
21 Protective Services about --
22 A  I don't think so.
23 Q  What have you done on your own to try and control your
24 impulses to have sexual contact with children?
25 A  I have tried to keep away from them as much as

42 (Pages 162 to 165)

Jack A. Onefrey
January 27, 2006

Page 166

```
 1     possible. And the last two years I live -- I didn't
 2     go to church.
 3  Q  Which two years are we referring to?
 4  A  The last two.
 5  Q  Meaning in the -- in Kent?
 6  A  Yes. I -- even though I wanted to go to church, I
 7     didn't because it was -- I don't -- I didn't know how
 8     to say no. And so I just kind of hid away, worked
 9     every day, seven days week, took three days off one
10     year at Christmas time, and that was it.
11  Q  This was the two-year period of time before you moved
12     to Kenora?
13  A  Yes.
14  Q  Were you still living in the house that you bought?
15  A  Yes.
16  Q  There was nothing that prevented you from going to
17     church, was there?
18  A  No. It was a decision I made because it was best for
19     me to not be around them.
20  Q  At the time you made the decision not to -- or to stay
21     away from church, were you taking sacrament?
22  A  No.
23  Q  No?
24  A  I didn't go to church.
25  Q  Were you still working with scouts?
```

Page 167

```
 1  A  No.
 2  Q  You had stopped working with scouts by that time?
 3  A  Yes.
 4  Q  How long had you not been working with the scouts at
 5     the time you stopped going to -- we're talking about
 6     the Kent 2nd Ward?
 7  A  Right. Well, that was the incident of Todd Denny. I
 8     completely didn't go to any scout thing. I didn't go
 9     to church because I was working seven days a week,
10     and -- because I had planned on moving up north.
11  Q  Had anybody told you not to come to church?
12  A  No.
13  Q  Had anybody told you not to participate in scouting?
14  A  I can't remember that.
15  Q  What I'm getting at, were you told to stay away from
16     scouting, or was that just a decision you made because
17     you didn't want to be tempted?
18  A  It was a decision I made. And I'm sure if I didn't
19     make it, I'd have been told.
20  Q  Why are you sure of that?
21  A  Hmmm?
22  Q  Why are you sure of that?
23  A  Well, just -- just assuming it I guess.
24  Q  What did the fact of the, if any -- strike that.
25     So you worked a lot during that two years, and then
```

Page 168

```
 1     you decided to move to Kenora?
 2  A  No. I decided to move to Kenora before those two
 3     years. And I worked for two years preparing to go up
 4     there, paying off my equipment as much as possible,
 5     saving some money and went up there looking for land
 6     and that kind of stuff.
 7  Q  So it was a -- it was a several year period of time,
 8     your --
 9  A  Yeah.
10  Q  -- your move -- your planned move and then move --
11  A  Yeah.
12  Q  -- to Canada?
13  A  Everybody knew about it because I didn't keep no
14     secret about that.
15  Q  All right. You came back to Washington state in
16     approximately 1984 or '85?
17  A  It would be more like '85, '86.
18  Q  '85, '86. And what was your decision based on?
19  A  Coming back?
20  Q  Yeah.
21  A  Well, I had lost everything up there. And my parents
22     were living down here, so I came to live with them for
23     awhile while I started up my business again.
24  Q  Were your parents aware of your legal difficulties up
25     in Canada?
```

Page 169

```
 1  A  Yes.
 2  Q  That is, that you'd been to prison for child molesting?
 3  A  Yeah.
 4  Q  When did your parents first learn that you had this
 5     problem?
 6  A  Oh, must have been shortly before the Todd Denny
 7     thing.
 8  Q  Do you know how they found out?
 9  A  I'm not too sure on that.
10  Q  Did you tell them?
11  A  No.
12  Q  And you don't know who told them?
13  A  I don't know how they found out.
14  Q  How did you learn that they knew?
15  A  I'm not sure how that came about. They said something
16     to me about it, so I think it -- I'm not sure.
17  Q  Was your mother concerned?
18  A  Yes.
19  Q  Was your stepfather concerned?
20  A  Yes.
21  Q  Did they make any recommendations or proposals to you
22     about your problem?
23  A  I know it bothered them, but I don't remember them --
24     I know that my dad didn't approve of any kids coming
25     around, so he told some to leave a couple of times.
```

43 (Pages 166 to 169)

Jack A. Onefrey
January 27, 2006

Byers & Anderson
Court Reporters & Video

Page 202

1  children?
2  A  I don't know -- I really don't know if he indicated it
3     or not, but I think he knew.
4  Q  You think he knew?
5  A  Yeah.
6  Q  What makes you think that he knew?
7  A  Well, he thought it would be better if I was, you
8     know, in a place of my own. So I kind of assume that
9     that -- and one of the boys might have told him, or
10    all three boys. I don't know. And I didn't -- it's
11    something -- just, you know, took it, well, it was the
12    best thing even for me. I figured it was.
13 Q  Jimmy Allenbach, I'll represent to you, has testified
14    that he told his father that you had touched him. Did
15    Jimmy ever tell that to you?
16 A  No.
17         MR. FREY: Okay. I don't have
18    anything further.
19
20         FURTHER EXAMINATION
21 BY MR. KOSNOFF:
22 Q  There's one area I forgot. Sorry.
23    When you were involved with scouting, Dr. Allenbach
24    was also involved with the older scouts?
25 A  Yeah.

Page 203

1  Q  And he had been involved with the scouts even before
2     you came into the ward; correct?
3  A  It could be. I'm not sure.
4  Q  Okay. Was Herman Allenbach, to your knowledge, ever on
5     a bishopric?
6  A  I don't think so. He might have been on the stake,
7     but that's -- but he wasn't in the bishopric when I
8     was there.
9  Q  He was on the stake high council?
10 A  For awhile I think.
11         MR. KOSNOFF: Okay. No further
12    questions.
13         THE VIDEOGRAPHER: One second. Let
14    me get off record.
15
16         FURTHER EXAMINATION
17 BY MR. FREY:
18 Q  With regard to his being on the stake high council, are
19    you certain that he was on the stake high council?
20 A  I wasn't for sure, because I -- that was a period of
21    time where I didn't know too much about the church and
22    their -- their organization.
23 Q  So this would be early on?
24 A  Yes.
25 Q  Okay. When you first joined the church?

Page 204

1  A  Yes, somewhere in that area I believe.
2         MR. FREY: Okay. Thank you.
3         THE VIDEOGRAPHER: Number of tapes
4     used in today's deposition were three. This concludes
5     the deposition for today. The time is 2:27 p.m.
6         (Signature reserved.)
7         (Deposition concluded at 2:27
8     p.m.)

STATE OF WASHINGTON ) I, Barbara E. Hayden, CCR, RPR,
                    ) ss CCR #2220, a duly authorized
County of Snohomish ) Notary Public in and for the State
                      of Washington, residing at
                      Mountlake Terrace, do hereby
                      certify:

That the foregoing videotaped deposition of JACK A. ONEFREY was taken before me and completed on January 27, 2006, and thereafter was transcribed under my direction; that the deposition is a full, true and complete transcript of the testimony of said witness, including all questions, answers, objections, motions and exceptions;

That the witness, before examination, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the witness reserved the right of signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel and that I am not financially interested in the said action or the outcome thereof;

That I am herewith securely sealing the said deposition and promptly delivering the same to Attorney Tim Kosnoff.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 29th day of January, 2006.

_____
Barbara E. Hayden, CCR, RPR,
Notary Public in and for the State
of Washington, residing at
Mountlake Terrace.

52 (Pages 202 to 205)

Jack A. Onefrey
January 27, 2006