# EXHIBIT  E

E – 53

Dockets.Justia.com



THE NORTHWEST'S LARGEST AUTOMOBILE DEALERSHIP!

• LARGEST INVENTORY

• LARGEST SERVICE DEPARTMENT

• LARGEST CAMPER & TRAILER LOT

250 RAINIER AVE. SO., RENTON    AL 5-2531

MOBILE HOMES
BA 6-3052

OPEN ROAD NORTHWEST
BA 6-6590

Robinson & Lyon Ford

Mrs. Maureen Rater
11004 SE 235th St.
Kent, WA 98031-3439

**1972**
•
**1973**

**RENTON**

**STAKE**

**DIRECTORY**

**AND**

**ACTIVITY**

**CALENDAR**

STAKE OFFICERS ▶

KENT ▶

KENT SECOND ▶

MAPLE VALLEY ▶

RENTON ▶

RENTON SECOND ▶

RENTON THIRD ▶

RENTON FOURTH ▶

CALENDAR ▶

## KENT SECOND WARD
24419 94th South

Bishops Office . . . . . . . . . . . . . . . . . . . . . . UL 2-4661
Foyer . . . . . . . . . . . . . . . . . . . . . . . . . . . UL 2-9892

### MEETINGS

| | |
|---|---|
| Priesthood Meeting . . . . . . . . . . . . . . . . . | Sunday, 7:15 am |
| Sacrament Meeting . . . . . . . . . . . . . . . . . | Sunday, 2:30 pm |
| Fast and Testimony Meeting . . . . . . . . | First Sunday, 2:30 pm |
| Sunday School Meeting . . . . . . . . . . . . . . | Sunday, 9:00 am |
| MIA Meeting . . . . . . . . . . . . . . . . . . . . | Tuesday, 7:30 pm |
| Relief Society Meeting . . . . . . . . . . . . . . | Thursday, 9:30 am |
| Primary . . . . . . . . . . . . . . . . . . . . . | Wednesday, 4:45 pm |
| Executive Committee Meeting . . . . . . . . . . | Sunday, 10:30 am |
| Ward Council Meeting . . . . . . . . . . . . | First Sunday, 10:30 am |
| Bishop's Meeting . . . . . . . . . . . . . . . . . | Sunday, 6:15 am |

### WARD COUNCIL

Bishop—Randall K. Borland . . . . . . . . . . . . . . . . 631-2493
1st Counselor—Arlo D. Young . . . . . . . . . . . . . . . 631-4123
2nd Counselor—K. Dennis Hoffmann . . . . . . . . . . . 631-2088
Executive Secretary—Don W. Boren . . . . . . . . . . . . 631-2899
Ward Clerk (Historical)—Parley M. Conder . . . . . . . . 631-2228
Asst. Clerk (Financial)—J. Kent Weir . . . . . . . . . . UL 4-2500
Asst. Clerk (Statistical)—Jack T. Swain . . . . . . . . . 631-4748
High Priest Group Leader—Harold D. Hancock . . . . . . UL 4-3996
Seventy Group Leader—
Elders Quorum President—Robert M. Searle . . . . . . . 631-4320
Gen. Sec. Youth Aaronic & YMMIA—Richard Pettit . . 631-0758
Relief Society President—
Sunday School President—Max Pettey . . . . . . . . . . VE 9-1900
Primary President—Carolle Berry . . . . . . . . . . . . . UL 2-4552
YWMIA President—

ALDER, Harold, Florence, 24906 38th Ave. So. . . . VE 9-7140
ALLENBACH, Herman, Veloy, 25829 162nd S. E. . 631-2433
ALLEN, Bonnie, 26123 197th S. E. . . . . . . . . . . . 631-2425
ANDERSON, Charles, 26623 114th S. E. . . . . . . . UL 2-1551

BARBEE, Betty, 17149 S.E. 267th . . . . . . . . . . . 631-4177
BATEMAN, N. James, Doris, 10433 Kent-Kangley Rd.
# 224 . . . . . . . . . . . . . . . . . . . . . . . . . . UL 2-1534
BEAVER, Dana, 16750 S. E. 252nd Ct. . . . . . . . 631-4388
BEERS, Max, Jean, 3414 S. 253rd . . . . . . . . . . UL 2-8954
BERBERT, Richard, Mariedda, 3406 S. 253rd . . . . VE 9-3618
BECK, Carl, 17626 S. 260th . . . . . . . . . . . . . .

BECHT, Robert, Ada, 25820 136th S. E. . . . . . . . 631-1166
BERRY, Lloyd, Carolle, 28411 69th Ave. So. . . . . UL 2-4557
BERRY, Robert, Diane, 4531 S. 256th . . . . . . . . . UL 4-2638
BLANCHARD, Patrice, 11804 S. E. 275th . . . . . . 631-3310
BODILY, Reed, 25231 129th Pl. S. E. . . . . . . . . . UL 4-3571
BOND, John, 4808 S. 256th . . . . . . . . . . . . . . . UL 4-4753
BOND, Albert, Josephine, 25425 115th S. E. . . . . . UL 2-7785
BODVIN, Barbara, 304 Kenoshia . . . . . . . . . . . . UL 4-2081
BOOVIN, Dale, 11020 Kent-Kangley . . . . . . . . . . UL 4-1888
BOND, Yvonne, 19102 S. E. 266th . . . . . . . . . . .
BOREN, Don, Patsy, 14611 S. E. 276th Pl. . . . . . 631-2895
BORLAND, Randall, Dennie, 26236 S.E. 173rd . . . . 631-2493
BOWEN, Gordon, Ethel, 26860 172nd Pl. S. E. . . . 631-9787
BOWERS, Edwin, Leta, 514 Kenosia, #208 . . . . . . UL 4-9784
BRADSHAW, Gaylon, Peggy, 12624 S. E. 270th . . . 631-2613
BROWN, Roberta, 11835 S. E. 276th . . . . . . . . . 631-2022
BURNHAM, Richard, Beverly, 19441 S. E. 267th . . 631-2855
BURT, Velma, 518 Kenosia #B 111 . . . . . . . . . . UL 2-3715
BURWELL, Daniel, Katherine, 4421 So. 272nd . . . . UL 4-1603
BYE, Kathleen, 16625 S. E. 272nd . . . . . . . . . . .

CARTER, Lamont, Marie, 4051 So. 270th . . . . . . UL 2-7783
CLARKSON, Louis, 19850 S. E. 272nd . . . . . . . . 631-1648
COLE, Al, Alberta, 4825 So. 272nd . . . . . . . . . . UL 4-9788
COLEMAN, Phillip, Donna, 26246 172nd S. E. . . . 631-2635
CONDER, Parley, Opal, 14432 S. E. 263rd . . . . . . 631-2235
COSAND, Charles, Gail, 28642 112th S. E. . . . . . UL 2-6533
COWAN, Donald, 15629 262nd Pl. S. E. . . . . . . .
CROSTICK, Jean, 17265 S. E. Wax Rd. . . . . . . . . 631-1781

DAHL, Gary, 1259 W. Smith . . . . . . . . . . . . . .
DANELUK, Jerry, 12806 S. E. 273rd . . . . . . . . .
DAVIDSON, Eva, 3807 Hampton Way . . . . . . . . . UL 4-3777
DAVIS, Dorothy, 19454 S. E. 267th . . . . . . . . . . 631-3317
DAY, Harold, 915 E. Maclyn . . . . . . . . . . . . . . UL 4-4392
DEHART, Arie, Sarah, 17238 S. E. 261st . . . . . . . 631-0300
DELANO, Frank, 731 S. 5th, #27. . . . . . . . . . . .
DEVERAUX, Don, Jeanette, 27830 108th S. E. . . . UL 2-4098
DEWEY, Jerald, 19221 S. E. 268th . . . . . . . . . . 631-4534
DILLEY, Helen, 27465 Military Rd. So., Auburn . . UL 4-1045
DONNER, Michael, Linda, 14719 S. E. 262nd . . . . 631-0302
DUKE, Donald, Marion, 17111 S. E. 285th . . . . . 631-0876
DUKES, Eric, Melva, 17201 S. E. 264th . . . . . . . 631-4389
DUNN, Larry, 9623 S. 248th, D-8 . . . . . . . . . . .

EATON, Susan, 1132 Chicago St. . . . . . . . . . . .
ENGEBRETH, Julia, 16326 S. E. 263rd Pl. . . . . . . 631-1739

KF00809

FLUE, Helma, 533 3rd So. . . . . . . . . . . . . . . . UL 2-2248
FOX, Janet, 17625 S. E. 267th . . . . . . . . . . .
FREDRIKS, Donna, 12868 S. E. 252nd . . . . . . . .

GAINES, Jack, Joanne, 27439 141st S. E. . . . . . . 631-3569
GARBANAT, Ida, 14517 S. E. 261st. . . . . . . . . . 631-2752
GIBB, Byron, Alys Mary, 3405 So. 263rd . . . . . . . VE 9-0481
GIBBY, David, Ingelise, 14410 S. E. 261st. . . . . . . 631-9145
GJERDRUM, Johan, 7333 So. 285th. . . . . . . . . . UL 2-5899
GRAFF, Lamar, Gail, 27634 42nd So. . . . . . . . . . UL 4-2479
GRAHAM, Jean, 26530 Princeton Ave. . . . . . . . . UL 2-8854
GRAHAM, Michael, Linda, 26946 Military Rd. So. . . . UL 2-0409
GWIN, Joan, 4505 So. 283rd, Auburn . . . . . . . . .

HAGBERG, Betty, 10608 S. E. 256th . . . . . . . . . . UL 4-2699
HANCOCK, Harold, Kay, 26513 Cambridge Dr. . . . . UL 4-3959
HAND, William, Florence, 208 E. Morton St. . . . . . . UL 2-7778
HARRISON, Mina, 30031 164th S. E. . . . . . . . . . . 631-4519
HAZEN, Fawn, 724 3rd So. . . . . . . . . . . . . . . . UL 4-4410
HEAPS, Norma, 17805 S. E. 266th Pl. . . . . . . . . . 631-2683
HEGLE, Susan, 25820 136th S. E. . . . . . . . . . .
HESS, Blaine, Alice, 26815 102nd S. E. . . . . . . . . UL 2-8652
HIRSCHI, DeVon, Udell, 3701 Hampton Way . . . . . UL 2-8652
HARKER, Van, Deanne, 4316 So. 261st. . . . . . . . UL 4-1793
HARPER, Brent, Kathy, 11020 Kent-Kangley, #c-26 . . UL 2-8718
HAMMOND, Nancy, 18006 S. E. 254th . . . . . . . . 631-3176
HAMMOND, Robert, 619 1st Ave. So. #9 . . . . . . . UL 2-3416
HIGGINS, Sherry, 27406 131st Ave. E. . . . . . . . .
HOFFMANN, Dennis, Karen, 26224 173rd S.E. . . . . 631-2088
HODGEN, Robert, Linda, 10433 Kent-Kangley Rd. . . .
HOGGATT, Oma, 11834 S. E. 270th . . . . . . . . . . 631-0300
HUGHES, Orsel, Gertrude, 26016 144th S. E. . . . . . 631-2294

ISAACKS, Joseph, Linda, 12005 S. E. 270th . . . . . 631-2556

JACKSON, Paul, 28634 51st Pl. So. . . . . . . . . . . VE 9-2871
JACOB, Paul, Judith, 26253 172nd S. E. . . . . . . . 631-2981
JARVIS, Ronald, Mildred, 855 Tilden . . . . . . . . . .
JENSEN, Lola, 24906 38th So. . . . . . . . . . . . . . VE 9-7141
JENSEN, Kay Don, Kathleen, 1245 Weiland St. . . . . UL 2-1782
JOHANSEN, Rex, Eunice, 16810 S. E. 264th . . . . . 631-1821
JOHNSON, Trena, 26412 94th So. . . . . . . . . . . . UL 2-7641
JOHNSON, Lynn, Louise, 17323 S. E. 265th . . . . . 631-2781
JOLLEY, Clifford, Verda, 12981 S. E. 273rd Court . . 631-3071
JONES, Myles, Rosetta, 4216 Carnaby . . . . . . . . UL 4-9041
JUDD, Billy, 11425 S. E. 266th . . . . . . . . . . . . UL 2-1851
JUST, Ruth, 431 Scenic Way . . . . . . . . . . . . . . UL 2-8591

KALINA, Diane, 26815 102nd S. E. . . . . . . . . . .
KELLER, Kenneth, Pauline, 13624 S. E. 256th. . . . . 631-2611
KITZMILLER, Patricia, 26224 172nd S. E. . . . . . . . 631-3943
KNIGHT, Gale, 26509 173rd Pl. S. E. . . . . . . . . . 631-3956
KLOEPFER, Floyd, 1492 S. E. 270th Pl. . . . . . . . . 631-1417
KRIER, Juanita, 324½ Naden Ave. . . . . . . . . . . . UL 2-8434

LABRUM, Owen, Evelyn, 25643 Lake Fenwick Rd. . . UL 4-4844
LANE, David, Sandra, Steven, 27403½ 118th S. E. . . 631-3844
LARSEN, Gareth, Patty, 15265 S. E. 275th . . . . . . 631-4434
LARSEN, Jean, 19414 S. E. 265th . . . . . . . . . . . 631-3397
LAYLAND, Terry, 10433 Kent-Kangley Rd. #219 . . . .
LEWIS, Frank, 4821 Kent-Des Moines Rd. #162 . . . .
LINCOLN, Vivian, 25851 142nd S. E. . . . . . . . . . 631-3768
LOHOLT, Jack, 25829 152nd S. E. . . . . . . . . . . . 631-2437
LONG, Teresa, 25311 182nd S. E. . . . . . . . . . . . 631-4386

McCANN, Michael, Cheryl, 14612 S. E. 278th Pl. . . . 631-0837
McCONNAHA, Robert, Francis, 26502 186th S. E. . . 631-3708
McGUIRE, Elbert, Donna, 410 So. 2nd . . . . . . . . . UL 4-1205
McKENNEY, Diana, 3023 So. 220th . . . . . . . . . .
MACKAMAN, Lily, 26636 167th Pl. S. E. . . . . . . . 631-2012
MACKEY, John, Lana, 25320 Lake Fenwick Rd. . . . UL 2-5680
MILLER, Faye, 17814 S. E. 282nd . . . . . . . . . . . 631-1308
MILLER, Bill, Phyllis, 17814 S. E. 282nd . . . . . . . 631-1308
MONACO, Charles, Kristina, 13719 S. E. 272nd . . . 631-9457
MONSON, Lynn, Sheri, 28219 45th So. . . . . . . . . UL 4-0160
MOORE, Essie, 9623 So. 248th, #84 . . . . . . . . . . UL 4-1813
MORGAN, Albert, Patty, 318½ Naden Ave. . . . . . . UL 2-3892
MORGAN, Leland, Carolyn, 24814 128th S. E. . . . . UL 2-8160
MORRIS, Marion, 28710 47th Pl. S. E. . . . . . . . .
MORRIS, Timothy, 27431 S. E. 141st . . . . . . . . . 631-3259

NABROTZKY, Ursula, 4821 Kent-Des Moines Rd. #123
NEILSON, John, Sandra, 24827 128th Pl. S. E. . . . . UL 4-1191
NEILSON, Afton, 26616 94th Pl. So. . . . . . . . . . . UL 2-3627
NEILSON, Betty, 15219 S. E. 273rd Pl. . . . . . . . . 631-0774
NOVAK, John, Deborah, 26447 170th S. E. . . . . . . 631-3715

OAKDEN, Gary, 25406 34th Pl. S. E. . . . . . . . . . VE 9-9146
O'NEIL, Lavar, 3424 So. 288th . . . . . . . . . . . . VE 9-1326
ORNDORFF, Darrell, Bonnie, 26454 Green River Rd. . UL 2-0946
OSTLER, Hazel, Karen, 717 So. Maple Wood . . . . . UL 2-3209

PARENT, Vivian, 14515 S. E. 260th . . . . . . . . . . 631-4315
PARK, Jessie, 27430 156th S. E. . . . . . . . . . . .
PARKHURST, Dan, Ruth, 616 So. 2nd . . . . . . . . . UL 2-4348
PATZER, Richard, Carol, 13522 S. E. 278th . . . . . . UL 2-6627

KF00810

# EXHIBIT  F



STATE OF WASHINGTON

# DEPARTMENT OF SOCIAL AND HEALTH SERVICES

14TH & JEFFERSON • OB-2

PO Box 45710 • Olympia, WA 98504-5710

(360) 902-7920 • TDD (360) 902-9706 • FAX (360) 902-7903

December 29, 2005

Jack Kennedy, Paralegal
Law Offices of Gordon, Thomas, Honeywell,
       Malanca, Peterson & Daheim LLP
One Union Square
600 University, Suite 2100
Seattle, Washington 98101-4185

Re:  Public Disclosure Request

Dear Mr. Kennedy:

In regard to your December 20, 2005 request for records, the Children's Administration has no records for Jack Loholt or the Church of Jesus Christ of Latter Day Saints in Kent/Renton/Des Moines, Washington.

Please let me know if you have any questions.

Sincerely,

Barbara J. McPherson, Supervisor
Division of Field Operations
Children's Administration
360 902-7914

F - 58

# EXHIBIT  G

DEPOSITION OF JAMES ALLENBACH - FLEMING, et al. v. MORMON CHURCH, et al. - 7/26/05

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,                )
                                             )
                 Plaintiffs,                 )
                                             )
        vs.                                  ) NO. 04-2338 RSM
                                             )
THE CORPORATION OF THE PRESIDENT OF THE      )
CHURCH OF JESUS CHRIST OF LATTER-DAY         )
SAINTS, a Utah corporation sole, a/k/a       )
"MORMON CHURCH"; LDS SOCIAL SERVICES         )
a/k/a LDS FAMILY SERVICES, a Utah            )
corporation,                                 )
                                             )
                 Defendant.                  )

DEPOSITION UPON ORAL EXAMINATION OF

JAMES ALLENBACH

VIDEOTAPED PROCEEDING

9:39 o'clock a.m.

July 20, 2005

601 Union Street

Suite 3100

Seattle, Washington

REPORTED BY:
ALISON LOTT, CCR#2337

DEPOSITION OF JAMES ALLENBACH - FLEMING, et al. v. MORMON CHURCH, et al. - 7/26/05

Page 30

1  Q   How long were they in there with your dad?
2  A   I don't remember.  A little bit of time.
3  Q   Was your mother there?
4  A   I can't remember.
5  Q   At the time that that incident occurred, was Jack Loholt
6      living in your your house?
7  A   Yes.
8  Q   Was he living down in the basement?
9  A   Yes.
10 Q   And after that incident, did he continue to live in the
11     basement?
12 A   I can't remember.  I remember just very little things.
13 Q   Do you remember any further abuse that occurred to you down
14     in that apartment in the basement, other than the two we've
15     talked about?
16 A   Yes.
17 Q   Pardon me?
18 A   Yes.
19 Q   Okay.  Did that abuse continue after this incident of
20     running around naked or the incident out in the field with
21     the Kelly boys?
22 A   Yes.
23 Q   And for about how long did that continue after those first
24     two instances that we've talked about?
25 A   Through Scouting.

Page 31

1  Q   Do you know how long Jack Loholt continued to live in the
2      basement?
3  A   No.
4  Q   Do you know if your dad ever talked to Jack Loholt about
5      the abuse that you had talked to Mrs. Kelly about?
6  A   No.
7  Q   Did he ever come and talk to you about it?
8  A   No.  I went to him, and talked to him when I was eight.
9  Q   What did you tell him when you were eight years old?
10 A   That it happened.
11 Q   That what happened?
12 A   With my little sister in the bathtubs.
13 Q   You and your sister were in the bathtub together?
14 A   Yeah.
15 Q   With Jack Loholt?
16 A   (Witness nods.)
17 Q   What did your dad say about that?
18 A   Not much.
19 Q   Do you know if he talked to Jack Loholt?
20 A   No.
21 Q   Did you tell him again after that?
22 A   I can't remember.
23 Q   Any time you want to stop, you just let me know.
24 A   Yeah.
25 Q   We have what we call Answers to Interrogatories,

Page 32

1      Mr. Allenbach.  And these are questions that were sent to
2      your attorney for you to answer.  And in Interrogatory No.
3      8, the question was, identify each person that you informed
4      that you were the victim of inappropriate sexual contact
5      and to the best of your ability, the date that you informed
6      such person.  The answer given by you was, I told my
7      father, Herman Allenbach, when I was eight years old, that
8      Loholt bathed my sister and me.  Later, I told my father
9      that Loholt did inappropriate things to me.  I have also
10     told my wife about the abuse by Jack Loholt.  My question
11     now is, it says, later I told my father that Loholt did
12     inappropriate things to me.  When did you later tell him?
13 A   When I was in Scouting.
14 Q   Were you still in Scouting when you told him, or had you
15     finished Scouting?
16 A   Would be still in Scouting.
17 Q   When you say you were in Scouting, were you actually in Boy
18     Scouts at the time?  You were a Boy Scout?
19 A   Yeah.
20 Q   And Jack Loholt, what was his position in Scouting at that
21     time?
22 A   Scout master.
23 Q   So it was while he was Scout master that you told -- and
24     you were in Scouting, that you told your dad, as you put
25     here, "I told my father that Loholt did inappropriate

Page 33

1      things to me"?  Is that when you told him, while Loholt was
2      Scout master and you were in Scouting?  Is that correct?
3  A   Repeat that?
4  Q   Okay.  I don't mean to confuse you.  You said in your
5      interrogatory that, "Later I told my father that Loholt
6      did inappropriate things to me."  You said previously that
7      that's when you were in Scouting, when you told your dad;
8      is that correct?
9  A   Yes.
10 Q   Was Jack Loholt the Scout master at the time?
11 A   Far as I know.  It was directed under him.
12 Q   Okay.  And what did you tell your father was going on?
13 A   That things had happened.  I didn't talk to him, tell him
14     what it was, I just said things had happened to us.
15 Q   Did he ask you what you were talking about?
16 A   He didn't -- we didn't talk much about it.  I mean, I was
17     close to him, but I wasn't close to be able to talk to him
18     as son to father.
19 Q   What did you say to him that -- about inappropriate
20     contact?  Did you say he'd been touching you or did you
21     give him any idea of what was happening with Loholt?
22 A   No, I didn't -- I mean, I couldn't talk to him like that,
23     tell him that he'd been touching.  I just said things had
24     happened.
25 Q   Did you tell him that it upset you?  Did you tell him you

Verb8M Reporting

G - 61

800 Fifth Ave., Suite 101-122 , Seattle, WA  98104 - (206) 467-0800

5b268a61-7336-4a74-be22-cd4e709c9085

DEPOSITION OF JAMES ALL..  _ACH - FLEMING, et al. v. MORMO.. _HURCH, et al. - 7/26/05

Page 54

1  A   He depended on me more than the others.
2  Q   Did you ever talk to your dad later on in your life about
3      what Jack Loholt had done to you?
4  A   No.
5  Q   Did you ever ask him a question, you know, why didn't you,
6      when I told you, why didn't you do something about it?
7          MR. KOSNOFF: Objection. Are you asking when
8      was an adult?
9  Q   (By Mr. Frey) Yeah, when you were an adult, did you ever
10     have any discussions with your dad about the abuse when
11     you told him about those two occasions you told him about?
12     Did you ever discuss that with him later on in life?
13 A   No.
14 Q   What was the relationship, as far as you could see it, how
15     was the relationship between your mother and your father?
16 A   I always figured happy.
17 Q   By the way, did you attend church on a regular basis
18     growing up?
19 A   Yes.
20 Q   Do you remember what ward you were in?
21 A   Kent Second.
22 Q   And how long did you continue to attend church at the Kent
23     Second Ward?
24 A   Up till I served a mission.
25 Q   And when did you serve your mission?

Page 55

1  A   '80 -- 1979-'80, or -- probably -- '81-'82? '82-'83.
2  Q   Before you went on your mission, were you interviewed by a
3      bishop?
4  A   Yes.
5  Q   And were you interviewed by the stake president?
6  A   Yes.
7  Q   Did you mention to them at any point in time about the
8      abuse that you had suffered with Jack Loholt?
9  A   No.
10 Q   Have you ever told any church or official, a bishop or one
11     of his counselors or stake president or one of his
12     counselors about your abuse?
13 A   When it went on with Kevin Boren, we went to the bishop,
14     Bishop Pettit.
15 Q   When did you go with Ken Boren to see --
16 A   Kevin Boren.
17 Q   Kevin, pardon me, Boren, to see Bishop Pettit? Do you
18     remember when that was?
19 A   I don't remember the date. I just remember we went to him
20     and talked to him of it.
21 Q   How old were you?
22 A   I can't remember.
23 Q   Was it before or after your mission?
24 A   Before. When -- it was back when it was going on, the
25     incident.

Page 56

1  Q   Back when it was going on?
2  A   (Witness nods.)
3  Q   So --
4  A   Yes.
5  Q   So you were in Scouts at the time?
6  A   I was what?
7  Q   Were you in Scouting at the time you went to see the
8      bishop?
9  A   Yes.
10 Q   And what did you tell Bishop Pettit?
11 A   Of the abuse, the things that were happening.
12 Q   What did you say to him?
13 A   I don't remember what we talked about.
14 Q   Did you tell him it was sexual abuse?
15 A   Yes.
16 Q   And what did Bishop Pettit say?
17 A   I don't --
18 Q   Was he the bishop at the time, by the way?
19 A   Yes.
20 Q   What did he say?
21 A   I don't remember what he said, just it would be taken care
22     of.
23 Q   All right. And you're sure you were in Scouting at the
24     time that you told him that?
25 A   As far as I can remember, yeah.

Page 57

1  Q   Anybody other than Bishop Pettit that you remember telling
2      of the abuse?
3  A   No.
4  Q   Was Kevin Boren there at the time that you spoke with -- in
5      the room with you, physically, when you spoke with Bishop
6      Pettit?
7  A   I can't remember. I know he pulled us into the room, said
8      what would you like to talk about.
9  Q   He pulled you into a room?
10 A   Into the room, you know, like one for an interview.
11 Q   Had you set this up in advance, to go talk to him?
12 A   I don't remember. I think we just went to talk to him.
13 Q   Is it possible that Bishop Pettit had actually seen you and
14     asked you boys to come in because he wanted to talk to you?
15 A   I can't remember. All's I remember was talking to him
16     about it.
17 Q   And you don't know whether he was the one who initiated
18     that and asked you to step in a room and talk with him or
19     whether you initiated it by setting up an appointment?
20 A   I actually don't remember.
21 Q   You don't remember how that happened?
22 A   No.
23 Q   Was he -- did he ask you what was going on, do you
24     remember?
25 A   Did who ask me?

Verb8M Reporting
800 Fifth Ave., Suite 101-122 , Seattle, WA  98104 - (206) 467-0800

5b268a61-7336-4a74-be22-cd4e709c9085

G - 62

DEPOSITION OF JAMES ALLEN BACH - FLEMING, et al. v. MORMON CHURCH, et al. - 7/26/05

Page 58

1 Q   Bishop Pettit, did he say anything about how are you doing
2     or is there anything wrong or do you have any remembrance
3     of that meeting at all?
4 A   No. I don't remember it.
5 Q   But you have a clear memory that you told him there was
6     some abuse?
7 A   I know I talked to him, yes.
8 Q   And you told him about the abuse?
9 A   (Witness nods.) Yes.
10 Q   Is that correct?
11 A   Yes.
12 Q   But you don't remember what he told him, huh?
13 A   No.
14 Q   When you say that he pulled them in -- "he pulled us in,"
15     both of you boys went in together? Did he have both of you
16     inside there, it sounds like? That's your description, not
17     mine. You said, "He pulled us in."
18 A   Well, I had gone to Kevin and talked to him, so -- I can't
19     remember if he pulled us both in or one at a time.
20 Q   You had gone to Kevin to talk to who?
21 A   Well, we used to always kid about it, I'd kid about it when
22     I was a kid.
23 Q   With whom?
24 A   Several of the Scouts.
25 Q   Did Kevin tell you that he had been abused?

Page 59

1 A   No.
2 Q   So you don't know whether Kevin had been abused; is that
3     correct?
4 A   Well, just through hearsay, that he had.
5 Q   But he never told you that?
6 A   No.
7 Q   Do you know if he ever told Bishop Pettit that he had been
8     abused?
9 A   No, I don't know.
10 Q   Okay. It sounds like he interviewed both of you
11     separately; is that a fair statement?
12 A   Probably.
13 Q   Now, I want to go back for a minute to this interrogatory
14     about -- it asks you who you told about this abuse. We've
15     talked about your telling your dad --
16 A   Mm-hmm.
17 Q   And we've talked about -- we haven't talked about, but the
18     next person you list is your wife.
19 A   Mm-hmm.
20 Q   When did you tell your wife? You said sometime -- in an
21     answer, in the 1990s. Do you remember when you told your
22     wife?
23 A   No, it just came up.
24 Q   How did it come up?
25 A   Just through conversations with others, other friends and

Page 60

1     that we talked about it, and she'd always thought I was
2     kidding about it.
3 Q   Was it -- when you say others, who was there?
4 A   Just friends that hung out in church, we were all together,
5     church members.
6 Q   And were you still attending a church in the '90s, the LDS
7     church?
8 A   Far that I know of, I was kind of inactive active.
9 Q   By the way, are you currently active in the church at all?
10 A   Right now, I'm -- my wife's active and I am inactive. I go
11     there every so often.
12 Q   With regard to telling your wife, would this have been in
13     conjunction with your going -- when you agreed to go for
14     counseling for cocaine addiction, back in '96?
15 A   Repeat the question?
16 Q   Would you have told your wife at the time in the '90s,
17     would it have been about the same time you went in to
18     the -- what's his name, the Puget Sound Hospital for
19     cocaine addiction?
20 A   I'm not sure.
21 Q   The records indicate that you told the people at Puget
22     Sound Hospital about your sexual abuse. Do you remember
23     that? You told them you were sexually abused?
24 A   Do I remember that?
25 Q   Yeah, do you remember telling them that?

Page 61

1 A   No, I don't remember.
2 Q   When you told your wife, you said you were always kidding
3     about it. I'm not sure what you're telling me. Would you
4     explain that?
5 A   The actions that Jack did to me, I would kid about it, like
6     the events that happened, I would tell them and everybody
7     would think that I was just kidding around with them.
8 Q   And what do you mean, "everybody"? Who would you tell?
9 A   The boys -- we hung out really close, all the kids at the
10     church, youth and that, as we grew up. We were really
11     close.
12 Q   So this is way after, well after Scouting and you were
13     still in the church?
14 A   Yeah.
15 Q   How old would you be when you discussed this -- when did
16     you discuss this with the other kids? How long would this
17     last?
18 A   Oh, just jokes, I'd tell them -- like the pencil trick or
19     I'd say stuff like that, to kid around with them. It
20     wasn't a --
21 Q   So sometime in the '90s, you told your wife; is that
22     correct?
23 A   Mm-hmm. Well, she had heard -- you know, as we grew up,
24     she'd heard different things and that, but she never came
25     and confronted me.

Verb8M Reporting
800 Fifth Ave., Suite 101-122 , Seattle, WA   98104 - (206) 467-0800

5b268a61-7336-4a74-be22-cd4e709c9085
G - 63

DEPOSITION OF JAMES ALLEN ... ACH - FLEMING, et al. v. MORMON CHURCH, et al. - 7/26/05

**Page 62**

1 Q   And what did you tell your wife?
2 A   Just I was involved in sexual abuse.
3 Q   Did you explain to her what had happened to you?
4 A   I can't remember.
5 Q   Well, did she ask you what are you talking about?
6 A   No, she didn't ask. I just pretty well told her that I
7     was -- things that happened to me, growing up, through
8     Scouts.
9 Q   Did you tell her some of the things you've told me?
10 A   No, she'd heard about the -- you know, joking around,
11    pencil tricks, stuff like that, they all thought --
12 Q   Pencil tricks? What do you mean?
13 A   He would take a pencil and put it up his butt, and then do
14    it up ours, mine, and make it disappear.
15 Q   And you told your wife about that, or people that you joked
16    about that?
17 A   Yeah.
18 Q   So when you told your wife, what was her reaction to this?
19 A   Not much. I don't know. I can't remember much about it.
20 Q   Okay. Did you tell her how it affected you?
21 A   I can't remember.
22 Q   Was there a particular circumstance that caused you to tell
23    your wife, like you were --
24 A   She might have asked. I just -- I told her a little bit
25    about it.

**Page 63**

1 Q   Okay. Now, after you disclosed this to your wife, did you
2     talk about it after that for any period of time, or did it
3     come up again at all?
4 A   I can't remember.
5 Q   Other than your wife and your dad, who else have you told
6     about your being abused that you can remember?
7 A   No one, that I can remember. I kept it pretty quiet.
8 Q   Did you tell -- well, Bob Kelly knew, didn't he?
9 A   Yes.
10 Q   And how about Todd Denny? Do you know who Todd Denny is?
11 A   Mm-hmm.
12 Q   Did you tell him about it?
13 A   He was one that we'd always joke about. It was a big
14    joke, basically.
15 Q   Okay. And did Denny joke with you about it?
16 A   Mm-hmm, yeah.
17 Q   Anyone else that you can remember that you told?
18 A   No.
19 Q   So we've talked about Bishop Pettit, we've talked about
20    your wife and your dad and you said Todd Denny knew and Bob
21    Kelly knew. Anyone else you can think of?
22 A   I can't think of anyone else right to hand.
23 Q   Did you tell your mom?
24 A   No.
25 Q   How about your brothers?

**Page 64**

1 A   In the joking, they'd heard it.
2 Q   They heard it in the joking?
3 A   When -- yeah.
4 Q   Did you understand that they knew that -- when you were
5     joking, that something had actually happened?
6 A   What was that? Repeat that?
7 Q   Well, you said you joked about it.
8 A   Yeah.
9 Q   In what way did you joke with them about it?
10 A   We'd call it the pencil trick or stuff like that.
11 Q   Was this something that was kind of humorous?
12 A   To us?
13 Q   Yes.
14 A   No, it was a way that I was trying to probably reach out.
15    I don't know what it was.
16 Q   Did either of your brothers indicate to you that they had
17    been abused too?
18 A   No.
19 Q   So Brent and Rick never said anything to you?
20 A   Hmm-mm.
21 Q   All right. But you knew Rick had been abused, right?
22 A   The only thing I heard was through -- that he did a plaster
23    of Paris, and that's the only thing.
24 Q   But never in your -- he was never abused in your
25    presence --

**Page 65**

1 A   No.
2 Q   -- is that correct? Okay. Have you gone to see any
3     counselor or psychologist or therapist of any kind to work
4     with you concerning the abuse that you suffered at the
5     hands of Jack Loholt?
6 A   No. I've wanted to, but I don't want to bring it up.
7 Q   Okay. Have you ever -- when you were at Puget Sound
8     Hospital, do you know if they ever gave you any type of
9     psychological tests, such as they gave you a form and
10    you had to fill in little dots, they'd ask questions
11    like -- we call it an MMPI.
12 A   I can't remember.
13 Q   Okay. So you don't know what testing if any they gave you
14    there?
15 A   (Witness shakes head.)
16 Q   Okay. How would you describe your relationship with your
17    brothers, Brent and Rick?
18 A   Brent, I'm really close to. Ricky, I don't care for.
19 Q   Is there some reason you don't care for Ricky?
20 A   It has to deal with my mom.
21 Q   Is that because you believe your mother favored Ricky over
22    you?
23 A   Yes.
24 Q   How would she do that?
25 A   At Christmas time she'd give him my presents and I'd get

Verb8M Reporting

800 Fifth Ave., Suite 101-122 , Seattle, WA  98104 - (206) 467-0800

5b268a61-7336-4a74-be22-cd4e709c9085

G - 64

# EXHIBIT H

Page 1

```
 1        UNITED STATES DISTRICT COURT
 2       WESTERN DISTRICT OF WASHINGTON
 3               AT SEATTLE
 4  _____
 5  KENNETH FLEMING and JOHN DOE,   )
                                    )
 6        Plaintiffs,   )
                        )
 7  vs.          ) NO. 04-2338 RSM
                 )
 8  THE CORPORATION OF THE PRESIDENT OF THE )
    CHURCH OF JESUS CHRIST OF LATTER-DAY   )
 9  SAINTS, a Utah corporation sole, a/k/a )
    "MORMON CHURCH"; LDS SOCIAL SERVICES   )
10  a/k/a LDS FAMILY SERVICES, a Utah      )
    corporation,               )
11                             )
          Defendant.    )
12  _____
13     DEPOSITION UPON ORAL EXAMINATION OF
14             KENNETH FLEMING
15          (VIDEOTAPED PROCEEDING)
16  _____
17         9:38 o'clock a.m.
18          July 20, 2005
19          601 Union Street
20          Suite 3100
21          Seattle, Washington
22
23
24
   REPORTED BY:
25  ALISON LOTT, CCR#2337
```

Page 2

```
 1
 2         A P P E A R A N C E S
 3  For the Plaintiffs:   TIMOTHY D. KOSNOFF
                          Attorney at Law
 4                        One Union Square
                          600 University
 5                        Suite 2101
                          Seattle, Washington  98101
 6
 7  For the Defendant:    THOMAS D. FREY
                          MARCUS NASH
 8                        Stafford Frey Cooper
                          601 Union Street
 9                        Suite 3100
                          Seattle, Washington  98101
10
11  Videotaped by:        Dan Bassett,
                          Prolumina Trial Technologies
12
13
14     ** MARKED PORTION OF PROCEEDINGS **
       PAGE 86, LINE 14, THROUGH PAGE 87, LINE 15
15
16         E X H I B I T   I N D E X
17  NUMBER       DESCRIPTION          PAGE
18  1   Defendant COP's First Interrogatories and   65
        Requests for Production to Plaintiff Kenneth
19      Fleming and Answers, Responses and Objections
        thereto
20
21  2   Defendant COP's First Interrogatories and   65
        Requests for Production to Plaintiff Kenneth
22      Fleming and Supplemental Answers, Responses and
        Objections thereto
23  3   Defendant COP's First Interrogatories and   65
        Requests for Production to Plaintiff Kenneth
24      Fleming and Amended Answers, Responses and
        Objections thereto
25
```

Page 3

```
 1        THE VIDEOGRAPHER:  We are on the record.
 2  This is the videotaped portion in the deposition of Kenneth
 3  Fleming. My name is Dan Bassett. I am the videographer
 4  here today. I'm employed by Prolumina Trial Technologies
 5  located at 80 South Washington, Suite 200, in Seattle
 6  Washington, 98104. The court reporter is Alison Lott from
 7  Verb8M Reporting. This deposition is being recorded this
 8  20th day of July, 2005.
 9        The time now is approximately 9:38 a.m. We are in
10  the offices of Stafford, Frey, Cooper, located at 601 Union
11  Street, Suite No. 3100, in Seattle Washington, 98101. This
12  deposition is being recorded in the matter of Fleming
13  versus the Mormon Church, et al. The case number is
14  04-2338 RSM, in the United States District Court, Western
15  District of Washington at Seattle. This deposition was
16  noticed by Tom Frey.
17        Counsel and all present please identify yourselves
18  for the record, and then the witness may be sworn in.
19        MR. KOSNOFF:  Timothy Kosnoff on behalf of
20  the plaintiff, Ken Fleming.
21        MR. FREY:  Thomas Frey on behalf of the
22  Corporation the President of the Church of Jesus Christ of
23  Latter Day Saints, and the LDS Social Services.  And also
24  present is Mr. Marcus Nash, counsel for the same
25  defendants.
```

Page 4

```
 1  KENNETH FLEMING,        having been duly sworn by the
                            Notary to tell the truth, the whole
 2                          truth and nothing but the truth,
                            testified as follows:
 3
 4         DIRECT EXAMINATION
 5  BY MR. FREY:
 6  Q   Mr. Fleming, I've already identified myself on the record.
 7      My name is Tom Frey. I'm one of the attorneys for the LDS
 8      Church and LDS Social Services. Have you ever had your
 9      deposition taken before?
10  A   No.
11  Q   This is a process in which we're going to be asking you
12      questions for the purpose of trying to find out the facts
13      and circumstances of your claim. You're under oath, and
14      this deposition can be used in a court at a later date if
15      we deem it appropriate to do so. So what I want to be sure
16      is that my questions are intelligible to you, you
17      understand them, and that you give me a full and complete
18      answer. Can we agree on that?
19  A   I'll try my best.
20  Q   The other thing is that some of us try to say "uh-huh" or
21      "huh-uh" and we don't answer. So please answer audibly,
22      yes or no, or if you give a more detailed answer, speak up
23      so the court reporter can hear you, okay?
24  A   Okay.
25  Q   Now, if I ask you a question and you don't understand it,
```

DEPOSITION OF KENNETH FLEMING, et al. - FLEMING v. "MORMON CHURCH," et al. - 7/20/05

Page 53

1  was abusing you when that occurred?
2  A  I felt trapped there. And I guess that question could also
3     be asked to a woman that's being beaten by her husband, why
4     did you stay? I didn't know how to get away from it.
5  Q  Were you living at home at the time?
6  A  Yes.
7  Q  Did you have to pay room and board or anything while you
8     were living at home when were you 16 and 17, or did your
9     family provide you a place to sleep and eat?
10 A  I did not pay room and board.
11 Q  So they provided you a place to sleep and food on the
12    table, I presume; is that correct?
13 A  That's correct.
14 Q  So, when you went to work for Jack Loholt, this was
15    something that you didn't have to do? Nobody forced you to
16    go to work for him; you could have worked someplace else;
17    is that correct?
18 A  Actually, I don't believe that is, because I felt trapped
19    into going to work for Jack Loholt.
20 Q  Can you tell me why you felt trapped into working for him?
21 A  A lot of the parents thought Jack was good for the boys.
22    He had a construction company. He built things. He ran
23    bulldozers and backhoes and dump trucks. And I tried to
24    get away from Jack Loholt, and Jack Loholt approached my
25    mother, offered a job for me. I couldn't say no.

Page 54

1  Q  And the reason you couldn't say no?
2  A  The reason that I felt I couldn't say no was because then
3     it would have brought up questions like why? You can make
4     more than you can cleaning the meat department at
5     Albertson's or Safeway. Why would you not want to go to
6     work for him where he's going to pay you more? When you've
7     got the opportunity to learn so much. I didn't know how I
8     would be able to go down that road.
9  Q  So you feel you were coerced into working for him because
10    of your mother and the amount of money he was paying you?
11 A  Not because of my mother, because of my fear. And not that
12    he was paying me a great deal of money. I don't even
13    recall what it was. Because of how -- of my fear and how
14    he convinced -- expressed what a great opportunity it would
15    be to my mother. She thought it was a great thing.
16 Q  Was he physically abusing you on a regular basis while you
17    were working for him in his construction job?
18 A  Every day.
19       MR. KOSNOFF: Tom, I don't mean to interrupt
20    you, but if you get a break opportunity in the next few
21    minutes --
22       MR. FREY: Okay. Let's stop right now.
23    We've answered the question.
24       THE VIDEOGRAPHER: Going off the record. The
25    time right now is approximately 11:26 a.m.

Page 55

1        (A brief recess was taken.)
2        THE VIDEOGRAPHER: Back on the record. This
3  is the beginning of Tape No. 2 in the continuing deposition
4  of Kenneth Fleming. The time now is approximately 11:38
5  a.m.
6  Q  (By Mr. Frey) Mr. Fleming, you said he abused you every
7     single day. What kind of abuse are we talking about? What
8     was he doing to you?
9  A  Do you want details?
10 Q  Yes.
11 A  We usually had to go --
12 Q  If you need to take a break at any point in time, we can do
13    that.
14 A  We would go into his room every morning, and he would take
15    off my clothes and tell me to lay on the bed. He would
16    fondle me, he would have oral sex with me, he would lay on
17    top of me and rub his body on me, he would kiss me, he
18    would tell me he loved me, he would take a stick and put
19    Vasoline on it, he would put that into my body, and then he
20    would lay on me and attempt to put his penis in me. He
21    would want me to fondle him, to masturbate him, he would
22    ejaculate into vials that he would save and would want me
23    to do the same. Sometimes he would want me to ejaculate
24    into his mouth.
25 Q  And this was on a daily basis?

Page 56

1  A  Daily, to some degree.
2  Q  Not everything, but some aspect of this?
3  A  Mm-hmm.
4  Q  According to the answers to interrogatories, you worked for
5     him -- we're talking about when you were 16 and 17, you
6     worked for him. How long did this go on?
7  A  Until he left to go to Canada.
8  Q  But can you give me a sense of time?
9  A  I don't know what year he left to go to Canada.
10 Q  In the answers to interrogatories, it says you worked for
11    him 1978-1979. So did this go on for a year or two or
12    longer than that, from your memory? I mean, was it more
13    than one summer, more than one winter? I'm trying to get
14    you to think in terms of seasons, maybe, or --
15 A  I believe it was more than a year.
16 Q  When he did this to you on a regular basis, some form of
17    this sexual activity, how did you feel about it?
18 A  I never wanted it to happen.
19 Q  Did it upset you?
20 A  Yes.
21 Q  Did you ever tell him that you did not want to do it?
22 A  Yes.
23 Q  Would he force himself on you then?
24 A  He would generally tell me this will be the last time, and
25    it never was.

14 (Pages 53 to 56)

# EXHIBIT  I

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Plaintiffs,　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　vs.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
THE CORPORATION OF THE PRESIDENT　　　　)
OF THE CHURCH OF JESUS CHRIST OF　　　　) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah　　　　　　　　)
corporation sole, a/k/a "MORMON　　　　　)
CHURCH"; LDS SOCIAL SERVICES a/k/a　　　)
LDS FAMILY SERVICES, a Utah　　　　　　　)
corporation,　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　Defendants.　　　)

DEPOSITION OF PHILIP J. COLEMAN

September 15, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square　　　2208 North 30th Street, Suite 202
600 University St.　　Tacoma, WA 98403
Suite 2300　　　　　　(253) 627-6401
Seattle, WA 98101　　(253) 383-4884 Fax
(206) 340-1316　　　　scheduling@byersanderson.com
(800) 649-2034　　　　www.byersanderson.com

25th Anniversary 1980-2005

Philip J. Coleman
September 15, 2005

Byers & Anderson
Court Reporters & Video

Page 42

1   that your predecessor served?
2   A  Well, I started in 1973, and this was 1970, so no
3   less than three. How much less, I don't remember.
4   Q  Can you give me a general sense of the kind of
5   communication or the types of communications that go
6   on between a departing bishop and an arriving bishop
7   regarding the transfer of responsibilities within the
8   ward?
9           MR. FREY: Could I ask for a
10  clarification?
11      Are you talking about then or now?
12          MR. KOSNOFF: He can only testify as to
13  his experience.
14  Q  (By Mr. Kosnoff) If it changed in your later
15  bishopric, perhaps you can point that out, but I'm
16  trying to get a sense of is there a practice, is
17  there a custom. How are the reigns transferred?
18          MR. FREY: I am going to object to the
19  form of the question. It's indeterminate in time,
20  but go ahead and answer.
21          THE WITNESS: Is there a protocol? I
22  don't remember.
23      I can remember what might have taken place.
24      There would be a transfer of records, keys, the
25  current mechanics in progress as far as the

Page 43

1   organization is concerned, nonconfidential items of
2   concern.
3   Q  (By Mr. Kosnoff) Now, I understand that the
4   responsibilities of the bishop are great and
5   multifaceted and include both administrative
6   responsibilities and pastoral responsibilities.
7       Do you recall having discussions of an
8   administrative nature with your predecessor, Bishop
9   Borland?
10          MR. FREY: I am going to object to the
11  form of the question.
12          THE WITNESS: And I'm not sure I
13  understand the question.
14  Q  (By Mr. Kosnoff) Well, you talked about keys,
15  records. I'm assuming you're referring to things
16  that had to do with the administrative operations of
17  the ward.
18  A  Yes.
19  Q  Did it also involve discussions regarding personnel--
20  strike that. Individuals in callings, positions, and
21  offices under the purview of the bishop?
22  A  It might have.
23  Q  Do you have any specific recollection of any of those
24  discussions?
25  A  I do not.

Page 44

1   Q  Did you have, for example, a discussion about how the
2   Boy Scout program was operating and what changes need
3   to be made there?
4   A  I do not recall any.
5   Q  Are there any protocols or practices that you recall
6   involving communicating confidential, sensitive
7   issues involving members of the ward?
8   A  I don't remember a protocol for that.
9   Q  Do you have any recollection of Bishop Borland
10  telling you any sensitive or confidential information
11  concerning any members of the ward?
12  A  I do not.
13  Q  When you became bishop, at that point had you been
14  aware of there being any complaints of sexual
15  misconduct with boys by Jack LoHolt?
16  A  No.
17  Q  Had you heard any rumors to that effect?
18  A  No.
19  Q  To your understanding what kind of a job was Jack
20  LoHolt doing within the ward Scout program when you
21  became bishop?
22  A  A young men's secretary position is often given to a
23  person who is-- who needs something to do.
24  Q  And in that instance Jack LoHolt needed something to
25  do?

Page 45

1   A  I can't infer the second from the earlier, but that
2   was a statement of fact of the position.
3   Q  Okay.
4   A  I don't recall how well Jack was doing or why he was
5   put in the position.
6   Q  He was already in that position when you became
7   bishop?
8   A  I don't recall that either.
9   Q  At some point during the three years that you were
10  bishop, did someone bring to your attention an
11  allegation that Jack LoHolt was sexually molesting
12  boys?
13  A  In the specific, I have to say no to sexually
14  molesting.
15  Q  What about generally?
16  A  In the general to sexually molesting, I have to say
17  no.
18  Q  Did you receive any information of any kind from any
19  person that Jack LoHolt was allegedly engaging in
20  sexually inappropriate activity?
21  A  Yes.
22  Q  From who whom did you learn that?
23          MR. FREY: I am going to object at this
24  point in time.
25      Let me tell you the basis for the objection.

12  (Pages 42 to 45)

Philip J. Coleman
September 15, 2005

5fc57d2b-87e8-42e1-820b-e6596dfd1fb5

Byers & Anderson
Court Reporters & Video

Page 46

1 He was a bishop at the time, and we treat those
2 communications as confidential, and in trying to help
3 you with this answer, I'm not trying to present a
4 roadblock.
5 As an accommodation and because of the fact that
6 the individuals involved have not authorized this
7 information to be given, I think they have a right to
8 privacy in that regard and a right to have it
9 protected.
10 As an accommodation, I'll allow the witness to
11 tell you in a general sense what he heard had
12 happened, and I'm not waiving any privilege by doing
13 that.
14 If you'll accept that, we can go forward.
15 You don't have to accept my objection, but if you
16 want to go forward, I'm willing to do that on this
17 basis.
18 MR. KOSNOFF: Tom, I would like to take
19 a brief bathroom break and come back and continue
20 this dialogue on that point.
21 (Recess 10:27 to 10:33 a.m.)
22
23 MR. KOSNOFF: Mr. Frey, this is not
24 unfamiliar ground to the two of us, this point.
25 We've been at similar points in other cases.

Page 47

1 From your comments I take that you are making an
2 objection based upon a number of criteria. One, I
3 think I heard an assertion of the clergy penitent
4 privilege.
5 MR. FREY: I'll make it simple for you.
6 I'll tell you what the basis for my objection is:
7 one, it's a constitutional objection on the free
8 exercise clause; number two, it may also be on the
9 basis of the priest penitent privilege depending on
10 the circumstances under which he may have heard
11 something; and the third ground is that we've said in
12 our answers to interrogatories I'm not prepared to
13 reveal the names of anybody or have my client reveal
14 the names of anyone who has been molested without
15 that person's consent because I know for a fact, and
16 I've gotten court orders on this, that it can be
17 devastating to have someone knock on their door and
18 say, "I understand you've been abused and I'd like to
19 talk to you about it."
20 For those three reasons-- I am willing to go
21 forward because I know that you have the right to
22 determine knowledge and what they knew and should
23 have known, and I'm willing to let him tell you in a
24 general fashion, and I guess I could proffer this for
25 the record what he can tell you to get you to where

Page 48

1 you need to go--
2 MR. KOSNOFF: Before we go there, I
3 think this is important that we establish enough of a
4 factual record here for Judge Martinez so we only
5 have to take one trip up and bring Dr. Coleman back
6 one more time as opposed to two more times, so I
7 would propose that with respect to the assertion of
8 the claimed privileges that you're making, that you
9 take a moment and establish whatever factual basis
10 you would like with Dr. Coleman to support the
11 assertion of those privileges.
12 I'm inviting you to do that because, as you know,
13 it's the proponent of the privilege that carries the
14 burden of establishing it, and I just want to make
15 sure that when this goes up to Judge Martinez, that
16 you've had a full opportunity to make as full an
17 evidentiary record as you need to make your arguments
18 to him.
19 MR. FREY: It's not my burden. Under
20 the rule I'm exercising those privileges, and I've
21 enumerated them.
22 If you wish to question the witness, you are free
23 to do that. If you choose to go to Judge Martinez,
24 I'll be happy to supply whatever additional
25 information I need by way of affidavit or otherwise.

Page 49

1 I've tried to explain to you, and you're free to
2 ask him the circumstances and free to ask him a
3 number of questions, and I think you can get the
4 information that you need without revealing these
5 names.
6 Quite frankly, Tim, I don't want to reveal any
7 names or my client to reveal any names that he may
8 have heard of that are not public right now because I
9 simply don't think it's appropriate.
10 As I've said before, I've gotten court orders
11 restricting that information.
12 MR. KOSNOFF: I understand that there
13 are--
14 MR. FREY: So you can question him now
15 and ask him--
16 MR. KOSNOFF: I just want the record to
17 reflect that I am not unaware of the fact that there
18 are protected limited privacy interests of third
19 parties that the Court has to be mindful of, and it's
20 a weighing of rights and interests that the Court
21 will have to make.
22 Let me go forward with some additional questions
23 so that at least we have some factual record for the
24 Court.
25 Q (By Mr. Kosnoff) Dr. Coleman, as I understand

13 (Pages 46 to 49)

Philip J. Coleman
September 15, 2005

5fc57d2b-87e8-42e1-820b-e6596dfd1fb5
I - 71

Byers & Anderson
Court Reporters & Video

Page 50

1    Mr. Frey's comments, you received a communication
2    from someone whom you were bishop regarding an
3    allegation of sexual misconduct by Jack LoHolt; is
4    that correct?
5  A  That's correct.
6  Q  Was the person who communicated this to you a member
7    of the Mormon church?
8  A  Yes.
9  Q  Was this communication made to you in your capacity
10   as bishop?
11 A  I think so.
12 Q  Okay.  Did it occur at, for example, the ward
13   building or your office?
14 A  I don't remember that.
15 Q  Okay.  Was the person who communicated this to you,
16   in your capacity, making a statement of confession or
17   penitential contrition?
18 A  No.
19 Q  Under the doctrines and tenants of your faith, do you
20   believe that you are absolutely required to keep what
21   that person said to you confidential, and I mean that
22   you cannot repeat it to anyone?
23 A  No.
24 Q  Do you know the Harrison family?
25 A  I do.

Page 51

1  Q  Did a member of the Harrison family disclose to you
2    that Jack LoHolt had or was sexually molesting one or
3    more of their sons?
4        MR. FREY:  I am going to object to the
5    question and instruct the witness that he does not
6    have to answer it.
7        THE WITNESS:  I am going to say no.
8        MR. KOSNOFF:  I'm sorry, Tom, I missed
9    what you said.  Did you say that you were instructing
10   him not to answer?
11       MR. FREY:  I instructed him not to
12   answer, but he already said "No."
13 Q  (By Mr. Kosnoff)  You knew the Harrison family?
14 A  Yes.
15 Q  And as I recall, she was a member of the church but
16   Mr. Harrison was not?
17 A  That's as I recall.
18 Q  And they had three sons who were members of the
19   church?
20 A  I think so.
21 Q  Did any member of the Harrison family tell you that
22   Jack LoHolt was sexually molesting them?
23       MR. FREY:  If this is going to require
24   you to breach any confidential agreement you have had and/or to
25   understanding that you believe you have had and/or to

Page 52

1    confirm, I suppose, the name of a victim, then I'm
2    going to tell you you don't have to answer it.
3        THE WITNESS:  To my own understanding of
4    the question, the answer is no.
5  Q  (By Mr. Kosnoff)  In October of 2003, did you get a
6    phone call from a woman that was asking you about
7    what you knew about Jack LoHolt?
8  A  I did.
9  Q  And did you tell her that Jack's problem came to your
10   awareness, "When some young boys came to me and told
11   me that Jack had been molesting them"?
12 A  I did not say that, to my knowledge.
13 Q  Did you tell that person that after talking with
14   those people, that you spoke with Jack LoHolt and his
15   parents?
16 A  This question was contingent on the prior one about
17   boys having spoken to me, and the answer to that one
18   is no, and therefore the answer to this one is no.
19       May I take a moment with these gentlemen?
20 Q  Of course.
21       Have you finished your last answer?
22 A  On that question, yes.
23       (Recess 10:43 to 10:47 a.m.)
24
25       MR. FREY:  We can go back on the record,

Page 53

1    and the witness wants to clarify the answer is maybe
2    the best way to put it.
3  Q  (By Mr. Kosnoff)  Dr. Coleman, do you want to clarify
4    an earlier answer?
5  A  If I may.
6        With regard to an individual making me aware of
7    something that happened between her sons and Jack
8    LoHolt, the answer is yes, and the answer is that
9    there was an exposure.
10       In my own mind, at least at the time, maybe not
11   now, that did not constitute abuse.
12       That's why I gave "no" to those answers, but I
13   wanted you to be aware of what did happen.
14 Q  What was your understanding of what Jack LoHolt had
15   done, allegedly?
16 A  Exposed his private parts.
17 Q  To whom and where?
18 A  As I recall it--
19       MR. FREY:  I am going to again instruct
20   the witness not to say the names of who, but he can
21   say anything else.
22       THE WITNESS:  As I recall, two boys, as
23   I recall it, on an outing, which Jack frequently took
24   them, either fishing or camping-- he was a bit of a
25   replacement for an absentee father.

14  (Pages 50 to 53)

Philip J. Coleman
September 15, 2005

Byers & Anderson
Court Reporters & Video

Page 54

1  Q  (By Mr. Kosnoff)  In fact, Jack had become kind of a
2     surrogate father to the boys in absence of their
3     natural father?
4  A  That's calling for a judgment.
5  Q  Is that your understanding?
6  A  I think what I said earlier would be appropriate.
7  Q  But it was your understanding that Jack had been
8     spending a lot of time with these boys?
9  A  I think so.
10 Q  When you received this information, were you
11    concerned?
12 A  Indeed.
13 Q  Were you very concerned?
14 A  Indeed.
15 Q  Okay.  Being very concerned, what did you do?
16 A  Spoke to Jack.
17 Q  Where did that conversation take place?
18 A  In the bishop's office.
19 Q  Did you call him in?
20 A  I did.
21 Q  What was said by Jack to you?
22 A  I don't recall the details, but he denied it.
23 Q  Jack denied that he'd engaged in the conduct?
24 A  He did.
25 Q  Did Jack acknowledge, however--

Page 55

1        MR. FREY:  For the record, I want to
2     make this clear because this is going to come up
3     again.
4        In those conversations where you're acting with
5     your bishop's hat on and you're speaking to one of
6     your people and it involves what could be classified
7     as a transgression within the church, you do have the
8     right not to disclose that information.
9        On the other hand, I want you to be able to
10    answer Counsel's question as best you can because he
11    has a right to find out what we knew or didn't know
12    or should have known.
13 Q  (By Mr. Kosnoff)  I would add whether or not a
14    privilege really applies really depends on the
15    circumstances and the conduct and the intent of the
16    parties.
17 A  I think in this context it would.
18 Q  The question of whether or not under the doctrine and
19    beliefs of the Mormon church and the circumstances of
20    this communication between you and Jack, is it your
21    belief that this was a privileged communication
22    between bishop and member?
23 A  May I make a statement?
24    The information came to me other than Jack.
25 Q  I understand that, but I'm referring to the meeting

Page 56

1     that you had with Jack.
2  A  That would fall under the auspices of a privileged
3     communication, yes, I think so.
4  Q  After you talked with Jack, did you talk with his
5     parents?
6  A  I did.
7  Q  Where did that take place?
8  A  Bishop's office.
9  Q  Okay.  What was said by the parents to you-- strike
10    that.
11       Did you tell the parents the information that you
12    had regarding Jack's behavior?
13 A  I did.
14 Q  What was their reaction?
15 A  Disbelief.
16 Q  Okay.  After that exchange, what did you do with this
17    information?
18 A  We released Jack from his church callings, and I
19    notified, as I recall, at least some key individuals
20    who would need to know about it.
21 Q  And those were priesthood leaders?
22 A  My counselors.  I remember specifically-- I can't
23    honestly say I remember talking to the young men's
24    president, but that might have been usual, and
25    perhaps to the Scout master, but I don't remember

Page 57

1     that.
2  Q  Richard Pettit was one of your counselors, correct?
3  A  He was.
4  Q  And, in fact, you did tell Richard Pettit?
5  A  That's my recollection.
6  Q  What else did you do?
7  A  If I can digress for a moment, my role as a bishop
8     was to serve everyone, including, if possible, Jack.
9        During an era at that time where at least
10    personally and I think rather generally there was
11    little information about the recurrent nature or
12    problem of a sexual offender and indeed little about
13    how to deal with it in the social aspect, I continued
14    to work privately with Jack to try to help him to be
15    reconciled to Christ.
16 Q  Through your work with Jack to be reconciled with
17    Christ, did you come away with a feeling that the
18    problem had been adequately addressed?
19       MR. FREY:  In answering that question--
20       THE WITNESS:  I can't answer that.  I
21    can't say.
22 Q  (By Mr. Kosnoff)  Did you do anything to investigate
23    whether there may have been other incidents and other
24    victims?
25 A  I want to say yes, but I frankly don't remember the

15  (Pages 54 to 57)

Philip J. Coleman
September 15, 2005

Byers & Anderson
Court Reporters & Video

Page 58

1  answer to that.
2  Q  Did you consider at any point calling the police and
3    letting them handle it?
4  A  Surely in today's environment, surely in the
5    environment as a bishop in 1988 the answer would have
6    been an obvious yes.
7      In the environment at that time, given society's
8    general level of expectation and indeed perhaps my
9    own naivety, I guess not. I don't think so, no.
10 Q  Just to clarify, the question was directed at what
11   your state of mind was at that time, and my question
12   is:  Did it ever cross your mind to call the police?
13 A  I answered that question in the best way I could, and
14   I can't possibly say if something might have ever
15   crossed my mind at that point.
16 Q  But as you sit there now, you can't remember having
17   thought that at the time?
18 A  I have no recollection of having thought that.
19 Q  Do you remember when in relation to the beginning and
20   the end of your term as bishop that this situation
21   arose with Jack?
22 A  I believe, and this is a vague memory, that it would
23   have been in 1975.
24 Q  So maybe in the final year of your bishopric?
25 A  That's correct or just prior to the final year.

Page 59

1      I am not sure exactly the time of year.
2  Q  What sort of memory queues are you relying on the
3    pinpoint it to that particular period of time?
4  A  Well, I knew my time in service, and I just have to
5    say to the best of my recollection I just can't say I
6    have a queue there.
7  Q  Is it linked to--
8  A  I seemed later in my tenure rather than sooner.
9  Q  I thought it was maybe linked to some other event--
10 A  Well, Bishop Pettit was not a counselor in the
11   earlier part of the bishopric.
12 Q  Within a bishopric is a first counselor someone who
13   has more authority or responsibility than a second
14   counselor or are they co-equals?
15 A  I would say largely co-equal, but in the absence of
16   the bishop, the first counselor takes charge.
17 Q  Did you do anything-- strike that.
18      Did you ask First Counselor Pettit to do anything
19   to assist you with respect to dealing with the
20   situation involving Jack LoHolt?
21 A  I don't remember.
22      The truth is I don't remember if he was my first
23   or second counselor.
24 Q  You said that you removed Jack from positions working
25   with youth in the ward?

Page 60

1  A  Any position, as I recall.
2  Q  Did you announce it to the ward membership as a whole
3    that Jack had been removed from all positions within
4    the ward?
5  A  Not that I remember.
6  Q  Did you take any special precaution to warn families
7    with children to avoid Jack LoHolt?
8  A  It's been 30 years. I don't remember that.
9  Q  Did you take any special precautions to try and
10   prevent Jack LoHolt from having contact with
11   children?
12 A  Within the church setting, yes, but I have to say
13   that in my own efforts to personally help Jack along
14   in his own life, that he came to my own home, was in
15   my own home for Christmas, the following Christmas,
16   and to dinner on other occasion, and my own children
17   were present, although my children were protected at
18   the time, although I don't know that I expected
19   anything to happen from Jack.
20      That's enough of a statement.
21 Q  Your children were, at that time, in the '70s, some
22   of them were teenagers and some of them were younger?
23 A  The first oldest born in '68, so '75 would have been
24   7 or going on 7 years of age.
25 Q  So your oldest was 7?

Page 61

1  A  Mm-hm.
2  Q  Did you say anything to any of your own children
3    along the lines of, "Stay away from Jack.  Avoid
4    Jack"?
5  A  If I did, I don't remember that.
6  Q  After you became aware of the situation with Jack,
7    did you do anything to limit the contact that Jack
8    LoHolt had with any of your own children?
9  A  I don't know that there was any necessity of doing
10   that.
11      There would have been no reason for him to have
12   contact with my children, but I would have, I think,
13   if that helps.
14 Q  During the period that you were working with Jack to
15   try and help him, did he continue to attend Sunday
16   services?
17 A  I'm unsure about that.  My best recollection is no.
18 Q  Did you exclude him?
19 A  No.
20 Q  Were you aware, when you found out about the
21   situation with Jack, where Jack was residing?
22 A  Yes, I think so.
23 Q  And was he residing at the Allenbach compound?
24 A  A home on the property belonging to Herman Allenbach,
25   a small home.

16  (Pages 58 to 61)

Philip J. Coleman
September 15, 2005

5fc57d2b-87e8-42e1-820b-e6596dfd1fb5

I - 74