# EXHIBIT J

J - 75

Dockets.Justia.com

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,        )
                                     )
            Plaintiffs,              )
                                     )
    vs.                              )
                                     )
THE CORPORATION OF THE PRESIDENT     )
OF THE CHURCH OF JESUS CHRIST OF     ) No. 4-2338 RSM
LATTER-DAY SAINTS, a Utah            )
corporation sole, a/k/a "MORMON      )
CHURCH"; LDS SOCIAL SERVICES a/k/a   )
LDS FAMILY SERVICES, a Utah          )
corporation,                         )
                                     )
            Defendants.              )

DEPOSITION OF DANIEL R. FLEMING

September 23, 2005

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300                (253) 627-6401
Seattle, WA 98101         (253) 383-4884 Fax
(206) 340-1316            scheduling@byersanderson.com
(800) 649-2034            www.byersanderson.com

25th Anniversary 1980-2005

Byers & Anderson
Court Reporters & Video

Page 14

1  A  I don't recall the man's name.
2  Q  What about when the meetings were at Jack's house?
3     Were there any other adults present?
4  A  There were other adults present at times when we--
5     depending on what the activity was.
6        When we shot .22s, there were other people there
7     to make sure that an accident didn't happen.
8  Q  When you say "other people," were these other adult
9     volunteers from the Kent 2nd Ward?
10 A  Yes.
11 Q  Do you ever recall any meetings where the bishop was
12    present?
13 A  Depending which bishop you're referring to--
14 Q  Well, any bishop.
15 A  I know that Bishop Coleman was a part of our Scouting
16    program at one time, and I recall him being at
17    meetings at the church.
18 Q  Can you think of any other bishops that may have been
19    present during any Scout meetings or Scout functions?
20 A  I know that Bishop Pettit was in office or the
21    bishopric, held the bishop's position at that time.
22 Q  Do you have any specific recollection of him actually
23    being present during a Scout meeting?
24 A  Right in the Scout meeting, no.
25 Q  Were there Scout outings or functions up at a

Page 15

1     property in the vicinity of Snoqualmie Pass?
2  A  Yes.
3  Q  And where was that and what was it?
4  A  It was at Lake Kachess on Snoqualmie Pass, and there
5     was a cabin being built there that we would meet at.
6  Q  And when you say "we would meet at," who are you
7     referring to?
8  A  The Scouts that would have attended.
9  Q  Members of the troop?
10 A  Right.
11 Q  How would you be transported up to that location?
12 A  One time I was riding with Jack in his dump truck.
13 Q  Was there more than one occasion that you went to
14    that place?
15 A  Yes, I believe so.
16 Q  Were there ever any campouts up there?
17 A  Yes.
18 Q  Did you, when you were a boy in Scouting, have a
19    friend by the name of Todd Denny?
20 A  Yes.
21 Q  How did you know Todd?
22 A  Todd was our neighbor.
23 Q  Was he a good friend?
24 A  Yes.
25 Q  Did Todd ever participate in any Kent 2nd Ward

Page 16

1     Scouting activities with you?
2  A  Yes.
3  Q  What activities do you recall him participating in?
4  A  I invited Todd to go to the Lake Kachess cabin for a
5     Scouting campout over a weekend. I believe it was a
6     weekend.
7  Q  It was a weekend campout?
8  A  Yes.
9  Q  Was Jack LoHolt there?
10 A  Yes.
11 Q  Did something happen to Todd by Jack LoHolt on that
12    weekend?
13 A  Yes.
14 Q  What happened?
15 A  Todd told me when we got home that Jack was fondling
16    him while we slept.
17 Q  Had you been aware of that while it was going on or
18    did you learn of it when he told you that?
19 A  I learned of it when he told me that.
20 Q  Was that the first that you were aware of Jack
21    engaging in that type of conduct with boys?
22 A  I had heard that Jack was rather strange in that area
23    prior to that.
24 Q  What had you heard?
25 A  I had heard that Jack liked to suck on boys' toes

Page 17

1     while they slept at different campouts.
2        I had a run-in with Jack prior to that campout, I
3     believe.
4  Q  And did he attempt to do something of a sexually
5     inappropriate nature with you?
6  A  Yes.
7  Q  Were you surprised when Todd Denny told you what he
8     told you had happened to him?
9  A  Yes.
10 Q  What did you do with that information?
11 A  I went and reported it to Bishop Pettit.
12 Q  Do you remember approximately what year that would
13    have been?
14 A  I believe it was around 1976.
15 Q  Is there any reason why you think it was 1976 as
16    opposed to some other year?
17 A  I just recall what my Scout badges were prior to
18    that, and I base my recollection on that.
19 Q  When you talked to Bishop Pettit, did you meet
20    face-to-face or was it over the phone?
21 A  I met face-to-face with Bishop Pettit.
22 Q  Where did you meet with him?
23 A  At the Kent 2nd Ward bishop's office.
24 Q  Who else was in the office besides Bishop Pettit and
25    yourself?

5 (Pages 14 to 17)

Daniel Fleming
September 23, 2005

e3ab1a8c-7c27-4da8-b756-34d1444aa4c4

J - 77

Byers & Anderson
Court Reporters & Video

Page 18

1  A  No one.
2  Q  What did you tell Bishop Pettit?
3  A  I told Bishop Pettit that my friend Todd Denny
4     reported to me that Jack had molested him on our
5     previous campout.
6  Q  Did you mention anything to Bishop Pettit about that
7     you had heard about other acts of that nature by Jack
8     LoHolt and other boys?
9  A  Yes.
10 Q  Why did you go and tell Bishop Pettit?
11 A  I recall my motives for going to Bishop Pettit were
12    not for the regard of Todd Denny.
13 Q  What were they in regard for?
14 A  My motives for talking to Bishop Pettit about this
15    was so that I could be held up as the little hero in
16    the church for exposing what was going on and I would
17    receive a lot of positive attention for that.
18 Q  When you told Bishop Pettit what you did, what did he
19    say?
20 A  When I told Bishop Pettit what?
21 Q  When you told Bishop Pettit what Todd Denny had told
22    you and what you knew about Jack's conduct with other
23    boys.
24 A  Bishop Pettit asked me that this not leave his office
25    that day, that I was not to go out and broadcast this

Page 19

1     or tell anyone what I had just told him.
2  Q  He told you not to tell anybody else?
3  A  Yes.
4  Q  Did he say anything else besides, "Don't tell anyone
5     else"?
6  A  He said he did not want Todd to repeat this to anyone
7     else.
8  Q  Did he say anything else?
9  A  I recall that he told me to keep quiet.
10 Q  Did he say what he was going to do, if anything,
11    about Jack?
12 A  He said they would take care of it.
13 Q  Did he say how he was going to take care of it?
14 A  I don't recall.
15 Q  Did Jack's involvement or participation in Scouting,
16    from what you could see, change after you went and
17    talked to Bishop Pettit?
18 A  Yes.
19 Q  How?
20 A  I recall that Jack was out of the picture for a
21    while, that Jack was not our Scout-- was not at the
22    meetings for a short time or our Scout master any
23    longer.
24 Q  So he kind of disappeared from the ward Scouting
25    program for a while?

Page 20

1  A  For a while and then returned.
2  Q  Do you have any sense of how long he was out of
3     Scouting before he returned?
4  A  I have a sense as far as I remember that it didn't
5     seem very long before he was standing in front with
6     the leadership of our Scout troop again. In one form
7     or another he was up front because I remember
8     feeling-- I wondered if he knew I was the one that
9     told Bishop Pettit on him.
10 Q  Was that a source of worry for you?
11 A  Yes.
12 Q  When you saw him up there with the Scout leadership,
13    what kind of events are you referring to?
14    Are these like Scout honor courts or what are you
15    referring to?
16 A  This particular meeting was a Scout meeting in the
17    Kent 2nd Ward building where we were all sitting in
18    chairs, and I don't recall the subject matter, but I
19    recall that he was standing up front alongside the
20    other leadership that were standing in front of the
21    Scout troops.
22 Q  When he returned, did his activities with respect to
23    working with Scouts differ than what it had before or
24    was he participating in the same kind of Scouting
25    activities that he had before you went to see Bishop

Page 21

1     Pettit?
2  A  He still had contact-- I don't know the context of
3     his participation, but he was still part of Scouting
4     activities.
5  Q  Was he still going on campouts with boys?
6  A  I don't recall.
7  Q  Okay. Did there continue to be Scout meetings at his
8     house?
9  A  Yes.
10 Q  Did you eventually leave Scouting or quit Scouting or
11    outgrow Scouting or did you stay in Scouting
12    throughout the time that you were age eligible to be
13    in Scouting?
14 A  I fell out of Scouting and the church. I moved in
15    with my father in the middle of 9th grade.
16 Q  In the middle of what year?
17 A  9th grade. I was 14 and a half.
18 Q  Did you continue as an active member of the church
19    after that?
20 A  No.
21 Q  Was that the end of your active involvement in the
22    Mormon church?
23 A  No. I reentered an active status in the church when
24    I was 19 and went on my mission for the Mormon
25    church.

6 (Pages 18 to 21)

Daniel Fleming
September 23, 2005

# EXHIBIT K

Page 1

```
 1         UNITED STATES DISTRICT COURT
 2         WESTERN DISTRICT OF WASHINGTON
 3                   AT SEATTLE
 4   _____
                                          )
 5   KENNETH FLEMING and JOHN DOE,        )
                                          )
 6        Plaintiffs,                     )
                                          )
 7   vs.                ) NO. 04-2338 RSM
                                          )
 8   THE CORPORATION OF THE PRESIDENT OF THE )
     CHURCH OF JESUS CHRIST OF LATTER-DAY )
 9   SAINTS, a Utah corporation sole, a/k/a )
     "MORMON CHURCH"; LDS SOCIAL SERVICES )
10   a/k/a LDS FAMILY SERVICES, a Utah    )
     corporation,                         )
11                                        )
          Defendant.                      )
12   _____
13        DEPOSITION UPON ORAL EXAMINATION OF
14                    ROBERT KELLY
15               VIDEOTAPED PROCEEDING
16   _____
17               1:10 o'clock p.m.
18               August 29, 2005
19               601 Union Street
20               Suite 3100
21               Seattle, Washington
22
23
24
     REPORTED BY:
25   ALISON LOTT, CCR#2337
```

Page 2

```
 1          A P P E A R A N C E S
 2
 3   For the Plaintiffs:    TIMOTHY KOSNOFF
                            Attorney at Law
 4                          One Union Square
                            600 University
 5                          Suite 2101
                            Seattle, Washington  98101-4161
 6
 7
 8   For the Defendants:    THOMAS D. FREY
                            MARCUS NASH
 9                          Stafford Frey Cooper
                            601 Union Street
10                          Suite 3100
                            Seattle, Washington  98101
11
12
13   Videotaped by:         Brook Young
                            Prolumina Trial Technologies
14
15
16        E X H I B I T   I N D E X
17   NUMBER       DESCRIPTION               PAGE
18     1  Defendant COP's First Interrogatories and   34
          Requests for Production to Plaintiff R.K.
19
20
21
22
23
24
25
```

Page 3

```
 1            THE VIDEOGRAPHER: We are on the record.
 2   This is the video tape portion in the deposition of Robert
 3   Kelly. My name is Brook Young. I'm employed by Prolumina
 4   Trial Technologies, located at 80 South Washington, Suite
 5   200, in Seattle, Washington, 98104. This deposition is
 6   being recorded on this 29th day of August, 2005.
 7            The time now is approximately 1:10 p.m., and we are
 8   located at 601 Union Street, Suite No. 3100 in Seattle,
 9   Washington. This deposition is being recorded in the
10   matter of Fleming, et al. versus the Corporation of the
11   President of the Church of Jesus Christ of Latter Day
12   Saints, et al. The case number is 04-2338 RSM, in the
13   United States District Court, Western District of
14   Washington at Seattle.
15            This deposition was noticed by Thomas Frey.
16   Counsel and all present may identify themselves for the
17   record, and the witness may be sworn in.
18            MR. KOSNOFF: For the record, Timothy
19   Kosnoff, co-counsel on behalf of the plaintiff.
20            MR. FREY: Tom Frey, co-counsel on behalf of
21   the defendant -- all of the defendants.
22            MR. NASH: Marcus Nash, counsel for the
23   defendants.
24
25
```

Page 4

```
 1   ROBERT KELLY,           having been duly sworn by the
                             Notary to tell the truth, the whole
 2                           truth and nothing but the truth,
                             testified as follows:
 3
 4            DIRECT EXAMINATION
 5   BY MR. FREY:
 6   Q   Mr. Kelly, my name is Tom Frey. I'm one of the attorneys
 7       for the LDS Church, and I want to go over a few preliminary
 8       matters with you. Have you ever had your deposition taken
 9       before?
10   A   No, I haven't.
11   Q   I'm going to be asking you a series of questions, and if at
12       any time you wish to take a break, we can do that for any
13       reason. The only time we can't take a break is if I have a
14       question pending and you haven't answered it, then you
15       should answer the question first. If you need to speak
16       with your attorney, you can do that, again, as long as a
17       question isn't pending.
18            The nature of these cases is such that they
19       sometimes involve testimony which is fairly, either
20       intimate or personal or what-have-you. My goal and the
21       object here is not to embarrass you. I won't intentionally
22       do that. I may have to ask you some questions which will
23       be difficult for you to answer, or they may even be a
24       little bit embarrassing, and I can assure you it's not my
25       intention to do that for my own purposes or any other
```

1 (Pages 1 to 4)

Page 13

1  Q  Very good. Okay, thank you. Are you aware that your
2     mother's deposition has been taken in this case?
3  A  Yes, I am.
4  Q  And have you spoken with her about that deposition?
5  A  I've spoken with her, not in great detail.
6  Q  Did you read her deposition?
7  A  No, I did not.
8  Q  What did you talk about with your mother concerning her
9     deposition?
10 A  What it was like to meet you.
11 Q  And did she talk to you about the questions that she was
12    asked?
13 A  Can you rephrase the question, please?
14 Q  Did your mother discuss with you the questions that she was
15    asked in her deposition?
16 A  Yes.
17 Q  And what did she tell you she was asked?
18 A  When the abuse occurred, and that's pretty much all we
19    talked about, is the dates of the abuse.
20 Q  To the best of your memory, what was your age at the time
21    the abuse commenced?
22 A  I know the abuse happened somewhere in the early to mid
23    '70s. And I was born in 1962, so that would put it
24    around -- somewhere between nine and twelve years old,
25    somewhere in that area.

Page 14

1  Q  I asked that question because in the records from the anger
2     control school or management that you took, there's two
3     references in there to you being abused at the age of six
4     for a period of months, which is allegedly attributed to
5     you. In fact, to be more specific, in a letter dated April
6     4, 2001, a Mr. Keith Waterman, to which the notes are
7     attached, it states, "Client asked that his own sexual
8     abuse with an adult neighbor at age six, that lasted for
9     several months, not be released to others because it
10    appeared it would be construed that the sexual allegations
11    of child abuse against him would be given more merit." Was
12    he correct in his recounting that conversation with you,
13    both as to the age and the amount of time that the abuse
14    lasted?
15 A  Well, I don't recall the specifics of that conversation
16    with Mr. Waterland.
17 Q  By the way, have you reviewed the notes of your treatment
18    at the anger management before your deposition today?
19 A  No.
20 Q  There's another reference by -- I guess it is correct,
21    Dr. Warland, W-A-R-L-A-N-D, middle initial D, as in duck,
22    Wight, W-I-G-H-T, Ph.D., in which he is writing to an
23    individual by the name of Carl Kocis, K-O-C-I-S, one of
24    your attorneys. And there's a mention made in that letter
25    that he says, "He was sexually abused at six years old, and

Page 15

1     has never obtained treatment for it." Again, do you
2     remember telling him that that was about the age that you
3     were molested?
4  A  I don't recall that conversation. I mean, the specific
5     dates that were discussed. I remember meeting with
6     Dr. Wight, but I don't recall the specific dates that I
7     mentioned to him.
8  Q  Well, both of these mention you being six years of age. Do
9     you think it was older now, than being six, when this first
10    happened?
11 A  Since I met with Dr. Wight, I had a chance to more
12    critically reflect on the dates and now I think it was at
13    an older age.
14 Q  So you think it's between nine and twelve now?
15 A  That's correct.
16 Q  What made you change your mind?
17 A  Well, I reflectively thought that -- I know I wasn't abused
18    when I -- I transferred to a private grade school when I
19    was midway through my sixth year grade, and I know I wasn't
20    abused at that point on and afterwards. It happened before
21    then. And it happened sometime during the point when Jack
22    moved into the home. And I didn't -- when I met with
23    Dr. Wight and Keith Waterland, I didn't connect those two.
24 Q  Now, did you and one of the Allenbach children both go to a
25    different private school in the sixth grade?

Page 16

1  A  That's correct.
2  Q  And which child was that?
3  A  Jimmy Allenbach.
4  Q  Have you spoken with Jimmy Allenbach prior to your becoming
5     a plaintiff in this litigation?
6  A  No, I have not.
7  Q  Did you speak with Ken Fleming before you became involved
8     in this litigation?
9  A  I -- yes, I spoke with him.
10 Q  When did you speak with him?
11 A  I spoke with him maybe approximately three weeks ago.
12 Q  You did not, then, speak with him prior to becoming a
13    plaintiff in this lawsuit?
14 A  We grew up together, and we -- you know, growing up, we
15    spoke. But for several years there was no contact.
16 Q  Okay. But my question, more precisely is, before you
17    became a plaintiff in this lawsuit, did you discuss joining
18    the lawsuit with Ken Fleming?
19 A  I don't recall. I don't think so.
20 Q  Did Ken Fleming -- you don't recall having any conversation
21    with him about joining this lawsuit, then, before you
22    became a plaintiff; is that correct?
23 A  That's correct.
24 Q  And would you have the same answer for Jimmy Allenbach?
25 A  That's correct.

4 (Pages 13 to 16)