The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING, JOHN DOE, R.K., and T.D.,<br><br>Plaintiffs,<br><br>v.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/d/a "MORMON CHURCH"; LDS SOCIAL SERVICES a/d/a LDS FAMILY SERVICES, a Utah corporation,<br><br>Defendants. | NO. 04-2338 RSM<br><br>DECLARATION OF MICHAEL ROSENBERGER IN SUPPORT OF DEFENDANT'S IN LIMINE MOTION TO EXCLUDE EVIDENCE OF: (1) LOHOLT'S OTHER ACTS OF ABUSE; (2) DAMAGES SUFFERED BY OTHER VICTIMS; AND (3) DEFENDANTS' SETTLEMENTS WITH OTHERS |

Michael Rosenberger, being duly sworn on oath, deposes and says:

1. I am one of the attorneys representing Defendants in this matter. I make this Declaration based upon personal knowledge.

2. Attached to this Declaration are true and accurate copies of excerpts from the depositions of Jack Onefrey (aka Loholt), Randall Borland, and Richard Pettit.

DECLARATION OF MICHAEL ROSENBERGER- 1
No. 04-2338 RSM

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

Dockets.Justia.com

I declare under the laws of the State of Washington and of the United States that the foregoing is true and correct.

Signed this 18th day of August, 2006.

_____
Michael Rosenberger

DECLARATION OF MICHAEL ROSENBERGER- 2
No. 04-2338 RSM

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following. The parties will additionally be served in the manner indicated.

| Michael T. Pfau<br>Gordon, Thomas, Honeywell, Malanca,<br>Peterson & Daheim LLP<br>P.O. Box 1157<br>Tacoma, WA 98401-1157<br>Telephone: (206) 676-7500<br>Facsimile: (206) 676-7575<br>E-Mail: mpfau@gth-law.com<br><br>( ) Mail      ( ) Hand Delivery<br>( ) Fax       ( ) Federal Express | Timothy D. Kosnoff<br>Law Offices of Timothy D. Kosnoff, P.C.<br>600 University Street, Suite 2101<br>Seattle, WA 98101<br>Telephone: (206) 676-7610<br>Facsimile: (425) 837-9692<br>E-Mail: timkosnoff@comcast.net<br><br>( ) Mail      ( ) Hand Delivery<br>( ) Fax       ( ) Federal Express |
|---|---|

**GORDON MURRAY TILDEN LLP**

By /s/ Michael Rosenberger
Michael Rosenberger, WSBA #17730
Attorneys for Defendant The Corporation of the
President of The Church of Jesus Christ of
Latter-Day Saints
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154-1007
Telephone: (206) 467-6477
Facsimile: (206) 467-6292
Email: mrosenberger@gmtlaw.com

DECLARATION OF MICHAEL ROSENBERGER- 3
No. 04-2338 RSM

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,        )
                                     )
        Plaintiffs,                  )
                                     )
    vs.                              ) No. C04-2338RSM
                                     )
THE CORPORATION OF THE               )
PRESIDENT OF THE CHURCH OF           )
JESUS CHRIST OF LATTER-DAY           )
SAINTS, a Utah corporation           )
sole, a/k/a the "MORMON              )
CHURCH," LDS SOCIAL SERVICES,        )
a/k/a LDS FAMILY SERVICES,           )
a Utah corporation,                  )
                                     )
        Defendants.                  )

VIDEOTAPED DEPOSITION OF JACK A. ONEFREY

January 27, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

| One Union Square | 2208 North 30th Street, Suite 202 |
| 600 University St. | Tacoma, WA 98403 |
| Suite 2300 | (253) 627-6401 |
| Seattle, WA 98101 | (253) 383-4884 Fax |
| (206) 340-1316 | scheduling@byersanderson.com |
| (800) 649-2034 | www.byersanderson.com |

Serving Washington's Legal Community Since 1980

Jack A. Onefrey
January 27, 2006


Exhibit___ Page 4

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 120

1           MR. WOLFE: Mr. -- yeah.
2  Q  (By Mr. Kosnoff)  Were you released as assistant
3     scoutmaster because of allegations that you had
4     sexually molested a boy?
5           MR. WOLFE:  We're going to object on
6     privilege.
7  Q  (By Mr. Kosnoff)  After you were released as assistant
8     scoutmaster, you continued to work in the ward's scout
9     program though?
10 A  No.
11 Q  No?  You didn't?  Did you come back into the scouting
12    program at some later date?
13 A  Not sure when I came back.
14 Q  The records that have been provided by the church
15    indicate that you were released as assistant
16    scoutmaster of the Kent 2nd Ward in February of 1972.
17 A  Could be.
18 Q  So approximately one year after you had been appointed
19    assistant scoutmaster you were released?
20 A  Yeah, I wasn't -- I don't know what the dates are.
21 Q  And at some later point you recall coming back in and
22    working with the scouts, though, don't you?
23 A  I probably supplied some transportation and things.
24 Q  Supplied transportation, went on 50 mile hikes, went on
25    campouts, that kind of thing?

Jack A. Onefrey
January 27, 2006

Exhibit____ Page 5

b2cbc3c6-879a-4364-b6a5-9911772d6961

```
                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE

KENNETH FLEMING and JOHN DOE,:   No. C04-2338 RSM
                             :   (Judge Ricardo Martinez)
                             :
              Plaintiffs,    :
                             :
         -v-                 :
                             :
THE CORPORATION OF THE       :
PRESIDENT OF THE CHURCH OF   :
JESUS CHRIST OF LATTER-DAY   :
SAINTS, a Utah corporation   :
sole, a/k/a "MORMON CHURCH"; :
LDS SOCIAL SERVICES a/k/a    :
LDS FAMILY SERVICES, a Utah  :   Videotaped Deposition of:
corporation,                 :   RANDALL BORLAND
                             :
              Defendants.    :


            September 20, 2005 - 9:08 a.m.


         Location:  Kirton & McConkie
         60 East South Temple, Suite 1800
                Salt Lake City, Utah


              Diane W. Flanagan, RPR
      Notary Public in and for the State of Utah
```

Case 2:04-cv-02338-RSM   Document 148   Filed 08/18/2006   Page 7 of 19
FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                              RANDALL BORLAND

Page 54

1    University in the fall of 1973 and not in 1975?
2        A    Is it possible?
3        Q    Yes.
4        A    Instead of when?
5        Q    I believe you testified earlier that you thought
6    you came to Utah in 1975 to begin your studies.
7        A    That was a guess, wasn't it?  That was an
8    approximate guess.
9        Q    Yes.
10       A    Yeah, it's possible then.  It's possible, but I
11   don't know, but very possible.
12       Q    Okay.
13       A    That would fall in line.  This is -- in that
14   regard that's helpful.
15       Q    Well, as we get older, we all need these little
16   aids, don't we?
17            So during this approximate three-year time period
18   that you were bishop of the Kent Second Ward, you've
19   indicated that you did receive a complaint regarding
20   sexually inappropriate activity by Jack Loholt.  Correct?
21            MR. FREY:  I'm going to object to the form of the
22   question.  It assumes something that he hasn't testified to.
23            Go ahead.
24       Q    (By MR. KOSNOFF) Did you receive a complaint or
25   report from anybody that Jack Loholt had engaged in sexually

Page 55

1  inappropriate activity during the time that you were bishop
2  of the Kent Second Ward?
3              MR. FREY:  Now, again, Bishop, I'm going to
4  caution you that if you learned any of this information in
5  your capacity as a bishop in a confidential communication
6  that you have the privilege not to answer it, in my opinion.
7  Counsel may differ with that, but I would instruct you not
8  to answer it if that's the basis upon which you gained your
9  information.
10             MR. KOSNOFF:  I would like to ask a few foundation
11 questions before he answers that question in light of your
12 instruction to your client.
13             MR. FREY:  Okay.
14     Q    (By MR. KOSNOFF) Assuming the answer to the
15 question is yes, did you receive this communication in your
16 capacity as a clergy person for the Mormon church, that is,
17 in your role as clergy in the Mormon church?
18             MR. FREY:  Object to the --
19     A    That was a hypothetical.  That was hypothetical --
20             MR. FREY:  Excuse me.  I'm going to object to the
21 form of the question.
22             You may answer, though.  Go ahead.  Have her read
23 it back.  Please wait until -- give me a second because I
24 have the right to make objections.
25             THE WITNESS:  I'm sorry.

Page 56

1  MR. FREY: Okay. Go ahead.
2  (The record was read as requested)
3  A   I'm answering a question based on an assumption?
4  Q   Yes. I'm not asking you for the content of the
5  communication yet. I'm asking you questions about the
6  circumstances under which the communication was made.
7  A   Yes.
8  Q   Was the communication made for purposes of
9  pastoral response by you?
10 A   Are we still on an assumption? Are these
11 questions or -- because you said assuming that the answer
12 was yes. I've never answered that question yet, and forgive
13 me. I'm being a little dense here, but I don't know if I'm
14 still answering on an assumption. Am I saying that right
15 even?
16 Q   Yes, you are.
17 A   Okay.
18 Q   Because the answer yes or no to the question could
19 potentially violate a privilege. But before you answer that
20 question, I'm asking you questions surrounding that
21 communication. Okay? I'm not asking you about what was
22 said or whether the answer to my -- that previous question
23 was yes or no. I'm just asking you other questions related
24 to the nature of that communication and the surrounding
25 circumstances.

Page 57

1   A   Okay.
2   Q   So again my question is: Was this something that
3 you learned in connection with pastoral counseling within
4 the Church?
5   A   Yes.
6   Q   Was the information that you received something
7 that you are required to keep confidential under the
8 doctrines and teachings of your church?
9   A   Yes.
10  Q   Was the communication that you received something
11 that you in fact kept confidential, that is, that you did
12 not disclose to any other person?
13  A   Let me make sure I understand that. A
14 communication not disclosed to anybody else?
15  Q   Correct.
16  A   The answer to that question, if I've heard the
17 question correct, is yes or -- let me rephrase it, and then
18 tell you what I thought you said.
19  Q   Go ahead.
20  A   I did not disclose what was said confidentially to
21 me to others.
22  Q   Just so that I'm clear on this, you did not
23 disclose the content of what was said to you by that person
24 to any other person?
25  A   The content of that conversation, that meeting, I

Page 58

1  did not.
2      Q   Okay.
3      A   The best of my recollection.
4      Q   Okay.  Did you ever make a referral to LDS Social
5  Services for counseling Jack Loholt?
6      A   I don't remember.  I do not remember that.
7      Q   Did you do anything or say anything to anyone else
8  following the communication that you received from this
9  person?
10     A   Regarding specifics?
11     Q   Anything.
12     A   Yes.
13     Q   What did you do or say?
14     A   I talked --
15         MR. FREY:  Again I'm going to caution you that if
16 you took any steps in your capacity as a clergyman and
17 ecclesiastical in accordance with the teachings and beliefs
18 of the LDS religion that you are not obligated to break that
19 confidentiality if in fact you learned that in those
20 circumstances.
21         And for the record, Counsel, what I'm trying to do
22 here is allow you to ask questions without reaching what I
23 believe is a privilege that he has as a bishop to receive
24 information, treat it with confidentiality, and act on it in
25 an ecclesiastical fashion.

Page 59

1    MR. KOSNOFF: Could you identify the source of
2 that privilege.
3    MR. FREY: State v. Martin and the statute, the
4 First Amendment.
5    MR. KOSNOFF: So are you relying on the clergy
6 penitent privilege?
7    MR. FREY: And his First Amendment rights.
8    MR. KOSNOFF: What First Amendment rights are you
9 referring to?
10   MR. FREY: Free exercise rights.
11   MR. KOSNOFF: Specifically what in the free
12 exercise clause are you basing this privilege?
13   MR. FREY: That he has the right to free exercise
14 of religion to be free from the restraint of having a civil
15 court interfere and make him disclose confidential
16 communications. We've been through this. We've briefed it.
17 We've already argued it in the Court of Appeals and won it.
18   MR. KOSNOFF: No. We've --
19   MR. FREY: And that's what I'm doing here.
20   MR. KOSNOFF: No. That was a completely different
21 issue and very different narrow issue than --
22   MR. FREY: And there's a third item involved here
23 that we haven't gotten to yet, but that is the privacy
24 rights of individuals who may be involved, if any. But I'm
25 trying not to interfere with your legitimate discovery area,

Page 60

1  and so I'm trying to be very careful here.  And I want you
2  to understand that it's not my purpose here to frustrate
3  your discovery, but I do want him to be careful that he
4  doesn't breach any of the confidentiality that is imposed
5  upon him by his position as a clergyman.
6            So if you can read back the question.  Sorry about
7  the speech --
8            MR. KOSNOFF:  Well, I -- we have gone through the
9  criteria for the appropriate assertion of the clergy
10 penitent privilege, and that shields him from disclosing the
11 content of privileged communications based upon that
12 statute.  My questions now are not directed at the content
13 of that communication.  My questions are directed at what he
14 did or said to others following that communication.
15           MR. FREY:  But that may very well involve his
16 working in an ecclesiastical capacity and involve
17 conversations with other people that are privileged, and
18 that's my point.
19           MR. KOSNOFF:  That -- it's our position that that
20 would not be privileged and that he is required to answer
21 those questions.
22           MR. FREY:  Just a second.
23           (Defense counsel confer)
24           MR. FREY:  I -- I've made my objection.  We
25 disagree.  Okay?

Page 61

1    MR. KOSNOFF:  Are you directing him not to answer.

2    MR. FREY:  No, I'm not.  I'm asking him if he can answer without violating -- if he can answer about what he did without violating any confidentiality that I believe he has the right to maintain as a bishop, then he may answer the question.

7    A    I believe I can do that.  Confidentiality is very important to me.  I -- the only reason I even hesitate at all is because of the conversation, and I'm very respectful of both of you.  I didn't talk about, to another person, the content of my discussion with the ward member that contacted me, but the circumstance surrounding it I did, and that was Jack Loholt.  I had to talk with him.

14   Q    And that conversation that you had with Jack Loholt took place fairly soon after?

16   A    Yes, sir.

17   Q    And what was said?

18   MR. FREY:  Again, you may answer that question if it will not violate any privilege that you have as a clergyman.

21   A    I don't believe I can answer that.

22   Q    Again let's go through some of the questions that I asked you before, a checklist, if you will.

24   A    Okay.

25   Q    Because there's -- may well be a judge that's

Case 2:04-cv-02338-RSM    Document 148    Filed 08/18/2006    Page 15 of 19
FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                    RANDALL BORLAND

Page 81

1   we can, when Jack Loholt was released by you as assistant
2   scoutmaster of the Kent Second Ward. If you would turn to
3   page 5 of Exhibit 1. That is the numbered page 5.
4       A    Okay.
5       Q    If you go to February 6, 1972, the entry indicates
6   Jack Loholt was released as assistant scoutmaster on that
7   day?
8       A    Yes, that's what it says. I don't remember the
9   dates.
10      Q    Okay. But is that consistent with your general
11  recollection as to when you released Jack from the scouting
12  program?
13      A    Yes.
14      Q    And without disclosing the communication, was it
15  fairly quickly after you received information regarding Jack
16  Loholt?
17      A    Are you asking if that's my memory?
18      Q    Yes.
19      A    Yes, uh-huh (affirmative).
20      Q    And is it -- is it your testimony that you never
21  spoke to the scoutmaster, why you were releasing his
22  assistant scoutmaster?
23      A    That's correct.
24      Q    And you never told your first or second counselor
25  the reasons why you were taking that action?

```
              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
                      AT SEATTLE
```

| | |
|---|---|
| KENNETH FLEMING and JOHN DOE,  )<br>  )<br>  Plaintiffs,  )<br>  )<br>  vs.  )<br>  )<br>THE CORPORATION OF THE PRESIDENT )<br>OF THE CHURCH OF JESUS CHRIST OF )<br>LATTER-DAY SAINTS, a Utah  )<br>corporation sole, a/d/a "MORMON  )<br>CHURCH"; LDS SOCIAL SERVICES,  )<br>a/d/a LDS FAMILY SERVICES, a  )<br>Utah corporation,  )<br>  )<br>  Defendants.  )  | Case No. C04-2338 RSM<br><br>Videotaped Deposition<br>of:<br>RICHARD PETTIT |

```
              December 13, 2005
                  9:24 a.m.



              Kirton & McConkie

            1800 Eagle Gate Tower

            60 East South Temple

         Salt Lake City, UT  84145-0120




         Sharon Morgan, CSR, RPR, CRR

   Notary Public in and for the State of Utah
```

Case 2:04-cv-02338-RSM    Document 148    Filed 08/18/2006    Page 17 of 19
FLEMING V. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
December 13, 2005                                              RICHARD PETTIT

Page 31

1  second counselor?
2     A.  Second. I'm sorry, now, I was not -- in 1971
3  I was not a counselor.
4     Q.  Okay. What were the circumstances under
5  which you received this information from this boy?
6     A.  It was voluntary.
7     Q.  Where did he tell you this?
8     A.  In my home.
9     Q.  Was the boy a friend of your son?
10    A.  No.
11    Q.  Was it one of your sons?
12    A.  Yes.
13    Q.  Was it Scott?
14    A.  Yes.
15    Q.  When your son Scott told you this
16 information, did you believe it?
17    A.  Yes.
18    Q.  Did you do anything with this information?
19    A.  Yes.
20    Q.  What was that?
21    A.  I went to Bishop Borland.
22    Q.  And did you tell Bishop Borland what your son
23 Scott had told you?
24    A.  Yes.
25    Q.  And what did Bishop Borland say?

FLEMING V. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
December 13, 2005                                          RICHARD PETTIT

Page 32

1    A.    He was shocked.
2          MR. FREY:  At this point -- did you expect
3    your conversation -- let me interpose an objection and
4    ask a question.  Do you expect your conversation with
5    Bishop Borland to be confidential?
6          THE WITNESS:  Yes.
7          MR. FREY:  Are you willing to waive that
8    confidentiality and testify about it today, about what
9    you spoke to about with Bishop Borland?
10         THE WITNESS:  Yes.
11         MR. FREY:  Okay.  Go ahead, Counsel.
12   Q.    (By Mr. Kosnoff)  When you went to Bishop
13   Borland, you were not going to him for purposes of
14   confessing your sin, were you?
15   A.    No.
16   Q.    And you would hope that he would -- that --
17   strike that.  What was your reason for going to Bishop
18   Borland?
19   A.    To inform him of the situation.
20   Q.    And was it your hope or intention that Bishop
21   Borland would use this information and take some kind
22   of concrete action with respect to Jack LaHolt?
23   A.    Yes.
24   Q.    And what was your -- what did you hope that
25   he would do?

Case 2:04-cv-02338-RSM   Document 148   Filed 08/18/2006   Page 19 of 19
FLEMING V. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
December 13, 2005                                          RICHARD PETTIT

Page 33

1  A. Correct it.
2  Q. What did Bishop Borland say to you?
3  A. I don't remember.
4  Q. Did he tell you that he would do something
5  about Jack?
6  A. I don't remember.
7  Q. Did he give you any kind of assurances that
8  the matter would be handled?
9  A. Yes.
10 Q. And did you trust that the matter would be
11 handled?
12 A. Yes.
13 Q. Was it handled?
14 A. Yes.
15 Q. To your knowledge, what happened with respect
16 to Jack LaHolt?
17 A. Within one week he was released.
18 Q. How did you become aware that he had been
19 released?
20 A. At the church service the following week.
21 Q. Did somebody communicate that to you?
22 A. Yes.
23 Q. Bishop Borland?
24 A. Yes.
25 Q. And he told you that he released Jack?