THE HONORABLE RICARDO MARTINEZ

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING, JOHN DOE, R.K. and T.D.,

Plaintiffs,

vs.

THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/d/a "MORMON CHURCH,"; LDS SOCIAL SERVICES a/d/a LDA FAMILY SERVICES, a Utah corporation,

Defendants.

NO. C04-2338RSM

**PLAINTIFF R.K.'S OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE CLERGY-PENITENT COMMUNICATION**

**NOTE ON MOTION CALENDAR: SEPTEMBER 8, 2006**



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Dockets.Justia.com

## I. INTRODUCTION

Plaintiff R.K. submits this opposition to defendant Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("COP") "motion in limine" to exclude what it has termed a "clergy-penitent communication." COP's motion should be denied because (a) the communication does not meet the criteria necessary to qualify for the clergy-penitent privilege and (b) the mandatory reporting statute in effect at the time of the communication required disclosure to appropriate authorities, and enforcing the statute would not have offended Constitutional principles.

## II. BRIEF STATEMENT OF RELEVANT FACTS[1]

In January 1972, future Mormon bishop, Richard Pettit, advised his then-bishop, Randall Borland, that his (Pettit's) son had been sexually molested by Jack Loholt. Pettit provided the information to Borland because he wanted Borland to take some "concrete action" against Loholt. In fact, Mr. Pettit unequivocally testified in his deposition that he went to Bishop Borland, not for spiritual counseling (as is now asserted), but because he wanted Borland to take some corrective action with respect to Loholt.[2] In fact, Mr. Pettit specifically testified that he went to Bishop Borland to (a) inform him of the situation and (b) because he hoped Bishop Borland would use the information and take some kind of concrete correct action with respect to Jack Loholt.[3] Bishop Borland assured Mr. Pettit that something would be done and indeed something was done. Within one week, Borland had confronted Loholt and released Loholt from his position as Assistant Scout Leader.[4] Richard Pettit was

---

[1] This Court has resolved multiple motions by the parties, including motions for summary judgment. A detailed statement of facts was contained in plaintiffs' opposition to defendants two motions for summary judgment (Dkt Nos. 79 and 80). In the interest of brevity, plaintiff will only repeat facts necessary for the determination of the issues addressed in this motion.

[2] Deposition of Richard Pettit, pg. 32, ll. 12 – pg. 34, ll. 1 (set out in the Declaration of Michael T. Pfau and attached thereto as **Exhibit A**).

[3] *Id.*

[4] Deposition of Randall Borland, pgs. 61, 72 and 73 (attached to declaration of Michael T. Pfau as **Exhibit B**).



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

later advised, by Bishop Borland, that he (Borland) had taken "corrective" action of "releasing" Loholt as a scout leader.[5] Despite being a mandatory reporter under the then-existing mandatory reporting statute, Borland did not take any other action, e.g., he did not notify law enforcement officials or Child Protective Services and he did not warn members of his congregation about Loholt. In the year following Pettit's disclosure, plaintiff R.K. was sexually abused, on multiple occasions, by Jack Loholt.

## III. LEGAL ARGUMENT

### A. THE COMMUNICATION BETWEEN BISHOP BORLAND AND PETTIT WAS NOT A "PRIVILEGED COMMUNICATION.[6]

A party asserting that a communication is privileged by the clergy-penitent privilege has the initial burden of demonstrating that the privilege exists. *See, Dietz v. Doe,* 131 Wn.2d 835, 844, 935 P.2d 611 (1997). The first criteria is that the communication **must** be a confession. *State v. Glenn,* 115 Wn. App. 540, 548, 62 P.3d 921 (2003) ("the clergy-penitent privilege attaches only to 'confession[s].") To invoke the Constitutional protection of the Free Exercise clause the "communication" must meet the following criteria: (1) the clergy member must have a religious duty to keep the communication secret, (2) the penitent must have a reasonable expectation that it will remain private, (3) the communication must be penitential in nature, and (4) the communication must have been received in the course of discipline enjoined by the church to which he or she belongs. *State v. Martin,* 91 Wn. App. 621, 630,

---

[5] Pettit Depo., pg. 33 (**Exhibit A**) Unfortunately, the removal was ineffective. Loholt testified that despite being "released," he continued to "help out" with the scouting program. Deposition of Jack Loholt, pg. 120 (attached to Pfau Decl., as **Exhibit C**).

[6] In bringing its motion, COP has implied that this Court has previously determined that the communication between Pettit and Borland was privileged. Plaintiff respectfully disagrees. In this Court's February 2, 2006 Order, the Court ruled that communications Jack Loholt had with Mormon clergy-members were protected by the clergy-penitent privilege. However, the Court did not make an affirmative finding with regard to communications between Bishop Borland and Richard Pettit. Instead, the Court simply noted that because Richard Pettit had waived the clergy-penitent privilege, any privilege that existed no longer applied. *See Order Granting in Part Plaintiffs' Motion to Compel, pg. 3, ll. 9-16 (Dkt. No. 88).* However, the Court has not squarely addressed this issue. Defendant's "Motion in Limine" is a thinly-disguised Motion for Summary Judgment and should be stricken accordingly. Plaintiff hereby incorporates the argument to strike contained in the opposition to Motion to Exclude Evidence of Mandatory Reporting Statute (filed concurrently with this motion).



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

789; 959 P.2d 152, 158-159 (1998), *aff'd, State v. Martin,* 137 Wn.2d 774, 975, P.2d 1020 (1999).

Here, there is no dispute that Borland was a clergy member, but there is no evidence that he had a "religious duty" to keep information about a known pedophile in its midst in confidence. Moreover, there is no credible evidence before this Court suggesting that Pettit had a reasonable expectation that the communication would remain private. In fact, his sworn deposition testimony establishes quite the opposite: Pettit expected Borland to take some corrective action with respect to Loholt – and Borland did so. Most importantly, the reason he sought Bishop Borland's assistance was not to confess his sins, to seek absolution, or anything of the kind. Instead, Pettit sought assistance to ensure his son (and presumably other children of the church) would no longer be in danger of being molested by Loholt. Finally, there is no evidence (or even argument) that Pettit revealed that a pedophile was molesting his son for the purpose of receiving guidance from his Church or to be shown the error of his or her way. It is inconceivable to assert that a person who reports the abuse of his child needs to be shown the "right way" or how to seek "atonement." The "discipline" prong does not apply this in circumstance.[7]

### (1) THERE IS, AT A MINIMUM, A QUESTION OF FACT AS TO WHETHER PETTIT HAD A "REASONABLE EXPECTATION" THAT THE COMMUNICATION WOULD REMAIN PRIVATE.[8]

Under Washington law, the clergy-penitent privilege applies only if a communication is confidential. *State v. Martin,* 137 Wn.2d 744, 787, 975 P.2d 1020 (1999). The mere fact

[7] COP relies on the Utah case of case of *Scott v. Hammock,* 870 P.2d 947 (Utah 1994) to support its position. This case is governed by Washington law, not Utah law. Furthermore, even the "broad interpretation" of privilege announced in *Scott* would not apply in this situation. In *Scott,* the Court noted the "essential role" that "most churches perform" is to provide confidential counsel to communicants in order to help them "abandon wrongful or harmful conduct, adopt higher standards of conduct and reconcile themselves with others and God." *Scott,* 870 P.2d at 952. Again, the communicant in this case – Richard Pettit – had not engaged in any "wrongful or harmful conduct." He was simply reporting that a pedophile had molested his son.

[8] While the "question of fact" standard does not normally arise in the context of a motion in limine, the standard should apply here where COP is really bringing a motion for summary judgment as a motion in limine.



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

that a communication is made to a member of the clergy, is not sufficient alone to invoke the privilege, it must be made with a reasonable expectation that it will remain secret. *State v. Martin, supra; Hutchison v. Luddy, St. Mary 's Catholic Church,* 606 A.2d 905, 909 (Pa. Super 1992). The determination of whether a communication is confidential turns on whether the penitent has a reasonable belief that the communication will remain confidential. *See, State v. Maxon,* 110 Wn.2d 564, 572, 756 P.2d 1297 (1988); *State v. Martin,* 91 Wn. App. 621, 632, 959 P.2d 152, 158-159 (1998); *In re: Henderson,* 29 Wn. App. 748, 752-53, 630 P.2d 944 (1981) (the psychologist-patient privilege "does not apply in situations where it is manifest that the patient did not intend her communications to be confidential.").

If a person expects some action to be taken as a result of his or her communication with a member of the clergy, the person cannot be said to have a "reasonable expectation" that the communication will be held in confidence.[9] In *Edwards,* the defendant in a criminal trial asserted that the clergy-penitent privilege prohibited the prosecutor from eliciting testimony from a priest (Fr. Rankin), with whom she had discussed embezzling funds from his church. Both the trial court and the California appellate court rejected the defendant's position that the communication was privileged. In affirming, the appellate Court first noted that not "every communication to a member of the clergy is privileged."[10] Instead, the Court explained the party asserting that the privilege applied had to show, among other things, that he or she intended the communication to be kept in confidence.[11] In holding that the communication did not meet this standard, the appellate court specifically noted that:

> Father Rankin had a clear recollection that defendant stated she needed his help in order that the bad checks would not bounce and thereby disclose her wrongdoing and inflict hurt in the process. He emphasized that the conversation did not even 'remotely resemble' a religious

---

[9] *See, e.g., People v. Edwards,* 203 Cal. App.3d 1358, 248 Cal.Rptr. 53 (1988).

[10] *Id.* at 1362.

[11] *Id.* at 1362-63.



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

> confession; rather, that the mutual encounter involved a 'problem-solving' entreaty under a promise of confidence from which defendant ultimately released him."[12]

Here, as in *Edwards,* there can be no real assertion that Pettit's conversation with Borland could "remotely resemble" a confession. Pettit was not confessing any sin. Furthermore, he was not seeking any spiritual guidance. Instead, he was reporting that his son had been sexually abused. Here, as in *Edwards,* Pettit spoke to Borland because he (Pettit) was seeking Borland's help in resolving a situation – he wanted Borland to do "something" about Loholt. In this situation, it cannot be said that Richard Pettit had a "reasonable expectation of confidentiality." The clergy-penitent privilege does not apply.[13]

**(2) THE COMMUNICATION WAS NOT "PENITENTIAL" IN NATURE NOR DID IT QUALIFY FOR PROTECTION AS "SPIRITUAL COUNSELING".**

**(a) THE COMMUNICATION WAS NOT PENITENTIAL.**

"Penitence" means "the quality or state of being penitent: sorrow for sins or faults."[14] Richard Pettit was not disclosing a sin or a fault to his bishop. He was simply reporting that his son had been abused.

**(b) THE COMMUNICATION WAS NOT PROTECTED AS "SPIRITUAL COUNSELING."**

In apparent recognition that the communication from Pettit to Borland would not qualify as a "confession," COP attempts to invoke the "spiritual counseling" element of the clergy-penitent privilege. The Supreme Court has held that there are two elements to the

---

[12] *Id.* at 1632-63.

[13] Other courts have held that communications with clergy are not protected by the privilege when the communication involves a request for non-spiritual help that explicitly or implicitly requires disclosure to others. For example, in *People v. Johnson*, 270 Cal. App. 204, 207, 75 Cal. Rptr. 605 (1969) the court held that the clergy communications privilege did not apply when the claimant walked into a minister's office after a run in with the police and simply explained his situation and asked the minister for help. *Id.* at 207. In *State v. Black*, 291 N.W.2d 208, 216 (Minn. 1980), the Court held that the privilege did not apply when the defendant asked a jail minister to call the defendant's friend and relay a message. *Id.* at 216. In reaching its holding, the *Black* court reasoned that the "defendant wanted to have the communications repeated to others. This alone would render the communications not privileged." *Id.*

[14] Merriam-Webster Online Dictionary (http://www.m-w.com/dictionary/penitence)



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

clergy-penitent privilege (1) confession or (2) spiritual counseling. *State v. Martin,* 137 Wn.2d 774, 785, 975 P.2d 1020 (1999). However, to invoke the "spiritual counseling," element, the counseling must be done in the "course of discipline enjoined by the church." *Id.* The phrase "course of discipline enjoined by the church," applies to the clergy member; however, the definition is not as broad as COP asserts. The, phrase "in the course of discipline" was defined in the appellate court decision of *State v. Martin* as referring to the

> duties and obligations 'traditionally enjoined upon all clergy [members] by the practice of their respective churches.' (Citation omitted.) It is the clergy member who must be constrained by the dictates of his or her religion to be 'alert and efficient in submission to duty, to concern themselves' in providing spiritual aid and counseling. (Citation omitted). It is the course of discipline enjoined by the clergy member's practice by which the clergy member is to show the **communicant the error of his or her way; to teach penitent the right way; to point the way to faith, hope, and consolation; and to lead the penitent to seek atonement.**

91 Wn. App. at 629-630 (*aff'd* 137 Wn.2d at 789) (emphasis added).

Here, Richard Pettit's communication with Bishop Borland does not qualify as "spiritual counseling" under this definition. Richard Pettit went to his Bishop to advise that there was a pedophile in the organization. He had done nothing wrong and was not shown the errors of his way, the way to "faith, hope or consolation" and he certainly did not need to seek atonement. The definition simply does not apply in this circumstance of this case. COP's effort to shield this key piece of evidence from the jury under the guise of "spiritual counseling" asks this court to interpret the priest penitent privilege more broadly than any other court in the nation.

### B. This Court Should Not Consider a Declaration Which Contracts Prior Sworn Testimony.

In attempting to characterize the communication between Pettit and Borland as one which could invoke the clergy-penitent privilege, COP submitted a declaration by Richard



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Pettit in which Mr. Pettit now contradicts his prior sworn testimony on this issue. As discussed above, during his deposition Mr. Pettit was specifically asked **why** he approached Bishop Borland with information about Loholt's abuse of his son. His testimony presumably was truthful and could not be clearer. He responded that he went to the Bishop because (a) he wanted to inform him of the situation and (b) he wanted the Bishop to "correct" the situation.[15] Now, in complete contradiction, Richard Pettit submits that he went to his Bishop because he wanted "spiritual counseling" and "guidance." Furthermore, Richard Pettit's prior testimony was that "he could not remember" how his Bishop responded to the information, and that he "could not remember" whether Bishop Borland said whether he would "do something about Jack."[16] However, now in an effort to dismiss plaintiff's case, Pettit apparently can recall that he expected his communication to be kept confidential and that he sought out Bishop Borland for "spiritual counseling and guidance."

Richard Pettit's declaration is directly contradictory to his prior sworn testimony relating to his purpose in conferring with Bishop Borland. A party may not submit declaration testimony which contradicts previously sworn testimony in order to create a question of fact on a motion for summary judgment. *Marshall v. AC&S,* 56 Wn. App. 181, 185, 782 P.2d 1107 (1989). The same principle must hold true for this "motion in limine." This Court should either deny this motion in limine or should allow the jury to determine whether Richard Pettit was truly seeking "spiritual counseling" and/or whether he had a "reasonable expectation of confidentiality" at the time he advised Bishop Borland that his son had been abused.

### C. IF A PRIVILEGE APPLIED, IT WAS WAIVED AT THE TIME OF THE PETTIT/BORLAND COMMUNICATION.

---

[15] Pettit Depo. pg. 32, ll. 19 and pg. 33, ll. 1 (**Exhibit A** to Pfau Decl.).

[16] Pettit Depo., pg. 33, ll. 2-5 (**Exhibit A** to Pfau Decl.).



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

COP has asserted that Bishop Borland could not reveal the contents of Richard Pettit's communication because all such communications had to be held in strict confidence. However, as discussed above, shortly after Pettit informed Borland of Loholt's abuse of his (Pettit's) son, Borland confronted Loholt about the situation. According to COP's own submission, Bishops are not permitted to disclose "confidences" unless the consent of the other party is received. However, Borland did reveal the communication. First, it is known that Borland confronted Loholt and that Borland "released" Loholt from his position as Assistant Scout Master. If the "communication" was indeed a confidential communication protected by the clergy-penitent privilege, Borland would not have been permitted to confront Loholt. By confronting Loholt, Borland himself vitiated the confidentiality of the communication. In this circumstance, COP's current claim that reporting Loholt to proper authorities would have required Borland to violate the tenants of his religion is specious at best.

### D. The First Amendment.

#### (1) The First Amendment Does Not Shield Religious Organizations from Liability.

A church is not immune from civil liability simply because it is entitled to certain protections under the First Amendment. The First Amendment was never meant as a protection for tortious activities. *C.J.C. v. Corp. of Catholic Bishop of Yakima,* 138 Wn.2d 699, 728, 986 P.2d 262 (1999). A church can be liable for tortious conduct "so long as liability is predicated on secular conduct and does not involve the interpretation of church doctrine or religious beliefs." *Id.* Stated otherwise, a Church is liable in tort for the activities of its pastors and/or clergy if the determination of liability can be made according to "neutral principles of law." *See, e.g., Southside Tabernacle v. Pentecostal Church of God, Pacific Northwest Dist.,* 32 Wn. App. 814, 817-20, 650 P.2d 231 (1982).



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Furthermore, a religious organization (and its members) cannot invoke the Constitutional guarantees of religious freedom to protect secular beliefs and behavior even if they are part of an otherwise religious relationship between a minister and a member of his or her congregation. *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 336 (5th Cir. 1998). As explained by *C.J.C.*, to hold otherwise would impermissibly place a religious leader in a preferred position in our society. *Cert. denied*, 525 U.S. 868, 119 S. Ct. 161, 142 L. Ed. 2d 132 (1998). *C.J.C, supra,* at 728.

**(2) IMPOSING A REPORTING OBLIGATION ON COP'S CLERGY DOES NOT INFRINGE ON THE FREE EXERCISE CLAUSE.**

The key issue in determining whether a given act will violate principles of freedom of religion is "whether religious tenants can still be observed" despite **some** state interference. *State v. Motherwell,* 114 Wn.2d 353, 363, 788 P.2d 1066 (1990) (emphasis added). In making that determination a Court is **not** required to analyze whether its actions will have any "detrimental effect" on a church's ability to "counsel their parishioners." *Id.* at 363-364. Instead, the determination of whether a given state action may equate to infringement is whether the state action interferes with a belief or a religious practice. *Id.* While the state cannot interfere with a religious belief, it can intervene with regard to religious **practices**. *Id.* (emphasis added.)

The *Motherwell* decision on this issue was based on the court's review and analysis of the United States Supreme Court case of *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). As the *Motherwell* court explained, the *Lyng* court explicitly resolved this very issue:

> claimants are not coerced into violating their religious beliefs merely because the governmental act will impede, or even '**virtually destroy**,' their ability to **practice** their religion. (Citation omitted.) The Court expressly refused to analyze free exercise issues on the basis of the effect on religious **practices**, stating that it would be put in the untenable position of weighing the 'value of every religious belief and



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

> practice that is said to be threatened by any government program,' when the value of any particular belief cannot be measured by one not holding that belief. (Citation omitted.) Moreover, the Court stated that the language of the free exercise clause itself – 'Congress shall make no law . . . *prohibiting* the free exercise [of religion]' – requires **more than a simple showing of impaired practices.**

*Motherwell,* 114 Wn.2d at 363-64 citing and quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) (emphasis in *italic* in original; emphasis in bold added).

Here, COP asserts that if Bishop Borland was required to comply with the law he would, at the same time, be required to violate his faith and, therefore, that complying with the statute would have constituted a "substantial burden" on his free exercise of religion. COP's assertion is misplaced. To invoke Constitutional scrutiny under the Free Exercise clause, the proponent of the theory must show that the governmental action imposes a substantial burden on a religious practice. *Vernon v. City of Los Angeles,* 27 F.3d 1385, 1392 (9th Cir. 1994). However, not all burdens on religion are unconstitutional. *State v. Motherwell,* 114 Wn.2d 353, 365, 788 P.2d 1066 (1990). Instead, even if there is a "substantial burden"(which is not conceded), the statute will withstand Constitutional scrutiny if there is "compelling governmental interest [which] justifies the regulation in question." *Id.* at 364-65 (citations omitted).

COP attempts to portray the "compelling" governmental interest as one in which the Legislature of this state "singled out clergy for a special burden."[17] This position is non-sensical. The compelling governmental interest is the protection of children.[18] Our state legislature, and many of our courts, has repeatedly declared that the protection of children from childhood sexual abuse is of paramount importance. *See* RCW 26.44.010. In fact, the compelling governmental interest in protecting children was specifically was addressed in

---

[17] Motion in Limine, pg. 12, ll. 31 (Dkt. No. 141).

[18] *Id.* at 365-66.



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

*State v. Motherwell,* 114 Wn.2d 353, 788 P.2d 1066 (1990). In rendering its opinion as to whether requiring "religious counselors" to report known instances of child abuse, our Supreme Court specifically noted:

> **Here, the State's interest in the protection of children is unquestionably of the utmost importance.** The Supreme Court has long recognized the significance of this interest in upholding state regulations concerning children's welfare over the free exercise objections of others. *See Prince v. Massachusetts*, 321 U.S. 158, 88 L. Ed. 645, 64 S. Ct. 438 (1944) (the State's interest underlying child labor laws); *Jehovah's Witnesses v. King Cy. Hosp.*, 390 U.S. 598, 20 L. Ed. 2d 158, 88 S. Ct. 1260 (1968) (the State's interest in providing minor children with blood transfusions over parents' free exercise objection), *aff'd* 278 F. Supp. 488 (W.D. Wash. 1967). Washington courts have similarly accorded great weight to this interest. *See State v. Meacham*, 93 Wn.2d 735, 740-41, 612 P.2d 795 (1980) (the State's interest in protecting children's welfare by requiring individuals to establish paternity through blood testing). As we stated in *Meacham*, '[t]hat the State has a compelling interest in [safeguarding children] cannot be gainsaid.' *Meacham*, at 741. **Because the State cannot combat the evils of child abuse without some means of bringing such abuse to light, we conclude that the mandatory reporting requirement of former RCW 26.44.030(1) is justified by a compelling state interest.**
>
> Additionally, the State uses the least restrictive means[19] with which to satisfy its interest in protecting children from abuse. The State is not requiring individuals to take any steps to prevent the abuse, but is only requiring them to report to the authorities. Given that the duty is only one of reporting, it is not clear how this could be accomplished in a less inhibitory manner to religious interests while still allowing the State to satisfy its interests. The only suggestion made by the counselors is that the State could exempt all religious officials from the reporting requirement. Requiring the State to do so, however, would unduly interfere with the fulfillment of its own interest. In *Lee*, the Supreme Court concluded that exempting religious claimants from having to pay taxes would unduly interfere with the government's interest, reasoning that '[b]ecause the broad public interest in maintaining a sound tax system is of such a high order, religious belief in conflict with the payment of taxes affords no basis for resisting the tax.' *Lee*, 455 U.S. at

[19] COP does not address the "least restrictive means" portion of the constitutionality test, presumably, because our Supreme Court has already stated that requiring reporting is the least restrictive means.



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

> 260. Similarly, any restriction on the scope of reporting duties beyond that determined to be necessary by the Legislature constitutes undue interference when the State's goal is as important as the protection of children from physical and sexual abuse. We conclude that the State has used the least restrictive means that would not unduly interfere with the pursuit of its compelling interest.

*State v. Motherwell,* 114 Wn.2d at 365-66 (emphasis added).

Furthermore, contrary to COP's assertions, the Legislature, has not, at any time, "singled out" clergy as mandatory reporters. Instead, the statute continues to apply to a myriad of categories of persons: doctors, psychologists, psychiatrists, teachers and other school personnel, nurses, social services counselors, pharmacists, child care workers (or their employees), employees of the department, juvenile probation officers, placement and liaison specialists, responsible living skills program staff, HOPE center staff, or state family and children's ombudsman or any volunteer in the ombudsman's office. RCW 26.44.030. [20]

**E. THE REPEAL OF THE STATUTE IS IRRELEVANT.**

This case arose out of conduct that occurred while clergy members were mandatory reporters.[21] Consequently, the applicable law is that which existed in 1975. It is the law that COP violated, and it is evidence of negligence.

///
///
///
///
///

---

[20] Finally, COP's reliance on *Mockaitis v. Harcleroad,* 104 F.3d 1522 (9th Cir 1977) is confusing. In that case, a prosecutor obtained a search warrant to record a confession. Further, the penitent confessed to a murder to the priest to absolve himself of his sins. The priest – not the penitent – brought a claim against the district attorney asserting that his privacy rights had been violated. The Court found that because Father Mockaitis had a "reasonable expectation of privacy" that there was not a "compelling governmental interest" that would permit a violation of the priest's Fourth amendment rights. *Id.* Plaintiff fails to see the relevance of this case to the facts at hand.

[21] Furthermore, the Legislature did not exempt clergy members from the reporting requirements in all circumstances. Instead, as explained in *State v. Motherwell, supra,* "establishing one's status as "clergy" is not enough to trigger the exemption in all circumstances. One must also be functioning *in that capacity* for the exemption to apply." *Motherwell,* 114 Wn.2d at 359 (emphasis in original).



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

RESPECTFULLY SUBMITTED this 1 day of August, 2006.

GORDON, THOMAS, HONEYWELL, MALANCA, PETERSON & DAHEIM LLP

By: /S/
Michael T. Pfau, WSBA No. 24649
mpfau@gth-law.com
Michelle A. Menely, WSBA No. 28353
mmenely@gth-law.com

LAW OFFICES OF TIMOTHY D. KOSNOFF

By: /S/
Timothy D. Kosnoff, WSBA No. 16586
timkosnoff@comcast.net
Co-Counsel for Plaintiff



LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575