FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005
RANDALL BORLAND

### Page 1

```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
KENNETH FLEMING and JOHN DOE,: No. C04-2338 RSM
                              : (Judge Ricardo Martinez)
         Plaintiffs,:
                              :
    -v-                       :
                              :
THE CORPORATION OF THE        :
PRESIDENT OF THE CHURCH OF    :
JESUS CHRIST OF LATTER-DAY    :
SAINTS, a Utah corporation    :
sole, a/k/a "MORMON CHURCH";  :
LDS SOCIAL SERVICES a/k/a     :
LDS FAMILY SERVICES, a Utah   : Videotaped Deposition of:
corporation,                  : RANDALL BORLAND
                              :
         Defendants.:

September 20, 2005 - 9:08 a.m.

Location: Kirton & McConkie
          60 East South Temple, Suite 1800
          Salt Lake City, Utah

Diane W. Flanagan, RPR
Notary Public in and for the State of Utah
```

### Page 2

```
              APPEARANCES
For the Plaintiffs:
          Tim Kosnoff
          ATTORNEY AT LAW
          600 University
          Suite 2101
          Seattle, Washington 98101-4161
          206.676.7610

For the Defendants:
          Thomas D. Frey
          Marcus B. Nash
          STAFFORD FREY COOPER
          601 Union Street
          Suite 3100
          Seattle, Washington 98101-1374
          206.623.9900

          Randy T. Austin
          KIRTON & MCCONKIE
          60 East South Temple
          Suite 1800
          Salt Lake City, Utah 84111
          801.328.3600
Also present:
          Josh Jentzsch, Videographer
          Garcia & Love Reporting

               INDEX
WITNESS                         PAGE
   RANDALL BORLAND
   Examination by Mr. Kosnoff      3

              EXHIBITS
EXHIBIT NO.                     PAGE
No. 1   Defendant COP's Supplemental Response to   3
        Plaintiffs' First Requests for Production of
        Documents
```

### Page 3

1  September 20, 2005                9:08 a.m.
2       P R O C E E D I N G S
3       (Exhibit No. 1 marked)
4       THE VIDEOGRAPHER: This is the videotaped
5  deposition of Bishop Randall Borland, being held in the law
6  offices of Kirton & McConkie in Salt Lake City, Utah, on
7  September 20, 2005, at 9:08 a.m.
8       My name is Josh Jentzsch, legal videographer for
9  Garcia & Love Reporting. The court reporter is Diane
10 Flanagan, also with Garcia & Love Reporting.
11      Will Counsel please state their appearances for
12 the record, and the witness will be sworn.
13      MR. KOSNOFF: For the record, Timothy Kosnoff on
14 behalf of the plaintiffs.
15      MR. FREY: Thomas Frey on behalf of the
16 defendants.
17      MR. NASH: Marcus Nash also on behalf the
18 defendants.
19      RANDALL BORLAND,
   called as a witness by and on behalf of the Plaintiffs, being
20 first duly sworn, was examined and testified as follows:
21      EXAMINATION
22 BY MR. KOSNOFF:
23   Q   Good morning, sir. Would you please state your
24 full name?
25   A   Yes. Randall Kent Borland.

### Page 4

1    Q   Mr. Borland, I'm going to introduce myself again.
2  We met briefly before we got started this morning. My name
3  is Tim Kosnoff. I'm one of the attorneys for the plaintiffs
4  in this matter. How are you feeling today, sir?
5    A   I'm sorry?
6    Q   How are you feeling today?
7    A   I feel pretty good. I'm dealing with an allergy.
8  I'm a bit tired, but I feel pretty good.
9    Q   Good. I want you to know that we will accommodate
10 whatever your needs are today. If you feel that you need to
11 get up and stretch your legs, take a walk, use the rest
12 room, please let me know at any point, and we will take a
13 break?
14   A   Okay. I didn't take an allergy capsule because
15 sometimes they make you drowsy. If I need it later, I'll
16 take it.
17   Q   Very good.
18   A   I'm fine right now.
19   Q   Good. Sir, could you give us a mailing address?
20   A   Yes. 620 Sumac, S-U-M-A-C, Avenue Provo, Utah
21 84604.
22   Q   Mr. Borland, have you ever had your deposition
23 taken before?
24   A   I have.
25   Q   On how many occasions?


Exhibit B

GARCIA & LOVE
801.538.2333

Dockets.Justia.com

Case 2:04-cv-02338-RSM    Document 158-3    Filed 09/01/2006    Page 2 of 4

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                                         RANDALL BORLAND

Page 61

1  MR. KOSNOFF: Are you directing him not to answer.
2  MR. FREY: No, I'm not. I'm asking him if he can
3  answer without violating -- if he can answer about what he
4  did without violating any confidentiality that I believe he
5  has the right to maintain as a bishop, then he may answer
6  the question.
7     A  I believe I can do that. Confidentiality is very
8  important to me. I -- the only reason I even hesitate at
9  all is because of the conversation, and I'm very respectful
10 of both of you. I didn't talk about, to another person, the
11 content of my discussion with the ward member that contacted
12 me, but the circumstance surrounding it I did, and that was
13 Jack Loholt. I had to talk with him.
14    Q  And that conversation that you had with Jack
15 Loholt took place fairly soon after?
16    A  Yes, sir.
17    Q  And what was said?
18    MR. FREY: Again, you may answer that question if
19 it will not violate any privilege that you have as a
20 clergyman.
21    A  I don't believe I can answer that.
22    Q  Again let's go through some of the questions that
23 I asked you before, a checklist, if you will.
24    A  Okay.
25    Q  Because there's -- may well be a judge that's

Page 62

1  going to review this transcript and make a decision, a
2  ruling, as to whether or not you've appropriately or legally
3  asserted the privilege in this context, and so I just want
4  to make sure that we've got a clear record.
5         Was your communication -- was your -- was your
6  communication with Jack Loholt done in your capacity as a
7  clergyman?
8     A  Was my communication with him done in the capacity
9  of a clergyman?
10    Q  Yes.
11    A  Yes.
12    Q  And would you agree with me that as a bishop
13 you -- you have many functions within the ward?
14    A  Many responsibilities in the ward?
15    Q  Many responsibilities. Correct?
16    A  Yes.
17    Q  And some of those are administrative, financial
18 management, things of a nonecclesiastical nature?
19    A  I think that's all -- in my mind that's all
20 ecclesiastical.
21    Q  That everything the bishop does --
22    A  Yes.
23    Q  -- all of his functions are ecclesiastical?
24    A  To me, that's my understanding.
25    Q  Does a bishop have overall responsibility for

Page 63

1  making sure that the ward building is closed and locked when
2  it's not in use?
3     A  Not necessarily. There might be other people that
4  do that. The bishop doesn't go do that generally.
5     Q  I understand that, but does the bishop have
6  ultimate responsibility for making sure that the building is
7  secured?
8     A  Which bishop?
9     Q  The bishop of the ward.
10    A  It would be the agent bishop of that building.
11 That particular person -- the buck would stop there, I
12 suspect.
13    Q  Okay.
14    A  Yes.
15    Q  So would you regard that as an ecclesiastical
16 responsibility?
17    A  I haven't given any such thing a thought, but I
18 would have to think that all of the responsibilities are
19 based upon his ecclesiastical calling, I would think.
20    Q  Okay. Does the -- when you were bishop, did you
21 have responsibility for tending to the proper handling of
22 tithing receipts?
23    A  Did I have responsibility?
24    Q  Yes.
25    A  Yes.

Page 64

1     Q  Okay. And do you regard that as a -- as an
2  ecclesiastical or clerical function in your role as bishop?
3     A  Which one?
4     Q  Either or both.
5     A  Ecclesiastical or clerical?
6     Q  Okay. Do you draw a distinction between --
7     A  Well, it would -- again, everything -- it seems to
8  me in my own perhaps ignorant way of looking at it that
9  everything that the bishop has that is his responsibility
10 that's under the mantle of a bishop's responsibility would
11 be ecclesiastical in nature.
12    Q  Okay.
13    A  I don't -- I can't draw a distinction.
14    Q  So, for example, the proper management of dealing
15 with tithing receipts that come in, you would equate with
16 pastoral counseling that you would deliver as bishop --
17    A  With what?
18    Q  -- to a member? With pastoral counseling.
19    A  Equate?
20    Q  Yes.
21    A  They're both responsibilities.
22    Q  Okay. Are they both clergy functions of the
23 bishop?
24    A  Well, yeah, they are, uh-huh (affirmative).
25    Q  Okay. So you don't recognize there being any

Case 2:04-cv-02338-RSM    Document 158-3    Filed 09/01/2006    Page 3 of 4

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                    RANDALL BORLAND

Page 69

1  A  I would say that's possibly.
2  Q  Would that include communicating it to the mother
3  of the child that made the complaint?
4  A  If it evolved to that point.
5  Q  If -- I'm sorry. If what evolved?
6  A  Well, this is all an assumption. Everything is an
7  assumption. Did you say that a mother came in and said that
8  a child, not her child? Am I right?
9  Q  Just a woman in the ward, a ward worker, a
10 volunteer hypothetically in the Primary, receives this
11 report from a child and she conveys it to you.
12 A  And so then I would --
13 Q  And my question is: Would you find it appropriate
14 to convey this confidential information to the mother of
15 that child?
16 A  I would have to have more groundwork on it before
17 I did that. I would probably -- if I felt that there was a
18 substantive basis for it, I would talk to the mother.
19 Q  If you felt that there was a substantive basis for
20 the accusation?
21 A  But there's footnote to that. The person that
22 came to me, if they came with the idea that, Bishop, I want
23 to talk with you, this is in confidence, that particular
24 individual's name, circumstance, involvement would not --
25 that would be held confidential.

Page 70

1  Q  Would you communicate this information to the
2  police?
3  A  Not necessarily, no.
4  Q  Would you communicate it to the local Child
5  Protective Services agency?
6  A  No.
7  Q  Would you attempt to substantiate the accusation
8  yourself?
9  A  I suspect I would, uh-huh (affirmative).
10 Q  How?
11 A  It would depend on the circumstance. It would
12 depend on the people. It would depend on the emotions. It
13 would depend on a gamut of things, a wide range of things
14 that would all focus in on is this legitimate, is this real,
15 or is it just an accusation, is it somebody that's upset
16 with somebody and angry, whatever it might be.
17 Q  Have you ever actually had to conduct such an
18 investigation?
19 A  I'm sorry?
20 Q  Have you ever actually been presented with a
21 scenario like this?
22 A  I'm going to have a difficulty answering that
23 question --
24    MR. FREY: Again, I'm going to instruct you if
25 that's going to cause you -- or require you, pardon me, to

Page 71

1  go ahead and disclose any type of information that you
2  received in your position as a clergy member.
3     For the record, I want to make this clear,
4  Counsel. I'm quoting from State v. Martin so we'll know
5  exactly what we're talking about. And they there say that
6  rather than the statute -- "Rather, the statute only
7  requires the clergy member receiving the confidential
8  communication be enjoined by the practices or rules of the
9  clergy member's religion to receive the confidential
10 communication and to provide spiritual counseling." That's
11 what I'm trying to protect him with.
12    MR. KOSNOFF: That's one of the elements.
13    MR. FREY: Okay. Well --
14    MR. KOSNOFF: They didn't throw out the elements
15 of the statute, and I'm very well-acquainted with State v.
16 Martin.
17 Q  (By MR. KOSNOFF) Let's get back to -- let's get
18 back to Mr. Loholt. You testified earlier that you spoke
19 with Jack Loholt. Are you asserting the privilege with
20 respect to your communication with Jack Loholt regarding any
21 allegations of child sexual abuse?
22 A  As being confidential?
23 Q  Yes.
24 A  Yes.
25 Q  Did you speak with anybody else other than Jack

Page 72

1  Loholt regarding information that he may have engaged in
2  sexual misconduct with a child?
3  A  No.
4  Q  So anything that was said between Jack Loholt and
5  yourself was kept strictly to yourself. Is that correct?
6  A  I can't speak for Jack Loholt. It was kept within
7  me.
8  Q  Was that information shared with anyone else on
9  the bishopric, such as your first or second counselor?
10 A  What information?
11 Q  Any information that Jack Loholt may have engaged
12 in sexual misconduct with a child.
13    MR. FREY: Again, these communications between you
14 and your counselors are also privileged, but go ahead.
15 A  So the answer -- I guess my answer would be -- is
16 my discussion with my counselors would be confidential. I
17 don't -- I don't remember discussing that with anybody.
18 Q  So you have no recollection of discussing with
19 anybody else?
20 A  I have no recollection of that.
21 Q  Okay.
22 A  That's correct. I do not.
23 Q  Did you remove Jack Loholt from any positions
24 working with youth in the ward while you were bishop?
25 A  Did I remove him?

Case 2:04-cv-02338-RSM   Document 158-3   Filed 09/01/2006   Page 4 of 4

FLEMING v. THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS
September 20, 2005                                                                    RANDALL BORLAND

Page 73

1  Q  Yes.
2  A  Released him --
3  Q  Okay.
4  A  -- yes.
5  Q  And what positions did you release him from?
6  A  His responsibility in scouting.
7  Q  Why did you release him?
8     MR. FREY: You can't --
9  A  I can't divulge that.
10 Q  I'm not asking you to reveal any communications.
11 I'm asking you your personal reasons why you released him
12 from scouting.
13    MR. FREY: Same objection. You're entitled to
14 claim the privilege.
15    One reveals the other, Counsel.
16 Q  (By MR. FREY) Isn't it a fact that you removed
17 Jack Loholt from scouting because you knew that he presented
18 a danger to boys of sexual abuse?
19 A  I -- I am not going to answer that.
20 Q  Did anybody ask you why you were releasing Jack
21 Loholt from scouting?
22 A  Nobody asked me why I was releasing him that I can
23 remember.
24 Q  Did you make any announcement to members of the
25 ward, either in a general meeting or in meetings of any

Page 74

1  units within the ward, that Jack Loholt should not be
2  permitted to work with or around children?
3  A  I don't recall any such thing.
4  Q  Was -- was LDS Social Services available to you as
5  a bishop for referrals when you were bishop of the Kent
6  Second Ward?
7  A  I can't remember the dates. It seemed like it was
8  just coming into the fore, and I don't remember when. And
9  so I -- I don't remember that.
10 Q  Did you send Jack Loholt to LDS Social Services
11 for any reason?
12 A  I don't remember doing that.
13 Q  Are you saying you didn't?
14 A  I say I don't remember ever doing that. It was a
15 long time ago.
16 Q  You have no recollection of sending Jack Loholt to
17 LDS Social Services for sexual deviancy counselling?
18    MR. FREY: Counsel, I'm going to object to this
19 question. You've asked it three times now, and he's
20 answered the question twice already saying he has no memory
21 of it. I think your badgering the witness.
22    You can answer it one more time, and then we're
23 not going to answer it again.
24 A  What was it again?
25 Q  You have no recollection of having released Jack

Page 75

1  Loholt to LDS Social Services for sexual deviancy?
2  A  I have no recollection of doing that.
3  Q  Did you ever at any time tell anybody that they
4  should not allow Jack Loholt to work with or around their
5  children?
6  A  Did -- do I remember telling anybody that?
7  Q  Anybody.
8  A  I do not remember that.
9  Q  If as bishop you had determined that an assistant
10 scoutmaster was sexually molesting boys, what would you have
11 done to warn or protect children within the ward from that
12 assistant scoutmaster?
13    MR. FREY: For the record, I'm going to object to
14 the question. It assumes, No. 1, facts not in evidence, and
15 the question is incomplete.
16    Go ahead. Object to the form.
17 A  What would I do if an assistant scoutmaster was, I
18 guess, taking liberties, immoral liberties, or how would you
19 say it?
20 Q  Yes, sexual -- you had credible reason to believe
21 that a scoutmaster or assistant scoutmaster was sexually
22 abusing kids in the ward.
23 A  If I had that credible --
24 Q  Yes.
25 A  I would -- if I had that, that that was happening,

Page 76

1  I would -- I would talk to my stake president if I had that
2  kind of information, that it was credible.
3  Q  Did you ever speak to your stake president
4  regarding Jack Loholt?
5  A  Not specifically, no.
6  Q  Did you ever speak with your stake president
7  generally about -- without identifying the individual, a
8  concern about a scoutmaster, assistant scoutmaster molesting
9  children?
10    MR. FREY: Object to the form of the question.
11 What time period are we talking about now?
12    MR. KOSNOFF: When he was bishop of the Kent
13 Second Ward.
14    MR. FREY: Okay. Again, as long as this doesn't
15 violate any type of confidence that you have between your
16 counselors and your stake president in your ecclesiastical
17 position.
18 A  That's what I'm wrestling with, and I believe it
19 does. I don't believe I can answer that question.
20 Q  (By MR. KOSNOFF) So did I understand, your
21 hesitancy to answer the question is that you're taking the
22 privilege -- or the position that any communication between
23 you and the stake president is also privileged?
24 A  Anything that would break confidentiality I take
25 as an ecclesiastical privilege, yes.