1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45

The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

KENNETH FLEMING, JOHN DOE, R.K., and
T.D.,

                   Plaintiffs,

     v.

THE CORPORATION OF THE PRESIDENT
OF THE CHURCH OF JESUS CHRIST OF
LATTER-DAY SAINTS, a Utah corporation
sole, a/d/a "MORMON CHURCH"; LDS
SOCIAL SERVICES a/d/a LDS FAMILY
SERVICES, a Utah corporation,

                   Defendants.

NO.  04-2338 RSM

**SECOND DECLARATION OF
MICHAEL ROSENBERGER IN
SUPPORT OF MOTIONS IN
LIMINE**

Michael Rosenberger, being duly sworn on oath, deposes and says:

1.     I am one of the attorneys representing the Defendants in this matter.  I make this declaration based upon personal knowledge.

2.     Attached as Exhibit 1 is a true and accurate copy of Plaintiff's Interrogatory Answers.

3.     Attached as Exhibit 2 is a true and accurate copy of Plaintiff's Pretrial Statement captioned as "Pretrial Order," which was served on August 21, 2006.

SECOND DECLARATION OF MICHAEL
ROSENBERGER IN SUPPORT OF MOTIONS IN
LIMINE - 1
No. 04-2338 RSM

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA  98154
Phone (206) 467-6477
Fax (206) 467-6292

Dockets.Justia.com

4.    Attached to this Declaration are true and accurate copies of excerpts from the

Deposition of Plaintiff R.K., Dorothy L. Kelly, and Jack A. Onefrey (aka Loholt).

**I declare under the laws of the State of Washington and of the United States that the**

**foregoing is true and correct.**

DATED this 15th day of September, 2006.

_____
Michael Rosenberger

SECOND DECLARATION OF MICHAEL
ROSENBERGER IN SUPPORT OF MOTIONS IN
LIMINE - 2
No. 04-2338 RSM

GORDON MURRAY TILDEN LLP
1001 Fourth Avenue, Suite 4000
Seattle, WA 98154
Phone (206) 467-6477
Fax (206) 467-6292

THE HONORABLE RICARDO MARTINEZ

RECEIVED

MAY 0 9 2005

STAFFORD FREY COOPER

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING and JOHN DOE,<br><br>Plaintiffs,<br><br>v.<br><br>THE CORPORATION OF THE PRESIDENT OF THE CHURCH OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah corporation sole, a/k/a "MORMON CHURCH"; LDS SOCIAL SERVICES a/k/a LDA FAMILY SERVICES, a Utah corporation,<br><br>Defendants. | NO. C04-2338 RSM<br><br>DEFENDANT COP'S FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF R.K.<br><br>**AND ANSWERS, RESPONSES AND OBJECTIONS THERETO** |

## INTERROGATORIES AND REQUESTS FOR PRODUCTION

INTERROGATORY NO. 1:  Identify your current address and Social Security Number.

ANSWER:

Robert P. Kelly
15016 S.E. 260th Street
Kent, WA  98042

Social Security No.: 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

DEF'S 1ST DISCOVERY TO PTF R.K.  - 1 of 14
(C04-2338RSM)
[139272 v12.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Exhibit___Page___3

Fred Hutchinson Cancer Research Center: Administrative Intern; Outpatient Department, September 1989 to January 1991

Analytical Technologies – Chemist; June 1987 to September 1989

REQUEST FOR PRODUCTION NO. 1: Please produce, for inspection and copying, all employment records in your possession for the employers identified in response to Interrogatory NO. 6.

RESPONSE:

I do not have employment records in my possession.

INTERROGATORY NO. 7: With respect to the occurrences of inappropriate sexual contact that you attribute to Jack Loholt/Onefrey, please identify the date of such alleged occurrence of sexual contact (to the best of your ability), the place in which the alleged inappropriate sexual contact occurred, and describe the acts of inappropriate sexual contact by Jack Loholt/Onefrey that allegedly took place during this occurrence.

ANSWER:

I first met Jack LoHolt in the early 1970s, after he moved into Herman Allenbach's home in Kent, Washington. The sexual abuse occurred in the early to mid 1970s when I was in grade school. I am unaware of the precise dates of abuse, but believe it occurred between the ages of 10-12 years old. The sexual abuse became more intense and was progressively worse each time Mr. Loholt sexually abused me.

**First Incident of Abuse.**

The first incident occurred in a field near the Allenbach home. Mr. Loholt lured Jimmy Allenbach, my brother (Tom Kelly) and I to a field near our house. Mr. Loholt masturbated in front of us. Jimmy, Tom and I ran down to my house and told my mom.

**Second Incident of Abuse.**

DEF'S 1ST DISCOVERY TO PTF R.K. - 5 of 14
(C04-2338RSM)
[139272 v12.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

1

## VERIFICATION

2

STATE OF _____)
                        ) ss.
3

COUNTY OF _____)

4

    Robert Kelly, being first duly sworn on oath, deposes and states:

5

    I am the plaintiff herein, have read the foregoing Interrogatories and Requests
6

for Production, and answers and responses thereto, and believe the same to be true
7

and correct.

8

                         _____

9

10

    SUBSCRIBED AND SWORN to before me this _____ day of _____,

11

2005.

12

                         _____

13

                         Signature
                         Print Name: _____
14

                         NOTARY PUBLIC in and for the State of
                         _____, residing at _____
15

                         My Commission Expires: _____

16

17

18

19

20

21

22

23

24

25

26

DEF'S 1ST DISCOVERY TO PTF R.K. - 13 of 14
(C04-2338RSM)
[139272 v12.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7675

Exhibit____Page___5___

1

## ATTORNEY CERTIFICATION

2    ANSWERS DATED: _____5/5/_____, 2005.

3

The undersigned attorney has read and/or reviewed the foregoing answers to
4    interrogatories, responses and objections to requests for production and certifies that
they comply with FRCP 26, 33, and 34.

5

6    GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP

7

8    By_____

9    Michael T. Pfau, WSBA No. 24649
mpfau@gth-law.com
10    Attorneys for Plaintiffs

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEF'S 1ST DISCOVERY TO PTF R.K. - 14 of 14
(C04-2338RSM)
[139272 v12.doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 · FACSIMILE (206) 676-7575

Exhibit___Page_6__

THE HONORABLE RICARDO MARTINEZ

1
2
3
4
5
6
7
8    UNITED STATES DISTRICT COURT
9    WESTERN DISTRICT OF WASHINGTON
     AT SEATTLE
10
11   KENNETH FLEMING, JOHN DOE, R.K. and    NO. C04-2338RSM
     T.D.,
12                                           **PRETRIAL ORDER**
         Plaintiffs,
13
14   vs.
15   THE CORPORATION OF THE PRESIDENT
     OF THE CHURCH OF JESUS CHRIST OF
16   LATTER-DAY SAINTS, a Utah corporation
     sole, a/d/a "MORMON CHURCH,"; LDS
17   SOCIAL SERVICES a/d/a LDA FAMILY
     SERVICES, a Utah corporation,
18
         Defendants.
19
         COME NOW the plaintiff R.K. and defendants Corporation of the President of the
20
     Church of Jesus Christ of Latter-day Saints and LDS Social Services and submit the following
21
     pre-trial order.
22
                        I.    **FEDERAL JURISDICTION**
23
         Jurisdiction is vested in this court by virtue of 28 U.S.C. § 1332(a)(1) because there is
24
     complete diversity of citizenship between the plaintiff and defendant and the amount in
25
     controversy exceeds the requisite amount established by 28 U.S.C. § 1332. Venue is likewise
26

PRE-TRIAL ORDER - 1 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 7

proper in this Court because plaintiff is a resident of King County and because the acts giving

rise to this action occurred in King County.

## II.     CLAIMS AND DEFENSES

### A. PLAINTIFF'S CLAIMS.

Defendants are each responsible for, negligence and breach of fiduciary duty and

negligent infliction of emotional distress arising from their failure to prevent Jack Loholt aka

Jack Onofrey's abuse of children, including plaintiff R.K. Defendants are additionally liable

for negligence stemming from their hiring, supervision and retention of Jack Loholt as

Scoutmaster and Melchesidek Priest, negligence based on their failure to report Loholt's

sexual abuse of children pursuant to RCW 24.44; negligent infliction of emotional distress

based on its continuing retention of Loholt as Scoutmaster and Melchesidek Priest knowing

he had abused several children and was likely continuing to abuse others; ,

### B. AFFIRMATIVE DEFENSES.

[Deleted: civil conspiracy]

[Deleted: sexual abuse of R. K.]

[Deleted: .]

[Deleted: and, civil conspiracy based on their mutual agreements and agreements with others to conceal from children, their parents, CPS and the general public evidence of Loholt's abuse of children]

## III.     ADMITTED FACTS

### A. ADMITTED FACTS.

1.     The plaintiff, R.K., was at all material times, a minor under the age of eighteen

years. His date of birth is June 26, 1962.

2.     Defendants the Corporation of the President of the Church of Jesus Christ of

Latter-day Saints, a Utah Corporation Sole, a/d/a "the Mormon Church" ("COP") and LDS

Social Services, a/d/a "LDS Family Services," ("LDSSS"), a Utah Corporation, are Utah

Corporations headquartered in Salt Lake City, UT.

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 8

3.    Jack Loholt is a twice-convicted serial child molester of pre-pubescent boys. Loholt is a citizen and resident of Canada.

4.    Jack Loholt was a member of the Mormon Church and a member of Mormon church wards in the in the Renton and Kent Stakes from approximately 1967 until 1980 when he moved to Canada.

5.    During the period of abuse, Loholt resided in a downstairs apartment in the Dr. Herman Allenbach home in Kent.

6.    Allenbach was a High Priest, a member of the High Priests Quorum and is the Eagle Scout leader in the Kent Second Ward during this time.

7.    The Kent 2d Ward regularly conducted religious and social activities at the Allenbach compound at which R.K. was present.  R.K. was not a member of the Mormon Church.  However R.K. was proselytized by Mormon missionaries and Mormon Elders including Loholt at the Allenbach compound.  R.K. participated in ward scout troop meetings held at the Allenbach compound.

8.    Loholt was an ordained Melchesidek Priest and Elder within the Mormon Church Kent 2nd Ward.

9.    Loholt served as a member of an Elders' Quorum within the church and worked as an adult volunteer in the scouting program of the ward and the ward's Young Men's Mutual Improvement Association working with 12 to 18 year-old boys.

10.    In February 1971 Loholt was officially called to be assistant scoutmaster.  Ken Keller was the ward scoutmaster.

11.    Jim Allenbach disclosed Loholt's abuse of him to his father, Dr. Herman Allenbach in approximately 1971.

PRE-TRIAL ORDER - 3 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 9

12.    Jack Loholt abused scouter S.P. on a troop campout.[1] S.P. disclosed the abuse to his father, Richard Pettit, in approximately February 1972. Richard Pettit informed Kent 2d Ward Bishop Randall Borland regarding Loholt's sexual abuse of his son soon after the disclosure.

13.    Bishop Borland sent Jack Loholt to LDSSS for sexual deviancy counseling. Borland did not reveal Loholt's abuse of Pettit to anyone.

14.    Borland officially removed Loholt from scouting program but Loholt continued to "help out" with the scout troop. When victim K.F. joined the Kent Second Ward in 1972 Loholt was functioning as the scoutmaster.

15.    Dr. Allenbach asked Loholt to move from the apartment. Loholt moved to a house a short distance away from the Allenbach compound.

16.    Loholt participated in sexual deviancy counseling with LDSSS for about one year starting around February 1972.

17.    Between 1971 and 1975, the Mormon Church and LDSSS and its agents were mandatory child abuse reporters under RCW 26.44.

18.    Child Protective Services has no record of ever receiving a report of child sexual abuse involving Jack Loholt.

19.    Phillip Coleman was ordained bishop of Kent 2d Ward on August 19, 1973. At the same time, Richard Pettit was named Coleman's Second Counselor on the ward bishopric.

20.    In October 1973, Bishop Coleman appointed Loholt "Assistant Venturer Leader" working with teenage boys.

21.    In May 1974, Coleman appointed Loholt to the position of Kent 2d Ward Scoutmaster.

---

[1] Defendant has moved to exclude evidence of other victims' abuse.

PRE-TRIAL ORDER - 4 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 10

22.    In 1975, a woman reported to Bishop Coleman that Loholt exposed himself to her sons on a fishing outing. Coleman removed Loholt from his church positions and informs his counselors, including Richard Pettit.

23.    R.K. was abused on multiple occasions in Loholt's downstairs apartment and in a field at the Allenbach compound.

24.    Loholt admits to the abuse of multiple children; however, he denies abusing plaintiff R.K.

25.    Loholt abused other children in the apartment, including B.A., R.A. and J.A. During the same time frame Loholt was abusing other children, including K.F., T.D., D.F., S.P., and others, at other locations.

26.    At no time did the Mormon Church or any of its leaders report their knowledge Loholt's abuse of children to CPS or law enforcement authorities.

## B. PLAINTIFF'S CONTENTIONS.

1.    Defendants COP and LDSSS were negligent because they had a duty to prevent Loholt's abuse of children and failed to do so.

2.    Defendants COP and LDSSS were negligent because they had a duty to protect foreseeable victims of Loholt from harm.

3.    Plaintiff was at all relevant times a "child" for purposes of RCW 4.16.340 defining "childhood sexual abuse" and the time during which a cause of action may be brought.

4.    Plaintiff was subjected to multiple acts of childhood sexual abuse as defined by RCW 4.16.340(5) by Jack Loholt.

5.    At the time of Loholt's abuse of Plaintiff, Loholt was a Mormon Church Elder, Youth minister and scout leader in the Kent 2d Ward.

PRE-TRIAL ORDER - 5 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 11

5.    Loholt was an agent of the Mormon Church and was subject to their supervision and control.

6.    Loholt resided in an apartment at the Allenbach compounded.

7.    Dr. Herman Allenbach was a leader in the defendant's Scouting program, a High Priest and member of the High Priest's Quorum and a former member of the Kent 2d ward's bishopric and was otherwise the defendant COP's agent.

8.    Bishop Randall Borland was at relevant times the ward bishop and was the defendant COP's agent.

9.    Bishop Philip Coleman was at all relevant times the ward bishop and was the defendant COP's agent.

10.    Bishop Richard Pettit was at all relevant times a counselor to the bishop or a bishop of the Kent 2d ward and was the defendant COP's agent.

11.    The Kent 2d Ward regularly conducted religious and social activities at the Herman Allenbach compound which Plaintiff regularly attended. The Mormon Church and its agents, including Loholt, regularly proselytized to Plaintiff urging him to relinquish Roman Catholicism and become Mormon.

12.    Loholt held ward boy scout troop meetings at the Allenbach compound which Robert Kelly attended.

13.    Loholt's positions within the Mormon Church as Mormon Priest, youth minister and Scoutmaster allowed him to gain Plaintiff's trust and were a cause of his abuse at the hands of Loholt.

14.    Before, during and after Loholt's abuse of Plaintiff, church leaders including Bishops Borland, Coleman and Pettit and Scout leader and High Priest Herman Allenbach received complaints from victims that Loholt was sexually abusing children.

PRE-TRIAL ORDER - 6 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 12

15.    Defendant LDS Social Services was aware of Loholt's sexual abuse of children and counseled him around his pedophilia during the same time period that Loholt was continuing to sexually abuse plaintiff. Defendants failed to warn or protect plaintiff of the danger it knew Loholt plaintiff presented to him but instead continued to present Loholt to plaintiff and others as someone who was trustworthy and suitable to work with or around children.

16.    Defendants had a special relationship with Loholt because as Scoutmaster, youth minister and Mormon Priest and Elder he was their agent. COP chose Loholt to be an Elder, youth minister and scoutmaster and had the ability to restrict and control his conduct.

17.    Defendants had a special relationship with Plaintiff because he was a child that it attempted to recruit into its membership and because he was within a protected class recognized by the state as needing special protection. A special relationship also existed because the Mormon Church brought Loholt into contact with Plaintiff.

18.    As a matter of public priority, the protection of children from sexual abuse is a high priority.

19.    COP had a special relationship with Plaintiff because he was within a foreseeable zone of harm by Loholt who was its agent.

20.    Defendants had a special relationship with Plaintiff by virtue of the fact that they were mandatory child abuse reporters that repeatedly ignored their statutory reporting duties during the time period of plaintiff's abuse.

21.    Defendants had a duty of reasonable care to protect plaintiff under the circumstances of this case because the defendants' knowledge of the potential harm was certain, the character of the harm was extremely grave, the importance of the social interest needing protection was paramount and the burden of compliance upon defendants was insignificant.

PRE-TRIAL ORDER - 7 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 13

22.     Defendant COP and Loholt conspired to cover up his crimes against children including plaintiff, prevent their detection, prevent the seeking out and redressing of injuries to children, including plaintiff, that Loholt had abused. The conspiracy between COP and Loholt prevented civil authorities from learning of Loholt's twenty-year long predations against children in Washington state including K.F., D.F., J.A., D.F., J.A., R.A., B.A., R.P., T.D., and C.W., and children in Canada. Loholt was later convicted of molesting after fleeing to Kenora, Ontario and joining a ward of the Mormon Church in Canada. Based on these actions, COP and Loholt conspired for the unlawful purpose of concealing and suppressing information on the danger and threat that Loholt presented to children.

23.     As the result of defendants' failure to protect plaintiff from a known violent sexual abuser of children and of repeatedly shielding and protecting a man defendants knew was a dangerous sexual predator of children, defendants enabled Loholt to repeatedly raped and violate plaintiff and cause him to sustain severe and life-long psychological and emotional damages.

24.     Defendants negligently failed to report Loholt to civil authorities, warn or protect Plaintiff from Loholt knowing of his dangerous propensities and did so with awareness that a high degree of probability existed that its conduct would cause emotional distress and proceeded to deliberately disregard it.

25.     Defendants' conduct was so extreme in degree and outrageous in character as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community.

26.     COP adopted guidelines for handling victims of child sexual abuse and sex offenders. Plaintiff is a member of the class of people whom the guidelines were designed to protect. The harm Plaintiff suffered as a result of Defendants' negligence was the harm contemplated in Defendants' Handbook of Instruction to clergy.

PRE-TRIAL ORDER - 8 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575


Exhibit ___ Page ___

27.     COP failed to train and supervise its hierarchal clergy in the proper implementation of its guidelines, policies and procedures regarding the identification and removal of child molesters from its ranks and the treatment of victims of child sexual abuse, to monitor and insure compliance with their guidelines, policies and procedures, treatment of child sexual abusers and reporting of child sexual abuse.

C. DEFENDANTS' CONTENTIONS.

Defendants COP and LDSSS contend as follows:

### IV.     ISSUES OF LAW

1.     Did COP have a special relationship with Jack Loholt because he was its youth minister, scout leader and religious Elder?

2.     Did LDSSS have a special relationship with Jack Loholt because it counseled him around his sexual deviancy and because it was a mandatory child abuse reporter, was aware that Loholt had molested children and knew or should have known that Loholt was continuing to have contact with children in connection with his church positions?

3.     Did COP have a special relationship with Plaintiff?

4.     Was COP's knowledge of the potential harm to children by Loholt so certain and so grave, that regardless of the existence of a special relationship, the societal interest in protecting children from known sexual abusers, requires the imposition of a duty on defendants without more?

5.     Defendant defendants, and each of them, violate RCW 26.44.030?

PRE-TRIAL ORDER - 9 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 15

6.    Were COP and LDSSS conduct so extreme in degree and outrageous in character as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community?

7.    Is segregation of damages required under *Tegman* to a non-party?

8.    Is segregation of damages to a non-party intentional tortfeasor required under *Tegman* where it was the alleged negligence of the defendant that was the cause of the intentional tortfeasor's sexual abuse of the plaintiff?

9.    Once the plaintiff has met his initial burden of showing that his injuries are indivisible, do the defendants then bear the burden of establishing that the damages can be segregated?

## V.    EXPERT WITNESSES

(a) Each party shall be limited to two (2) expert witnesses on the issues of (1) the nature and extent of R.K.'s damages and (b) the standard of care applicable to entities serving children during the relevant time frame.

(b) The names and address of the expert witnesses to be used by each party at the trial and the issues upon which each will testify is:

(1) <u>On behalf of Plaintiff:</u>

Dr. Jon Conte.   Dr. Conte will testify about plaintiff's emotional and psychological injuries resulting from his being repeatedly sexually abused by Jack Loholt. The substance of Dr. Conte's report is set forth in his report.

Dr. Eli Newberger.   Dr. Newberger will testify to defendant's violation of the standard of care applicable to facilities serving children during the relevant time period.

(2) <u>On behalf of Defendant:</u>

PRE-TRIAL ORDER - 10 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit __2__ Page __16__

Dr. Fred Wise. Dr. Wise will testify regarding his evaluation of the Plaintiff and the documents he reviewed. The substance of Dr. Wise's testimony is set forth in his report.

## VI.    OTHER WITNESSES

The names and addresses of witnesses, other than experts to be used by each party at the time of trial and the general nature of the testimony of each are:

**(I) On behalf of Plaintiff:**

a)  Robert Kelly c/o Gordon Thomas Honeywell, 600 University, Suite 2100, Seattle, WA 98101. Plaintiff Robert Kelly will testify about the Mormon Church's religious activities at the Allenbach compound, its proselytizing efforts towards him, Jack Loholt's sexual abuse of him and how he believes the abuse impacted him.

b)  Jack Loholt aka Jack Onofrey, RR 1, Lac La Hache, B.C. Canada (250) 396-7106. Mr. Loholt will testify regarding his involvement with the Mormon Church in the 1960's, his leadership positions working with boys in the Kent 2d Ward including Scoutmaster. He will testify regarding his sexual abuse of boys in the Kent 2d Ward, the fact of his removal from scouting positions by church leaders because of his sexual abuse of boys, his treatment for sexual deviancy treatment at LDS Social Services in the early 1970's, his subsequent continuing involvement as a scout leader in the ward scouting program, the circumstances of his departure to Canada in approximately 1979, his subsequent joining of the a Mormon ward and scout troop in Canada and sexual abuse of more boys. He will testify regarding his conviction in Canada for sexually abusing boys and subsequent ex-communication from the Church.

PRE-TRIAL ORDER - 11 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 17

He will testify regarding his return to the Kent area following his release from prison in Canada and of the Mormon Church leaders efforts to bring him back in to fellowship in the church. He will testify regarding his abuse of more children in the 1980's upon returning to Kent from Canada.

c) Other Victims of Loholt:

(i)    K.F. c/o Gordon Thomas Honeywell, 600 University, Suite 2100, Seattle, WA 98101. KF will testify about his membership in the Kent 2d Ward of the Mormon Church and involvement in the ward scouting program. He will testify about how the scouting program was managed, about Jack Loholt's involvement as scoutmaster in the scouting program and his sexual abuse by Loholt.

(ii)   J.A. c/o Gordon Thomas Honeywell, 600 University, Suite 2100, Seattle, WA 98101. JA will testify about his father Dr. Herman Allenbach and Dr. Allenbach's positions in the Mormon Church and Mormon Church religious and social activities conducted at the Allenbach compound. . He will testify about Jack Loholt's positions in the Mormon Church, his working as the ward's scoutmaster while living at the Allenbach compound, his sexual abuse by Jack Loholt and his complaints as a boy to his father about Loholt's sexual abuse of him.

(iii)  B.A., 1556 W. 1500 N, Farmington, UT, 801-451-8810 will testify about his father Dr. Herman Allenbach and Dr. Allenbach's positions in the Mormon Church and  Mormon Church religious and social activities conducted at the Allenbach compound. He will testify about Jack Loholt's positions in the Mormon Church, his working as the

PRE-TRIAL ORDER - 12 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 18

ward's scoutmaster while living at the Allenbach compound and his
sexual abuse by Jack Loholt.

(iv)   D.F. c/o Gordon Thomas Honeywell, 600 University, Suite 2100,
       Seattle, WA 98101. D.F. will testify about his membership in the Kent
       2d ward as a boy, his participation in the ward scouting program with
       Loholt as Scoutmaster, his sexual abuse by Loholt, his reports of
       Loholt's sexual abuse of boys to Bishop Pettit and Bishop Pettit's
       response to those reports.

(v)    K.B., 804 E. Main St., Apt 5, Emmett, ID 83617, 208- 412-5753. K.B.
       will testify about his membership in the Kent 2d ward as a boy, his
       participation in the ward scouting program with Loholt as Scoutmaster
       and his sexual abuse by Loholt and his report of the abuse to the ward
       bishop.

(vi)   S.P.  S.P. will testify about his membership in the Kent 2d ward as a
       boy, his participation in the ward scouting program with Loholt as
       Scoutmaster and his sexual abuse by Loholt. He will testify regarding
       his disclosure of the abuse to his father, Bishop Richard Pettit.

(vii)  T. D. c/o Gordon Thomas Honeywell, 600 University, Suite 2100,
       Seattle, WA 98101. T.D. will testify about his participation in the Kent
       2d Ward scouting program, his sexual abuse by Jack Loholt as
       scoutmaster and his reporting the abuse incident to D. F.

(viii) C.W.B. c/o Gordon Thomas Honeywell, 600 University, Suite 2100,
       Seattle, WA 98101. She will testify that her family were members of
       the Mormon Church in the Kent area in the 1980's. She will testify
       regarding church leaders' knowledge she was at risk and of the lack of

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 19

any efforts by church leaders to warn or protect her or to warn her parents about Loholt sexual propensities towards children. She will testify regarding Loholt's two year-long sexual abuse of her, Loholt's subsequent arrest and conviction for his sexual molestations of her.

d) Representatives of the Kent 2nd Ward, including:

(i) Ken Keller, 541 Ranch Loop Rd., Preston, ID 83263. Mr. Keller will testify regarding his involvement in the Kent 2d Ward scouting program and what he was by told by church leaders told about Loholt's sexual abuse of children and suitability to work with young boys.

(ii) Bishop Randall Borland, 620 Sumac Avenue Provo, Utah, 84604. Bishop Borland will testify regarding his tenure as bishop of the Kent 2d Ward in the 1970's, the organization structure of the Mormon Church, the Handbook of Instructions, about reports he received of sexual abuse by Jack Loholt of S.P. and his response to those reports. He will testify regarding his sending Loholt to LDSSS for sexual deviancy counseling.

(iii) Bishop Philip Coleman will testify regarding complaints of sexual misconduct by Jack Loholt he received when he was bishop of the Kent 2d Ward and his response to those reports.

(iv) Bishop Richard Pettit will testify regarding his son's disclosure of sexual abuse by Loholt, of his subsequent reporting of the abuse to Bishop Borland. He will testify about receiving reports of sexual abuse from D.F. regarding Loholt's abuse of T.D. and what he did in response to those abuse reports.

PRE-TRIAL ORDER - 14 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 20

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

(v)    Bishop Larry Pitts, 24011 137th Avenue Southeast, Kent, Washington,
98042. Bishop Pitts will testify regarding warnings he received from
church members regarding Loholt and what he did in response to those
warnings. Pitts will testify he was never informed by church
headquarters that Loholt had been excommunicated in Canada for
sexually abusing boys.

e)  Miscellaneous Witnesses:

(i)    Dorothy Kelly, 15016 S.E. 260th, Kent, Washington, 98042. Mrs.
Kelly will testify that she is the mother R.K. She will testify that in
approximately 1969, R.K. disclosed an incident involving Jack Loholt
masturbating to ejaculation in front of him, his brother T.K., J.A. and
R.A. in a field on the Allenbach compound. She will further testify that
she notified Dr. Allenbach of the incident and will testify regarding
his responses to her complaint. Dorothy Kelly will also testify
regarding R.K.'s damages.

(ii)    Jerry Kelly, 15016 S.E. 260th, Kent, Washington, 98042.  Mr. Kelly
will testify that is R.K.'s father.  He will testify that in approximately
1969, R.K. disclosed an incident involving Jack Loholt masturbating
to ejaculation in front of him, his brother T.K., J.A. and R.A. in a field
on the Allenbach compound.  He will further testify regarding the
notification Dr. Allenbach received of the incident and will testify
regarding Dr. Allenbach's responses to that information.  Jerry Kelly
will also testify regarding R.K.'s damages.

(iii)    Ernie Humphrey, 27325 156th Avenue, Kent, WA 98042 (253) 631-
6199. He will testify regarding his warnings to church leaders about

PRE-TRIAL ORDER - 15 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 21

Loholt's sexual abuse of boys in the scouting program, how Loholt

was stalking their sons. He will testify that church officials covered up

for Loholt and enabled him to abuse children.

(iv)    Jeanne Humphrey, 27325 156th Avenue, Kent, WA 98042 (253) 631-

6199. She will testify that she is a member of the Mormon Church. She

will testify about warnings she and her husband gave to church leaders

regarding Loholt and of how they unsuccessfully urged church leaders

to inform church members about Loholt.

(v)    Evalyn deGuzman, address to be supplemented. Ms. deGuzman will

testify regarding her relationship with R.K., including her observation

of R.K. and will provide testimony relating to R.K.'s damages.

(vi)    Jovine Umali, address to be supplemented. Ms. Umali will testify

regarding her relationship with R.K., including her observation of R.K.

and will provide testimony relating to R.K.'s damages.

(vii)    Julie Garasi, address to be supplemented. Ms. Garasi will testify

regarding her relationship with R.K., including her observation of R.K.

and will provide testimony relating to R.K.'s damages.

(viii)    Rachelle Cope, address to be supplemented. Ms. Cope will testify

regarding her relationship with R.K., including her observation of R.K.

and will provide testimony relating to R.K.'s damages.

(2) <u>On behalf of Defendants:</u>

## VII.   EXHIBITS

(a) ADMISSIBILITY STIPULATED.

PRE-TRIAL ORDER - 16 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 22

**Plaintiff's Exhibits:**

1. Medical and psychological records of Robert Kelly

2. Jack Onfrey, aka Jack Loholt, King County Suspect Information Report and Bail Order, No. 90-1-01505-6

3. Jack Onofrey, aka Jack Loholt, King County Criminal Court File Documents, 90-1-01505-6.

4. Renton and Kent State Directories 1969 through 1980.

5. Historical Report of the Kent 2d Ward January 3, 1971 through December 28, 1975.

6. Demonstrative Exhibit Timeline of Events re Loholt youth leadership positions and abuse complaints of victims and others to church leaders

7. Dr. Jon Conte Forensic Report and forensic tests administered to Robert Kelly and Conte C.V.

8. Childhood photographs of Robert Kelly.

9. Articles of Incorporation COP and LDSSS..

10. Excerpts from of Church Handbook of Instructions

11. Excepts from Encyclopedia of Mormonism, Priesthood and Church Organization

12. Washington State Mandatory Reporting Statute 1971

13. Depositions of Dwayne Liddell and Harold Brown in *Scott v. Mormon Church*, Oregon Circuit Court.

14. Real Estate Contract between Jack Loholt and Madeline J. Wham relating to 1973 purchase of Kent residence.


**Defendant's Exhibits:**

PRE-TRIAL ORDER - 17 of 18
(C04-2338RSM)
[Pretrial order (2).doc]

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 23

## VIII.   ACTION BY THE COURT

(a) Trial of this matter is scheduled for October 2nd, 2006.  The parties anticipate trial length of 7-10 days.

(b) Trial briefs shall be submitted to the Court on or before September 27, 2006.

(c) Jury instructions requested by either party shall be submitted to the Court on or before September 27, 2006.  Suggested question of either party to be asked of the jury by the Court on Voir Dire shall be submitted to the Court on or before September 27, 2006.

(d) This order has been approved by the parties as evidenced by the signatures of their counsel.  This order shall control the subsequent course of the action unless modified by subsequent order.  This order shall not be amended except by order of the Court pursuant to agreement of the parties or to prevent manifest injustice.

SIGNATURE LINES FOR COURT AND ALL PARTIES

LAW OFFICES
GORDON, THOMAS, HONEYWELL, MALANCA,
PETERSON & DAHEIM LLP
ONE UNION SQUARE
600 UNIVERSITY, SUITE 2100
SEATTLE, WASHINGTON 98101-4185
(206) 676-7500 - FACSIMILE (206) 676-7575

Exhibit 2 Page 24

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| KENNETH FLEMING and JOHN DOE, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) NO. 04-2338 RSM |
| | ) |
| THE CORPORATION OF THE PRESIDENT OF THE | ) |
| CHURCH OF JESUS CHRIST OF LATTER-DAY | ) |
| SAINTS, a Utah corporation sole, a/k/a | ) |
| "MORMON CHURCH"; LDS SOCIAL SERVICES | ) |
| a/k/a LDS FAMILY SERVICES, a Utah | ) |
| corporation, | ) |
| | ) |
| Defendant. | ) |

DEPOSITION UPON ORAL EXAMINATION OF

ROBERT KELLY

VIDEOTAPED PROCEEDING

1:10 o'clock p.m.

August 29, 2005

601 Union Street

Suite 3100

Seattle, Washington

REPORTED BY:
ALISON LOTT, CCR#2337

Exhibit____Page 25

Page 19

 1         sexual conduct, six separate incidences of abuse.  Do you

 2         remember that?

 3   A    Yes, I do.

 4   Q    In each of those -- well, the first one you indicate

 5         occurred in a field near the Allenbach home.  In each of

 6         the others, you relate that the incident occurred in

 7         Mr. Loholt's apartment.  Is that the apartment in the

 8         basement of the Allenbach house?

 9   A    That's correct.

10   Q    Did any of the abuse which you sustained at the hands of

11         Jack Loholt occur anyplace other than in the apartment in

12         the Allenbach home?

13   A    Well, there was the incident in the field.

14   Q    Other than that?

15   A    All the abuse occurred in his apartment.

16   Q    The incident in the field, you indicate, is the first

17         incident of abuse.  And that involved whom?

18   A    Jimmy was in the field, my brother Tom, and me, and Jack.

19   Q    And had you met Jack Loholt prior to that incident?

20   A    Yes, I did.

21   Q    How long had you known him prior to that incident?

22   A    I don't really recall.

23   Q    Was it a matter of years, or was it a matter of months?

24   A    I don't recall.  It was at least months.

25   Q    Had you ever had any contact with him prior to that

Exhibit____ Page 26

Page 26

 1          ceased.  They thought Jack stopped abusing us.  And so they
 2          told us not to be around Jack, but -- and they thought the
 3          problem didn't happen any more.
 4     Q    Did the incident with Jack in the field embarrass you or
 5          scare you in any way?
 6     A    Yeah, it scared me a lot.
 7     Q    And according to the incidents that you relate that
 8          followed after that, you apparently continued to go back to
 9          the apartment where Mr. Loholt was living, though; is that
10          correct?
11     A    That's correct.
12     Q    Is there some reason that you continued to go back there
13          even after you were so frightened from the first incident
14          involving the -- his masturbating in front of you in the
15          field?
16     A    Well, Jack was a -- seemed like an expert at manipulation
17          and intimidation, and so he -- it was like -- he had like
18          two sides to his personality.  He lured us into his place,
19          his apartment, by like playing with us, and then he started
20          abusing us.  And -- so the lure was really neat, because it
21          was like making root beer floats, and homemade ice cream,
22          and I especially liked the firecrackers, because he had --
23          he gave us firecrackers if we did what he wanted.  And so I
24          liked the firecrackers.
25     Q    Did your mother ever follow up and ask you whether or not

Exhibit_____Page 27

Page 75

1    engaged in any type of cover-up concerning the abuse of

2    Mr. Loholt towards you?

3  A  I don't know.

4  Q  Have you talked to any victims, sexual abuse victims of Mr.

5    Loholt who indicated that they told anyone in the LDS

6    church about the abuse that was occurring to them?

7  A  Can you read it, please, again.

8                          (The pending question was read by

9                           the reporter.)

10 A  I don't know.

11 Q  So it's clear, you did not come to know Mr. Loholt because

12   of any type of involvement that you had with the LDS church

13   at the time; is that correct?

14 A  That's correct.

15 Q  He simply was a neighbor living in the basement of

16   Dr. Allenbach's house; is that right?

17 A  That's right.

18 Q  And he never at any time that he was abusing you made any

19   claims concerning either his membership or affiliation or

20   anything to do with the LDS church; is that correct?

21 A  I don't know.

22 Q  I have no other questions.  Thank you very much.

23 A  Thank you, Mr. Frey.

24                  THE VIDEOGRAPHER:  This concludes the

25   deposition of Robert Kelly.  The time now is approximately

Exhibit____Page 28

Byers & Anderson, Inc.
Court Reporters & Video

Page 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

KENNETH FLEMING and JOHN DOE,                    )
                                                 )
                          Plaintiffs,            )
                                                 ) No.
             vs.                                 ) C04-2338RSM
                                                 )
THE CORPORATION OF THE PRESIDENT OF THE CHURCH   )
OF JESUS CHRIST OF LATTER-DAY SAINTS, a Utah     )
corporation sole, a/k/a the "MORMON CHURCH," LDS )
SOCIAL SERVICES a/k/a LDS FAMILY SERVICES, a Utah)
corporation,                                     )
                                                 )
                          Defendants.            )

VIDEOTAPED DEPOSITION OF DOROTHY L. KELLY
March 2, 2005
Seattle, Washington

BYERS & ANDERSON, INC. - COURT REPORTERS & VIDEO
2208 North 30th Street              One Union Square
     Suite 202                      600 University Street
Tacoma, WA 98403-3360                    Suite 2300
   (253) 627-6401                  Seattle, WA 98101-4128
 Fax: (253) 383-4884                   (206) 340-1316
                     (800) 649-2034
            scheduling@byersanderson.com

Dorothy L. Kelly
3/2/05

Exhibit_____Page 29

96259d00-8faa-11d9-a1fc-8450c3937918

Byers & Anderson, Inc.
Court Reporters & Video

Page 10

1                    THE WITNESS:  Jack LaHolt was present.

2                    MR. FREY:  Okay.  Thank you.

3   Q   (By Mr. Kosnoff)  And when you say they were playing in the

4       field, would that have been a field on the Allenbach

5       property?

6   A   On the Allenbach property.

7   Q   Was the Allenbach property ever referred to as "the

8       Allenbach compound"?

9                    MR. FREY:  Object to the form of the

10      question.  You can answer.

11  Q   (By Mr. Kosnoff)  Have you ever heard that term used?

12  A   Yes, I have.

13  Q   Did you ever use that term in referring to the Allenbach

14      property?

15  A   Yes, I did.

16  Q   Now, you said that the boys, the Allenbach boys and your

17      sons, were playing in a field and Jack LaHolt was there?

18  A   Mm-hm. (Witness answers affirmatively.)

19  Q   Did you witness this or did you learn about it later?

20  A   I learned about it --

21  Q   Who did you learn --

22  A   -- right after it happened.

23  Q   Okay.  How did you learn about it, and what did you learn

24      occurred in that field?

25  A   Jimmy and Bob and Tom come running down to the house --

Dorothy L. Kelly
3/2/05

Byers & Anderson, Inc.
Court Reporters & Video

Page 19

```
 1        it up on the map last night so I'd be sure and be here on
 2        time.
 3    Q   Did you talk about what -- did he talk to you about the
 4        questions he was going to ask you?
 5    A   No.
 6    Q   So all you talked about was finding the building for 15
 7        minutes in there?
 8    A   No.
 9    Q   What else did you talk about?
10    A   Oh, I believe we were waiting for this room to get set up,
11        and it was taking long.  They were going to do it in the
12        other room, but then they decided to move to the big room.
13    Q   Mrs. Kelly, I was standing out in the hall looking through
14        the window, and you were talking with Mr. Kosnoff for about
15        15 minutes.  Are those the only two things you can remember
16        that you talked about?
17    A   I told you they were casual remarks.
18    Q   And there was no mention at all of anything to do with this
19        deposition or your testimony in this deposition or what you
20        knew or didn't know or the type of questions he was going to
21        ask you, anything of that nature?
22    A   I told you before on the phone that I had not discussed this
23        case with anybody, and I'd prefer to leave it that way.
24    Q   I appreciate that.  But my question to you was, I'm trying
25        to get a sense of what you talked about in there for -- by
```

Dorothy L. Kelly
3/2/05

Byers & Anderson, Inc.
Court Reporters & Video

Page 23

```
 1   A   I don't recall.

 2   Q   You don't recall.  You could have, but you don't remember;

 3       is that what you're saying?

 4   A   More or less.

 5   Q   Okay.  Now, in addition to possibly have spoken with Linda

 6       Walker, did you talk with Kenny Fleming?

 7   A   Yes, I did.

 8   Q   Okay.  When did you first talk to Kenny Fleming about this?

 9   A   Oh, I believe it was about a year ago.

10   Q   Okay.  And --

11   A   He called my son first.

12   Q   Okay.  Which son did he call first?

13   A   Tom.

14   Q   Okay.  So he called Tom first.  And did Tom come and tell

15       you that Kenny had contacted him?

16   A   No.  I believe Kenny called me.  Tom called him back and

17       said it would be all right.  He -- Tom had asked me if I

18       would talk to Kenny.

19   Q   All right.  By the way, was Tom the one who was at your home

20       when I called and answered the phone?  Was that one of your

21       sons?

22   A   Could have been my grandson.

23   Q   Okay.  You remember when I did call, there was a --

24   A   Mm-hm.

25   Q   -- the second time, a gentleman answered the phone?
```

Dorothy L. Kelly
3/2/05

96259d00-8faa-11d9-a1fc-8450c3937918

Byers & Anderson, Inc.
Court Reporters & Video

Page 33

1  Q  Okay.  Did you ever speak to Jack LaHolt about this
2     incident?

3  A  No.

4  Q  Okay.  Did Jack LaHolt continue to work at Dr. Allenbach's
5     after you went over and spoke with Dr. Allenbach about this
6     incident?

7  A  I saw him there occasionally.

8  Q  Okay.  Did you ever go back and talk to Dr. Allenbach about
9     it?

10 A  No.  I assumed that he had taken care of it.

11 Q  Okay.  When this inc- -- when you were told of this incident
12    by the children, you properly thought this was a pretty
13    outrageous and terrible thing that --

14 A  Yes, I did.

15 Q  -- had happened?

16    Okay.  Did you ever talk to any of the authorities, go
17    to the police and report this or go to any other social
18    agency and said, "Hey, this guy is down here masturbating --

19 A  No.

20 Q  -- in front of kids"?

21 A  Back in those days we -- things like that were different.

22 Q  Okay.

23 A  You went to the head of the source.  I knew Dr. Allenbach
24    was very high in the church.  Jack was his employee.  And I
25    figured Dr. Allenbach, being a bishop or a high priest,

Dorothy L. Kelly
3/2/05

Exhibit____Page 33

Byers & Anderson, Inc.
Court Reporters & Video

Page 34

1     would -- I took him at his word that he would take care of
2     it.
3   Q   Now, you don't know --
4   A   You didn't go --
5   Q   Excuse me.  Go ahead.  I'm sorry.
6   A   You didn't go to police with things like that in those days.
7   Q   Okay.  And you didn't expect Dr. Allenbach to go to the
8       police either, did you?
9   A   I didn't know what he would do.  I had no idea.
10  Q   Right.  But you didn't think you had to go to the police or
11      should go to the police --
12  A   No.
13  Q   -- correct?
14  A   Never entered my mind.  I didn't know what the police could
15      do.
16  Q   Okay.  Now, let me ask you this:  Do you know at this time
17      when this incident occurred, were you aware as to whether or
18      not Jack LaHolt was living in the Allenbach house?
19  A   Yes.  He lived in the mother-in-law apartment.
20  Q   Okay.  Was that physically attached to the main home?
21  A   It was underneath the -- they had a two-story and a partial
22      attic.  And he lived -- well, his was situated right below
23      Herman and Veloy's bedroom.
24  Q   Okay.  And the -- some of the boys slept down there, didn't
25      they, with him?

Dorothy L. Kelly
3/2/05

96259d00-8faa-11d9-a1fc-8450c3937918

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

KENNETH FLEMING and JOHN DOE,　)
　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs,　　　　)
　　　　　　　　　　　　　　　　)
　　　　　vs.　　　　　　　　　　) No. C04-2338RSM
　　　　　　　　　　　　　　　　)
THE CORPORATION OF THE　　　　　)
PRESIDENT OF THE CHURCH OF　　　)
JESUS CHRIST OF LATTER-DAY　　　)
SAINTS, a Utah corporation　　　)
sole, a/k/a the "MORMON　　　　　)
CHURCH," LDS SOCIAL SERVICES,　 )
a/k/a LDS FAMILY SERVICES,　　　)
a Utah corporation,　　　　　　　)
　　　　　　　　　　　　　　　　)
　　　　　　　Defendants.　　　　)

VIDEOTAPED DEPOSITION OF JACK A. ONEFREY

January 27, 2006

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square　　　2208 North 30th Street, Suite 202
600 University St.　　Tacoma, WA 98403
Suite 2300　　　　　　(253) 627-6401
Seattle, WA 98101　　 (253) 383-4884 Fax
(206) 340-1316　　　　scheduling@byersanderson.com
(800) 649-2034　　　　www.byersanderson.com

Serving Washington's Legal Community Since 1980

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 86

1        church?

2                         MR. WOLFE:  We're going to assert a

3        privilege --

4                         THE WITNESS:  No.

5                         MR. WOLFE:  Excuse me.  We're going

6        to assert a privilege as to communication relating to

7        the disciplinary court.

8   Q    (By Mr. Kosnoff)  When you met Dr. Allenbach for the

9        first time, he was teaching this investigator class.

10       Did your relationship change at that time?  Did you

11       become friends?  Did you go to work for him?  What

12       was the -- how did the nature of your relationship

13       change, if any?

14  A    Just friends.

15  Q    Okay.  What were the circumstances that led to you

16       moving to -- to the Allenbach compound?

17  A    Compound?

18  Q    You were -- was Dr. Allenbach living on a house on a

19       property on --

20  A    Yeah, it's his home.

21  Q    It's his home?

22  A    Yeah.

23  Q    Okay.  This was an acreage?

24  A    Yes.

25  Q    Okay.  And there were other buildings besides his home

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

1     on the property?

2  A  Not at that time.

3  Q  Not at that time.  There was just his home?

4  A  Yeah.

5  Q  Okay.  Was it a large home?

6  A  Yes.

7  Q  Did it have an apartment or --

8  A  Yeah.

9  Q  -- attached to it?  And did you move into that

10    apartment?

11  A  Yes.

12  Q  How did that come about that you came to live in that

13    apartment attached to the Allenbachs' home?

14  A  Well, I -- I just told him my parents were taking the

15    trailer back because they wanted to move it to

16    California.  So I told him I was going to be look --

17    going to be moving.  And his apartment was empty at

18    the time, so I rented that from him.

19  Q  Okay.  And did you come to know the Allenbach children

20    at that time?

21  A  I knew them before that time.

22  Q  You knew them.  From church?

23  A  Yeah.

24  Q  After you were baptized into the church, you began

25    attending the Kent 2nd Ward?

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 90

1    Q   On his property?

2    A   Yeah.   That's all I did.

3    Q   Did Dr. Allenbach talk with you about the plans he had

4        for building other structures on the property?

5    A   No.

6    Q   Did he at some point later?

7    A   Yes.

8    Q   Okay.   And what were his plans?

9    A   I'm not sure what his plans were.   Just that on a

10       piece of property, I tore down a building and I

11       reassembled it out there.

12   Q   So one of the things you did -- was that one of the

13       first things you did, was to tear down a building and

14       reassemble it on his property?

15   A   Yes.

16   Q   Okay.   Was that before or after you were living there?

17   A   After.

18   Q   How long did you live at the Allenbach --

19   A   About three and a half years.

20   Q   Now, eventually the Allenbach property had two more

21       duplex structures on it, didn't it?

22   A   Yes.   He --

23   Q   Did you help build those?

24   A   No.

25   Q   Okay.   Were those being built during the time that you

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 91

1      lived there?

2  A   No.

3  Q   Came after you left?

4  A   Yes.

5  Q   What were the other structures that were eventually

6      built on the property?

7  A   Who?

8  Q   The other structures?

9  A   What about them?

10  Q   What were they?

11  A   There were like little apartments for his mother and

12     his aunt.

13  Q   Did Mormon missionaries sometimes live in those

14     structures?

15  A   After -- no.  No, they didn't.

16  Q   They didn't?

17  A   No.

18  Q   There were no Mormon missionaries that stayed in those

19     apartments?

20  A   They stayed where I stayed.

21  Q   Where did -- which was where?

22  A   The main house underneath the big bedroom.

23  Q   And these would be missionaries that would come into

24     the area to serve their mission, and that's where they

25     would stay?

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 94

1    Q    Did you ever participate in any --

2    A    No.

3    Q    -- baseball or softball games there?

4    A    No.

5    Q    Do you know whether any church league games took on --

6         or took place there?

7    A    I don't know.  He was involved with community baseball

8         too, so...

9    Q    So you have no knowledge whether or not there were any

10        church --

11   A    No.

12   Q    -- league baseball games played there?

13   A    No.

14   Q    What kinds of church activities took place at the

15        Allenbach --

16   A    I didn't hear you.

17   Q    What kind of church-related activities took place at

18        the Allenbach property?

19   A    I don't know of any.

20   Q    Were there prayer meetings?

21   A    No.

22   Q    Were there ever meetings of any elders?

23   A    There wasn't any church meetings that I know of.

24   Q    Okay.  But there may have been meetings that you were

25        not aware of?

Jack A. Onefrey
January 27, 2006

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 96

1    Q   Did you molest Rick Allenbach?

2    A   Yes.

3    Q   Jim Allenbach?

4    A   Yes.  They would be the first.

5    Q   They were the first ones?

6    A   Yeah.

7    Q   Do you know whether -- which one of those brothers you

8        molested first?

9    A   No.

10   Q   Did the molestation take place in your apartment?  I'm

11       referring to the apartment at the Allenbach property.

12   A   Yeah.  I'm -- I'm not sure.

13   Q   Did you -- did you molest Bob Kelly?

14   A   No.

15   Q   You never molested Bob Kelly?

16   A   No.

17   Q   Did you molest Tom Kelly?

18   A   No.

19   Q   Did you ever masturbate in front of boys in a field at

20       the Allenbach home in approximately 1970 or '71?

21   A   No.

22   Q   Did Dr. Allenbach ever speak to you about allegations

23       that you had molested a child?

24   A   I don't remember.

25   Q   You don't remember --

Jack A. Onefrey
January 27, 2006

Exhibit_____Page_ 41

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 138

1    Q   Did you ever tell Chelsey Wieder that you had had sex

2        with more than 250 children in your life?

3    A   No.

4    Q   Never made that statement?

5    A   No.

6    Q   Never said anything like that to her?

7    A   No.

8    Q   Did you ever go to LDS Social Services for sexual

9        deviancy counseling or treatment?

10   A   Yes.

11   Q   Okay.  About what time period?

12   A   Probably -- I'm really not sure on that.

13   Q   But it was while you were in the Kent 2nd Ward in the

14       1970s?

15   A   Yes.

16   Q   Okay.  And you were referred there by a bishop?

17                    MR. WOLFE:  We're going to object,

18       assert privilege.

19   Q   (By Mr. Kosnoff)  You were referred to or sent to LDS

20       Social Services by Bishop Borland, isn't that correct?

21                    MR. WOLFE:  Assert privilege.

22   Q   (By Mr. Kosnoff)  When you went to LDS Social Services,

23       you told them about your -- you were truthful about

24       your sexual contact with children, weren't you?

25   A   Yes.

Jack A. Onefrey
January 27, 2006

Exhibit____Page 42

b2cbc3c6-879a-4364-b6a5-9911772d6961

Byers & Anderson
Court Reporters & Video

Page 146

1       we're trying to establish.

2                       MR. NASH:  Well, then we'll wait and

3       reserve the issue.

4    Q   (By Mr. Kosnoff)  What was the -- what was the time

5       period that you went to -- the one year that you were

6       going to LDS Social Services?

7    A   I can't remember when that was.

8                       (Mr. Frey enters.)

9

10   Q   (By Mr. Kosnoff)  Was it -- how soon after you were

11      removed as scoutmast- -- assistant scoutmaster in

12      February of 1973?

13   A   I really can't remember the -- the date.

14   Q   But was it soon after that?

15   A   I have two recollections, and I really don't know.

16   Q   Okay.  Let's talk about the first recollection you

17      have.  What is the first recollection you have?

18   A   That I might have gone right after Bishop Borland.

19   Q   And the second recollection?

20   A   It might have been after that sometime somewhere.

21   Q   Do you think there may have been more than two times

22      you went to LDS Social Services, that is, two separate

23      periods of counseling?

24   A   I only went one period, but I don't know where in

25      the...

Jack A. Onefrey
January 27, 2006

Exhibit____Page 43

b2cbc3c6-879a-4364-b6a5-9911772d6961