1                    UNITED STATES DISTRICT COURT
                  WESTERN DISTRICT OF WASHINGTON
2                            IN SEATTLE

3       ------------------------------------------------------------

4    ROBERT KELLY,                    )
                                      )
5               Plaintiff,            )   No. C 04-2338RSM
                                      )
6        v.                           )
                                      )
7    THE CORPORATION OF THE PRESIDENT )
     OF THE CHURCH OF JESUS CHRIST    )
8    OF LATTER-DAY SAINTS             )
                                      )
9               Defendant.           )
                                      )
10      ------------------------------------------------------------

11                       CLOSING ARGUMENTS

12

13      ------------------------------------------------------------

14           BEFORE THE HONORABLE RICARDO S. MARTINEZ

15

16                       October 10, 2006

17

18   APPEARANCES:

19   For the Plaintiff:      Michael T. Pfau
                             Tim Kosnoff
20                                and
                             Michael Rosenberger
21                           Attorneys at Law

22   For the Defendant:      Charles Gordon
                                  and
23                           Jeffrey Tilden
                             Attorneys at Law

24

25

 1          MR. PFAU:  Thank you, your Honor.  Counsel.

 2   Ladies and gentlemen.

 3          Where were you when Jack Kennedy was shot and

 4   assassinated?  It is a phrase that has almost become a

 5   cliche in our society.  For those of us or you that were not

 6   born in 1963 or were too young to remember that date, I

 7   think 9/11 serves the same analogy.  Why is that important

 8   or what relevance does it have to this case?  One of the

 9   fundamental issues in this case is when was Bobby Kelly

10   sexually abused by Jack Loholt.

11          The strongest testimony is from Dorothy Kelly.

12   And when asked, both on direct examination and

13   cross-examination, why it is that she, without question,

14   believes that it was the summer of 1972, amongst all the

15   other things she could remember, she said because it was

16   traumatic.

17          She said two things, for a variety of reason I

18   am going to go into.  Primarily she said, you remember

19   things surrounding trauma.  She said, I remember it was in

20   the summer of '72, and importantly I remember after talking

21   with Dr. Allenbach that he was gone in a matter of months.

22   How many months she wasn't sure, but of these issues she was

23   sure.

24          Ladies and gentlemen, I submit to you that all

25   the competent and most relevant testimony in this case

1    established conclusively that Robert Kelly was sexually

2    abused in the summer of 1972.

3            If you look at the exhibit in front of you, her

4    belief or her reflection that it was '72 is also based on

5    facts.

6            Very importantly, she said that she recalls her

7    daughter -- she recalls it was the summer of '72s because

8    her daughter was divorced in 1971 and moved back to

9    Washington from California.  Another, I won't call it a

10   tragedy, but something that would help someone remember

11   when.  And she remembered it was in the spring of that year

12   that her daughter who had been staying with her after she

13   left her husband, after she moved back from California, left

14   to buy her own home which she shared with her daughter --

15   her daughter's daughter in Black Diamond.  And she recalls

16   she wasn't in the home, the Kelly family home in Kent,

17   because after Bobby -- after Loholt masturbated in front of

18   the boys in the field she was concerned.  And a number of

19   the relatives came back for a family meeting.  And she was

20   asked about that specifically by both lawyers for both

21   sides.  And she said, I am certain it was after she moved

22   out because she came back to the home, wasn't living there.

23           That is one piece of evidence in a string of

24   evidence, ladies and gentlemen.  She recalls Bobby Kelly

25   developing serious behavioral problems in the fifth grade.

1    Again, a very important fact.

2            Bobby Kelly doesn't remember exactly when he

3    developed these problems but his mom does.  And it is not

4    pie in the sky.  There was an event that followed the

5    behavioral problems.  And he was transferred from public to

6    private school.  A major event.  And he was transferred from

7    public to private school not because of his grades.  Counsel

8    pointed out, well, geez, there is not that much difference

9    in his grades, he had Ds, Cs and Bs throughout.  That didn't

10   change.  It was his behavioral problems.

11           And remember the testimony, ladies and

12   gentlemen.  You heard snippets of what those behavioral

13   problems were that caused the concern that led to a transfer

14   to a private school, Saint James Catholic School, which they

15   thought would be more disciplined for their son.

16           And these weren't little things, ladies and

17   gentlemen.  There was testimony that Robert Kelly in the

18   fifth grade, which would have been after the summer of 1972,

19   plugged up the toilets, turned on the water and flooded the

20   school.  There was testimony that he stood up and he punched

21   the tiles and he broke the tiles.  There was testimony that

22   he became more violent and he was involved in fights.

23           As an aside --  I am deviating from my outline

24   here but I don't want to forget about this.  It has to do

25   with Dr. Wise's testimony that all personalities are formed

1    within the first three to five years, and therefore it is

2    unlikely that the child would be affected by the rape.

3            Jimmy Allenbach was also transferred to Saint

4    James because of behavioral problems.  He is one year --

5    they were one year apart.  What is the likelihood that both

6    these kids developed behavioral problems at or around the

7    fifth grade and are transferred to Saint James?  Keep that

8    in mind, ladies and gentlemen.  Both kids were abused

9    together, were transferred because of behavioral problems.

10            That is not the only testimony.  The testimony

11    in the depositions, and was repeated at trial, from Dorothy

12    Kelly, he was approximately nine years old when the abuse

13    occurred.  Looking back over the course of 30 years, mom

14    testified that he was approximately nine years old.

15            Robert Kelly testified in deposition, and he

16    reported that he was nine to twelve years old.  Same time

17    period.

18            Interestingly, nine years old places Robert

19    Kelly, in part, in the summer of 1972.  I don't think it is

20    that important, because I think when you are talking about

21    approximate ages, nine, ten, etcetera -- those were

22    approximate ages.  But the facts that allow witnesses to

23    place people and events in a time frame are very important.

24    But he was nine years old in the summer of 1972.

25            Why is it the summer -- or summer or fall --

1    All of the testimony establishes that it was warm whether,

2    ladies and gentlemen.  Remember, Loholt lured the children

3    into the apartment with root beer and firecrackers.

4    Summertime activities, summertime things.

5            You will recall that when Dorothy Kelly and her

6    husband went to speak with Dr. Allenbach he was lying in bed

7    with a broken leg.  He had broken his leg playing baseball,

8    a summer or fall activity in this state.

9            Dorothy Kelly testified that Loholt moved out

10   within months of her complaining to Dr. Allenbach about the

11   abuse.  This makes sense, ladies and gentlemen.  He moved

12   out in January of 1973.  If the complaint took place in the

13   summer or the fall, Bobby Kelly is approximately nine years

14   old, nine or ten, he is between the fourth and fifth grade,

15   it is in the summer, and Loholt is asked to leave and does

16   move within months.

17           Now the term "months" has been used to describe

18   the duration of the abuse.  No one here --  I think

19   Mr. Gordon in opening said it was two months.  But there is

20   no testimony it was two months.  I think Rochelle

21   testified -- Rochelle testified that Bobby told her it was

22   six to eight months.  There has been testimony that it might

23   have been four months.  That is reasonable.  You are talking

24   about looking back over time and trying to figure out when

25   something happened.

1              The medical records indicate that Robert Kelly

2     was nine years old.

3              So what's left of the argument that it was

4     before the summer of 1972, despite all that proof from the

5     witnesses?  Very very little.

6              At one point Robert Kelly told a counselor that

7     it was age six.  He went in, he wasn't dealing with these

8     issues, and he told him it was age six.  It is a single

9     reference contradicted by a second reference in counseling.

10    And it is not even possible because Loholt wasn't living

11    there at age six.

12             Ladies and gentlemen, all of the credible

13    evidence suggests it is 1972; it is the summer of 1972.

14             You are instructed on the burden of proof.  The

15    burden is on behalf of the plaintiff to prove these facts to

16    you, to prove the case to you.

17             Remember this isn't a criminal case.  It is not

18    beyond a reasonable doubt.  Our burden of proof doesn't

19    suggest it has to be 1972 and there could be no possible

20    reasonable doubt.  All we have to prove is that it is more

21    probably true than not that it happened in the summer of

22    1972.  I think that is a critical fact.

23             I think the other critical fact or cluster or

24    constellation of facts in this case has to do with Bishop

25    Borland's testimony, ladies and gentlemen.

1          Before we talk about Bishop Borland's testimony,

2    which is fascinating when you look at the facts that

3    surround it, I want you to look at a clip of then Richard

4    Pettit, eventually Bishop Pettit's testimony about --

5          MR. TILDEN:  Your Honor, we would object to a

6    replay of the evidence.  The evidence has already in.

7    (At this time the jury entered the courtroom.)

8          MR. PFAU:  No different, your Honor, than showing

9    a page of the deposition.

10          MR. TILDEN:  I agree with that.

11          THE COURT:  I agree with that as well.  The

12    objection will be sustained.

13          MR. PFAU:  Let me summarize what he said.  And I

14    hope you recall.  Do you remember, first of all, Bishop

15    Borland said, and his testimony changed as he went on, he

16    said the dad was distraught, Pettit was distraught when he

17    came to him.  Pettit testified --  Richard Pettit's

18    testimony was, I was shocked at what my son told me.  I felt

19    sorry for my son because of what he told me.  I went to the

20    Bishop because I wanted concrete action.  I wanted the

21    bishop to do something about Loholt.

22          It is against that backdrop, ladies and

23    gentlemen, that Bishop Borland comes to you and he

24    testifies --  Why don't we turn to Exhibit 3 -- or

25    Exhibit 2?  Recall this testimony.

1          Before we do that, step back.  Remember, we also

2     heard from the son, Scott Pettit.  Scott Pettit came.  And

3     what did Scott Pettit testify about what happened?  Scott

4     Pettit testified that he slept over at the Allenbachs'.  He

5     was a friend.  He was older, 15, 16.  He slept over.  He was

6     a friend of Brent Allenbach.  During the night Loholt came

7     into his sleeping bag and repeatedly tried to grab at his

8     penis and his testicles.  He fought him off and he rolled

9     over, and Loholt was back again.  He fought him off and

10    rolled over, and Loholt was back again.  It went on all

11    night.  He was sexually assaulted, ladies and gentlemen.

12          He went to his dad.  He testified he went to his

13    dad.  The testimony was that he was crying and he was upset.

14          Enter Bishop Borland.  And recall there were

15    actually very few surprises.  We take depositions.  We know

16    what witnesses are going to say.  This was a surprise from

17    the perspective of our case.  Not an unpleasant surprise

18    because the testimony, ladies and gentlemen, is so

19    unbelievable as to be preposterous.

20          What he said is that he had a son and a father

21    come to him, and he said it was a special meeting.  And I

22    asked a lot of questions.  And maybe it didn't seem like

23    there was a rhyme or reason to them.  But there was.  I

24    asked Bishop Borland whether it was a special meeting or

25    just something in the congregation.  Did you catch him at

1    the congregation to talk to him?  No.  He said it was a

2    special meeting set up because dad, Richard Pettit, wanted

3    to talk to him.  And then he said --  I asked the question,

4    what did he talk to you about.  Well, there was some

5    inadvertent touching.

6            And then, ladies and gentlemen, the target

7    begins to move.  What do you mean by inadvertent touching?

8    Of a sexual nature?  No, no, no, of course not, just horsing

9    around like we used to do.

10           Ladies and gentlemen, have you ever seen a child

11   spin a tale?  It starts with an iota of truth and it

12   changes.  And it changes subtilely with each question.  I

13   submit that is what was happening.

14           Okay.  It was inadvertent touching.  What does

15   that mean?  Well, I'm not exactly sure what that means.

16   Well what did he say.  He said he had lost confidence in his

17   scout master.

18           So one student loses confidence in a scout

19   master because of some horsing around and he is removed?  He

20   was removed as the only assistant scout master in this

21   troop.  And this becomes more incredible with each question

22   that is asked.

23           He was removed because there was some

24   inadvertent touching?  And he said, yeah, he was worried, he

25   had lost confidence, was worried about getting his Eagle

1    Scout.  Ladies and gentlemen, that is unbelievable

2    testimony.

3         MR. TILDEN:  Your Honor, that is a comment on

4    credibility and we would object.

5         THE COURT:  The objection is overruled.  This is

6    argument.

7         MR. PFAU:  Next, well, did you tell Ken Keller,

8    the scout master?  And remember the questions I asked of

9    Bishop Borland.  I said, Bishop Borland, were you friends

10   with Ken Keller?  Yes, I was.  I was personal friends with

11   Ken Keller.  Bishop Borland, what is the responsibility of

12   the bishop vis-a-vis scouting?  The bishop oversees

13   scouting.

14        So he has now testified, that although dad was

15   distraught, although the child was there, although the child

16   was crying, although the child has testified that he was

17   sexually assaulted, that wasn't mentioned at this meeting

18   that was set up specially; and that he released the scout

19   master because one scout in an entire troop had lost

20   confidence in him because he was horsing around, and then I

21   never told the scout master.

22        Imagine that, ladies and gentlemen.  Imagine 20,

23   30, 40 kids.  You have a scout master, you have an assistant

24   scout master, and one day the scout master doesn't show up?

25   And no one has any questions?

1          But remember Ken Keller's testimony.  You have

2     to weave these things together.  What did he say?  He said,

3     no one talked to me about it, and it was none of my

4     business.

5          Think about that, ladies and gentlemen.  If

6     there is a big big issue it may not be part of your

7     business.  It may be confidential.  And what else did he

8     say?  I didn't --  He connected the not talking to the

9     bishop.  He has lost his assistant scout master.  What were

10    they doing on hikes, at merit badges, at meetings.  It begs

11    the question.

12         And then he said, yeah, Jack Loholt stopped

13    coming to church for a while.  I didn't see him during that

14    time period.  And he was going through some sort of church

15    discipline, some sort of disciplinary action.

16         Ladies and gentlemen, one plus one equals two.

17    Bishop Borland removed Scott -- removed Loholt from scouting

18    because he had sexually assaulted a child.  And there was a

19    report of that sexual assault.

20         And what you are seeing here, ladies and

21    gentlemen, is none other than full blown clergy cover up

22    years after it happened.  All the facts point to it.

23         Vicki, can you turn to Exhibit 4?  There is

24    more, ladies and gentlemen.  Bishop Borland testified that

25    he removed Loholt within a week or so of this complaint,

1    immediately.  He gets a complaint of inadvertent touching or

2    horsing around that doesn't have anything to do with

3    sexuality, but I remove him.  Rather draconian actions.  But

4    suppose that was true.  I think they didn't think we would

5    look and check the details.

6           Look at the entry on February 6th --  I will

7    call out the entry for February 6th, 1972.  Jack Loholt is

8    released as the scout master.  Assume we accept that he was

9    released as scout master because one scout lost confidence

10   in him for horsing around.  The same day he was released as

11   the decon's quorum advisor.  We spent a lot of time on

12   definitions, because definitions are important.  The decon's

13   quorum advisor was the youth pastor to the 12 to 14 year

14   olds.  Scott Pettit is 15.

15          If he is truly being removed from scouting, if

16   you can believe that, because of one scout losing confidence

17   in him because he was horsing around, why is he being

18   removed as the Deacon's Quorum advisor?  In essence, the

19   youth pastor to the 12 to 14 year olds.

20          Ladies and gentlemen, he is being removed from

21   these positions because he is a danger to children.  They

22   knew it and they were trying to do what they could to take

23   band-aid or immediate action.

24          And then what does he do later that month?  If

25   you would look at 2/23.  He is reinstated on the scout

1    committee.

2         Do you remember the questions, ladies and

3    gentlemen, about the scout committee?  Bishop Borland went

4    to great lengths to talk about the scout committee.  It is

5    not hands on.  It doesn't have anything to do with kids.  It

6    is distant.  They don't go on hikes, etcetera, etcetera,

7    etcetera.

8         What they did in the span of a week or so of

9    receiving this complaint was remove him from all his

10   callings dealing with children and put him in a position

11   where he was still active but not dealing with children.

12   Why?  Because he is a danger to children.

13        Ladies and gentlemen, why would Bishop Borland

14   come in here?  First of all, the circumstances under --  I

15   don't know if this was clear or not.  In the deposition they

16   took the position that that communication was confidential.

17   You can't ask about that conversation.  Lo and behold by the

18   time we get to trial they waive the confidentiality.  Waive

19   is a fancy legal term for it is no longer confidence

20   anymore.

21        If this was so innocuous, if this was such a

22   small event, and it was simply removing a scout master, why

23   was it confidential?  Why did you waive it?  Why did he tell

24   this story when he came into court?

25        For two reasons, ladies and gentlemen.  One

1  primarily, he is a mandatory reporter under the law.  In

2  1971, as clergy, Bishop Borland had a mandatory duty to

3  report.  Not may but shall.  If he suspected child abuse he

4  had a mandatory duty to call the police or call CPS.  There

5  is no getting around it in this case.

6           So he tells you, oh, it must have been --

7  despite all the facts that we just set forth, it was

8  something else, it was inadvertent touching, but we removed

9  him from all youth activities, etcetera, etcetera.  Ladies

10  and gentlemen, it doesn't even pass the smell test.

11           The question also becomes of Bishop Borland --

12  Well, let me change gears here.  Suppose, ladies and

13  gentlemen, you are not as cynical as I am.  Suppose you

14  accept Bishop Borland's testimony at face value.  And that

15  is okay.  It is hard, for example, to believe that police

16  officers beat people in prison.  It is hard to believe that

17  doctors commit medical malpractice.  There is a reason it is

18  hard to believe that.  Because in society we have to trust

19  these people to do what's right.  You tend to trust clergy.

20           Let's assume, for argument sake, that Mr. Pfau

21  is a cynic, I'm not, maybe I believe this story.  Here is

22  the beauty of this from our perspective, ladies and

23  gentlemen.  If Bishop Borland is testifying about what

24  really happened he was grossly negligent in how he reacted

25  to what were serious, serious red flags.  A dad who was

1    distraught, a child is talking about being touched in some

2    fashion.  This is in a light most favorable to Bishop

3    Borland.  No follow up investigation.  No further

4    questioning.  Nothing.

5         What could Bishop Borland have done?  Why don't

6    we turn to Tab 5?  There a lot of things he could have done.

7    And there are a lot of things he should have done.  He

8    should have called the police.  He should have called CPS.

9    He could have called his stake president.

10        Remember his testimony about that?  I could have

11   got on the phone to call my superior.  I am trained to call

12   my superior.  He could have alerted the Boy Scout Council.

13   He could talked to Ken Keller about the reasons he was

14   removing Loholt.  He could have alerted the congregation.

15   He could have alerted the parents.  He could have alerted

16   Dr. Allenbach.  In the winter of 1971 and the early months

17   of 1972 he could have conducted a thorough investigation.

18        Part of plaintiff's theory of the case is that

19   he failed to warn and he failed to investigate.  He failed

20   to report per his requirements, but he failed to

21   investigate.  There was no investigation.

22        He could have sent Loholt for sexual deviancy

23   treatment.  He could have, importantly, identified other

24   victims, ladies and gentlemen.  He could have asked Scott

25   Pettit some questions, who was with you.  Brent Allenbach

1    and Terry Clark.  That takes him right to 152nd Street.

2              And he would have realized Loholt, if he didn't

3    know it already, was living with a Mormon family with a lot

4    of kids that was in rural Kent right next to a house owned

5    by a Catholic family with a lot of kids.

6              All of these things would have resulted in Jack

7    Loholt either being sent away for treatment, removed from

8    children, removed from the congregation, removed from the

9    Allenbach's house, monitored, investigated, reprimanded, all

10   of it, ladies and gentlemen.

11             Remember the testimony about, if I would have

12   known I would have taken a brick hammer to Loholt.  What he

13   was saying to you is, I could have done something.  It was

14   in my power.  It was my power as bishop to effectuate what I

15   needed to do to protect kids, including Robert Kelly.

16             This brings us to the plaintiff's claims.  And

17   they are threefold, ladies and gentlemen.  You are going to

18   get instructions.  And in these instructions it will talk

19   about the plaintiff's case, the defenses.  But there are

20   three theories, three claims, and three ways in which the

21   church was negligent.

22             First and foremost, in 1971 clergy were

23   mandatory reporters.  They had a duty to go to the police.

24   They had a duty to go to CPS.  They had a duty to get the

25   ball rolling.

1          Now, interesting, despite this claim of

2   confidentiality, Bishop Borland went to Loholt.   Remember

3   the testimony about confidentiality is not absolute.   He

4   went to Loholt.   According to Ken Keller Loholt was involved

5   in some church discipline.   He could have gone to the

6   police.

7          Had he gone to the police an investigation would

8   have ensued, they would have gotten involved, they would

9   have done what is proper, interview the family members,

10  interview Scott Pettit.

11         I assessed Scott Pettit's credibility.   He was

12  very credible.   He would have told the police what happened

13  to him.   And it was not inadvertent touching.   There was

14  nothing about his testimony to suggest it was horsing

15  around.   That is theory number one.

16         If you find for plaintiff on theory number one,

17  you have found the church negligent, and you will be

18  instructed to award the plaintiff damages.

19         Theory number two, failure to investigate,

20  failure to warn.   These are the things that the bishop could

21  have done because of his power within the ward, because of

22  his responsibilities and because of his duties.   The laundry

23  list I just went through.   Had he done those things, ladies

24  and gentlemen, change would have been effected, Robert Kelly

25  would not have been sexually abused.

1              The final theory of the case, which is

2    interesting, is that Herman Allenbach was an agent of the

3    church.  And you will be instructed on that.  And I will

4    talk more about that later.  But Herman Allenbach --  It is

5    interesting.  30 years later the church very much wants to

6    distance themselves from Herman Allenbach.  The facts speak

7    for themselves.  Herman Allenbach was a high priest.  Herman

8    Allenbach, more importantly, was the priest quorum advisory.

9    Not for a couple of years.  There are admitted facts he was

10   the priest quorum advisor from approximately 1969 to 1974.

11   During the entire period giving rise to these facts he was

12   the youth pastor.

13             Counsel suggests that he was a Sunday school

14   teacher.  It doesn't matter under an agency analysis.  It

15   was more than that.  The testimony has been from every

16   Mormon witness that Boy Scouts, the Priest and Deacon's

17   Quorum, the meetings on Sunday, and the Young Men's Mutual

18   Association are interwoven.  Ken Keller talked about that.

19             Herman Allenbach was the person at this ward in

20   charge of youth between the ages of 14 and 16 during the

21   entire relevant period.  He was their agent.

22             Loholt was the youth pastor involved with

23   children between the ages of 12 to 14.  Bishop Borland over

24   saw them both, and could do what he needed to do.

25             When Herman Allenbach learned twice, one when

1   his son testified, and you heard Jimmy Allenbach's

2   testimony, I told my dad about Loholt, and my sister, when I

3   was in the bathtub.  It is a red flag, Dr. Allenbach.  It is

4   a red flag that something is wrong with Loholt.

5           Fast forward to the summer of 1972.  A neighbor

6   comes and says Loholt is masturbating in front of the kids.

7   It is a red flag, Dr. Allenbach.  And Dr. Allenbach,

8   although I anticipate the defense is going to suggest this,

9   can't take his agency hat on and off.  For this reason,

10  whether or not the abuse or the events giving rise to notice

11  take place on church property, he learned about them.

12          And when he goes back as the agent of the

13  church, and as the youth pastor, he knows that his fellow

14  youth pastor is a danger to children.  He acted too slowly.

15  He didn't remove Loholt from his premise until the late

16  winter of 1972 or January of 1973.  And that liability is

17  imputed onto the church.  They controlled him, ladies and

18  gentlemen.

19          Those theories of the case, you don't have to

20  find all three, one, two or three add up to a verdict in the

21  plaintiff's favor.  The evidence is overwhelming that Bishop

22  Borland and Dr. Allenbach were negligent.  It is

23  overwhelming based on the story that was concocted here in

24  court, and what he didn't do and could have done, even if

25  you accept his facts.

1          I want to turn your attention now -- I want to

2     move from the liability case to the damage case.  And what I

3     mean by that is --  Why don't we turn to Tab 7, Vicki?  I

4     want to talk about Robert Kelly.  You have seen in this

5     trial, and we didn't attempt to shield it in any way, shape

6     or form, Robert Kelly, the good, the bad and the ugly.

7     There is good, there is bad and there is ugly.  I am going

8     to go into this.  But he is the plaintiff, and the evidence

9     that he is damaged, and profoundly damaged, is

10    uncontroverted.

11         Dr. Wise and Dr. Conte, I am going to talk about

12    their testimony and I am going to compare the two of them

13    momentarily.  They may disagree on what caused Robert's

14    damages but they agree completely on what his damages are.

15         If you take a look at the slide in front of you,

16    it summarizes some of Dr. Conte, Dr. Wise and what I will

17    call the lay fact witnesses, the girlfriends' and the

18    ex-wife's testimony.

19         I don't think anything sums up Robert Kelly

20    better than Dr. Conte's testimony that this is a stunted

21    adolescent.  He acts like an adolescent.  He does things

22    like an adolescent.  He makes decisions like an adolescent.

23    And it is also borne out by the testing.  Emotionally he is

24    a 12 year old.  With regard to understanding his damages, he

25    is like a 12 year old.

1          Ladies and gentlemen, he is a 44 year old man
2     living at his mother's house.  He has always lived at his
3     mother's house, but for a short period of time when he was
4     married.

5          Is that the be all and end all?  No.  Dr. Wise,
6     what do you think of that?  I think it is pretty odd.  Did
7     you follow up whether it was clinically significant?  No, I
8     didn't ask that question.  I didn't have enough time.  I
9     only had an hour or two.

10          What does he do when he is engaged in conflict?
11    He goes back home, ladies and gentlemen.

12          Let's talk about some of the other damages that
13    is borne out.  Dr. Conte says he is hiding out.  He has
14    anger management problems.  It is uncontroverted.

15          Jovine Umali described him as a Dr. Jekyll and
16    Mr. Hide.  She says he is a nice guy, I liked him.  And just
17    like that his temper explodes and he is unreasonable and he
18    is irrational.

19          Rachelle Cope talked about the same thing.  She
20    talked about the uncontrollable anger.  He was in anger
21    management therapy.  You have seen some of the records.  He
22    was evaluated because of his anger in a bitter, bitter
23    custody battle over the right to see his son.

24          That segues into another profound area of
25    damage.  Robert Kelly can't sustain a meaningful

1    relationship.  Lots of people have relationships broken off.

2    Not everyone marries everyone that they date.  But he has a

3    history.  Dr. Wise testified to it, Dr. Conte testified to

4    it, the ex-girlfriends and the ex-spouse testified to it, of

5    not being able to exist in a relationship.  He gets angry,

6    he gets jealous, there are intimacy issues.

7            What are the intimacy issues?  You heard from

8    Rachelle Cope.  She was the blond haired woman.  You heard

9    from Ms. Umali.  And they phrased it differently, but they

10   were talking about the same thing, ladies and gentlemen.

11   Physically he can't be intimate.  Emotionally he pushes

12   away.  Rachelle Cope talked about physically not being

13   intimate.  Ms. Umali was a little more up front.  She said

14   during the relationship he couldn't achieve an erection.

15           Let's think about that.  That was a relationship

16   in the early to mid '90s, ten years ago.  Robert was

17   healthy.  He was in his thirties.  He was a ski instructor.

18   He was a tennis coach.  There is no history of any organic

19   problems.  He was involved in what appeared to be a

20   committed -- with a committed and beautiful woman.  He

21   couldn't achieve an erection.

22           I will talk about some of the defenses.  But one

23   of the defenses I think is, well, geez, this guy is damaged

24   because his dad yelled at him, spanked him, and he was hit

25   by a golf club once.  Does anybody really think his

1    inability to have a sexual relationship is based on his dad

2    yelling at him on occasion and spanking him?  The cause and

3    the effect is obvious, ladies and gentlemen.

4              There are work failures.  Dr. Wise talked with

5    the work failures.

6              There are successes.  Robert Kelly is smart.  He

7    gets good grades.  His resume looks wonderful.  Remember

8    Ms. Umali?  I thought he was the total package.  He was good

9    looking.  He came from a good family.  We liked the same

10   things.  We had the same interests.  But when you peel away

11   the surface there is a damaged individual.

12             The same holds true for work.  Dr. Wise talked

13   about the work, talked about the problems with the work.

14   And it happens when he is faced with interpersonal

15   relationships.  He doesn't get along with bosses.  He

16   doesn't get along with teachers.  He has problems with the

17   students.

18             He suffers from depression and anxiety.

19   Dr. Wise talked about chronic low grade depression.  He

20   talked about anxiety.  He has been hospitalized, according

21   to Dr. Wise, who reviewed the records, for anxiety attacks.

22   He has been on medication for anxiety.

23             Now, the doctors that support this, they are not

24   talking in terms of formal diagnosis.  Dr. Conte even said,

25   diagnosis and symptoms are not the best way to figure out

1    what is wrong with this gentleman.

2              But think about that, ladies and gentlemen.

3    Think about what we have talked about.  Relationships, work,

4    family, hiding out, inability to sustain a job or

5    relationship.  This is the fabric which makes a happy and

6    contented life.  These are the things we rely on for

7    support.  These are the things we rely on for self-esteem.

8    Without these things we can't move forward in a positive

9    way.

10              Does that mean, ladies and gentlemen, that

11   everything about Robert Kelly is bad?  There is a danger in

12   that.  There is a danger in opening up your lives, for

13   jurors seeing bad things, seeing unpleasant things, seeing

14   things that maybe you are not happy about.

15              There is also -- Why don't we turn to 11?  This

16   is one of Robert's resumes.  It details some of the things

17   he has done over the past five years.  Quinalt Native

18   American Tribe, historical research and artifact

19   preservation.  Political consultant campaign manager for the

20   Auburn Citizens for Schools campaign in the school district.

21   Metropolitan Development Council, program director.

22   Administrator of the Enhanced Mentoring Program, a program

23   designed for disadvantaged, at risk Native American

24   students.  United Way of King County, Seattle, Washington,

25   1999 to 2000.  Professional Development Positional

1    Responsibilities.  Appointed by the Metropolitan King County

2    Council as a committee member to the Regional Governance

3    Council to analyze, review and decide the incorporation of a

4    municipality.  Central Del Le Raza, mentoring and tutoring

5    at risk minority children.  Central Area Youth Association,

6    mentoring and tutoring at risk minority children.

7    Legislative analysis, King County Council, initiated

8    professional internship.

9         I give you this, ladies and gentlemen, because

10    the human psyche, the human spirit, they are complex.

11    Unlike Dr. Wise, who testified about it being rocket

12    science, it is not.

13         There are good things about Robert.  Rachel

14    talked about the good things.  Jovine talked about the good

15    things.  You heard from Julie Ellis.  She is obviously a

16    very very angry woman.  She hates Robert.  Consider that

17    when you consider her testimony.

18         But the themes are all the same.  This is

19    somebody that tries hard.  This is somebody that looks good

20    on the surface, but this is someone who is profoundly,

21    profoundly damaged.

22         I want to talk about Dr. Wise and Dr. Conte.

23    Those are the experts.  Who is Dr. Conte?  Dr. Conte opines

24    on a more probably than not basis that Robert Kelly has been

25    damaged and has been damaged significantly because of the

1   childhood sexual abuse he endured.  He has testified that

2   that is based on his observations, his testing and the

3   literature.

4            Dr. Conte, we are fortunate in this state to

5   have one of the foremost experts and researchers in the

6   United States at the University of Washington.  His CV or

7   his resume, to the extent it is of interest to you, will be

8   provided.  It has been made an exhibit.  Look at it.  Look

9   at the research.  Look at the decades of work he has done in

10  this field.  Consider his testimony.  Consider his grasp of

11  the issues.  Consider his expertise.

12           And he said, without question, the damages that

13  Robert suffered are due in part to the childhood sexual

14  abuse he suffered.

15           Contrast Dr. Wise.  I like Dr. Wise.  I have

16  deposed him.  He is a nice guy.  He is an expert.  Is he an

17  expert in traumatic brain injury cases, and he is an expert

18  in involuntary commitments.  He is not an expert in child

19  sexual abuse.

20           Recall the first question he had.  Mr. Tilden

21  asked him, how many times was Robert abused.  And he was

22  going like this.  He couldn't answer it.  He testifies three

23  to four times a week.  He didn't even know that fundamental

24  fact.

25           And I asked him questions about his testimony.

1   And you remember he kept talking about the literature, the

2   literature, the literature.  Dr. Wise, what literature?

3   Tell us.  Right here.  Right here.  He fumbled around and he

4   pulled it out.  I knew what he was doing.  Dr. Wise, what

5   year is that study?  1991.  It was 15 years old.  I said,

6   Dr. Wise --  I questioned him about the deposition.  He

7   admitted that when prior to having to prepare for trial,

8   when he pulled out one study, I asked him what studies, what

9   literature, what research do you base your opinion on,

10  Doctor?  And he said, I can't think of any.  Give me an

11  author, Doctor.  I can't think of any.  I am drawing a

12  blank.  Give me a year, Doctor.  I can't think of any.  He

13  admitted that what he does -- he occasionally testifies in a

14  case involving child sexual abuse.

15          By contrast, Dr. Conte has evaluated 5000

16  victims of child sexual abuse.

17          He gets on line and researches some literature.

18  It is important because you have to consider his testimony

19  substantively.

20          What did he say?  He basically said that he

21  doesn't think the abuse had any effect.  And he made a

22  statement that I found incredible.  He said that victims of

23  rape, they get over it or the symptoms dissipate in six

24  months to a year.  That is amazing testimony.  It is

25  absolutely unsupported.  That people get over trauma --  He

1    went into testimony about the brain secreting certain

2    chemicals.  How does that explain combat trauma?  How does

3    that explain depression following family loss that goes on

4    for years?  How does that explain rape victims that are

5    scared to go outside for a lifetime?  It doesn't.  He is not

6    competent in this field.  His testimony should be given very

7    very very little credibility.

8          He said that the human personality is formed

9    between the ages of three to five.  And therefore that is a

10   reason -- or he implied that is a reason that Robert Kelly

11   was not affected by the multiple rapes he endured in the

12   summer of 1972.  Ladies and gentlemen, that is incredible

13   testimony.

14         What he was talking about is something I think

15   we all know.  Human beings are wired differently.  Some

16   human beings are more resilient than others, more resilient

17   to stress, but it is not a cause and effect analysis.

18         However, Dr. Wise had to agree with me on a

19   number of things.  And, Vicki, why don't you turn to Tab 12?

20   Ladies and gentlemen, this is very important on what the

21   cause of Robert Kelly's damages are.  Was he affected by the

22   childhood sexual abuse?  Both experts agree that there are

23   risk factors for negative outcome.  If the sexual abuse

24   involves certain things, certain facts, the literature

25   suggests that they are at risk for a more negative outcome.

1          The experts testified that it is highly

2     variable, there is no explanation as to why one person is

3     abused badly and another person is fondled, and the person

4     who is fondled has problems.  It has to do with the

5     complexity of the human psyche.

6          But the literature and the experts agree there

7     are certain risk factors.  And I walked Dr. Wise through

8     these risk factors.  And he had to agree with me, every

9     single one applied to Robert.

10          And I will walk you through them.  Male on male

11     abuse.  I am not a practitioner.  I don't know this, but the

12     literature suggests that when an adult male sexually abuses

13     a boy the outcome is worse than when an adult male sexually

14     abuses a girl or an adult female sexually abuses a girl.  I

15     don't know why.  Both experts have testified that the

16     literature supports that.  This was male on male abuse.

17     Very important.

18          Threats of violence, threats of force.  When a

19     child is abused and there are threats involved it tends to

20     be a more negative, long-term outcome than when the child is

21     manipulated or the child is touched or the child is raped

22     without force.  This is important, because Robert Kelly

23     testified that while he can't remember the exact sequence of

24     occurrences, they escalated in seriousness and nature.  And

25     he described crying during the later events.  He described

1  gagging.  He described graphically Loholt's penis in his

2  mouth.  And he described, at the last event, Loholt saying,

3  if you tell anyone I am going to kill you.

4         Ladies and gentlemen, this is textbook.  It is

5  textbook for a poor and a negative outcome.

6         The force involved.  Robert Kelly, I anticipate

7  you will probably hear something along the lines, well, it

8  was only four or five events.  Ladies and gentlemen, this

9  isn't four or five events of inadvertent touching or

10 touching the boy over the clothes.  Robert Kelly set aside

11 the masturbation incident, set aside being fondled the first

12 time down in the room.  He was orally sodomized on three to

13 four occasions.  He was forcibly raped.

14         One of the risk factors for negative income, and

15 a significant one, is whether there is force in penetration.

16 Make no bones about it, ladies and gentlemen, Robert Kelly

17 was raped multiple times in the summer of 1972.  He

18 testified that Loholt ejaculated in his mouth and on his

19 face.  It was a completed sex act.

20         No professional intervention.  Robert Kelly, but

21 for some anger management counseling, has never seen a

22 counselor.  He is an untreated victim of childhood sexual

23 abuse.  Both Dr. Wise and Dr. Conte testified that he is in

24 need of counseling, and he is in need of counseling because

25 he was abused.  Very very important.  And I spent a lot of

1    time on it.

2             Another risk factor is the age at which the

3    child was abused.  Robert Kelly was abused at a critical

4    developmental age.  He was abused at age nine or age ten.

5    And the experts talked about this.  This is different than

6    being abused when you are four or five or six.  And it is

7    different, in part, because you are going to remember it,

8    you are going to be able to process some of it, you are not

9    a toddler, you are an early adolescent.  This is somebody

10   who is beginning to understand sexuality.  If it occurred in

11   the summer of 1972 he would have been between the fourth and

12   fifth grade at that time.

13            It is different when a boy is abused between the

14   ages of 9 and 12 than when he is abused between the ages of

15   12 and 18.  And Dr. Wise or Dr. Conte, I can't remember who,

16   explained this.  A ten year old doesn't have the ability to

17   process what happened to him, a 15 year old does.  Scott

18   Pettit had the ability to process what was happening to him.

19   And he went to his dad.  A ten year old developmentally does

20   not.  And it is supported in the literature, ladies and

21   gentlemen.  If you are abused at age ten your risk for

22   negative outcome is worse than it is if you are 15, and it

23   is worse than it is when you are five.  And Robert Kelly was

24   abused during that time period.

25            He was abused with other victims.  There were

1    multiple instances of abuse.

2         And then finally at the bottom, this is

3    critical, whether the victim comes from a functional or a

4    dysfunctional family -- Very very important in general, but

5    important in this case when you consider the defense of this

6    matter.  I asked both experts, who have reviewed all the

7    records, who have interviewed Robert and who have

8    testified -- or tested Robert, whether there was an abusive

9    home.  Even Dr. Wise, their own expert, said no.  There is

10   no evidence that this was an abusive home.

11        When considering whether the abuse caused Robert

12   Kelly's problems, despite what Dr. Conte says, one of the

13   leading experts, despite what the literature says about risk

14   factors --  Apply common sense, ladies and gentlemen.  Think

15   about it.  He had never been sexually abused before or

16   after.  Yet he ends up with anger problems.  He ends up with

17   relationship problems.  He ends up with intimacy problems.

18   He ends up with an inability to achieve an erection.  He

19   ends up with problems with his children.

20        He had never been physically abused before or

21   after but for one occasion.  Remember, this was one

22   occasion, the golf club.  And I don't mean to demean it.  I

23   don't mean to underplay it.  But I do need to remind you of

24   kind of what happened during the course of the trial.

25        I don't know if you are familiar with subliminal

1    advertising.  That is when Coca-cola or Budweiser, or

2    somebody in the Super Bowl, they want to show you a Coke or

3    a Budweiser as many times as they can.  They flash it in

4    front of you.  And their hope is you buy Coke or you buy

5    Budweiser.

6              The defense did a little of that every single

7    chance they could, the single incident in a lifetime of the

8    family, in a lifetime of good, bad, ups and downs, was

9    flashed before you probably ten times.  It is like

10   subliminal advertising.  He is hit by a golf club, he is hit

11   by a golf club.

12             Consider the facts.  The facts are that Robert

13   testified that he believes his family is supportive.  The

14   facts are that he had some tension with his father.  There

15   is no question about it.  The facts are his dad yelled at

16   him.  The facts are in the late 1960s or early 1970s he was

17   spanked, spanked with a belt.

18             I am not suggesting those are good things.  Put

19   it in context, ladies and gentlemen.  Are they going to lead

20   to the problems that he has, problems with authority,

21   problems with women, problems in the workplace?

22             However, one of the risk factors to consider is

23   whether the family was dysfunctional.  I think the evidence

24   doesn't support it.  Jovine Umali said she loved the family,

25   she stayed there for a few months.  But if that family was

1    disfunctional, if Robert was affected by his father's

2    yelling, if Robert was affected by the golf club, if Robert

3    was affected by the alcoholism, which was never supported

4    factually, you take the victim as you find them.  That is a

5    maxim of law in our state, in our country.

6         And if the plaintiff came from a dysfunctional

7    family that is one of the factors that leads to a worse

8    outcome when someone is sexually abused.  I don't think the

9    evidence is there, but if that is the case, ladies and

10    gentlemen, it is going to affect his outcome.

11         THE COURT:  Counsel, you have seven minutes.  I

12    don't know if you want to save any for rebuttal.

13         MR. PFAU:  I do, your Honor.  Ultimately, ladies

14    and gentlemen, you are going to have to decide how much

15    money to award Robert Kelly.  We told you at the beginning

16    of the case that we were going to be asking for a

17    substantial sum.  We think the facts support that.

18         We are talking about a life.  The rape alone

19    supports a substantial verdict against the defendant.  If

20    you take away all the damages, and just look at what

21    happened to that fourth grade kid, it is supports a

22    substantial sum.

23         What is a substantial sum?  I can't hazard to

24    guess.  2 million?  3 million?  4 million?  5 million?

25    Maybe that is too high, maybe that is too low.  I am not

1    going to provide you with a range other than that, other

2    than I suggest you consider what happened to Robert Kelly,

3    and you consider the lifetime of effects and how it

4    permeates literally every piece of his life.

5              I will save the remainder for rebuttal, your

6    Honor.

7              THE COURT:  Thank you, Counsel.  All right.

8    Ladies and gentlemen, please now give your kind attention to

9    Mr. Tilden for his closing on behalf of the defendant.

10             MR. TILDEN:  Good afternoon, ladies and gentlemen.

11   On behalf of Chuck Gordon and Mike Rosenberger, my partners,

12   and Randy Borland, it has been our privilege to represent

13   the Mormon Church in this case.

14             I would like to perhaps shed less heat on this

15   debate and more light.

16             35 years ago some really really offensive things

17   happened to Robert Kelly.  We are sorry they happened to

18   Mr. Kelly.  And we are sorry that happens to any child

19   anywhere in the world.  But no Mormon official was involved

20   in the action.  And when you analyze the law that the Judge

21   has given you, you will conclude we are not legally

22   responsible for what has happened.

23             If you forget the law for a moment, and just use

24   your common sense, we believe you will come to the same

25   conclusion.

1           This is especially the case where this lawsuit

2   is brought, as it has been, 35 years after the events in

3   question.

4           It is especially the case where, as he is doing,

5   Mr. Kelly is suing the Allenbach estate right now for this

6   same harm.

7           It is especially the case where his own parents

8   who actually did know about the abuse at the time did

9   nothing.

10          Mr. Pfau has just told you they want millions of

11  dollars from my client, despite the fact that this did not

12  happen on church property, at a church outing, a church

13  event, and despite the fact that Jack Loholt and Robert

14  Kelly were not brought together by anything we did.  They

15  were neighbors.

16          He has told you they want millions of dollars

17  despite the fact that we first met Mr. Kelly in March

18  of 2005.

19          The basic question that you all have to answer

20  here is when a church is responsible or whether a church is

21  responsible for the acts of any given member.

22          On that front, remember that Hitler at least

23  professed to be a churchgoer up until his last days.  Bank

24  robbers go to church.  When the banks get robbed do they sue

25  the church?  Lots of people in car wrecks go to church.  Do

1   the victims sue the church?  No.  We will address why not

2   when we look at the instructions Judge Martinez has given

3   you.

4           This is not a case about theology.  For our

5   purposes here the Mormon Church could be any kind of

6   defendant.  We could be the Boeing Company or Paccar or

7   Puget Power.  We could be the University of Washington,

8   Pacific Lutheran.  We could be the City of Kent, King

9   County, the State of Washington.  We could be the Kiwanis

10  Club or PTA or Girl Scouts.

11          The plaintiff argues two things in this attack

12  on us.  And I would like to address them each in turn.  The

13  first, Dr. Allenbach was our agent.  The plaintiff talked

14  about that some but they did not show you the instruction.

15          Turn, if you would, to Instruction Number 18.

16  "In this case, during the relevant time period,

17  defendant --" that is us "-- admits that Bishop Borland was

18  acting within the scope of authority.  However, if you

19  determine that Dr. Allenbach was an agent of defendant, one

20  of the issues for you to also decide is whether

21  Dr. Allenbach was acting within the scope of authority."

22          Instruction Number 17 actually talks about

23  whether you are an agent.  The second paragraph of 18 talks

24  about scope of authority.  "An agent is acting within the

25  scope of authority if the agent is performing duties that

 1    were expressly or impliedly assigned to the agent by the

 2    principal or that were expressly or impliedly required by

 3    the contract of employment.  Likewise, an agent is acting

 4    within the scope of authority if the agent is engaged in the

 5    furtherance of the principal's interests."

 6            Was Dr. Allenbach our agent for these purposes?

 7    Was he acting within the scope of his authority?  Leave

 8    Allenbach out of it for a minute.  Let's talk about what you

 9    already know.

10            Mrs. Kelly told us her husband worked at Boeing.

11    She didn't tell us what her husband did at Boeing, or if she

12    did I forgot.  Let's assume for a moment he works at Boeing

13    and he is an engineer or works at one of the plants.  He is

14    driving to Boeing, going to work, from Boeing going home.

15    He is in a car wreck.  Is Boeing responsible?  No.  It is

16    not within the scope of his authority.

17            Assume on the other hand that Mr. Kelly was a

18    Boeing truck driver and is driving a Boeing truck when he is

19    in a car wreck.  Is Boeing responsible?  Yes, if it happens

20    within the scope of his authority.

21            "An agent is acting within the scope of

22    authority if the agent is engaged in furtherance of

23    principal's interests."

24            In theory you might argue, well, you know, by

25    driving to work in the morning, that is in furtherance of

1    Boeing's interest because you need to get to work.  But

2    Boeing doesn't tell people how to come to work in the

3    morning.  Right?  They tell you you need to be there at 7:00

4    or whatever time your shift is.  It makes no difference to

5    them whether you ride the bus, take the train or walk.

6          So with that background let's take a look at

7    Herman Allenbach.  What do we know about Herman Allenbach?

8    We know he was an oral surgeon.  We know he was a small time

9    real estate developer.  We know he lived out in rural Kent.

10   We know he was active in the church.  He was a Sunday school

11   teacher, as a protestant would call it, and his wife led the

12   choir.  We know he was not a member of the Mormon clergy.

13         Was he an agent of the Mormon Church for any

14   purpose at all?  If he was an agent of the Mormon Church for

15   any purpose at all, what was he assigned to do?  He was a

16   Sunday school teacher for older children.  Does that make

17   him a 24-hour a day, seven days a week agent of ours?  No,

18   it doesn't.  How do you know that?  Because Judge Martinez

19   has told you what the law is.

20         Mr. Kelly is not a Boeing agent driving to work

21   or from work.  Bank robbers who work at Boeing aren't Boeing

22   agents when they rob the bank.  That is the answer to the

23   Herman Allenbach question there.

24         Was he a bishop?  There was a flavor of this

25   throughout the trial.  No, he wasn't.  How do we know?

1   Jimmy Allenbach, his son, testified, I never saw my dad up

2   there where the bishop sits.  But we know a better way.

3   Admitted fact number 10 tells you that Herman Allenbach was

4   never a bishop.

5          High priest, like any observant male over 45.

6   How do you know that?  Admitted fact number 8.  And a Sunday

7   school teacher.

8          When his son Jimmy came to him and said at the

9   age of about eight, Mr. Loholt molested my sister and I in

10  the bathtub, did Jimmy come to him in his capacity as a

11  Sunday school teacher of older boys?  No.  He came to him as

12  his father.

13         The events at issue here had nothing do with

14  Herman Allenbach's relationship with the church.  They had

15  to do with the fact that Jack Loholt was a tenant of his,

16  who lived in the basement, and he was a next door neighbor

17  of the Kellys.  The best evidence of that is Mr. Kelly's own

18  testimony.

19         Can we have Exhibit 19, Page 32?  You all have

20  seen this chart before.  Don't bother blowing it up.  Who

21  did it?  A neighbor.  What happened?  It is not exactly

22  clear to me what the word is there, but either neighbor or

23  neighbor's friend.  No discussion of the church.

24         Turn to Exhibit 20, Page 2.  Blow up the part at

25  the bottom, if you would.  The client asks that his own

1    sexual abuse with an adult neighbor at age six that lasted

2    for several months not be released to others.  He is a

3    neighbor.  The Kellys' neighbor could have been anyone.  It

4    could have been a Paccar employee, a UW employee, King

5    County, State of Washington, the Girl Scouts or a lawyer,

6    judge, a court reporter or bailiff.

7         Where was the church?  The church was four miles

8    away.  You heard a lot in opening about the Allenbach

9    compound.  You didn't hear anything about it in closing.  We

10    showed you a picture of the Allenbach compound.  It was a

11    rural area.

12         They pushed the envelope again trying describe

13    Dr. Allenbach's cabin at Lake Kachess as a boy scout camp.

14    It was a cabin.

15         Leave aside for a moment whether Dr. Allenbach

16    was an agent or not, and if he was an agent what the scope

17    of the agency was.  There is one other issue that relates

18    directly to this attack on us.  The order in which the

19    events happened.

20         Remember, the Kelly boys and the Allenbach boys

21    go to Mrs. Kelly, she waits for her husband, they then come

22    over to the Allenbach home that night.  The argument is if

23    Allenbach had done something the abuse -- further abuse

24    wouldn't have occurred.

25         What's the testimony on that?  Robert Kelly told

1    us when he met with his parents that night at the dinner

2    table he said for several months there is a lot that, you

3    know, that has happened in the downstairs apartment with

4    Jack.

5            Not only was the masturbation in the field not

6    the first event, it may have been the last.  We have no

7    reason to believe that there is any sexual misconduct after

8    Allenbach was informed.  None.  We know the vast majority of

9    it, at a minimum --  There is a lot that you know happened

10   in the downstairs apartment with Jack.  We know almost all

11   of it, at a minimum, happened before Dr. Allenbach heard.

12           I would like to turn to the Bishop Borland

13   argument, their second suggestion that we are responsible

14   for what happened to Mr. Kelly.

15           Could we have Instruction Number 21, please.

16   The Washington statute enacted in 1971 provided --  It goes

17   on to tell you what the statute provided, and the things

18   that are required.  What would we say?  First, Bishop

19   Borland heard about the Pettit complaint in February

20   of 1972.  The instruction doesn't tell you how recent the

21   statute was at the time.  But it was relatively brand new.

22   It could have been a month or two old --

23           MR. PFAU:  Objection, your Honor.  Relevance.

24           THE COURT:  The objection is sustained.

25           MR. TILDEN:  Second, what did Bishop Borland say.

1    He said, it is an article of my religion that the Pettit

2    communication was privileged, privileged like a priest, I

3    couldn't talk about it.  Violation of the statute is not

4    negligence, it is evidence of negligence.  Turn to

5    Instruction Number 20 in your book.  20 says just that.

6    Some statutes are just -- it would seem self-evident

7    negligent to violate.  Don't go over 35 miles an hour.

8           What is running through Bishop Borland's head

9    when he hears this communication?  I am a clergy member of

10   this church.  This communication is sacred.  I cannot

11   disclose it.  I am like a priest.  That is what Bishop

12   Borland is thinking.  Is it negligent not to report under

13   those circumstances?  No, it is not.

14          The statute doesn't compel you to report, or at

15   least it doesn't compel a finding of negligence.  You have

16   to weigh what was going on in Bishop Borland's head.  And

17   Bishop Borland knew that he was --

18          MR. PFAU:  I will object, your Honor.  This is

19   speculation.

20          THE COURT:  The objection will be overruled.  It

21   is argument.

22          MR. TILDEN:  Bishop Borland knew he was clergy and

23   he knew that this communication was confidential.

24          There is a large debate in the case what Bishop

25   Borland was told.  And I think Mr. Pfau pushed too far on

1    that.  The first question is what happened to Scott Pettit.

2            Did Scott Pettit testify that he was repeatedly

3    assaulted, that it went on all night, touching his penis and

4    testicles?  My recollection of Pettit's testimony is that it

5    was obvious that Loholt's hand was trying to get somewhere.

6    I have no recollection of whether he actually made contact.

7    Pettit rolled over in the sleeping bag.  He may have rolled

8    over again, but then it was over.  I am not defending the

9    conduct in any way, but it did not go on all night.  And

10   when Scott Pettit woke up he wondered whether it really

11   happened.  He then went to his parents.

12           His dad, quite concerned, took that problem to

13   Bishop Borland in confidence.  He told Bishop Borland there

14   has been inappropriate touching.  Bishop Borland came in

15   hear and he told you inadvertent, uncomfortable --

16   uncomfortable horse play.  They are awfully critical of that

17   recollection.  They are awfully critical.

18           How long ago was 1972?  Mr. Pettit is 75 now.

19   He was 40 then.  Bishop Pettit (sic) was 33 at the time.  If

20   you were waiting for the Microsoft stock offering, the IPO,

21   you would have 15 more years to wait.  It was a third after

22   century ago.  Bonanza, Laugh In were on TV.  To personalize

23   it, I had no children, no wife, no job, no degree.  I had

24   never kissed a girl and I had no driver's license.  Those

25   last two may have been related.  It was a third of a century

1    ago.

2            And they come in and criticize and old man's

3    recollection from around the time of Watergate?  Ten years

4    after the events in issue here, but a quarter of a century

5    ago Pope John Paul II was the subject of an assassination

6    attempt.  That seems like the distant past.

7            18 years ago I was married.  I recall proposing

8    to my wife.  And there was a time when the 30 seconds of

9    proposal and acceptance I could play like a movie in my

10   head.

11           MR. PFAU:  Objection, your Honor.  I understand it

12   is argument.

13           THE COURT:  Overruled.

14           MR. TILDEN:  There was a time when I could play

15   the movie in my head over and over again, 30 seconds.  Maybe

16   it was 20.  I don't know.  But I could remember it all.  18

17   years later I can only remember brief snippets, like a

18   painting that has been torn up, I only have a few pieces

19   left.  In 18 more years when a third of a century has

20   passed, all I will know is that she said yes.  They come in

21   here and they are critical of a third of a century old

22   recollection.

23           What is Bishop Borland certain of?  He is

24   certain that Scott felt uncomfortable.  He is certain he

25   took immediate action to get rid of the scout master.

1          Mr. Pfau says, wouldn't that be highly unusual

2     if you are a boy scout?  Well, they got a new scout master

3     assistant the same day, Lloyd Berry.  It is on the chart.

4     If you are a kid you know your assistant scout master has

5     been replaced.  He took it as seriously as he thought.

6          What are we are sure Bishop Borland was not

7     told?  No one suggests that Bishop Borland was told about

8     oral sex, ejaculation or semen.  There is not even a hint

9     that Bishop Borland was told about the masturbation in the

10    field.  Bishop Borland knew far less than the Kelly parents,

11    and he knew far less than the Allenbach neighbors.

12         Part and parcel of the Bishop Borland argument

13    is the issue of when did this happen.  I loved the JFK

14    example.  I remember exactly where I was.  I was in third

15    grade and my teacher came in in hysterics.  I was not in

16    second grade.  I was not in fourth grade.  I was not in

17    fifth grade.  And I was not in first grade.  I was in third

18    grade.  And I am absolutely positive I was in third grade.

19         I believe that the events here would make an

20    extraordinary impression on Robert Kelly.  And I believe him

21    when he told us initially when this happened.  Like the

22    shooting of JFK, Robert Kelly told us when this happened.

23    He told us that it either happened when he was six or when

24    he was nine.

25         Keep in mind, unlike some parts of the country,

1    here we go to school until the end of June.  Robert Kelly

2    was nine up until late June of 1972.  So he would have got

3    out of school in late June 1972.  The summer in which Robert

4    Kelly was nine, if summer is defined when you play outside

5    and chase snakes and play baseball, the summer when Robert

6    Kelly was nine was 1971.

7            Mr. Kosnoff said in opening there was only a

8    single shred of evidence that it happened when he was six.

9    I forget Mr. Pfau's exact words now, but it was along the

10   same theme.  That is not true.  There is way more than a

11   thread.

12           Can we have the when did it happen chart?  First

13   his mother.  She testified that Mr. Loholt moved in late

14   '69, '70 or '71, and that it happened within a few months of

15   his moving in.  She didn't know him well.  In fairness to

16   the truth, she also testified that it happened within a few

17   months of his moving out.

18           So what do we make of Ms. Kelly's testimony

19   there?  I think we have to conclude that there is not

20   anything in Mrs. Kelly's testimony that would help you

21   answer the question when.  It can't have happened within a

22   few months of moving in in '69 or '70, and it can't have

23   happened within a few months of moving out in '73 at the

24   same time.  So she has told us two different things and they

25   can't both be right.

1          So let's move off that Mrs. Kelly comment.  She

2     was asked by her own -- her son's own lawyer, Mr. Kosnoff,

3     March 2nd, 2005, what happened in approximately 1971.  This

4     is their thinking, not ours.  We didn't make this question

5     up, although we couldn't improve on it.  They didn't say

6     what happened in approximately 1972 or '73.  He said, what

7     happened in approximately 1971.  And if Mr. Gordon and I

8     could have written the question, that is one we would have

9     written.

10          What did Mr. Kelly say?  He said in Exhibit 20,

11     pages 2 and 3, two separate events six months apart, that he

12     was abused by a scout master at the age of six.  And he said

13     on the sheet we looked at a moment ago that he was a

14     sexually abused when he was nine by a neighbor.  The summer

15     when he was nine, the summer when you can play outside, is

16     1971.  He would have quit being nine in '72, about the time

17     school got out.

18          The last question on the Borland complaint

19     front.  If Bishop Borland at the time heard something that

20     he felt constituted sex abuse or reasonable cause to believe

21     sex abuse had occurred, if he was going to ignore his

22     confidentiality obligation, if the Kelly abuse was still in

23     the future, so that anything Bishop Borland did may have had

24     some effect on --  Remember if it was in '71 it already

25     would have occurred.  Bishop Borland heard in February '72.

1    If all of those things what would have happened?  They have

2    not brought anyone in here to tell you what the police would

3    have done with a complaint in '71.

4          What can Bishop Borland say consistent with his

5    confidentiality obligation?  It is my understanding that

6    some improper conduct occurred in Kent?  How much can he

7    say?  What would the police have done?  He certainly can't

8    identify Scott Pettit's name.

9          What did Dorothy Kelly say?  These things were

10   swept under the rug at the time.  Do I believe that?  I am

11   not prepared to buy it hook, line and sinker.  But I kind of

12   like to wish I had heard someone come tell us what would

13   happen at the time, and no one did.  There has been a total

14   failure of proof on this issue of what would have happened.

15         In order to find that the church is liable on

16   this front you have got to find that Bishop Borland was told

17   something that gave him reasonable cause to believe it was

18   sex abuse, that it was not privileged and that he could have

19   talked about it, that the police would have done something

20   had they heard, and that Mr. Kelly's abuse -- I am up to my

21   fourth finger -- had not already occurred.

22         The burden of proof instruction in here tells

23   you that the burden rests on the plaintiff.  They have to

24   convince you that their version of the facts is more

25   probably true than not.  Each of those four prongs they have

1    to prove more probably true on.  When you add them up they

2    can't do it.

3           We do know how some people would have acted in

4    the early '70s.  Not the police.  Not CPS.  We know how the

5    Kelly parents acted.  From the standpoint of 2006 it is

6    pretty easy.  This is 1971.  Was the world different?  I

7    don't know.  You have heard no testimony.

8           I will make one more point about the reporting

9    statute and then move on.  Dr. Allenbach himself was an oral

10   surgeon and a practitioner.  He had a reporting obligation

11   independent of the fact that he was a Mormon.  He would have

12   had a reporting obligation whether he been a Catholic,

13   atheist or a Jew, whether he had been an American, an

14   Englishman, whether he had been in the Kiwanis club or not.

15          I like to change subjects if I could and talk

16   about damages.  Could we have the first chart with the four

17   experts up please?  I am unable to clear my little red

18   things but I think we can survive with what we have got.

19   This is the expert lineup in this case.  And it is only a

20   slight stretch to say it is four against one.

21          Mr. Pfau wants you to accept Dr. Conte's

22   testimony hook, line and sinker and jettison the testimony

23   of the others.  What do we know about Dr. Conte and the

24   others?  A quick list:  Dr. Conte did not review, prior to

25   forming his opinions, any of the anger control files or

1    Dr. Ben Hamida's file.

2          He disregard grossly exaggerated interview

3    evidence from Mr. Kelly.  He concluded that Mr. Kelly was

4    not intentionally misreporting symptoms, although Mr. Kelly,

5    to his credit, sat on the stand and told you that he had

6    intentionally over reported.

7          He agrees with the MMPI conclusions of Dr. Wise

8    and Dr. Ben Hamida.  That while Mr. Kelly has problems, and

9    we don't deny that, his essential personal profile is within

10   normal limits.

11         Could we have the Conte chart?  Mr. Pfau told

12   you a few things about Dr. Conte's testimony.  I would like

13   to tell you a few more.  Mr. Pfau criticized Dr. Wise for

14   concluding that victims of rape, on a more probable than not

15   basis, wouldn't have symptoms later on.  Dr. Conte told us

16   the same thing.

17         He agrees with Dr. Finkelhor, who he recognizes

18   as a world authority, that fewer than 20 percent of child

19   sex abuse victims have significant psychological problems as

20   adults.  He told us that the impact on Robert Kelly, even

21   from a professional point of view, is relatively subtle.  He

22   is not suggesting that the abuse caused every aspect of this

23   man's life.  He does agree with Dr. Wise, that there is a

24   biological basis for anxiety/depression, that Mr. Kelly is

25   certainly not clinically depressed, that the MMPI validity

1    scales are superior to what he did.

2            And Rachelle Cope told him that Mr. Kelly was

3    abused by his father, sexually abused by his neighbor and is

4    living at home because he needs the support of his family

5    for this case.

6            We know Mr. Kelly is capable of skewing his

7    answers when it serves his purpose.

8            Can we have Page 17, Exhibit 4?  This is how

9    Mr. Kelly completed a chart for Dr. Ben Hamida in 2001 when

10   it was in his interest to look like a healthy person.  It is

11   Page 4 of Exhibit 17.  You will have it.  And what it shows

12   is a person with no problems.

13           Could we have Page 11 of Exhibit 19, please?

14   This is what Mr. Kelly told Dr. Conte in 2005 when it was in

15   his interest to look ill.  Not just anxiety and depression,

16   but look at the scores.  There is a bar graph above this on

17   the page that you will have when you are back there, phobic,

18   anxiety, extremely atypical; paranoid ideation, extremely

19   atypical; psychotic, extremely atypical.

20           Mr. Kelly is a smart guy.  What did he tell

21   Dr. Ben Hamida?  I am not suicidal.  What did he tell Conte?

22   I am suicidal.  What did he tell Dr. Ben Hamida?  Anger

23   problems at home.  Did he mention it to Dr. Conte?  No.  The

24   best evidence here is Mr. Kelly's own testimony.

25           Could we have Exhibit 20, Page 2?  When

1    Mr. Kelly was on the stand Mr. Kosnoff asked him about some

2    of his answers to Dr. Wight and Dr. Waterland.  And he said,

3    I skewed the answers because I wanted to see my son.  And,

4    God knows, that is the best reason I can imagine to skew

5    answers.  But those are answers that you would skew to make

6    yourself look healthy, like the ones we just saw.

7             I would like to show you four things that

8    Mr. Kelly said at the time he was trying to make himself

9    look good.  The bottom of Exhibit 20, Page 2.  Let's blow

10   that up one last time.  Skip the golf club.  He described

11   his father's anger as explosive.  When asked if he felt safe

12   and connected growing up he said no.  We didn't say that.

13   Mr. Kelly said it.

14            Could we have Exhibit 20, Page 3?  He stated he

15   did not feel safe at home.

16            Exhibit 19, Page 32.  'Physical.  Dad hit me

17   with a golf club, caused a huge bruise.  How did you feel?

18   Pain, guilt, anger, emotional pain, that's then and now.

19   Emotional.  Father at 39.  Dad's regular emotional

20   outbursts, yelling.  Very hurt, defensive."

21            Exhibit 19, number 33.  "Track your emotional

22   energy.  Describe a recent situation when you felt strong

23   emotions.  Name the feeling of anger, whether it is

24   frustration, tension or anything else.  Rate the feeling

25   from one to ten.  Feeling anger, level nine."

1          Remember Mr. Kelly is trying to look good for

2    these people.  "My dad was yelling at my nieces and nephew

3    the other morning.  I asked him to stop yelling at the kids

4    and he yelled at me, no, I will not.  This set me off.

5    Totally angry.  My dad yelled at me since I was a kid, and I

6    see that this pattern has been repeated with a new

7    generation."  Mr. Kelly's own diagnosis of what has gone on

8    in his family.  That is all I have for that.

9          Julie Ellis walked in here, his ex-wife.  I

10   don't know if you could feel the courage in her testimony,

11   but she did not want to be here.  She did not want to be

12   here.  And she believes in the lady with the scale and she

13   raised her hand and she told the truth, and she didn't want

14   to do it.  She said Robert felt like the black sheep at

15   home, he was abused at home.  Asked, are you talking about

16   sexual abuse by the neighbor?  No, abused at home.  She said

17   that Mr. Kelly called her a year ago and told her, don't

18   tell the jury my mother was an alcoholic.  She told us that

19   his brother has built a house in the field in front of his

20   parents.  Whatever else you conclude in this case, I want

21   you to conclude Mrs. Ellis -- Ms. Ellis has a lot of

22   courage.

23         They did not call Mr. Kelly's dad or his brother

24   or sister.

25         MR. PFAU:  Objection, your Honor.

1          THE COURT:  The objection will be sustained.

2          MR. TILDEN:  Mr. Kelly admits that he has never

3    sought treatment, other than this brief visit in 2001 for

4    any of his symptoms.  An action speaks louder than words.

5    When Mr. Kelly finally called someone in 2005 he didn't call

6    a doctor, he called a lawyer.

7          I want to talk to you some about the statute of

8    limitations, why we are here in 2006 for events in 1971 or

9    '72.  This is the law that Judge Martinez has given you on

10   the statute of limitations.  You must bring an action for

11   childhood sexual abuse within the later of the following:

12   Three years of your 18th birthday.  That would be 1983 if

13   you are Mr. Kelly.  Three years of the time the victim

14   discovered or reasonably should have discovered that the

15   injury or condition was caused by the acts, that his

16   problems in life were cause the by the sex abuse, his

17   contention.  Or within three years of the time that he

18   discovers that the sex abuse caused the injury for which the

19   claim was brought.

20         I will confess to you that I don't know the

21   difference between B and C.  But maybe you can divine one.

22   In all events, Mr. Kelly's legal obligation is to bring a

23   lawsuit within three years of learning the connection

24   between the abuse and the acts.

25         Now, he has told us, and Dr. Conte has told us,

1   that he is psychologically unsophisticated.  But what else

2   do we know?  We know that his mom had a meeting or gathering

3   in either 1971 or '72 with family members.  We know that she

4   attributed problems early to this.  We know that he told

5   Ms. deGuzman in the late 80s, '90, '91 at the latest, I was

6   sexually abused as an explanation for his conduct.  Jovine

7   Umali told us that he told her in the '91 to '95 time frame.

8   Julie Ellis told us he told her early in their relationship.

9   He told Dr. Wise and Dr. Waterland in 2001.

10          The first notice to us was in 2005.  Why does

11  this matter?  What position would you all be in if this

12  claim had been brought in 1982?  Allenbach --

13          MR. PFAU:  Objection, your Honor.

14          THE COURT:  Overruled.

15          MR. TILDEN:  Dr. Allenbach would still be alive,

16  and he would be alive for 17 more years.  This debate about

17  what was told to Pettit or Borland would be a lot fresher in

18  their minds.  The order in which the events occurred would

19  be fresher.  What year it happened, what Mrs. Kelly

20  believes, what Robert Kelly believes, all fresher.

21          The discrepancies we have got in this case from

22  the testimony are to be expected when witnesses are 70 and

23  they are talking about things when they were 35.  That is

24  what the statute of limitations about.

25          When does the statute of limitations run?  It is

1    their position it hasn't started to run yet and they can sue

2    us forever.

3            I want to talk to you about a handful of

4    miscellaneous things, and then go to the verdict form.  The

5    burden of proof, Instruction Number 8.  I hinted at this a

6    minute ago because I got ahead of myself.

7            "When a party has the burden of proof on any

8    claim or affirmative defense by a preponderance of the

9    evidence --" and that is all of the burdens of proof in this

10   case "-- it means you must be persuaded by the evidence that

11   the claim or affirmative defense is more probably true than

12   not true."

13           Their claims are that we were negligent with

14   respect to either Dr. Allenbach or Bishop Borland's

15   activities.  Our affirmative defense is the statute of

16   limitations.  The burden of proof on all of them is a slight

17   tipping of the scale in favor or against.

18           We don't dispute that Mr. Kelly was abused.  We

19   don't dispute he was abused six times.  We don't dispute

20   that he was abused by Jack Loholt.  We don't dispute any of

21   those things.  The burden of proof has been carried on all

22   of that, because we don't dispute it.

23           There are serious questions about when it

24   happened, the order of it happened, who was told what and

25   who would have done what.  And the burden of proof has not

1    been carried on any of those issues.  Collectively these

2    problems prevent Mr. Kelly from carrying this burden.

3            This is especially the case where the evidence

4    has been manipulated.  You saw what he told Dr. Ben Hamida,

5    Exhibit 17, 2001, I am fine.  What did he tell Dr. Conte in

6    2005?  I am really not fine.  We know that he told his

7    ex-wife to come in here and not tell you some important

8    things.

9            He claims here to just be in the initial stages

10    of figuring out his problems and how they relate to the

11    abuse, but he has been telling girlfriends and a wife that

12    for 15 years.

13            He has told us here that the abuse occurred when

14    he was ten or 11 or 12, at a time before the lawsuit when he

15    presumably wasn't thinking about a claim.  He told people

16    who counted it happened when he was six or nine.

17            And, finally, it is a minor thing, but like the

18    mark on the leopard maybe it helps you know it is true.  He

19    told you that he worked on merit badges with Jack Loholt.

20    Well, in the Mormon troop you work on merit badges when you

21    are 12 or 13 or 14.  His friend, Jimmy Allenbach, was a year

22    younger than him.  So Jimmy is 12 at the youngest, Robert is

23    13.  Robert was born in '62.  He turned 12 in 1974.  He

24    turned 13 in 1975.  This is long after anybody contends the

25    abuse happened in this case.

1          Mr. Pfau has talked about a cover up.  You heard

2    Jack Loholt testify that he didn't masturbate in front of a

3    field, on the videotape -- masturbate in a field in front of

4    Mr. Kelly.  Mr. Gordon and I speak for the Mormon Church on

5    only about one zillionth of the possible things, but we

6    speak for them on this subject.  We don't believe that.  We

7    think he did.  We are not covering it up.

8          They asked Bishop Pettit -- former Bishop Pettit

9    a question about what he told Randy Borland in 2005 -- in

10   2005 when they asked him what he told him 33 years ago.  Did

11   Bishop Pettit say it was confidential?  No.  He told them.

12   He told them.  They asked for old records.  We have produced

13   them.  That comment is offensive.

14          I want to turn your attention to the verdict

15   form real quick.  I don't know if this is in your package.

16   But you will be asked to answer one or more questions.

17   Question number one, "did plaintiff commence this action

18   within the period of time required by law?  Yes or no."  For

19   the reasons we have outlined we believe the correct answer

20   is no.  And we that we have carried our burden of proof on

21   that issue.  This lawsuit should have been commenced a long

22   time ago.

23          You will then see after the answer a direction

24   to you that follows many of them.  "If you answered yes,

25   keep going.  If you answer no, stop."

1          Let's round out the remainder of the questions.

2     "Do you find that the defendant --" that's us "-- is

3     negligent?"  We believe the correct answer is no.

4          "Was such negligence a proximate cause of injury

5     to the plaintiff?"  Proximate cause is a fancy legal work.

6     I guess it is two fancy legal words.  Here is what it means.

7     "The term proximate cause means a cause which in a direct

8     sequence unbroken by any new independent cause produces the

9     injuries or damages complained of, and without which such

10    injury or damages would not have happened."  In order to

11    find the Mormon Church negligent you mind find that

12    something we did caused this, and had we not done it, it

13    would not have happened.

14          Put another way, something we failed to do

15    didn't stop it.  You have to conclude more probably than not

16    that if Bishop Borland had called the police, and consistent

17    with his confidentiality obligation said, I have reason to

18    believe there has been some abuse in the Kent neighborhood,

19    that that would have prevented any subsequent abuse of

20    Mr. Kelly.

21          As part of that you have to conclude that the

22    abuse hadn't already occurred.  We think it had, and he said

23    it had.

24          "Was the negligence the proximate cause of

25    injury to the plaintiffs?"  No.

1          "Do you find that any of the following

2    non-parties were negligent in this case?"  This is

3    Dr. Allenbach and the Kelly parents.

4          Instructions 9 and 10 tell you "negligence is

5    the failure to exercise ordinary care."  "Ordinary care is

6    what a reasonable person would have done at the time."  What

7    would reasonable parents have done at the time?

8          The contention here is that Bishop Borland is --

9    the Mormon Church is wildly negligent for failing to call

10    the police about a boy we never met.  He wasn't injured on

11    an outing -- a Mormon outing.

12          Here we have parents of a boy who has seen an

13    instance of masturbation in the field and do nothing.  Is

14    that reasonable behavior for a parent, besides go next door?

15    You have the man next door, who has heard about it and done

16    nothing.

17          You can find fault, if you want, with our

18    removal of Mr. Loholt as an assistant scout master, but we

19    are the only party in this case that did anything.  We are

20    the only one.

21          We believe you should find all three of these

22    individuals negligent.  We don't believe you will conclude

23    they acted, at least in the sense -- with respect to the

24    Kellys as parents should, with respect to Allenbach as a

25    landlord and father himself should.

1          Our favorite piece of evidence with respect to

2    Dr. Allenbach on this score is one that came out maybe

3    sideways during the trial.  But Mr. Kelly is now suing

4    Dr. Allenbach's estate and Mrs. Allenbach, his still living

5    wife.  He believes he is at fault.

6          "Do you find that Herman Allenbach was an agent

7    of defendant acting within the scope of his authority with

8    respect to acts or omissions of Loholt?"  The answer to this

9    has to be no.  He had a landlord/tenant relationship with

10   Mr. Loholt.  He had a employer/employee relationship with

11   Mr. Loholt.  Herman Allenbach's relationship with the church

12   had nothing do with this.  Herman Allenbach taught the 14

13   and 15 year old boys Sunday school.

14         "Assume 100 percent represents the total

15   combined negligent that proximately caused the plaintiff's

16   injuries.  What percentage goes to each?"  We are on the

17   first page.

18         Your Honor, there should be a Herman Allenbach

19   here on question 7.

20         In all events, we believe that any -- we believe

21   the proper percentage applied to us is zero.  We believe the

22   statute is filed well beyond the statute of limitations and

23   you should never get to this question.  But if you are here,

24   we bear a tiny portion of the responsibility compared to

25   people that knew about the masturbation in the field, knew

1      about the Allenbach boys in the basement, knew it was their

2      own son and did not do a thing.  That is question 8.  You

3      divide up the percentages.

4              "What do you find the amount of plaintiff's

5      compensatory damages to be?"  We believe the number

6      suggested by Mr. Pfau or the ranges were remarkable.  Think

7      about what you invest that money at and what the return

8      would be.

9              Then finally question 10.  There is an argument

10     that we are all beating ourselves up about this, all of us.

11     Maybe more than we should.  There was a bad actor here.

12     Jack Loholt.  And he was a Mormon, the same way that Charles

13     Manson probably belonged to a church.  Hitler did belong to

14     a church.  40 percent of America goes to church, and a lot

15     of them do bad things.

16             Let's flip it around.  Mr. Pfau spent an hour

17     talking about things he thinks are bad, and I have spent

18     most of my time on a similar subject.  Let's assume it was

19     something good for a second.  Hank Aaron has 755 home runs.

20     Who gets credit for that?  His dad who taught him to play

21     ball?  His coach in Mobile?  His priest?  His minister?

22     Youth leader?  Professional baseball coach?  No.  When you

23     go to the record book none of those people get any credit.

24     Hank Aaron hit the home runs.  Jack Loholt did this.  And we

25     believe that anyway you carve up responsibility for it the

1    vast majority of it rests with him.

2            That is about all I have to say.  I want to

3    conclude with a few remarks.  First, we are just here to try

4    one case.  There are other sex abuse cases in the country.

5    We all know it.  And many of them will have different

6    outcomes.  We are only here about this one.

7            Second, it is hard emotionally sometimes to send

8    a plaintiff out of court.  It is hard.  But you can't think

9    about it.  You have to do it.

10            Instruction Number 1.  This is the first

11   instruction.  "You must not be influenced by any personal

12   likes or dislikes, opinions, prejudices or sympathy."  This

13   is a hard thing to do.  When you come in the courthouse

14   downstairs on the first floor you go through a metal

15   detector and all the metal gets left behind.  When you walk

16   through these doors or those you go through a similar

17   detector, and all the sympathy and all the prejudice has to

18   be left behind.  That is your job.  And I am not here to

19   tell you it is easy.  But the judge has been quite clear

20   about it.

21            Why is it important?  If we are not going to

22   follow that rule then anybody can be liable for anything.

23   Right?

24            The symbol of justice in America is woman with

25   blindfold and scale.  Who knows what is in her other hand?

```
 1    I have been a lawyer for 25 years and I was 50 before I
 2    learned this.  Don't beat yourself up if you don't know.  In
 3    her other hand is a sword.
 4            There are statues of lady justice in which the
 5    scale is down by the side and the sword is in the air.  It
 6    gives you an entirely different picture of what goes on in
 7    the courthouse.  The scale symbolizes the careful weighing
 8    of the evidence and the following of the instructions.  But
 9    the sword symbolizes the courage to do what you have to do.
10    The scale is no good if you refuse to do what you have to
11    do.
12            The Judge has told you in Instruction Number 3
13    what evidence is.  The evidence here is the documents and
14    what the witnesses say.  The witness chair was there, and
15    you saw them all.
16            No one sat in that chair and told you that we
17    knew Mr. Kelly at the time, we knew he was being abused,
18    that he was abused on Mormon Church property or on an
19    outing.  No one sat there and told you that we introduced
20    Jack Loholt to him.  They met in his neighborhood.  It could
21    have been any neighborhood.
22            Everyone told you that Mr. Kelly was aware of
23    the abuse at the time, that Kelly parents were informed and
24    Dr. Allenbach knew.  Mr. Kelly told you it happened when he
25    was six.  It happened when nine.  His girlfriends and former
```

1    wife told you he connected the abuse at the time years ago.

2    Mr. Kelly told you that the cycle of abuse existed in the

3    home and started early.

4         Mr. Kelly's lawyers told you in a question to

5    Mrs. Allenbach that it happened in 1971.  In a courthouse

6    about a mile from here they are telling someone that

7    Dr. Allenbach --

8         MR. PFAU:  Objection, your Honor.

9         THE COURT:  The objection is sustained.

10        MR. TILDEN:  Lawyers spend all of their time

11   wondering what the jurors think.  I don't know if you all

12   have spent any time wondering what the lawyers think.  We

13   think when you analyze the evidence through the burden of

14   proof this is not a close call, which is not to say that

15   Mr. Kelly did not have five or six really, really, really

16   bad things happen to him.  That's not the issue for you.  If

17   we were to address that issue we would have agreed, we did

18   agree, and we would have been gone a week and a half ago.

19   The question instead isn't Mr. Kelly, it is who is

20   responsible for the events that occurred.

21        That's all I have about the case.  I want to

22   tell you one other thing and then sit down.  I think I have

23   three minutes.  All the lawyers in the case, we are here

24   because we think this is really, really neat.  You don't

25   know us.  We don't know you.  You have been called off the

1    street to answer questions for your fellow citizens whom you

2    have never met.  It is amazing, isn't it?

3             5,000,000 people will be called to jury duty

4    this year.  1,000,000 people will serve.  80,000 juries.

5    The jury is the most powerful arm of the government.  You

6    don't feel powerful because you are made to come.  You don't

7    have a choice.  The power is split up each year among

8    1,000,000 of you.

9             Imagine for a second there was only one juror,

10   and that person answered every question in American courts

11   all the time.  We would know that person's name and we would

12   hate them.  And the British figured out a long time ago that

13   what you ought to do with power that immense is spread it

14   up, divide it equal.

15            The jury system fulfills the promise that every

16   man in America will be a king or a queen.

17            Thomas Jefferson said that the right to trial by

18   jury was more important than the right to vote.  Mr. Gordon

19   and I, I don't know whether we believe that or not, but we

20   really like the way it sounds.  Thank you very much for your

21   time.

22            THE COURT:  Thank you, Counsel.  Members of the

23   jury, once again, please give your attention to Mr. Pfau for

24   a short rebuttal.  Six minutes, Counsel.

25            MR. PFAU:  Thank you, your Honor.  Ladies and

1    gentlemen, the message was delivered in sheep's clothing by

2    Mr. Tilden, but make no bones about it, it was a classic

3    rape defense, pick apart the victim, blame others.  It is an

4    effort, ladies and gentlemen, to take you away from the

5    facts.  Think about the facts.  Think about what you have

6    written down.  Think about what you said.

7         I have limited time so I can't address every

8    point, but I want to address some important points.

9    Mr. Gordon said there are other sex abuse cases in the

10   country.  There are other sex abuse cases in this state.

11   And there is a reason that are sex abuse cases in this state

12   dating back many many years.  And that is because Washington

13   has one of the broadest statute --

14        MR. TILDEN:  Your Honor, we didn't say any of

15   this, and we deny that.

16        THE COURT:  The objection will be sustained.

17        MR. PFAU:  Let's take a look, ladies and

18   gentlemen, at Exhibit 25.  This is the statute of

19   limitations.  It has some markings on it.  It is the

20   instructions on the statute of limitations.

21        Mr. Ellis (sic) said, I didn't know the

22   difference between -- Mr. Tilden said, I didn't know the

23   difference between (b) and (c).  I know the difference

24   between (b) and (c).  And it is very very important.  "Any

25   person bringing an action for recovery of damages caused by

1    childhood sexual abuse must commence his lawsuit within the

2    latter of the following periods:"  And I point your

3    attention to period (c), which applies here, "within three

4    years of the time the victim discovered that the act cause

5    the injury for which the claim is brought."

6            It is a complicated question, ladies and

7    gentlemen.  In order to trigger the statute of limitations

8    the plaintiff needs to know that the sexual abuse caused the

9    injuries for which he is bringing this suit.

10           Dr. Conte and Dr. Ben Hamida have both testified

11   that he is psychologically unsophisticated, and he has no

12   idea what the effects are.  That is the standard.  It is

13   not, were you abused three years later.  It is not, did you

14   know you were abused.  It is not, did you tell a girlfriend

15   you were abused.  Mr. Tilden pushed the limits when he said

16   that the conversations with girlfriends had to do with the

17   effects of the abuse.

18           And even if that had been the case, until

19   Mr. Kelly understands through therapy or through evaluation

20   how the abuse affects him the statute of limitations has not

21   begun to run.  That is the law in Washington.

22           I want to turn your attention to another issue

23   which is seemingly confusing.  And I wish I had more time to

24   dedicate to it.  It is question number 10 on your verdict

25   form.  And this is the segregation of damages between Loholt

1    and the Mormon Church.

2            "What percent of damages in your answer to

3    question 9 do you find were caused by the negligent conduct

4    and what percentage were caused by Mr. Loholt's intentional

5    conduct?"  That is not an allocation of fault.  They tried

6    to argue that it is.  Who is at fault, what percentage of

7    fault.

8            The way this is interpreted, ladies and

9    gentlemen, is, are there any damages that were caused by

10   Loholt's intentional conduct that were not caused by the

11   negligent conduct.

12           I will give you two examples.  One very very

13   relevant.  Loholt can be characterized as an animal, what he

14   did to these kids.  A tiger.  A tiger escapes in the zoo and

15   malls a child.  A lawsuit ensues.  Do you sue the tiger for

16   his intentional acts?  The tiger knew what he was doing.

17   Loholt knew what he was doing.  Or does the lawsuit lie in

18   negligence for the actions of the gatekeeper that let the

19   tiger out?  It may seem like a silly analogy, but that is

20   the proper method to analyze this.  It is not an allocation

21   of fault.  It is a segregation of damages.

22           Another way to think of it is, but for the acts

23   of the Mormon Church, Loholt's intentional acts would have

24   not have damaged the child.

25           A couple of things I want to comment on, and

1   then my time will be up.  We talked about Julie Ellis having

2   the courage to come in here.  Ladies and gentlemen, she was

3   seething with hatred.  She hates my client.  Consider that

4   when you consider the source of some of her comments.

5           Interesting.  The time.  Look at the facts.

6   Don't look at people talking about what age they remember.

7   Yes, Robert Kelly was age nine in the summer of 1971.  He

8   was also age nine in the summer of 1972.  But that's not

9   important.  What is important is what acts support and what

10  facts support the summer of '72.  We have been through that.

11          Interesting.  What could we have done.  What

12  could we have done.  The parents, they are to blame.

13  Dr. Allenbach is to blame.  Dr. Allenbach and the parents

14  did do something.  The parents went to Dr. Allenbach.  They

15  went to him because they knew he was a neighbor, and they

16  knew he was affiliated with the church, and they knew that

17  Loholt was affiliated with the church.  They asked him to

18  take action.  And he was gone within months.

19          Consider an important fact.  That sleep over

20  took place in 1971 -- in October of 1971.  It was Brent

21  Allenbach's friend.  All the evidence suggests that this was

22  in the summer of 1972, that Dr. Allenbach, while potentially

23  not acting quick enough, did remove Loholt when he received

24  the complaint about the masturbation.  He bought him a

25  house.  He got him off the property.

1          Would he have been in the house in 1971 if the

2     Kellys had made that complaint prior to that time?  It

3     doesn't make sense.

4          Causation.  What could we have done, what could

5     we have done, what could we have done.  They could have done

6     a lot.

7          Bishop Borland, you need to assess his

8     credibility.  He is either not telling you the truth, ladies

9     and gentlemen, or he didn't do anything to investigate on

10    what were clear facts and red flags.  From his mouth he gave

11    you all the things he could have done, call the police, call

12    CPS, investigate, etcetera, etcetera, etcetera.  All roads

13    lead to 152nd Street.

14         The evidence is, that while Robert Kelly was not

15    a Mormon, he lived right next door to someone who was the

16    youth pastor.  And on the issue of agency, don't fall for

17    this analysis that if he heard about the information when he

18    wasn't at church it is not information he can do something

19    about.  Even if Dr. Allenbach heard about the information

20    when he was at home, through his son, when he went to church

21    and he was a youth pastor working with Loholt he possessed

22    that information and he could have gone to the bishop.  And

23    the bishop gave you a litany of ten things, including taking

24    a brick hammer to the victim, that he could have done and he

25    would have done (sic).

1          Finally, be aware of his confidentiality.

2     Confidentiality is what the bishop said it is.  They said it

3     was confident in the deposition, they waived it, and they

4     came into trial.

5          He went to Loholt with the information he had.

6     He could have gone to the police with the information he

7     had.

8          Thank you.  I agree with everything Mr. Tilden

9     said about the jury and the jury process.  We believe in it.

10    We believe that will you do the correct thing.  Thank you.

11         THE COURT:  Thank you, Counsel.  All right.  As I

12    told you, we are going to go ahead and release you for

13    tonight.  Tomorrow morning I want you back in our jury room

14    at the same time.

15         You are not allowed to deliberate, not allowed

16    to discuss the case amongst yourselves until all of you are

17    present.  All right?  All of you have to be there.  Then you

18    start the deliberation.

19         The flip side of that is you are not allowed to

20    deliberate with anyone else other than the jurors present.

21    That includes our staff.  If Ms. ^ Courisma or Ms. Williams

22    are coming in there, they will knock on the door to announce

23    that they are coming in to talk to you for whatever reason,

24    you are to stop deliberating at that point in time.  You are

25    not allowed to deliberate with anyone else present in that

1    room.

2            For your information, once we begin

3    deliberations we will release you at 4:30 instead of 4:00.

4    If that effects ferry schedules or anything else like that,

5    you need to let me know, or let Ms. Cuaresma know it is

6    going to be a problem.

7            The other thing we do for you, aside from

8    holding you for another half hour, is we provide lunch.  If

9    you have been bringing your lunch, don't worry about it

10   tomorrow.  If you are deliberating through lunch we will

11   provide lunch for you.

12           Any questions?  Great.  Remember the case is not

13   to you yet.  It will not be to you until you come into our

14   jury room tomorrow.

15           What you will find is my original copy of the

16   instructions that are signed.  You will find the special

17   verdict form that you not have in your packets, but it is

18   attached as part of this.  And will you find all of the

19   exhibit that were admitted.  At that point in time, once

20   everybody is there, you are free to begin deliberations.

21           Have a great evening.  We will see you all

22   tomorrow.  Just like we ask you to leave your notes, we ask

23   that you leave your copy of the instructions here.

24   (At this time the jury left the courtroom.)

25           THE COURT:  Counsel, thank you very much.  We ask

1    that you be no further than 15 minutes away from the

2    courthouse in case the jurors have a question, or they reach

3    a verdict.  Will that be a problem for either side?

4              MR. GORDON:  No, your Honor.

5              THE COURT:  All we need is one representative.  We

6    don't need to have everybody present.

7                  The other thing is, please leave with

8    Ms. Cuaresma cell phone numbers.  That will make it easier

9    to get a hold of you mean.

10                 Two, I don't know if you have already done this

11    or not, but I need to review the exhibits to make sure we

12    all agree.  If there is any disagreement I want to be able

13    to deal with it before they go to the jury tomorrow morning.

14             MR. PFAU:  Your Honor, do you want us to do that

15    tonight or tomorrow morning?

16             THE CLERK:  Let's do it now.

17             THE COURT:  We will be in recess.

18                     (Adjourned.)

19

20

21

22

23

24

25

1                          CERTIFICATE

2

3

4

5

6

7

8

          I, Barry L. Fanning, Official Court Reporter, do hereby
9     certify that the foregoing transcript is true and correct.

10

11                                    S/Barry L. Fanning

12                                    _____

13                                    Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25